UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 01-1781(DSD/FLN)

3M Innovative Properties Company and Minnesota Mining and Manufacturing Company,

Plaintiffs,

v.

**ORDER**

Avery Dennison Corporation,

Defendant.

Carolyn V. Peters, Esq., 3M Company, P.O. Box 33427, St. Paul, MN 55133; Frank P. Porcelli, Esq., Kurt L. Glitzenstein, Esq. and Fish & Richardson, Suite 3100, 225 Franklin Street, Boston, MA 02110; John C. Adkisson, Esq., R.J. Zayed, Esq. and Fish & Richardson, 3300 Dain Bosworth Plaza, 60 South Sixth Street, Minneapolis, MN 55402, counsel for plaintiffs.

David P. Pearson, Esq. and Winthrop & Weinstine, 3200 Minnesota World Trade Center, 30 East Seventh Street, St. Paul, MN 55101; Jay R. Campbell, Esq. and Renner, Otto, Boisselle & Sklar, 1621 Euclid Avenue, Cleveland, OH 44114; Roderick G. Dorman, Esq., Lawrence M. Hadley, Esq. and Hennigan, Bennett & Dorman, 601 Figueroa Street South, Suite 3300, Los Angeles, CA 90017, counsel for defendant.

This matter is before the court upon plaintiff's motion for a preliminary injunction, defendant's motion to submit the supplemental declaration of Anthony McHugh, and plaintiff's motion for leave to submit the supplemental declaration of Charles A. Calisto. Based on a review of the file, record and proceedings

FILED 2-19-02
RICHARD D. SLETTEN, CLERK
Judgment Ent'd. ______
Deputy Clerk's Initials ______

herein, and for the reasons stated, the court denies plaintiff's motion for a preliminary injunction, grants defendant's motion to submit the supplemental declaration of Anthony McHugh, and grants plaintiff's motion for leave to submit the supplemental declaration of Charles A. Calisto.

## BACKGROUND

This action involves the alleged infringement of a patent relating to advanced commercial adhesive products. Plaintiff 3M Innovative Properties Company ("3M") produces, develops and markets adhesive-based products for the commercial graphics industry. Defendant Avery-Dennison Corporation ("Avery") is a leading competitor in this market. 3M asserts that Avery's "EZ Series Fleet Marketing Films" infringes upon 3M's Comply product, specifically United States Patent No. 5,897,930 (the "'930 patent").

Commercial graphic materials are used for advertising, logos and signs on the exterior of trucks, buses and other large vehicles. Instead of traditionally painting the advertisements onto the vehicles, computer generated logos and murals are created and generated onto a layer of film. Similar to a bumper sticker, the film has a "release liner" that when stripped off exposes a pressure-sensitive adhesive. The large sheet of film is then placed onto the vehicle, essentially "wrapping" the vehicle in the

adhesive graphic. The task of "wrapping" a vehicle with the film is one that poses two problems: (1) positionability and (2) air entrapment.

**A. Positionability**

The problem of positionability occurs when the film is not correctly situated initially. There is a risk that the product will wrinkle, tear, or stretch when it is repositioned. In 1993, 3M addressed this problem with its Controltac products. Conventionally, the surfaces on both the release liner and the adhesive film are smooth. Controltac products, on the other hand, have a shaped release liner that imparts a special contour to the surface of the adhesive. The surface of the Controltac adhesive is covered with bumps or protrusions that are made of glass beads and a small amount of adhesive. These bumps, naked to the human eye, are only a few microns high.[1]

Because these bumps project out from the surface of the aggressive adhesive, they are the first to come into contact with the application surface. Instead of immediately adhering to the surface, because of the glass beads, the adhesive film can be slid

---

[1] The bumps on the adhesive surface are created with a special release liner that has micron-scale depressions. Each depression in the release liner will form one of the bumps on the adhesive film. By spreading the mixture of both glass and adhesive across the release liner, molds of glass beads are formed. A screen of aggressive adhesive is then layered over these beads. In the final step of the application process, when the release liner is peeled off, the glass bumps remain stuck to the adhesive layer.

over the surface until it is in the desired location. Once in place, the installer simply presses firmly down on the adhesive film, allowing the aggressive adhesive surrounding the beads to come into contact with the surface to form a permanent bond.

**B. Air Entrapment**

Installers of large scale commercial graphics also face the problem of air entrapment. When air becomes trapped beneath the film, the graphic's appearance may become blemished by blisters or bubbles. To address this issue, 3M modified the adhesive surface by adding micron-scale channels to the release liner to allow air to "bleed" out of the edges of the adhesive film. The surface area of the release liner above the depressions are called "lands." A high spot on the release liner creates a low spot on the adhesive film. The release liner is disclosed and claimed in the '930 patent.

**C. 3M's Patent**

3M marketed products with these two features, glass beads to better position the film and air channels to combat air entrapment, as "Controltac Plus Graphic Films with Comply Performance Adhesive Technology" (the Comply products). 3M received a patent for the technology included in the Comply products, patent '930. The language of claim 1 of 3M's '930 patent, the relevant claim in this action, states:

> A carrier web, comprising:
>
> at least one surface that has a multiple embossed pattern having a first embossed pattern and a second embossed pattern, wherein the first embossed pattern forms an array of depressions, wherein the depressions of the first embossed pattern in the second embossed pattern, wherein the second embossed pattern comprises lands and ridges between the lands, and wherein the height of the ridges over the lands ranges from about 3 to 45 microns.

**D. EZ Films**

A leading competitor in commercial graphics, Avery developed a product which targets the same market as 3M's Comply product. 3M asserts that Avery's recently launched "EZ Series Fleet Marketing Films" ("EZ Films") infringe upon the '930 patent.

Avery's primary product in the commercial graphics market has been its FT1000 product. This product was in direct competition with 3M's Comply products. In 1998, Avery began developing a graphics film that addressed the problem of air entrapment that it faced with the FT1000 product. As a result of this effort, Avery created and launched EZ Films. EZ Films have a special release liner that has a honeycomb pattern of micron-scale ridges surrounding hexagonal lands. The ridges and lands create the air channels in the adhesive sheet. Additionally, the liner also has micron-scale depressions that correspond to the bumps on the surface of the adhesive strip. These bumps are created by depositing raised liquid ink dots on the liner and then hardening

the dots through a UV curing process. In July 2001, Avery began selling its EZ Films to buyers in the commercial graphics market.

3M argues that the release liner on Avery's EZ Films product infringes upon claim 1 of the '930 patent. 3M now seeks to enjoin Avery from making and selling its EZ Series Fleet Marking Films ("EZ Films"). 3M moves for a preliminary injunction. Based upon a review of the file, record and proceedings herein, and for the reasons stated, the court denies plaintiff's motion.[2]

**DISCUSSION**

**I. Plaintiff's Motion for a Preliminary Injunction**

The grant or denial of a preliminary injunction is within the discretion of the district court. Amazon.com, Inc. v. Barnesandnoble.com, Inc., 239 F.3d 1343, 1350 (Fed. Cir. 2001). As the moving party, 3M is entitled to a preliminary injunction if it can succeed in showing: (1) a reasonable likelihood of success on the merits, (2) irreparable harm if an injunction is not granted, (3) a balance of hardships tipping in its favor and (4) the injunction's favorable impact on the public interest. See, e.g., id.; Purdue Pharma L.P. v. Boehringer Ingelheim GmbH, 237 F.3d 1359, 1363 (Fed. Cir. 2001). None of these factors is dispositive.

---

[2] The court also grants Avery's motion to submit the supplemental declaration of Anthony McHugh and plaintiff's motion for leave to submit the supplemental declaration of Charles A. Calisto.

Amazon.com, Inc. v. Barnesandnoble.com, Inc., 239 F.3d at 1350. Rather, the court weighs each factor against the others and against the form and magnitude of the relief sought. Id. (quoting Hybritech, Inc. v. Abbott Labs, 849 F.2d 1446, 1451 (Fed. Cir. 1988)). The Federal Circuit, however, has emphasized that "a preliminary injunction is a drastic and extraordinary remedy that is not to be routinely granted." Intel Corp. v. ULSI Sys. Tech., Inc., 995 F.2d 1566, 1568 (Fed. Cir. 1993). Here, the court denies plaintiff's motion for a preliminary injunction because plaintiff cannot establish a likelihood of success on the merits or irreparable harm. See Amazon.com, Inc., 239 F.3d at 1350 ("a movant cannot be granted a preliminary injunction unless it establishes both of the first two factors, i.e., a likelihood of success on the merits and irreparable harm."); Vehicular Techs. Corp. v. Titan Wheel Int'l, Inc., 141 F.3d 1084, 1088 (Fed. Cir. 1998)("[Movant] had to establish both of the first of the first two factors, i.e., likelihood of success and irreparable harm, to receive a preliminary injunction.").

**A. Likelihood of Success on the Merits**

To establish the likelihood of success on the merits, plaintiff must show that, in light of the presumptions and burdens that will inhere at a trial on the merits, (1) plaintiff will likely prove that defendant infringes upon its patent and

(2) plaintiff's infringement claim will likely withstand defendant's challenges to the validity and the enforceability of the patent. Vehicular Tech. Corp., 141 F.3d at 1088.

**1. Infringement**

A product infringes on a patent if it contains every limitation of any one claim or an equivalent of each limitation not literally met. Dolly, Inc. v. Spaulding & Evenflo Cos., Inc., 16 F.3d 394, 397 (Fed. Cir. 1994); Becton Dickinson & Co. v. C.R. Bard, Inc., 922 F.2d 792, 796 (Fed. Cir. 1990). An infringement analysis requires two steps. The first is to construe the meaning and the scope of the patent claims, a step commonly referred to as claim construction. Southwall Tech. Inc. v. Cardinal IG Co., 54 F.3d 1570, 1575 (Fed. Cir. 1995). The second is to determine whether the accused invention infringes the patent claim as construed. Markman v. Westview Instruments, Inc., 52 F.3d 967, 976 (Fed. Cir. 1995). While the first step is solely a question of law to be determined by the court, the second step is one for the trier of fact. Purdue, 237 F.3d at 1363; Cybor Corp. v. FAS Techs., Inc., 138 F.3d 1448, 1454-55 (Fed. Cir. 1998)(en banc)

**a. Claim Construction of the '930 Patent**

Plaintiff contends that defendant is infringing upon claim 1 of the '930 patent. Claim 1 of the '930 Patent provides:

> A web carrier, comprising:
>
> at least one surface that has a multiple embossed pattern having a first embossed

> pattern and a second embossed pattern, wherein the first embossed pattern forms an array of depressions, wherein the depressions of the first embossed pattern in the second embossed pattern, wherein the second embossed pattern comprises lands and ridges between the lands, and wherein the height of the ridges over the lands ranges from about 3 to 45 $\mu$m.

(Decl. of Adkisson, Ex. A, Col. 9, Ln. 31-42.) The parties dispute two critical terms in claim 1: "multiple embossed pattern" and "first embossed pattern... of depressions." Defendant contends that these terms describe a product-by-process patent requiring sequentially-created patterns with tools having corresponding topographies (Def.'s Opp. to 3M's Mot. for a Prelim. Inj. at 12), while plaintiff asserts that these terms describe the structure of the patent, not its process (P's Reply Mem. in Supp. of Mot. for Prelim. Inj. at 3-4). Those two terms therefore require construction.[3]

---

[3] A "true" product claim is one in which the product is defined by structural characteristics only. Chisum, Chisum on Patents, § 8.05 (Matthew Bender 1999). Such a claim is infringed by a product falling within the language of the claim, even though the infringing product is made by a process substantially different than that employed by the patentee. Id.; see, e.g., Dunn Wire-Cut Lug Brick Co. v. Toronto Fire Clay Co., 259 F.2d 258, 261 (6th Cir. 1919)("Certain it is, in view of the weight of authority and the latest decisions, that the inventor of a new and useful product or article of manufacture may have a patent which covers it and gives a monopoly upon it regardless of great variations in the method of making..."). A "product-by-process" claim is one in which the product is defined at least in part by describing the method or process by which it is made. Chisum, Chisum on Patents, § 8.05.

Claim construction involves ascertaining the true meaning and scope of each claim as a matter of law. See Markman v. Westview Instruments, Inc., 517 U.S. 370, 386 (1996). In determining the meaning of the terms of a claim, the court considers "intrinsic" evidence, which consists of the language of the claims, the specification of the patent and the prosecution history. See Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996). If the meaning of the claim terms is not ambiguous and can be determined from the intrinsic evidence, the court need not rely on extrinsic evidence in rendering its claim construction. See id. at 1583. Courts should give the words of a claim their ordinary and accustomed meaning, unless it appears that the inventor used them differently. See ZMI Corp. v. Cardiac Resuscitator Corp., 844 F.2d 1576, 1579 (Fed. Cir. 1988). Here, intrinsic evidence illustrates that the terms "multiple embossed pattern" and "first embossed pattern ... of depressions" describe a product-by-process patent requiring sequential embossments.

**(1) "Multiple Embossed Pattern"**

As discussed, there is a hierarchy to the evidence to be considered in claim construction: the claim language first, then the patent specification and finally the file history. Vitronics, Inc., 90 F.3d at 1582-85. In this case, the language of the claim, the patent specification and the file history clearly show that the

term "multiple embossed pattern" defines a product-by-process patent requiring sequential embossing patterns.

While the language of the claim does not mention the word "sequential," it nevertheless illustrates that the term "multiple embossed pattern" requires sequential embossments. In particular, the claim provides for "[a] web carrier, comprising:

> at least one surface that has a multiple embossed pattern having a first embossed pattern and a second embossed pattern...."

(Adkisson Decl., Ex. A, Col. 9, lns. 33-36.) The fact that the language of claim 1 expressly refers to two separately-created embossed patterns as "a **first** embossed pattern" and a "**second** embossed pattern" clearly establishes from the language of the claim alone that the term "multiple embossed pattern" requires multiple embossments which are applied one after the other. (Id. (emphasis added).)

Moreover, even if the claim's language is ambiguous, which it is not, the patent specification makes absolutely clear that the term "multiple embossed pattern" mean sequential embossments. As the court in Vitronics stated, and as plaintiff cites, the patent specification is "[u]sually ... dispositive; it is the single best guide to the meaning of a disputed claim." Vitronics, 90 F.3d at 1582; (P's Reply Mem. in Supp. of Mot. for Prelim. Inj. at 2.); see also, United States v. Adams, 383 U.S. 39, 49 (1966)("[w]hile the claims ... limit the invention, and the specifications cannot be

utilized to expand the patent monopoly, ... claims are to be construed in the light of the specifications and both are to be read with a view to ascertaining the invention."); Autogiro Co. v. United States, 384 F.2d 391, 397-398 (Ct. Cl. 1967)("the specification aids in ascertaining the scope and meaning of the language employed in the claims inasmuch as words must be used in the same way in both the claims and the specification .... The use of the specification as a concordance for the claim is accepted by almost every court, and is a basic concept of patent law.").

The specification defines the term "multiple embossed:"

> "Multiple embossed" means two or more embossing patterns that are superimposed on the web to create a complex pattern of differing depths of embossing.

(Adkisson Decl., Ex. A, Col. 2, ln. 1-3.) Not only does that definition on its face describe a product-by-process patent, the definition specifically requires two or more embossing patterns. Moreover, that term read in the context of the rest of the specification is consistent with the understanding that "multiple embossed pattern" describes a product-by-process requiring sequential steps. In fact, the language of the sentence in the specification immediately following the definition of the term "multiple embossed pattern" provides: "Another aspect of the present invention is a carrier web having at least one surface that is multiple, **sequentially** embossed, wherein depressions created from the prior embossing pattern(s) are substantially preserved

during the **subsequent** embossing pattern(s)..." Id. (emphasis added). Other language in the specification further emphasizes that the term "multiple embossed pattern" in claim 1 means sequential embossing steps:

- "Although the multiple embossing steps could be combined into a single step with the design of a suitable tool or mold, the advantage of multiple steps is that the depressions formed by the prior step(s) can be filled with a material prior to the **subsequent** embossing step(s). The number of same or different materials can be as many as the number of sequential step(s) or can be any subset of them." (Adkisson Decl., Ex. A., Col. 2, Ins. 11-17 (emphasis added)).

- "An advantage of the present invention is to create a means of **sequential** manufacturing of articles using different depths of depressions of the same or different materials." (Adkisson Decl., Ex. A, Col. 3, lns. 16-18 (emphasis added)).

- "A **sequential** manufacturing process for the web 10 or liner 20 determines the order of the embossings. The manufacturing of the double embossed liner 20 actually requires the formation of the smaller embossing pattern 26 first, followed by the formation of the larger embossing pattern 24, second." (Adkisson Decl., Ex. A, Col. 5, lns. 5-9.(emphasis added)).

- "Because the embossing of the pattern 26 occurs before the embossing of pattern 24, the depths identified here are the cumulative effects of **both embossings**, not necessarily the height of the embossing tool." (Adkisson Decl., Ex. A, Col. 6, lns. 16-24.(emphasis added)).

- "A multiple embossed web of the present invention can be used for the formation of materials that utilize the complex topography

> of the surface of the web. **Because the multiple embossings of the web occur sequentially**, material can be placed in the depressions caused by first pattern being formed before the second embossing pattern is applied." (Adkisson Decl., Ex. A, Col. 6, ln. 64- Col. 7, ln. 2.(emphasis added)).

The prosecution history further illustrates this understanding. Plaintiff argues that because it took the word "sequential" out of claim 1, the court would commit an error of law pursuant to the theory of file wrapper estoppel to read "sequential" back into the claim. Plaintiff's argument is unpersuasive, given the context of the prosecution history. The examiner rejected the original claim 1, finding the claim confusing. (Adkisson Decl., Ex. A, No. 4. at p. 3.) In response, plaintiff filed claim 1 as "a multiple embossed pattern having a first embossed pattern and a second embossed pattern...." In contrast to plaintiff's assertion, the file history makes absolutely clear that plaintiff's patent requires a second embossed pattern following a first embossed pattern. The court therefore rejects plaintiff's file wrapper estoppel argument and finds that the term "multiple embossed pattern" means sequential embossing patterns.[4]

---

[4] The court is well aware of the cannon of claim construction providing that the court cannot import a limitation from the specification's general discussion. <u>See</u>, <u>e.g.</u>, <u>Transmatic, Inc. v. Gulton Indus., Inc.</u>, 53 F.3d 1270, 1278 (Fed. Cir. 1995)(finding the district court "erred by importing unnecessary functional limitations into the claim."). The court, however, does not import (continued...)

**(2) "First Embossed Pattern... of Depressions"**

The parties also dispute the meaning of the term "first embossed pattern... of depressions." While defendant claims that the first embossed pattern consists of depressions in the liner surface and that its ink deposits are embedded rather than embossed into the liner surface (Def.'s Opp. to 3M's Mot. for a Prelim. Inj. at 14), plaintiff fails to define this term. Instead, plaintiff states that "the point is that Avery subsequently presses these 'ink deposits' into the deformable release liner, and from that point on, the liner has a 'first embossed pattern of... depressions.'" (P's Reply Mem. in Supp. of Mot. for Prelim. Inj. at 2.) Here, the specification of the '930 Patent expressly defines "embossed:"

> "Embossed" means a topography on a web or on tooling having an effective three-dimensional pattern that generates a difference in surface planar dimension in the liner or the tooling.

---

[4] (...continued)
a limitation from the specification into the claim but instead reads the term "multiple embossed pattern" in light of the specification's language, including the language about sequential embossing patterns, to interpret the term "multiple embossed pattern." See Young Dental Mfg. Co. v. Q3 Special Prods., Inc., 112 F.3d 1137, 1143 (Fed. Cir. 1996)("Although limitations may not be read into the claims from the specification, claims are to be read in view of the specification of which they are a part."); Ethicon Endo-Surgery, Inc. v. United States Surgical Corp., 93 F.3d at 1578 ("the district court did not import an additional limitation into the claim; instead, it looked to the specification to aid its interpretation of a term already in the claim, an entirely appropriate practice.").

(Adkisson Decl., Ex. A., Col. 1, ln. 60-64.) Based upon this definition in the specification, the court concludes that the meaning of the term "embossed" is a topography created on material by impressing a corresponding inverse topography on its surface.

While the court need not look to extrinsic evidence to construe the term "embossed," technical dictionaries support this understanding of the term. See Bell Atlantic v. Covad Communs. Group, Inc., 262 F.3d 1258, 1267 (Fed. Cir. 2001)(providing that courts may rely upon scientific dictionaries). The TAPPI 1993-1994 Technical Information Sheets define "embossing" as "creating a finish or design imparted by compressing a material between matched rigid surfaces or rigid and ductile surface having the desired raised or depressed surface pattern." (Hadley Decl., Ex. 6.) Moreover, as defendant argues, plaintiff's own witness agrees with that definition of embossing:

> Q. So embossing means creating a series of impressions which are the inverse of a pattern on the embossing tool?
>
> A. That's the way I would define it.

(Hadley Decl., Ex. 7, Calisto Dep. at p. 101.)

**b. Infringement**

After the claims are construed as a matter of law, the court must consider whether "a reasonable trier of fact could find that every limitation in any construed claim at issue" may be found in

the accused devise. Unidynamics Corp. v. Automatic Products Int'l, Ltd., 157 F.3d 1311, 1316-17 (Fed. Cir. 1998).

**(1) Literal Infringement**

Literal infringement of a claim occurs when every limitation recited in the claim appears in the accused device, or put differently, when "the properly construed claim reads on the accused device exactly." DeMarini Sports Inc. v. Worth, Inc., 239 F.3d 1314, 1331 (Fed. Cir. 2001) (quoting Amhil Enters. Ltd. v. Wawa, Inc., 81 F.3d 1554, 1562 (Fed. Cir. 1996)); Dolly, Inc., 16 F.3d at 397 (an accused device must include every claim limitation of the claim). If just one limitation is missing or is not met as claimed, there is no literal infringement. London v. Carson Pirie Scott & Co., 946 F.2d 1534, 1539 (Fed. Cir. 1991); Mas-Hamilton Group v. La Gard, Inc., 156 F.3d 1206, 1211 (Fed. Cir. 1998).

Here, the court finds that there is no literal infringement because defendant's liner does not have a "multiple embossed pattern having a first embossed pattern and a second embossed pattern."[5] Instead, defendant deposits ink dots onto the surface of a liner in a process know as "flexographic printing." Those ink dots are hardened on the liner through UV curing. Defendant then uses a single embossing roller. The liner with the ink dots passes

[5] The court need not address whether defendant's liner contains a "first embossed pattern ... of depressions" because defendant's liner does not contain "multiple embossed patterns" and thus no infringement exists.

through that single embossing roller only once. The single roller, which has a hexagonal pattern on its roller surface, simultaneously embosses the hexagonal pattern into the liner and embeds the ink dots into the liner. Because defendant's liner contains no multiple embossed pattern with a second embossed pattern following a first embossed pattern, the court concludes that plaintiff's infringement claim fails.[6]

**B. Irreparable Harm**

The movant for a preliminary injunction must demonstrate not only a reasonable likelihood of success on the merits, but also a lack of adequate remedy at law or other irreparable harm. H.H. Robertson Co. v. United Steel Deck Inc., 820 F.2d 384, 390 (Fed. Cir. 1987). Irreparable injuries are those that are impossible to measure in monetary terms. Atlas Powder Co. v. Ireco Chem., 773 F.2d 1230, 1233 (Fed. Cir. 1985). A presumption of irreparable harm exists "when a clear showing has been made of patent validity and infringement." H.H. Robertson Co., 820 F.2d at 390. Absent this clear showing, the patentee must submit evidence and reasoned analysis to support the argument that money damages will be an inadequate remedy. Nutrition 21, 930 F.2d at 872.

Here, 3M does not have a presumption of irreparable harm because it did not make a strong showing of patent infringement.

---

[6] Because plaintiff does not claim infringement under the doctrine of equivalents, the court does not address this issue.

See Eli Lilly and Co., 82 F.3d at 1578 (finding that movant is not entitled to presumption of irreparable harm because movant "has not made a strong showing on the issue of infringement."). Since 3M did not meet its burden, 3M must provide an independent showing of irreparable harm in order to be entitled to a preliminary injunction. Roper Corp. v. Litton Sys., Inc., 757 F.2d 1266, 1271 (Fed. Cir. 1985). The court addresses each of 3M's claims of irreparable harm in turn and concludes that 3M cannot establish irreparable harm.

**1. Loss of Reputation, Good Will and Market Share**

3M argues that it will suffer irreparable harm to its reputation, good will and market share if Avery's EZ Film is allowed to remain on the market until trial. Loss of sales, profits, and market share does not constitute irreparable harm, absent special circumstances. Eli Lilly and Co. v. American Cyanamid Co., 896 F. Supp. 851, 860 (S.D. Ind. 1995). Potential sales loss alone during pretrial litigation cannot establish "manifest irreparable harm." Such a position would require a finding of irreparable harm to every patentee, regardless of the circumstances. Illinois Tool Works v. Grip-Pak Inc., 906 F.2d 679, 683 (Fed. Cir. 1990). Moreover, the court is not persuaded by 3M's argument that its reputation and goodwill will be damaged as 3M provides only speculative evidence in the record to support this claim. See Tech-Wear, Inc. v. Acme Laudry Prods., Inc., 38 F.

Supp. 2d 1147, 1152 (C.D. Cal. 1998)(stating that allegations regarding lost market share and diminished reputation, without supporting facts, are insufficient to establish irreparable harm); Quickie Mfg. Corp. v. Libman Co., No. CIV.A. 01-4971 (JEI), 2002 WL 80257 (D.N.J. Jan. 22, 2002).

3M also asserts that the potential injury will be difficult to calculate. "Neither the difficulty in calculating losses in market share, nor speculation that such losses might occur, amount to proof of special circumstances justifying the extraordinary relief of an injunction prior to trial." Nutrition 21, 930 F.2d at 871. Furthermore, the practical reality of the commercial graphics market is that if 3M were to bid for a particular project during the course of the action and Avery won, the loss by 3M would be easily ascertainable and compensable in monetary terms.

3M also argues that it will have fewer dollars to invest in the research and development of its products if it is forced to continue to compete with Avery throughout the litigation. This argument is not compelling. It is difficult to imagine any manufacturer with a research and development program that could not make the same claim and thus be equally entitled to preliminary relief. Eli Lilly, 82 F.3d at 1578.

**2. Permanent Discounts**

3M claims that it will be forced to permanently lower its prices unless a preliminary injunction is immediately granted.

Because this kind of harm can be measured by monetary damages, it does not constitute irreparable injury.

**3. Ability to Pay Monetary Damages**

The court has found that an alleged infringer's ability to pay money damages for infringement during litigation is strong evidence against a finding of irreparable harm. Eli Lilly, 896 F. Supp. at 860; Nutrition 21, 930 F.2d at 871. There is no basis for concluding that Avery will be unable to satisfy an adverse judgment. In the record before the court, there is the undisputed declaration of one of Avery's executives attesting to the company's financial soundness and ability to satisfy a monetary damage award. (Karavolos Decl. at ¶ 11.) 3M has not presented the court with clear evidence that Avery is unable to meet possible future financial obligations. In sum, the record before the court fails to support 3M's claim of irreparable injury or the inadequacy of monetary damages.

**C. Balance of Hardships**

Plaintiff's weak showing of likelihood of success on the merits clearly tips the balance of hardships in defendant's favor. Moreover, granting a preliminary injunction may damage defendant's reputation, causing irreparable harm, which may keep defendant's product out of the market permanently. See Alliance Research Corp. v. Telular Corp., 859 F. Supp. 400, 405 (C.D. Cal. 1994)("The hardship on a preliminarily enjoined manufacturer who must withdraw

its product from the market before trial can be devastating.")(quoting Illinois Toll Works, 906 F.2d at 683).

Conversely, plaintiff will suffer less harm if the court denies its motion for a preliminary injunction than defendant will suffer if the court grants its motion. In light of the relatively smaller hardship plaintiff will suffer if the court denies plaintiff's motion, the court concludes that the balance of hardships titles in defendant's favor.

**D. Public Policy**

Finally, public policy favors denying the preliminary injunction. Public interest favors patent rights and competitive markets. Illinois Tool Works, 906, F.2d at 684. Allowing defendant to continue to sell its product encourages competitive markets. It does so without sacrificing plaintiff's patent rights because, as the court has noted, plaintiff has failed to show the likelihood of success on the merits. Public policy therefore favors denying plaintiff's motion for a preliminary injunction. Thus, based on an analysis of all four preliminary injunction factors, the court denies plaintiff's motion for a preliminary injunction.

## CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** that:

1. Plaintiff's motion for a preliminary injunction [Docket No. 19] is denied;

2. Defendant's motion to submit the supplemental declaration of Anthony McHugh [Docket No. 41] is granted; and

3. Plaintiff's motion for leave to submit the supplemental declaration of Charles A. Calisto [Docket No. 46] is granted.

Dated: February 15, 2002

David S. Doty, Judge
United States District Court