UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| 3M INNOVATIVE PROPERTIES COMPANY<br><br>and<br><br>MINNESOTA MINING AND MANUFACTURING COMPANY,<br><br>Plaintiffs,<br><br>v.<br><br>AVERY DENNISON CORPORATION,<br><br>Defendant. | Civil No. 01-CV-1781 DSD/FLN |

**PLAINTIFFS' MEMORANDUM IN RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OF NON-INFRINGEMENT OF U.S. PATENT NO. 5,897,930**

**EXHIBIT B**

# TABLE OF CONTENTS

**Page**


I. BACKGROUND ....................................................................................................4

A. Avery's Representations To The Court ............................................................5

B. The Preliminary Injunction Ruling ...................................................................7

C. 3M's Discovery Of Avery's Manufacturing Process..........................................7

D. Avery's Efforts To Embed The Ink Dots Prior To Embossing ............................9

E. Avery's Withdrawn Summary Judgment Motion Of Non-Infringement......................................................................................................11

II. ARGUMENT..........................................................................................................12

III. AVERY'S EZ LINER CONTAINS A "MULTIPLE EMBOSSED PATTERN" AS THAT CLAIM LIMITATION WAS CONSTRUED BY THE COURT ............................................................................................13

A. Avery's EZ Liner Is Embossed Sequentially A First Time At The Squeegee Roll, Before Reaching The "Embossing Roll".....................................14

1. Avery's Arguments That Its "Embedded" Ink Dots Do Not Constitute A "First Embossed Pattern" Are Unsupported.........................17

a. Avery Has Submitted No Competent Evidence Showing That Its Ink Dots Are Not Embedded Into The Surface Of The Liner ..........................................................17

b. Avery's "Embedded" Ink Dots Are "Embossed" Into The Liner As That Term Is Used In The '930 Patent.......................................................................................19

2. This Court Should Reject Avery's Invitation To Read The Term "Machined Tool" Into The Claim ...................................................20

B. At The Embossing Roll Itself, Avery's Liner Is Sequentially Embossed .........................................................................................................21

IV. AVERY'S EZ LINER ALSO CONTAINS A "FIRST EMBOSSED PATTERN … OF DEPRESSIONS" .........................................................................................23

A. "Depressions" Are Simply Lowered Regions in Surface Of The Liner.......................................................................................................................23

B. Under Either Definition, Avery's EZ Liner Contains "A First Embossed Pattern Form[ing] An Array Of Depressions" ....................................24

## TABLE OF CONTENTS

**Page**

V. THIS COURT'S CLAIM CONSTRUCTION USED FOR PURPOSES OF DETERMINING 3M'S MOTION FOR PRELIMINARY INJUNCTION SHOULD BE REVISITED ....26

VI. AVERY'S EZ LINER INFRINGES 3M's '930 PATENT UNDER THE DOCTRINE OF EQUIVALENTS ....28

A. Avery's EZ Film Is Not Insubstantially Different Than The "Carrier Web" Recited In The '930 Patent ....30

B. Because The EZ Liner Is Sequentially Embossed, 3M's Theory Of Equivalence Will Not Vitiate Any Claim Element ....30

C. 3M Did Not Expressly Disclaim Or Surrender Claim Coverage For Single Step" Embossing Through Its Description In The Specification ....31

D. Avery's Final Doctrine Of Equivalents Argument Is Completely Unsubstantial By Competent Evidence In The Record ....33

VII. CONCLUSION ....34

# TABLE OF AUTHORITIES

**Page**

**Cases**

*3M Innovative Properties Co. v. Avery Dennison Corp.*,
185 F.Supp.2d 1031 (D. Minn. 2002) ........................................ 7

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ........................................ 12

*Atari Games Corp. v. Nintendo of America, Inc.*, 897 F.2d 1572 (Fed. Cir. 1990) ........................................ 27

*Avia Group Int'l., Inc. v. L.A. Gear California, Inc.*, 853 F.2d 1557 (Fed. Cir. 1988) ........................................ 12

*Bai v. L&L Wings, Inc.*, 160 F.3d 1350 (Fed. Cir. 1998) ........................................ 13

*Bayer AG v. Biovail Corp.*, 279 F.3d 1340 (Fed. Cir. 2002) ........................................ 20

*Beckson Marine, Inc. v. NFM, Inc.*, 63 F.3d 1031 (Fed. Cir. 2002) ........................................ 13

*Catalina Marketing Int'l v. Coolsavings, Inc.*, 289 F.3d 801 (Fed. Cir. 2002) ........................................ 13

*Celotex Corp. v. Catrett*, 477 U.S. 312 (1986) ........................................ 18

*Ethicon Endo-Surgery, Inc. v. United States Surgical Corp.*,
149 F.3d 1309 (Fed. Cir. 1998) ........................................ 29

*Illinois Tool Works, Inc. v. Grip-Pak, Inc.*, 906 F.2d 679 (Fed. Cir. 1990) ........................................ 26

*International Communication Materials, Inc. v. Ricoh Co.*,
108 F.3d 316 (Fed. Cir. 1997) ........................................ 27

*Itron, Inc. v. Benghiat*, 169 F. Supp. 1073 (D. Minn. 2001) ........................................ 18

*Johnson & Johnson Associates, Inc. v. R.E. Service Co.*,
285 F.3d 1046 (Fed. Cir. 2002) ........................................ 32

*Kraft Foods, Inc. v. Int'l Trading Co.*, 203 F.3d 1362 (Fed. Cir. 2000) ........................................ 29

*Leggett & Platt, Inc. v. Hickory Spring Mfg. Co.*, 285 F.3d 1353 (Fed. Cir. 2002) ........ 29, 33, 34

*Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995) ........................................ 3, 13

*Optical Disc Corp. v. Del Mar Avionics*, 208 F.3d 1324 (Fed. Cir. 2000) ........................................ 29

*Quickie Mfg. Corp. v. The Libman Co.*, 180 F. Supp. 2d 636 (D.N.J. 2002) ........................................ 26

## TABLE OF AUTHORITIES

**Page**

*Rexnord, Inc. v. Laitram Corp.*, 274 F.3d 1336 (Fed. Cir. 2001) ........ 21, 27

*Southwall Tech. Inc. v. Cardinal IG Co.*, 54 F.3d 1570 (Fed. Cir. 1995) ........ 13

*Sunny Fresh Foods, Inc. v. Michael Foods, Inc.*,
2002 U.S. Dist. LEXIS 11246 (D. Minn. 2002) ........ 3, 21, 27

*Toro Co. v. John Deere & Co.*, 143 F. Supp. 2d 1122 (D. Minn. 2001) ........ 12

*Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17 (1997) ........ 29, 33

**Rules**

Fed. R. Civ. P. 56 (c) ........ 12

**Other Authorities**

*Robert C. Faber, Landis on Mechanics of Patent Claim Drafting*
(4th Ed., PLI Press Release No. 5, Nov. 2001) ........ 28

The facts of this case have changed dramatically since this Court heard 3M's Motion for Preliminary Injunction last December. Most importantly, 3M has been afforded an opportunity to see defendant Avery's manufacturing process firsthand. Through that discovery, 3M has determined that Avery's representations about its so-called "simultaneous embossing" process made at the preliminary injunction stage were incomplete in material respects. Avery in fact sequentially embosses the liner of its infringing "EZ Films" three times – first, through the partial embedment of ink bumps into the surface of the liner upstream of Avery's "embossing roll," second through the complete embedment of those ink bumps just prior to the point where the embossing roll imprints a hexagonal pattern onto the surface of the liner, and third through the embossing of the hexagonal pattern itself. Far from "simultaneous embossing," the testimony of Avery's own witnesses makes clear that Avery's EZ Liner is manufactured by using multiple, sequential embossing steps.

"Sequential embossing" is exactly what this Court held the claims of 3M's United States Patent No. 5,987,930 ("the '930 Patent") to require when it denied 3M's Motion for Preliminary Injunction. In fact, the Court held that 3M was not likely to succeed on the merits solely because Avery told the Court that Avery practices "simultaneous embossing." Now that the truth about Avery's process has been revealed, infringement is not only likely, it is virtually certain.

3M is submitting herewith its evidence demonstrating that Avery's sequential embossing process literally creates the "multiple embossed pattern" required by the claims of the '930 Patent. This evidence includes declarations from Drs. A. Brent Strong and Jeffery J. Payne, 3M's technical experts, test data supporting the experts' conclusions, admissions from Avery's own witnesses, and Avery's own documents showing that sequential embossing is exactly what Avery set out to accomplish with its process. In 3M's view, this evidence shows that even under

the claim construction used by the Court in denying 3M's motion for a preliminary injunction (a claim construction with which 3M respectfully disagrees),[1] Avery is literally infringing the '930 Patent by sequentially embossing its EZ Liner, first at the "squeegee roll," and then once the liner reaches the so-called "embossing roll."

3M recognizes, however, that this is not a typical patent case, where the Court's claim construction alone often resolves the issue of literal infringement. Avery has put conflicting expert testimony in the record, which Avery argues demonstrates that sequential embossing is not in fact taking place in its process. By filing this Motion, Avery has missed the point. It is not up to the Court to decide which party's expert is right. That is the role of the jury. That is why 3M did not cross-move for summary judgment of infringement. The jury must decide which expert is more persuasive on the fundamental factual dispute in this case: whether Avery partially "embosses" its "ink bumps" before the EZ Liner arrives at the "embossing roll" for a second embossing step. As the Court can see from the thoroughness of 3M's submission, there is sufficient evidence in this record such that a reasonable jury could bring back a legally supportable verdict in favor of 3M. The fact that Avery may dispute this evidence gives it the right to a trial by jury -- not the right to ask this Court for summary judgment.

Genuine issues of material fact also preclude summary judgment on the remaining argument raised by Avery – that its EZ Liner does not contain "depressions" as that term is used in the '930 Patent. The evidence of record shows that Avery's EZ Liner contains "depressions,"

---

[1] 3M is preparing to file a motion with the Court requesting a claim construction hearing pursuant to the Federal Circuit's decision in *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 996 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996); *see also Sunny Fresh Foods, Inc. v. Michael Foods, Inc.*, 2002 U.S. Dist. LEXIS 11246 (D. Minn. 2002) (conducting *Markman* hearing). 3M is requesting a *Markman* hearing because Avery disputes a number of additional claim terms, several of which Avery has not discussed in the instant motion. These claim construction disputes should be resolved before trial. For the purpose of economy, 3M requests that the Court combine the hearing on Avery's instant motion for summary judgment with the *Markman* proceeding.

and the fact that Avery fills those depressions with ink does not allow Avery to avoid literal infringement or infringement under the doctrine of equivalents.

Finally, summary judgment of noninfringement would be improper for a separate and independent reason. Genuine issues of material fact exist regarding whether Avery infringes the '930 Patent under the doctrine of equivalents. Avery's EZ Liner performs the same function, in the same way, to achieve the same result as the carrier web disclosed in the '930 Patent, and Avery has provided this Court with no evidence in an attempt to establish the contrary.

The disputes surrounding these issues preclude a finding of summary judgment of non-infringement. Genuine issues of material fact remain for the jury, and 3M asks that this Court deny Avery's unwarranted request to end this litigation without a trial on the merits.

## I. BACKGROUND

3M sued Avery on September 26, 2001, alleging that Avery's recently-launched EZ Films infringe 3M's '930 Patent. Shortly after initiating this action, 3M filed a motion for preliminary injunction. 3M's motion was based only on Claim 1 of the '930 Patent, a product claim directed to the structure of a release liner used in adhesive articles. Because this claim is directed to the structure of a material, rather than how a material is made, 3M did not believe discovery of Avery's process was necessary to resolve the infringement issues. In opposition to 3M's motion, Avery argued that Claim 1 of the '930 Patent was a "product by process" claim and that no infringement existed because "Avery makes its EZ product liner in a distinct process from that disclosed in the '930 Patent." (Avery PI Opposition Brief at 15).

In support of its position, Avery relied on testimony from its infringement expert, Dr. Anthony McHugh, ostensibly describing the Avery manufacturing process. The day after receiving Avery's opposition papers, 3M requested that Avery provide Dr. McHugh for immediate deposition. (Adkisson Decl., Exh. 1). 3M sought Dr. McHugh's deposition in part to

obtain testimony about the manner in which the Avery product was allegedly manufactured. Avery flatly rejected 3M's request to depose Dr. McHugh during the preliminary injunction stage, and instead demanded that 3M withdraw its preliminary injunction motion before Avery would allow any discovery of its manufacturing process. (Adkisson Decl., Exh. 2).

To avoid protracted discovery disputes that would have delayed 3M's request for immediate injunctive relief, 3M took Avery at its word. At the preliminary injunction hearing, 3M told the Court just that, stating that "At least for purposes of this motion, we're willing to accept their representations of how it's made. We reserve the right for discovery . . ." (Transcript at 19).

### A. Avery's Representations To The Court

At the preliminary injunction stage, Avery provided the Court with several pages worth of explanation about the process by which Avery's EZ Films are manufactured. In fact, Avery submitted two separate Declarations -- one from Dr. McHugh, its infringement expert, and another from Michael Hannington, Avery's special projects manager for Avery's EZ Film product, to describe the manufacturing process for the EZ Films.

Mr. Hannington's Declaration stated that Avery's manufacturing process for the EZ Films begins with a liner purchased from an outside vendor. (Hannington Decl., ¶ 6). Avery then uses a "flexographic printing process" to print liquid ink dots onto the surface of the liner. *Id.* Avery then hardens the ink dots through the use of an ultraviolet curing process. *Id.*

Mr. Hannington went on to describe what he called "*the next step* in the manufacturing process" – a step in which the Avery EZ liner with the hardened ink dots "is embossed with a hexagonal pattern, which simultaneously embeds the cured ink dots into the surface of the liner." (Hannington Decl., ¶ 7 (emphasis added)). Thus, according to Mr. Hannington, there are no

other steps taking place between the printing/curing of the ink dots and the passing of the liner through the hexagonal embossing roller.

In its briefing and at oral argument, Avery echoed this, repeatedly representing that there was no "embossing" or "embedding" of any kind prior to the hexagonal embossing roller:

- "*There is only single embossing*, and even if one were incorrectly to focus on the embedding of those hardened ink dots into a liner as an event of embossment such that the hardened ink dots embedded was an embossment and so was the hexagonal pattern, *it is clear that that occurs simultaneously* . . . " (Transcript at 50) (emphasis added).

- "Next, the liner with ink dots is subject to a *single* embossing step where a hexagonal pattern is depressed in the liner surface. This embossing simultaneously embeds the hardened ink dots into the liner surface as well." Avery Brief at 7 (emphasis in original).

- "Because the ink dots are embedded *simultaneously* with the embossed hexagonal pattern, the sequentially-created "multiple embossed pattern" required by the claim would still be missing. Avery Brief at 15 (emphasis added).

- "To the extent that 3M may argue that the process of embedding the ink dots into the liner to create depressions is an embossment, then there is only a single embossed pattern since there is only a single embossing operation, which *simultaneously* embeds the ink dots and forms the hexagonal ridge pattern." *Id.* (emphasis added).

Taking Avery at its word, 3M even prepared an animation in an effort to depict the Avery process, which it presented at the preliminary injunction hearing. The animation showed the ink dots on Avery's EZ Liner being embedded by the same embossing roll that imprints the hexagonal pattern on the surface of the liner. At no time during the preliminary injunction briefing or hearing did Avery attempt to correct or clarify the true nature of Avery's process.

### B. The Preliminary Injunction Ruling

On February 15, 2002, this Court denied 3M's Motion for Preliminary Injunction. *3M Innovative Properties Co. v. Avery Dennison Corp.*, 185 F.Supp.2d 1031 (D. Minn. 2002) ("Order"). For the purposes of that Order, the Court, like 3M, took Avery's representations regarding its manufacturing process as true.

In that order, the Court used the following description of Avery's manufacturing process as support for its preliminary injunction finding of no literal infringement:

> . . . Defendant then uses a single embossing roller. The liner with the ink dots passes through that single embossing roller only once. The single roller, which has a hexagonal pattern on its roller surface, simultaneously embeds and embosses the hexagonal pattern into the liner and embeds the ink dots into the liner.

*Order* at 1041. Based on that understanding of the Avery process, the Court found that Avery's liner "contains no multiple embossed pattern with a second embossed pattern following a first embossed pattern." *Id.*

### C. 3M's Discovery Of Avery's Manufacturing Process

Once discovery commenced, 3M immediately sought an inspection of Avery's manufacturing process. Only then did Avery inform 3M that its manufacturing process for the EZ Film was actually a two-stage, two-location operation: The EZ Film is first flexographically printed at Trinity Packing Company ("Trinity") in Remington, VA, and then shipped in large rolls to a second location, Omnova Solutions, Inc. ("Omnova") in Jeannette, PA for embossing.[2] From Omnova, the EZ Film is finally shipped to Avery's Painesville, Ohio facility for the

---

[2] 3M was surprised to learn that the flexographic printing of Avery's EZ Liner takes place in Virginia and that the embossing of Avery's EZ Liner takes place in Pennsylvania. Avery had previously requested that this Court transfer this case to the Northern District of Ohio. In that motion, Avery claimed that its "manufacturing process" and "the location of the alleged infringement" were both located exclusively in the Northern District of Ohio. Avery Brief in Support of Motion to Transfer at 10. As far as 3M can tell, no printing, embedding or embossing of the Avery EZ Liner takes place anywhere in the Northern District of Ohio.

application of the adhesive and graphics film (the material that is ultimately printed with the graphic image), as well as for final packaging.

3M (along with its experts) inspected the Trinity plant on January 31, 2002, and inspected the Omnova plant on February 27, 2002. At the Omnova inspection, 3M was surprised to learn that Avery does all kinds of things to its liner before the liner ever hits the so-called "embossing roll." Most importantly, 3M learned that Avery creates a "first embossed pattern" by embossing the hardened ink dots into the surface of the liner upstream of the embossing roll.

In fact, one need only look at Page 7 of Avery's brief to see how different Avery's process is than the process described by Avery at the preliminary injunction stage. On that page Avery provides a diagram showing the path of the Avery EZ Liner as it travels through the production line at Omnova. Of the *nine* separate components shown in Avery's diagram, only *one* of those components – "the embossing roll" -- was mentioned by Avery at the preliminary injunction stage. Moreover, as will be discussed below, Avery's depiction of the Omnova production line – even as it is shown to the Court on Page 7 of Avery's brief – is still to this day incomplete and omits critical components.

At the Omnova inspection, 3M and its expert, Dr. A. Brent Strong, observed an actual production run of Avery EZ material. (Strong Decl., Exh. 1 at 5, 6). From the production run at Omnova, 3M was able to observe the Avery EZ liner material passing over and around a "squeegee roll" prior to arriving at the embossing roll. *Id.* At the "squeegee roll," the hardened ink deposits on the EZ liner make direct contact with the surface of the squeegee roll. *Id.* at 7. Because the liner is in tension, there is a force pressing the ink deposits into the surface of the squeegee roll. *Id.*

At the Omnova inspection, 3M also obtained samples of Avery's product as it existed at various stages along the Omnova production line. One such sample is of material just prior to the point where it enters the embossing roll, downstream from the "squeegee roll." *Id.* at 12.

In conjunction with the Omnova inspection, 3M also took 30(b)(6) testimony of Avery regarding Avery's manufacturing process. Avery's designee for this deposition was Peter Payne, Omnova's technical director. Mr. Payne explicitly identified the "squeegee roll" – along with the rubber bed roll and the embossing roll – as the "embossing section" in the Omnova equipment:

> Q: Would you go over and indicate the embossing section?
> A: All this part in here is generally considered the embossing section.
> . . .
> Q: And the embossing section you've indicated generally has which rolls?
> A: We have a *squeegee roll* is rotating right there. We have a rubber bed roll, which is right here, we have the embossing roll, which is this roll right here.

(Adkisson Decl., Exh. 3) (emphasis added).

**D. Avery's Efforts To Embed The Ink Dots Prior To Embossing**

Avery's production documents show that Avery knew full well, long before the contrary positions it took in opposing 3M's motion for preliminary injunction, that the manufacturing process at Omnova embeds the ink bumps into the liner before the liner material reaches the embossing roll. Avery's own internal designation for the manufacturing process carried out at Trinity and Omnova is a "print/embed/emboss" process, expressly recognizing that the process has three separate and sequential steps: printing (at Trinity), embedding (at Omnova, before the embossing roll), and embossing (at Omnova, at the embossing roll).

During development of this manufacturing process, Avery realized that there were manufacturing advantages to "embedding" the ink bumps before the embossing roll, and Avery

purposefully sought to achieve that result. A February 27, 2001 memo from Dr. Douglas Lilac, Avery's senior research engineer for the EZ Product, to Peter Payne at Omnova describes Avery's efforts to use the squeegee roll on the Omnova production line to embed the ink: "We would like to revisit the possibility of using the squeegee roll to embed the ink prior to embossing." (Adkisson Decl., Exh. 4). A March 23, 2001 internal Avery memo shows unequivocally that Avery indeed did embed the ink dots prior to embossing:

> The issue of the ink pick-off was addressed during the last Omnova trial by *embedding all the ink prior to the embossing process* . . .

(Adkisson Decl., Exh. 5) (emphasis added).

Avery's documents also show that Avery uses its sequential process in commercial production runs. For example, Avery produced 25,000 feet of its EZ Film for Ryder Truck Lines in early 2001 by using sequential embossing, as was detailed in a March 30, 2001 Avery memo:

> 25,000 yards of EASAP liner was embossed at Omnova Solutions from February 28 to March 2, 2001 . . . *The entire ink surface was embedded prior to the embossing stage. This was accomplished by utilizing the squeegee roll.* This resulted in uniform ink embedding resulting in less ink pick-off on the F3 coater.

(Adkisson Decl., Exh. 6) (emphasis added).

Although Avery made some further changes to the process insofar as the squeegee roll was concerned, to this day the liner material continues to be processed at Omnova using the squeegee roll, as shown in the figure on Page 7 of Avery's brief. In fact, one of the subsequent changes made to the process was to add a special infrared heater just upstream of the squeegee roll, so as to further heat the surface of the release liner before it arrives at the squeegee roll. Such heat aids the embossing process by softening the plastic surface of the release liner, thus

making it easier for the ink deposits to be pressed down into the softened plastic.[3] (Strong Decl., Exh. 2 at ¶ 17(e)). Notably, Avery has completely omitted any reference to this heater in its figures, brief, or supporting declarations.

**E. Avery's Withdrawn Summary Judgment Motion Of Non-Infringement**

Despite threatening at the preliminary injunction hearing to file a summary judgment motion of noninfringement "within a week," Avery did not make good on its promise until nearly three months later, on March 7, 2002. (Adkisson Decl., Exh 7). Then, just a few weeks after that, Avery unilaterally withdrew this motion after receiving 3M's infringement evidence. (Adkisson Decl., Exh. 8).

The substance of Avery's first summary judgment motion was dramatically different than the motion which is now before the Court. In that summary judgment motion, Avery provided the Court with the same incomplete description of Avery's manufacturing process that it provided in conjunction with the preliminary injunction motion. That motion also stressed that the EZ Liner was not "embossed" at any time prior to the embossment which takes place at the embossing roll itself. (Adkisson Decl., Exh. 7 at 6). Avery even represented that "[t]he state of the facts regarding the relevant structure, features, and process by which Avery's [sic] makes its EZ Film product *is undisputed* . . . " *Id.* at 12 (emphasis added).

Three weeks after Avery served 3M with its First Motion for Summary Judgment of Noninfringement, Avery's counsel wrote to 3M and stated that Avery was withdrawing it. (Adkisson Decl., Exh. 8). The parties proceeded to complete fact and expert discovery, and

---

[3] In additional to adding this infrared heater, Avery also moved the squeegee roller out of contact with the rubber bed roll. The net effect of these two changes resulted in less force, but greater heat, at the squeegee roll. Avery thus "traded off" force for heat; the greater heat results in greater softening of the plastic release liner, and so less force is needed to press the ink deposits into the softened material. (Strong Decl., Exh. 2).

Avery served 3M with the instant motion on July 3, 2002, the final day that dispositive motions could be served under the Court's Pretrial Scheduling Order.

The centerpiece argument of Avery's first summary judgment motion was the same as in its opposition to 3M's motion for preliminary injunction – namely that there is no "sequential embossing" in Avery's process. However, this argument has now been relegated to Avery's third argument in the instant motion. Avery evidently realized that, at the very least, a genuine issue of fact exists with respect to whether the EZ Liner is "multiple, sequentially embossed."

Avery's two other noninfringement arguments fare no better. Disputed questions of material fact also exist as to whether Avery's EZ Liner is "embossed" under the Court's prior definition, and whether the EZ Liner contains "depressions" as that term is used in the '930 Patent. And apart from these factual disputes, the doctrine of equivalents factual issues are barely mentioned – much less resolved – in Avery's motion. This case should proceed to trial.

## II. ARGUMENT

The standard for summary judgment in a patent case is no different than in any other case. Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (c); *Avia Group Int'l., Inc. v. L.A. Gear California, Inc.*, 853 F.2d 1557, 1561 (Fed. Cir. 1988). On a summary judgment motion, the evidence is viewed in the light most favorable to the non-movant and all justifiable inferences are to be drawn in the non-movant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment should only be granted when no "reasonable jury could find a verdict for the non-moving party." *Id.*

An infringement analysis requires two steps. The first is to construe the meaning and scope of the patent claims. *Toro Co. v. John Deere & Co.*, 143 F. Supp. 2d 1122, 1127 (D.

Minn. 2001), *citing Southwall Tech. Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1575 (Fed. Cir. 1995). The second is to determine whether the accused invention infringes the patent claims as construed. *Id., citing Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995). A product infringes a patent if it literally contains every limitation of any one claim or an equivalent of each limitation not literally met. *Id.* While the first step is solely a question of law to be determined by the court, the second step is one for the trier of fact. *Id.*

Summary judgment of noninfringement must be denied when, construing the facts in a manner most favorable to the nonmovant, a reasonable jury could find that the accused product or method meets every limitation recited in the properly construed claims. *See Catalina Marketing Int'l v. Coolsavings, Inc.*, 289 F.3d 801, 812 (Fed. Cir. 2002), *citing Bai v. L&L Wings, Inc.*, 160 F.3d 1350, 1353 (Fed. Cir. 1998). Infringement is thus a question of fact that cannot be resolved on summary judgment unless no genuine issue of material fact remains. *Beckson Marine, Inc. v. NFM, Inc.*, 63 F.3d 1031 (Fed. Cir. 2002).

## III. AVERY'S EZ LINER CONTAINS A "MULTIPLE EMBOSSED PATTERN" AS THAT CLAIM LIMITATION WAS CONSTRUED BY THE COURT.

Avery's brief reveals its continuing desire to avoid the true nature of its manufacturing process. Avery suggests that a thorough examination of that process is not necessary on summary judgment, stating that "[t]he Court's prior Order describes Avery's manufacturing process." Avery Brief at 6. This statement is remarkable, given all that 3M uncovered during discovery. Even though Avery might like to ignore those months of discovery, it cannot. The Court's prior Order, like 3M's preliminary injunction submissions, was necessarily based upon Avery's own incomplete representations and submissions to the Court at the preliminary injunction stage, and thus cannot substitute for the actual details of Avery's process.

At the preliminary injunction stage, the Court's held that the claim term "multiple embossed pattern" requires "sequential embossments" and that the claim term "embossed" should be read to mean "a topography created on material by impressing a corresponding inverse topography on its surface." *Order* at 1038, 1040. While the Court previously concluded that Avery's product was not likely to infringe, the fully-developed record now before the Court mandates that the Court reach a different conclusion on summary judgment.

### A. Avery's EZ Liner Is Embossed Sequentially A First Time At The Squeegee Roll, Before Reaching The "Embossing Roll."

In its Order, this Court determined that the claim term "multiple embossed pattern" requires "sequential embossments." *Order* at 1038. It is clear that Avery's EZ Product is embossed sequentially, first prior to the embossing roll and then at the embossing roll. As shown on Page 7 of Avery's brief and as is highlighted below, in the Omnova production line, the squeegee roll is located upstream of the embossing roll:




As noted earlier, the infrared heater added by Avery earlier this year was not included by Avery in the diagram shown on Page 7 of Avery's brief.

Mr. Payne from Omnova testified as Avery's corporate designee that the printed side of the Avery EZ Liner is pressed against the squeegee roll during Avery's manufacturing process.

> Q: And in the squeegee roll, the printed side, the dots, is – that face is pressed up against the squeegee roll?
> A: Yes, it is.
> Q: And at that point, when it gets to the squeegee roll, that web, that material has been heated?
> A: Yes, it has, by the hot drum and by that first infrared.

(Adkisson Decl., Exh. 3 at 59-60).

To determine the impact of the squeegee roll on the printed dots on the surface of Avery's liner, 3M obtained samples of the EZ Liner from the location after the liner had left the squeegee roll, and just before the EZ Liner reaches the embossing roll. 3M engaged its technical expert, Dr. Strong, to examine that sample of the EZ Liner to determine whether, in fact, the ink bumps on top of the EZ Liner had been embossed prior to entering the embossing roll.

Dr. Strong concluded unequivocally that the hardened ink bumps are embossed into the liner's surface upstream of the embossing roll, at the squeegee roll:

> In traversing the squeegee roll, the liner is wrapped around the squeegee roller with the bumps on the release surface facing the roll. There is tension in the liner at this point, and this tension in the liner causes a radially inward force that presses the hard bumps into the softened PE coating.

(Strong Decl., Exh. 1 at 9).

To test his conclusion, Dr. Strong first stripped ink bumps from a portion of the surface of a sample of EZ Liner taken from just prior to the embossing roll. Dr. Strong then examined the sample under high magnification using Scanning Electron Microscopy (SEM), and oversaw the generation of SEM images that reveal the topography of the "stripped" and "unstripped' regions of the liner. (Strong Decl., Exh. 1 at 16-18). The purpose of taking and examining these SEM images was to determine whether the ink bumps were visibly impressed into Avery's liner after the liner left the squeegee roll and before the liner arrived at the embossing roll. A

representative SEM image is shown below (Copies of the actual SEM images examined by Dr. Strong are appended to the Strong Decl. as Exh. 1, Tabs F3-F10).




As these images show, during production of Avery's EZ product, the ink bumps are embedded into the surface of the Avery liner prior to the liner arriving at the embossing roll. This embedment – and the resulting depression -- is clearly visible on the stripped portion of the sample, in the locations that correspond to the locations of the ink bumps. Dr. Strong's evaluation of the Omnova production equipment and process and his evaluation of the SEM images of the samples collected from Omnova led him to conclude that "the hard bumps are pressed into the surface of the liner before the liner enters the nip that provides the embossed pattern of hexagonal ridges and lands." (Strong Decl., Exh. 1 at 17). In support of its conclusion that depressions are created by the ink bumps embedded in Avery's process, 3M has also submitted the Declaration of Jeffrey J. Payne, 3M's expert in scanning electron microscopy. *See* Declaration of Jeffrey J. Payne, served herewith.

Avery has previously suggested that the sample obtained by 3M at the Omnova inspection was not "representative" of the Omnova process. This contention is without merit. Although true that some small regions of the entire sample collected at Omnova were heat-

damaged, Dr. Strong easily avoided those areas for purposes of reaching his conclusions. *Id.* at 20. Moreover, Avery's own corporate designee, Mr. Payne, testified unequivocally that he was unaware of any other way that a sample could be obtained of the Avery EZ Liner prior to the embossing roll. (Adkisson Decl., Exh. 4).

The finding that the ink bumps are embossed into the surface of the Avery EZ Liner prior to the embossing roll cannot be a surprise to Avery, since Avery's own documents show that Avery in developing the manufacturing process sought to achieve precisely this result, and in fact did so. Dr. Lilac in February 2001 stated that Avery "would like to revisit the possibility of using the squeegee roll to embed the ink prior to embossing." (Adkisson Decl., Exh 5). Dr. Lilac later proudly reported in March 2002 that he was successful in "embed[ding] the ink prior to embossing" in the commercial production EZ Product. (*See* Adkisson Decl., Exhs. 6 and 7).

**1. Avery's Arguments That Its "Embedded" Ink Dots Do Not Constitute A "First Embossed Pattern" Are Unsupported.**

Unable to continue to shield the true details of its process from full discovery, Avery has proffered two new arguments to avoid infringement, one factual and one legal. First, Avery insists that "Avery's manufacturing process does not 'partially' embed the ink dots before the liner reaches the single embossing roll." Avery Brief at 3. Second, Avery suggests that even if some embedment takes place (tacitly conceding the factual issue that led it to prevail in the preliminary injunction setting), "embedding" is not "embossing" as that term is used in the '930 Patent. Neither of these arguments are supportable.

**a. Avery Has Submitted No Competent Evidence Showing That Its Ink Dots Are Not Embedded Into The Surface Of The Liner.**

Avery repeatedly insists that its manufacturing process does not "partially embed" the ink bumps before the EZ Liner reaches the single embossing roll. But this is pure *ipse dixit*. In fact,

Avery can provide no evidentiary support whatsoever for its assertion. The closest Avery gets to providing evidence on this point is Dr. McHugh's statement that he "disagrees" with 3M's contention that embedding of the ink takes place prior to the embossing of the hexagonal pattern. *See* McHugh Decl., ¶ 22. But in arriving at his conclusions, even Dr. McHugh has operated under the assumption that "some embedding" may take place prior to the embossing roll. *Id.* This statement alone is not the stuff of which summary judgment is made – at best, it creates a dispute among the parties' experts for the jury to resolve at trial.

As the movant, Avery bears the burden of bringing forward sufficient evidence to establish that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. *See Itron, Inc. v. Benghiat*, 169 F. Supp. 1073, 1081 (D. Minn. 2001). Moreover, Avery, as the moving party, "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, 'which it believes demonstrate the absence of a genuine issue of material fact.'" *Celotex Corp. v. Catrett*, 477 U.S. 312, 322 (1986).

By pointing to no evidence in the record which supports its repeated denial that embedding takes before the liner arrives at the hexagonal embossing roll, Avery has failed to meet its burden on summary judgment. In contrast, 3M submits the Declarations of Dr. Strong and Dr. Payne, along with accompanying exhibits. Dr. Strong has concluded that, in Avery's process, ink is embedded into the liner surface at the "squeegee roll" itself. (Strong Decl., Exh. 1 at 17). Dr. Strong has also submitted testing evidence to back up this testimony. *Id.* at 14-17. The declarations of 3M's experts, combined with Avery's own documents and 30(b)(6)

testimony, establishes that – at the very least – a genuine issue of material fact exists as to whether Avery's sequentially embosses its liner.

**b. Avery's "Embedded" Ink Dots Are "Embossed" Into The Liner As That Term Is Used In The '930 Patent.**

Forced to accept that the evidence now shows that its ink dots are partially embedded before arriving at the embossing roll, and contrary to its position in the preliminary injunction setting, Avery also asks this Court to abandon the very definition of "embossing" that Avery urged upon this Court during the preliminary injunction briefing and which the Court adopted in its Order.

Using the Court's definition of the claim term "embossed" as "a topography created on material by impressing a corresponding inverse topography on its surface," (*Order* at 1040) the pattern of depressions that underlie the ink bumps prior to the embossing roll unquestionably form an "embossed pattern." Avery creates a topography on its release liner by impressing (or embedding) a corresponding inverse topography (the ink dots) into the surface of the liner. As can be seen by the SEM image shown on Page 16 above, the topography on Avery's EZ Liner prior to entering the embossing roll is the inverse of the topography of the ink dots which have been pressed into the liner itself.

Avery's nonetheless argues that "partial embedment" does not constitute "embossing." Neither the definition of "embossed" contained in the '930 Patent nor the Court's definition requires "full embedment" or "full embossment." A topography can be created on a surface regardless of whether the element being pressed into the surface has been fully pressed into the surface. The SEM images attached to the Declaration of Dr. Strong unequivocally establish that, prior to the embossing roll, Avery has created an embossed topography on the surface of the EZ Liner through the embedment of the ink dots themselves. (Strong Decl., Exh. 1, Tabs F3-F10).

### 2. This Court Should Reject Avery's Invitation To Read The Term "Machined Tool" Into The Claim.

In yet another attempt to avoid infringement, Avery further suggests that this Court should clarify its definition of "embossed" by inserting the phrase "a machined tool having a" into the Court's previous definition. Building on that argument, Avery then states that the "ink bumps" themselves cannot serve as an embossing tool. Avery Brief at 11.

The '930 Patent contains no such requirement. The definition of the term "embossed" expressly set forth in the specification of the '930 Patent makes clear that a "machined tool" is not required:

> "Embossed" *means a topography on a web or on tooling* having an effective three-dimensional pattern that generates a difference in surface planar dimension in the liner or the tooling.

'930 Patent, Col. 1, lines 61-64 (emphasis added). Thus, the '930 Patent makes clear that the term "embossed" means a topography on a web *or* on tooling. The precise mechanism by which that topography is created – whether it by a "machined" tool or not – is irrelevant, and is certainly not required by the claims.

Avery also cites a number of passages from the '930 Patent specification which ostensibly support its position that the definition of the term "embossed" should reference some sort of "machined tool." The fact that a tool can be used in the process does not mean that a tool is required.[4] In fact, the specification states just the opposite:

> Although the multiple embossing steps could be combined into a single step with the design of a suitable tool *or mold* . . .

Col. 2, lines 11-13 (emphasis added).

---

[4] All of the passages cited by Avery in support of this point are taken from the section of the '930 Patent labeled "Embodiments of the Invention." As the Federal Circuit has noted, "A court may not read into a claim a limitation from a preferred embodiment, if that limitation is not present in the claim itself." *Bayer AG v. Biovail Corp.*, 279 F.3d 1340, 1348 (Fed. Cir. 2002).

Avery also proposes yet a further embellishment, in that the term "embossed" should also require the tool to be "removed." Avery Brief at 3. Avery offers no specification support for this argument, because there is none. An embossed pattern is exhibited by the topography of the release liner. This topography is created by deforming the release liner. The deformation takes place when the tool is inserted. Removal is irrelevant to the issue of whether or not the carrier web has an embossed pattern.[5]

Finally, Avery argues that 3M's previous patents distinguish between "embedding" and "embossing." Those other patents are irrelevant to the proper construction of the terms used in the claims of the '930 Patent. 3M is fully entitled to "act as its own lexicographer" in setting forth a particular definition of "embossed" for the '930 Patent. *Rexnord, Inc. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001) ("[P]atent law permits the patentee to choose to be his or her own lexicographer by clearly setting forth an explicit definition for a claim term that could differ in scope from that which would be afforded by its ordinary meaning."); *see also Sunny Fresh Foods, Inc.*, 2002 U.S. Dist. LEXIS 11426 at *11-12 (same). Definitions set forth in 3M's other patents are simply irrelevant to the construction of a term which 3M explicitly defined in the '930 Patent.

**B. At The Embossing Roll Itself, Avery's Liner Is Sequentially Embossed.**

Even setting aside the fact that 3M's voluminous evidence shows that there is at least a genuine issue of material fact as to whether the ink bumps are embedded before the liner reaches the embossing roll, Avery's process for a second and independent reason nonetheless literally contains a "multiple embossed pattern" as that phrase has been defined by the Court. The embossing roll itself creates two embossed patterns sequentially.

---

[5] Moreover, the ink bumps in Avery's EZ Product are in any event removed from the underlying depressions when the adhesive-backed film is removed from the liner.

As explained more fully in the accompanying Declaration of Dr. Strong, this sequential embossing is the only way that Avery can fully embed the protruding ink bumps into the liner surface:

> There is further sequential embossing at the embossing nip itself. After the squeegee roll, the bumps are still higher than the flat surface of the liner. Because of this, the outer surface of the embossing roll will contact the raised bumps prior to the liner surface. Thus, at the embossing nip the hard bumps are pressed fully down into the surface of the liner. This happens before the hexagonal ridges and lands are embossed into the liner, which occurs as the embossing roll continues to rotate into contact with the liner surface.

(Strong Decl., Exh. 1 at 33).

This sequential embossing at the embossing nip itself was demonstrated by the animation shown by 3M at the preliminary injunction hearing.[6] Consistent with Dr. Strong's conclusion expressed above, the animation showed that the hardened ink dots were pressed into the surface first, followed by the creation of the hexagonal pattern by the embossing roll:




Thus, "sequential embossment" of the Avery EZ Liner (with the ink dots being pushed in first, followed by the creation of the hexagonal pattern) takes place at the embossing roll itself,

and the resulting liner has a "multiple embossed pattern" as that term has been construed by this Court.

## IV. AVERY'S EZ LINER ALSO CONTAINS A "FIRST EMBOSSED PATTERN . . . OF DEPRESSIONS"

Avery also argues that the EZ Liner does not contain "depressions" as that term is contained in the claims of the '930 Patent. While 3M and Avery generally agree that the term "depression" should be construed in accordance with its ordinary meaning, only 3M has submitted evidence on this issue, and it conclusively demonstrates that Avery's EZ Liner contains "depressions" as that term is used in the '930 Patent.

### A. "Depressions" Are Simply Lowered Regions In Surface Of The Liner

3M and Avery generally agree that the term "depression" should be construed in accordance with its ordinary meaning. 3M does not agree with Avery that the "ordinary meaning" of the term "depression" is one which is an empty area "that is capable of being filled with a material." Avery Brief at 13. Rather, 3M believes that, consistent with the specification and the prosecution history, the term depression should be defined as "any reduction in surface height or lowering of one region of the carrier web relative to surrounding regions of the carrier web."

The specification of the '930 Patent makes clear that the "depressions" claimed in the patent can be of varied shape or geometry:

> Therefore, this invention is not limited by these percentages concerning the area of depressions 29 when creating the volume of depressions or the geometry used to achieve those depressions. In other words, the depressions 29 can assume any solid geometric [sic] desired by those skilled in the art, within the percentage areas expressed above.

[6] As noted earlier, the animation shown by 3M was inaccurate because, in Avery's process, the hardened ink dots are partially embedded into the surface of the liner prior to arriving at the embossing roll itself.

Col. 5, lines 65-67, Col. 6, lines 1-4.

Moreover, that portion of the '930 Patent's specification which discusses "sequential" embossing also discusses the fact that the shape of the "depressions" created by the first emboss can be changed by the second embossing step:

> At the greater depths of the second emboss, it appeared that the diameter of the depressions from the first emboss had a slight reduction in diameter when compared to their initial size.

Col. 7, lines 58-60.

The specification makes clear that while the depressions *can* be filled with material, it is not necessarily a requirement to do so. *See.*, e.g., Col. 6, line 66 – Col. 7, line 2 (" . . . material *can be placed* in the depressions caused by the first pattern being formed before the second embossing pattern is applied.") (emphasis added); Example 1, Col. 7, lines 46-63 (disclosing an embodiment with "empty depressions").

3M submits that the correct construction of "depression" is "any reduction in surface height or lowering of one region of the carrier web relative to surrounding regions of the carrier web." 3M's definition is consistent with the ordinary meaning of the term, and takes into account the '930 Patent's specification's teachings that the depressions can be of varied size and shape, and can even change shape during the manufacturing process.

### B. Under Either Definition, Avery's EZ Liner Contains "A First Embossed Pattern Form[ing] An Array Of Depressions."

As it did at the preliminary injunction stage, Avery claims that its EZ Liner does not contain depressions, because the depressions in Avery's liner are filled with the ink dots, so that the "ink on Avery's liner is embedded flush with the liner surface." Avery Brief at 13.

This argument has no merit. Claim 1 states that the "depressions" are in the release liner (the "carrier web"), and Avery cannot seriously contend that its ink deposits are part of the

release liner. This is demonstrated by the fact that the release liner is what is left behind after it is stripped off the adhesive, and the ink deposits stay attached to the adhesive surface, not the release liner.

Claim 1 of the '930 Patent states that the "carrier web" contains an "array of depressions." That claim also makes clear that the "array of depressions" be contained on the "surface" of the "carrier web." Col. 9, lines 34-42. Just because Avery fills those depressions with ink dots does not mean that the depressions no longer exist. In fact, as stated by 3M at oral argument, by analogy, Avery would apparently argue that a lake is not a "depression" in the earth's surface simply because it contains water. It is the *liner surface* that must be depressed to meet the limitation, and that is clearly the case in Avery's product:

Moreover, the specification of the '930 Patent, which serves as a guide to understanding the meaning of claim terms, makes no distinction between empty depressions and depressions that have been filled with material. Both configurations qualify as "depressions" as that term is used in Claim 1:

> "A second embossed Controltac Plus liner with *its depressions filled with a glass bead slurry* was embossed a second time . . .

Col. 7, lines 66-67, Col. 8, line 1 (emphasis added).[7]

As demonstrated by the accompanying Declaration of Dr. Strong, in Avery's process, a first pattern of depressions exists as soon as the "squeegee roll" partially presses the ink dots into the surface of the liner. At that point the liner contains an "array of depressions." Strong Decl., Exh. 1 at 17. From there, the "array of depressions" is made more pronounced by the subsequent completion of the embedment of the ink dots at the embossing roll. While the depressions in

[7] Similarly, "[a] release liner . . . was microembossed with small pits on the glossy silicone-coated side and the pits filled with fine glass beads according to the procedure described in U.S. Patent No. 5,362,516 (Col. 8, lines 13-22).

Avery's product change shape at the embossing roll itself, such change is contemplated in the '930 Patent (*see* Col. 7, lines 58-60), and the same depressions exist after the first and second emboss. As such, Avery's EZ Product contains a "first embossed pattern" which "forms an array of depressions."

## V. THIS COURT'S CLAIM CONSTRUCTION USED FOR PURPOSES OF DETERMINING 3M'S MOTION FOR PRELIMINARY INJUNCTION SHOULD BE REVISITED.

The foregoing argument demonstrates that Avery's EZ Product infringes -- or at least that there is a genuine issue of material fact as to infringement – even under the Court's initial claim construction. But lest 3M be accused of waiving its claim construction arguments, 3M respectfully asks the Court to revisit that claim construction. Under what 3M believes is the correct construction of "multiple embossed pattern," there is no question that Avery literally infringes.

A claim construction adopted in the preliminary injunction setting is not binding at trial. *See Quickie Mfg. Corp. v. The Libman Co.*, 180 F. Supp. 2d 636, 641 (D.N.J. 2002), *citing Illinois Tool Works, Inc. v. Grip-Pak, Inc.*, 906 F.2d 679, 681 (Fed. Cir. 1990). Moreover, the Court's obligation at the preliminary injunction stage is only to determine the probability that infringement can be proved after a full presentation of the evidence at trial. *Atari Games Corp. v. Nintendo of America, Inc.*, 897 F.2d 1572, 1575 (Fed. Cir. 1990). It is entirely proper for a Court to revisit claim constructions reached at the preliminary injunction stage. *See International Communication Materials, Inc. v. Ricoh Co.*, 108 F.3d 316, 318 (Fed. Cir. 1997) (noting that after preliminary ruling on claim construction at lower court, there were "substantial open issues and questions that must be litigated before a finding of infringement can be made, including claim construction . . . ").

Specifically, 3M submits that this Court should revisit the construction of the term "multiple embossed pattern" in Claim 1 of the '930 Patent.[8] In addressing 3M's motion for preliminary injunction, the Court concluded that the adjectives "first" and "second" established a sequential relationship:

> The fact that the language of Claim 1 expressly refers to two separately-created patterns as a "*first* embossed pattern" and a "*second* embossed pattern" clearly establishes from the language of the claim alone that the term "multiple embossed pattern" requires multiple embossments which are applied one after the other.

*Order* at 1038 (emphasis in original).

In the interest of economy, 3M will not reiterate arguments made in its briefs in connection with its motion for preliminary injunction, but will instead present only new information not included in the initial briefing.

3M submits with this opposition a declaration from one of its experts, Gerald A. Mossinghoff. (Adkisson Decl., Exh. 10). Mr. Mossinghoff, a former United States Commissioner of Patents and Trademarks, notes that the terms "first" and "second" are commonly used in patent claim drafting in order to make unambiguous reference to two separate items, without any temporal connotation. *Id., citing Robert C. Faber, Landis on Mechanics of Patent Claim Drafting* (4th Ed., PLI Press Release No. 5, Nov. 2001). Mr. Mossinghoff analogizes this practice to the contract-drafting technique of "party of the first part" and "party of the second part," which is used to avoid confusion and allow for unambiguous reference to the

---

[8] 3M also requests this Court to revisit its construction of the claim term "embossed" as meaning a "topography created on material by impressing a corresponding inverse topography on its surface." *Order* at 1040. Like the term "multiple embossed pattern," the term "embossed" was expressly defined in the specification of the '930 Patent as meaning "a topography on a web or on tooling having an effective three-dimensional pattern that generates a difference in surface planar dimension in the liner or the tooling." Col. 1, lines 61-64. Because the term "embossed" is expressly defined in the specification, the inventors of the '930 Patent have permissibly acted

parties in subsequent portions of the contract. *Id.* From his review of the '930 Patent and its file history, Mr. Mossinghoff concludes that the terms "first" and "second" in Claim 1 does not require that the first pattern be created prior to the second pattern. *Id.*

In this regard, 3M notes that this Court found support for its claim construction in the preliminary injunction motion in the file history, stating that "the file history makes absolutely clear that plaintiff's patent requires a second embossed pattern followed by a first embossed pattern." *Order* at 1040. However, further information since the preliminary injunction hearing shows unequivocally that the Examiner understood Claim 1 of 3M's patent *to cover simultaneous embossing.*

On April 30, 1998, the Examiner determined that a prior art reference, Lewicki U.S. Patent 3,887,678, disclosed a "multiple embossed pattern." (Adkisson Decl., Exh. 11). This conclusion is significant, because Lewicki discloses a process *whereby two multiple embossed patterns are created simultaneously.* (Strong Decl., Exh. 1 at 31).[9] Thus, in determining whether the claims were patentable, the Examiner expressly and affirmatively concluded that the term "multiple embossed pattern" includes patterns created by simultaneous embossing processes.[10]

## VI. AVERY'S EZ LINER INFRINGES 3M'S '930 PATENT UNDER THE DOCTRINE OF EQUIVALENTS.

Infringement by equivalents is shown by evidence that the accused device contains an element that is not "substantially different" from any claim element that is literally lacking, *see Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 40 (1997), or that the claimed

---

as their own lexicographers. *See Rexnord, Inc.*, 274 F.3d at 1341; *Sunny Fresh Foods, Inc.*, 2002 U.S. Dist. LEXIS 11426 at *11-12.

[9] Avery's expert, Dr. McHugh, agrees that Lewicki discloses a process whereby two embossed patterns are created simultaneously. (Adkisson Decl., Exh. 11).

limitation and the accused component "perform [] substantially the same function in substantially the same way to achieve substantially the same result," *see Ethicon Endo-Surgery, Inc. v. United States Surgical Corp.*, 149 F.3d 1309, 1321 (Fed. Cir. 1998). Infringement under the doctrine of equivalents is a question of fact. *See Warner-Jenkinson*, 520 U.S. at 40.

Summary judgment under the doctrine of equivalents should not be granted when, as here, evidence is presented that creates a genuine issue of material fact as to whether the accused products are insubstantially different and serve substantially the same function in substantially the same way to achieve substantially the same result. *See Optical Disc Corp. v. Del Mar Avionics*, 208 F.3d 1324, 1335-36 (Fed. Cir. 2000); *Kraft Foods, Inc. v. Int'l Trading Co.*, 203 F.3d 1362, 1372-73 (Fed. Cir. 2000). "Because infringement under the doctrine of equivalents often presents difficult factual determinations, a summary conclusion that a reasonable jury could not find infringement is often illusive." *Leggett & Platt, Inc. v. Hickory Spring Mfg. Co.*, 285 F.3d 1353, 1360 (Fed. Cir. 2002) (overturning a district court's grant of non-infringement under the doctrine of equivalents because factual issues were present).

Avery sets out a laundry list of noninfringement arguments regarding the doctrine of equivalents. Yet they all have one thing in common – they all rest on the faulty premises outlined earlier – either than Avery's EZ Liner is not "sequentially embossed" or that the EZ Liner does not contain "depressions." Avery has submitted no evidence whatsoever regarding the factual question of whether its EZ Product infringes under the doctrine of equivalents. As such, regardless of whether this Court finds that a factual dispute exists with respect to the question of whether Avery's EZ Liner literally infringes the '930 Patent, Avery is not entitled to summary judgment of noninfringement under the doctrine of equivalents.

---

[10] As discussed by Dr. Strong in his declaration, the '930 Patent issued over another cited reference, United States Patent No. 5,229,186 (Tribble) which disclosed both simultaneous

**A. Avery's EZ Film Is Not Insubstantially Different Than The "Carrier Web" Recited In The '930 Patent.**

First, Avery suggests that "no reasonable juror could find that embedded ink dots flush with the liner surface is equivalent to a first embossed pattern form[ing] an array of depressions." Avery Brief at 18.

As a factual matter, Avery again ignores the fact that "depressions" are unquestionably created in the surface of the EZ Liner by Avery's embedment of ink dots. Equally important for the doctrine of equivalents analysis, Avery's depressions serve the same function as those disclosed in the '930 patent. For example, one example contained in the '930 Patent states that the "depressions" in the '930 Patent are created to receive "glass beads" that will project out from the surface of the adhesive to make the adhesive "positionable." *See* Col. 8, lines 4-11. In his attached declaration, Dr. Strong confirms that the depressions in the EZ Liner perform substantially the same function (receiving material to impart positionability) in substantially the same way (by deforming the liner) to achieve substantially the same result (positionability bumps on the surface of the adhesive). (Strong Decl., Exh. 1 at 34).

Far from being the "opposite" of the depressions called for in the '930 Patent, Avery's EZ Liner is manufactured with depressions, the equivalent of the "depressions" claimed in the '930 Patent. Any reasonable juror could so conclude.

**B. Because The EZ Liner Is Sequentially Embossed, 3M's Theory Of Equivalence Will Not Vitiate Any Claim Element.**

Avery also contends that 3M's doctrine of equivalents arguments would vitiate the "sequential" limitation from Claim 1. Avery pins its "vitiation" argument on two contingencies: First, Avery hopes that this Court will find that the EZ Liner is not "sequentially embossed."

---

and sequential embossing. (Strong Decl. at ¶ 3).

Second, Avery hopes that this Court will determine as a matter of law that "embedding" is distinct from "embossing."

Even if this Court determines that there is no question of material fact that Avery's EZ Liner is not sequentially embossed, a question of fact remains as to whether the Avery process is "equivalent" to sequential embossing. For example, a benefit of the invention claimed in the '930 Patent is that depressions are filled prior to the creation of the ridges and lands, which allows the depressions to be filled with a material different than the ridges and lands. As discussed by Dr. Strong, that is exactly what happens in Avery's process, and there is a question of fact as to whether the process for making the EZ Liner nonetheless infringes under the doctrine of equivalents. (Strong Decl., Exh. 1 at 35).

**C. 3M Did Not Expressly Disclaim Or Surrender Claim Coverage For "Single Step" Embossing Through Its Description In The Specification.**

Despite the fact that Avery argued at the preliminary injunction stage that 3M did not disclose "sequential embossing" in the '930 patent's specification, Avery now states that 3M disclosed single embossing in the specification and should be precluded from asserting doctrine of equivalents infringement. In making its argument, Avery focuses on the following language in the specification of the '930 Patent:

> Although the multiple embossing steps could be combined into a single step with the design of a suitable tool or mold, the advantage of multiple steps is that the depressions formed by the prior step(s) can be filled with material prior to the subsequent embossing step(s).

Col. 2, lines 11-15 (emphasis added).

In opposition to 3M's Motion for Preliminary Injunction, Avery took the position that the above-cited passage disclosed only *sequential*, not simultaneous, embossments. Avery PI Opposition Brief at 12. Now, having received a favorable claim construction, Avery has

changed its position, claiming that, in the above-quoted passage in the specification, 3M clearly disclosed "single-step" embossing and should be prevented from recapturing single-step embossing via the doctrine of equivalents. Plainly, Avery cannot be allowed to have it both ways.

Avery has previously admitted that 3M has not disclosed "single-step embossing" anywhere within the specification of the '930 Patent. In fact, now the only passage in which Avery states that 3M disclosed "single-step embossing" is the express passage in which Avery said single-step embossing was not described. Accordingly, 3M's disclosure in the specification of the '930 Patent does not limit the application of the doctrine of equivalents to the phrase "multiple embossed pattern."

In support of its position, Avery cites to the Federal Circuit's *en banc* decision in *Johnson & Johnson Associates, Inc. v. R.E. Service Co.*, 285 F.3d 1046, 1055 (Fed. Cir. 2002). Given Avery's previous positions regarding the disclosures in the '930 Patent, 3M respectfully submits that the *Johnson & Johnson Assocs.* case has no bearing on this case. In *Johnson & Johnson Assocs.*, the patentee stated in the specification that "while aluminum is currently the preferred material for the substrate, other metals, such as stainless steel or nickel alloys, may be used." 285 F.3d at 1055. The Federal Circuit held that the patentee had disclosed but not claimed the steel substrates, and as a result was precluded from seeking coverage of steel substrates through the doctrine of equivalents. *Id.* In this case, Avery's prior representations prevent it from arguing that 3M has "disclosed" simultaneous embossing.

Patentees should be rewarded, not punished, for broadly disclosing their invention to the public. The breadth of 3M's patent specification should not be ignored for purposes of claim construction, and then embraced as part of a non-infringement argument. If anything, Avery's

arguments underscore the need for this Court to revisit its prior construction of "multiple embossed."

**D. Avery's Final Doctrine Of Equivalents Argument Is Completely Unsubstantiated By Competent Evidence In The Record.**

Avery's final "catch-all" argument simply states that Avery's EZ Liner does not meet the function/way/result test laid out by the Supreme Court in *Warner Jenkinson Co.* Avery's last-ditch argument is just that – indeed, Avery does not include a single citation to any factual evidence to back up its statement that "Avery's EZ Film liner does not meet this test." *See* Avery Brief at 21.

Avery's failure to cite to any competent evidence is fatal to its fact-based doctrine of equivalents arguments. In fact, earlier this year, the Federal Circuit reversed a district court's finding of noninfringement under analogous circumstances. *Leggett & Platt*, 285 F.3d at 1359. In *Leggett & Platt*, the district court granted summary judgment of noninfringement under the doctrine of equivalents. *Id.* at 1355. The Federal Circuit reversed, finding (1) that the defendant had not put in any evidence (aside from one of its own patents) regarding noninfringement under the doctrine of equivalents; and (2) that the district court did not supply any reason to reject the allegations of the plaintiff's experts, who both testified that infringement existed under the doctrine of equivalents. *Id.* at 1359.

Similarly, Avery has submitted nothing more than attorney argument in support if its claim that its EZ Product does not infringe the '930 Patent under the Supreme Court's "function/way/result" test. Avery's failure to submit evidence – combined with 3M's accompanying Declaration of Dr. A. Brent Strong regarding his findings of infringement under the doctrine of equivalents – mandates a denial of Avery's fact-based noninfringement arguments under the doctrine of equivalents.

## VII. CONCLUSION

Because genuine issues of material fact exist regarding whether Avery's EZ Films infringe 3M's '930 Patent both literally and under the doctrine of equivalents, 3M respectfully requests that this Court deny Avery's motion in its entirety.

Dated: July 24, 2002

FISH & RICHARDSON P.C., P.A.

By: [signature]

R.J. Zayed (#309849)
John C. Adkisson (#266358)
FISH & RICHARDSON P.C., P.A.
3300 Dain Rauscher Plaza
60 South Sixth Street
Minneapolis, MN 55402
Tel: (612) 335-5070
Fax: (612) 288-9696

Frank P. Porcelli
Kurt L. Glitzenstein
Timur S. Engin
FISH & RICHARDSON P.C.
225 Franklin Street
Boston, MA 02110-2804

OF COUNSEL:

Carolyn V. Peters
3M Innovative Property Company
3M Center
P.O. Box 33427

Attorneys for Plaintiffs
3M INNOVATIVE PROPERTIES COMPANY
and MINNESOTA MINING AND
MANUFACTURING COMPANY

60094566.doc