IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| 3M INNOVATIVE PROPERTIES COMPANY and MINNESOTA MINING AND MANUFACTURING COMPANY, | : | |
| Plaintiffs, | : | Civil Action No. 01-CV-1781 (JRT/FLN) |
| vs. | : | |
| AVERY-DENNISON CORPORATION, | : | |
| Defendant. | : | |

**CLAIM CONSTRUCTION BRIEF OF DEFENDANT AVERY DENNISON CORPORATION**

## TABLE OF CONTENTS

(Page)

I. INTRODUCTION AND OVERVIEW OF DISPUTED CLAIM TERMS ................ 1

II. DESCRIPTION OF THE '930 PATENT ................ 2

A. The Specification ................ 3

B. The Claims ................ 5

C. The Prosecution History and Prior Art ................ 6

III. LEGAL STANDARDS FOR CLAIM CONSTRUCTION ................ 7

A. Claim Terms Are Presumed To Carry Their Ordinary And Customary Meaning ................ 7

B. The Presumption That Claim Terms Carry Their Ordinary And Customary Meaning May Be Overcome ................ 9

IV. CONSTRUCTION OF DISPUTED TERMS ................ 11

A. Depressions: Hollow or Open Areas Below the Surface ................ 11

1. The Ordinary and Accustomed Meaning of "Depressions" in Claim 1 Applies ................ 11

2. Avery's Proposed Construction is Legally Correct Because Claim 12 of the '930 Patent Would be Nonsensical Otherwise ................ 12

3. The Patent Specification Repeatedly Uses the Word "Depressions" in its Ordinary and Accustomed Sense ................ 12

B. Carrier Web: Sheeting Material That Carries Or Can Carry Another Material ................ 13

1. Avery's Proposed Construction of "Carrier Web" is Consistent with the Ordinary Meaning of that Term ................ 13

2. The Patent Specification Repeatedly Confirms This Intended Definition of Carrier Web ................ 14

C. Ridges: An Elongated Crest or Raised Strip ................ 14

D. Lands: The Area of the Carrier Web Between Ridges ................ 14

V. CONCLUSION ................ 14

# TABLE OF AUTHORITIES

(Page)

**Cases**

Alloc, Inc. v. International Trade Commission,
342 F.3d 1361 (Fed. Cir. 2003)........7, 8, 10

Arlington Industries, Inc. v. Bridgeport Fittings, Inc.,
345 F.3d 1318 (Fed. Cir. 2003)........8, 9

Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.,
334 F.3d 1294 (Fed. Cir. 2003)........12

CCS Fitness, Inc. v. Brunswick Corp.,
288 F.3d 1359 (Fed. Cir. 2002)........7, 8, 9, 10

Dow Chemical Co. v. Sumitomo Chemical Co.,
257 F.3d 1364 (Fed. Cir. 2001)........8

Ferguson Beauregard, Inc. v. Mega Sys., LLC,
350 F.3d 1327 (Fed. Cir., 2003)........9

Hoescht Celanese Corp. v. BP Chemicals, Inc.,
78 F.3d 1575 (Fed. Cir. 1996)........8

Invitrogen Corp. v. Biocrest Mfg., L.P.,
327 F.3d 1364 (Fed. Cir. 2003)........7

J.T. Eaton & Co. v. Atlantic Paste & Glue Co.,
106 F.3d 1563 (Fed. Cir. 1997)........10

Johnson Worldwide Associates, Inc. v. Zebco Corp.,
175 F.3d 985 (Fed. Cir. 2000)........7, 9

Markman v. Westview Instruments, Inc.,
517 U.S. 370 (1996)........1

Multiform Dessicants, Inc. v. Medzam, Ltd.,
133 F.3d 1473 (Fed. Cir. 1998)........8

**TABLE OF AUTHORITIES (cont'd)**

**(Page)**

Network Services, Inc. v. Covad Comm. Group, Inc.,
262 F.3d 1258 (Fed. Cir. 2001)........................................11

North American Vaccine, Inc. v. American Cyanamid Co.,
7 F.3d 1571 (Fed. Cir. 1993)........................................10

Pitney Bowes, Inc. v. Hewlett-Packard Co.,
182 F.3d 1298 (Fed. Cir. 1999)........................................8, 11

Renishaw PLC v. Marposs Societa' per Azioni,
158 F.3d 1243 (Fed. Cir. 1998)........................................10

SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.,
242 F.3d 1337 (Fed. Cir. 2001)........................................10

Specialty Composites v. Cabot Corp.,
845 F.2d 981 (Fed. Cir. 1988)........................................10

Sulzer Textil A.G. v. Picanol N.V.,
358 F.3d 1356 (Fed. Cir. 2004)........................................1

Texas Digital Systems, Inc. v. Telegenix, Inc.,
308 F.3d 1193 (Fed. Cir. 2002)........................................8, 9

Vitronics Corp. v. Conceptronic, Inc.,
90 F.3d 1576 (Fed. Cir. 1996)........................................7, 8, 10

**Statutes**

35 U.S.C. § 112(2)........................................8

**Other Authorities**

Webster's II New Riverside Dictionary at 191 (1st ed. 1984)........................................11

Webster's Ninth New Collegiate Dictionary (9th ed. 1991)........................................14

**TABLE OF AUTHORITIES (cont'd)**

**(Page)**

Defendant Avery Dennison Corporation ("Avery") respectfully submits this brief and the accompanying declaration regarding the construction of disputed claim terms in U.S. Patent 5,897,930 ("the '930 patent").

## I. INTRODUCTION AND OVERVIEW OF DISPUTED CLAIM TERMS

In patent cases, claim terms are construed by the court as a matter of law. Markman v. Westview Instruments, Inc., 517 U.S. 370 (1996). Since Markman, it has become standard practice for the court to tell the jury as part of the jury instructions how the disputed claim terms must be construed. See e.g., American Intellectual Property Law Association, Guide to Model Patent Jury Instructions, Instruction No. 2. See also Sulzer Textil A.G. v. Picanol N.V., 358 F.3d 1356, 1366 (Fed. Cir. 2004) ("[A]s to claim coverage, the district court must instruct the jury on the meanings to be attributed to all disputed terms used in the claims in suit so that the jury will be able to intelligently determine the questions presented.") (internal quotation and citation omitted).

3M accuses Avery of infringing claims 1-5 of the '930 patent.[1] (A copy of the '930 patent is attached as Exhibit 1 to the accompanying declaration of Lawrence M. Hadley.) Based on rulings by the Federal Circuit Court of Appeals and subsequent agreement of the parties, the construction for two terms used in claim 1 will be the precise definitions provided by the patentee in the patent specification:

- **Embossed**: "Embossed" means a topography on a web or on tooling having an effective three-dimensional pattern that generates a difference in surface planar dimension in the liner or the tooling. (Col. 1, lns. 60-64.)[2]
- **Multiple Embossed:** "Multiple embossed" means two or more embossing

---

[1] On October 19, 2002, this Court granted summary judgment in favor of Avery on all 12 claims of the '930 patent. The Federal Circuit's December 2, 2003 opinion reversed-in-part, vacated-in-part, and remanded the case back to this Court. Following the remand, the parties agree that Avery's accused EZ Film does not infringe "method" claims 6-11 and "use" claim 12. Thus, this Court need not construe any terms in claims 6-12.

[2] All references to the '930 patent are by column and line numbers unless otherwise noted.

> patterns are superimposed on the web to create a complex pattern of differing depths of embossing. (Col. 2, lns. 1-3.)

In accordance with Magistrate Judge Noel's April 21, 2004 Minute Order, the terms used in these definitions will not be further construed. Thus, Avery understands that, in the event this case proceeds to trial, the jury will be provided with these definitions.

The parties have agreed to the legal constructions for the terms "array" and "pattern." In 3M's July 30, 2002 Memorandum in Support of Motion for Construction of Disputed Claim Terms, 3M stated it would accept Avery's proposed construction for "array." Thus, the term "array" should be construed as "an orderly arrangement." If 3M now proposes any other construction, Avery will respond in its reply brief. Additionally, for purposes of this action, Avery will accept 3M's definition of "pattern," which is contained in the patent specification. Col. 1, lns. 65-67 ("'Pattern' means any formation of embossings that can utilize any theory of geometry, including without limitation, Euclidian geometry and fractal geometry."). In accepting this definition, Avery does not agree that 3M acted as its own "lexicographer" by providing a clear definition differing from the ordinary and accustomed meaning. Rather, the definition contained in the patent specification appears consistent with the ordinary meaning that Avery had proposed.

Four terms from claims 1-5 remain for interpretation by this Court: (1) depressions, (2) carrier web, (3) ridges, and (4) lands. Avery below describes the patented technology, identifies the relevant legal principals of claim construction, and properly construes each of these four claim terms.

## II. DESCRIPTION OF THE '930 PATENT

The '930 Patent describes "multiple embossed webs" useful as liners for pressure sensitive adhesives and for other industrial applications. Col. 1, lns. 4-6. When used for commercial graphics, pressure sensitive adhesive products provide a substitute for painting signs, logos, and advertisements. Similar to a large bumper sticker, the graphic film is printed on one side. On the other, a "carrier web" or release liner is coated with an adhesive and attached to the

film. Removing the release liner exposes the adhesive so the film can be affixed to the intended surface.

Like wallpaper, two features can make graphic films easier to apply: (i) the ability to position the film before the adhesive takes hold and (ii) the ability to remove trapped air. Col. 1, lns. 15-30. 3M's '930 patent purports to solve these problems by embossing a web with two different patterns. The first embossed pattern forms tiny depressions or dimples in the carrier web surface. As explained in the patent, these depressions can be filled with small particles (such as glass beads) before the adhesive is applied. Col. 3, ln. 25-36. Upon removing the carrier web from the film, the beads transfer with the adhesive to form small protrusions, which come into contact with the application surface before the adhesive takes hold so the film can be positioned more easily. The second embossed pattern consists of a larger pattern of "lands and ridges." The ridges from the second embossed pattern form channels in the adhesive, which allow air to escape during application. Id. Besides liners for pressure sensitive adhesives, the '930 patent explains that the web can be used as "the final article" for a variety of purposes such as a carrier for soaps, lubricants, perfumes, and abrasive slurries. Col. 2, ln. 27-55.

**A. The Specification**

The specification describes a generic embodiment for the multiple embossed web, and a method of making a multiple embossed web. Figure 2 of the '930 patent illustrates a cross-section of the described embodiment:




FIG. 2

As shown in Figure 2, the surface of carrier web (10) has one pattern consisting of open depressions (14). Additionally, it has a pattern of ridges (12) spaced between open "land" areas (16).

Figure 3 of the 930 patent provides a photograph of this web surface:




FIG.3

Like above, the carrier web surface has one pattern of open depressions and a second pattern of intersecting ridges. Open land areas are formed between the ridges.

Following the description of a generic embodiment, the '930 patent discusses three examples of specific embodiments. Col. 7, ln. 44 to col. 9, ln. 29. In the first example, a liner was formed with depressions of 50-75 microns in diameter. With the depressions unfilled, the liner was embossed with a square lattice pattern to create lands and ridges. According to the example, the second embossing step "did not remove the presence of the depressions created by the first embossing step," thus forming a "multiple embossed web." Col. 7, lns. 46-63. In the second example, the depressions formed during the first embossing step were filled with a glass bead slurry. Then the web was embossed with a tool having square posts separated by intersecting grooves. Col. 7, ln. 66 - col. 8, ln. 10. The third example describes a web similar to the second, micro-embossed with small pits and those pits subsequently filled with glass beads. A second embossed square grid pattern was imposed on the web surface. Col. 8, lns. 13-50.

**B. The Claims**

The '930 patent contains 12 claims—with two independent claims (1 and 6). Independent claim 1 is a product claim directed to a "carrier web" and contains all the disputed terms remaining between the parties (emphasized below):

> A ***carrier web*** comprising:
> At least one surface that has a multiple embossed pattern having a first embossed pattern and a second embossed pattern, wherein the first embossed pattern forms an array of ***depressions***, wherein the ***depressions*** of the first embossed pattern are in the second embossed pattern, wherein the second embossed pattern comprises ***lands*** and ***ridges*** between the ***lands***, and wherein the height of the ***ridges*** over ***lands*** ranges from about 3 to about 45 μm.

Claims 2-5 are dependent on claim 1 and contain no disputed terms.

As recited, the carrier web of claim 1 has a "multiple embossed pattern" consisting of a "first embossed pattern form[ing] an array of depressions" and a "second embossed pattern compris[ing] lands and ridges." Consistent with the abstract and summary of invention, the second embossed pattern does not destroy the first. Rather, the first embossed pattern of depressions remain, and are located "in" the second pattern. Also, the height of the ridges over the lands ranges from about 3-45 microns. Col. 9, lns. 33-42. Although the Patent Examiner and

District Court found claim 1 written in the "product-by-process" format, the Federal Circuit accepted 3M's argument that claim 1 is a "purely structural" product claim. 3M Innovative Properties Co., 350 F.3d at 1374; Hadley Dec., Ex. 2. Thus, the patent does not limit how the embossed pattern, as defined in the specification, is created. 350 F.3d at 1374.

Claim 6 is a method claim, and claims 7-11 are depended on that claim. While no longer asserted, these claims differ from structural product claim 1 in several respects. First, claim 6 recites a method of making a carrier web in two, sequential steps. Col. 10, lns. 9-24. Dependent claim 7 adds the step of filling the depressions made by the first embossing step before performing the second embossing step. Col. 10, lns. 25-27. Similarly, dependent claim 8 adds the step of filling the depressions created by the second embossing step. Col. 10, lns. 28-29.

Dependent claim 12 is a hybrid claim—reciting a method of using the web of product claim 1. Specifically, claim 12 recites the step of filling the open depressions existing on the surface of the web recited in claim 1 with a pressure sensitive adhesive. Col. 10, lns. 41-45.

### C. The Prosecution History and Prior Art

When 3M applied for the patent, it conceded that the disclosed method for achieving positionability through embossed depressions was already known in the art; indeed, the same 3M inventors had patented the method. Col. 1, lns. 10-45. Likewise, embossing or roughening surfaces to create air egress channels was already known in the art as well—Avery had disclosed this feature in a patent 15 years earlier. (Hadley Dec., Ex. 3 at col. 6, lns. 39-41 and 61-65.) The Examiner also cited art showing embossed patterns, made simultaneously, but occupying different levels. (Hadley Dec. Ex. 4 (attaching the file history for the '930 patent) at 59-62.)

Although 3M's disclosed methods for solving both the positionability and air egress problems were already known, and simultaneously-made embossments of different patterns at different levels were also disclosed in the same prior art, 3M argued that it still disclosed patentable subject matter. Specifically, 3M asserted to the Patent Office that no one had earlier divined how to emboss the same material twice, where the first embossed pattern "survives" a subsequent embossing to form two distinct patterns of "differing depths of embossing." (Hadley

Dec., Ex. 4 at 71-72.)

Nonetheless, the Examiner again rejected the claims, citing at least four prior art references showing two separately-made embossed patterns on the same surface. (Id., Ex. 4 at 78-83.) In response, 3M amended all claims by adding a specific height limitation for the ridges formed by the second embossed pattern. (Id., Ex. 4 at 88-89.) With this amendment, the Patent Office allowed the claims. (Id., Ex. 4 at 92.)

## III. LEGAL STANDARDS FOR CLAIM CONSTRUCTION

The Federal Circuit has instructed courts to construe the terms of a claim, if possible, based on the "intrinsic" patent record. This record consists of the claims, specification, and prosecution history, including the prior art. Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996). Within these parameters, more particular construction rules applicable to this case are outlined below.

### A. Claim Terms Are Presumed To Carry Their Ordinary And Customary Meaning

Because patent claims define the scope of an invention, courts begin the construction process by examining the language of the claim itself. Alloc, Inc. v. International Trade Commission, 342 F.3d 1361, 1368 (Fed. Cir. 2003); Johnson Worldwide Associates, Inc. v. Zebco Corp., 175 F.3d 985, 989 (Fed. Cir. 2000). Courts indulge a "heavy presumption" that a claim term carries its ordinary and customary meaning. CCS Fitness, Inc. v. Brunswick Corp., 288 F.3d 1359, 1366 (Fed. Cir. 2002); Johnson Worldwide, 175 F.3d at 989 ("a court must presume that the terms in the claim mean what they say, and, unless otherwise compelled, give full effect to the ordinary and accustomed meaning of claim terms."); Alloc, 342 F.3d at 1368, quoting Invitrogen Corp. v. Biocrest Mfg., L.P., 327 F.3d 1364, 1367 (Fed. Cir. 2003) ("'Claim language generally carries the ordinary meaning of the words in their normal usage in the field of the invention at the time of the invention.")

In determining what the ordinary and customary meaning of a claim term is, "the context of the surrounding words in a claim also must be considered." Arlington Industries, Inc. v.

Bridgeport Fittings, Inc., 345 F.3d 1318, 1325 (Fed. Cir. 2003). A court may "immerse itself in the specification, the prior art, and other evidence, such as the understanding of skilled artisans at the time of invention, to discern the context and normal usage of the words in the patent claim." Alloc, 342 F.3d at 1368 (citing Hoescht Celanese Corp. v. BP Chemicals, Inc., 78 F.3d 1575, 1579 (Fed. Cir. 1996)).

Courts are cautioned, however, not to import limitations from the specification or prosecution history when discerning the ordinary and customary meaning of a claim term. Texas Digital Systems, Inc. v. Telegenix, Inc., 308 F.3d 1193, 1201 (Fed. Cir. 2002) ("Consulting the written description and prosecution history as a threshold step in the claim construction process, before any effort is made to discern the ordinary and customary meanings attributed to the words themselves, invites a violation of our precedent counseling against importing limitations into the claims.")

Dictionaries may also help supply the pertinent context and usage for claim construction. Alloc, 342 F.3d at 1368 (citing Texas Digital, 308 F.3d at 1201 and Pitney Bowes, Inc. v. Hewlett-Packard Co., 182 F.3d 1298, 1309 (Fed. Cir. 1999)). Because patent claims must give the public fair notice of meaning, 35 U.S.C. § 112(2), dictionaries and scientific treatises can be used to determine the ordinary meaning of claim terms. CCS Fitness, 288 F.3d at 1366; Vitronics Corp, 90 F.3d at 1584 n.6. When dictionary definitions are used, however, the definitions must be consistent with the use of the words by the inventor. Texas Digital, 308 F.3d at 1204 (citing Dow Chemical Co. v. Sumitomo Chemical Co., 257 F.3d 1364, 1372-73 (Fed. Cir. 2001) and Multiform Dessicants, Inc. v. Medzam, Ltd., 133 F.3d 1473, 1433 (Fed. Cir. 1998)). Moreover, dictionary definitions must be considered from the standpoint of a person skilled in the art within the context of the surrounding claim text, the other claims, the specification, and the prosecution history, especially when dictionaries provide multiple definitions:

> The words used in the claims must be considered in context and are examined through the viewing glass of a person skilled in the art. It is the use of the words in the context of the written description and customarily by those skilled in the relevant art that

> accurately reflects both the "ordinary" and the "customary" meaning of the terms in the claims of a patent.... In construing claim terms, the general meanings gleaned from reference sources, such as dictionaries, must always be compared against the use of the terms in context, and the intrinsic record must always be consulted to identify which of the different possible dictionary meanings is most consistent with the use of the words by the inventor. Where there are several common meanings for a claim term, the patent disclosure serves to point away from the improper meanings and toward the proper meanings.

Ferguson Beauregard, Inc. v. Mega Sys., LLC, 350 F.3d 1327, 1338 (Fed. Cir., 2003) (internal quotations and citations omitted).

### B. The Presumption That Claim Terms Carry Their Ordinary And Customary Meaning May Be Overcome

While a court begins with the ordinary and accustomed meaning of the claim term, it must also examine the intrinsic record to determine whether anything in the record overcomes the presumption that the term has the ordinary meaning. Arlington Industries, 345 F.3d at 1326.

There are limited circumstances where the "heavy presumption" that a claim term is given its ordinary and accustomed meaning may be overcome and the court may supply a definition of a claim term or phrase different than its ordinary and accustomed meaning. CCS Fitness, 288 F.3d at 1366. In each circumstance there must be textual language from the patent specification that is clearly associated with a claim term and its proffered construction. Johnson Worldwide, 175 F.3d at 989.

First, a claim term will not receive its ordinary meaning if the patentee acted as his own lexicographer and clearly set forth a definition of the disputed claim term in either the specification or prosecution history. Johnson Worldwide, 175 F.3d at 990. Just supplying a definition, however, is not enough. The inventor's definition must "clearly" indicate an intent to depart from the ordinary meaning. Texas Digital Sys., 308 F.3d at 1204.

Second, a claim term will not carry its ordinary meaning if the intrinsic evidence shows that the patentee (i) distinguished that term from prior art on the basis of a particular embodiment, (ii) expressly disclaimed subject matter, or (iii) described a particular embodiment as important to the invention. CCS Fitness, 288 F.3d at 1366-67.

Third, if the specification makes clear that the claimed invention is narrower than the claim language might imply, it is entirely permissible and proper to limit the claims. Alloc, 342 F.3d at 1366 (citing SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc., 242 F.3d 1337, 1345 (Fed. Cir. 2001)).

Fourth, a claim term will not have its ordinary and accustomed meaning if the term "chosen by the patentee so deprives the claim of clarity." CCS Fitness, 288 F.3d at 1367. In such cases, the court must construe the claim term consistent with the meaning found in the intrinsic patent record. J.T. Eaton & Co. v. Atlantic Paste & Glue Co., 106 F.3d 1563, 1568 (Fed. Cir. 1997) (Because "[the disputed claim term] is a term with no previous meaning to those of ordinary skill in the prior art[,] its meaning, then, must be found [elsewhere] in the patent."); North American Vaccine, Inc. v. American Cyanamid Co., 7 F.3d 1571, 1576 (Fed. Cir. 1993) (using the specification for guidance "when the meaning of a claim term is in doubt.")

Lastly, when a term has more than one "ordinary" meaning, other claims (both asserted and non-asserted) often determine the scope of the patented invention. Vitronics, 90 F.3d at 1582 ("[W]e look to the words of the claims themselves, both asserted and non-asserted, to define the scope of the patented invention."); Specialty Composites v. Cabot Corp., 845 F.2d 981, 987 (Fed. Cir. 1988) ("The scope of a particular claim can often be determined on inspection of the other claims.").

In the end, a persuasive claim construction is one which defines terms in the context of the whole patent:

> Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim. The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction. A claim construction is persuasive, not because it follows a certain rule, but because it defines terms in the context of the whole patent.

Renishaw PLC v. Marposs Societa' per Azioni, 158 F.3d 1243, 1250 (Fed. Cir. 1998) (citations omitted).

## IV. CONSTRUCTION OF DISPUTED TERMS

Avery's proposed definition for the four disputed claim terms are set forth below.[3] In proposing constructions, Avery relies on the intrinsic record: the claims, specification, file history, prior art, and dictionary definitions. To the extent ambiguity remains after considering these sources, the Federal Circuit allows courts to examine extrinsic evidence, so long as the extrinsic evidence is not used to vary the meaning of the claim limitations. Bell Atlantic Network Services, Inc. v. Covad Comm. Group, Inc., 262 F.3d 1258, 1268-69 (Fed. Cir. 2001). Extrinsic evidence also can be used to assist a court in understanding the technology at issue. Pitney Bowes, 182 F.3d at 1309. To the extent extrinsic evidence is needed, Avery incorporates by reference the Expert Report of Dr. Anthony McHugh.

### A. Depressions: Hollow or Open Areas Below the Surface

In the context of claim 1, the ordinary and accustomed meaning of "depressions" applies. The ordinary meaning of the word "depressions" as used in claim 1 is reinforced by the language of claim 12. Furthermore, the patent specification repeatedly uses the word "depressions" consistent with its ordinary and accustomed meaning.

#### 1. The Ordinary and Accustomed Meaning of "Depressions" in Claim 1 Applies

Claim 1 uses the term "depressions" in the ordinary and accustomed sense—namely: ***hollow or open areas below the surface.*** "Depressions" is not a technical term; it is commonly used to describe an open hole, pit, or dimple that is lower than the surrounding surface. For example, the most relevant definition of "depression" from Webster's states: "a sunken or depressed area: hollow" Webster's II New Riverside Dictionary at 191 (1st ed. 1984) (Hadley Dec., Ex. 5.) Thus, in the context of the carrier web product recited in claim 1 (from which the term "depressions" must be construed) depressions must mean hollow or open areas below the surface of the carrier web. Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc., 334 F.3d 1294, 1299 (Fed. Cir. 2003) ("While certain terms may be at the center of the claim construction

debate, the context of the surrounding words of the claim also must be considered in determining the ordinary and customary meaning of those terms.").

### 2. Avery's Proposed Construction is Legally Correct Because Claim 12 of the '930 Patent Would be Nonsensical Otherwise

The language of claim 12 makes clear that the definition of "depressions" must be a hollow or open area below the surface which is capable of being filled. Claim 12 recites a method of using the web of claim 1, with the step of ***filling*** the multiple embossed patterns:

> 12. A method of using a web of claim 1 as a release liner for a pressure sensitive adhesive, comprising the step of filling the multiple embossed pattern with a pressure sensitive adhesive.

Col. 10, lns 40-45. In claim 1, the "multiple embossed pattern" includes both the pattern of "depressions" and the pattern of "lands and ridges." Since both patterns must be capable of undergoing the "filling step" recited in claim 12, the depressions ***must be open*** in the structure of the web recited in claim 1. Otherwise, claim 12 would be a nullity.

### 3. The Patent Specification Repeatedly Uses the Word "Depressions" in its Ordinary and Accustomed Sense

The patent specification confirms that the patentee intended to use the word "depressions" in its ordinary sense. The specification repeatedly uses the term "depressions" to describe open pits on the carrier web surface:

- ***"depressions*** created from the prior embossing patterns(s) are preserved during the subsequent embossing pattern(s) even though the subsequent embossing pattern(s) are superimposed on the depressions from the prior embossing pattern(s)." (Abstract.)
- "the advantage of multiple steps is that the ***depressions*** formed by the prior step(s) can be filled with material prior to the subsequent embossing step(s)." Col. 2, lns. 14-16.
- "Another feature of the multiple embossed webs is the ability to control the

---

[3] Appendix A to this Brief summarizes Avery's proposed claim construction proposals.

layered introduction of same or different materials into ***depressions*** of differing depths for later use or further manufacturing." Col. 3, lns. 13-15.

- "the percentage of thickness X to thickness T can range from about 1% to about 99%, meaning that the depth of ***depressions*** caused in surface 12 by pattern 14 can range from a minor fraction of thickness T to almost the entire original thickness T." Col. 4, lns. 21-26.
- "FIG. 2 shows how ***depressions*** formed in pattern 14 cover the entire surface 12 of web 10 and also reside in the larger ***depressions*** formed in pattern 16." Col. 4, lns. 33-36.
- In figure 3, "[p]attern 26 forms an array of ***depressions*** 29." Col. 5, lns 3-4.
- "***depressions*** 29 are discontinuous because separate projections on the tooling for forming pattern 26 do not intersect with one another..... The result of pattern 24 creates separated lands 27 from one another, and the result of pattern 26 creates separated ***depressions*** 29 from one another." Col. 5, lns. 29-33.
- "In other words, the ***depressions*** 29 can assume any solid geometric desired by those skilled in the art, within the percentage areas expressed above." Col. 6, lns 2-4.

For all these reasons, the meaning that Avery proposes for "depressions" should be adopted.

### B. Carrier Web: Sheeting Material That Carries Or Can Carry Another Material

Avery proposes that the term "carrier web" be construed to have its ordinary meaning. In the context of the '930 patented invention, the term "carrier web" is comprised of the words "carrier" and "web." Avery and 3M agree that a "web" in this case is "sheet material." Avery and 3M disagree as to the meaning of "carrier."

#### 1. Avery's Proposed Construction of "Carrier Web" is Consistent with the Ordinary Meaning of that Term

A carrier web is sheeting material that carries or can carry another material. Dictionaries define "carrier" as "one that carries." (Hadley Dec., Ex. 6.) Once a person or thing can no

longer carry, it is no longer a "carrier." For example, a mail carrier is someone who carries or is capable of carrying mail. After the mail carrier retires, he is no longer a mail carrier. The dictionary definition of "carrier" should control.

### 2. The Patent Specification Repeatedly Confirms This Intended Definition of Carrier Web

The "Field of Invention" section of the '930 patent states: "The invention relates to embossed webs useful as lines for pressure sensitive adhesives and other industrial applications." (Col. 1, lns. 3-7.) Thus, the sheeting material of the '930 patent carries or is capable of carrying pressure sensitive adhesives and other materials for industrial applications. According to the specification, the materials that a carrier web can carry range from graphic films to pressure sensitive adhesives, as well as "resins, polymers, particles, slurries, or dispersions." Col. 2, lns. 24-26. The specification makes clear that the patentee intended the term "carrier web" to mean "sheeting" material that carries or can carry another material.

### C. Ridges: An Elongated Crest or Raised Strip

Both Avery and 3M agree that the ordinary and accustomed definition of "ridges" should apply, but they disagree as to the proposed construction. Webster's Ninth New Collegiate Dictionary (9th ed. 1991) provides several definitions of "ridge" in different contexts, the most applicable of which include: "an elongate crest" and "a raised strip." (Hadley Dec., Ex. 7.) Using those definitions, Avery proposes that "ridges" mean an elongated crest or raised strip.

### D. Lands: The Area of the Carrier Web Between Ridges

The term "land" as used in the '930 patent has a specific meaning: the area of the carrier web between ridges. This definition is consistent with the use of the term in the specification and the illustrations provided in the figures. See figures 2 and 3; Col. 4 ln. 66 to col. 5, ln. 4 and col. 6, lns. 5-8.

## V. CONCLUSION

For the foregoing reasons, Avery respectfully asks this Court to construe the four disputed terms in the '930 patent in the manner suggested by Avery.

DATED: June 14, 2004

Respectfully submitted,

s/David P. Pearson
David P. Pearson, #84712
WINTHROP & WEINSTINE, P.A.
225 South Sixth Street, Suite 3500
Minneapolis, Minnesota 55402
(612) 347-0700 - Telephone
(612) 347-0600 - Facsimile

Of Counsel:

Roderick G. Dorman
Lawrence M. Hadley
HENNIGAN, BENNETT & DORMAN LLP
601 South Figueroa Street, Suite 3300
Los Angeles, California 90017
(213) 694-1200 - Telephone
(213) 694-1234 - Facsimile

Jay R. Campbell
RENNER OTTO BOISSELLE & SKLAR
1621 Euclid Avenue, 19th Floor
Cleveland, Ohio 44115
(216) 621-1113 - Telephone
(216) 621-1260 - Facsimile

406302\v2

# APPENDIX A

## SUMMARY OF AVERY'S PROPOSED CONSTRUCTIONS

| CLAIM TERM | AVERY'S PROPOSED CONSTRUCTION |
|---|---|
| Depression | Hollow or open areas below the surface. |
| Carrier Web | Sheeting material that carries or can carry another material. |
| Ridges | An elongated crest or raised strip. |
| Lands | The area of the carrier web between ridges. |