UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

3M INNOVATIVE PROPERTIES COMPANY and 3M COMPANY (formerly known as MINNESOTA MINING AND MANUFACTURING COMPANY),

Plaintiffs,

v.

AVERY DENNISON CORPORATION,

Defendant.

Civil Action No. 01-1781 JRT/FLN

**PLAINTIFFS' CLAIM CONSTRUCTION BRIEF**

Plaintiffs 3M Innovative Properties Company and 3M Company (formerly known as Minnesota Mining and Manufacturing Company) (collectively "3M") submit this brief in support of their proposed construction of certain terms in the claims of 3M's United States Patent No. 5,897,930 ("the '930 Patent"). 3M agrees with Defendant Avery Dennison Corporation ("Avery") that only a handful of remaining terms in Claim 1 of the '930 Patent require construction before trial, including "depression" and "carrier web." Moreover, to the extent any construction of the term "ridges" is required at all, 3M agrees with Avery's proposed claim construction of the term.

3M's agreement with Avery's claim construction position ends there. Avery advances new claim construction positions in an effort to raise new noninfringement arguments in the wake of the Federal Circuit's decision, but Avery's latest round of proposed constructions again violates well-settled claim construction law. For example, although Avery pays lip service to the "ordinary and customary meaning" of claim terms, Avery then proposes a construction of "depression" that reads out an entire embodiment in the patent, and a construction of "carrier

web" that puts an unnecessary temporal scope on the term. Avery's constructions are inconsistent with the teachings of the '930 Patent and Federal Circuit authority.

In contrast, 3M has supported each of its proposed constructions with explicit support from either the specification or the prosecution history of the '930 Patent or relevant dictionary definitions. 3M's proposed constructions are also consistent with Federal Circuit authority. As such, 3M respectfully requests that this Court adopt 3M's claim construction position in its entirety.

## BACKGROUND

Clyde Calhoun and David Koskenmaki, the inventors of the '930 Patent, invented a special type of carrier web (also called a "release liner") to protect pressure-sensitive adhesive on the backs of sheets of plastic film. The front of the plastic film typically is imprinted with advertising graphics, and the graphics film is applied to a surface, such as the side of a truck. The release liner is removed from the graphics film to expose the adhesive on the back of the film just before the film is applied to the surface.

The carrier webs described and claimed in the '930 Patent have a microstructured surface topography, referred to as a "multiple embossed pattern." In the preferred embodiment of the '930 Patent, the "multiple embossed pattern" consists of two superimposed patterns of differing depths. One of the patterns is an array of depressions spread over the surface of the release liner. The other pattern is "lands" and "ridges" that criss-cross through the pattern of depressions, as shown below in Figure 3 of the '930 Patent, to which labels have been added for clarity:




FIG.3

Through this invention, 3M provided commercial graphics installers with two features that they needed to ensure a fast, high-quality result: air bleed <u>and</u> positionability. 3M's commercial products with these two features are called "Controltac™ *Plus* Graphic Films with Comply Performance Adhesive Technology" ("the Comply™ products"). The Comply™ products are now 3M's flagship commercial graphics film.

The claim at issue for the purposes of this motion is Claim 1, which states as follows:

> 1. A *carrier web*, comprising:
> at least one surface that has a multiple embossed pattern having a first embossed pattern and a second embossed pattern, wherein the first embossed pattern forms an array of *depressions*, wherein the *depressions* of the first embossed pattern are in the second embossed pattern, wherein the second embossed pattern comprises *lands* and ridges between the *lands*, and wherein the height of the ridges over the *lands* ranges from about 3 to about 45 ?m.

'930 Patent, col. 9, lines 32-41 (Adkisson Decl., Ex. A) (remaining disputed terms italicized).[1]

As Avery correctly notes, the Federal Circuit ruled late last year that Claim 1 of the '930 Patent is not limited to the manner in which the "carrier web" is made and that Claim 1 "is not limited to a serial method of manufacture." *3M Innovative Properties Co. v. Avery Dennison Corp.*, 350 F.3d 1365, 1370 (Fed. Cir. 2003), *reh'g denied, reh'g en banc denied*, 2004 U.S. App. LEXIS 2004, *cert. denied*, 124 S. Ct. 2877 (2004).[2] In defining the term "embossed," the Federal Circuit also held that "the patent does not limit how the embossed pattern, as described in the specification, is created." *Id.* at 374.

The parties last met with the Court on April 21, 2004. At that conference, Avery's counsel identified certain terms that required construction, and the Court set the present hearing to discuss construction of those terms. At that same conference, the Court stated that this case would be set for trial after the parties conduct their final pretrial conference with Magistrate Judge Noel, which is scheduled for October 5, 2004.

## ARGUMENT

Federal Circuit authority regarding claim construction is well known to the Court and need not be belabored here. The Federal Circuit has instructed courts to construe the terms of a claim, if possible, based on the "intrinsic" patent record. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). The intrinsic record consists of the claims, the specification, and the prosecution history, including the prior art. *Id.*

[1] For example, Avery states in its Footnote 1 that "the parties agree" that Avery's accused EZ Film does not infringe Claims 6-12 of the '930 Patent. 3M has no knowledge of any such agreement. 3M has told Avery that, in an effort to streamline the issues put to the jury in this case, 3M will not assert Claims 6-12 against Avery in this lawsuit.

[2] Since the time Avery submitted its brief, the United States Supreme Court denied Avery's petition for a writ of certiorari in this case. (Adkisson Decl., Ex. B).

The intrinsic record in this case, supplemented with dictionary definitions where appropriate, is more than sufficient to construe the contested terms in Claim 1 of the '930 Patent. Thus, 3M disagrees with Avery's suggestion that this Court should consult non-dictionary "extrinsic evidence" in arriving at its claim construction, specifically the "Supplemental Expert Report" of Dr. Anthony McHugh. Where, as is the case here, the intrinsic record resolves any ambiguity about the appropriate construction of disputed claim terms, "consideration of extrinsic evidence is inappropriate." *Sunrace Roots Entertainment Co. v. SRAM Corp.*, 336 F.3d 1298, 1307 (Fed. Cir. 2003) (citation omitted). To the extent that this Court believes any extrinsic evidence is necessary at all, the dictionary definitions proferred by 3M and Avery are sufficient to inform the analysis. *Texas Digital Sys. v. Telegenix, Inc.*, 308 F.3d 1193, 1203 (Fed. Cir. 2002) (dictionaries and treatises are "unbiased reflections of common understanding not influenced by expert testimony or events subsequent to the fixing of the intrinsic record by the grant of the patent, not colored by the motives of the parties, and not inspired by litigation").

With that in mind, 3M will turn to the specific terms at issue in this motion – "depressions," "carrier web," "lands" and "ridges."

**Proposed Constructions**

**1. "Depressions"**

*3M's Definition*: A depressed or sunken place or part of the carrier web. As used in Claim 1 of the '930 Patent, the depressions can be either "filled" or "empty."

*Avery's Definition*: Hollow or open areas below the surface that must be empty.

3M agrees that the term "depression" should be construed in accordance with its ordinary meaning. In fact, 3M's definition is supported by the dictionary definition of the term "depression." *See Random House Webster's New Unabridged Dictionary* (using definition cited above) (Adkisson Decl., Ex. C); *Webster's Third New Int'l Dictionary* (defining depression as "a

place or part that is depressed.") (Adkisson Decl., Ex. D). The point of divergence between the parties is Avery's insistence that the term "depression" as used in Claim 1 refer to something other than a topography on the surface of a carrier web, and that it be limited to a depression that "must be open." Avery Br. at 12. The '930 Patent does not use the term "depression" so narrowly.

Although Avery claims it is advocating the "ordinary meaning" of the term "depressions," Avery's insistence on this Court adopting a construction requiring that the depressions be "empty" cuts squarely against ordinary meaning. For example, the bottom of a lake bed is a "depression" in the Earth's surface, whether that lake bed is filled with water or not. Likewise, a "depression" in the surface of the carrier web does not cease to be a depression just because it is filled. Yet under Avery's construction, the term "depression" would exclude any depression that is filled. Not only is this contrary to the ordinary meaning of the term "depression," but as explained below, it is contradicted by the description of "depressions" and embodiments of carrier webs with filled "depressions" in the specification of the '930 Patent.

### A. The '930 Patent Describes "Depressions" In The Carrier Web That Are Filled And That Are Empty.

The '930 Patent does not use the term "depression" in the cramped manner that Avery seeks. In fact, the '930 Patent makes clear that the "depressions" exist *in the carrier web*, and that those depressions can be either "filled" or "empty." In other words, the patent teaches that a depression in the carrier web does not cease to be a depression just because it is filled with another material.

**1. Carrier Web With "Depressions" That Are Empty**




There is no dispute that the term "depressions" encompasses open pits on the surface of the carrier web, as shown above. Although the specification states that the "depressions" can be filled with material, it also makes clear that "empty" depressions also meet the meaning of the term. *See, e.g.*, Col. 6, line 66 – Col. 7, line 2 (" . . . material *can be placed* in the depressions caused by the first pattern being formed before the second embossing pattern is applied.") (emphasis added); Example 1, Col. 7, lines 46-63 (disclosing an embodiment with "empty depressions").

Thus, the real dispute is whether the term "depressions" is limited to only this embodiment, or whether it also encompasses "depressions" in the carrier web's surface that are filled. As explained below, the specification of the '930 Patent is consistent with the ordinary meaning of the term, and makes clear that a depression in the surface of the liner does not cease to be a depression just because it is filled. Avery's proposed definition is not only at odds with the ordinary meaning of the term "depression," but it also contradicts express teachings and embodiments of the specification. Under Federal Circuit authority, Avery's proposed definition should be rejected.

**2. Carrier Web With "Depressions" That Are Filled**




The specification explicitly contemplates a carrier web with "depressions" in the carrier web's surface that are filled, as shown above. In fact, Example 2 of the '930 Patent specifically teaches an embodiment with filled "depressions" in the carrier web:

> A second embossed Controltac Plus liner *with its depressions filled* with a glass bead slurry was embossed a second time . . .

Col. 7, lines 66-67, Col. 8, line 1 (emphasis added). Additional passages from the specification also discuss "filled" depressions in the carrier web. See Col. 2, lines 31-33 ("In this embodiment, liquids such as soaps, lubricants, perfumes and abrasive slurries can fill one or more levels of the embossed depressions."); Col. 3, lines 12-15 ("Another feature of the multiple embossed webs is the ability to control the layered introduction of same or different materials into depressions of differing depths for later use or further manufacturing").

Recognizing that the patent specification must give meaning to the term "depressions" as used in Claim 1, Avery recites a number of passages from the specification that Avery asserts describe "open pits on the carrier web surface." Avery Br. at 12-13. Yet conveniently absent from Avery's brief are the passages from the specification that make it equally clear that the depressions in the carrier web surface can also be filled. And as this Court is undoubtedly aware, there is no Federal Circuit caselaw to support Avery's novel argument that Avery can pick and choose among the descriptions of depressions in the specification to define the term, using only those that describe "open" depressions and ignoring those that describe "filled" depressions.

Simply put, by requesting that this Court limit the term "depressions" to depressions that are "empty," Avery is asking this Court to adopt a claim construction that would read out the "filled depressions" described in Example 2 of the Patent. It is black-letter law that "a claim construction that excludes a preferred embodiment is "rarely, if ever correct." *Anchor Wall Systems, Inc. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1308 (Fed. Cir. 2003), *citing Vitronics Corp.*, 90 F.3d at 1582.

For example, in *Anchor Wall Systems*, the claim term at issue was "protrusion." 340 F.3d at 1308. The specification of the patent in suit described that a "protrusion" could take any kind of shape, including, but not limited to, a kidney shape, a dogbone shape and a circular shape. *Id.* In reversing the District Court (which held that the term "protrusion" should be limited to a protrusion with "a central narrow portion"), the Federal Circuit noted that the District Court's erroneous construction "excluded the circular protrusions disclosed in Figure 3A." *Id.* As the Court held, "varied use of a disputed term in the written description attests to the breadth of a term rather than providing a limited definition." *Id.*

Similarly, the '930 Patent describes "depressions" in the carrier web that are empty and that are filled. A proper construction of the term "depression," therefore, must encompass both.

**B. Avery's Argument Regarding Claim 12 Misses The Point.**

Avery's argument with respect to Claim 12 of the patent, which describes a method of "filling" the "multiple embossed pattern" of Claim 1 with a "pressure sensitive adhesive," is not at all in conflict with 3M's claim construction. As explained above, Claim 1 contemplates that the "depressions" in the carrier web can be filled or empty – it certainly does not *require* that those depressions be empty. If the depressions are empty, they can be filled, in accordance with

the method of Claim 12. Thus, the fact that Claim 12 discusses "filling" the multiple embossed pattern of Claim 1 does not in any way render Claim 1 a nullity as Avery suggests.

Moreover, Avery's argument ignores that Claim 12's reference to "filling the multiple embossed pattern" means *coating* the carrier web with a pressure sensitive adhesive. The carrier web can be coated whether or not the depressions are filled. This is demonstrated by the fact that the "multiple embossed pattern" that is filled includes the "second embossed pattern" of "lands and ridges between the lands." Yet Avery has not contended that either the "lands" or the "ridges" somehow must be empty so that they can be filled. As Avery knows full well, "filling" in the context of Claim 12 means "coating," and there is no reason why "lands" must be "empty lands" or "ridges" must be "empty ridges" in order to be coated. Likewise, there is no reason why "depressions" must be redefined to "empty depressions" in order to satisfy Claim 12.

Consistent with the ordinary meaning of the term "depression," and the usage of that term in the specification and claims of the '930 Patent, 3M requests that the term "depressions" not be redefined to mean only "empty depressions," as Avery suggests. As used in Claim 1 of the '930 Patent, "depressions" in the surface of the carrier web can be either filled or empty.

**2. "Carrier Web"**

*3M's Definition*: Generally planar material that carries, can carry or that has carried another material that is releasable from the web.

*Avery's Definition*: Sheeting material that carries or can carry another material.

3M and Avery generally agree that the term "carrier web" is a web that carries another material, such as pressure sensitive adhesive. The parties differ on two points: First, 3M believes that the term "carrier web" should be read to encompass a web which "carries, *has carried*, or is capable of carrying" another material, specifically material that is releasable from the web. Second, contrary to Avery's unsupported assertion that the parties agree on this point,

(Avery Br. at 13), 3M disagrees that the definition of "carrier web" should be limited to "sheeting material."

**A. The Term "Carrier Web" Should Not Be Limited To A Web That Is Currently Carrying Another Material.**

Avery attempts to import a temporal limitation on the term "carrier web" by arguing that, once the "carrier web" is stripped away from the film to which it attaches, it is no longer a "carrier web." This argument is at odds with the ordinary meaning of the term. For example, once ice cubes are taken out of an ice cube tray, it would be ridiculous to suggest that the remaining structure is no longer an "ice cube tray."[3]

The same can be said of the "carrier web" described in the '930 Patent. One purpose of the "carrier web" is to serve as a "transfer article" that carries pressure sensitive adhesive until the point that the graphics film is stripped away from the liner (at which point the adhesive is "transferred" to the film). But, just like the ice cube tray, the "carrier web" remains a "carrier web" even after the pressure sensitive adhesive has been stripped away. The specification is entirely consistent with 3M's proposed construction. For example, the specification states that the "carrier web" can operate "as a *transfer article* or as a final article of material." Col. 7, lines 26-37 (emphasis added).

The prosecution history also supports 3M's proposed construction. On October 20, 1997, Claim 1 of the '930 Patent was rejected as anticipated by an earlier patent (United States Patent No. 5,462,765) (Adkisson Decl., Ex. E). In that rejection, the Examiner stated that "(the earlier reference) teaches the flexible carrier web can serve as a permanent backing or a *disposable*

---

[3] Avery's "mail carrier" analogy on Page 14 of its brief does nothing to inform the proper construction of "carrier web." A more apt analogy would be the use of wallpaper. Avery could not credibly argue that wallpaper ceases to be wallpaper once it is stripped away from the wall. Similarly, the "carrier web" described in the '930 Patent does not cease to be a "carrier web" once it has been stripped away from the graphic film.

*release liner*." *Id.* at 4. While other language was changed in the '930 Patent subsequent to the Examiner's rejection, the phrase "carrier web" remained unchanged. (Adkisson Decl., Ex. F). As such, it is clear that the Examiner understood the phrase "carrier web" to encompass a "disposable" release liner, or one which "has carried" pressure sensitive adhesive.

**B. The Material Carried By The Web Is "Releasable" From The Web Itself.**

The '930 Patent makes clear that the "carrier web" is just that, meaning that the web carries material that can be released from the web itself. The specification notes that a number of items can be "introduced" into the carrier web itself:

> Once the number of same or different materials reside in the multiple embossed web, they can be removed from their multiple depth depressions for use or for further manufacturing or assembly.
>
> A wide variety of materials can benefit from being introduced into the embossed web. Nonlimiting examples of the materials include adhesives, resins, polymers, particles, slurries or dispersions.

Col. 2, lines 18-25. The '930 patent further discusses the types of articles that can be introduced into the carrier web, including "liquids such as soaps, lubricants, perfumes and abrasive slurries" that "can fill one or more levels of the embossed depressions." Col. 2, lines 31-33.

As such, Plaintiffs' definition takes into account the fact that the material introduced into the "carrier web" itself can be released from the carrier web. By defining "carrier web" as "generally planar material that carries, can carry or that has carried another material that it releasable from the web," this Court gives the intended meaning to the claim term.

**C. The Term "Carrier Web" Should Not Be Limited To "Sheeting Material."**

Like Avery's proposed definition of "depressions," Avery's position that the term "carrier web" be limited to "sheeting material" is far too narrow. By limiting the term "carrier web" to "sheeting material," Avery is again inviting this Court to read out full embodiments

described in the specification of the '930 Patent. Specifically, the '930 Patent discusses that the "carrier web" can take many forms. (*See, e.g.*, Col. 2, lines 50-55). For example, the patent specifically notes that "[w]hile the most common multiple embossing of a carrier web is a double embossed web used as a release liner for pressure sensitive adhesives, the invention is not limited to merely double embossing." The specification goes on to give additional examples of "carrier webs" that would not include "sheeting material." (Col. 2, line 40-55). Cleary, Avery's "sheeting material" limitation would not encompass all of the different types of "carrier webs" described by the inventors.

A "sheeting material" is one form of a "carrier web," but Avery has pointed to nothing in the specification or the prosecution history that would limit the term "carrier web" only to sheeting. Because "neither the plain text of the claims, the specification, nor the file wrapper justifies the imposition of this negative limitation," *Omega Eng'g v. Raytek Corp.*, 334 F.3d 1314, 1333 (Fed. Cir. 2003), Avery's belated request to impose a "sheeting" limitation on the term "carrier web" should be rejected.

**3. "Lands"**

*3M's Definition*: Relatively planar, lower regions on the surface of the carrier web between the ridges.

*Avery's Definition*: The region of the carrier web between the ridges.

While Avery contends that its proposed definition of "lands" is consistent with the use of the term in the specification, the specification provides much more guidance than does Avery's definition.[4] 3M's definition emphasizes that lands are "relatively planar, lower" regions of the

---

[4] Avery has not contended in this litigation that its accused EZ Film Products do not contain "lands" or "ridges," and its noninfringement expert did not address the terms at all in his expert report. As such, 3M believes that construction of these two terms is unnecessary for resolution of this case. Nonetheless, 3M will proceed with its proposed construction of both claim terms out of an abundance of caution.

carrier web located between the ridges. This definition is in accordance with the specification's description of what "lands" are in the context of the '930 Patent:

> A careful viewing of Figure 3 shows pattern 24 comprising *both relatively planar lands 27, i.e., large squares that have been depressed from the initial surface 22 of liner 20* and a series of ridges 28 formed from the material moved from the lands 27 during the embossing process.

Col. 4, lines 66-67, Col. 5, lines 1-4. As such, 3M's definition takes the specification's description of "lands" into account, whereas Avery's definition does not. *See Renishaw PLC v. Marposs Societa Per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998) ("a claim must be read in view of the specification, of which it is a part").

Additionally, Avery's definition – "the region of the carrier web between the ridges" – assumes that any type of formation could satisfy the "lands" limitation, so long as that region is "between the ridges." The specification makes clear that the lands in the '930 are meaningful structures (in that they impart the flat, adhesive surface to the film) and are "substantially planar." As such, the description of "lands" in Column 4 of the '919 Patent should be reflected in the Court's definition of the term.

**4. "Ridges"**

To the extent the term "ridges" needs to be construed at all (See Footnote 4, *infra*), 3M does not disagree with Avery's definition of "ridges" as an "elongated crest or raised strip." As such, 3M respectfully requests that the Court adopt Avery's proposed definition of the claim term.

## CONCLUSION

For the reasons set forth herein, 3M respectfully asks this Court to construe the four disputed terms in the '930 Patent in the manner suggested by 3M.

Dated: August 10, 2004

FISH & RICHARDSON P.C., P.A.

By: **/s/ John C. Adkisson**

Jonathan E. Singer (#283459)
John C. Adkisson (#266358)
Katherine A. Moerke (#312277)
FISH & RICHARDSON P.C., P.A.
3300 Dain Rauscher Plaza
60 South Sixth Street
Minneapolis, MN 55402
Tel: (612) 335-5070
Fax: (612) 288-9696

Juanita R. Brooks (Admitted Pro Hac Vice)
FISH & RICHARDSON P.C.
12390 El Camino Real
San Diego, CA 92130-2081
Tel: (858) 678-5070
Fax: (858) 678-5099

Kevin H. Rhodes
3M Innovative Property Company
3M Center
P.O. Box 33427
St. Paul, MN 55133

Attorneys for Plaintiffs
3M INNOVATIVE PROPERTIES COMPANY
and MINNESOTA MINING AND
MANUFACTURING COMPANY

# APPENDIX A

## SUMMARY OF 3M'S PROPOSED CONSTRUCTIONS

| CLAIM TERM | 3M'S PROPOSED CONSTRUCTION |
|---|---|
| Depressions | A depressed or sunken place or part of the carrier web. As used in Claim 1 of the '930 Patent, the depressions can be either "filled" or "empty." |
| Carrier Web | Generally planar material that carries, can carry or that has carried another material that is releasable from the web. |
| Lands | Relatively planar, lower regions of the surface of the carrier web between the ridges. |
| Ridges | An elongated crest or raised strip. |

60226215.doc