# EXHIBIT E

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| 3M INNOVATIVE PROPERTIES COMPANY and MINNESOTA MINING AND MANUFACTURING COMPANY, Plaintiffs, | Civil Action No. 01-CV-1781 (DSD/FLN) |
| vs. | |
| AVERY DENNISON CORPORATION, Defendant. | |

**SUPPLEMENTAL AND REVISED REBUTTAL EXPERT REPORT OF -DR. ANTHONY J. McHUGH REGARDING NON-INFRINGEMENT OF U.S. PATENT NO. 5,897,930**

**CONTAINS CONFIDENTIAL INFORMATION SUBJECT TO JOINT STIPULATED PROTECTIVE ORDER**

## ~~VI.~~I. INTRODUCTION

My name is Anthony J. McHugh and I am ~~58~~ 60 years old. I live in Coopersburg, Pennsylvania~~Urbana, Illinois~~. I have been retained by the law firm of Hennigan, Bennett & Dorman on behalf of Avery Dennison Corporation ("Avery") as a technical expert in this litigation. I submit this rebuttal expert report under the requirements of Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure as a statement of rebuttal opinions that I have thus far formed and intend to give in this litigation regarding whether the United States Patent No. 5,987,930 (henceforth "the '930 patent") is infringed in response to the infringement-related opinions of 3M's experts, Dr. Strong, Mr. Gerald Mossinghoff and Mr. Jeffrey Payne.

I formed the rebuttal opinions that I express here based on my consideration and review of a variety of information and documents, which I will detail below, as well as my professional experience and training. As other information, documents or testimony are brought to my attention, it may become necessary that I supplement my report. ~~I understand that the co-inventor of the '930 patent, Dr. Calhoun, was deposed on June 6, 2002. Depending on my examination of Dr. Calhoun's deposition testimony and any other information that I consider after submission of this rebuttal expert report,~~ I reserve the right to supplement or amend my rebuttal opinions (and the bases for those opinions) and I also reserve the right to form additional opinions on the issue of infringement.

## ~~VII.~~II. QUALIFICATIONS AND PROFESSIONAL EXPERIENCE

I am presently the P. C. Rossin Senior Professor and Chair of the Department of Chemical Engineering at Lehigh University. At the time I provided my original report in this matter, I was the James W. Westwater Professor of Chemical Engineering at the University of Illinois at Urbana-Champaign where I had~~have~~ been since 1979. My area of research specialty is polymer materials science and engineering and I have authored or co-authored over 150 publications in this area. I have attached my Curriculum Vitae at Exhibit 1 to this report, detailing my academic and professional experience, all publications that I have authored or co-

authored, technical paper presentations, invited seminars, a complete breakdown of current and past areas of research expertise and research contracts as well as a listing of my past consulting engagements in my areas of expertise. Exhibit I does not reflect my move to Lehigh University, and I will provide an updated curriculum vitae upon request. In addition to the qualifications listed in my attached curriculum vitae, I also have experiences in the following relevant areas of polymer processing and characterization:

a. I have taught courses in polymer materials chemistry, rheology, and processing at both the undergraduate and graduate level at the University of Illinois for 23 years, and, before that, for 7 ½ years at Lehigh University. I have directed over 75 M.S. and Ph.D thesis studies in the general areas of polymer science and engineering and, in a large number of cases, on problems involving the behavior of polyethylene (PE) solutions, melts, and blends. My own M.S. and Ph.D studies involved the characterization of PE crystallization and structure formation in solutions and melts. Among my more than 150 technical publications are numerous papers dealing with polyethylene (PE). I have also served as Technical Program Chair and Symposium Chair for numerous Society of Rheology and American Institute of Chemical Engineers national meetings in the areas of polymer materials, polymer rheology, and polymer processing.

b. I have been a recipient of the prestigious U.S. Senior Scientist Award of the Alexander von Humboldt Foundation in recognition for my many contributions to the fields of polymer science and engineering, and, in particular for my work on the crystallization and processing behavior of PE.

c. I have worked as a consultant with a wide range of companies on problems associated with PE processing. I continue to present seminars as an invited

speaker (and plenary lecturer) at industrial, academic, national and international conferences on various aspects of polymer rheology and processing.

d. I am familiar with Scanning (SEM) and Transmission (TEM) Electron Microscopy and have published numerous papers in which these techniques have been an integral part of the characterization of the polymer systems (including PE) with which I and my students have been working. I am also familiar with, and experienced in the use of a wide range of PE characterization tools, including Differential Scanning Calorimetry (DSC) and Atomic Force Microscopy (AFM). The latter technique is used for characterization of film surfaces and surface roughness. Among my publications are numerous papers in which these techniques have been used. Moreover, in my research activities, I have either directly used or have been exposed to the use of and analysis of nearly every major polymer characterization tool, including chromatography, rheological and rheo-optical analysis, NMR (nuclear magnetic resonance) spectroscopy, crystal morphology and structure analysis (including X-ray diffraction, electron and optical microscopy), as well as a variety of other optical and physical characterization techniques. I also have extensive experience and publications in the areas of polymer extrusion and film casting operations.

I have not testified (by deposition or at trial) as an expert in any litigation other than this case in the preceding four years.

## ~~VIII.~~III. COMPENSATION

I have been retained by Avery's counsel for purposes of consultation regarding technical issues, as well as to review and analyze the prior art, the '930 patent and its prosecution history and other evidence, to form rebuttal opinions about whether the '930 patent is infringed by Avery's EZ Film products or process, to prepare this rebuttal expert report and to be available to

testify in this litigation. I am being paid for my work at my standard consulting fee of $250 per hour with reimbursement of actual expenses. My billing rate will be $500 per hour for time spent on giving deposition or trial testimony. No part of my compensation depends on the outcome of this litigation.

## ~~IX.~~IV. MATERIALS REVIEWED

In preparing this rebuttal report, I have reviewed a variety of materials, including: (1) U.S. Patent No. 5,897,930 (the '930 patent), (2) the file history for the '930 patent, including prior art cited therein, and also prior art references not cited during prosecution, (3) 3M's claim construction contentions served in this case, (4) the expert reports of Brent Strong, Jeffrey Payne, and Gerald Mossinghoff, including their exhibits, (5) the Court's February 15, 2002 Order denying 3M's preliminary injunction request, (6) the parties' interrogatory responses and the parties' contentions concerning infringement, (7) the videotapes and transcripts of the depositions (including exhibits) of the following individuals: Mr. Charles Calisto (3M), Mr. Peter Payne (Omnova), Mr. Danny L. Fleming (3M – Nevada), Mr. Michael Hannington (Avery), Mr. Mark Timmerman (Trinity), Mr. W. Douglas Lilac (formerly with Avery), and Mr. Frank T. Sher (3M), (8) documents produced by 3M during discovery as well as those produced for the 3M-Nevada inspection and deposition, (9) the Court's October 19, 2002 Order granting Avery Summary Judgment, and (10) the Federal Circuit's December 2, 2003 Opinion. In addition, I have examined samples of the liner for Avery's EZ Film products taken during 3M's deposition and inspection of the manufacturing process at Omnova. Finally, I have visited the Omnova facility and observed the embedding/embossing process for the liner in Avery's EZ Film product under various operating conditions and have examined samples taken during my visit.

I have provided a partial list of the materials that I have reviewed at Exhibit 2. In forming my rebuttal opinions, I have also relied upon my experience and knowledge as well as on well-established engineering and materials science principles and technical knowledge in existence before December 1996.

## ~~X.~~V. CAPSULE SUMMARY OF PRESENTLY-HELD REBUTTAL OPINIONS CONCERNING NON-INFRINGEMENT

I am advised that the first step in an infringement analysis is the interpretation of patent claims. I have provided a chart summary of my opinions concerning the meaning of the '930 patent claim terms, and the definitions that I will apply for certain claim terms, at Exhibit 3. The chart has been revised to reflect new claim constructions provided by the Federal Circuit and to eliminate constructions involving claims 6-12, which I understand are no longer at issue in this case.

I have analyzed the '930 patent's claims, specification and prosecution history, including prior art cited therein, and also prior art references not cited during prosecution. I have also examined the samples of the liner in Avery's EZ Film product. Based on the foregoing and the legal principles that I have been advised to be applicable, it is my opinion that the liner in the Avery EZ Film products and the process for embossing that liner do not infringe ~~any~~ claims 1-5 of the '930 patent, literally or under the doctrine of equivalents.

I have considered 3M's positions concerning the meaning of the '930 patent claim terms, which are set forth in a document entitled "Plaintiffs' Claim and Infringement Contentions," dated March 29, 2002, and also in the expert reports of Dr. Strong and Mr. Mossinghoff. Based on my analysis of the '930 patent claims, its specification and prosecution history, it is my opinion that 3M's contentions as to the meaning of "multiple embossed pattern," "embossing" and "embossed pattern form[ing] an array of depressions" are not supported by the specification. However, I understand that, based on the decision by the Federal Circuit, the parties have agreed to use the definitions of "embossed" and "multiple embossed" provided in the patent specification. Accordingly, my opinions will reflect those definitions.

## ~~XI.~~VI. DETAILED REBUTTAL OPINIONS AND THEIR BASES

I was advised by counsel of the legal principles to follow in forming my opinions regarding whether any claim of the '930 patent is infringed. In the first step in my analysis, I ascertained the meaning and scope of the claims. Then, once I interpreted each claim, I

compared the claims to the accused Avery product and process. The interpretation step is presented below in Section VI.A and the infringement analysis is presented in Section VI.B.

**~~B.~~A. Opinions Regarding The Meaning of '930 Patent Claim Terms**

The '930 patent is entitled "multiple embossed web." The application that resulted in the '930 patent was filed on December 31, 1996. Since I have construed the claims in light of the intrinsic patent documents (*i.e.*, the specification and the file history) the following briefly discusses the background of the '930 patent.[1]

**1. Commercial Graphics Film Technology**

The invention of the '930 patent relates generally to "embossed webs useful as release liners for pressure-sensitive adhesives and other industrial applications," (the '930 patent, col. 1, lns. 4-6), such as in the commercial graphics industry.

Generally speaking, the commercial graphics industry caters to the graphics needs associated with advertising logos and signage products. A significant application for commercial graphics material is trucks. There, instead of painting logos or other signage directly on the surfaces of the truck, the desired logo or signage is printed onto one surface of a sheet of film that in turn has a pressure-sensitive adhesive coated on its back surface, and which would then be placed on the truck surfaces (or other substrates) as desired. A simplified cross-sectional depiction of a graphic film material illustrating its essential components is shown below:




[1] Earlier this year, Judge Doty, the judge presiding over this case, issued an order denying 3M's motion for a preliminary injunction. In that Order, the Judge set forth a concise summary of the technological background. I agree with the Judge's summary and incorporate it by reference in my rebuttal report.

**Typical Commercial Graphics Film (Cross-Sectional View)**

The film typically comes in large rolls and includes a release liner adhered to the film's back surface in order to hold or carry the pressure-sensitive adhesive ("PSA"). When the release liner is stripped off, it no longer holds or carries the PSA. The PSA instead remains adhered to the back surface of the film. The film, now released from the liner, has its PSA-backed surface exposed, and may be placed on the truck surface (or other substrate surface).

The use of an embossed web as a carrier for a PSA and backing for graphic film was well-known in the prior art before the December 31, 1996 filing date of the '930 patent. A commonly encountered problem in affixing graphics film to the substrate is that of entrapped air between the film and substrate. The prior art describes a solution to overcome this problem by employing a release liner, having a topography that is created by an embossing tool, to carry the PSA. When the embossed release liner is peeled off, the exposed surface of the PSA is left with a topography that is imparted by the embossing pattern of the release liner. This topography can provide a pathway in the adhesive for air egress when the film is applied onto a substrate surface. (For example, see JP 59-78285 and JP 2587198).

A related common problem in the graphics film application area is that of repositionability. Aggressive adherence of the film to the substrate by the adhesive prevents easy removal and reapplication of the film, either to remove entrapped air, or to reposition the film to a more desirable position. Multiple attempts to adhere the same film to the substrate can compromise the pressure sensitive adhesive or increase the probability of an uneven or misaligned film on the substrate. The prior art solves this problem by employing release liners (to carry the PSA) whose topography creates protrusions on the surface of the later-exposed PSA surface. (For example, see U.S.P.N. 5,141,790, the references cited and discussed in U.S.P.N. 5,650,215, and those cited in the '930 patent). In some cases the protrusions are made by embossing a liner and filling the depressions with small particles, which transfer to the adhesive when the liner is removed from an attached film. (For example, see U.S.P.N. 5,141,790, U.S.P.N. 5,296,277, and U.S.P.N. 5,362,516). The object of these prior art solutions is to

facilitate repositioning by limiting the initial contact area between the PSA-backed film and the substrate. Once properly positioned, the film can then be pressed firmly against the substrate to obtain final adhesion.

### 2. The '930 Patent: Multiple~~, Sequentially~~ Embossed Carrier Webs

The '930 patent describes graphic film liners that have two embossed patterns of depressions. According to the preferred embodiment, t~~T~~he embossed patterns are made in a sequential process, one after the other. Figure 1 is a cross-section illustration of the depressions (14) made according to a first embossing step [on a web by the first embossment]:




FIG. 1

After the first embossing step, a material such as glass beads is placed into the embossed holes. Then the carrier web is embossed a second time with a different tool that makes a larger, interconnected, diamond-shaped pattern. ('930 patent, col. 4, ln. 61 - col. 5, ln. 12; col. 6, ln. 64 - col. 7, ln. 3). This diamond-shaped pattern forms "lands" (the depressed area of the web) and "ridges" on the web surface. Figure 2 of the '930 patent is a cross section illustration of the web with the two sequentially embossed patterns:




FIG. 2

The abstract of the '930 patent summarizes the invention:

> A carrier web having at least one surface that is *multiple, sequentially embossed*, wherein depressions created from the *prior embossing* pattern(s) are preserved during the *subsequent embossing* pattern(s) even though the *subsequent embossing pattern(s)* are superimposed on the depressions from the *prior embossing* pattern(s). The patterns of *embossing* can be Euclidean or fractal created from *machine tools* produced by using microreplication and other techniques. The carrier webs are useful for release liners for pressure-sensitive adhesives and other industrial applications. (Emphasis added).

The '930 patent emphasizes the advantage of webs having multiple "sequential" embossings: "the advantage of multiple steps is that the depressions formed by the prior step(s) can be filled with material prior to the subsequent embossing step(s)." (col. 2, lns. 13-15). Figure 3 of the '930 patent (shown below) is a photograph of the surface of a carrier web with the two sequentially embossed patterns:




FIG.3

Liner surface (22)

The '930 patent's specification notes the following nomencl ... ove:

Lands (27)

| Number Refe[r]... | Description |
|---|---|
| 20 | "liner" (or carrier web). |
| 22 | "liner surface" (that is embossed). |
| 24 | "one pattern of interconnected embossings comprising lands (27), *i.e.*, large squares that have been depressed from the initial surface **22** of liner **20** and ridges **28** formed from the material moved from the lands **27** during the embossing process." |
| | "a second pattern of embossings forming an array of depressions **29**. ***Between the time for making the two embossing patterns***, a desired material can be introduced into the second embossing pattern **26** such as glass beads." |

Ridges (28)

Embossed pattern of depressions (26 and 29)

Pattern of interconnected embossings comprising lands and ridges (24)

(col. 4, ln. 61 to col. 5, ln. 12).

As emphasized in the '930 patent, "The manufacturing of the double embossed liner **20** actually requires the formation of the smaller embossing pattern **26** first, followed by the formation of the larger embossing pattern **24**, second. Between the time of making the two embossing patterns, a desired material can be introduced into second embossing pattern **26**, such as glass beads ..." (col. 5, lns. 6-12).

### 3. The Claims of the '930 Patent

The '930 patent has twelve claims, of which two are independent: claim 1 and claim 6. According to the most recent decision of the Federal Circuit, product claim 1 does not require that the embossed patterns be made sequentially, whereas method ~~Claim 1 covers a carrier web having a multiple, sequentially embossed pattern, and~~ claim 6 covers a multiple, sequential method of embossing a carrier web.

Independent claim 1 reads:

> 1. A carrier web **(20)**, comprising:
> at least one surface **(22)** that has a ***multiple embossed pattern*** having a ***first embossed pattern*(26)** and a ***second embossed pattern* (24)**,
> wherein ***the first embossed pattern forms an array of depressions*** **(29)**,
> wherein the depressions **(29)** of the first embossed pattern are in the second embossed pattern **(24)**,

> wherein the second embossed pattern (24) comprises lands (27) and ridges (28) between the lands, and
> wherein the height of the ridges over lands ranges from about 3 to about 45 μm.

Independent claim 6 reads:

> 6. A method of *embossing*, comprising the steps of:
> (a) *embossing a* carrier web (20) *having* at least one surface (22) with a first pattern (26) *to create a first pattern of depressions* (29);
> (b) *embossing* the surface with a second pattern (24), *to create a second pattern of depressions* (24) comprising lands (27) and ridges (28);
> wherein the depressions (29) created from the first embossing step are substantially preserved during the second embossing step even though the second embossing step superimposes the second pattern (24) on the depressions (29) created by the first embossing step, and
> wherein the height of ridges over the lands ranges from about 3 to about 45 μm.

For ease of reference, I have italicized certain claim language that I have been told the parties contest. I have also added reference numerals, used in the patent's figures and specification, in the claims. Dependent claims 2-5 and 12 derive from claim 1, and dependent claims 7-11 derive from claim 6. Claims 1-5~~12~~ are all reproduced at Tab 3. I understand that 3M no longer contends that Avery's EZ Film product infringes claims 6-12.

### ~~3.~~4. Analysis of '930 Claim Language and Meaning

Exhibit 3 contains a chart summarizing my opinions regarding the meaning of the claims. I understand from counsel and from my review of the parties' preliminary injunction papers, that at least the following claim terms are in dispute:

- "multiple embossed pattern"
- "embossed pattern form[ing] an array of depressions"
- "carrier web"

#### (i) "Multiple Embossed Pattern"

I have reviewed the District Court's February 15, 2002 written Order (attached at Exhibit 4). In that Order, the Court found that the term "multiple embossed pattern" means "sequentially embossed patterns." I agree with the court's definition for the following reasons. First, Judge

Doty accurately described how the term "multiple embossed pattern" is used in the intrinsic patent documents:

> While the language of the claim does not mention the word "sequential," it nevertheless illustrates that the term "multiple embossed pattern" requires sequential embossments. In particular, the claim provides for "[a] web carrier, comprising:
>
> at least one surface that has a multiple embossed pattern having a first embossed pattern and a second embossed pattern. . . ."
>
> (. . . col. 9, lns. 33-36.) The fact that the language of claim 1 expressly refers to two separately-created embossed patterns as "a **first** embossed pattern" and a "**second** embossed pattern" clearly establishes from the language of the claim alone that the term "multiple embossed pattern" requires multiple embossments which are applied one after the other. (Id. (emphasis added).)
>
> Moreover, even if the claim's language is ambiguous, which it is not, the patent specification makes absolutely clear that the term "multiple embossed pattern" means sequential embossments.
>
> * * *
>
> The specification defines the term "multiple embossed:"
>
> "Multiple embossed" means two or more embossing patterns that are superimposed on the web to create a complex pattern of differing depths of embossing.
>
> (. . . col. 2, lns. 1-3.) . . . . The definition specifically requires two or more embossing patterns. . . . In fact, the language of the sentence in the specification immediately following the definition of the term "multiple embossed pattern" provides: "Another aspect of the present invention is a carrier web having at least one surface that is multiple, **sequentially** embossed, wherein depressions created from the prior embossing pattern(s) are substantially preserved during the **subsequent** embossing pattern(s) . . ." Id. (emphasis added). Other language in the specification further emphasizes that the term "multiple embossed pattern" in claim 1 means sequential embossing steps. . . .

(Judge Doty's February 15, 2002 Order, at pages 10-11 and 12-13, attached at Exhibit 4) (emphasis in original). *See also* Avery's Amended Claim Construction Contentions, Exhibit 5, incorporated herein by reference.

Second, I concur with the Judge's characterization that claim 1 is a product-by-process claim because the language of claim 1 defines the invention, in part, by the way the carrier web

is embossed, *i.e.*, it is multiple, sequentially embossed. This provides additional support for my opinions concerning the meaning of "multiple embossed pattern."

Finally, as explained in the Court's Order, the file history supports the Court's definition. During prosecution, the term "sequential" was removed from claim 1 to overcome a vagueness rejection. In comments accompanying the Amendment, the applicants made clear that they were simply clarifying the language of claim 1, and that the claim still required sequential embossments when the second pattern is superimposed over the first pattern. At no time did the applicants suggest that they intended to broaden the claim. John Hornickel, the lawyer that drafted the Amendment, confirmed in his deposition that the Amendments were designed only to overcome the examiner's vagueness rejection.

However, I have been informed (and have read) that the Federal Circuit determined that the term "multiple embossed pattern," as used in Claim 1, does not contain a requirement that the patterns be made in sequence. Accordingly, for purposes of the opinions set forth in this report as to whether Avery's accused EZ Film contains the limitations in Claim 1, I will read that phrase more broadly to encompass single embossed patterns—i.e., embossed patterns made at the same time. I further understand that the Federal Circuit determined that the definition of "multiple embossed" contained in the patent specification at column 2, lines 1-4 govern the meaning of that term in Claim 1. Thus, for purposes of the opinions set forth in this report as to whether Avery's accused EZ Film contains the limitations in Claim 1, I will read "multiple embossed" in Claim 1 to mean as follows: "Two or more embossing patterns are superimposed on the web to create a complex pattern of differing depths of embossing."

**(ii) "Embossed Pattern Form[ing] an Array of Depressions"**

The Court in its February 15, 2002 Order concluded that the meaning of the term "*embossed*" is a "topography created on material by impressing a corresponding inverse topography on its surface." (Judge Doty's Order, at page 16). I agree with this definition. As the Court noted, this definition is consistent with accepted technical dictionary definitions, and also is admitted to by the deposition testimony of Mr. Calisto of 3M. (Order, at page 16). I have

also reviewed the recent deposition testimony of Mr. Frank Sher and Mr. Dan Fleming of 3M. In my opinion, the testimony of both Mr. Sher and Mr. Fleming indicate that their understanding of the meaning of an "embossed" pattern is consistent with the definition that the Court has adopted.

Nevertheless, I believe that recent positions taken by 3M in its infringement contentions and the expert report of Dr. Strong necessitate the addition of clarifying language to the above definition. I understand that 3M has now taken the position that the ink dots flexographically printed on the Avery liner which are hardened through UV exposure constitute an embossing tool and that the Avery liner with the embedded ink dots has an embossed pattern corresponding to those ink dots. I disagree with 3M's position as inconsistent with the Court's definition. In view of 3M's new positions, I believe the following additional language is required to clarify what meaning a person of ordinary skill would give to the term "*embossed*": Specifically, an embossed pattern requires the use of tooling. Use of an embossing tool to create an embossed pattern requires the impressing of the tool into the material and the removal of the tool from the material.

The '930 patent, specification and the recent deposition testimony of Messrs. Sher and Fleming, in my opinion, support the further clarifying language concerning the meaning of an "embossed" pattern. (See, for example, deposition of Sher at pages 18-19 and Deposition of Fleming at pages 26-34.) The '930 patent specification, for example, states:

- Abstract: "The patterns of embossing can be Euclidean or fractal ***created from machine tools***...."
- Col. 5, lns. 25-30: "For example, in Fig. 3, lands 27 are discontinuous, because separate ***projections on the tooling for forming pattern 24*** do not intersect with one another. Likewise, depressions 29 are discontinuous because separate ***projections on the tooling for forming pattern 26*** do not intersect with one another."
- ·Col. 5, lns. 36-42: "In other words, ***the topography of the tool(s) is an obverse image of the final topography*** of the microreplicated adhesive, with the liner 20 serving as the inverse image for transferring the image of the tool(s) to the microreplicated adhesive. Therefore, the topography(ies) of the ***embossing tool(s)*** for liner 20 is essentially the topography of the microreplicated adhesive."

- Col. 6, lns. 16-19: "Because the embossing of pattern 26 occurs before the embossing of pattern 24, the depths identified here are the cumulative effect of both embossings, not necessarily the ***height of the embossing tool.***"

- Col. 6, lns. 48-51: "Precision of topographical formation of web 10 or 20 can be achieved using a variety of machining techniques. The ***machine tool industry is capable of creating tools with any pattern desired by those skilled in the art.***"

- Col. 6, lns. 56-58: "***Tools can range from planar presses to cylindrical drums*** to other curvilinear shapes, depending on how it is desired to employ the embossing steps."

- Col. 6, lns. 59-63: "Nonlimiting examples of ***sources of tooling include*** commercial sources of photolithographic printing plates and cylinders, precision engraved plates and cylinders, laser machined plates and cylinders, and the like."

Thus, in my opinion, the Court's construction of the term "embossed" should be clarified to mean "a topography created on material by impressing a tool having a corresponding inverse topography on its surface, and removing the tool from the material." I also note that the deposition testimony of Mr. Mark Timmerman is corroborative of my proposed clarification. (For example see pages 251-260 and 292-295 of the Deposition of Timmerman.).

I have been informed that, following the Federal Circuit's decision, the parties agree that the definition of "embossed" contained in the patent specification at column 1, lines 61-64 govern the meaning of that term in Claim 1, and that Claim 1 is "structural." Thus, for purposes of the opinions set forth in this report as to whether Avery's accused EZ Film contains the limitations in Claim 1, I will read "embossed" in Claim 1 to mean as follows: "a topography on a web or tooling having an effective three-dimensional pattern that generates a difference in surface planar dimension in the liner or the tooling."

"*Pattern*," means: A consistent characteristic form, or systematic arrangement and design. (The American Heritage College Dictionary, p. 1003 (3d ed. 2000); Roget's II, The New Thesaurus, p. 673 (1980)). A "*pattern*" in the '930 context implies a geometric form or configuration that is repeatable, repeated or duplicated. This conforms with the definition provided in the specification: "Pattern means any formation of embossings that can utilize any theory of geometry, including without limitation, Euclidian geometry and fractal geometry."

(col. 1, lns. 65-67). Thus, the definition of pattern provided in the specification is consistent with the ordinary and accustomed meaning. As used in the '930 patent, "*pattern*" refers to both the repeated geometric form of each depression and the arrangement of identical geometric forms across a surface.

The meaning of "*array*," according to its ordinary and accustomed meaning: An orderly arrangement. (The American Heritage College Dictionary, pp. 75-76 (3d ed. 2000)). As used in the '930 patent, it refers to the arrangement of the embossed pattern across the surface of a material. (*See* col. 5, lns. 3-4 ("Pattern **26** forms an array of depressions **29**."); col. 9, lns. 1-5 ("The pressure sensitive adhesive had . . . a uniform array of 8-12 micron high protruding mounds of glass beads corresponding to the pits on the liner.")).

A "depression" is an empty area that is sunk blow its surroundings; a hollow. (The American Heritage College Dictionary, p. 374 (3d ed. 2000)). As used in the '930 patent, a depression is capable of being filled with a material. (*See* claim 7 ("The method of claim 6, further comprising the step of ***filling depressions*** created by the first embossing step...."); col. 2, lns. 13-15 ("the ***depressions*** formed by the prior step(s) ***can be filled*** with material prior to the subsequent embossing step(s)"); col. 6, ln. 66 - col. 7, ln. 2 ("Because the multiple embossings of the web occur sequentially, material can be placed in the depressions caused by the first pattern being formed before the second embossing pattern is applied.")).

Combining these terms, the meaning of the phrase "*embossed pattern form[ing] an array of depressions*" is: An array of embossed depressions created in the surface of a material by first impressing onto the surface an embossing tool having a corresponding topography that is the inverse of the desired topography of the array of depressions. Put another way, "an embossed pattern ... of depressions" means a pattern formed by "embossing" (as that term is defined above) the material, using an embossing tool. The embossed depressions are orderly arranged—that is, consistent, repeatable and repeated.

**(iii) <u>"Carrier Web"</u>**

As used in the '930 patent, a web is a material capable of being embossed. ('930 patent, col. 3, lns. 58-59). A "carrier web" is a web that "carries" or is capable of carrying or is intended to carry another material such as a graphic film with pressure sensitive adhesive. Accordingly, a "carrier web" includes a release liner for a graphic film. ('930 patent, Fig. 3 and col. 3, ln. 64-col. 4, ln. 5 ("When webs of the invention are used as release liners, such liners are typically polyethylene coated papers with commercial silicone release coatings. . . .")).

Should the Court later adopt different definitions than those set forth in its February 15 Order, I reserve the right to provide additional opinions concerning the meaning of the claim terms and further rebuttal opinions regarding infringement issues.

**C.B. Rebuttal Opinions Regarding Infringement**

**4.5. The Liner in the Accused Avery EZ Film Products**

Avery's EZ Film liner contains only one embossed pattern. Avery also prints and embeds with polyurethane (PU) liquid ink dots into the liner.

The manufacturing process begins at the Trinity printing plant with a liner that Avery purchases from Assi Domain in Germany. While some of the liner properties may vary, the typical liner consists of a polypropylene (PP) substrate (~ 20 μm thick), overlaid with a layer of paper (~ 150 μm thick), which is coated with a polyethylene (PE) layer (~ 20 μm thick) and a thin (~1 μm) silicone surface layer. The silicone layer acts as a release agent. The PE layer is a low-density polyethylene and has a Vicat Softening Point of 186.8°F (86°C). Differential Scanning Calorimetry (DSC) data obtained at my direction on the PE material show that it is semi-crystalline with a melting point (solid to liquid) of ~ 217.4°F (103°C) and a crystallization (solidification) point of ~ 188.6°F (87°C). The degree of crystallinity of this material is about 21%, and its crystallization temperature is essentially the same as its softening point. These numbers are based on DSC data taken at my direction at Avery Research Center (ARC), which data are attached to this report as Exhibit 6.

At the Trinity printing plant, raised liquid dots consisting of polyurethane (PU) are deposited onto the surface of a liner in a process known as flexographic printing. The printing

sleeve of the flexographic printing machine transfers the ink dots to the liner surface by contacting the liner surface under a so-called "kiss" impression mode in which the pressure of the rubber printing sleeve on the liner surface is very low (~2 psi, *see* Timmerman deposition, p. 162), and, therefore, does not result in embedding of liquid ink dots into the liner surface. Since the ink tends to flow slightly before being cured, the ink dots are all different in shape and size. The raised liquid ink dots are then hardened while atop the liner surface through a UV curing process, where the ink is cross-linked. At this stage, the hardened PU ink drops or dots rest on the liner surface. As illustrated below (in the diagram and photograph), no two PU ink dots have exactly the same geometric pattern:




**Illustration of EZ Liner**




**Magnified photograph of the EZ liner with ink dot deposits**

After printing the liner at Trinity, the liner is taken to the Omnova embossing facility in Greensburg, Pennsylvania. At Omnova, the printed liner (with the hardened ink dots resting atop the liner surface) is subjected to a single embossing step using a single embossing roll. The embossing roll impresses a hexagonal pattern into the liner surface, and simultaneously embeds

the hardened ink dots into the liner surface. The embossing tool (or roll) used in this single step only includes a single embossed pattern—*i.e.*, the hexagonal pattern—and is used only once.

To emboss and simultaneously embed the PU ink, the printed liner first passes over a number of guide rolls and heating elements prior to reaching the embossing nip created by the contacting of the embossing roll and the backing (or bed) roll. The liner travel path at the Omnova embossing plant, under normal operation, is illustrated below:




The liner speed across this path is at approximately 25 yards per minute.

The raised hexagonal pattern on the single embossing roll at the Omnova plant consists of regular hexagons approximately 550 μm in width, surrounded by valleys, approximately 56 μm in depth and approximately 120 μm in width. The web is directed to the nip (or contact area) formed between the embossing roll and the bed (or backing) roll, where upon application of sufficient pressure, the hexagonal pattern on the embossing roll is impressed into the liner and the ink dots resting on the surface of the liner are simultaneously embedded into the liner.

To emboss the liner surface with the hexagonal pattern and also embed the PU ink dots into the liner, the PU ink must be considerably softened, and the PE layer of the liner must be above its softening point, in nearly a molten state (186.8 °F $\leq$ T $\leq$ ~220 °F). Otherwise, the embossing pattern will not take effect. Additionally, the combination of stretching forces (due to the applied web tension) and the relatively low viscosity of the molten PE will tend to erase the embossed pattern unless the film is quickly cooled to lock-in the embossed pattern. For this reason, under normal operating conditions, the embossing roll surface is maintained at temperatures lower than the softening point (or the crystallization temperature) of the PE liner.

To bring the liner to the proper temperature that ensures embossment of the embossed pattern, the liner travels over the heat drum, and past the Teflon roll and electric heaters, and over the rubber bed roll, to provide the necessary heat. After the heat drum, the "squeegee roll" guides the liner around the rubber bed roll, which presses against the embossing roll.

Even with heating of the liner by the IR heaters and also by contacting the liner to the hot rubber bed roll, enormous pressure is required to emboss. Specifically, sustaining the desired inverse topography of the embossing roll on the liner requires a force of approximately 600 psi at the nip between the embossing roll and the rubber bed roll. Also, the combination of cooling of the PE surface at the embossing roll, followed by further cooling of the film on the 4" chill roll, is necessary in order to lock-in the embedded ink dots and the embossed hexagonal pattern. The remaining cooling rolls serve to further lower the film temperature to room temperature.

Table 1 below lists the approximate normal operating conditions at the Omnova facility during actual operation:

**Table 1. Normal Operating Conditions for Omnova Process**

| *Location* | *Temp. (°F)* | *Press. (psi)* | *Roller Dimension (in)* | *Comments* |
|---|---|---|---|---|
| Heat roll | 200 | NA | 36 | Measured web surface temperature, actual heat roll set temperature may differ. |
| Squeegee roll | 200 | 0 (off) | 6 | Pneumatic pressure on roll set to 0 psi or off, means the roller is fully retracted from the bed roll. |
| Bed roll | 235 | | 12.4 | Measured web surface temperature, actual bed roll set temperature may differ |
| Embossing roll | 140 | 600 | 11 | Embossing roll gauge pressure reading. |
| 4" chill roll | 80 | | 4 | Measured web surface temperature, actual chill roll set temperature may differ |
| 24" chill rolls | | | 24 | |
| Web speed | | | | ~27 ½ yards/min |

Simultaneously with the embossing of the hexagonal pattern at the nip formed between the embossing roll and rubber bed roll, the PU ink material displaces the PE in the liner, forming a composite polymer liner material with a flush surface consisting of the dispersed PU ink in a continuous PE matrix. In other words, after cooling, the upper layer of the liner is no longer a homogeneous PE material, but rather a PE/PU composite with irregularly-shaped PU material interspersed in the PE:



**Magnified photograph of the EZ embossed liner (before adhesive application)**

Because the PU ink is softened before embedding and deformed during the embedding process, it does not retain its original shape when mixed into the PE liner. In fact, after the PU ink re-hardens within the PE, the shape more closely resembles the mirror image of the ink dot that previously sat atop the liner surface, with the flat surface pointing up:



**(Printed Ink Dots)**



**(Embedded Ink Dots)**

As shown in the illustration, the shape of the PU ink material within the PE liner is neither the topography nor the inverse topography of the PU ink as it appeared on top of the liner.

Because some of the ink falls off both prior to and within the embossing roll before embedding, the dispersion of PU ink within the PE material does not match the PU ink array on top of the liner prior to embedding.

After the liner or web is embossed once, an adhesive is applied to the liner and a graphic film is then applied to the adhesive. When the liner is peeled from the adhesive-backed film, the PU ink separates from the PE liner material and transfers to the adhesive to create PU ink "bumps" on the adhesive surface. The ink bumps allow for easier film positioning. Likewise, the ridges from the embossed hexagonal pattern form channels in the adhesive to allow for air egress.

## ~~5.~~6. Analysis of Samples Considered In Dr. Strong's Report, Analysis of Independent Tests Conducted at Omnova and Rebuttal Opinions

On May 24, 2002, I visited the Omnova facility to observe operation of the embossing process and to direct a number of experiments designed to (i) provide further understanding of the heating and embossing process and (ii) provide analysis of observations made in Dr. Strong's expert report. One of the primary purposes of these tests was to determine whether any embossing takes place prior to the embossing roll, and where in the process any embedding of the PU ink dots takes place.

During the Omnova visit, I took a number of samples of liner material. On June 4 and 5, 2002, I analyzed these samples, as well as others, at Avery Research Center ("ARC") in Pasadena, California.

These various tests, analyses, and conclusions that I reached from them are described below.

### a) Omnova Testing Conditions

At the Omnova plant, I did the following:

1. I observed the embossing process under the operating conditions set forth in Table 1 above. Temperatures were measured using a calibrated optical pyrometer. Measurements were taken at three positions across the web (machine (or gear) side, middle, and operator side) and are listed in the Table attached as Exhibit 7-1.

2. I repeated the shut down procedure used by Dr. Strong during his visit to Omnova. As described in Dr. Strong's report, the samples that Dr. Strong analyzed and that form the bases for his opinions were taken following a shut down of the embossing line. After shutting down the line, I took samples at various points. In shutting down the line, the following steps were used and I made the following observations:

1) all heaters were turned off.
2) the line speed was reduced from 27 ½ yd/min to 15 yd/min and allowed to run for an additional 20-30 seconds.

3) the line stop button was hit, after which the web traveled about an additional 6" before coming to a complete halt.

4) markings were made on the film at the various web line points. This took about 10 minutes, during which time the film was stationary on the various rollers.

5) the film was then run out of the machine, cut and labeled for analysis.

In the figure below, I show the locations along the web path at which I took the samples of the liner. These locations are labeled with unprimed numbers A, B, C, D, and E. I also show using primed numbers B', C', D' and E' the locations where Dr. Strong took samples when he visited the Omnova facility:




3. I re-directed the embossing line in an attempt to obtain a more representative sample of the effect of the squeegee roller on the liner and ink dots. In particular, the effect of the squeegee roller on the liner during normal operation cannot be accurately determined from the samples obtained during shutdown. This is due to the fact that the embossing line must be considerably slowed to a stop, bringing the material to rest over heat elements for an extended period before the samples can be taken. Thus, the liner is effectively exposed to more heat and

remains on the squeegee roller for a significantly longer period than during normal operation. As discussed below, this resulted in extensive blistering of the samples on the rubber bed roll.

In redirecting the line, I disengaged the embossing roll and ran the line directly from the rubber bed roll to the chill roll as illustrated below:




I then ran the line with this configuration under four different operating conditions

a) Squeegee roll disengaged (i.e., no pressure) and IR heaters on.

b) Squeegee roller engaged at 45 psi and IR heaters on.

c) Squeegee roller disengaged and IR heater off.

d) Squeegee roller engaged at 45 psi and IR heaters off.

Temperatures measured at various positions across the web are listed in the Tables attached as Exhibit 7-2.

4. I measured the footprint of the nip formed between the embossing roll and the rubber bed roll in the machine direction along the liner path. In doing so, I compressed a

covered strip of adhesive-coated EZ film between the embossing and bed rolls at the "normal" operating pressure of 600 psi. This produced a "track" in the film showing the length of the contact region. I then measured the track with a ruler and double checked the length optically. The film contact length in the nip roll region was ~15/16". As noted, the average size of the hexagonal pattern on the embossing roller is roughly 650-700 µm. Thus, the average number of simultaneous hexagonal patterns stamped out in a single pass through the embossing wheel in the machine direction is roughly 35-40. This test disproves Dr. Strong's unsupported conclusion that the embossing roll embeds the ink dots before impressing a hexagonal pattern.

**b) <u>Analysis Method At ARC</u>**

At ARC, I analyzed each sample using the following methods:

Surface morphologies of samples from the various runs were analyzed using optical microscopy, scanning electron microscopy (SEM), and surface profilometry (also referred to as surface morphology microscopy (SMM)). In order to quantify surface features, SMM measurements were made on the same areas that were viewed under SEM. In both cases, areas of the film surfaces with the ink dots in place were compared to areas where the ink dots had been stripped off. Ink dots were removed by applying a strip of Avery FT1000 clear tape to a portion of the film and gently removing it. Optical microscopy observations of the film surfaces as well as the FT1000 tape showed that this process stripped off most (but not all) of the bumps.

The following sample preparation protocols were followed for each of the investigations.

*i) Optical Microscopy*

Samples for optical microscopy were viewed at various magnifications without prior preparation.

*ii) Scanning Electron Microscopy*

a. Approximately 1 cm x 1 cm strips were cut from the starting materials. Samples from Dr. Strong's test and from my tests were taken from the regions that had been marked during the time the plant runs were made. Samples from the other runs described below were taken as indicated.

b. The strips were attached to adhesive carbon tapes on top of 2, 1-cm. metal stubs that were taped together.

c. Samples were sputter coated using gold.

d. The samples were then imaged on a JEOL JSM – 6300F SEM with digital capture. In all cases, samples were viewed with the stage tilted at 45° to enable easy identification of the ink dots and areas where they had been removed. Magnifications are indicated on the micrographs.

e. In order to identify patterns associated with regions where ink dots had been removed, borderline regions showing both ink dot patterns and regions free of ink dots were analyzed and are shown in the micrographs.

*iii) Surface Profilometry (SMM)*

Samples were analyzed for their 3D topography, surface roughness, and morphology, using a Wyko NT 3300 Optical 3D Profiling System. The coated specimens from the SEM analysis were used for the profilometry measurements. All specimens were viewed at zero tilt. In order to insure that the same regions that had been observed under SEM were being analyzed in SMM, samples were first scanned at optical magnifications to locate the precise regions in question. The data was analyzed using the system software. Topographical images of the regions in question and associated profilometry scans were also taken. The system software generated all quantitative statistics associated with the surface topography.

**c) <u>Samples Analyzed At ARC</u>**

At ARC, using the methods described above, I analyzed the following samples:

1. I reviewed the photographs attached as exhibits to Dr. Strong and Mr. Payne's reports. I noted that a number of the photographs showed "pads" or areas of smoother material. Dr. Strong's report states that these "pad" areas correspond to places where he removed ink from the liner surface. He also concludes that the pads are depressed below the surface of the liner, thus indicating that the ink had been embedded into the liner surface before removal. As

explained in the conclusions below, I have demonstrated that Dr. Strong's observations are wrong.

2. I visually examined the printed liner material as received from Trinity. The micrograph on the left illustrates the surface with ink dots in place, and on the right shows the same surface after removal of the ink dots following the procedure described above.




These images show a background surface roughness (irregularity) in the film upon which the raised ink dots (left image) stand out. Moreover, the right image shows there is no discernible pattern of impressions or "pads" in the areas where the ink dots have been removed.

3. I analyzed the samples taken from points A, B, C, D, and E during my May 24, 2002 visit to Omnova.

4. I analyzed samples taken during Dr. Strong's visit to Omnova at points B', C', D' and E'. My understanding is that after the line was stopped and the material removed, the sample was marked to show various points along the line. The sample was then cut in half along the length and 3M received one-half of the sample, and Avery received the other half. I analyzed the sample that Avery received corresponding to the sample that Dr. Strong tested.

5. I analyzed samples taken without the embossing roll engaged under each of the four conditions of heat and squeegee roll pressure listed in section (b) above.

6. I analyzed samples of the printed liner that were heated in an oven to simulate the effect of heat on the ink without any pressure. Specifically, the samples were held for 15 minutes at the following temperatures: 200°F, 210°F, 220 °F, and 225 °F.

**d) Observations Of Samples Analyzed At ARC**

*~~4.1.~~Observations of Shut Down Samples (Both Dr. Strong's Samples and My Samples)*

- Sample A (Not Examined By Dr. Strong)

Sample A was taken from the heat roll, approximately 37 ½ " downstream from the put on roll. As noted, Dr. Strong did not take a sample from this location. The film temperature at this point is ~ 200°F.

Exhibit 8-1 shows an SEM image of the film surface of sample A. The image shows the boundary between the lower region containing intact ink dots and the upper region, in which the ink dots have been stripped away by the FT1000 film. The ink dots show a variety of shapes, but are, in general either circular or ellipsoidal-like in shape. However, no two ink dots have the same shape. Also, it appears that one or more ink dots have fallen off, so there is no uniform spacing between the ink dots. Although their relatively low contrast with the surroundings makes them difficult to see an identifiable row of "pads" can be seen in the first row above the topmost row of ink dots. The size and location of these pads indicates that they correspond to locations where ink dots have been removed.

Exhibit 8-2 shows a higher magnification of the region near and above the three central ink dots. Although the ink dots clearly lie above the surface of the film, it is not possible by visual inspection alone to determine how much they protrude above the surface, nor is it possible to determine their topography, i.e., variations in their protrusion height. Likewise, it is not possible to determine by simple visual inspection whether the ink pads in the top row correspond to depressions in the surface where the particles had been, or, to raised regions where the ink dots had been. Surface profilometry does allow such determinations to be made.

Exhibit 8-3 shows a 3-D topographical image of the ink pad directly above the ink dot that is second from the right in the top row of Exhibit 8-1 and directly above the right-most dot of Exhibit 8-2. Since the SMM images are interference enhanced, the ink pads show much more clearly than they do in the SEM images. The 3-D image, together with the profilometry scan shown in Exhibit 8-4, illustrate that the central region and the outer edges of the pad protrude

above the surface of the surrounding landscape, while portions of the inner region fall below the mean level of the landscape. The x-profile shows that, on average, the particle protrudes about 2 μm above the surface and the y-profile shows that it protrudes about 2 ¼ μm. The 3-D scan indicates that the peak to valley distance, $R_t$ is 4.18 μm.

- <u>Samples B and B'</u>

Samples B (my test) and B' (Dr. Strong's test) were taken from precisely the same locations along the web line, approximately 2/3 of the distance around the heat roll.

Exhibit 9-1 shows an SEM image of the film surface of sample B. The image shows the boundary between the lower region containing intact ink dots, and the upper region, in which the ink dots have been stripped away by the FT1000 film. The ink dots show a variety of shapes, but are, in general either circular or ellipsoidal-like in shape. Again, the ink is not uniform in shape or evenly distributed across the liner surface. Although difficult to see because of the relatively low contrast with their surroundings, a row of "pads" can be discerned in the first row above the topmost row of ink dots. The size and location of these pads indicates that they correspond to locations where ink dots have been removed from that row.

Exhibit 9-2 shows a higher magnification of the region near and above the three central ink dots.

Exhibit 9-3 shows a 3-D image of the ink pad directly above the central ink dot in Exhibit 9-2. The image clearly shows the pad and also illustrates that its surface sits above the surrounding terrain with a maximum peak to valley height difference of 5.96 μm.

Exhibit 9-4 shows x and y profile scans of the pad region. The peak to valley height difference of the pad is 1.27 μm in the x-direction and 0.75 μm in the y-direction.

Exhibit 9-5 shows an SEM image of the film surface of sample B' from Dr. Strong's sample. The image shows the boundary between the lower region containing intact ink dots and the upper region, in which the ink dots have been stripped away by the FT1000 film. The ink dots show a variety of shapes, but are, in general either circular or ellipsoidal-like in shape. A series of "pads" can be seen in the second row above the topmost row of ink dots. Although

difficult to locate, because of their low contrast relative to the surroundings, the size and location of these pads indicates that they correspond to locations where ink dots have been removed.

Exhibit 9-6 is a higher magnification image of the region shown in Exhibit 9-5. The general appearance of the surfaces in these exhibits is similar to that of the Omnova Sample B.

Exhibit 9-7 shows a 3-D topographical image of an ink dot pad from the central region of Exhibit 9-6. Again, the ink pad is more readily identifiable in the SMM image. The ink pad sits above the mean landscape and has a peak-to-valley height of 4.14 μm.

Exhibit 9-8 shows profile scans of the same pad. The scan indicates that portions of the y-profile that fall below the zero-line correspond to regions where the local landscape also does so. In other words, the particle apparently adheres to the local surface and moves with it as the landscape undulates up or down. However, no part of the pad is depressed into the surface of the liner. Overall the topology seen is similar for both the B and B' samples.

- Samples C and C'

Sample C was obtained during my shutdown test. C' was obtained during Dr. Strong's shutdown test. Both samples were taken from the region 2" before the squeegee and both samples correspond to the same locations along the web line.

Exhibit 10-1 shows an SEM image of the film surface of sample C. The image shows the boundary between the lower region containing intact ink dots and the upper region, in which the ink dots have been stripped away by the FT1000 film. Occasional dots can be seen in the top region (two in this case) where stripping was incomplete. The ink dots show a variety of shapes, but are, in general, either circular or ellipsoidal-like in shape. Again, the ink dots are not uniform in shape or evenly distributed across the liner surface. As with the previous SEM images, the pads corresponding to ink dots that have been stripped from the upper rows show relatively little contrast with the surroundings. A line of ink pads can be seen in the first row above the topmost row of ink dots. The size and location of these pads indicates that they correspond to locations where ink dots have been removed.

Exhibit 10-2 shows a higher magnification image of the area above the second particle from the left in Exhibit 10-1.

Exhibit 10-3 shows a 3-D topographical image of an ink dot from the top row of dots shown in Figure 10-1. The "zero" reading of the color code on the right-hand side corresponds to the root mean square roughness for the entire measured array, Rq, which is 0.968 μm. The color code suggests that the dot protrudes about 5 μm above the surface. The overall shape of the ink dot is more or less like a volcano, with a hollowed out region in the center.

Exhibit 10-4 shows the profile scan for just the region corresponding to the ink dot. The top profile is a scan across the ink dot (X profile) and the bottom profile is a scan from top to bottom (Y profile) of the ink dot. Both profiles further illustrate the volcano-like shape of the ink dot. The maximum peak-to-valley height of the particle, $R_t$, is 4.73 μm in the x-direction, and 5.29 μm in the y-direction.

Exhibit 10-5 shows a 3-D topographical image of one of the ink pads from the stripped region of Exhibits 10-1 and 10-2. Again, the SMM image is more readily identifiable. The outermost edges of the pad sit above the mean landscape, meaning that the pad rises above the liner surface. The central most regions of the interior lie essentially even with the mean level of the landscape. The maximum peak-to-valley distance is 6.58 μm.

Exhibit 10-6 shows the x- and y ink pad profiles. These more clearly demonstrate that portions of the interior lie flat with the local landscape, while the outer edges protrude above it.

Exhibit 10-7 shows the 3-D topographical image of an ink pad taken from an area adjacent to that of the pad shown in Exhibit 10-5.

Exhibit 10-8 shows the x,y-profiles for the same image. As both Exhibit 10-7 (the color coded image) shows and Exhibit 10-8 quantifies the entire pad lies in a local valley in the landscape. The entire landscape appears to be lower than other areas of the surface. Correspondingly, the ink pad is even with the local surface landscape. This shows that ink dots simply follow the local undulations of the landscape, whose "roughness" changes as the material

heats up or cools down in moving from the hot roll towards the squeegee. However, the ink has not been "depressed" into the liner surface.

Exhibit 10-9 shows an SEM image of Sample C' (from Dr. Strong's test shutdown), taken from the same position along the web line as that of sample C. The row of ink dots and demarcation of the region from which the dots have been stripped is essentially the same as exhibited by Sample C.

Exhibit 10-10 is a higher magnification SEM image of the region above the second particle from the right in Exhibit 10-9. Images of two symmetrically placed pads can be observed in the row above the two central ink dots.

Exhibit 10-11 shows a 3-D topographical image of the ink pad in the region directly above the left most ink dot shown in Exhibit 10-10. The upper left edges and portions of the interior are seen to be above the mean landscape, while the interior portions appear to lie relatively flat with the mean landscape height.

Exhibit 10-12 is the x,y-profile scan for the same image The profile scans in this exhibit clearly show that the pad topography "rises and falls" with the local landscape topography. The general appearance and topographical details of the ink pads in samples C and C' are essentially the same.

- Samples D and D'

Both samples were taken from the same positions in the gap between the squeegee and bed rolls. If Dr. Strong correctly concludes that the squeegee roll "partially" embeds the ink, we should expect to see changes in both the ink dot and ink dot pads in this location. Inspection of the SEM images and corresponding SMM data shows this is not the case. Dr. Strong's report contains no analysis of the material that he took from this point.

Exhibit 11-1 shows an SEM image of the surface of sample D (my sample) showing the demarcation between the row below, which are ink dots, and above where the ink dots have been stripped.

Exhibit 11-2 is a higher magnification image of the region above the second ink dot from the right of Exhibit 11-1. Although difficult to discern due to the low contrast with the film surface, several ink pads can be seen in the row directly above the ink dots. The location and size of these pads indicates that they correspond to positions where the ink dots have been removed.

Exhibit 11-3 is a 3-D topographical image of the ink pad. Again, the ink pad is more readily identifiable in the SMM image. In this case, the outer edges of the pad appear to be slightly below the mean landscape, while the central portions appear to undulate with the landscape.

Exhibit 11-4 shows the x,y topography scans for the ink pad. Both the 3-D image and the scan show that the local surface moves up or down with the local landscape; the pad surface is not depressed below the surface landscape.

Exhibit 11-5 shows an SEM of the surface of sample D' (Dr. Strong's sample). The overall appearances of the ink dots and region above the ink dots containing pads in this micrograph are similar to sample D.

Exhibit 11-6 is a higher magnification image of Exhibit 11-5.

Exhibit 11-7 shows the 3-D topographical image of a ink pad in the region above the third ink dot from the right of Exhibit 11-5. The outermost edges of the pad appear to be slightly below the mean landscape, while portions of the interior either rise above or remain nearly flat with the landscape.

Exhibit 11-8 is the x,y-profile scans for the same image. It demonstrates that the local surface moves up or down with the local landscape, and the pad surface is not depressed below the surface landscape.

- Samples E and E'

These samples come from the region 2 ½" onto the bed roll where, as shown in Table 1, temperatures are the highest. Dr. Strong's report does analyze material taken at this point. Thus, I was able to compare my observations of both the material that I took and that Dr. Strong took

with Dr. Strong's observations of the same material. As described below, the effects of the uncharacteristically long exposure to the high thermal environment of the rubber bed roll experienced by the samples during and following shutdown is apparent.

Exhibit 12-1 shows an SEM image of sample E (my sample). Two features are apparent. First the general background texture of the film is considerably more mottled and blistered than the previous samples. Second, the appearance and location of the ink pads is much more predominant. In this case, a row of six symmetrically placed ink pads is clearly visible above the line of ink dots.

Exhibit 12-2 shows a higher magnification of three of these pads corresponding, respectively, to positions directly above the second, third and fourth ink dots from the left of Exhibit 12-1.

Exhibit 12-3 shows a 3-D topographical image of the ink pad directly above the third ink dot of Exhibit 12-1. The shape is more nearly circular when viewed head on as opposed to the somewhat ovoid shape in the 45° tilt SEM images. The generally mottled or highly ridged character of the surrounding landscape is apparent in Exhibit 12-3. Moreover, the overall topography of the ink pad suggests that the ink dot itself tends to attenuate the local changes in topography. I believe this attenuation effect is what leads to the somewhat smooth appearance of the ink pads seen in Exhibits 12-1 and 12-2.

Exhibit 12-4 is the x-y scan of the image in Exhibit 12-3. The topological profiles clearly reflect the sharp changes in local topography around the ink dots. Moreover, careful analysis of the data shows that the local film substrate tends to rise up around the ink dot (apparently due to the intense heat), and that most of the pad remains above the local topography.

Exhibit 12-5 is an SEM image of Sample E' (Dr. Strong's sample), which shows similar effects. For example, the image shows a row of ink dots and a row of pads above it.

Exhibit 12-6 shows a higher magnification view of the region directly above the second particle from the left on Exhibit 12-5. A symmetric arrangement of three ink pads is apparent in the row above the ink dots. However, the intensity of the background film texture and the

apparent "smoothness" of the ink pads are not as pronounced as they are sample E. This would suggest that the duration of exposure of the film on section E of the bed roll was less for Dr. Strong's sample. Nevertheless, striations corresponding to ridges in the film topography can be clearly seen in both Exhibits 12-5 and 12-6. In particular, the ink pad directly above the second ink dot from the right in 12-5 shows the interruption of such a ridge due to the presence of the ink dot that had been there.

Exhibit 12-7 shows a 3-D topographical image of the particle mentioned above. The increased intensity of the surrounding landscape and changes relative to the other images are apparent. Nevertheless, as shown in the 3-D image and in the topographical scans in Exhibit 12-8, the ink pad sits above the mean landscape in the x-direction and dips below it in portions of the y-direction. Again, this is clear evidence that the ink dots remain adhered to the film surface and more or less move with local undulations in the landscape; the pads are not depressed into the surface. It is also apparent that these surface undulations reflect the severity of the increased thermal heating of the web surface in this region.

Exhibits 12-9 and 12-10 show data for another ink pad from the same row and illustrates the dramatic effect of the local topography on the ink pad shape. These Exhibits again show that the ink adhered to and moves with the local surface, but does not embed into it prior to the embossing roll.

*~~5.~~2. Observations of Oven Heated Samples*

SEM micrographs of Avery's printed liner subjected only to oven heating at temperatures from 200°F to 220°F show precisely the same characteristics seen in Samples B through D, and B' through D'.

Exhibits 13-1 though 13-4 are two SEM photographs, a 3-D topographical image, and x-y scan of a sample heated at 200°F for 15 minutes.

Exhibits 13-5 though 13-8 are two SEM photographs, a 3-D topographical image, and x-y scan of a sample heated at 210°F for 15 minutes.

Exhibits 13-9 though 13-12 are two SEM photographs, a 3-D topographical image, and x-y scan of a sample heated at 220°F for 15 minutes.

Exhibits 13-13 though 13-16 are two SEM photographs, a 3-D topographical image, and x-y scan of a sample heated at 225°F for 15 minutes.

These Exhibits show a gradual evolution of texture and ink pads, which became more pronounced and readily identifiable with increased heat. Also, the 3-D topography and profile scans of these materials showed essentially the same characteristics as shown in the shutdown samples. Specifically, the ink pad topographies show more or less conformance with the local underlying film topography with the development of ridges at the edges and internal topographies, which either rise or fall with the local landscape. As with the shutdown samples, these effects were most pronounced with the 225°F sample. Importantly, these samples show that the effects observed during shutdown are unrelated to any pressure or force as the ink dots pass over the squeegee roll.

*~~6~~.3. Observations of Embossing Roll By-Pass Samples*

As shown in section VI.B.2.b above, during the Omnova visit I obtained samples with the embossing roll disengaged under four different operating conditions in an attempt to obtain a more representative sample of liner after passing over the squeegee roll. My observations of these samples at ARC are as follows:

- <u>Squeegee Roll Disengaged, IR Heaters Off</u>

Exhibits 14-1 and 14-2 are low and high magnification images of the liner surface. The boundary region between the top two rows of ink dots and the upper region where the dots have been stripped have the same appearance as seen in the A, B, B', C, and C' samples discussed above. A row of ink pads corresponding to regions where the ink dots have been removed by stripping is clearly discernible above the three ink dots in Exhibit 14-2. As before, the contrast between the ink pads and surroundings is low.

Exhibits 14-3 and 14-4 are the 3-D topographical images and x-y scans of two of the pads from the row above the ink dots, which are discernible in Exhibit 14-2. As the image and

profiles show, the pads adhere to the surface of the liner and portions lie above or below the average surface height, depending on whether the local surface is raised or lowered from the average height. In no case is the pad depressed below the local surface height of the liner.

Exhibits 14-5 and 14-6 are another set of topographical images and x-y scan of two of the pads from the row above the ink dots. These images and scans further demonstrate that the pads adhere to the surface of the liner and rise and fall with the undulations in the local liner surface without embedding below the local liner surface.

- Squeegee Roll Disengaged, IR Heaters On

Exhibits 15-1 and 15-2 show SEMs of the liner surface structure at low and high magnification obtained with the IR heaters on. Similar to the E and E' samples and the oven heated samples at 225°F analyzed earlier, the film surface exhibits a more mottled or blistered topography. Likewise, the ink pads corresponding to regions where the particle had been stripped are more apparent due to their relatively smooth texture relative to the film substrate.

Exhibits 15-3 and 15-4 are the 3-D topographical images and associated topographic scans. These Exhibits show that the ink pads conform to the surface topography and either rise above or below the average surface height, depending on the local topography. Again, these Exhibits also show that the pad is not depressed below the local surface height of the liner.

- Squeegee Roll Engaged at 45 psi, IR Heaters Off

In these samples, the squeegee roller is engaged to see whether any embedding of the ink takes place even under moderate pressure, albeit much less than the 600 psi at the embossing roll.

Exhibits 16-1 and 16-2 are low and high magnification images of the liner surface. The boundary region between the top two rows of ink dots and the upper region where the dots have been stripped have the same appearance as seen in the A, B, B', C, and C' samples discussed above. A row of ink pads corresponding to regions where the ink dots have been removed by stripping is discernible.

Exhibits 16-3 through 16-6 are the 3-D topographical images and x-y scans of two of the pads from the row above the ink dots, which are discernible in Exhibits 16-1 and 16-2. As the images and scans show, the pads adhere to the surface of the liner and portions lie above or below the average surface height, depending on whether the local surface is raised or lowered from the average height. In no case is the pad depressed below the local surface height of the liner.

- Squeegee Roll Engaged at 45 psi, IR Heaters On

Exhibits 17-1 and 17-2 show SEMs of the liner surface structure at low and high magnification obtained with the squeegee engaged and the IR heaters on. Similar to the E and E' samples and the oven heated samples at 225°F analyzed earlier, the film surface exhibits a more mottled or blistered topography. Likewise, the ink pads corresponding to regions where the particle had been stripped are more apparent due to their relatively smooth texture relative to the film substrate.

Exhibits 17-3 and 17-4 are the 3-D topographical images and associated topographic scans of the ink pad directly above the middle ink dot in Exhibit 17-2. These Exhibits show that the ink pads adhere and conform to the surface topography and either rise above or below the average surface height, depending on the local topography. Again, these Exhibits also show that the pad is not depressed below the local surface height of the liner. Based on these images, squeegee pressure, even at 45 psi, does not embed the ink into the liner surface.

e) **Conclusions Regarding Observations and Analyses of Avery's Liner During Omnova Runs**

The conclusions I reach from my analyses of the samples obtained from the Omnova runs and the analyses of the samples at ARC are as follows:

1. The conditions to which the liner was exposed during shutdown of the Omnova process, both when Dr. Strong obtained his samples, and when I took samples at Omnova on 5/24/02, are not representative of the liner conditions during steady-state operation. In both shutdown cases, the film remained stationary on heated rolls for times much greater than normal. Additionally, the liner passed over rollers and heating elements at a much slower rate just before

stopping. The film surface also came into contact with heated surfaces, either because of the loss of line tension during and after shutdown, or during removal of the film from the web line. As a result of excessive thermal heating, portions of the film surface were severely blistered. Thus, the conclusions that Dr. Strong reached regarding the effect of the squeegee roller on the ink dots has no bearing on whether any embedding takes place at the squeegee roller during normal operation.

2. Dr. Strong's analysis that the squeegee roller embeds the ink, even under the abnormal shutdown conditions, is in error. The squeegee roll does not embed the ink dots into the surface of the liner. Instead, the ink dots remain adhered to the surface of the liner following contact with the squeegee roller and effectively move with local changes in underlying liner topography. Even with the squeegee roller engaged at 45 psi, the squeegee roller does not embed the ink dots into the liner surface.

3. Prior to the embossing roller, heat alone is insufficient to embed the ink dots into the liner surface. Rather, heat tends to enhance the appearance of the pads that are observed on the liner once the ink dots are removed, and the pads appear irrespective of whether the ink dots come into contact with any surface or whether any moderate amount of pressure is applied to the ink dots. In fact, the thermal history of the liner is the critical determinant of the texture of the liner surface and ink pad appearance and topography.

4. It is virtually impossible to tell from the SEM images attached to Dr. Strong's report whether the pads are depressed into the liner surface. Rather, the only way to determine whether the pads are depressed into the liner surface is by SMM analysis. For example, comparing the results of Exhibit 12 with those shown in corresponding Exhibits F-3 through F-10 in Dr. Strong's report demonstrates that the liner appearance is the same, but that Dr. Strong has misinterpreted the SEM pictures.

5. For some unexplained reason, Dr. Strong failed to do any SMM analysis even though I believe that 3M is familiar with SMM technology. Had Dr. Strong used SMM analyses

on the samples that he took, he would have seen that the pads were not embedded into the liner surface and that he reached the wrong conclusions.

6. Moreover, Dr. Strong selectively elected to examine only the sample that was subjected to the highest thermal effects—sample 39A from the rubber bed roll. Even then, had Dr. Strong examined samples taken before the rubber bed roll, he would have seen that the pads were present both before and after the squeegee roll, and that the squeegee roll does not change the appearance of the pads. Rather, distortions in the surface of the liner caused by the heat from the rubber bed roll only make the pads easier to see.

### **3.7. Application of '930 Patent Claims to Avery's Product and Method of Embossing**

I have been asked to consider whether each feature and limitation of the claims of the '930 patent are present in the liner of the EZ Film products, and/or the method of embossing the release liner in the Avery EZ Film products.

Contrary to Dr. Strong's conclusion, I have concluded that each and every element of claims 1-5 of the '930 patent is not present in the release liner of Avery's EZ Film products. I have also concluded that each and every step of claims 6-12 of the '930 patent is not performed on the release liner in the EZ Film products. The bases for these conclusions, including whether the disputed terms or limitations of the claims of the '930 patents are present in the accused product and process, are set forth below.

**Claim 1:**

*A carrier web, comprising:*

*at least one surface that has a multiple embossed pattern having a first embossed pattern and a second embossed pattern, wherein the first embossed pattern forms an array of depressions, wherein the depressions of the first embossed pattern are in the second embossed pattern, wherein the second embossed pattern comprises lands and ridges between the lands, and wherein the height of the ridges over the lands ranges from about 3 to about 45 μm.*

*i)* *A carrier web, comprising:*

Dr. Strong asserts that the liner in the EZ Film products is a carrier web. I agree that the release liner in the Avery EZ Film products as attached, or before it is attached, to the graphics film is a carrier web. I disagree that the spent release liner, however, is a carrier web, because the spent liner no longer carries and is not capable of carrying another material such as pressure-sensitive adhesive. 3M and Strong further suggest that a web that "has previously carried" adhesive is a "carrier web." But once a liner has been used—*i.e.*, released from a graphic film—it is no longer capable of being used (or reused) as a carrier for graphic film. For this reason, Dr. Strong's conclusions based on examinations of the waste liner of used EZ film is irrelevant to whether Avery infringes claims for a "carrier web."

Accordingly, it is my opinion that the "carrier web" limitation is not met by the spent release liner, and is met only by the release liner of the Avery EZ Film products so long as it is attached to the film or before it is attached to the film and is capable of carrying another material fact such as pressure sensitive adhesive.

*ii)* *at least one surface that has a multiple embossed pattern having a first embossed pattern and a second embossed pattern.*

Dr. Strong asserts that the release liner in the Avery EZ Film products meet this limitation or feature. I disagree.

Applying the District Court's interpretation of the phrase "***multiple embossed pattern***" (with which interpretation I agree), I conclude that the release liner in the Avery EZ Film products does not have a "multiple embossed pattern" for the following reasons:

- The release liner in the EZ Film products are not multiply, sequentially embossed.
- The ink dots deposited onto the surface of the release liner of the EZ Film products are not pre-embedded at the "squeegee roll" preceding the embossing roll.
- Dr. Strong's assertion that there is further sequential embossing at the embossing nip itself is also in error. The ink dots deposited onto the surface of the release liner are not embedded into the surface of the release liner at the embossing roll prior to the embossment of the hexagonal pattern, because the nip formed by the contacting of the embossing roll with the backing (or bed) roll has a footprint of about one inch in the direction of liner travel, which is orders of magnitude larger

than the width of the hexagonal pattern. In fact, as described earlier, my measurements of the footprint of the embossing nip indicate that there about 35-40 hexagonal patterns that are *simultaneously* created at the embossing nip in the machine direction along with the embedding of the ink dots present in the lands formed by the hexagonal patterns.

- Regardless, even if there were any pre-embedding of the ink dots before the embossing of the hexagonal patterns, which there is not, neither embedding nor pre-embedding is embossing. Therefore, there is not a "first" and a "second" embossed pattern in the release liner of the EZ Film products. There is only one embossed pattern--a hexagonal embossed pattern--in the release liner in the Avery EZ Film products.

- Dr. Strong incorrectly characterizes the topography of the release surface as including "two distinct embossed patterns: an embossed pattern of depressions and an embossed pattern of hexagonal ridges and lands." The act of embedding the ink dots into the film at the single embossing station is not an embossing step. The definitions of the two terms, "embedding" and "embossing" are quite distinct and separate in the technical polymer processing literature (see for example *The Encyclopedia of Polymer Science and Technology*, vol. 5, p 792 and vol. 2, p. 620). Embedding implies (in fact is used synonymously with) impregnation or encapsulation, and generally implies complete encasement in some uniform external shape, creating a composite structure. In contrast, embossing requires the use an embossing roll or tool that creates a desired topography. From a purely structural standpoint, an embossed surface is distinct and differs from a flush surface consisting of one material embedded into another.

Applying the definition of "multiple embossed" from the specification, without any requirement that the "embossing patterns" be made sequentially, I conclude that the release liner used with Avery's EZ Film product still does not have a "multiple embossed pattern." The reasons are set forth in the last two bullet points above: Avery's EZ Film liner has only one embossed pattern, not two. The polyurethane ink embedded in the top, polyethylene layer of the liner does not structurally form an embossed pattern. Instead, it forms a composite polymer material with a flush surface. In characterizing the embedded ink as an embossed pattern, Dr. Strong improperly focuses just on the polyethylene material in the top layer. Essentially, Dr. Strong mentally pictures the polyethylene without the intermixed polyurethane ink. Dr. Strong focuses on the wrong material. The question is whether the carrier web, as a whole, contains a multiple embossed pattern. Whether the polyethylene material could be considered multiply embossed if the embedded ink were disregarded lacks relevance to Claim 1.

*iii)* *wherein the first embossed pattern forms an array of depressions.*

Dr. Strong incorrectly equates liner deformation with embossing (p. 29, para. c). Liner deformation, per se, is not embossing. It only becomes so if a) the deformation follows a pattern of depressions that is the inverse of the tool creating it, and b) the pattern of depressions locks-in by, for example, rapid cooling of the embossed material. Embedding partially deformed ink dots (whose deformation is caused by the combination of heat and pressure during the embedding process) into a more-or-less liquid PE surface is not embossing. Likewise, expressly describing the deformable ink dots as an embossing tool that is later removed is incorrect. The embedded, deformed ink dots remain in the liner surface on exiting the embossing nip, forming a composite structure.

I disagree that the this feature or limitation of claim 1 is present in the release liner of the EZ Film product for the following reasons:

- The embedding of the ink dots into the liner does not constitute a "first embossed pattern."
- There is no "first embossed pattern" for the reasons stated above; *i.e.*, embedding of ink dots is not embossing. No tool with the inverse topography of the ink is impressed into the liner and removed. Indeed, the single embossing tool that Avery uses has the only inverse of a impressed topography, namely, the impressed hexagonal pattern. From a purely structural standpoint, an embossed surface is distinct and differs from a flush surface consisting of one material embedded into another.
- The embedding of the ink dots in the liner does not form an array of "depressions," which are open, empty areas beneath the surface. The ink dots embedded into the liner are embedded flush with the liner surface. There are no depressions in the PE layer of the liner that can be filled.
- The embedded ink dots do not form an "array." During the manufacturing process, some of the ink falls off the printed liner before it can be embedded. Moreover, some of the ink never becomes embedded, e.g., the ink that falls within the hexagonal channels. With an embossing tool, a uniform, repeated array of embossments is formed that match the array on the tool. This can be seen with both the embossments illustrated in the '930 patent and on the single hexagonal embossment on Avery's EZ liner. In contrast, the embedded ink in the EZ liner is not uniformly repeated across the liner. Indeed, it is impossible to create a uniform, repeated array of embedded ink because the ink falls off at random places.

- The embedded ink dots do not fit the definition of a "pattern." The photographs of embedded ink dots (discussed earlier) show their irregular shapes. Indeed, no two places in which PU ink is embedded into the PE layer of the liner look alike. Because the ink is essentially dropped onto the liner, then hardened, softened again, deformed, and impressed, they are as random in shape as drops of paint splattered on a floor. Unlike a pattern on an embossing tool, they certainly cannot be characterized as a formation that uses a theory of geometry. Thus, the liner in the Avery EZ Film products lacks the "pattern" required by this claim language as well.

- Dr. Strong's interpretation of the "grid pattern" of the "depressions" left after removal of the ink dots from the liner (which means the liner is no longer being used as a carrier) is incorrect in two ways. First he incorrectly describes the depressions as having been created by a "tool" – in this case – the ink dots. As noted above, embossing requires removal of the tool to leave behind a depression as part of the inverse topography created by the tool. Put simply, embedding partially softened (and therefore deformable) ink particles into a wholly or partially molten PE matrix, is not embossing. Moreover, if, as noted in his SEM investigations of the surface depressions, "occasionally a depression is missing," by definition one does not have a regular grid pattern. In addition, an "embossing tool" (*i.e.* ink dots as argued by Dr. Strong) that is randomly missing portions of its topography, cannot produce a regular three-dimensional pattern.

- Dr. Strong's assertion that the "depressions formed by the polyurethane bumps are likewise an embossed pattern" is incorrect. The polyurethane bumps are heated and deformed during the embedding process. The significant change in shape of the bumps at this stage contradicts their definition as a tool that is creating a predetermined topography, as is done in embossing. One cannot produce a pattern (array) based on randomly deformed objects. Moreover, I disagree that the pattern of depressions in the liner is the corresponding inverse of the raised bumps on the liner surface. The depression topography is not the inverse of the bump topography. Rather as described in earlier, it is more the mirror image of the bump (and randomly so at that).

- Applying the definition of "embossed" from the specification, the so-called "depressions" within the polyethylene material where the polyurethane is embedded still does not form an "embossed" structure. No topography on a web or tooling having an effective three-dimensional pattern generates a difference in surface planar dimension in the liner. Thus, the structure of even the polyethylene without the polyurethane cannot be considered an embossed pattern that forms an array.

- The assertion that the depressions remaining in the liner after the adhesive and bumps have been removed corresponds to a pattern of depressions that could have been created using a separate tool having the inverse topography makes no sense. The very fact that the distribution of ink dots in both the machine and transverse directions of the web is random, necessarily means that the corresponding depressions left when the dots are removed will be equally random in shape, size and distribution. I know of no tool that could produce a random pattern such as

this in both directions. In fact, it contradicts the definition inherent in having a tool pattern.

- Since the embedded ink dots are a) not embossed—even under the definition in the patent, and b) do not form an array, (since as noted earlier the "grid" is not geometrically regular, and there are random regions where bumps are missing altogether) the Avery ink dots do not correspond to an "array of depressions."

- In his equivalency argument, Dr. Strong asserts that, in the Avery process, depressions are fully filled with polyurethane material *prior* to the creation of the embossed pattern of hexagonal ridges and lands. This is incorrect. As noted earlier, in the nip region of the embossing roll, at least 35-40 hexagonal embossing and numerous ink dot embeddings occur *simultaneously* in the machine direction.

*iv)* *wherein the depressions of the first embossed pattern are in the second embossed pattern*

The foregoing limitation is not present in the liner of the EZ Film products for the following reasons:

- There are no "depressions" of a "first embossed pattern" in the Avery EZ Film products (for the reasons stated above) that would be in a second embossed pattern.

*v)* *wherein the second embossed pattern comprises lands and ridges between the lands, and wherein the height of the ridges over the lands ranges from about 3 to about 45 μm.*

This limitation is not present in the liner of the Avery EZ Film products, because, as explained above, there is only one embossing roll, one embossing step and therefore one embossed pattern in the Avery's liner; there is no "second" embossed pattern in the Avery release liner.

**Claim 2:**

*The web of claim 1, wherein a depth of depressions caused in the surface by any embossing pattern can range from a minor fraction of an original thickness of web to almost the entire original thickness.*

The features or limitations of claim 2 are not present in the liner of the Avery EZ Film products for the following reasons:

- The features of claim 1, discussed above, are not present in the Avery liner.
- As discussed in claim 1, there are no "depressions" caused by a "first embossed pattern."

**Claim 3:**

*The web of claim 1, wherein the surface can be embossed with any pattern ranging from a minor fraction of an area of the surface to the entire area of the surface.*

The features or limitations of claim 3 are not present in the liner of the Avery EZ Film products for the following reasons:

- The features of claim 1, discussed above, are not present in the Avery liner.

**Claim 4:**

*The web of claim 1, wherein a shape of embossings for any pattern can range from a constant radius of curvature to a polygonal shape of at least 2 surfaces.*

The features or limitations of claim 4 are not present in the liner of the Avery EZ Film products for the following reasons:

- The features of claim 1, discussed above, are not present in the Avery liner.
- As noted in claim 1, there is only one "embossing" in the Avery liner; there are not "embossings."

**Claim 5:**

*The web of claim 1, wherein a width of embossings in any pattern can range from about 1 μm to about 10,000 μm.*

The features or limitations of claim 5 are not present in the liner of the Avery EZ Film products for the following reasons:

- The features of claim 1, discussed above, are not present in the Avery liner.

- As noted in claim 1, there is only one "embossing" in the Avery liner; there not "embossings."

**Claim 6:**

*A method of embossing, comprising the steps of:*
*(a) embossing a carrier web having at least one surface with a first pattern, to create a first pattern of depressions;*
*(b) embossing the surface with a second pattern, to create a second pattern of depressions comprising lands and ridges;*
*wherein the depressions created from the first embossing step are substantially preserved during the second embossing step even though the second embossing step superimposes the second pattern on the depressions created by the first embossing step, and wherein the height of the ridges over the lands ranges from about 3 to about 45 μm.*

Dr. Strong asserts that, under the Court's definition and also under 3M's definition for "embossing," the method of embossing of the release liner in the Avery EZ Film products is that of claim 6. I disagree.

Claim 6 is a method claim comprising two sequential embossing steps. As explained in detail above in connection with claim 1 (the analysis and proposed constructions of which are incorporated herein), "*embossing*" is a process by which a material can be *embossed.* A material is "*embossed*" using an embossing tool, whereby the tool, having the desired topography, is impressed onto the surface of the material and is then removed.

I do not agree with 3M's and Dr. Strong's definition that "embossing" is any process that produces an embossed surface.

Using the constructions of the pertinent terms from claims 1-5, claim 6 defines "a method of "*embossing*" [as defined above and in claims1-5] comprising two sequential embossing steps: (1) first one surface of a carrier web is *embossed* [as defined] with a first pattern, resulting in a first pattern or array of *depressions* [as defined], and (2) second, that same surface is *embossed* again, but with a second pattern, resulting in a second pattern of depressions including lands and ridges.

*i)* *<u>A method of embossing, comprising the steps of:</u>*

Avery's method does not meet this limitation because the Avery method has only *one* embossing step using a single embossing roll.

*ii)* *(a) embossing a carrier web having at least one surface with a first pattern, to create a first pattern of depressions;*

It is my opinion, based on the proper interpretation of the term "embossing," that the Avery release liner does not meet the above language for the following reasons:

- In the Avery method, there is no "embossing" of the liner with a first pattern as a first step of a sequential, double embossing process. Rather, there is only one embossing step using a single embossing roll.
- The ink dots deposited onto the liner surface are not pre-embedded at the "squeegee roll."
- The deposited ink dots are not embedded into the liner at the embossing nip prior to the embossing of the hexagonal patterns. (See discussion in claim 1).
- Regardless, even if there were any pre-embedding of the ink dots prior to the embossing of the hexagonal patterns, which there is not, pre-embedding is not embossing, and, therefore, is not "embossing . . . with a first pattern."
- Embedding of ink dots in the Avery liner does not create a first pattern of "depressions." (See claim 1).
- Once again, Dr. Strong asserts that depressions created by the ink bumps are "arranged in a grid pattern." As noted earlier, the absence of machine and transverse direction reproducibility of this "pattern" does not form a grid pattern, or array.

*(b) embossing the surface with a second pattern, to create a second pattern of depressions comprising lands and ridges;*

It is my opinion, based on the proper interpretation of the term "embossing," that the Avery release liner does not meet the above language for the following reasons:

- There is no embossing of the Avery liner with a "second pattern;" there is only one embossing step using a single embossing roll.

*iii)* *wherein the depressions created from the first embossing step are substantially preserved during the second embossing step even though the second embossing step superimposes the second pattern on the depressions created by the first embossing step, and wherein the height of the ridges over the lands ranges from about 3 to about 45 μm.*

It is my opinion, based on the proper interpretation of the term "embossing," that the Avery release liner does not meet the above language for the following reasons:

- There is not a "first embossing step" in the Avery method. (*See* discussion above re embedding is not embossing).
- There are no "depressions" created from any first "embossing" step.
- There is not a "second embossing step."
- The hexagonal pattern in the Avery liner is not "superimposed" on any first pattern. The embossing and embedding is performed simultaneously at the embossing nip in the Avery method.

**Claim 7:**

*The method of claim 6, further comprising the step of filling depressions created by the first embossing step with a material before performing the second embossing step.*

It is my opinion, based on the proper interpretation of the term "embossing," that the Avery release liner does not meet the above language for the following reasons:

- For the reasons stated in claim 6 above.
- In the Avery method, there are no "depressions" created by a first embossing step that can be filled

**Claim 8:**

*The method of claim 7, further comprising the step of filling depressions created by the second embossing step.*

It is my opinion, based on the proper interpretation of the term "embossing," that the Avery release liner does not meet the above language for the following reasons:

- For the reasons stated in claims 6 and 7 above.
- There is not a "second embossing step" in the Avery method.

**Claim 9:**

*The method of claim 6, wherein the surface can be embossed during any embossing step in an area ranging from a minor fraction of the area of the surface to the entire area of the surface.*

It is my opinion, based on the proper interpretation of the terms "embossed" and "embossing," that the Avery release liner does not meet the above language for the following reasons:

- For the reasons stated in claim 6 above.

- There is only one embossing step in the Avery method, and, therefore, the "any embossing step" limitation is not met.

**Claim 10:**

*The method of claim 6, wherein a shape of embossings for any embossing step can range from a constant radius of curvature to a polygonal shape of at least 2 surfaces.*

It is my opinion, based on the proper interpretation of the term "embossing," that the Avery release liner does not meet the above language for the following reasons:

- For the above reasons stated above in claim 6.
- There is only one embossing step in the Avery method, and, therefore, "a shape of embossings for any embossing step" limitation is not met.

**Claim 11:**

*The method of claim 6, wherein a width of embossings for any embossing step can range from about 1 μm to about 10,000 μm.*

It is my opinion, based on the proper interpretation of the term "embossing," that the Avery release liner does not meet the above language for the following reasons:

- For the reasons stated above in claim 6.
- There is only one embossing step in the Avery method, and, therefore, "a width of embossings for any embossing step" limitation is not met.

**Claim 12:**

*A method of using a web of claim 1 as a release liner for a pressure sensitive adhesive, comprising the step of filling the multiple embossed pattern with a pressure sensitive adhesive.*

It is my opinion, based on the proper interpretation of the term "embossing," that the Avery release liner does not meet the above language for the following reasons:

- For the reasons stated above in claim 1.
- There is no "multiple embossed pattern" in the Avery liner that can be filled.

## 4.8. Additional Rebuttal Opinions Regarding Doctrine of Equivalents Infringement

Dr. Strong asserts that each limitation that is not literally found in the Avery liner or method, is equivalently present therein nevertheless. Specifically, Dr. Strong states that: (1) the embedded ink dots are equivalent to an embossed pattern, and (2) that the simultaneous embedding and embossing process of Avery is equivalent to the claimed multiple sequential embossing process. I disagree with Dr. Strong on both points. I am informed by counsel that, to establish infringement under the "doctrine of equivalency," 3M must prove that Avery's release liner has the substantial equivalent of the "first embossed pattern form[ing] an array of depressions" limitation and the substantial equivalent of the "multiple embossed pattern" limitation. Dr. Strong does not make that showing.

First, as I stated earlier based on my detailed observations and analyses of the Avery release liner samples, the release liner in the Avery EZ Film products simply does not have a "first embossed pattern. . . ." In other words, this limitation is completely absent in the Avery product.

Second, even if one were to ignore the "sequential" requirement, "embedding" an ink dot into the liner is wholly distinct from the process of embossing the liner with a first "pattern form[ing] an array of depressions," and thus by definition is more than insubstantially different. The same is true for the resulting structure.

Third, any substantial equivalence would require that the Avery liner have depressions corresponding to the locations of hard bumps. The partially deformed, and embedded ink particles, however, are flush with the surface, forms a composite structure of particles in a PE matrix. This is *not* an array of depressions.

Lastly, I have been told that doctrine of equivalents may be shown if the accused product or process performs substantially the same function in substantially the same way to obtain substantially the same result as a claim element. Based on my analysis, the above limitation of the claims (*i.e.*, "first embossed pattern . . ." in claims 1-5 and 12 or "embossing . . . with a first

pattern of depressions . . ." in claims 6-11) does not perform substantially the same function in substantially the same way to obtain substantially the same result as an embedded ink dot configuration or the process of embedding an ink dot.

The second basic premise of Dr. Strong's equivalence argument--namely, that Avery's single-step simultaneous embedding and embossing process is equivalent to a multiple sequential embossment--is also in error.

First, the '930 patent specification expressly distinguishes single step embossings from multiple sequential embossments. (*See*, for example, '930 patent, col. 2, lns. 11-17).

Second, as a matter of common sense, a single-step process is more than insubstantially different from a double, sequential step process.

Third, the '930 patent does not teach how to make the claimed invention in a single embossing step. Thus, a single-step process is not within the scope of any claims.

Fourth, in his equivalency argument, Dr. Strong asserts that, in the Avery process, depressions are fully filled with polyurethane material *prior* to the creation of the embossed pattern of hexagonal ridges and lands. This is incorrect. First, as noted earlier, in the nip region of the embossing roll, at least 35-40 hexagonal embossing and numerous ink dot embeddings occur *simultaneously* in the machine direction. Second, there are no "depressions" created by the embedding of ink dots, as "depression" is an empty, hollow area.

Lastly, in view of the '930 patent's own emphasis on the sequential embossment process, such a process does not perform substantially the same function, in substantially the same way to obtain substantially the same result as Avery's simultaneous embedding and embossing of its release liner.

Executed this __ day of MayJune, 20042, in Bethlehem, Pennsylvania Los Angeles, California

Anthony J. McHugh