Exhibit 2a

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| 3M INNOVATIVE PROPERTIES COMPANY and MINNESOTA MINING AND MANUFACTURING COMPANY, Plaintiffs, | Civil Action No. 01-CV-1781 (JRT/FLN) |
| vs. | |
| AVERY-DENNISON CORPORATION, Defendant. | |

**SUPPLEMENTAL AND REVISED EXPERT REPORT OF DR. ANTHONY J. McHUGH REGARDING INVALIDITY OF U.S. PATENT NO. 5,897,930 PURSUANT TO FED. R. CIV. P. 26(a)(2)(B)**

**CONTAINS CONFIDENTIAL INFORMATION SUBJECT TO JOINT STIPULATED PROTECTIVE ORDER**

RECEIVED
JUL 1 2 2005
DAVE P. PEARSON

## I. INTRODUCTION

My name is Anthony J. McHugh and I am 61 years old. I live in Coopersburg, Pennsylvania. I have been retained by the law firm of Hennigan, Bennett & Dorman on behalf of Avery Dennison Corporation as a technical expert in this litigation. I submit this supplemental expert report under the requirements of Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure as a statement of the opinions that I have thus far formed and intend to give in this litigation regarding whether the United States Patent No. 5,987,930 (henceforth "the '930 patent") is valid.

I formed the opinions that I express here based on my consideration and review of a variety of information and documents, which I will detail below, as well as my professional experience and training. If other information, documents or testimony are brought to my attention, it may become necessary that I further supplement my report.

## II. QUALIFICATIONS AND PROFESSIONAL EXPERIENCE

I am presently the Ruth H. and Sam Madrid Professor and Chair of the Department of Chemical Engineering at Lehigh University. At the time I provided my original report in this matter, I was James W. Westwater Professor of Chemical Engineering at the University of Illinois at Urbana-Champaign where I had been since 1979. My area of research specialty is polymer materials science and engineering and I have authored or co-authored over 160 publications in this area.

I have attached my Curriculum Vitae at Tab 1 to this report, detailing my academic and professional experience, all publications that I have authored or co-authored, technical paper presentations, invited seminars, a complete breakdown of current and past areas of research expertise and research contracts as well as a listing of my past consulting engagements in my areas of expertise. Tab 1 does not reflect my move to Lehigh University, and I will provide an updated curriculum vitae upon request. I have not testified (by deposition or at trial) as an expert in any litigation other than this case in the preceding four years.

## III. COMPENSATION

I have been retained by Avery Dennison's counsel for purposes of consultation regarding technical issues, as well as to review and analyze the prior art, the '930 patent and its prosecution history and other evidence, to form opinions about the validity of the '930 patent, to prepare this expert report and to be available to testify in this litigation. I am being paid for my work at my standard consulting fee of $250 per hour with reimbursement of actual expenses. My billing rate will be $500 per hour for time spent on giving deposition or trial testimony. No part of my compensation depends on the outcome of this litigation.

## IV. MATERIALS REVIEWED

In preparing this report, I have reviewed the '930 patent, its prosecution history, the prior art references cited during the prosecution of the patent, additional prior art references not cited during the '930 patent's prosecution,

deposition testimony of witnesses, interrogatory responses, the parties' contentions, documents produced by 3M, various pleadings, and other documents. I have listed the materials that I have reviewed at Tab 2. In forming my opinions, I have also relied upon my experience and knowledge as well as on well-established engineering and materials science principles and technical knowledge in existence before December 1996. Finally, I have adopted the claim construction definitions set forth in the Court's June 20, 2005 Memorandum Opinion and Order Construing Disputed Claims. For all other claim terms, I use the ordinary meaning in the art.

## V. CAPSULE SUMMARY OF PRESENTLY-HELD OPINIONS CONCERNING INVALIDITY

I am advised that the first step in a validity analysis is interpretation of patent claims. As indicated above, I have used the claim construction definitions set forth in the Court's June 20, 2005 Memorandum Opinion and Order Construing Disputed Claims. For all other claim terms, I use the ordinary meaning in the art. I have not considered the meaning of terms in claims 6-12, which I understand are no longer at issue in this case.

I have analyzed the '930 patent's prosecution history, including prior art cited therein, and also prior art references not cited during prosecution, and, based on the legal principles that I have been advised to be applicable, I have formed the following opinions:

(1) At least claim 1 of the '930 patent is invalid as anticipated under section 102(a) and section 102(b) by Sawka '675 (U.S.P.N. 5,405,675).

(2) I understand that 3M contends in this litigation that embedding one material into another creates "at least one surface . . . having a . . .first embossed pattern form[ing] an array of depressions" as used in claim 1 of the '930 patent. If embedded material can be said to form an "embossed pattern of depressions" (which I believe is contrary to the understanding of those skilled in the embossing arts), it is my further opinion that claims 1-5 of the '930 patent are invalid as anticipated under section 102(a) and section 102(b) by at least U.S. Patents 3,190,178 (McKenzie '178), 4,025,159 (McGrath '159), 4,075,049 (Wood '049), and 3,989,775 (Jack '775), as well as retro-reflective sheets made according to these patents.

(3) The subject matter of claims 1-5 of the '930 patent would have been obvious to a person of ordinary skill in the art, and thus, claims 1-5 of the '930 patent are invalid under 35 U.S.C. §103.

(4) Claims 1-5 fail to disclose all the proper inventors.

## VI. <u>DETAILED OPINIONS AND THEIR BASES</u>

Below I provide a summary of the alleged invention followed by my validity analysis.

## A. Summary of Alleged Inventions

The '930 patent is entitled "multiple embossed web." The application that resulted in the '930 patent was filed on December 31, 1996. The following briefly discusses the background of the '930 patent.[1]

### 1. Commercial Graphics Film Technology

The invention of the '930 patent relates generally to "embossed webs useful as release liners for pressure-sensitive adhesives and other industrial applications," (the '930 patent, col. 1, lns. 4-6), such as in the commercial graphics industry.

Generally speaking, the commercial graphics industry caters to the graphics needs associated with advertising logos and signage products. A significant application for commercial graphics material is trucks. There, instead of painting logos or other signage directly on the surfaces of the truck, the desired logo or signage is printed onto one surface of a sheet of film that in turn has a pressure-sensitive adhesive coated on its back surface, and which would then be placed on the truck surfaces (or other substrates) as desired. A simplified cross-sectional depiction of a graphic film material illustrating its essential components is shown below:

---

[1] Earlier in this case, Judge Doty, the judge presiding over this case, issued an order denying 3M's motion for a preliminary injunction. In that Order, the judge set forth a concise summary of the technological background. I agree with the judge's summary and incorporate it by reference in my report.




**Typical Commercial Graphics Film (Cross-Sectional View)**

The film typically comes in large rolls and includes a release liner adhered to the film's back surface in order to hold or carry the pressure-sensitive adhesive ("PSA"). When the release liner is stripped off, it no longer holds or carries the PSA. The PSA instead remains adhered to the back surface of the film. The film, now released from the liner, has its PSA-backed surface exposed, and may be placed on the truck surface (or other substrate surface).

The use of an embossed web as a carrier for a PSA and backing for graphic film was well-known in the prior art before the December 31, 1996 filing date of the '930 patent. A commonly encountered problem in affixing graphics film to the substrate is that of entrapped air between the film and substrate. The prior art describes a solution to overcome this problem by employing a release liner, having a topography that is created by an embossing tool, to carry the PSA. When the embossed release liner is peeled off, the exposed surface of the PSA is left with a topography that is imparted by the embossing pattern of the release liner. This

topography can provide a pathway in the adhesive for air egress when the film is applied onto a substrate surface. (For example, see JP 59-78285 and JP 2587198).

A related common problem in the graphics film application area is that of repositionability. Aggressive adherence of the film to the substrate by the adhesive prevents easy removal and reapplication of the film, either to remove entrapped air, or to reposition the film to a more desirable position. Multiple attempts to adhere the same film to the substrate can compromise the pressure sensitive adhesive or increase the probability of an uneven or misaligned film on the substrate. The prior art solves this problem by employing release liners (to carry the PSA) whose topography creates protrusions on the surface of the later-exposed PSA surface. (For example, see U.S.P.N. 5,141,790, the references cited and discussed in U.S.P.N. 5,650,215, and those cited in the '930 patent). In some cases the protrusions in the adhesive are filled with small particles. (For example, see U.S.P.N. 5,141,790, U.S.P.N. 5,296,277, and U.S.P.N. 5,362,516). The object of these prior art solutions is to facilitate repositioning by limiting the initial contact area between the PSA-backed film and the substrate. Once properly positioned, the film can then be pressed firmly against the substrate to obtain final adhesion.

### 2. <u>The '930 Patent: Multiple Embossed Carrier Webs</u>

The abstract of the '930 patent summarizes the invention:

> A carrier web having at least one surface that is multiple, sequentially *embossed*, wherein depressions created from the prior embossing pattern(s) are preserved during the subsequent embossing pattern(s)

> even though the subsequent embossing pattern(s) are superimposed on the depressions from the prior embossing pattern(s). The patterns of *embossing* can be Euclidean or fractal created from *machine tools* produced by using microreplication and other techniques. The carrier webs are useful for release liners for pressure-sensitive adhesives and other industrial applications.

The '930 patent specification emphasizes the advantage of webs having multiple "sequential" embossings: "the advantage of multiple steps is that the depressions formed by the prior step(s) can be filled with material prior to the subsequent embossing step(s)." (col. 2, lns. 13-15). Figure 3 of the '930 patent (shown below) shows a double, sequentially embossed release liner having the features claimed:



FIG.3

**The '930 Patent**

The '930 patent's specification notes the following nomenclature for Figure 3 above:

<u>Number Reference</u> <u>Description</u>

| | |
|---|---|
| **20** | "liner" (or carrier web). |
| **22** | "liner surface" (that is embossed). |
| **24** | "one pattern of interconnected embossings comprising lands (**27**), *i.e.*, large squares that have been depressed from the initial surface **22** of liner **20** and ridges **28** formed from the material moved from the lands **27** during the embossing process." |
| **26** | "a second pattern of embossings forming an array of depressions **29**. *Between the time for making the two embossing patterns*, a desired material can be introduced into the second embossing pattern **26** such as glass beads." |

(col. 4, ln. 61 to col. 5, ln. 12).

### 3. <u>The Claims of the '930 Patent</u>

The '930 patent has twelve claims, of which two are independent: claim 1 and claim 6. According to the Federal Circuit decision in this case, the definition of "multiple embossed" as used in product claim 1 does not require that the embossed patterns be made sequentially. However, method claim 6 is limited to a multiple, sequential method of embossing a carrier web.

Dependent claims 2-5 and 12 derive from claim 1, and dependent claims 7-11 derive from claim 6. I understand that 3M no longer contends that Avery's EZ Film product infringes claims 6-12.

### 4. <u>Definitions Used</u>

I was advised to use the Court's claim construction rulings in analyzing the validity of the claims. While I have used these construction, I believe that some of them are inconsistent with definitions provided in the '930 patent and with the

ordinary and accustomed use of such terms in the embossing arts. If different claim constructions are provided to me, my opinions may change.

In analyzing the validity of claims 1-5, I have applied the following meanings to the claim terms:

"Embossed" means a topography on a web or on tooling having an effective three-dimensional pattern that generates a difference in surface planar dimension in the liner or the tooling.

"Multiple embossed" means two or more embossing patterns are superimposed on the web to create a complex pattern of differing depths of embossing.

"Array" means an orderly arrangement.

"Ridges" means an elongated crest or raised strip.

"Pattern" means any formation of embossings that can utilize any theory of geometry, including without limitation, Euclidian geometry and fractal geometry.

"Depression" means lower, sunken, or depressed areas of the carrier web.

"Carrier web" means material with at least one surface that carries, can carry, or has carried another material.

"Lands" means areas of the surface of the carrier web between the ridges.

Additionally, I understand 3M contents that an "embossed depression" includes one material embedded into another, even when the embedded material forms a flush surface on the web material. Thus, according to 3M, Avery's process of taking a liner consisting of pre-printed polyurethane ink dots on a polyethylene top layer, and pressing the ink into the polyethylene after heating to form a flush upper surface, satisfies the "first embossed pattern . . . of depressions" language in claim 1. While I disagree with 3M's expansive contention, I have applied 3M's contention in analyzing the validity of claims 1-5.

**B. Opinions Regarding Validity**

**1. Anticipation**

I understand that a patent claim is invalid under section 102(a) of the Patent Act if, prior to the date of the invention, the invention was described in a patent in this country. I further understand that a patent claim is invalid under section 102(b) of the Patent Act if, more than one year before the filing date, the invention was described in a U.S. patent. Similarly, I understand that a patent claim is invalid under section 102(b) of the Patent Act if the invention was in public use or on sale more than one year prior to the filing date. In considering anticipation, I understand that each element of the patent at issue must be found in a single prior art reference.

**a) Sawka '675 Patent**

In my opinion, the Sawka '675 patent (U.S.P.N. 5,405,675), which issued on April 11, 1995 (before the December 31, 1996 filing date of the application for the '930 patent) anticipates at least claim 1 of the '930 patent under section 102(a). Because the Sawka patent issued more than one year before the filing date of the application for the '903 patent, it is my opinion that at least claim 1 of the '930 patent is invalid under section 102(b) as well.

The Sawka '675 patent relates to a film 10 (see Fig. 1 below) with a multiple embossed pattern on a base or carrier web 12 formed by sequentially embossing the web with two distinct embossing tools to transfer a desired a pattern from the tools into the web. col. 2, ll. 37-45. One embodiment disclosed in the Sawka patent shows a first embossed pattern and a second embossed pattern that "selectively replaces" the first pattern. col. 4, ll. 20-34. In a second embodiment, however, the second embossed pattern does not replace the first pattern, but rather is embossed over the first pattern so that both patterns exist simultaneously. col. 15, ll. 56-60. Accordingly, the pattern of the first embossing step is retained in the second embossing step. Each embossed pattern may include series of ridges and depressions or virtually any other shape, such as the ridges and lands shown in Figure 1:




FIG.1

As explained in the Sawka specification, the depth of the patterns is preferably "no more than one-third the total thickness of the base layer 12." col. 4, ll. 6-9. The base layer 12 thickness ranges from "about 25 to 350 microns." col. 5, lines 14-17. Consequently, if the base layer in Sawka is 25 microns thick, the height of ridges over lands in Sawka would be approximately 8 microns, exactly within the 3 to 45 micron range specified in claim 1 of the '930 patent.

As is shown in the chart below, the Sawka patent discloses every element of claim 1 of the '930 patent.

| '930 Claim 1 | Sawka '675 |
|---|---|
| 1. A carrier web, comprising: | The Sawka '675 patent relates to an embossed multilayer film having an embossed base or carrier layer. |
| at least one surface that has a multiple embossed pattern having a first embossed pattern and a second embossed pattern, | [T]he film can be re-embossed such that the film exhibits a first embossed pattern (such as an overall background pattern) and a second embossed pattern (such as a subsequently applied legend or logo.) col. 2, ll. 41-45. |
| wherein the first embossed pattern forms an array of depressions, | Sawka discloses that the first embossed pattern may be an overall |

| '930 Claim 1 | Sawka '675 |
| --- | --- |
| | background pattern with a open "recessed" finish, in a "virtually unlimited multitude of patterns." One example pattern is "pebbled." Sawka patent, col .9, ll. 38-43. |
| wherein the depressions of the first embossed pattern are in the second embossed pattern, | "The re-embossable feature of the inventive films was also demonstrated by thermomechanically embossing the film of example 3 at a temperature of 151C, and at a pressure of 100 bars to provide a first embossed pattern. The embossed film was then high frequency re-embossed as described above to provide the film with ***simultaneous first and second embossed patterns that were different***." col. 15, ll. 52-60 (emphasis added). |
| wherein the second embossed pattern comprises lands and ridges between the lands, and wherein the height of the ridges over the lands ranges from about 3 to about 45 $\mu$m. | "[T]he embossed pattern of FIG. 1 is shown as comprising a series of alternating depressions 16 and ridges 18...." col. 4, ll. 12-14. The thickness of the carrier 12 is disclosed as "in the range of about 25 to 350 microns." col. 5, lines 14-17. The depth of the pattern is preferably "no more than one-third the total thickness of the base layer 12." col. 4, lines 6-9. As such, the height of the ridges over the lands in Sawka is well with the range of "3 to about 45 $\mu$m." |

**b) Embedding/Embossing Prior Art**

Accepting 3M's expansive view that an embedded material constitutes an "embossed depression" (which I do not agree with), I further concluded that the '930 cannot be valid. Numerous prior art patents disclose carrier webs that structurally contain both embossed patterns of lands and ridges, together with embedded or partially embedded materials. In some of these references, the lands and ridges are within the 3 to 45 micron limitation contained in claims 1-5.

**(1) McKenzie '178 and McGrath '159**

The McKenzie '178 and McGrath '159 patents, both assigned to 3M, describe a cellular retroreflective sheeting. McGrath uses the sheeting structure described in McKenzie, and teaches certain improvements. As both patents explain, the sheeting material contains raised ridges and land areas between the ridges. Within the land areas, a pattern of microspheres are distributed across the surface in a continuous layer, resulting in close, side-by-side spacing. Once applied, the microspheres are pressed into the sheeting. Next, the web is embossed, creating raised ridges above the land surface, as illustrated below:




FIG. 1




FIG. 3

The maximum height of the ridges (no. 13 in figure 3) can be determined from the McGrath specification. At columns 3 and 4, the '159 patent explains that ridges (13) form intersecting bonds with the cover film (12), and that as little as a monomolecular layer of air separates the top of the microspheres (16) from the cover film. This necessarily means that the ridge height equals the height of

microspheres extending above the base sheet surface. This height can be found in patent specification. At columns 5 and 6, the '159 patent states that the microspheres are between 10 and 200 microns in diameter, preferably between 50 and 60 microns. Using the example with diameters of 50 to 60 microns for the spheres, the patent instructs that the microspheres are embedded to about 40% of their diameter. Thus, the portion of the microspheres raised above the base layer is between 30 and 48 microns, and the corresponding ridge height is 30 to 48 microns. This height will not increase during the embossing process. If anything, the ridge height will slightly decrease. Tests of 3M reflective materials confirm that the ridge height will not exceed the diameter of the microspheres, and generally extend less than 90% of the sphere diameter. Thus, each limitation in claims 1-5 of the '930 patent are found in the McKenzie/McGrath patents.

The following chart compares the elements of claim 1 of the '930 patent with the web disclosed in the McGrath '159 patent.

| '930 Claim 1 | McGrath '159 Patent (Accepting 3M's Contentions) |
|---|---|
| 1. A carrier web, comprising: | The Court defined a carrier web as a material with at least one surface that . . . can carry another material. The base sheet carries both the microspheres and the cover film. |
| at least one surface that has a multiple embossed pattern having a first embossed pattern and a second embossed pattern, | Figures 1 and 3 show two separate "topographies" on the base sheet – one formed by the intersecting ridges and the other formed by the depressed |

| '930 Claim 1 | McGrath '159 Patent (Accepting 3M's Contentions) |
|---|---|
| | microspheres. |
| wherein the first embossed pattern forms an array of depressions, | The depressed microspheres. |
| wherein the depressions of the first embossed pattern are in the second embossed pattern, | The microspheres are located in the land area between the ridges. |
| wherein the second embossed pattern comprises lands and ridges between the lands, and wherein the height of the ridges over the lands ranges from about 3 to about 45 $\mu$m. | Assuming the use of spheres that are 50 microns in diameter as described in example 1, the ridges are 30 microns in height above the lands. |

**(2) Wood '049**

The Wood '049 patent also discloses a retroreflective sheeting and a method for making the sheeting. As explained, microsphere beads are distributed across a web surface, as in the McKenzie patent. Next, the web surface is heated, which allows the beads to partially embed into the surface. Then, an embossing tool is used to create a land/ridge pattern on the beaded surface. At this point, as illustrated in figure 4 of the '049 patent (reproduced below), the web material contains (i) a first pattern formed by an array of embedded beads, and (ii) an embossed pattern of lands and ridges, where the embedded beads are in the pattern of lands and ridges: