Exhibit 2b

FIG. 4.




The height of the lands and ridges fall within the 3 to 45 micron limit specified in claim 1 of the '930 patent. In column 2, the Wood patent explains that the microsphere beads range from 1-10 mils (i.e., 25.4 to 254 microns) in diameter. In column 3, the Wood patent states that the groved land areas have depths greater than the radius of the microspheres, preferably about 2-4 times the radius of the spheres. Assuming a sphere of 1 mil, and a depth of at 2 times the radius, the corresponding ridge height will be 25.4 microns. Thus, each limitation in the '930 patent (accepting 3M's contentions) is found in Wood '049.

**(3) Jack '775**

The Jack '775 patent describes a method of making retroreflective beaded material. Glass beads are distributed on a web surface. Then the surface is embossed with a pattern, which simultaneously embeds the beads partially in the surface. Embossing serves to change the axes of the exposed portion of the beads to improve reflectivity at different sight angles. Although the patent does not provide specific dimensions for the depth of the embossed pattern (or resulting height of ridges that form), one example states that the "maximum depth" was 0.003 inches, which converts to approximately 76.2 microns. Since this is a maximum depth, the depth certainly could fall within the range contained in the

'930 patent. The '775 patent further explains that the embossing must be deep enough to tilt the bead axis preferably 35 to 80 degrees. Thus, accepting 3M's position that embedding a material creates an embossed depression, the Jack '775 patent discloses each limitation of the '930 patent.

### 2. <u>Obviousness</u>

I am advised that a claimed invention is unpatentable under 35 U.S.C. § 103 if, at the time the invention was made, the differences between the claimed invention and the prior art are such that the subject matter of the invention as a whole would have been obvious to a person having ordinary skill in the relevant field. I am advised that obviousness is based on the scope and content of the prior art, the differences between the prior art and the claimed invention, the level of ordinary skill in the art and evidence of secondary indicia of nonobviousness to the extent offered. I have also been advised that, in looking to combine prior art references for obviousness considerations, I am to consider the motivation, suggestion or teaching, implicit or express, in the prior art references or the prior art as a whole, the knowledge of one of ordinary skill in the art, or in the nature of the problem to be solved.

I also understand that secondary indicia of nonobviousness may include, for example, a long felt but unmet need in the prior art that was satisfied by the invention of the patent; commercial success of the processes covered by the patent; unexpected results achieved by the invention, praise of the invention by others

skilled in the art; taking of licenses under the patent by others; deliberate copying of the invention; and contemporaneous and independent invention by others. I also understand there must be a nexus between any such secondary indicia and the invention.

If 3M relies on secondary indicia to defend against obviousness, I reserve the right to supplement this report with respect to whether any such evidence has any impact on my final conclusion.

**a) Date of Invention**

I have used the date of filing of the '930 application--December 31, 1996--as the date of invention for purposes of this report. I reserve the right to modify my opinions and supplement this report should other information establish an earlier date of invention.

**b) Level of Ordinary Skill in the Art**

I understand that factors such as the education level of those working in the field, the sophistication of the technology, the types of problems encountered in the prior art, prior art solutions to those problems, and the speed at which innovations are made may help establish the level of skill in the art. I have considered the prosecution history of the '930 patent, the references that are cited therein, other prior art references, the state of knowledge existing at the time of the invention, as well as the level of skill of inventors in the field, and have concluded that, as of

December 31, 1996, a person of ordinary skill in the art would have had both educational as well as practical experience as follows:

- a Bachelor's degree in materials science, chemical engineering or chemistry; and
- practical working experience related to the processing of polymer films, including operations associated with coating, embossing and application of adhesives to such films.

**c) The Teachings of the Prior Art**

There are, and I have considered, numerous prior art references relating to embossed webs. I have selected the following material references as exemplary of the teachings of the prior art, and for each I provide representative commentary:

***(1) Prior Art Not Cited During '930 Prosecution***

- JP 2587198 teaches pressure sensitive adhesive sheets with small independent projections and a release liner with corresponding depressions. (page 19, claim 1). It teaches that projections are in the range of 3-50 $\mu$m (par. 0021), and that the range of 15-25 $\mu$m is especially desirable. It provides a solution to air egress and repositionability problems. (0003-0005, and 00041). It teaches, for example, that the projections may be prepared by coating the adhesive onto an embossed liner (par. 0026), and may be square truncated pyramids arranged in a lattice pattern (par. 0021);
- JP 59-78285 teaches embossed grooves in a release film (*i.e.*, a release liner), with groove lines having a height range of 1 to 15 $\mu$m that gives acceptable air egress property (claim 1). The continuous grooves prevent entrapment of air when the adhesive-backed film is applied to a substrate;
- Freedman '273 (U.S.P.N. 4,713,273) teaches formation of liners for pressure-sensitive adhesive labels in which the inner release-coated face of the liner is roughened and thus prevents air entrapment and bubble formation between the adhesive-backed label and the substrate. (col. 7, lns. 2-5; col. 1, ln. 42-46 and claim 1). Roughness

is achieved by forming a multi-phase particle-filled layer including a continuous phase of polymeric film material and a discontinuous phase of filler material. (claim 1);

- Sawka '675 (U.S.P.N. 5,405,675) relates to a film with a multiple embossed pattern on a base or carrier web formed by sequentially embossing the web with two distinct embossing tools to transfer a desired a pattern from the tools into the web. (col. 2, ll. 37-45). One embodiment disclosed in the Sawka patent shows a first embossed pattern and a second embossed pattern that "selectively replaces" the first pattern. (col. 4, ll. 20-34). In a second embodiment, however, the second embossed pattern does not replace the first pattern, but rather is embossed over the first pattern so that both patterns exist simultaneously. (col. 15, ll. 56-60). Accordingly, the pattern of the first embossing step is retained in the second embossing step. Each embossed pattern may include series of ridges and depressions or virtually any other shape, such as the ridges and lands. As explained in the Sawka specification, the depth of the patterns is preferably "no more than one-third the total thickness of the base layer 12." (col. 4, ll. 6-9). The base layer 12 thickness ranges from "about 25 to 350 microns." (col. 5, lines 14-17). Consequently, if the base layer in Sawka is 25 microns thick, the height of ridges over lands in Sawka would be approximately 8 $\mu$m.

- Henrickson '741 (U.S.P.N. 3,301,741) teaches embossing the release liner to create depressions in the liner surface, which, in turn, result in a repositionable adhesive sheet material having a pebbly contour with small protrusions and intervening planar areas. The protrusions are one to ten mils (~25 to 250 $\mu$m) in height. (claim 5). They are not less than 15 $\mu$m. (col. 3, ln. 59-60) The '741 patent teaches that the pebbly contour of protrusions is separated by intervening planar areas (col. 2, ln. 30-34)

- The McKenzie, McGrath, Wood, and Jack patents (discussed above) all teach embossing a land/ridge pattern on a material containing spheres partially embedded into the web surface. In each patent, the height of the ridges over the lands can range from 3 to 45 microns.

*(2) Prior Art Cited During Prosecution*

- Calhoun '790 (U.S.P.N. 5,141,790) teaches the presence of embossed depressions on the release liner that are filled with non-adhesive

particles. (col. 6, ln. 12-15). It teaches, for example, that the depressions of its example 2 are conical with a depth and width of about 10 $\mu$m. (col. 10, ln. 61-62)

- Wilson '277 (U.S.P.N. 5,296,277) and Wilson '516 (U.S.P.N. 5,362,516) teach adhesive articles having microstructured adhesive surfaces. These patents teach adhesive pegs formed from embossed depressions in a release liner. The pegs provide repositionability and have a height of at least 15 $\mu$m up to 200 $\mu$m. Moreover, '516 teaches composite pegs having small beads in them to aid in repositionability. Such composite pegs are produced by coating beads onto an embossed liner to fill the depressions of the liner with the bead slurry, followed by coating the filled, embossed liner with an adhesive solution. ('516, col. 7, ln. 24-32, claim 1, ln. 31-42)

- Lewicki '678 (U.S.P.N. 3,887,678) teaches a film having two patterns of embossed depressions, one within the other, a multiple embossed pattern. A surface texturing or microembossing pattern of ridges from 0 to 180 $\mu$m is superimposed on the raised areas of the larger embossing pattern or to portions of the deeply mechanically embossed region.

- Tribble '186 (U.S.P.N. 5,229,186) is directed to a multiple embossed plastic film having a plurality of superimposed deeply embossed macro cells together with one or more pluralities of microcells or depressions. The deep embossed pattern consists of a series of macro cells that are interconnected by lands extending between the adjacent macro cells (col. 2, ln. 29-33). In one embodiment, a two-step embossing process is used (col. 2, ln. 40-45, col. 3, ln. 26-62, and col. 4, ln. 11-19). A plurality of microcells having a diamond-shaped, structured pattern is produced in the first embossing step. A second plurality of depressions within a macro cell pattern of depressions is produced in the second embossing step. The micropattern has a depth range of 1 to 6 $\mu$m (claim 3);

- Cabe EP 0313766 B1 describes a double embossing process with a first macro embossed pattern followed by a second micro embossed pattern "while retaining the textile imprint of the macro embossing." (col. 3, ln. 5-14). In one illustration, the second micro embossed pattern, produced in the micro embossing station (Fig. 1) comprises a series of angled, parallel lines cut to a depth of 30 $\mu$m (a pattern being known in the art as a Schreiner pattern).

- In addition, I have considered the teachings of other prior art references discussed by the examiner during the prosecution of the'930 patent, including: GB 1543977, Thomas '919 (U.S.P.N. 3,611,919); Schulz '162 (U.S.P.N. 4,320,162); Ruppel '464 (U.S.P.N. 5,382,464), all of which, as the examiner noted, teach multiple embossed patterns.

### d) The Difference Between The Claimed Invention And The Prior Art

Based on my review of the prior art considered by the patent office during prosecution and the claims allowed, it is apparent that the only difference between the art and the allowed claims is the 3-45 μm height limitation of ridges over lands in the second embossment. The applicants added this height limitation during prosecution to distinguish the claimed invention over the prior art considered by the examiner. In fact, the applicants were able to convince the patent office that their claimed multiple embossed webs differed from the prior art only by adding the 3 - 45 μm height limitation after the examiner had rejected the claims.

As originally filed, claim 1 read:

> A carrier web, comprising: at least one surface that is *multiple,* ***sequentially*** *embossed* with a pattern, wherein depressions created from the ***prior embossing*** **pattern**(s) are substantially preserved during the ***subsequent*** **embossing pattern**(s) even though the ***subsequent*** **embossing pattern**(s) are **superimposed** on the depressions from the **prior embossing pattern(s)**.

The Patent Examiner rejected all of the originally filed claims on a number of grounds, including a vagueness rejection under Section 112, paragraph 2:

> Claims 1-18 are rejected under 35 U.S.C. § 112 and second paragraph, as the claimed invention is not described in such full, clear, concise . . . and for failing to particularly point out

> and distinctly claim the subject matter which the applicants regards as his invention.
>
> **Claim 1 is confusing** in the recitation of "**one surface that is multiple, sequentially embossed**." What is the intent of applicant?
>
> Claim 1 recites that limitation "***prior embossing pattern***." There is **insufficient antecedent** basis for this limitation in the claim. . . .

I am advised that a section 112, paragraph 2 rejection only deals with the clarity and precision of the claim language, not its breadth. To overcome the vagueness and other rejections, the applicants submitted an Amended claim 1, which replaced and rephrased the objectionable terms "sequential," "prior," "superimposed" and "subsequent" with alternate terms "first" and "second". The Amended claim 1 read as follows:[2]

> 1. (Amended) A carrier web, comprising:
>
> at least one surface that <u>has a multiple embossed pattern having a first embossed pattern and a second embossed pattern</u>, [is multiple, sequentially embossed with a pattern,] wherein depressions <u>of</u> [created from] the <u>first embossed</u> [prior embossing] <u>pattern are</u> [pattern(s) are substantially preserved during] <u>in the second</u> [subsequent embossing pattern(s)] <u>embossed pattern</u> [even though the subsequent embossing pattern(s) are superimposed on the depressions from the prior embossing pattern(s).].

In response to the anticipation and obviousness rejections, the applicants distinguished the prior art patents cited by the examiner and asserted the scope of amended claim 1 as follows:

---

[2] Language added to claim 1 is underlined, while deleted language from original claim 1 is bracketed.

> . . . [The] '681 [patent] does not disclose the creation of multiple embossed pattern having a first embossed pattern and a second embossed pattern. The [Patent] Office has correctly stated that two different adhesives are possible according to the teachings of the Patent '681. That is true. *But* ***Applicants are claiming two different embossment patterns where the first embossed pattern survives the embossing of the second pattern***. . . .
>
> Applicants' Claims 1, 3-8, 10, 13-15, 17 and 18 are also novel over Patent '765. . . There is ***nothing in Patent '765 that teaches*** that one can have ***two different embossed patterns, where the first pattern survives the embossing of the second pattern*** to create a complex pattern of differing depths of embossing.
>
> * * * *
>
> Neither Patent '765 nor Patent '681 discloses or suggest the construction of a web that has multiple embossed patterns, *where* ***the first embossed pattern is in the second embossed pattern***. . . . This invention unexpectedly has found that the ***depressions formed during the first embossed step are not lost when the second embossing step is performed.***

I understand from the prosecution history that the examiner was persuaded that the claims as amended and rephrased were no longer vague. However, the examiner continued to reject as invalid the amended claims in view of at least five (5) additional prior art references that taught multiple embossed patterns where the first embossed pattern survives the second embossment. In what I understand to be the second office action, the examiner explained its reasons for the rejection:

> Lewicki teaches a method and a sheet or web comprising at least one surface (wear layer 26) that has a multiple embossed pattern having a first and second embossed pattern. . . . Thus, ***Lewicki teaches an embossing pattern in an embossing pattern***.
>
> * * * *
>
> Claims 1, 3-7 are rejected under 35 U.S.C. § 102(b) as being anticipated by EP 0 313766 A2.

> EP 0 313766 teaches a film or web wherein the film is ***first*** *subjected to macro embossing* ***followed by*** *a micro embossing step.* ***Claims 1, 3-7 are drafted in the product-by-process format.***
>
> * * * *
>
> GB 1 543 977 teaches a sheet or web wherein the sheet is ***first*** subjected to *shallow emboss* ***followed by*** *a deep emboss step. . .*
>
> * * * *
>
> Thomas ('919) teaches two or more embossing station forming ***repetitive superimposed*** *continuous embossments* in the web (claim 1).
>
> Ruppel ('464) teaches *big "bosses"* ***alternating with*** *"little bosses"* are positioned in congruent and tip-to-tip relation with the bosses of the second embossed ply while the big bosses of the first ply are simultaneously positioned between two bosses of the second ply (column 2, lines 15-26; figures 2-5).
>
> Schulz ('162) teaches a web having multiple embossed pattern having a first embossed pattern and a second embossed pattern ***wherein the first pattern is in the second pattern*** (figures 3, 6, 8; columns 2-4; claims 1-18).

In response to the examiner's second rejection, the applicants again amended the claims -- but only to incorporate a height of ridges over lands limitation that the applicants stated would distinguish the claimed carrier webs having multiple, embossed patterns from the prior art.[3] The following limiting language was added to the end of claim 1: "wherein the second embossed pattern comprises lands and ridges between the lands, and wherein the height of the ridges over the lands ranges from about 3 to about 45 μm." With this amendment, the applicants argued that claim 1 should be allowed over each of the cited references because none of

---

[3] Prior to submitting its amendment, the applicants conducted an in-person interview with the Examiner wherein 3M indicated that it "will amend claim and put in additional limitation to distinguish over the prior art."

those references disclosed patterns with the heights of ridges over lands of about 3 to 45 microns. Specifically, the applicants stated that:

> Amendments to Claims 1 and 8 overcome the rejections citing Lewicki, EP 0 313 766 publication, and GB 1 543 977 publication. Each of these references are concerned with a series of multiple depressions where the larger surface area depressions are almost an order of magnitude larger than the *height range claimed between ridges and lands that comprise the result of the second embossing pattern or step*, respectively, of Claims 1 and 8: from about 3 to 45 micrometers.

In allowing the claims to issue, the examiner explained, in a prosecution document entitled the "Statement of Reasons for Allowance," that the rejections were withdrawn because, as represented by the applicants, "The prior art does not suggest or teach a carrier web with ridges and lands that ranges from 3 to 45 μm."

**e) Obviousness Conclusions**

There are several prior art references that were not considered during the '930 patent's prosecution, but which in fact teach precisely what 3M claimed was lacking in the prior art. Specifically, as summarized earlier, each of the following references teach dimensions of the embossing depths within the claimed range of ~3-45 μm: (1) Sawka '675; (2) Henrickson '741; (3) JP 2587198 and (4) JP 59-78285, (5) McKenzie/McGrath, (6) Wood, and (7) Jack. Therefore, it is my opinion that each of these references in combination with any of the prior art references relied on by the examiner to reject the claims a second time render the claims invalid as obvious.

The two Japanese references that I have discussed earlier, in fact explicitly state that their prescribed size limitation allows for air egress in a pressure sensitive adhesive.

In addition to the above references, I note that several prior art references cited during the prosecution in fact taught embossing depression sizes within the claimed range. For example, as I have stated earlier in my summary of the prior art, Tribble '186 and Cabe EPO313766 B1 provide such teaching. In my opinion, each of these two references as well renders the claims obvious over the prior art.

With respect to the additional features in the dependent claims, it is my opinion that those features (such as the pattern, shape and width recitations) in the dependent claims are inherent in the prior art references such as GB1543977, EP0313766, Lewicki '678 and Calhoun '681. During prosecution, the examiner expressed the same conclusion.

The obviousness of each claim in the '930 patent can be demonstrated by examining three representative prior art references: JP 59-78285; Calhoun '790; and Tribble '186 (or Lewicki '678 or Cabe EP 0313766 B1). These references (in combination with features express or inherent in the art), teach each element of each claim of the '930 patent, namely:

(1) multiple embossed pattern,

(2) one embossed pattern of depressions that can be filled with a material, and

(3) another superimposed pattern forming ridges 3 - 45 μm above the lands (suitable for air egress, even though such is not a claim limitation).

In my opinion, there was ample motivation in the art to combine these references (or combinations of them).

First, it was well known and desired in the art that repositionable graphics and graphics that facilitate air egress (i.e., removal of entrapped air during application) make graphics application easier.

Second, it was known in the art that carrier webs could be, and were, embossed to cause depressions that were filled to produce repositionability bumps (see, for example, Calhoun '790 and 3M's prior art Controltac Plus product).

Third, it was known in the art that carrier webs could be, and were, embossed with ridge dimensions within the range of 3 -45 μm for the purpose of achieving air egress. (See, for example, JP 59-78285).

Fourth, it was known in the art that webs could be, and were, multiply embossed. (See, for example, Tribble '186, Lewicki '678 or Cabe 0313766 B1.)

Thus, in my opinion, the prior art, knowledge of those skilled in the art, and the nature of the problem to be solved all provide the necessary motivation to combine these references.[4] Dr. Sher's deposition testimony regarding the

---

[4] There are other combinations of prior art references that render the '930 patent claims obvious, and may be found in my declarations in connection with the preliminary injunction proceedings. I incorporate those declarations by reference.

development of the '930 invention further corroborates the obviousness of the claimed invention.

Finally, without the requirement that the multiple embossed patterns be made sequentially (as directed by the Federal Circuit), and adopting 3M's argument that an embedded material satisfies the "first embossed pattern of depressions" limitation, the structure of claims 1-5 was obvious to anyone skilled in the art by combining any of the McKenzie/McGrath, Wood, and Jack references with each other, or with any of the references described in this section.

### C. Opinion Regarding Correct Inventors

I have reviewed the deposition testimony of Drs. Calhoun and Sher. According to Dr. Calhoun, he did not do any tests on multiple embossed webs that lead to the application for the '930 patent in which he determined the optimal height of the ridges over the lands. Nor does Dr. Calhoun recall Mr. Koskenmaki (the co-inventor on the '930 patent) conducting any such tests. However, Dr. Sher testified that he conducted many tests on the multiple embossed webs, and that he likely determined the optimal ranges for ridge height. Dr. Sher's laboratory notebooks confirm this testing.

The 3-45 micron ridge height is an essential element of claims 1-5. Indeed, the addition of this height range served as the only basis for allowance by the Patent Office. However, Dr. Sher is not listed as an inventor of the '930 patent. In my opinion, Dr. Sher contributed the only feature to the inventions claimed in the

'930 patent that the Patent Office considered novel. Thus, in my opinion, the '930 patent fails to disclose all the proper inventors by omitting Dr. Sher.

Dated: July ____, 2005

______________________________________

Anthony J. McHugh

# BIOGRAPHICAL SUMMARY

**Name:** Anthony J. McHugh

**Personal Information:**

Date of Birth: October 30, 1943
Marital Status: Married, no children
Office Phone: 217/333-1178

Place of Birth: Cleveland, Ohio
Soc. Sec. No.: 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
e-mail: a-mchugh@uiuc.edu

**Education:**

B.S., Cleveland State University, 1966 (Chemical Engineering)
M.S., University of Delaware, 1970 (Chemical Engineering)
Ph.D. University of Delaware, 1972 (Chemical Engineering)

**Honors and Awards:**

Senior U.S. Scientist Award, (Humboldt Award), Alexander von Humboldt Foundation, 1988
Alumni Professorship, Department of Chemical Engineering, University of Illinois, 1989 - 1994
Janet and William H. Lycan Professorship, School of Chemical Sciences, 1995-present
School of Chemical Sciences Teaching Award, University of Illinois, 1990, 1995

**Professional Experience:**

Professor of Chemical Engineering, University of Illinois, 1983-present
Acting Head, Department of Chemical Engineering, University of Illinois, 1990
Visiting Professor, University of Delaware (Department of Chemical Engineering), 1987
Associate Professor of Chemical Engineering, University of Illinois, 1979-1983
Associate Professor of Chemical Engineering, Lehigh University, 1976-1979
Assistant Professor of Chemical Engineering, Lehigh University, 1971-1976
Visiting Assistant Professor, Drexel University (Department of Chemical Engineering), 1975
Pittsburgh Plate Glass, Barberton, Ohio, Development Engineer, 1966

**Professional Activities:**

Site Visitor for Engineering College Evaluation, Case School of Engineering, Case Western Reserve University, 1999
Member, Bingham Award Committee, Society of Rheology, 1997-00, Chair, 1999-00
American Institute of Chemical Engineers, ABET Program Evaluator, 1987-1992
Technical Program Chairman, 54th Annual Meeting, Society of Rheology, Evanston, Illinois, October 25-28, 1982
Session Co-Chair, American Institute of Chemical Engineers, 1997 Annual Meeting, Los Angeles, CA, November, 16-21, 1997
Session Co-Chair, 69th Annual Meeting, Society of Rheology, Columbus, OH, October 19-23, 1997
Session Co-Chair, North American Membrane Society, 1997 Annual Meeting, Baltimore, MD, June 1-4, 1997
Session Co-Chair, 68th Annual Meeting, Society of Rheology, Galveston, TX, February 16-20, 1997
Session Co-Chair, XIIth International Congress on Rheology, Quebec City, Canada, August 18-23, 1996
Symposium Co-Chair, International Chemical Congress of Pacific Basin Societies, Honolulu, December 17-22, 1995
Session Co-Chair, North American Membrane Society, 1994 Annual Meeting, Breckenridge, May 21-24, 1994
Session Co-Chair, 33rd IUPAC Symposium on Macromolecules, Montreal, Canada, July 8-13, 1990
Session Co-Chair, Topical Materials Conference, AIChE National Meeting, San Francisco, November 5-10, 1989
Session Chairman, 58th Annual Meeting, Society of Rheology, Tulsa, Oklahoma, October 19-23, 1986

Member: American Institute of Chemical Engineers, American Chemical Society, Society of Rheology, North American Membrane Society, Materials Research Society, Controlled Release Society

**Research Interests:**

Polymer Materials Science and Engineering:

Phase transformations and mass transfer phenomena in quenched polymer solutions with applications to membrane formation and controlled release drug delivery. Modeling of flow-induced crystallization in polymer processing. Rheology and processing of crystallizable polymers. Rheo-optics of solutions and melts. Rheology and processing of reactive, highly-filled polymer systems. Rheology and processing of dendritic and hyperbranched polymers and blends.

**Research Grants and Contracts:**

Over $5 million dollars total from 1975 to present.

**Graduate Theses Directed:**

M.S. - 43; Ph.D. – 31

**Invited Talks, Seminars:** 150+

**Publications (154 total) – publications of last 4 years:**

"Observations on the Dynamics of Nonsolvent-Induced Phase Inversion ", B.F. Barton, J.L. Reeve, and A.J. McHugh, *J. Polym. Sci. Polym. Phys. Ed.*, **35**, 569-585 (1997).
"The Dynamics of Thermal Induced Phase Separation in PMMA Solutions", P.D. Graham, A.J. Pervan, and A.J. McHugh, *Macromolecules*, **30**, 1651-1655 (1997).
"Transient Flow-Induced Crystallization of a Polyethylene Melt", A.C. Bushman and A.J. McHugh, *J. Appl. Polym. Sci.*, **64**, 2165-2176, (1997).
"The Effects of Temperature and Solvent on the Rheo-Optical Behavior of Hydroxypropylcellulose Solutions", A. Immaneni, A.L. Kuba, and A.J. McHugh, **30**, *Macromolecules*, 4613-4618 (1997).
"The Effect of Concentration, Temperature and Molecular Weight on the Dynamics of Rigid-Rod Molecules in Semi-Dilute Solutions", A Immaneni and A.J. McHugh, *J. Polym. Sci. Polym. Phys. Ed.*, **36**, 181-190 (1998).
"Flow-Induced Conformational Changes and Phase Behavior of Aqueous Poly-L-Lysine Solutions", A. Immaneni and A.J. McHugh, *Biopolym.*,**45**, 239-246 (1998).
"Configuration Biased Monte Carlo and Brownian Dynamics Simulations of Semiflexible Polymers in Extensional Flows", N.C. Andrews, A.J. McHugh, and J.D. Schieber, *Macromol. Theory. Simul.*, 7, 19-26 (1998) .
"The Dynamics of Spinodal Decomposition in Polymer Solutions Near the Glass Transition", B.F. Barton, P.D. Graham, and A.J. McHugh, *Macromolecules*, **31**, 1672-1679 (1998).
"Conformational and Rheological Dynamics of Semi-Flexible Macromolecules Undergoing Shear Flow: A Non-Equilibrium Brownian Dynamics Study", N.C. Andrews, A.J. McHugh, and J.D. Schieber, *J. Rheol.*, **42**, 281-305 (1998).
"A Phenomenological Model for Flow-Induced Crystallization", I.S. Dairanieh, A.J. McHugh, and A.K. Doufas, *Proc. SPE/ANTEC Conf.*, 212-216 (1998).
"Polyelectrolytes in Shear and Extensional Flows: Conformation and Rheology", N.C. Andrews, A.J. McHugh, and J.D. Schieber, *J. Polym. Sci. Polym. Phys. Ed.*, **36**, 1401-1417 (1998).
"The Kinetics of Thermal-Induced Phase Separation in a Crystallizable Polymer Solution", P.D. Graham and A.J. McHugh, *Macromolecules*, **31**, 2565-2568 (1998).
"The Effect of Solvent Quality on the Rheological and Rheooptical Properties of Flexible Polymer Solutions", N.C. Andrews, A. Doufas, and A.J. McHugh, *Macromolecules*, **31**, 3104-3108 (1998).
"Processing/Property/Structure Interactions in a Calcium Aluminate-Phenol Resin

Composite", A.J. Walberer and A.J. McHugh, *Advn.Cem.Bas. Mat*, **8**, 91-100 (1998).
"A Continuum Model for Flow-Induced Crystallization of Polymer Melts", A.K. Doufas, I.S. Dairanieh, and A.J. McHugh, *J. Rheol.*, **43**, 85-109 (1999).
"Phase Inversion Dynamics of PLGA Solutions Related to Drug Delivery", P.D. Graham, K.J. Brodbeck and A.J. McHugh, *J. Control. Release*, **58**, 233-245 (1999).
"A Phenomenological Model for Flow-Induced Crystallization", *J. Reinf.Plastics Comp.*, **18**, 464-471 (1999).
"Kinetics of Thermally Induced Phase Separation in Ternary Polymer Solutions. Part I. Modeling of Phase Separation Dynamics", B.F. Barton and A.J. McHugh, *J. Polym. Sci. Polym. Phys. Ed.*, **37**, 1449-1460 (1999).
"Kinetics of Thermally Induced Phase Separation in Ternary Polymer Solutions. Part II. Comparison of Theory and Experiment", P.D. Graham, B.F. Barton and A.J. McHugh, *J. Polym. Sci. Polym. Phys. Ed.*, **37**, 1461-1467 (1999).
"Phase Inversion Dynamics of PLGA Solutions Related to Drug Delivery", A.J. McHugh, P.D. Graham, and K.J. Brodbeck, in *Biomedical Materials: Drug Delivery, Implants and Tissue Engineering*, eds., T. Neenan, M. Marcolongo, R.F. Valentini, Materials Research Society, **550**, 41-46, 1999.
"The Effect of Simple Shear Flow on the Helix-Coil Transition of Poly-L-Lysine", A.T. Lee and A.J. McHugh, *Biopolymers*, **50**, 589-594 (1999).
"Phase Inversion Dynamics of PLGA Related to Drug Delivery, Part II. The Role of Solution Thermodynamics and Bath-Side Mass Transfer", K.J. Brodbeck, J.R. DesNoyer, and A.J. McHugh, *J. Control. Release*, **62**, 333-344 (1999).
"Sustained Release of Human Growth Hormone from PLGA Solution Depots", K.J. Brodbeck, S. Pushpala, and A.J. McHugh, *Pharm. Res.*, **16**, 1825-1829 (1999).
"Modeling the Dynamics of Membrane Structure Formation in Quenched Polymer Solutions", B.F. Barton and A.J. McHugh, *J. Membr. Sci.*, **166**, 119-125 (2000).
"Effects of Molecular Variables and Architecture on the Rheological Behavior of Dendritic Polymers", I. Sendijarevic and A.J. McHugh, *Macromolecules*, **33**, 590-596 (2000).
"Simulation of Melt Spinning Including Flow-Induced Crystallization. Part I. Model Development and Predictions", A.K. Doufas, A.J. McHugh, and C. Miller, *J. Non-Newtonian Fluid Mech.*,**92**, 27-66 (2000).
"Simulation of Melt Spinning Including Flow-Induced Crystallization. Part II. Quantitative Comparisons with Industrial Spinline Data", A.K. Doufas, A.J. McHugh, A. Immaneni, and C. Miller, *J. Non-Newtonian Fluid Mech.*, **92**, 81-103 (2000).
"A Comparison of the Rheology of Reactive Filled Systems Using Lubricated Squeeze Flow", J.A. Walberer, and A.J. McHugh, *J. Rheol.*, **44**, 743-758 (2000).
"Synthesis and Characterization of Hyperbranched Aromatic Poly(ether imide)s with Varying Degrees of Branching", D.S. Thompson, L.J. Markoski, J.S. Moore, I. Sendijarevic, A. Lee, and A.J. McHugh, *Macromolecules*, **33**, 6412-6415 (2000).
"The Linear Viscoelastic Behavior of Highly Filled Polydimethylsiloxane Measured in Shear and Compression", J.A. Walberer and A.J. McHugh, *J. Rheol.*, 45, 187-201 (2001).
"Role of Crystallization in the Phase Inversion Dynamics and Protein Release Kinetics of Injectable Drug Delivery", J. DesNoyer and A.J. McHugh, *J. Control. Release*, **70**, 285-294 (2001).
"Simulation of Melt Spinning Including Flow-Induced Crystallization. Part III.

Quantitative Comparisons with PET Spinline Data", A.K. Doufas and A.J. McHugh, *J. Rheol.*, **45**, 403-420 (2001).
"Effect of Linear Sequence Length on the Properties of Branched Aromatic Etherimide Copolymers", L.J. Markoski, J.S. Moore, I. Sendijarevic, and A.J. McHugh, *Macromolecules*, **34**, 2695-2701(2001).
"Dynamics of Dendrimeric Molecules Undergoing Simple Shear Flow: A Nonequilibrium Brownian Dynamics Study", A.T. Lee and A.J. McHugh, *Macromol. Theory. Simul.*, **10**, 244-254 (2001).
"Two-Dimensional Simulation of Melt Spinning Including Flow-Induced Crystallization", A.K. Doufas and A.J. McHugh, *J. Rheol.*, **45**, 855-879 (2001).
"Modeling Flow-Induced Crystallization in Fiber Spinning", A.J. McHugh and A.K. Doufas, *Composites, Part A: Appl. Sci. Eng.*, **32**, 1059-1066 (2001).
"Rheology and Structuring in Organo-Ceramic Composites", A.J. McHugh and J.A. Walberer, *Composites, Part A: Appl. Sci. Eng.*, **32**, 1085-1093 (2001).
"The Effects of Extensional Flow and Hydrodynamic Interaction on the Nonequilibrium Brownian Dynamics of Dendrimers", *Macromol. Theory. Simul.*, **10**, 430-433 (2001).
"Simulations of Fiber Spinning and Film Blowing Based on a Molecular/Continuum Model for Flow-Induced Crystallization", *Korea-Australia Rheol. J.*, **13**, 1-12 (2001).
"Simulation of Film Blowing Including Flow-Induced Crystallization", A.K. Doufas and A.J. McHugh, *J. Rheology*, **45**, 1085-1104 (2001).
"Effect of Branching on the Rheological Properties of Solutions of Aromatic Etherimide Copolymers", I. Sendijarevic, M.W. Liberatore, A.J.McHugh, L.J. Markoski, and J.S. Moore, *J. Rheol.*, **45**, 1245-1258 (2001).
"A Brownian Dynamics Study of Mixed Linear-Hyperbranched Polymers", A.T. Lee and A.J. McHugh, *Macromolecules*, **34**, 7127-7134 (2001).
"Eliminating Variations in Elemental Composition in Studies on the Physical Properties of Linear to Hyperbranched Etherimide Copolymers", I. Sendijarevic, A. J. McHugh, L. J. Markoski, and Jeffrey S. Moore, *Macromolecules*, accepted.
"Modeling the Rheology of Concentrated AB/$AB_2$ Hyperbranched Polymeric Systems", A.T. Lee and A.J. McHugh, *Macromolecules*, accepted.

## LIST OF MATERIALS CONSIDERED

US 5,141,790

US 5,405,675

US 4,713,273

US 3,301,741

US 5,296,277

US 5,362,516

US 5,229,186

US 3,611,919

US 3,887,678

US 5,585,178

US 5,298,791

US 4,320,162

US 5,897,930

US 5,382,464

EP 0 313 766 B1

GB 1,543,977

JP 59-78285

JP 2587198

JP 06212131A

JP 07138541

File History of US 6,197,397 and prior art cited therein

File History of US 5,897,930 and prior art cited therein

Deposition of Charles A. Calisto, dated October 23, 1001

Deposition Transcript of Mark Timmerman, dated January 30, 2002

Exhibit 26 to the Timmerman Deposition

Deposition Transcript of W. Douglas Lilac, dated April 19,2002

Deposition Transcript of Danny L. Fleming, dated April 25, 2002

Deposition Transcript of Frank Sher, dated, May 1, 2002

Deposition Transcript of Michael Hannington, dated April 12, 2002

The parties' pleadings regarding 3M's Motion for a Preliminary Injunction

Court Order United States District Court District of Minnesota , dated February 15, 2002

Plaintiff's Claim and Infringement Contentions, dated March 29, 2002

Defendant's Amended Claim Construction Contentions and Present List of Invalidating Prior Art, dated May 4, 2002 and all supporting evidence cited therein as well as prior art cited therein

Declaration of Anthony J. McHugh and Supplemental Declaration in Rebuttal to Declaration of A. Brent Strong regarding 3M's Motion for Preliminary Injunction

Declaration of A. Brent Strong in Support of 3M's Motion for Preliminary Injunction

1993-1994 Technical Information Sheets

Video Inspection of Trinity Packaging Corporation, dated January 30, 2002

Documents produced by 3M during discovery

# CERTIFICATE OF SERVICE

I certify that on July 11, 2005 the true and correct copy of the foregoing **SUPPLEMENTAL AND REVISED EXPERT REPORT OF DR. ANTHONY J. McHUGH REGARDING INVALIDITY OF U.S. PATENT NO. 5,897,930 PURSUANT TO FED. R. CIV. P. 26(a)(2)(B)** was served by FedEx overnight delivery as follows:

John C. Adkisson
Jonathan E. Singer
Fish & Richardson, P.C.
60 South Sixth Street, Suite 3300
Minneapolis, Minnesota 55402

Juanita R. Books
Fish & Richardson, P.C.
12390 El Camino Real
San Diego, California 92130-2081

Lisa Spears