Exhibit 3

FILE

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

3M INNOVATIVE PROPERTIES COMPANY and MINNESOTA MINING AND MANUFACTURING COMPANY,

Plaintiffs,

v.

AVERY DENNISON CORPORATION,

Defendant.

Civil No. 01-CV-1781 (JRT/FLN)

**SUPPLEMENTAL REBUTTAL EXPERT REPORT OF A. BRENT STRONG, Ph.D.**

1. I am the same A. Brent Strong who submitted a Supplemental Expert Report on the Issue of Infringement dated July 5, 2005.

2. The information set forth in my previous Expert Report concerning my curriculum vitae, my rate, and my previous testimony remains unchanged. In addition to the materials listed in my previous Expert Report, I have reviewed the Supplemental and Revised Expert Report of Dr. Anthony McHugh Regarding Invalidity of United States Patent No. 5,897,930 ("the McHugh Supplemental Report") and the references cited therein.

3. I have been asked to review and comment on the McHugh Supplemental Report.

4. I set forth in this Rebuttal Report opinions that I am prepared to offer concerning the opinions and positions expressed in the McHugh Supplemental Report, if I am called to testify in this case, and the bases and reasons for those opinions.

## I. Anticipation

5. I am informed that in order for a prior art reference to "anticipate" claims of a United States patent, that single reference must disclose each and every element of the claim(s) as those claims have been construed by the Court.

6. For the purposes of this supplemental expert report, I have used the construction of the claims of the Calhoun '930 Patent as stated in the Federal Circuit Court of Appeals decision dated December 2, 2003 and as contained in the June 20, 2005 ruling by this Court. [1]

### A. Sawka United States Patent No. 5,405,675

7. In the McHugh Supplemental Report, Dr. McHugh states that the Sawka '675 Patent "anticipates at least claim 1 of the Calhoun '930 Patent." (McHugh Supplemental Report at 12.) I disagree.

8. Specifically, the Sawka Patent lacks at least the following elements of claim 1 of the Calhoun '930 Patent: (a) a "multiple embossed pattern . . . wherein the depressions of the first embossed pattern are in the second embossed pattern"; (b) an "array of depressions"; (c) a "second embossed pattern [that] comprises lands and ridges between the lands"; and (d) "the height of the ridges over the lands ranges from about 3 to about 45 $\mu$m."

9. The Court has construed "multiple embossed" to mean "two or more embossing patterns are superimposed on the web to create a complex pattern of differing depths of

---

[1] In his report, Dr. McHugh also offers new opinions that (1) United States Patent No. 4,075,049 ("Wood") anticipates and/or renders the Calhoun '930 Patent obvious; (2) United States Patent No. 3,190,178 ("McKenzie") anticipates and/or renders the Calhoun '930 Patent obvious; (3) "tests of 3M reflective materials confirm" his ridge height analysis with respect to the McGrath Patent; and (4) The Calhoun '930 Patent does not name the correct inventors. I understand that 3M is contending that all of these opinions were offered in violation of Court orders, and as such, I have not been asked to address Dr. McHugh's new opinions here. If the Court decides that Dr. McHugh's new opinions are properly part of the case, I reserve the right to supplement this report to address those new opinions.

embossing" (my underlining). This is reinforced by the language of claim 1 of the Calhoun '930 Patent, which requires the first of the two embossed patterns making up the "multiple embossed pattern" to be in the second embossed pattern: "wherein the depressions of the first embossed pattern are in the second embossed pattern" (my underlining).

10. Unlike the Calhoun '930 Patent, the Sawka Patent does not teach or suggest that two embossed patterns are superimposed or that one pattern is in the other.

11. Instead, the Sawka Patent describes a film in which a second embossed pattern replaces a first embossed pattern in the area where the second pattern is applied. This is like a pebbled-surface football in which the NFL logo has been impressed, or a pebbled steering wheel with the logo of the carmaker, like "Ford," in the center. Sawka teaches that when the second pattern (like the NFL or Ford logo) is formed, the first pattern (the pebbled surface) is replaced in the area of the second emboss: "Advantageously, base layer 12 is re-embossable, that is, base layer 12 may be repeatedly softened, embossed and set during multiple sequential heating and cooling cycles. Consequently, base layer 12 may be provided with a first embossed pattern (for example, a pebbled appearance) over virtually its entire surface, followed by the application (such as by hot-stamping or the like) of a second embossed pattern, (for example, a particular design, logo or legend) which selectively replaces the pebbled pattern in the area of the hot stamping. Even more generally, base layer 12 is re-embossable in the sense that the base layer may be heated to remove a previously applied embossed pattern so that it can be replaced with an alternative pattern." Col. 4, lines 20-33 (my underlining).

12. Thus, the Sawka Patent teaches that the second embossed pattern is "surrounded" by the first pattern, not that two embossed patterns are "superimposed" or that the first is "in" the second, as required by claim 1 of the Calhoun '930 Patent: "Consequently, after the

performance of a first embossing step, film may be re-embossed so as to provide, for example, a hot-stamped legend or logo on a portion of film 10, the subsequently applied legend or logo being surrounded by an overall embossed background pattern which was provided during the first embossing step." Col. 10, lines 10-16 (my underlining).

13. Dr. McHugh asserts in his Report that in a "second embodiment" disclosed in the Sawka Patent, "the second embossed pattern does not replace the first pattern, but rather is embossed over the first pattern so that both patterns exist simultaneously. col. 15, ll. 56-60. Accordingly, the pattern of the first embossing step is retained in the second embossing step." (McHugh Supplemental Report at 12.) I disagree that this teaches a "multiple embossed pattern . . . wherein the depressions of the first embossed pattern are in the second embossed pattern," as required by claim 1 of the '930 Patent.

14. First, this passage from the Sawka Patent says nothing about two patterns being "superimposed" or the first being "in" the second. It merely says that they exist "simultaneously," which simply means that the first pattern (for example, pebbling) surrounds the second (for example, the NFL or Ford logo), as I have explained above.

15. In addition, the passage from the Sawka '675 Patent on which Dr. McHugh relies is taken from Example 3 of Sawka. The "re-emboss" process described in Example 3 is the same "re-emboss" process that is previously described in Column 4 and also described in Column 10 of the Sawka Patent – namely, a "re-embossing" process in which the first embossment is "selectively replaced" by the second embossment in the area of the second embossment. Again, this is opposite to the teaching of the Calhoun '930 Patent that two embossed patterns are "superimposed" or that the first is "in" the second. Thus, the Sawka Patent cannot anticipate claim 1 of the Calhoun '930 Patent, or any of the claims dependent on claim 1.

16. The Sawka Patent also does not disclose a first embossed pattern that "forms an array of depressions." The Court's construction of the term "array" is "an orderly arrangement."

17. The Sawka Patent neither teaches nor suggests an embossed pattern that consists of an orderly arrangement of depressions.

18. The only structure identified by Dr. McHugh as corresponding to an "array of depressions" is a "background pattern with an open 'recessed' finish, in a virtually unlimited multitude of patterns. One example pattern is 'pebbled.'" McHugh Supplemental Report at 14.

19. Nothing in the passage cited by Dr. McHugh teaches or suggests an "array" of depressions, as required by claim 1 of the Calhoun '930 Patent. There is no teaching or suggestion in that passage or elsewhere in Sawka of a first embossed pattern consisting of an orderly arrangement of depressions. In fact, the "pebbled" finish that Sawka teaches underscores that Sawka was not concerned with an orderly arrangement of depressions. A "pebbled" finish is not ordered and, in fact, a dictionary definition of "pebbled" is "to grain (as leather) so as to produce a rough and irregularly indented surface" (my underlining). Webster's Ninth New Collegiate Dictionary. Thus, the Sawka Patent cannot anticipate claim 1 of the Calhoun '930 Patent, or any of the claims dependent on claim 1.

20. The Sawka Patent also lacks the "second embossed pattern [that] comprises lands and ridges between the lands" required by claim 1 of the Calhoun '930 Patent. In support of his argument that this claim element is disclosed in the Sawka Patent, Dr. McHugh cites only Figure 1 of Sawka, which is reproduced below:




FIG.1

In Figure 1, according to the Sawka Patent, reference numeral 18 refers to "ridges," and reference numeral 16 refers to "depressions." There is no reference to any "land" areas, as required by claim 1 of the Calhoun '930 Patent. Thus, although claim 1 of the '930 Patent requires three elements to make up the claimed "multiple embossed pattern" – depressions, lands and ridges – the Sawka Patent shows, at most, only two elements – depressions 16 and ridges 18.

21. My conclusion that the Sawka Patent fails to show the "lands" required as part of the "second embossed pattern" required in claim 1 of the Calhoun '930 Patent is bolstered by the Court's definition of "lands" to mean "areas of the surface of the carrier web between the ridges" (my underlining). As Figure 1 of Sawka shows, the only thing between the ridges 18 are depressions 16.

22. Even if Dr. McHugh were to change his opinion and argue instead that the depressions 16 between the ridges 18 in Figure 1 of Sawka are in fact "lands," then Figure 1 of Sawka would fail to show depressions. It would only show ridges and lands.

23. In summation, claim 1 of the Calhoun '930 Patent expressly requires three distinct elements to make up the "multiple embossed pattern" – depressions, lands and ridges – and the

Sawka Patent shows, at most, only two embossed elements. Thus, the Sawka Patent cannot anticipate claim 1 of the Calhoun '930 Patent, or any of the claims dependent on claim 1.

24. In addition, the Sawka Patent does not teach that "the height of the ridges over the lands ranges from about 3 to about 45 $\mu$m," as required by claim 1 of the Calhoun '930 Patent. First, as discussed above, Sawka does not show any "lands," and there can be no "height of the ridges over the lands" without any "lands." Moreover, Sawka neither teaches nor suggests particular thicknesses for the various embossed regions of the film, such as the film shown in Figure 1. Sawka merely describes a general range of thickness for the base layer for motor vehicle applications "in the range of about 25 to 350 microns," with the base layer used in Example 3 and cited by Dr. McHugh being 318 microns thick. Dr. McHugh cites the language in Column 4 referring to an embossed pattern with a depth preferably no more than about one-third of the total thickness of the base layer, but what Dr. McHugh overlooks is that in order to calculate an alleged height of "ridges" over "lands" in Sawka – assuming for the sake of argument that Sawka had any "lands," which it does not – one would need to know the relative depths of embossings of the patterns creating the alleged "ridges" and the alleged "lands." Referring to Figure 1, for example, one would need to know the difference in depths of the embossings that created patterns 16 and 18 (and the pattern that created alleged "lands," which are nonexistent in Figure 1). Sawka is completely silent on this point. Merely saying that "the embossed pattern preferably represents no more than about one-third of the total thickness of base layer 12," does not teach any particular height differential of one pattern over another, let alone a height of "from about 3 to about 45 $\mu$m," as required by claim 1 of the '930 Patent.

25. For this additional reason, the Sawka Patent cannot anticipate claim 1 of the Calhoun '930 Patent, or any of the claims dependent on claim 1.

**B. McGrath United States Patent No. 4.025,159**

26. In the McHugh Supplemental Report, Dr. McHugh seems to opine that that the McGrath '159 Patent by itself anticipates at least claim 1 of the Calhoun '930 Patent." (McHugh Supplemental Report at 17-18.) I disagree.

27. Specifically, the McGrath '159 Patent lacks at least the following elements of claim 1 of the Calhoun '930 Patent: (a) a "carrier web, comprising: at least one surface that has a multiple embossed pattern"; (b) an "array of depressions"; (c) a "second embossed pattern" that "comprises lands and ridges between the lands"; and (d) "wherein the height of the ridges over the lands ranges from about 3 to about 45 μm."

28. The McGrath Patent does not describe the type of "carrier web" described in the Calhoun '930 Patent and required by claim 1 of the Calhoun Patent. The claimed "carrier web" must have "at least one surface that has a multiple embossed pattern having a first embossed pattern and a second embossed pattern." In turn, the two embossed patterns must include three separate structural elements: "depressions," "ridges" and "lands." As described in claim 1 of the Calhoun '930 Patent, in order to be a "carrier web," each of these three embossed structures must be present on one surface of the material.

29. I understand that the Court has construed "carrier web" to mean "material with at least one surface that carries, can carry or has carried another material." Putting this definition in the context of the remaining language of claim 1 of the '930 Patent, the three structural elements of the carrier web's multiple embossed pattern – the "depressions," "ridges" and "lands" – each must meet this definition. Each must function as part of the "carrier web" in the sense that it "carries, can carry or has carried another material." Otherwise, an essential element of claim 1 would be missing: either the "carrier web" would lack one of the three required embossed

features, or else one of the three required features would not be part of the "carrier web." To put it another way, the Court's definition does not allow one of the three required elements of the "carrier web" not to function as part of the "carrier web."

30. The McGrath Patent fails to describe the type of "carrier web" required by claim 1 of the Calhoun '930 Patent because the structures identified by Dr. McHugh as the alleged "lands" do not, have not and cannot carry another material. On page 16 of his Supplemental Report, Dr. McHugh identifies as an alleged "land" in the McGrath Patent the "open area between microspheres." These areas do not carry, have never carried, and cannot carry another material. They carry neither the microspheres, nor the cover film. Additionally, as they sit in a hermitically sealed cell or pocket, the land area cannot carry anything else. Thus, one essential element of the surface of the "carrier web" of claim 1 of the Calhoun '930 Patent is absent from McGrath. For this reason, the McGrath Patent cannot anticipate claim 1 of the Calhoun '930 Patent, or any of the claims dependent on claim 1.

31. The McGrath Patent also fails to disclose an "array of depressions."

32. I understand that the Court construed the term "array" to mean "an orderly arrangement." The McGrath Patent does not discuss arranging the microspheres at all, much less putting them in an "orderly arrangement." To the contrary, one skilled in the art would understand that the microspheres (represented by the black dots in Figure 1 below) are laid out without order:




FIG. 1

33. In further support of my conclusion that in McGrath, the microspheres are not laid out in an orderly arrangement, I note that McGrath teaches the use of microspheres having a range of sizes. For example, in Column 5, the sizes of the microspheres are "generally less than 200 micrometers in diameter and greater than 10 or 15 micrometers in diameter and preferably are between about 25 and 80 micrometers in diameter" (my underlining). Similarly, in Example 1, McGrath states that the microspheres "rang[e] between about 50 and 80 micrometers in diameter" (my underlining). These differing-sized microspheres are "embedded by standard procedures to about 40 percent of their diameter in a 25-micrometer-thick layer of polyethylene" by "procedures well-known in the art, such as described for example in McKenzie, U.S. Patent No. 3,190,178." McGrath is otherwise silent as to the method by which the microspheres are embedded into the polyethylene. The passage of the McKenzie '178 Patent referenced by McGrath (Column 8, lines 1-14) teaches dipping polyethylene "into contact with a mass of the glass beads in a trough beneath the hot drum. The tacky plastic coating causes a compact monolayer of glass beads to be picked up."

34. There is no teaching or suggestion in McGrath that using microspheres ranging in size with the McKenzie embedding process would result in an array of embedded microspheres forming depressions. Therefore, there is no teaching in McGrath that the microspheres would form an "array of depressions," as required by claim 1 of the Calhoun '930 Patent. For this reason, the McGrath Patent cannot anticipate claim 1 of the Calhoun '930 Patent, or any of the claims dependent on claim 1.

35. The McGrath Patent also fails to disclose a "second embossed pattern" that "comprises lands and ridges between the lands." The only structures identified by Dr. McHugh as alleged "lands" in the McGrath Patent are shown on page 16 of his Supplemental Report. In Figure 3 of the McGrath Patent reproduced on that page, Dr. McHugh identifies as an alleged "land" in the McGrath Patent the "open area between microspheres." Dr. McHugh seems to suggest that Figure 3 shows an "array of depressions" and a pattern of "lands and ridges." For Dr. McHugh to argue that McGrath teaches an "array of depressions" in Figure 3, one must accept the extreme case that the entire surface is covered in close-packed depressions. There is nothing in Figure 3 to suggest that this is the case. The problem with Dr. McHugh's argument is that if depressions exist everywhere on the surface, there would be no pattern of "ridges and lands" in such an embodiment distinct from the depressions. In effect, under Dr. McHugh's argument, Figure 3 only shows a pattern of ridges and depressions. It is necessary that the carrier web surface have each of the three distinct elements to make up the "multiple embossed pattern" *i.e.*, depressions, lands and ridges, to fall within the scope of claim 1 of the Calhoun '930 Patent.

36. Conversely, Figure 1 of the McGrath Patent shows disorderly portions of the base sheet in between the non-orderly arrangement of microspheres. If Dr. McHugh were to allege

that Figure 1 shows "lands" – and this would be a brand-new allegation on his part – my response would to be point out that Figure 1 lacks an "array of depressions," for the reasons I have explained above.

37. In sum, the McGrath Patent shows, at most, only two of the three embossed elements required by claim 1 of the Calhoun '930 Patent. Contrary to Dr. McHugh, Figure 3 of McGrath does not show any "lands," and if Dr. McHugh were to argue that Figure 1 shows "lands," it is still the case that Figure 1 lacks an "array of depressions." There is no embodiment taught or even suggested in McGrath that contains each of the embossed elements required by claim 1 of the Calhoun '930 Patent, and for this additional reason, the McGrath Patent cannot anticipate claim 1 of the Calhoun '930 Patent, or any of the claims dependent on claim 1.

38. Finally, the McGrath Patent fails to teach or disclose "wherein the height of the ridges over the lands ranges from about 3 to about 45 μm." Dr. McHugh has identified elements of the "pockets" and "bonds" in the McGrath Patent as corresponding to the "ridges" and "lands" in the Calhoun '930 Patent. With respect to those pockets and bonds, the McGrath Patent provides too little information to determine the dimensions of various elements of the pockets and the bonds, much less to determine whether those dimensions fall within the "from about 3 to about 45 μm" range claimed in the Calhoun '930 Patent. Even accepting, for the sake of argument, Dr. McHugh's contention that McGrath's "pockets" and "bonds" are "lands" and "ridges," it is simply impossible to calculate, from the information provided in the McGrath Patent or elsewhere, whether the height of the "ridges" over the "lands" in fact "ranges from about 3 to about 45 μm."

39. Without ever defining what constitutes the top of what he calls the "ridge," or identifying any specific material that constitutes the "land," Dr. McHugh opines that the

maximum height of the ridges can be determined from the McGrath specification by adding together a percentage of the diameter of the micospheres and the thickness of the "monomolecular layer of air." Based on that calculation, Dr. McHugh concludes that "the portion of the microspheres raised above the base layer is between 30 and 48 microns, and the corresponding ridge height is 30 to 48 microns." I disagree with Dr. McHugh. He has simply failed to consider at least ***three*** key points that render his calculations meaningless:

a. *An air gap must exist over the largest beads.* As Dr. McHugh concedes, in McGrath a layer of air is required between the microspheres and the cover film. Dr. McHugh asserts that the thickness of the layer of air would be a "monomolecular layer" of air, the minimum taught by McGrath to achieve the purpose of the described retroreflective sheeting. In practice, the thickness of the air layer will certainly be far in excess of a "monomolecular layer." But in any event, in performing his calculations, Dr. McHugh apparently failed to realize that this layer of air must exist between the cover film and the largest microsphere. In other words, the so-called "height" of the cover film is governed by the size of the largest microsphere. The McGrath Patent teaches that the cover film must be separated from the top of the beads (including the largest beads) in the distribution by a layer of air. Therefore, the "height" of the cover film over the beads is not a range corresponding to the range in bead sizes, as Dr. McHugh mistakenly argues, but is a single height necessarily determined by the largest bead in the distribution – *i.e.*, a height sufficient to ensure that there is a layer of air over the largest bead in the distribution.

b. *There is no definable "land" surface.* As explained above, the only structures identified by Dr. McHugh as alleged "lands" in the McGrath Patent are shown

on page 16 of his Supplemental Report. In Figure 3 of the McGrath Patent reproduced on that page, Dr. McHugh identifies as the alleged "lands" the "open area between microspheres." Dr. McHugh then goes on to calculate an alleged "ridge height" based on the assumption that this "land" is at a uniform "height," defined as a percentage of the bead diameter. This calculation simply ignores that the beads are of differing sizes, so a percentage of the bead diameters will lead to "lands" of differing "heights." In fact, there is no teaching of the topography of the surface created between the beads. Absent a teaching in McGrath of the actual "height" of the material between the beads, one cannot measure a "height" of the ridges over the lands.

c. *The material that he says makes up the "ridge" migrates into the cover film.* According to the express teachings of the McGrath Patent, the improved bonding can be explained by the fact that, when the bonds are formed under heat and pressure, "some of the bond material migrates into the cover film." (Col 2, lines 54-55). The extent of this migration is undefined. Yet the "height" of any alleged "ridge," even under Dr. McHugh's argument, must extend ***at least*** as far as the bond material migrates into the cover film. In fact, it would also be appropriate to say that once the bond material migrates into the cover film and intermixes, the "height" of the "ridge" must include the thickness of the entire cover film.

40. Dr. McHugh's error with respect to the first of these three issues, and the lack of information in the McGrath Patent with respect to the two latter issues, make Dr. McHugh's calculations of alleged "ridge height" meaningless. Even accepting Dr. McHugh's definitions of what is a "land" and a "ridge" in the McGrath Patent, one cannot calculate whether the height of the "ridges" over the "lands" in fact "ranges from about 3 to about 45 μm," as required by claim

1 of the Calhoun '930 Patent. For this additional reason, the McGrath Patent cannot anticipate claim 1 of the Calhoun '930 Patent, or any of the claims dependent on claim 1.

**C. Jack, United States Patent No. 3,989,775**

41. In his Supplemental Report, Dr. McHugh devotes only half a page to the Jack '775 Patent. He fails to include a claim chart showing how it is alleged to anticipate the claim 1 of the Calhoun '930 Patent, and he never specifically points to the existence of any alleged "lands," "ridges" and "depressions" as claimed in the Calhoun '930 Patent. Thus, Dr. McHugh's own expert report on its face fails to show any argument of anticipation.

42. For the same reasons discussed above with respect to the McGrath Patent, the Jack '775 Patent also fails to disclose a "second embossed pattern" that "comprises lands and ridges between the lands." In the Jack '775 Patent, the surface of the matrix material is shown as being "filled" with microspheres, which eliminates any embossed pattern of "lands." Thus, the Jack Patent cannot anticipate claim 1 of the Calhoun '930 Patent, or any of the claims dependent on claim 1.

43. In addition, even Dr. McHugh concedes that there is no disclosure in the Jack '775 Patent of a "height of the ridges over the lands rang[ing] from about 3 to about 45 μm," as required by claim 1 of the Calhoun Patent. Figure 7 of the Jack '775 Patent shows an undulating pattern that has been impressed on the surface of the matrix material. Even if one were to assume the presence of a ridge and land pattern in Figure 7, then the <u>smallest</u> alleged "ridge height" disclosed in the Jack Patent is 76.2 $\mu$m, well outside the "about 3 to about 45 μm" range required by the Calhoun '930 Patent. Even Dr. McHugh conceded this point. McHugh Supplemental Report at 19. Dr. McHugh's statement "[s]ince this is a maximum depth, the depth certainly could fall within the range contained in the Calhoun '930 Patent" is mere

speculation on his part, and in fact, a range of 3-45 $\mu m$ is neither taught, nor even suggested, anywhere in the Jack '775 Patent. For this additional reason, the Jack Patent cannot anticipate claim 1 of the Calhoun '930 Patent, or any of the claims dependent on claim 1.

## II. OBVIOUSNESS

44. Dr. McHugh concludes that the invention of the Calhoun '930 Patent would have been obvious to a person of ordinary skill in the art at the time the invention was made. I strongly disagree. The invention of the Calhoun '930 Patent would not have been obvious to a person of ordinary skill in the pertinent art.

45. In considering the issue of obviousness, I am informed that the following considerations are to be made:

a. The level of ordinary skill in the art at the time the invention was made.

b. The scope and content of the prior art.

c. The differences between the prior art and the claimed invention.

d. Motivation, if any, to combine or modify the teachings of the prior art to arrive at the claimed invention.

e. Any objective indicia of non-obviousness, such as a long-felt need for the solution offered by the patented invention, and the commercial success and acclaim received by any embodiments of the patented invention.

Date of Invention

46. With regard to the date of the invention of the Calhoun '930 Patent, Dr. McHugh uses the filing date of the patent application, namely December 31, 1996. I understand that there will be evidence presented at trial that the invention was made by 3M before the filing date, in June of 1995.

Level Of Ordinary Skill In The Art

47. I have determined that a person of ordinary skill in this art at the time of the Calhoun '930 invention is someone who holds at least a bachelor of science degree in engineering technology or similar with 1-2 years of experience in the manufacturing of embossed materials or, in the alternative, an individual who has substantial experience (4-6 years) in the manufacturing of embossed materials. My opinion on this issue is unchanged if June 1995 is taken as the date of the invention, or if December 1996 is taken as the date of the invention.

Scope And Content Of The Prior Art, And The Differences Between The Claimed Invention And The Prior Art

48. I consider below the references that were cited during the prosecution of the Calhoun '930 Patent that Dr. McHugh expressly discusses in his Report:

a. United States Patent No. 5,141,790 (Calhoun '790 Patent): This patent discloses a pressure-sensitive adhesive product in which the release liner is embossed to provide an array of depressions. For instance, the depressions can be truncated cones or hemispheres with a depth of about 25 microns (col. 9, lines 35-38). (Dr. McHugh mistakenly says at page 21 of his report that the depressions are about 10 microns deep, citing to col. 10, lines 61-62. In fact, that section says that the depth is 10 microns larger than the depressions in the previous example, Example 2.) The depressions are filled with non-adhesive particles, which transfer to the adhesive surface to provide repositionability. In one embodiment disclosed in the Calhoun '790 Patent and shown in Figs. 6 and 7, the carrier web is embossed with both an array of depressions and a "cross-hatched pattern of ridges 78." (Col. 6, line 57.) This reference does not disclose a multiple embossed pattern or a second embossed pattern of ridges and lands.

b. United States Patent No. 5,296,277 (Wilson '277 Patent) and United States Patent No. 5,362,516 (Wilson '516 Patent): These patents disclose pressure-sensitive adhesive products in which the release liner is embossed to provide an array of depressions, with a depth of at least 15 microns. (Abstracts.) The depressions can be filled with adhesive or non-adhesive material, which transfer to the adhesive surface to create "pegs" that provide repositionability. These references do not disclose a multiple embossed pattern or a second embossed pattern of ridges and lands.

c. United States Patent No. 3,887,678 (Lewicki '678 Patent): Lewicki is directed to an embossed flooring material. Lewicki discloses a multiple embossed pattern created by simultaneously embossing a web with a pattern of depressions (texturing 34) and a pattern of ridges (region 31) and lands, where the height of the ridges over the lands is 254-305 microns (10-12 mils) (col. 4, lines 50-55). This reference does not disclose a second embossed pattern of ridges and lands wherein the height of the ridges over the lands is between about 3 and about 45 microns.

d. United States Patent No. 5,229,186 (Tribble '186 Patent): This patent is directed to films for use in applications such as in diapers and sanitary products for absorption purposes (i.e., to retain fluid, as opposed to removing or exhausting fluid). It discloses two embossed patterns: a pattern of deep embossed macro cells (21) and random micro depressions (24). The deep embossed macro cells are between 64 and 381 microns (2.5 to 15 mil). This reference does not disclose a second embossed pattern of ridges and lands wherein the height of the ridges over the lands is between about 3 and about 45 microns.

e. EP 0313766 B1 (Cabe '766 EP): This patent application is also directed to materials for diapers and sanitary products. The reference discloses sequential embossing of micro and macro patterns (in either order), with the macro patterns being at least 300 microns deep. The micro embossed pattern can be 30 micron-deep parallel lines (col. 5, lines 16-24, see Fig. 5), or a grid pattern (col. 5, lines 24-27, see Fig. 6). This reference does not disclose a second embossed pattern of ridges and lands wherein the height of the ridges over the lands is between about 3 and about 45 microns.

49. I consider below the references that were not cited during the prosecution of the Calhoun '930 Patent that Dr. McHugh expressly discusses in his Report:

a. Japanese Application 2587198 (Japanese '198; I express no opinion as to whether this reference is in fact prior art to the Calhoun '930 Patent): This reference discloses a pressure-sensitive adhesive material in which a release liner 5 has an array of depressions 4 into which material is deposited, and which correspond to an array of projections 2 (square truncated pyramids) on a pressure-sensitive adhesive layer 3. The depressions in the release liner are from 3-50 microns, preferably 15-25 microns. (Page 8, paragraph 24.) The structure disclosed in this reference is thus very similar to the structures disclosed in the earlier Calhoun '790 Patent, and the Wilson '277 and '516 Patents discussed above, all of which were before and considered by the patent examiner during prosecution of the Calhoun '930 Patent. The Japanese '198 Patent states that this structure provides both air bleed and repositionability features. For instance, at page 4 the reference states "in most cases, air is likely to be trapped between the pressure-sensitive adhesive sheet and the surface of the bonding object" and "when the above-mentioned pressure-sensitive adhesive sheet is applied in the wrong place, re-application

is required." "The purpose of the present utility model is to eliminate the above-mentioned existing problems and to produce a pressure-sensitive adhesive sheet with an absence of 'blisters' whereby re-application is made easy." The reference also states that tests were performed with embodiments of this structure, and that the goals of air egress and repositionability were achieved: "Since air escapes from the above-mentioned space, entrapped air can be easily removed." (Page 9, paragraph 37.) "Furthermore, . . . removal can be easily accomplished and re-application can be done easily." (Pages 9-10, paragraph 38.) I also note that this reference states that the depressions in the release liner can be created "by means of embossing or printing." (Page 8, paragraph 26.) Thus, this reference shows that embossing and printing were known and equivalent alternatives to achieve an array of depressions in a release liner. This reference does not disclose a multiple embossed pattern or a second embossed pattern of ridges and lands.

b. Japanese 59-78285 (Japanese '285): This reference discloses a pressure-sensitive adhesive material in which the release liner is embossed to provide ribs in the range 1-15 microns, preferably 2-10 microns. There is no recognition in this reference of the desirability of repositionability. Nor is there any appreciation or suggestion that there would be any additional benefit to providing repositionability as a feature. The reference expressly cautions against having a microstructured adhesive surface that exceeds 15 microns: "height exceeds 15 [microns], entrapment of air occurs under the adhesive surface (pressure-sensitive adhesive layer) and deformation occurs in the pressure-sensitive adhesive layer, and problems occur when the film is used for optical applications." This reference does not disclose a multiple embossed pattern or a first

embossed pattern forming an array of depressions in a second embossed pattern of ridges and lands.

c. United States Patent No. 4,713,273 (Freedman '273 Patent): This reference is directed to pressure-sensitive adhesive materials. The release liner imparts a roughened surface to the adhesive layer to prevent air entrapment: "The inner release-coated face of the paper web is uneven enough to slightly roughen the surface of the adhesive protected by the liner, thus preventing subsequent air entrapment and bubble formation between label and container in labeling applications." This reference does not disclose a multiple embossed pattern, a first embossed pattern forming an array of depressions or a second embossed pattern of ridges and lands.

d. The Sawka '675 Patent: I have considered this reference, and the differences between it and the Calhoun '930 Patent, in detail above.

e. United States Patent No. 3,301,741 (Henrickson '741 Patent): This patent is discussed extensively in the background section of the Calhoun '790 Patent: "U.S. Pat. No. 3,301,741 (Henrickson et al.) makes a pressure-sensitive adhesive sheet repositionable by shaping its surface into a pebbly contour of small protrusions that are covered by non-adhesive, continuous, fragile protective caps. Those caps had been formed by embossing polyethylene-coated paper to form a uniform array of depressions, filling the depressions with non-adhesive material such as a solution of polymethylmethacrylate, and wiping the solution off the areas between the depressions. After the sheet has been positioned, pressure is applied, shattering the caps and causing the adhesive to flow around the fragments into intimate contact with a substrate to which

the sheet is being applied." (Col. 1, line 57, to col. 2, line 2.) This reference does not disclose a multiple embossed pattern or a second embossed pattern of ridges and lands.

f. The McGrath '159 Patent: I have considered this reference, and the differences between it and the Calhoun '930 Patent, in detail above.

g. The Jack '775 Patent: I have considered this reference, and the differences between it and the Calhoun '930 Patent, in detail above.

No Motivation To Combine

50. I disagree with Dr. McHugh's obviousness conclusions. Dr. McHugh's approach is to pick and choose various features from various references to arrive at the claimed invention, with little if any consideration given to any motivation to make the combinations he proposes.

51. Part of my teaching curriculum includes a class dedicated to the consideration of the creative process. With very few exceptions, every invention is a combination of things that existed somewhere before. One very important facet of the act of invention is in recognizing that (and how) these "old" features should be combined.

52. With all due respect, Dr. McHugh gives short shrift to this key issue of motivation, i.e., why someone would think to take "old" features from various sources and combine them to get something new. Dr. McHugh purports to identify four "motivations" that would have led a person of ordinary skill to combine the various references that Dr. McHugh relies upon, in the way that Dr. McHugh proposes:

a. "First, it was well known and desired in the art that repositionable graphics and graphics that facilitate air egress (i.e., removal of entrapped air during application) make graphics application easier." While I believe this to be true (indeed, it

was this long-felt need that was met by 3M's invention), it does not provide the person of skill in the art any motivation to arrive at the claimed invention:

i. What Dr. McHugh overlooks is that the Japanese '198 reference offers a structure that purports to provide this dual functionality. The reference discusses tests that were performed that showed that in fact the structure disclosed therein satisfactorily solved the problem of providing both of these functions in a single material. Thus, a person of ordinary skill in the art, faced with the motivation that Dr. McHugh suggests and knowledgeable about the references that Dr. McHugh relies upon, would have no motivation to construct anything other than the singly embossed structure disclosed in the Japanese '198 reference. Dr. McHugh does not address the issue of why a person interested in a material having both these features would not simply use the structure in the Japanese '198 reference, let alone why he or she would go to the effort of modifying or combining the various references cited by Dr. McHugh. I also note that the structure disclosed in this reference is very similar to the structures disclosed in the Calhoun'790 Patent and the two Wilson Patents, and the examiner determined that the claimed invention was patentable over these three latter references.

ii. Moreover, even if a person of ordinary skill had been motivated (and in my view they would not) at the time of the invention of the Calhoun '930 Patent to go beyond the Japanese '198 reference and modify the various references cited by Dr. McHugh to achieve the dual functionality of air bleed and repositionability, Dr. McHugh does not identify even a single reason why such a person would have been motivated to make the very particular combination set

forth in the claimed invention of the Calhoun '930 Patent. What Dr. McHugh fails to consider is that the various references he cites could be modified or combined in numerous ways to provide the dual features of reduced air entrapment and repositionability. While I am not saying that any one of these particular solutions would have been obvious to the person of ordinary skill in the art, the fact that there are many ways (none of which are even considered by Dr. McHugh) to obtain the dual functionality that supplies Dr. McHugh's alleged motivation. This discussion further confirms that Dr. McHugh is using hindsight analysis, and demonstrates that there is no reason why a person of skill in the art would be motivated to arrive at the exact solution that is claimed in the Calhoun '930 Patent. For instance, the following approaches could also be used to achieve positionability and air bleed:

(1) Posts only. As taught in the Japanese '198 reference, the presence of 3-50 micron posts on the adhesive surface allows "entrapped air [to] be easily removed." (Page 9, paragraph 37.)

(2) Roughness. As disclosed in the Freedman '273 Patent, air entrapment can also be avoided by roughening the adhesive surface.

(3) Perforation. Although not mentioned by Dr. McHugh, a common technique for removing entrapped air bubbles was to perforate the film prior to the invention of the Calhoun '930 Patent. (The Calhoun '930 Patent, at col. 1, lines 29-31.) I personally have attempted this technique, and can confirm the statement in the patent that this approach is labor-intensive if the perforation is done manually. However, a pre-

perforated film with posts would allow entrapped air to escape through the material, while at the same time still providing the positionability feature.

(4) Two single-embossed liners. Rather than use one double-embossed liner to provide an adhesive surface topography having both posts and channels (as in embodiments of the Calhoun '930 Patent), one could instead successively apply two single-embossed liners to the adhesive surface, one to impart posts and the other to impart channels.

b. "Second, it was known in the art that carrier webs could be, and were, embossed to cause depressions that were filled to produce repositionability bumps." I disagree that this statement has anything to do with any motivation to combine references. This is simply a statement about the characteristics of an item of prior art, and says nothing about why or how this feature would be combined with others by the person of ordinary skill in the art.

c. "Third, it was known in the art that carrier webs could be, and were, embossed with ridge dimensions within the range of 3-45 microns for the purpose of achieving air egress." I disagree that this statement has anything to do with any motivation to combine references. This is simply a statement about the characteristics of an item of prior art, and says nothing about why or how this feature would be combined with others by the person of ordinary skill in the art. With respect to the 3 to 45 micron limitation, neither of the retroreflective sheeting patents (McGrath and Jack) define a ridge height that is consistent with the claims of the Calhoun Patent. Dr. McHugh has imposed certain selected dimensions into arguments wherein he asserts a ridge height. Not only are these dimensions poorly defined, but the actual dimensions of 3 to 45

microns are not taught. To the contrary, any reasonable examination of the retroreflective sheeting patents indicates that one of ordinary skill in this art simply would not be taught that a particular combination of dimensions are within the 3 to 45 micron range.

d. "Fourth, it was known in the art that webs could be, and were, multiply embossed." I disagree that this statement has anything to do with any motivation to combine references. This is simply a statement about the characteristics of an item of prior art, and says nothing about why or how this feature would be combined with others by the person of ordinary skill in the art.

53. Dr. McHugh's approach is simply to point to a list of references that disclose multiple embossed patterns, and another list that discloses single embossed patterns in the 3-45 micron range (I disagree with Dr. McHugh's inclusion of the Sawka '675 Patent, the McGrath '159 Patent, and the Jack '775 Patent on this list, for the reasons stated above), and from that conclude that it would be obvious to reduce the embossed dimension of the multiple embossed references to the smaller sizes disclosed in the second set of references. Dr. McHugh fails to identify even a single reason why a person of ordinary skill in the art would be motivated to modify these diverse and disparate reference as he suggests. Dr. McHugh's approach wholly ignores the nature, purposes, and context of the references he purports to modify. When these considerations are taken into account, it is clear that the modifications Dr. McHugh proposes are not only not obvious, but also are completely contrary to the purposes of these references:

a. The Lewicki '678 Patent is directed to a flooring material. Not only does Dr. McHugh not identify any suggestion in the Lewicki '678 Patent to reduce the dimension of the macro embossed floor texture to a micro embossed, it would not make

any sense to do so. Not only is there no need to reduce the embossing depth to the 3-45 micron range, it would be counter to the teachings of the reference to do so. The macro embossed pattern in Lewicki is intended to be in registry with, and to reflect, the printed design on the flooring material. (Col. 2, lines 3-5; col. 3, lines 45-46.) Since these printed designs are for aesthetic purposes (e.g., a brick pattern on vinyl flooring, where the printed/embossed regions are the "mortar" between the bricks), they are at a macro scale, and so too, then, must the embossed pattern stay in registry with the printed pattern and also be at a macro scale (e.g., the mortar area is perceptibly lowered with respect to the surrounding areas to provide a visual and tactile relief). In addition, as Dr. McHugh notes at page 28 of his report, the 3-45 micron embossment depth disclosed in the two Japanese references ('198 and '285) is intended to provide for air egress. There simply is no purpose to adding an air egress feature to the flooring material disclosed in the Lewicki Patent. Moreover, as Dr. McHugh himself recognizes, many of the prior art references discussed above that were expressly considered by the patent examiner taught embossing depressions in the 3-45 micron range. Despite the fact that the examiner was aware of these patents, and also aware of the Lewicki Patent, the examiner nonetheless concluded that the claimed invention of the Calhoun '930 Patent was not obvious, confirming my conclusion of non-obviousness.

b. The same conclusions apply to the UK reference mentioned in passing by Dr. McHugh (UK 1 543 977). Although Dr. McHugh does not explain the "scope and content" of this item of prior art, like Lewicki it is directed to flooring materials, where the macro embossing is intended to provide "deeply embossed relief areas in register with predetermined portions of a decorative pattern under the wear layer." (Col. 2, lines 88-

94.) For the same reasons as discussed above in connection with the Lewicki '678 Patent, there would be no motivation to modify this reference (and in fact it would be contrary to the reference) to reduce this macro embossed feature to a depth of only 3-45 microns.

c. The Cabe '766 reference is directed to materials for use in diapers and sanitary napkins. Again, Dr. McHugh does not point to anything in this reference that would motivate the person of ordinary skill in the art to reduce the size of the macro embossed pattern. In fact, the reference expressly states that the minimum depth of the macro embossed pattern is 300 microns (col. 5, lines 3-6), evidently to provide a minimum desired level of absorbency and fluid retention, and thus it would be completely contrary to the teachings of this reference to reduce the depth of the macro embossed pattern to 3-45 microns, as Dr. McHugh suggests. In addition, as Dr. McHugh notes at page 28 of his report, the 3-45 micron embossment depth disclosed in the two Japanese references ('198 and '285) is intended to provide for air egress. There simply is no purpose to adding an air egress feature to the diaper and sanitary napkin material disclosed in the Cabe reference. In fact, it would be contrary to the fluid retention purpose of the Cabe material to add such an egress feature. Moreover, as Dr. McHugh himself recognizes, many of the prior art references discussed above that were expressly considered by the patent examiner taught embossing depressions in the 3-45 micron range. Despite the fact that the examiner was aware of these patents, and also aware of the Cabe '766 reference, the examiner nonetheless concluded that the claimed invention of the Calhoun '930 Patent was not obvious, confirming my conclusion of non-obviousness.

d. The same conclusions apply to the three remaining multiple embossed references mentioned in passing by Dr. McHugh (Thomas United States Patent No. 3,611,919, Ruppel United States Patent No. 5,382,464, and Schultz 4,320,162). Although Dr. McHugh does not explain the "scope and content" of these items of prior art, they are generally directed to paper towels and tissues. Again, Dr. McHugh does not point to anything in these references that would motivate the person of ordinary skill in the art to reduce the size of the macro embossed pattern, and I would consider such a modification contrary to the teachings of the references. I also note that these references do not disclose a first embossed pattern "in" a second embossed pattern. In addition, as Dr. McHugh notes at page 28 of his report, the 3-45 micron embossment depth disclosed in the two Japanese references ('198 and '285) is intended to provide for air egress. There simply is no purpose to adding an air egress feature to the paper towel materials disclosed in these three patents. Moreover, as Dr. McHugh himself recognizes, many of the prior art references discussed above that were expressly considered by the patent examiner taught embossing depressions in the 3-45 micron range. Despite the fact that the examiner was aware of these patents, and also aware of these three references, the examiner nonetheless concluded that the claimed invention of the Calhoun '930 Patent was not obvious, confirming my conclusion of non-obviousness.

e. Many of the patents considered in my first report, such as Lewicki and Tribble, are from a different art than the commercial graphics film disclosed in Calhoun. Lewicki, for example, is a flooring patent that has little, if any relationship to the commercial graphics industry, and Tribble concerns disposable diapers and sanitary products. The more recent patents cited by Dr. McHugh (Jack and McGrath) all relate to

the art of retroreflective sheeting. In my opinion, one of ordinary skill in the art of carrier webs would not consider technologies developed in reflective signs within the same field as a patent related to carrier webs. Additionally, the retroreflective sheeting patents (McGrath and Jack) are not pertinent to the problem being solved in the Calhoun '930 Patent, and one of skill in the art of carrier webs would not look to retroreflective sheeting to assist in solving a problem. The Calhoun '930 Patent focuses on the need to have carrier webs with the claimed surface topography. In contrast, the retroreflective sheeting patents teach a cover sheet bonded to a base sheet with air between the cover sheet and the base sheet.

54. Dr. McHugh also concludes at page 30 of his Supplemental Report that three "representative" prior art references (Japanese '285, Calhoun '790, and Tribble '186) can be combined to arrive at the claimed invention of the Calhoun '930 Patent. Dr. McHugh does not give any reasonable explanation as to why anyone of ordinary skill in the art would have been motivated to make this combination. I disagree that the claimed invention would have been obvious to a person of ordinary skill in the art from these references:

a. There is nothing in the Japanese '285 reference that would lead anyone to modify the structure or method disclosed therein to include a second embossed pattern, or a second embossing step. There is nothing in the reference to suggest that it would be in any way desirable to add a repositionability feature to the particular disclosed material. None of the examples report any difficulty with positioning the disclosed material. In fact, this reference teaches away, or discourages, any modification that would add a second embossment of the type disclosed in the Calhoun '790 Patent. The reference expressly cautions against having a microstructured adhesive surface that exceeds 15

microns: "when the height exceeds 15 [microns], entrapment of air occurs under the adhesive surface (pressure-sensitive adhesive layer) and deformation occurs in the pressure-sensitive adhesive layer, and problems occur when the film is used for optical applications." The repositionability posts disclosed in the Calhoun '790 Patent are in and of themselves 25 microns high. If these were placed on top of the 1-15 micron high regions on the adhesive surface of the Japanese reference, the total structure would be approximately 40 microns, well above the 15 micron upper limit imposed by the '285 Japanese reference. A person of skill in the art would therefore understand from this caution that an additional embossed pattern should <u>not</u> be added to the structure disclosed in this reference.

b. There is nothing in the Calhoun '790 Patent that recognizes the problem of air entrapment, or that otherwise suggests the desirability of adding a second embossed pattern of ridges and lands to the embossed pattern of depressions on the release liner. In fact, the Japanese '198 reference shows that the strikingly similar structure disclosed in the Calhoun '790 Patent could have exhibited the air bleed feature without the addition of such a second embossed pattern.

c. The Tribble '186 Patent is directed to a material for use diaper or sanitary napkin applications, clearly outside the fields of the pressure-sensitive adhesive materials disclosed in the Calhoun '790 Patent and the Japanese '285 reference. There is no motivation to modify the material or method disclosed in the Tribble Patent to include any of the embossed structure disclosed in the Japanese '285 reference. In fact, doing so would be contrary to the teachings of Tribble, which use embossed patterns to retain fluid, not to exhaust fluid as in the Japanese reference. There is also no motivation to

modify the material or method disclosed in the Tribble Patent to include any of the embossed structures disclosed in the Calhoun '790 Patent. The repositionability feature is simply irrelevant to the technological field of Tribble.

Dependent Claims

55. Although Dr. McHugh concludes on page 32 of his supplemental report that it would have been obvious to the person of ordinary skill in the art to further modify the various references he considers to also have the additional features set out in the dependent claims of the Calhoun '930 Patent, he does not provide any substantive analysis to support this conclusion. I have reviewed these dependent claims and conclude that none of the references cited by Dr. McHugh (or combination thereof) would have rendered claims 2-5 of the '930 Patent obvious. My reasoning for this is set forth in my explanation as to the non-obviousness of independent claim 1 above.

Objective Indicia Of Non-Obviousness

56. Even though Dr. McHugh himself recognizes that there was a long-felt need for a material that offered both repositionability and air egress, he fails to consider this factor in his obviousness analysis.

57. As noted above, I have personally attempted to use a punch to remove entrapped air from graphic films, and I have found it to be time consuming.

58. I understand that installers of graphic films, particularly large-scale graphics films, have to contend with issues of both repositionability and air bleed.

59. 3M's commercial embodiment of the invention of the Calhoun '930 Patent (its Comply™ product) met this need, and these products have been commercially successful as I

understand it. I also understand that Avery's product embodying this invention has been commercially successful.

60. From reviewing the deposition transcript of Dr. Calhoun, I also understand that certain of Dr. Calhoun's colleagues (in particular, Mr. Meixner) did not believe that the invention would work, because Mr. Meixner did not believe that both patterns (ridges/lands and depressions) could exist on the carrier web simultaneously. When Dr. Calhoun demonstrated that both patterns could exist on the carrier web simultaneously, he achieved unexpected results.

61. I understand that 3M will present evidence that Avery copied the invention claimed in the Calhoun '930 Patent. Copying is another objective indicator that a patent was not obvious.

62. The long-felt need in the industry, the success of the Comply™ product, the unexpected results achieved by Dr. Calhoun and Avery's copying all confirm my conclusions that the invention of the Calhoun '930 Patent was not obvious to the person of ordinary skill in the art at the time of the invention.

Executed this 26 day of July, 2005.

A. Brent Strong