# A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| 3M INNOVATIVE PROPERTIES COMPANY and MINNESOTA MINING AND MANUFACTURING COMPANY, Plaintiffs, vs. AVERY-DENNISON CORPORATION, Defendant. | Civil Action No. 01-CV-1781 (DSD/FLN) |

**<u>SUPPLEMENTAL AND REVISED EXPERT REPORT OF DR. ANTHONY J. McHUGH REGARDING</u>**
**INVALIDITY OF U.S. PATENT NO. 5,897,930 PURSUANT TO FED. R. CIV. P. 26(a)(2)(B)**

**CONTAINS CONFIDENTIAL INFORMATION SUBJECT TO JOINT STIPULATED PROTECTIVE ORDER**

## I. INTRODUCTION

My name is Anthony J. McHugh and I am ~~58~~ 60 years old. I live in Coopersburg, Pennsylvania~~Urbana, Illinois~~. I have been retained by the law firm of Hennigan, Bennett & Dorman on behalf of Avery Dennison Corporation as a technical expert in this litigation. I submit this expert report under the requirements of Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure as a statement of the opinions that I have thus far formed and intend to give in this litigation regarding whether the United States Patent No. 5,987,930 (henceforth "the '930 patent") is valid.

I formed the opinions that I express here based on my consideration and review of a variety of information and documents, which I will detail below, as well as my professional experience and training. As other information, documents or testimony are brought to my attention, it may become necessary that I supplement my report. ~~For example, I understand that the co-inventor of the '930 patent, Mr. Calhoun, has yet to provide deposition testimony. Depending on Mr. Calhoun's future testimony and any other information that I consider after submission of this report,~~ I reserve the right to supplement my opinions (and the bases for those opinions) and I also reserve the right to form additional opinions on the issue of invalidity.

## II. QUALIFICATIONS AND PROFESSIONAL EXPERIENCE

I am presently the P. C. Rossin Senior Professor and Chair of the Department of Chemical Engineering at Lehigh University. At the time I provided my original report in this matter, I was James W. Westwater Professor of Chemical Engineering at the University of Illinois at Urbana-Champaign where I had~~have~~ been since 1979. My area of research specialty is polymer materials science and engineering and I have authored or co-authored over 150 publications in this area. I have attached my Curriculum Vitae at Tab 1 to this report, detailing my academic and professional experience, all publications that I have authored or co-authored, technical paper presentations, invited seminars, a complete breakdown of current and past areas of research expertise and research contracts as well as a listing of my past consulting engagements in my areas of expertise. Exhibit I does not reflect my move to Lehigh University, and I will provide an updated curriculum vitae upon request. I have not testified (by deposition or at trial) as an expert in any litigation other than this case in the preceding four years.

## III. COMPENSATION

I have been retained by Avery Dennison's counsel for purposes of consultation regarding technical issues, as well as to review and analyze the prior art, the '930 patent and its prosecution history and other evidence, to form opinions about the validity of the '930 patent, to prepare this expert report and to be available to testify in this litigation. I am being paid for my work at my standard

consulting fee of $250 per hour with reimbursement of actual expenses. My billing rate will be $500 per hour for time spent on giving deposition or trial testimony. No part of my compensation depends on the outcome of this litigation.

## IV. MATERIALS REVIEWED

In preparing this report, I have reviewed the '930 patent, its prosecution history, the prior art references cited during the prosecution of the patent, additional prior art references not cited during the '930 patent's prosecution, deposition testimony of witnesses, interrogatory responses, the parties' contentions, documents produced by 3M, various pleadings, and other documents. I have listed the materials that I have reviewed at Tab 2. In forming my opinions, I have also relied upon my experience and knowledge as well as on well-established engineering and materials science principles and technical knowledge in existence before December 1996.

## V. CAPSULE SUMMARY OF PRESENTLY-HELD OPINIONS CONCERNING INVALIDITY

I am advised that the first step in a validity analysis is interpretation of patent claims. I have provided a chart summary of my opinions concerning the meaning of the '930 patent claim terms, and the definitions that I will apply for certain claim terms, at Tab 3. The chart has been revised to reflect new claim constructions provided by the Federal Circuit and to eliminate constructions involving claim 6-12, which I understand are no longer at issue in this case.

I have analyzed the '930 patent's prosecution history, including prior art cited therein, and also prior art references not cited during prosecution, and, based on the legal principles that I have been advised to be applicable, it is my opinion that:

–(1) at least claim 1 of the '930 patent is invalid as anticipated under section 102(a) and section 102(b) by-_Sawka '675 (U.S.P.N. 5,405,675). Additionally, applying the meaning of claim terms advanced by 3M and the meaning of terms adopted by the Federal Circuit, it is my further opinion that claims 1-5 of the '930 patent are invalid as anticipated under section 102(a) and section 102(b) by the following U.S. patent references: McGrath '159 (U.S.P.N. 4,025,159, Jack '775 (U.S.P.N. 3,989,775), and Rusincovitch '929 (U.S.P.N. 5,487,929)

~~, and~~ (2) the subject matter of each of the '930 patent claims would have been obvious to a person of ordinary skill in the art, and thus, the claims of the '930 patent are invalid under section 103.

I have considered 3M's position concerning the meaning of the '930 patent claim terms, which are set forth in a document entitled "Plaintiffs' Claim and Infringement Contentions," dated March 29, 2002. Based on my analysis of the '930 patent claims, its specification and prosecution history, it is my opinion that 3M's contentions as to the meaning of "multiple embossed pattern," "embossing" and "embossed pattern" are not supported by the specification. I have concluded that if 3M's contentions concerning the meaning of these claim terms are accepted,

then the claims would be invalid under section 112, paragraph 1, of the Patent Code for lack of adequate written description support.

Moreover, if the claims in the '930 patent are construed to require that the claimed "carrier web" or "method of embossing" exhibit an air egress property, it is my opinion that the '930 patent specification does not contain enough teaching to enable a person of ordinary skill in the art to produce, without undue experimentation, the claimed invention. I am advised that the lack of sufficient enabling teaching would make the '930 patent claims invalid under section 112, paragraph 1.

~~I note that, in connection with these section 112 grounds and other bases of invalidity, I may form additional opinions or may revise or supplement my present opinions upon the completion of fact discovery and therefore reserve the right to supplement my report to reflect such changes as I believe to be appropriate.~~

## VI. DETAILED OPINIONS AND THEIR BASES

I was advised by counsel of the legal principles to follow in forming my opinions regarding whether the '930 patent claims are valid. In the first step in my analysis, I ascertained the meaning and scope of the claims. Then, once I interpreted each claim, I analyzed the validity of the claims. The interpretation step is presented below in Section VI.A and the validity analysis is presented in Section VI.B.

### A. Opinions Regarding The Meaning of '930 Patent Claim Terms

The '930 patent is entitled "multiple embossed web." The application that resulted in the '930 patent was filed on December 31, 1996. Since I have construed the claims in light of the intrinsic patent documents (i.e., the specification and the file history) the following briefly discusses the background of the '930 patent.[1]

### 1. Commercial Graphics Film Technology

The invention of the '930 patent relates generally to "embossed webs useful as release liners for pressure-sensitive adhesives and other industrial applications," (the '930 patent, col. 1, lns. 4-6), such as in the commercial graphics industry.

Generally speaking, the commercial graphics industry caters to the graphics needs associated with advertising logos and signage products. A significant application for commercial graphics material is trucks. There, instead of painting logos or other signage directly on the surfaces of the truck, the desired logo or signage is printed onto one surface of a sheet of film that in turn has a pressure-sensitive adhesive coated on its back surface, and which would then be placed on the truck surfaces (or other substrates) as desired. A simplified cross-sectional depiction of a graphic film material illustrating its essential components is shown below:

---

[1] Earlier this year, Judge Doty, the judge presiding over this case, issued an order denying 3M's motion for a preliminary injunction. In that Order, the judge set forth a concise summary of the technological background. I agree with the judge's summary and incorporate it by reference in my report.

Signage or Logo

[redacted]

**Typical Commercial Graphics Film (Cross-Sectional View)**

The film typically comes in large rolls and includes a release liner adhered to the film's back surface in order to hold or carry the pressure-sensitive adhesive ("PSA"). When the release liner is stripped off, it no longer holds or carries the PSA. The PSA instead remains adhered to the back surface of the film. The film, now released from the liner, has its PSA-backed surface exposed, and may be placed on the truck surface (or other substrate surface).

The use of an embossed web as a carrier for a PSA and backing for graphic film was well-known in the prior art before the December 31, 1996 filing date of the '930 patent. A commonly encountered problem in affixing graphics film to the substrate is that of entrapped air between the film and substrate. The prior art describes a solution to overcome this problem by employing a release liner, having a topography that is created by an embossing tool, to carry the PSA. When the embossed release liner is peeled off, the exposed surface of the PSA is left with a topography that is imparted by the embossing pattern of the release liner. This

topography can provide a pathway in the adhesive for air egress when the film is applied onto a substrate surface. (For example, see JP 59-78285 and JP 2587198).

A related common problem in the graphics film application area is that of repositionability. Aggressive adherence of the film to the substrate by the adhesive prevents easy removal and reapplication of the film, either to remove entrapped air, or to reposition the film to a more desirable position. Multiple attempts to adhere the same film to the substrate can compromise the pressure sensitive adhesive or increase the probability of an uneven or misaligned film on the substrate. The prior art solves this problem by employing release liners (to carry the PSA) whose topography creates protrusions on the surface of the later-exposed PSA surface. (For example, see U.S.P.N. 5,141,790, the references cited and discussed in U.S.P.N. 5,650,215, and those cited in the '930 patent). In some cases the protrusions in the adhesive are filled with small particles. (For example, see U.S.P.N. 5,141,790, U.S.P.N. 5,296,277, and U.S.P.N. 5,362,516). The object of these prior art solutions is to facilitate repositioning by limiting the initial contact area between the PSA-backed film and the substrate. Once properly positioned, the film can then be pressed firmly against the substrate to obtain final adhesion.

**2. The '930 Patent: Multiple~~, Sequentially~~ Embossed Carrier Webs**

The abstract of the '930 patent summarizes the invention:

A carrier web having at least one surface that is *multiple, sequentially embossed*, wherein depressions created from the *prior embossing*

> pattern(s) are preserved during the *subsequent embossing* pattern(s) even though the *subsequent embossing pattern(s)* are superimposed on the depressions from the *prior embossing* pattern(s). The patterns of *embossing* can be Euclidean or fractal created from *machine tools* produced by using microreplication and other techniques. The carrier webs are useful for release liners for pressure-sensitive adhesives and other industrial applications. (Emphasis added).

The '930 patent <u>specification</u> emphasizes the advantage of webs having multiple "sequential" embossings: "the advantage of multiple steps is that the depressions formed by the prior step(s) can be filled with material prior to the subsequent embossing step(s)." (col. 2, lns. 13-15). Figure 3 of the '930 patent (shown below) shows a double, sequentially embossed release liner having the features claimed:




FIG. 3

**The '930 Patent**

The '930 patent's specification notes the following nomenclature for Figure 3 above:

<u>Number Reference</u> <u>Description</u>

| | |
|---|---|
| **20** | "liner" (or carrier web). |
| **22** | "liner surface" (that is embossed). |
| **24** | "one pattern of interconnected embossings comprising lands (27), *i.e.*, large squares that have been depressed from the initial surface **22** of liner **20** and ridges **28** formed from the material moved from the lands **27** during the embossing process." |
| **26** | "a second pattern of embossings forming an array of depressions **29**. *Between the time for making the two embossing patterns*, a desired material can be introduced into the second embossing pattern **26** such as glass beads." |

(col. 4, ln. 61 to col. 5, ln. 12).

### 3. The Claims of the '930 Patent

The '930 patent has twelve claims, of which two are independent: claim 1 and claim 6. According to the most recent decision of the Federal Circuit, product claim 1 does not require that the embossed patterns be made sequentially, whereas method ~~Claim 1 covers a carrier web having a multiple, sequentially embossed pattern, and~~ claim 6 covers a multiple, sequential method of embossing a carrier web.

Independent claim 1 reads:

> 1. A carrier web (**20**), comprising:
> at least one surface (**22**) that has a *multiple embossed pattern* having a *first embossed pattern*(**26**) and a *second embossed pattern* (**24**),
> wherein *the first embossed pattern forms an array of depressions* (**29**),
> wherein the depressions (**29**) of the first embossed pattern are in the second embossed pattern (**24**),
> wherein the second embossed pattern (**24**) comprises lands (**27**) and ridges (**28**) between the lands, and
> wherein the height of the ridges over lands ranges from about 3 to about 45 μm.

Independent claim 6 reads:

> 6. A method of *embossing*, comprising the steps of:
> (a) *embossing a* carrier web **(20)** *having* at least one surface **(22)** with a first pattern **(26)** *to create a first pattern of depressions* **(29)**;
> (b) *embossing* the surface with a second pattern **(24)**, *to create a second pattern of depressions* **(24)** comprising lands **(27)** and ridges **(28)**;
> wherein the depressions **(29)** created from the first embossing step are substantially preserved during the second embossing step even though the second embossing step superimposes the second pattern **(24)** on the depressions **(29)** created by the first embossing step, and
> wherein the height of ridges over the lands ranges from about 3 to about 45 μm.

For ease of reference, I have italicized certain claim language that I have been told the parties contest. I have also added reference numerals, used in the patent's figures and specification, in the claims. Dependent claims 2-5 and 12 derive from claim 1, and dependent claims 7-11 derive from claim 6. Claims 1-5 are all reproduced at Tab 3. I understand that 3M no longer contends that Avery's EZ Film product infringes claims 6-12.~~Claims 1-12 are all reproduced at Tab 3.~~

### 4. Analysis of '930 Claim Language and Meaning

Tab 3 contains a chart summarizing my opinions regarding the meaning of the claims. I understand from counsel and from my review of the parties' preliminary injunction papers, that at least the following claim terms are in dispute:

- multiple embossed pattern
- "embossed pattern . . . of depressions"

I reserve the right to provide opinions as to the meaning of other claim terms after I have received and reviewed 3M's expert report on infringement.

(i) **"Multiple Embossed Pattern"**

I have reviewed the District Court's February 15, 2002 written Order (attached at Tab 4). In that order the Court found that the term "multiple embossed pattern" means "sequentially embossed patterns." I agree with the court's definition for the following reasons. First, Judge Doty accurately described how the term "multiple embossed pattern" is used in the intrinsic patent documents:

> While the language of the claim does not mention the word "sequential," it nevertheless illustrates that the term "multiple embossed pattern" requires sequential embossments. In particular, the claim provides for "[a] web carrier, comprising:
>
> > at least one surface that has a multiple embossed pattern having a first embossed pattern and a second embossed pattern. . . ."
>
> (. . . col. 9, lns. 33-36.) The fact that the language of claim 1 expressly refers to two separately-created embossed patterns as "a **first** embossed pattern" and a "**second** embossed pattern" clearly establishes from the language of the claim alone that the term "multiple embossed pattern" requires multiple embossments which are applied one after the other. (Id. (emphasis added).)
>
> Moreover, even if the claim's language is ambiguous, which it is not, the patent specification makes absolutely clear that the term "multiple embossed pattern" means sequential embossments.
>
> * * *
>
> The specification defines the term "multiple embossed:"
>
> > "Multiple embossed" means two or more embossing patterns that are superimposed on the web to create a complex pattern of differing depths of embossing.

> (. . . col. 2, lns. 1-3.) . . . . The definition specifically requires two or more embossing patterns. . . . In fact, the language of the sentence in the specification immediately following the definition of the term "multiple embossed pattern" provides: "Another aspect of the present invention is a carrier web having at least one surface that is multiple, **sequentially** embossed, wherein depressions created from the prior embossing pattern(s) are substantially preserved during the **subsequent** embossing pattern(s) . . ." Id. (emphasis added). Other language in the specification further emphasizes that the term "multiple embossed pattern" in claim 1 means sequential embossing steps. . . .

(Judge Doty's February 15, 2002 Order, at pages 10-11 and 12-13, attached at Tab 4) (emphasis in original). See also Tab 5, incorporated herein by reference.

Second, I would also concur with the Judge's characterization that claim 1 is a product-by-process claim because the language of claim 1 defines the invention, in part, by the way the carrier web is embossed, *i.e.*, it is multiple, sequentially embossed. This provides additional support for my opinions concerning the meaning of "multiple embossed pattern."

Finally, as explained in the Court's opinion, the file history supports the Court's definition. During prosecution, the term "sequential" was removed from claim 1 to overcome a vagueness rejection. In comments accompanying the Amendment, the applicants made clear that they were simply clarifying the language of claim 1, and that the claim still required sequential embossments when the second pattern is superimposed over the first pattern. At no time did the applicants suggest that they intended to broaden the claim. John Hornickel, the

lawyer that drafted the Amendment, confirmed in his deposition that the Amendments were designed only to overcome the examiner's vagueness rejection.

However, I have been informed (and have read) that the Federal Circuit determined that the term "multiple embossed pattern," as used in Claim 1, does not contain a requirement that the patterns be made in sequence. Accordingly, for purposes of the opinions set forth in this report as to whether 3M's '930 patent is valid, I will read that phrase more broadly to encompass single embossed patterns—i.e., embossed patterns made at the same time. I further understand that the Federal Circuit determined that the definition of "multiple embossed" contained in the patent specification at column 2, lines 1-4 govern the meaning of that term in Claim 1. Thus, for purposes of the opinions set forth in this report as to whether 3M's '930 patent is valid, I will read "multiple embossed" in Claim 1 to mean as follows: "Two or more embossing patterns are superimposed on the web to create a complex pattern of differing depths of embossing."

**(ii) "Embossed" Pattern of Depressions**

The Court in its February 15, 2002 Order concluded that the meaning of the term "*embossed*" is a "topography created on material by impressing a corresponding inverse topography on its surface." (Judge Doty's Order, at page 16). I agree with this definition. As the Court noted, this definition is consistent with accepted technical dictionary definitions, and also is admitted to by the deposition testimony of Mr. Calisto of 3M. (Order, at page 16). I have also

reviewed the recent deposition testimony of Mr. Frank Sher and Mr. Dan Fleming of 3M. In my opinion, the testimony of both Mr. Sher and Mr. Fleming indicate that their understanding of the meaning of an "embossed" pattern is consistent with the definition that the Court has adopted.

Nevertheless, I believe that recent positions taken by 3M in its infringement contentions necessitate the addition of clarifying language to the above definition. I understand that 3M has now taken the position that the ink dots flexographically printed on the Avery liner which are hardened through UV exposure constitute an embossing tool and that the Avery liner with the embedded ink dots has an embossed pattern corresponding to those ink dots. I disagree with 3M's position as inconsistent with the Court's definition. In view of 3M's new positions, I believe the following additional language is required to clarify what meaning a person of ordinary skill would give to the term "*embossed*": Specifically, an embossed pattern requires the use of tooling. Use of an embossing tool to create an embossed pattern requires the impressing of the tool into the material and the removal of the tool from the material.

The recent deposition testimony of Messrs. Sher and Fleming, in my opinion, support the further clarifying language concerning the meaning of an "embossed" pattern that I propose above. (Deposition of Sher at pages 18-19 and Deposition of Fleming at pages 26-24.) I also note that the deposition testimony of

Mr. Mark Timmerman is corroborative of my proposed clarification. (For example see pages 251-260 and 292-295 of the Deposition of Timmerman.)

I have been informed that, following the Federal Circuit's decision, the parties agree that the definition of "embossed" contained in the patent specification at column 1, lines 61-64 govern the meaning of that term in Claim 1, and that Claim 1 is "structural." Thus, for purposes of the opinions set forth in this report as to whether 3M's '930 patent is valid, I will read "embossed" in Claim 1 to mean as follows: "a topography on a web or tooling having an effective three-dimensional pattern that generates a difference in surface planar dimension in the liner or the tooling." I further understand that Dr. Strong's view of "embossed" is even broader than the definition in the patent. For example, Dr. Strong believes that an embossed material includes a material that has another material embedded into it. Although Dr. Strong contends that the definition of "embossed" in the patent specification supports his expansively unique understanding of the term embossed, I disagree. Nonetheless, I have considered Dr. Strong's view of "embossed" and discuss in this report prior art that would invalidate the '930 patent under Dr. Strong's view.

~~Should the Court later adopt different definitions than those set forth in its February 15 Order, I reserve the right to provide additional opinions concerning the meaning of the claim terms and further opinions regarding the validity issues.~~

B. **Opinions Regarding Validity**

**1. Anticipation**

I understand that a patent claim is invalid under section 102(a) of the patent code if prior to the date of the invention, the invention was described in a patent in this country. In my opinion, the Sawka '675 patent (U.S.P.N. 5,405,675), issued on April 11, 1995 -- before the December 31, 1996 date of the '930 invention -- anticipates at least claim 1 of the '930 patent under section 102(a).

I further understand that a patent claim is invalid under section 102(b) of the patent code, if more than one year before the filing date, the invention was described in a U.S. patent. The Sawka patent issued on April 11, 1995 -- more than one year before the December 31, 1996 filing date. It is my opinion that at least claim 1 of the '930 patent is invalid under section 102(b), as well.

The Sawka '675 patent relates to a film 10 (see Fig. 1 below) with a multiple embossed pattern on a base or carrier web 12 formed by sequentially embossing the web with two distinct embossing tools to transfer a desired a pattern from the tools into the web. col. 2, ll. 37-45. One embodiment disclosed in the Sawka patent shows a first embossed pattern and a second embossed pattern that "selectively replaces" the first pattern. col. 4, ll. 20-34. In a second embodiment, however, the second embossed pattern does not replace the first pattern, but rather is embossed over the first pattern so that both patterns exist simultaneously. col. 15, ll. 56-60. Accordingly, the pattern of the first embossing step is retained in the second embossing step. Each embossed pattern may include series of ridges and

depressions or virtually any other shape, such as the ridges and lands shown in Figure 1:




FIG.1

As explained in the Sawka specification, the depth of the patterns is preferably "no more than one-third the total thickness of the base layer 12." col. 4, ll. 6-9. The base layer 12 thickness ranges from "about 25 to 350 microns." col. 5, lines 14-17. Consequently, if the base layer in Sawka is 25 microns thick, the height of ridges over lands in Sawka would be approximately 8 microns, exactly within the 3 to 45 micron range specified in claim 1 of the '930 patent.

As is shown in the chart below, the Sawka patent discloses every element of claim 1 of the '930 patent.

| **'930 Claim 1** | **Sawka '675** |
|---|---|
| 1. A carrier web, comprising: | The Sawka '675 patent relates to an embossed multilayer film having an embossed base or carrier layer. |
| at least one surface that has a multiple embossed pattern having a first embossed pattern and a second embossed pattern, | [T]he film can be re-embossed such that the film exhibits a first embossed pattern (such as an overall background pattern) and a second embossed pattern (such as a subsequently applied legend or logo.) |

| '930 Claim 1 | Sawka '675 |
|---|---|
| | col. 2, ll. 41-45. |
| wherein the first embossed pattern forms an array of depressions, | Sawka discloses that the first embossed pattern may be an overall background pattern with a open "recessed" finish, in a "virtually unlimited multitude of patterns." One example pattern is "pebbled." Sawka patent, col .9, ll. 38-43. |
| wherein the depressions of the first embossed pattern are in the second embossed pattern, | "The re-embossable feature of the inventive films was also demonstrated by thermomechanically embossing the film of example 3 at a temperature of 151C, and at a pressure of 100 bars to provide a first embossed pattern. The embossed film was then high frequency re-embossed as described above to provide the film with ***simultaneous first and second embossed patterns that were different***." col. 15, ll. 52-60 (emphasis added). |
| wherein the second embossed pattern comprises lands and ridges between the lands, and wherein the height of the ridges over the lands ranges from about 3 to about 45 μm. | "[T]he embossed pattern of FIG. 1 is shown as comprising a series of alternating depressions 16 and ridges 18...." col. 4, ll. 12-14. The thickness of the carrier 12 is disclosed as "in the range of about 25 to 350 microns." col. 5, lines 14-17. The depth of the pattern is preferably "no more than one-third the total thickness of the base layer 12." col. 4, lines 6-9. As such, the height of the ridges over the lands in Sawka is well with the range of "3 to about 45 μm." |

I further have examined the validity of the '930 patent in light of the more expansive definitions of "multiple embossed" and "embossed" provided by the Federal Circuit, and advocated by Dr. Strong (based on his reading of the definitions of those terms in the patent specification). In order to support his infringement contentions, Dr. Strong states that "multiple embossed" includes single embossed patterns at differing depths—i.e., patterns made at the same time. Dr. Strong further states that an embossed structure exists where one material is embedded into another material. Similarly, Dr. Strong states that an embossed structure encompasses any three-dimensional surface topography. In other words, a surface may be "embossed" even if no tool is used to generate the difference in surface planar dimension on the material by impressing an inverse topography on its surface. These contentions, if accepted, render the '930 patent invalid under at least three prior United States Patents.

First, the McGrath '159 patent, assigned to 3M, describes a cellular retroreflective sheeting. The sheeting contains a surface with two topographies. The first "topography" (using Dr. Strong's definitions) has glass beads partially embedded into a polymer material. The material is then embossed from the opposite side, which forms ridges in a square pattern on the surface containing the glass beads. The ridge height is approximately 40% to 60% the diameter of the beads, which can range from 10 to 200 microns. Thus, the ridge height can range from approximately 4 to 120 microns, well within the range specified in the '930

patent. Thus, applying Dr. Strong's view of "embossed" and "multiple embossed," the McGrath '159 patent discloses each limitation of the '930 patent.

Second, the Jack '775 patent describes a method of making retroreflective beaded material. Glass beads are distributed on a web surface. Then the surface is embossed with a pattern, which simultaneously embeds the beads partially in the surface. Embossing serves to change the axes of the exposed portion of the beads to improve reflectivity at different sight angles. Although the patent does not provide specific dimensions for the depth of the embossed pattern (or resulting height of ridges that form), one example states that the "maximum depth" was 0.003 inches, which converts to approximately 76.2 microns. Since this is a maximum depth, the depth certainly could fall within the range contained in the '930 patent. The '775 patent further explains that the embossing must be deep enough to tilt the bead axis preferably 35 to 80 degrees. Thus, applying Dr. Strong's view of "embossed" and "multiple embossed," the Jack '775 patent discloses each limitation of the '930 patent.

Finally, the Rusincovitch '929 patent describes a repositionable wall covering. The wall covering is made by embossing a decorative pattern on the front side of the wallpaper. On the backside, two designs are applied—a pattern of PSA and non-adhesive projectiles. The thickness of the PSA is about 32 microns and the projections have a thickness of about 2% to 30% of the PSA thickness—i.e., 32 to 41 microns. Thus, applying Dr. Strong's view of "embossed" and

"multiple embossed," the Rusincovitch '929 patent discloses each limitation of the '930 patent.

### 2. Obviousness

I am advised that a claimed invention is unpatentable under 35 U.S.C. § 103 if, at the time the invention was made, the differences between the claimed invention and the prior art are such that the subject matter of the invention as a whole would have been obvious to a person having ordinary skill in the relevant field. I am advised that obviousness is based on the scope and content of the prior art, the differences between the prior art and the claimed invention, the level of ordinary skill in the art and evidence of secondary indicia of nonobviousness to the extent offered. I have also been advised that, in looking to combine prior art references for obviousness considerations, I am to consider the motivation, suggestion or teaching, implicit or express, in the prior art references or the prior art as a whole, the knowledge of one of ordinary skill in the art, or in the nature of the problem to be solved.

I also understand that secondary indicia of nonobviousness may include, for example, a long felt but unmet need in the prior art that was satisfied by the invention of the patent; commercial success of the processes covered by the patent; unexpected results achieved by the invention, praise of the invention by others skilled in the art; taking of licenses under the patent by others; deliberate copying of the invention; and contemporaneous and independent invention by others. I also

understand there must be a nexus between any such secondary indicia and the invention.

If 3M relies on secondary indicia to defend against obviousness, I reserve the right to supplement this report with respect whether any such evidence has any impact on my final conclusion.

### (i) Date of Invention

I have used the date of filing of the '930 application--December 31, 1996--as the date of invention for purposes of this report. I reserve the right to modify my opinions and supplement this report should other information establish an earlier date of invention.

### (ii) Level of Ordinary Skill in the Art

I understand that factors such as the education level of those working in the field, the sophistication of the technology, the types of problems encountered in the prior art, prior art solutions to those problems, and the speed at which innovations are made may help establish the level of skill in the art. I have considered the prosecution history of the '930 patent, the references that are cited therein, other prior art references, the state of knowledge existing at the time of the invention, as well as the level of skill of inventors in the field, and have concluded that, as of December 31, 1996, a person of ordinary skill in the art would have had both educational as well as practical experience as follows:

- a Bachelor's degree in materials science, chemical engineering or chemistry; and

- practical working experience related to the processing of polymer films, including operations associated with coating, embossing and application of adhesives to such films.

**(iii) The Teachings of the Prior Art**

There are, and I have considered, numerous prior art references relating to singly and multiply embossed webs. (See references listed in Avery's Claim Construction Contentions and Invalidating Prior Art, attached at Tab 5). I have selected the following material references as exemplary of the teachings of the prior art, and for each I provide representative commentary:

**Prior Art Not Cited During '930 Prosecution**

- JP 2587198 teaches pressure sensitive adhesive sheets with small independent projections and a release liner with corresponding depressions. (page 19, claim 1). It teaches that projections are in the range of 3-50 μm (par. 0021), and that the range of 15-25 μm is especially desirable. It provides a solution to air egress and repositionability problems. (0003-0005, and 00041). It teaches, for example, that the projections may be prepared by coating the adhesive onto an embossed liner (par. 0026), and may be square truncated pyramids arranged in a lattice pattern (par. 0021);

- JP 59-78285 teaches embossed grooves in a release film (*i.e.*, a release liner), with groove lines having a height range of 1 to 15 μm that gives acceptable air egress property (claim 1). The continuous grooves prevent entrapment of air when the adhesive-backed film is applied to a substrate;

- Freedman '273 (U.S.P.N. 4,713,273) teaches formation of liners for pressure-sensitive adhesive labels in which the inner release-coated face of the liner is roughened and thus prevents air entrapment and bubble formation between the adhesive-backed label and the

substrate. (col. 7, lns. 2-5; col. 1, ln. 42-46 and claim 1). Roughness is achieved by forming a multi-phase particle-filled layer including a continuous phase of polymeric film material and a discontinuous phase of filler material. (claim 1);

- Sawka '675 (U.S.P.N. 5,405,675) relates to a film with a multiple embossed pattern on a base or carrier web formed by sequentially embossing the web with two distinct embossing tools to transfer a desired a pattern from the tools into the web. (col. 2, ll. 37-45). One embodiment disclosed in the Sawka patent shows a first embossed pattern and a second embossed pattern that "selectively replaces" the first pattern. (col. 4, ll. 20-34). In a second embodiment, however, the second embossed pattern does not replace the first pattern, but rather is embossed over the first pattern so that both patterns exist simultaneously. (col. 15, ll. 56-60). Accordingly, the pattern of the first embossing step is retained in the second embossing step. Each embossed pattern may include series of ridges and depressions or virtually any other shape, such as the ridges and lands. As explained in the Sawka specification, the depth of the patterns is preferably "no more than one-third the total thickness of the base layer 12." (col. 4, ll. 6-9). The base layer 12 thickness ranges from "about 25 to 350 microns." (col. 5, lines 14-17). Consequently, if the base layer in Sawka is 25 microns thick, the height of ridges over lands in Sawka would be approximately 8 µm.

- Henrickson '741 (U.S.P.N. 3,301,741) teaches embossing the release liner to create depressions in the liner surface, which, in turn, result in a repositionable adhesive sheet material having a pebbly contour with small protrusions and intervening planar areas. The protrusions are one to ten mils (~25 to 250 µm) in height. (claim 5). They are not less than 15 µm. (col. 3, ln. 59-60) The '741 patent teaches that the pebbly contour of protrusions is separated by intervening planar areas (col. 2, ln. 30-34)

- <u>The McGrath '159, Jack '775 and Rusincovitch '929 patents discussed above in connection with anticipation.</u>

**<u>Prior Art Cited During Prosecution</u>**

- Calhoun '790 (U.S.P.N. 5,141,790) teaches the presence of embossed depressions on the release liner that are filled with non-adhesive particles. (col. 6, ln. 12-15). It teaches, for example, that the

depressions of its example 2 are conical with a depth and width of about 10 µm. (col. 10, ln. 61-62)

- Wilson '277 (U.S.P.N. 5,296,277) and Wilson '516 (U.S.P.N. 5,362,516) teach adhesive articles having microstructured adhesive surfaces. These patents teach adhesive pegs formed from embossed depressions in a release liner. The pegs provide repositionability and have a height of at least 15 µm up to 200 µm. Moreover, '516 teaches composite pegs having small beads in them to aid in repositionability. Such composite pegs are produced by coating beads onto an embossed liner to fill the depressions of the liner with the bead slurry, followed by coating the filled, embossed liner with an adhesive solution. ('516, col. 7, ln. 24-32, claim 1, ln. 31-42)

- Lewicki '678 (U.S.P.N. 3,887,678) teaches a film having two patterns of embossed depressions, one within the other, a multiple embossed pattern. A surface texturing or microembossing pattern of ridges from 0 to 180 µm is superimposed on the raised areas of the larger embossing pattern or to portions of the deeply mechanically embossed region.

- Tribble '186 (U.S.P.N. 5,229,186) is directed to a multiple embossed plastic film having a plurality of superimposed deeply embossed macro cells together with one or more pluralities of microcells or depressions. The deep embossed pattern consists of a series of macro cells that are interconnected by lands extending between the adjacent macro cells (col. 2, ln. 29-33). In one embodiment, a two-step embossing process is used (col. 2, ln. 40-45, col. 3, ln. 26-62, and col. 4, ln. 11-19). A plurality of microcells having a diamond-shaped, structured pattern is produced in the first embossing step. A second plurality of depressions within a macro cell pattern of depressions is produced in the second embossing step. The micropattern has a depth range of 1 to 6 µm (claim 3);

- Cabe EP 0313766 B1 describes a double embossing process with a first macro embossed pattern followed by a second micro embossed pattern "while retaining the textile imprint of the macro embossing." (col. 3, ln. 5-14). In one illustration, the second micro embossed pattern, produced in the micro embossing station (Fig. 1) comprises a series of angled, parallel lines cut to a depth of 30 µm (a pattern being known in the art as a Schreiner pattern).

- In addition, I have considered the teachings of other prior art references discussed by the examiner during the prosecution of the'930 patent, including: GB 1543977, Thomas '919 (U.S.P.N. 3,611,919); Schulz '162 (U.S.P.N. 4,320,162); Ruppel '464 (U.S.P.N. 5,382,464), all of which, as the examiner noted, teach multiple embossed patterns.

**(iv) <u>The Difference Between The Claimed Invention And The Prior Art</u>**

Based on my review of the prior art considered by the patent office during prosecution and the claims allowed, it is apparent that the only difference between the art and the allowed claims is the 3-45 μm height limitation of ridges over lands in the second embossment. The applicants added this height limitation during prosecution to distinguish the claimed invention over the prior art considered by the examiner. In fact, the applicants were able to convince the patent office that their claimed multiple embossed webs differed from the prior art only by adding the 3 - 45 μm height limitation after the examiner had rejected the claims.

As originally filed, claim 1 read:

> A carrier web, comprising: at least one surface that is *multiple, sequentially embossed* with a pattern, wherein depressions created from the ***prior embossing*** **pattern**(s) are substantially preserved during the ***subsequent*** **embossing pattern**(s) even though the ***subsequent*** **embossing pattern**(s) are **superimposed** on the depressions from the **prior embossing pattern(s).**

In my opinion, the original claim 1 shows that the invention was directed to carrier webs having multiple, sequential embossed patterns.

The Patent Examiner rejected all of the originally filed claims on a number of grounds, including a vagueness rejection under Section 112, paragraph 2:

> Claims 1-18 are rejected under 35 U.S.C. § 112 and second paragraph, as the claimed invention is not described in such full, clear, concise and for failing to particularly point out and distinctly claim the subject matter which the applicants regards as his invention.
>
> **Claim 1 is confusing** in the recitation of "**one surface that is multiple, sequentially embossed.**" What is the intent of applicant?
>
> Claim 1 recites that limitation "***prior embossing pattern***." There is **insufficient antecedent** basis for this limitation in the claim. . . .

I am advised that a section 112, paragraph 2 rejection only deals with the clarity and precision of the claim language, not its breadth. To overcome the vagueness and other rejections, the applicants submitted an Amended claim 1, which replaced and rephrased the objectionable terms "sequential," "prior," "superimposed" and "subsequent" with alternate terms "first" and "second". The Amended claim 1 read as follows:[3]

> 1. (Amended) A carrier web, comprising:
>
> at least one surface that has a multiple embossed pattern having a first embossed pattern and a second embossed pattern, [is multiple, sequentially embossed with a pattern,] wherein depressions of [created from] the first embossed [prior embossing] pattern are [pattern(s) are substantially preserved during] in the second [subsequent embossing pattern(s)] embossed pattern [even though the subsequent embossing pattern(s) are superimposed on the depressions from the prior embossing pattern(s).].

---

[3] Language added to claim 1 is underlined, while deleted language from original claim 1 is bracketed.

In submitting these amended claims, the applicants stated that the claim as amended and rephrased overcame the vagueness problems. The prosecution history, in my opinion, makes clear that the applicants continued to take the position that the Amended claim 1 was directed to ***multiple, sequentially embossed patterns*** where the first embossed pattern ***survives*** the embossing of the second pattern. Specifically, in response to the anticipation and obviousness rejections, the applicants distinguished the prior art patents cited by the examiner and asserted the scope of amended claim 1 as follows:

> . . . [The] '681 [patent] does not disclose the creation of multiple embossed pattern having a first embossed pattern and a second embossed pattern. The [Patent] Office has correctly stated that two different adhesives are possible according to the teachings of the Patent '681. That is true. ***But Applicants are claiming two different embossment patterns where the first embossed pattern survives the embossing of the second pattern***. . . .
>
> Applicants' Claims 1, 3-8, 10, 13-15, 17 and 18 are also novel over Patent '765. . . There is ***nothing in Patent '765 that teaches*** that one can have ***two different embossed patterns, where the first pattern survives the embossing of the second pattern*** to create a complex pattern of differing depths of embossing.
>
> * * * *
>
> Neither Patent '765 nor Patent '681 discloses or suggest the construction of a web that has multiple embossed patterns, *where* ***the first embossed pattern is in the second embossed pattern***. . . . This invention unexpectedly has found that the ***depressions formed during the first embossed step are not lost when the second embossing step is performed.***

I understand from the prosecution history that the examiner was persuaded that the claims as amended and rephrased were no longer vague. However, the examiner continued to reject as invalid the amended claims in view of at least five

(5) additional prior art references that taught multiple embossed patterns where the first embossed pattern ***survives*** the second embossment. In what I understand to be the second office action the examiner explained its reasons:

> Lewicki teaches a method and a sheet or web comprising at least one surface (wear layer 26) that has a multiple embossed pattern having a first and second embossed pattern. . . . Thus, ***Lewicki teaches an embossing pattern in an embossing pattern.***
>
> * * * *
>
> Claims 1, 3-7 are rejected under 35 U.S.C. § 102(b) as being anticipated by EP 0 313766 A2.
>
> EP 0 313766 teaches a film or web wherein the film is ***first*** *subjected to macro embossing* ***followed by*** *a micro embossing step.* ***Claims 1, 3-7 are drafted in the product-by-process format.***
>
> * * * *
>
> GB 1 543 977 teaches a sheet or web wherein the sheet is ***first*** subjected to *shallow emboss* ***followed by*** *a deep emboss step*. . .
>
> * * * *
>
> Thomas ('919) teaches two or more embossing station forming ***repetitive superimposed*** *continuous embossments* in the web (claim 1).
>
> Ruppel ('464) teaches *big "bosses"* ***alternating with*** *"little bosses"* are positioned in congruent and tip-to-tip relation with the bosses of the second embossed ply while the big bosses of the first ply are simultaneously positioned between two bosses of the second ply (column 2, lines 15-26; figures 2-5).
>
> Schulz ('162) teaches a web having multiple embossed pattern having a first embossed pattern and a second embossed pattern ***wherein the first pattern is in the second pattern*** (figures 3, 6, 8; columns 2-4; claims 1-18).

The second office action confirms to me that the examiner considered the '930 patent to be directed to multiple, sequentially embossed pattern.

In response to the examiner's second rejection, the applicants again amended the claims -- but only to incorporate a height of ridges over lands limitation that the applicants stated would distinguish the claimed carrier webs having ***multiple, sequential** embossings* from the prior art.[9] The following limiting language was added to the end of claim 1: "wherein the second embossed pattern comprises lands and ridges between the lands, and wherein the height of the ridges over the lands ranges from about 3 to about 45 µm." With this amendment, the applicants argued that claim 1 should be allowed over each of the multiple, sequential embossing references because none of the those references disclosed patterns with the heights of ridges over lands of about 3 to 45 microns. Specifically, the applicants stated that:

> Amendments to Claims 1 and 8 overcome the rejections citing Lewicki, EP 0 313 766 publication, and GB 1 543 977 publication. Each of these references are concerned with a series of multiple depressions where the larger surface area depressions are almost an order of magnitude larger than the *height range claimed between ridges and lands that comprise the result of the second embossing pattern or step*, respectively, of Claims 1 and 8: from about 3 to 45 micrometers.

In allowing the claims to issue, the examiner explained, in a prosecution document entitled the "Statement of Reasons for Allowance," that the rejections were

---

[9] Prior to submitting its amendment, the applicants conducted an in-person interview with the Examiner wherein 3M indicated that it "will amend claim and put in additional limitation to distinguish over the prior art."

withdrawn because, as represented by the applicants, "The prior art does not suggest or teach a carrier web with ridges and lands that ranges from 3 to 45 µm."

(v) **Obviousness Conclusions**

There are several prior art references that were not considered during the '930 patent's prosecution, but which in fact teach precisely what 3M claimed was lacking in the prior art. Specifically, as summarized earlier, each of the following references teach dimensions of the embossing depths within the claimed range of ~3-45 µm: (1) Sawka '675; (2) Henrickson '741; (3) JP 2587198 and (4) JP 59-78285. Therefore, it is my opinion that each of these references in combination with any of the prior art references relied on by the examiner to reject the claims a second time render the claims invalid as obvious.

The two Japanese references that I have discussed earlier, in fact explicitly state that their prescribed size limitation allows for air egress in a pressure sensitive adhesive.

In addition to the above references, I note that several prior art references cited during the prosecution in fact taught embossing depression sizes within the claimed range. For example, as I have stated earlier in my summary of the prior art, Tribble '186 and Cabe EPO313766 B1 provide such teaching. In my opinion, each of these two references as well renders the claims obvious over the prior art.

With respect to the additional features in the dependent claims, it is my opinion that those features (such as the pattern, shape and width recitations) in the

dependent claims are inherent in the prior art references such as GB1543977, EP0313766, Lewicki '678 and Calhoun '681. During prosecution, the examiner expressed the same conclusion.

~~Finally,~~ Tthe obviousness of each claim in the '930 patent can be demonstrated by examining three representative prior art references: JP 59-78285; Calhoun '790; and Tribble '186 (or Lewicki '678 or Cabe EP 0313766 B1). These references (in combination with features express or inherent in the art), teach each element of each claim of the '930 patent, namely:

(1) multiple embossed pattern,

(2) one embossed pattern of depressions that can be filled with a material, and

(3) another superimposed pattern forming ridges 3 - 45 μm above the lands (suitable for air egress, (even though such is not a claim limitation).

In my opinion, there was ample motivation in the art to combine these references (or combinations of them).

First, it was well known and desired in the art that repositionable graphics and graphics that facilitate air egress (i.e., removal of entrapped air during application) make graphics application easier.

Second, it was known in the art that carrier webs could be, and were, embossed to cause depressions that were filled to produce repositionability bumps (see, for example, Calhoun '790 and 3M's prior art Controltac Plus product).

Third, it was known in the art that carrier webs could be, and were, embossed with ridge dimensions within the range of 3 -45 μm for the purpose of achieving air egress. (See, for example, JP 59-78285).

Fourth, it was known in the art that webs could be, and were, multiply embossed. (See, for example, Tribble '186, Lewicki '678 or Cabe 0313766 B1.)

Thus, in my opinion, the prior art, knowledge of those skilled in the art, and the nature of the problem to be solved all provide the necessary motivation to combine these references.[4] Sher's deposition testimony regarding the development of the '930 invention further corroborates the obviousness of the claimed invention.

Finally, without the requirement that the multiple embossed patterns be made sequentially (as directed by the Federal Circuit), and adopting Dr. Strong's views regarding the breadth of the term "embossed," the "structure" of the '930 patent was obvious to anyone skilled in the art combining any of the McGrath '159, Jack '775 and Rusincovitch '929 with each other, or with any of the references described in this section.

Dated: May ___, 20042

____________________________
Anthony J. McHugh

[4] There are other combinations of prior art references that render the '930 patent claims obvious, and may be found in my declarations in connection with the preliminary injunction proceedings. I incorporate those declarations by reference.