# C

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| 3M INNOVATIVE PROPERTIES COMPANY and MINNESOTA MINING AND MANUFACTURING COMPANY, Plaintiffs, | Civil Action No. 01-CV-1781 (JRT/FLN) |
| vs. | |
| AVERY-DENNISON CORPORATION, Defendant. | |

**SUPPLEMENTAL AND REVISED EXPERT REPORT OF DR. ANTHONY J. McHUGH REGARDING INVALIDITY OF U.S. PATENT NO. 5,897,930 PURSUANT TO FED. R. CIV. P. 26(a)(2)(B)**

**CONTAINS CONFIDENTIAL INFORMATION SUBJECT TO JOINT STIPULATED PROTECTIVE ORDER**

## I. INTRODUCTION

My name is Anthony J. McHugh and I am 61 years old. I live in Coopersburg, Pennsylvania. I have been retained by the law firm of Hennigan, Bennett & Dorman on behalf of Avery Dennison Corporation as a technical expert in this litigation. I submit this supplemental expert report under the requirements of Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure as a statement of the opinions that I have thus far formed and intend to give in this litigation regarding whether the United States Patent No. 5,987,930 (henceforth "the '930 patent") is valid.

I formed the opinions that I express here based on my consideration and review of a variety of information and documents, which I will detail below, as well as my professional experience and training. If other information, documents or testimony are brought to my attention, it may become necessary that I further supplement my report.

## II. QUALIFICATIONS AND PROFESSIONAL EXPERIENCE

I am presently the Ruth H. and Sam Madrid Professor and Chair of the Department of Chemical Engineering at Lehigh University. At the time I provided my original report in this matter, I was James W. Westwater Professor of Chemical Engineering at the University of Illinois at Urbana-Champaign where I had been since 1979. My area of research specialty is polymer materials science and engineering and I have authored or co-authored over 160 publications in this area.

I have attached my Curriculum Vitae at Tab 1 to this report, detailing my academic and professional experience, all publications that I have authored or co-authored, technical paper presentations, invited seminars, a complete breakdown of current and past areas of research expertise and research contracts as well as a listing of my past consulting engagements in my areas of expertise. Tab 1 does not reflect my move to Lehigh University, and I will provide an updated curriculum vitae upon request. I have not testified (by deposition or at trial) as an expert in any litigation other than this case in the preceding four years.

## III. <u>COMPENSATION</u>

I have been retained by Avery Dennison's counsel for purposes of consultation regarding technical issues, as well as to review and analyze the prior art, the '930 patent and its prosecution history and other evidence, to form opinions about the validity of the '930 patent, to prepare this expert report and to be available to testify in this litigation. I am being paid for my work at my standard consulting fee of $250 per hour with reimbursement of actual expenses. My billing rate will be $500 per hour for time spent on giving deposition or trial testimony. No part of my compensation depends on the outcome of this litigation.

## IV. <u>MATERIALS REVIEWED</u>

In preparing this report, I have reviewed the '930 patent, its prosecution history, the prior art references cited during the prosecution of the patent, additional prior art references not cited during the '930 patent's prosecution,

deposition testimony of witnesses, interrogatory responses, the parties' contentions, documents produced by 3M, various pleadings, and other documents. I have listed the materials that I have reviewed at Tab 2. In forming my opinions, I have also relied upon my experience and knowledge as well as on well-established engineering and materials science principles and technical knowledge in existence before December 1996. Finally, I have adopted the claim construction definitions set forth in the Court's June 20, 2005 Memorandum Opinion and Order Construing Disputed Claims. For all other claim terms, I use the ordinary meaning in the art.

## V. CAPSULE SUMMARY OF PRESENTLY-HELD OPINIONS CONCERNING INVALIDITY

I am advised that the first step in a validity analysis is interpretation of patent claims. As indicated above, I have used the claim construction definitions set forth in the Court's June 20, 2005 Memorandum Opinion and Order Construing Disputed Claims. For all other claim terms, I use the ordinary meaning in the art. I have not considered the meaning of terms in claims 6-12, which I understand are no longer at issue in this case.

I have analyzed the '930 patent's prosecution history, including prior art cited therein, and also prior art references not cited during prosecution, and, based on the legal principles that I have been advised to be applicable, I have formed the following opinions:

(1) At least claim 1 of the '930 patent is invalid as anticipated under section 102(a) and section 102(b) by Sawka '675 (U.S.P.N. 5,405,675).

(2) I understand that 3M contends in this litigation that embedding one material into another creates "at least one surface . . . having a . . .first embossed pattern form[ing] an array of depressions" as used in claim 1 of the '930 patent. If embedded material can be said to form an "embossed pattern of depressions" (which I believe is contrary to the understanding of those skilled in the embossing arts), it is my further opinion that claims 1-5 of the '930 patent are invalid as anticipated under section 102(a) and section 102(b) by at least U.S. Patents 3,190,178 (McKenzie '178), 4,025,159 (McGrath '159), 4,075,049 (Wood '049), and 3,989,775 (Jack '775), as well as retro-reflective sheets made according to these patents.

(3) The subject matter of claims 1-5 of the '930 patent would have been obvious to a person of ordinary skill in the art, and thus, claims 1-5 of the '930 patent are invalid under 35 U.S.C. §103.

(4) Claims 1-5 fail to disclose all the proper inventors.

## VI. DETAILED OPINIONS AND THEIR BASES

Below I provide a summary of the alleged invention followed by my validity analysis.

### A. Summary of Alleged Inventions

The '930 patent is entitled "multiple embossed web." The application that resulted in the '930 patent was filed on December 31, 1996. The following briefly discusses the background of the '930 patent.[1]

#### 1. Commercial Graphics Film Technology

The invention of the '930 patent relates generally to "embossed webs useful as release liners for pressure-sensitive adhesives and other industrial applications," (the '930 patent, col. 1, lns. 4-6), such as in the commercial graphics industry.

Generally speaking, the commercial graphics industry caters to the graphics needs associated with advertising logos and signage products. A significant application for commercial graphics material is trucks. There, instead of painting logos or other signage directly on the surfaces of the truck, the desired logo or signage is printed onto one surface of a sheet of film that in turn has a pressure-sensitive adhesive coated on its back surface, and which would then be placed on the truck surfaces (or other substrates) as desired. A simplified cross-sectional depiction of a graphic film material illustrating its essential components is shown below:

[1] Earlier in this case, Judge Doty, the judge presiding over this case, issued an order denying 3M's motion for a preliminary injunction. In that Order, the judge set forth a concise summary of the technological background. I agree with the judge's summary and incorporate it by reference in my report.




**Typical Commercial Graphics Film (Cross-Sectional View)**

The film typically comes in large rolls and includes a release liner adhered to the film's back surface in order to hold or carry the pressure-sensitive adhesive ("PSA"). When the release liner is stripped off, it no longer holds or carries the PSA. The PSA instead remains adhered to the back surface of the film. The film, now released from the liner, has its PSA-backed surface exposed, and may be placed on the truck surface (or other substrate surface).

The use of an embossed web as a carrier for a PSA and backing for graphic film was well-known in the prior art before the December 31, 1996 filing date of the '930 patent. A commonly encountered problem in affixing graphics film to the substrate is that of entrapped air between the film and substrate. The prior art describes a solution to overcome this problem by employing a release liner, having a topography that is created by an embossing tool, to carry the PSA. When the embossed release liner is peeled off, the exposed surface of the PSA is left with a topography that is imparted by the embossing pattern of the release liner. This

topography can provide a pathway in the adhesive for air egress when the film is applied onto a substrate surface. (For example, see JP 59-78285 and JP 2587198).

A related common problem in the graphics film application area is that of repositionability. Aggressive adherence of the film to the substrate by the adhesive prevents easy removal and reapplication of the film, either to remove entrapped air, or to reposition the film to a more desirable position. Multiple attempts to adhere the same film to the substrate can compromise the pressure sensitive adhesive or increase the probability of an uneven or misaligned film on the substrate. The prior art solves this problem by employing release liners (to carry the PSA) whose topography creates protrusions on the surface of the later-exposed PSA surface. (For example, see U.S.P.N. 5,141,790, the references cited and discussed in U.S.P.N. 5,650,215, and those cited in the '930 patent). In some cases the protrusions in the adhesive are filled with small particles. (For example, see U.S.P.N. 5,141,790, U.S.P.N. 5,296,277, and U.S.P.N. 5,362,516). The object of these prior art solutions is to facilitate repositioning by limiting the initial contact area between the PSA-backed film and the substrate. Once properly positioned, the film can then be pressed firmly against the substrate to obtain final adhesion.

### 2. <u>The '930 Patent: Multiple Embossed Carrier Webs</u>

The abstract of the '930 patent summarizes the invention:

> A carrier web having at least one surface that is multiple, sequentially *embossed*, wherein depressions created from the prior embossing pattern(s) are preserved during the subsequent embossing pattern(s)

even though the subsequent embossing pattern(s) are superimposed on the depressions from the prior embossing pattern(s). The patterns of *embossing* can be Euclidean or fractal created from *machine tools* produced by using microreplication and other techniques. The carrier webs are useful for release liners for pressure-sensitive adhesives and other industrial applications.

The '930 patent specification emphasizes the advantage of webs having multiple "sequential" embossings: "the advantage of multiple steps is that the depressions formed by the prior step(s) can be filled with material prior to the subsequent embossing step(s)." (col. 2, lns. 13-15). Figure 3 of the '930 patent (shown below) shows a double, sequentially embossed release liner having the features claimed:




FIG.3

**The '930 Patent**

The '930 patent's specification notes the following nomenclature for Figure 3 above:

Number Reference  Description

| | |
|---|---|
| **20** | "liner" (or carrier web). |
| **22** | "liner surface" (that is embossed). |
| **24** | "one pattern of interconnected embossings comprising lands (**27**), *i.e.*, large squares that have been depressed from the initial surface **22** of liner **20** and ridges **28** formed from the material moved from the lands **27** during the embossing process." |
| **26** | "a second pattern of embossings forming an array of depressions **29**. *Between the time for making the two embossing patterns*, a desired material can be introduced into the second embossing pattern **26** such as glass beads." |

(col. 4, ln. 61 to col. 5, ln. 12).

### 3. <u>The Claims of the '930 Patent</u>

The '930 patent has twelve claims, of which two are independent: claim 1 and claim 6. According to the Federal Circuit decision in this case, the definition of "multiple embossed" as used in product claim 1 does not require that the embossed patterns be made sequentially. However, method claim 6 is limited to a multiple, sequential method of embossing a carrier web.

Dependent claims 2-5 and 12 derive from claim 1, and dependent claims 7-11 derive from claim 6. I understand that 3M no longer contends that Avery's EZ Film product infringes claims 6-12.

### 4. <u>Definitions Used</u>

I was advised to use the Court's claim construction rulings in analyzing the validity of the claims. While I have used these construction, I believe that some of them are inconsistent with definitions provided in the '930 patent and with the

ordinary and accustomed use of such terms in the embossing arts. If different claim constructions are provided to me, my opinions may change.

In analyzing the validity of claims 1-5, I have applied the following meanings to the claim terms:

> "Embossed" means a topography on a web or on tooling having an effective three-dimensional pattern that generates a difference in surface planar dimension in the liner or the tooling.
>
> "Multiple embossed" means two or more embossing patterns are superimposed on the web to create a complex pattern of differing depths of embossing.
>
> "Array" means an orderly arrangement.
>
> "Ridges" means an elongated crest or raised strip.
>
> "Pattern" means any formation of embossings that can utilize any theory of geometry, including without limitation, Euclidian geometry and fractal geometry.
>
> "Depression" means lower, sunken, or depressed areas of the carrier web.
>
> "Carrier web" means material with at least one surface that carries, can carry, or has carried another material.
>
> "Lands" means areas of the surface of the carrier web between the ridges.

Additionally, I understand 3M contents that an "embossed depression" includes one material embedded into another, even when the embedded material forms a flush surface on the web material. Thus, according to 3M, Avery's process of taking a liner consisting of pre-printed polyurethane ink dots on a polyethylene top layer, and pressing the ink into the polyethylene after heating to form a flush upper surface, satisfies the "first embossed pattern . . . of depressions" language in claim 1. While I disagree with 3M's expansive contention, I have applied 3M's contention in analyzing the validity of claims 1-5.

**B. <u>Opinions Regarding Validity</u>**

**1. Anticipation**

I understand that a patent claim is invalid under section 102(a) of the Patent Act if, prior to the date of the invention, the invention was described in a patent in this country. I further understand that a patent claim is invalid under section 102(b) of the Patent Act if, more than one year before the filing date, the invention was described in a U.S. patent. Similarly, I understand that a patent claim is invalid under section 102(b) of the Patent Act if the invention was in public use or on sale more than one year prior to the filing date. In considering anticipation, I understand that each element of the patent at issue must be found in a single prior art reference.

**a) Sawka '675 Patent**

In my opinion, the Sawka '675 patent (U.S.P.N. 5,405,675), which issued on April 11, 1995 (before the December 31, 1996 filing date of the application for the '930 patent) anticipates at least claim 1 of the '930 patent under section 102(a). Because the Sawka patent issued more than one year before the filing date of the application for the '903 patent, it is my opinion that at least claim 1 of the '930 patent is invalid under section 102(b) as well.

The Sawka '675 patent relates to a film 10 (see Fig. 1 below) with a multiple embossed pattern on a base or carrier web 12 formed by sequentially embossing the web with two distinct embossing tools to transfer a desired a pattern from the tools into the web. col. 2, ll. 37-45. One embodiment disclosed in the Sawka patent shows a first embossed pattern and a second embossed pattern that "selectively replaces" the first pattern. col. 4, ll. 20-34. In a second embodiment, however, the second embossed pattern does not replace the first pattern, but rather is embossed over the first pattern so that both patterns exist simultaneously. col. 15, ll. 56-60. Accordingly, the pattern of the first embossing step is retained in the second embossing step. Each embossed pattern may include series of ridges and depressions or virtually any other shape, such as the ridges and lands shown in Figure 1:




FIG.1

As explained in the Sawka specification, the depth of the patterns is preferably "no more than one-third the total thickness of the base layer 12." col. 4, ll. 6-9. The base layer 12 thickness ranges from "about 25 to 350 microns." col. 5, lines 14-17. Consequently, if the base layer in Sawka is 25 microns thick, the height of ridges over lands in Sawka would be approximately 8 microns, exactly within the 3 to 45 micron range specified in claim 1 of the '930 patent.

As is shown in the chart below, the Sawka patent discloses every element of claim 1 of the '930 patent.

| '930 Claim 1 | Sawka '675 |
|---|---|
| 1. A carrier web, comprising: | The Sawka '675 patent relates to an embossed multilayer film having an embossed base or carrier layer. |
| at least one surface that has a multiple embossed pattern having a first embossed pattern and a second embossed pattern, | [T]he film can be re-embossed such that the film exhibits a first embossed pattern (such as an overall background pattern) and a second embossed pattern (such as a subsequently applied legend or logo.) col. 2, ll. 41-45. |
| wherein the first embossed pattern forms an array of depressions, | Sawka discloses that the first embossed pattern may be an overall |

| '830 Claim 1 | Sawka '675 |
|---|---|
| | background pattern with a open "recessed" finish, in a "virtually unlimited multitude of patterns." One example pattern is "pebbled." Sawka patent, col .9, ll. 38-43. |
| wherein the depressions of the first embossed pattern are in the second embossed pattern, | "The re-embossable feature of the inventive films was also demonstrated by thermomechanically embossing the film of example 3 at a temperature of 151C, and at a pressure of 100 bars to provide a first embossed pattern. The embossed film was then high frequency re-embossed as described above to provide the film with ***simultaneous first and second embossed patterns that were different***." col. 15, ll. 52-60 (emphasis added). |
| wherein the second embossed pattern comprises lands and ridges between the lands, and wherein the height of the ridges over the lands ranges from about 3 to about 45 $\mu$m. | "[T]he embossed pattern of FIG. 1 is shown as comprising a series of alternating depressions 16 and ridges 18...." col. 4, ll. 12-14. The thickness of the carrier 12 is disclosed as "in the range of about 25 to 350 microns." col. 5, lines 14-17. The depth of the pattern is preferably "no more than one-third the total thickness of the base layer 12." col. 4, lines 6-9. As such, the height of the ridges over the lands in Sawka is well with the range of "3 to about 45 $\mu$m." |

**b) Embedding/Embossing Prior Art**

Accepting 3M's expansive view that an embedded material constitutes an "embossed depression" (which I do not agree with), I further concluded that the '930 cannot be valid. Numerous prior art patents disclose carrier webs that structurally contain both embossed patterns of lands and ridges, together with embedded or partially embedded materials. In some of these references, the lands and ridges are within the 3 to 45 micron limitation contained in claims 1-5.

**(1) McKenzie '178 and McGrath '159**

The McKenzie '178 and McGrath '159 patents, both assigned to 3M, describe a cellular retroreflective sheeting. McGrath uses the sheeting structure described in McKenzie, and teaches certain improvements. As both patents explain, the sheeting material contains raised ridges and land areas between the ridges. Within the land areas, a pattern of microspheres are distributed across the surface in a continuous layer, resulting in close, side-by-side spacing. Once applied, the microspheres are pressed into the sheeting. Next, the web is embossed, creating raised ridges above the land surface, as illustrated below:




FIG. 1




FIG. 3

The maximum height of the ridges (no. 13 in figure 3) can be determined from the McGrath specification. At columns 3 and 4, the '159 patent explains that ridges (13) form intersecting bonds with the cover film (12), and that as little as a monomolecular layer of air separates the top of the microspheres (16) from the cover film. This necessarily means that the ridge height equals the height of

microspheres extending above the base sheet surface. This height can be found in patent specification. At columns 5 and 6, the '159 patent states that the microspheres are between 10 and 200 microns in diameter, preferably between 50 and 60 microns. Using the example with diameters of 50 to 60 microns for the spheres, the patent instructs that the microspheres are embedded to about 40% of their diameter. Thus, the portion of the microspheres raised above the base layer is between 30 and 48 microns, and the corresponding ridge height is 30 to 48 microns. This height will not increase during the embossing process. If anything, the ridge height will slightly decrease. Tests of 3M reflective materials confirm that the ridge height will not exceed the diameter of the microspheres, and generally extend less than 90% of the sphere diameter. Thus, each limitation in claims 1-5 of the '930 patent are found in the McKenzie/McGrath patents.

The following chart compares the elements of claim 1 of the '930 patent with the web disclosed in the McGrath '159 patent.

| '930 Claim 1 | McGrath '159 Patent (According to 3M's Contentions) |
|---|---|
| 1. A carrier web, comprising: | The Court defined a carrier web as a material with at least one surface that . . . can carry another material. The base sheet carries both the microspheres and the cover film. |
| at least one surface that has a multiple embossed pattern having a first embossed pattern and a second embossed pattern, | Figures 1 and 3 show two separate "topographies" on the base sheet – one formed by the intersecting ridges and the other formed by the depressed |

| '930 Claim 1 | McGrath '159 Patent (Applying 3M's Contentions) |
|---|---|
| | microspheres. |
| wherein the first embossed pattern forms an array of depressions, | The depressed microspheres. |
| wherein the depressions of the first embossed pattern are in the second embossed pattern, | The microspheres are located in the land area between the ridges. |
| wherein the second embossed pattern comprises lands and ridges between the lands, and wherein the height of the ridges over the lands ranges from about 3 to about 45 $\mu$m. | Assuming the use of spheres that are 50 microns in diameter as described in example 1, the ridges are 30 microns in height above the lands. |

**(2) Wood '049**

The Wood '049 patent also discloses a retroreflective sheeting and a method for making the sheeting. As explained, microsphere beads are distributed across a web surface, as in the McKenzie patent. Next, the web surface is heated, which allows the beads to partially embed into the surface. Then, an embossing tool is used to create a land/ridge pattern on the beaded surface. At this point, as illustrated in figure 4 of the '049 patent (reproduced below), the web material contains (i) a first pattern formed by an array of embedded beads, and (ii) an embossed pattern of lands and ridges, where the embedded beads are in the pattern of lands and ridges:

FIG. 4.




The height of the lands and ridges fall within the 3 to 45 micron limit specified in claim 1 of the '930 patent. In column 2, the Wood patent explains that the microsphere beads range from 1-10 mils (i.e., 25.4 to 254 microns) in diameter. In column 3, the Wood patent states that the groved land areas have depths greater than the radius of the microspheres, preferably about 2-4 times the radius of the spheres. Assuming a sphere of 1 mil, and a depth of at 2 times the radius, the corresponding ridge height will be 25.4 microns. Thus, each limitation in the '930 patent (accepting 3M's contentions) is found in Wood '049.

(3) **Jack '775**

The Jack '775 patent describes a method of making retroreflective beaded material. Glass beads are distributed on a web surface. Then the surface is embossed with a pattern, which simultaneously embeds the beads partially in the surface. Embossing serves to change the axes of the exposed portion of the beads to improve reflectivity at different sight angles. Although the patent does not provide specific dimensions for the depth of the embossed pattern (or resulting height of ridges that form), one example states that the "maximum depth" was 0.003 inches, which converts to approximately 76.2 microns. Since this is a maximum depth, the depth certainly could fall within the range contained in the

'930 patent. The '775 patent further explains that the embossing must be deep enough to tilt the bead axis preferably 35 to 80 degrees. Thus, accepting 3M's position that embedding a material creates an embossed depression, the Jack '775 patent discloses each limitation of the '930 patent.

2. **Obviousness**

I am advised that a claimed invention is unpatentable under 35 U.S.C. § 103 if, at the time the invention was made, the differences between the claimed invention and the prior art are such that the subject matter of the invention as a whole would have been obvious to a person having ordinary skill in the relevant field. I am advised that obviousness is based on the scope and content of the prior art, the differences between the prior art and the claimed invention, the level of ordinary skill in the art and evidence of secondary indicia of nonobviousness to the extent offered. I have also been advised that, in looking to combine prior art references for obviousness considerations, I am to consider the motivation, suggestion or teaching, implicit or express, in the prior art references or the prior art as a whole, the knowledge of one of ordinary skill in the art, or in the nature of the problem to be solved.

I also understand that secondary indicia of nonobviousness may include, for example, a long felt but unmet need in the prior art that was satisfied by the invention of the patent; commercial success of the processes covered by the patent; unexpected results achieved by the invention, praise of the invention by others

skilled in the art; taking of licenses under the patent by others; deliberate copying of the invention; and contemporaneous and independent invention by others. I also understand there must be a nexus between any such secondary indicia and the invention.

If 3M relies on secondary indicia to defend against obviousness, I reserve the right to supplement this report with respect to whether any such evidence has any impact on my final conclusion.

**a) Date of Invention**

I have used the date of filing of the '930 application--December 31, 1996--as the date of invention for purposes of this report. I reserve the right to modify my opinions and supplement this report should other information establish an earlier date of invention.

**b) Level of Ordinary Skill in the Art**

I understand that factors such as the education level of those working in the field, the sophistication of the technology, the types of problems encountered in the prior art, prior art solutions to those problems, and the speed at which innovations are made may help establish the level of skill in the art. I have considered the prosecution history of the '930 patent, the references that are cited therein, other prior art references, the state of knowledge existing at the time of the invention, as well as the level of skill of inventors in the field, and have concluded that, as of

December 31, 1996, a person of ordinary skill in the art would have had both educational as well as practical experience as follows:

- a Bachelor's degree in materials science, chemical engineering or chemistry; and

- practical working experience related to the processing of polymer films, including operations associated with coating, embossing and application of adhesives to such films.

**c) The Teachings of the Prior Art**

There are, and I have considered, numerous prior art references relating to embossed webs. I have selected the following material references as exemplary of the teachings of the prior art, and for each I provide representative commentary:

***(1) Prior Art Not Cited During '930 Prosecution***

- JP 2587198 teaches pressure sensitive adhesive sheets with small independent projections and a release liner with corresponding depressions. (page 19, claim 1). It teaches that projections are in the range of 3-50 $\mu$m (par. 0021), and that the range of 15-25 $\mu$m is especially desirable. It provides a solution to air egress and repositionability problems. (0003-0005, and 00041). It teaches, for example, that the projections may be prepared by coating the adhesive onto an embossed liner (par. 0026), and may be square truncated pyramids arranged in a lattice pattern (par. 0021);

- JP 59-78285 teaches embossed grooves in a release film (*i.e.*, a release liner), with groove lines having a height range of 1 to 15 $\mu$m that gives acceptable air egress property (claim 1). The continuous grooves prevent entrapment of air when the adhesive-backed film is applied to a substrate;

- Freedman '273 (U.S.P.N. 4,713,273) teaches formation of liners for pressure-sensitive adhesive labels in which the inner release-coated face of the liner is roughened and thus prevents air entrapment and bubble formation between the adhesive-backed label and the substrate. (col. 7, lns. 2-5; col. 1, ln. 42-46 and claim 1). Roughness

is achieved by forming a multi-phase particle-filled layer including a continuous phase of polymeric film material and a discontinuous phase of filler material. (claim 1);

- Sawka '675 (U.S.P.N. 5,405,675) relates to a film with a multiple embossed pattern on a base or carrier web formed by sequentially embossing the web with two distinct embossing tools to transfer a desired a pattern from the tools into the web. (col. 2, ll. 37-45). One embodiment disclosed in the Sawka patent shows a first embossed pattern and a second embossed pattern that "selectively replaces" the first pattern. (col. 4, ll. 20-34). In a second embodiment, however, the second embossed pattern does not replace the first pattern, but rather is embossed over the first pattern so that both patterns exist simultaneously. (col. 15, ll. 56-60). Accordingly, the pattern of the first embossing step is retained in the second embossing step. Each embossed pattern may include series of ridges and depressions or virtually any other shape, such as the ridges and lands. As explained in the Sawka specification, the depth of the patterns is preferably "no more than one-third the total thickness of the base layer 12." (col. 4, ll. 6-9). The base layer 12 thickness ranges from "about 25 to 350 microns." (col. 5, lines 14-17). Consequently, if the base layer in Sawka is 25 microns thick, the height of ridges over lands in Sawka would be approximately 8 $\mu$m.

- Henrickson '741 (U.S.P.N. 3,301,741) teaches embossing the release liner to create depressions in the liner surface, which, in turn, result in a repositionable adhesive sheet material having a pebbly contour with small protrusions and intervening planar areas. The protrusions are one to ten mils (~25 to 250 $\mu$m) in height. (claim 5). They are not less than 15 $\mu$m. (col. 3, ln. 59-60) The '741 patent teaches that the pebbly contour of protrusions is separated by intervening planar areas (col. 2, ln. 30-34)

- The McKenzie, McGrath, Wood, and Jack patents (discussed above) all teach embossing a land/ridge pattern on a material containing spheres partially embedded into the web surface. In each patent, the height of the ridges over the lands can range from 3 to 45 microns.

### *(2) Prior Art Cited During Prosecution*

- Calhoun '790 (U.S.P.N. 5,141,790) teaches the presence of embossed depressions on the release liner that are filled with non-adhesive

particles. (col. 6, ln. 12-15). It teaches, for example, that the depressions of its example 2 are conical with a depth and width of about 10 $\mu$m. (col. 10, ln. 61-62)

- Wilson '277 (U.S.P.N. 5,296,277) and Wilson '516 (U.S.P.N. 5,362,516) teach adhesive articles having microstructured adhesive surfaces. These patents teach adhesive pegs formed from embossed depressions in a release liner. The pegs provide repositionability and have a height of at least 15 $\mu$m up to 200 $\mu$m. Moreover, '516 teaches composite pegs having small beads in them to aid in repositionability. Such composite pegs are produced by coating beads onto an embossed liner to fill the depressions of the liner with the bead slurry, followed by coating the filled, embossed liner with an adhesive solution. ('516, col. 7, ln. 24-32, claim 1, ln. 31-42)

- Lewicki '678 (U.S.P.N. 3,887,678) teaches a film having two patterns of embossed depressions, one within the other, a multiple embossed pattern. A surface texturing or microembossing pattern of ridges from 0 to 180 $\mu$m is superimposed on the raised areas of the larger embossing pattern or to portions of the deeply mechanically embossed region.

- Tribble '186 (U.S.P.N. 5,229,186) is directed to a multiple embossed plastic film having a plurality of superimposed deeply embossed macro cells together with one or more pluralities of microcells or depressions. The deep embossed pattern consists of a series of macro cells that are interconnected by lands extending between the adjacent macro cells (col. 2, ln. 29-33). In one embodiment, a two-step embossing process is used (col. 2, ln. 40-45, col. 3, ln. 26-62, and col. 4, ln. 11-19). A plurality of microcells having a diamond-shaped, structured pattern is produced in the first embossing step. A second plurality of depressions within a macro cell pattern of depressions is produced in the second embossing step. The micropattern has a depth range of 1 to 6 $\mu$m (claim 3);

- Cabe EP 0313766 B1 describes a double embossing process with a first macro embossed pattern followed by a second micro embossed pattern "while retaining the textile imprint of the macro embossing." (col. 3, ln. 5-14). In one illustration, the second micro embossed pattern, produced in the micro embossing station (Fig. 1) comprises a series of angled, parallel lines cut to a depth of 30 $\mu$m (a pattern being known in the art as a Schreiner pattern).

- In addition, I have considered the teachings of other prior art references discussed by the examiner during the prosecution of the'930 patent, including: GB 1543977, Thomas '919 (U.S.P.N. 3,611,919); Schulz '162 (U.S.P.N. 4,320,162); Ruppel '464 (U.S.P.N. 5,382,464), all of which, as the examiner noted, teach multiple embossed patterns.

### d) The Difference Between The Claimed Invention And The Prior Art

Based on my review of the prior art considered by the patent office during prosecution and the claims allowed, it is apparent that the only difference between the art and the allowed claims is the 3-45 μm height limitation of ridges over lands in the second embossment. The applicants added this height limitation during prosecution to distinguish the claimed invention over the prior art considered by the examiner. In fact, the applicants were able to convince the patent office that their claimed multiple embossed webs differed from the prior art only by adding the 3 - 45 μm height limitation after the examiner had rejected the claims.

As originally filed, claim 1 read:

> A carrier web, comprising: at least one surface that is ***multiple, sequentially*** *embossed* with a pattern, wherein depressions created from the ***prior embossing*** **pattern**(s) are substantially preserved during the ***subsequent*** **embossing pattern**(s) even though the ***subsequent*** **embossing pattern**(s) are **superimposed** on the depressions from the **prior embossing pattern(s).**

The Patent Examiner rejected all of the originally filed claims on a number of grounds, including a vagueness rejection under Section 112, paragraph 2:

> Claims 1-18 are rejected under 35 U.S.C. § 112 and second paragraph, as the claimed invention is not described in such full, clear, concise . . . and for failing to particularly point out

> and distinctly claim the subject matter which the applicants regards as his invention.
>
> **Claim 1 is confusing** in the recitation of "**one surface that is multiple, sequentially embossed.**" What is the intent of applicant?
>
> Claim 1 recites that limitation "***prior embossing pattern.***" There is **insufficient antecedent** basis for this limitation in the claim. . . .

I am advised that a section 112, paragraph 2 rejection only deals with the clarity and precision of the claim language, not its breadth. To overcome the vagueness and other rejections, the applicants submitted an Amended claim 1, which replaced and rephrased the objectionable terms "sequential," "prior," "superimposed" and "subsequent" with alternate terms "first" and "second". The Amended claim 1 read as follows:[2]

> 1. (Amended) A carrier web, comprising:
>
> at least one surface that has a multiple embossed pattern having a first embossed pattern and a second embossed pattern, [is multiple, sequentially embossed with a pattern,] wherein depressions of [created from] the first embossed [prior embossing] pattern are [pattern(s) are substantially preserved during] in the second [subsequent embossing pattern(s)] embossed pattern [even though the subsequent embossing pattern(s) are superimposed on the depressions from the prior embossing pattern(s).].

In response to the anticipation and obviousness rejections, the applicants distinguished the prior art patents cited by the examiner and asserted the scope of amended claim 1 as follows:

---

[2] Language added to claim 1 is underlined, while deleted language from original claim 1 is bracketed.

> . . . [The] '681 [patent] does not disclose the creation of multiple embossed pattern having a first embossed pattern and a second embossed pattern. The [Patent] Office has correctly stated that two different adhesives are possible according to the teachings of the Patent '681. That is true. ***But Applicants are claiming two different embossment patterns where the first embossed pattern survives the embossing of the second pattern. . . .***
>
> Applicants' Claims 1, 3-8, 10, 13-15, 17 and 18 are also novel over Patent '765. . . There is ***nothing in Patent '765 that teaches*** that one can have ***two different embossed patterns, where the first pattern survives the embossing of the second pattern*** to create a complex pattern of differing depths of embossing.
>
> * * * *
>
> Neither Patent '765 nor Patent '681 discloses or suggest the construction of a web that has multiple embossed patterns, *where* ***the first embossed pattern is in the second embossed pattern. . . .*** This invention unexpectedly has found that the ***depressions formed during the first embossed step are not lost when the second embossing step is performed.***

I understand from the prosecution history that the examiner was persuaded that the claims as amended and rephrased were no longer vague. However, the examiner continued to reject as invalid the amended claims in view of at least five (5) additional prior art references that taught multiple embossed patterns where the first embossed pattern survives the second embossment. In what I understand to be the second office action, the examiner explained its reasons for the rejection:

> Lewicki teaches a method and a sheet or web comprising at least one surface (wear layer 26) that has a multiple embossed pattern having a first and second embossed pattern. . . . Thus, ***Lewicki teaches an embossing pattern in an embossing pattern.***
>
> * * * *
>
> Claims 1, 3-7 are rejected under 35 U.S.C. § 102(b) as being anticipated by EP 0 313766 A2.

> EP 0 313766 teaches a film or web wherein the film is ***first*** *subjected to macro embossing* ***followed by*** *a micro embossing step.* ***Claims 1, 3-7 are drafted in the product-by-process format.***
>
> * * * *
>
> GB 1 543 977 teaches a sheet or web wherein the sheet is ***first*** subjected to *shallow emboss* ***followed by*** *a deep emboss step*. . .
>
> * * * *
>
> Thomas ('919) teaches two or more embossing station forming ***repetitive superimposed*** *continuous embossments* in the web (claim 1).
>
> Ruppel ('464) teaches *big "bosses"* ***alternating with*** *"little bosses"* are positioned in congruent and tip-to-tip relation with the bosses of the second embossed ply while the big bosses of the first ply are simultaneously positioned between two bosses of the second ply (column 2, lines 15-26; figures 2-5).
>
> Schulz ('162) teaches a web having multiple embossed pattern having a first embossed pattern and a second embossed pattern ***wherein the first pattern is in the second pattern*** (figures 3, 6, 8; columns 2-4; claims 1-18).

In response to the examiner's second rejection, the applicants again amended the claims -- but only to incorporate a height of ridges over lands limitation that the applicants stated would distinguish the claimed carrier webs having multiple, embossed patterns from the prior art.[3] The following limiting language was added to the end of claim 1: "wherein the second embossed pattern comprises lands and ridges between the lands, and wherein the height of the ridges over the lands ranges from about 3 to about 45 µm." With this amendment, the applicants argued that claim 1 should be allowed over each of the cited references because none of

[3] Prior to submitting its amendment, the applicants conducted an in-person interview with the Examiner wherein 3M indicated that it "will amend claim and put in additional limitation to distinguish over the prior art."

those references disclosed patterns with the heights of ridges over lands of about 3 to 45 microns. Specifically, the applicants stated that:

> Amendments to Claims 1 and 8 overcome the rejections citing Lewicki, EP 0 313 766 publication, and GB 1 543 977 publication. Each of these references are concerned with a series of multiple depressions where the larger surface area depressions are almost an order of magnitude larger than the *height range claimed between ridges and lands that comprise the result of the second embossing pattern or step*, respectively, of Claims 1 and 8: from about 3 to 45 micrometers.

In allowing the claims to issue, the examiner explained, in a prosecution document entitled the "Statement of Reasons for Allowance," that the rejections were withdrawn because, as represented by the applicants, "The prior art does not suggest or teach a carrier web with ridges and lands that ranges from 3 to 45 μm."

**e) Obviousness Conclusions**

There are several prior art references that were not considered during the '930 patent's prosecution, but which in fact teach precisely what 3M claimed was lacking in the prior art. Specifically, as summarized earlier, each of the following references teach dimensions of the embossing depths within the claimed range of ~3-45 μm: (1) Sawka '675; (2) Henrickson '741; (3) JP 2587198 and (4) JP 59-78285, (5) McKenzie/McGrath, (6) Wood, and (7) Jack. Therefore, it is my opinion that each of these references in combination with any of the prior art references relied on by the examiner to reject the claims a second time render the claims invalid as obvious.

The two Japanese references that I have discussed earlier, in fact explicitly state that their prescribed size limitation allows for air egress in a pressure sensitive adhesive.

In addition to the above references, I note that several prior art references cited during the prosecution in fact taught embossing depression sizes within the claimed range. For example, as I have stated earlier in my summary of the prior art, Tribble '186 and Cabe EPO313766 B1 provide such teaching. In my opinion, each of these two references as well renders the claims obvious over the prior art.

With respect to the additional features in the dependent claims, it is my opinion that those features (such as the pattern, shape and width recitations) in the dependent claims are inherent in the prior art references such as GB1543977, EP0313766, Lewicki '678 and Calhoun '681. During prosecution, the examiner expressed the same conclusion.

The obviousness of each claim in the '930 patent can be demonstrated by examining three representative prior art references: JP 59-78285; Calhoun '790; and Tribble '186 (or Lewicki '678 or Cabe EP 0313766 B1). These references (in combination with features express or inherent in the art), teach each element of each claim of the '930 patent, namely:

(1) multiple embossed pattern,

(2) one embossed pattern of depressions that can be filled with a material, and

(3) another superimposed pattern forming ridges 3 - 45 µm above the lands (suitable for air egress, even though such is not a claim limitation).

In my opinion, there was ample motivation in the art to combine these references (or combinations of them).

First, it was well known and desired in the art that repositionable graphics and graphics that facilitate air egress (i.e., removal of entrapped air during application) make graphics application easier.

Second, it was known in the art that carrier webs could be, and were, embossed to cause depressions that were filled to produce repositionability bumps (see, for example, Calhoun '790 and 3M's prior art Controltac Plus product).

Third, it was known in the art that carrier webs could be, and were, embossed with ridge dimensions within the range of 3 -45 µm for the purpose of achieving air egress. (See, for example, JP 59-78285).

Fourth, it was known in the art that webs could be, and were, multiply embossed. (See, for example, Tribble '186, Lewicki '678 or Cabe 0313766 B1.)

Thus, in my opinion, the prior art, knowledge of those skilled in the art, and the nature of the problem to be solved all provide the necessary motivation to combine these references.[4] Dr. Sher's deposition testimony regarding the

---

[4] There are other combinations of prior art references that render the '930 patent claims obvious, and may be found in my declarations in connection with the preliminary injunction proceedings. I incorporate those declarations by reference.

development of the '930 invention further corroborates the obviousness of the claimed invention.

Finally, without the requirement that the multiple embossed patterns be made sequentially (as directed by the Federal Circuit), and adopting 3M's argument that an embedded material satisfies the "first embossed pattern of depressions" limitation, the structure of claims 1-5 was obvious to anyone skilled in the art by combining any of the McKenzie/McGrath, Wood, and Jack references with each other, or with any of the references described in this section.

### C. Opinion Regarding Correct Inventors

I have reviewed the deposition testimony of Drs. Calhoun and Sher. According to Dr. Calhoun, he did not do any tests on multiple embossed webs that lead to the application for the '930 patent in which he determined the optimal height of the ridges over the lands. Nor does Dr. Calhoun recall Mr. Koskenmaki (the co-inventor on the '930 patent) conducting any such tests. However, Dr. Sher testified that he conducted many tests on the multiple embossed webs, and that he likely determined the optimal ranges for ridge height. Dr. Sher's laboratory notebooks confirm this testing.

The 3-45 micron ridge height is an essential element of claims 1-5. Indeed, the addition of this height range served as the only basis for allowance by the Patent Office. However, Dr. Sher is not listed as an inventor of the '930 patent. In my opinion, Dr. Sher contributed the only feature to the inventions claimed in the

'930 patent that the Patent Office considered novel. Thus, in my opinion, the '930 patent fails to disclose all the proper inventors by omitting Dr. Sher.

Dated: July 11, 2005

Anthony J. McHugh

# 1

## BIOGRAPHICAL SUMMARY

**Name:** Anthony J. McHugh

**Personal Information:**

Date of Birth: October 30, 1943
Marital Status: Married, no children
Office Phone: 217/333-1178

Place of Birth: Cleveland, Ohio
Soc. Sec. No.: 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
e-mail: a-mchugh@uiuc.edu

**Education:**

B.S., Cleveland State University, 1966 (Chemical Engineering)
M.S., University of Delaware, 1970 (Chemical Engineering)
Ph.D. University of Delaware, 1972 (Chemical Engineering)

**Honors and Awards:**

Senior U.S. Scientist Award, (Humboldt Award), Alexander von Humboldt Foundation, 1988
Alumni Professorship, Department of Chemical Engineering, University of Illinois, 1989 - 1994
Janet and William H. Lycan Professorship, School of Chemical Sciences, 1995-present
School of Chemical Sciences Teaching Award, University of Illinois, 1990, 1995

**Professional Experience:**

Professor of Chemical Engineering, University of Illinois, 1983-present
Acting Head, Department of Chemical Engineering, University of Illinois, 1990
Visiting Professor, University of Delaware (Department of Chemical Engineering), 1987
Associate Professor of Chemical Engineering, University of Illinois, 1979-1983
Associate Professor of Chemical Engineering, Lehigh University, 1976-1979
Assistant Professor of Chemical Engineering, Lehigh University, 1971-1976
Visiting Assistant Professor, Drexel University (Department of Chemical Engineering), 1975
Pittsburgh Plate Glass, Barberton, Ohio, Development Engineer, 1966

**Professional Activities:**

Site Visitor for Engineering College Evaluation, Case School of Engineering, Case Western Reserve University, 1999

Member, Bingham Award Committee, Society of Rheology, 1997-00, Chair, 1999-00

American Institute of Chemical Engineers, ABET Program Evaluator, 1987-1992

Technical Program Chairman, 54th Annual Meeting, Society of Rheology, Evanston, Illinois, October 25-28, 1982

Session Co-Chair, American Institute of Chemical Engineers, 1997 Annual Meeting, Los Angeles, CA, November, 16-21, 1997

Session Co-Chair, 69th Annual Meeting, Society of Rheology, Columbus, OH, October 19-23, 1997

Session Co-Chair, North American Membrane Society, 1997 Annual Meeting, Baltimore, MD, June 1-4, 1997

Session Co-Chair, 68th Annual Meeting, Society of Rheology, Galveston, TX, February 16-20, 1997

Session Co-Chair, XIIth International Congress on Rheology, Quebec City, Canada, August 18-23, 1996

Symposium Co-Chair, International Chemical Congress of Pacific Basin Societies, Honolulu, December 17-22, 1995

Session Co-Chair, North American Membrane Society, 1994 Annual Meeting, Breckenridge, May 21-24, 1994

Session Co-Chair, 33rd IUPAC Symposium on Macromolecules, Montreal, Canada, July 8-13, 1990

Session Co-Chair, Topical Materials Conference, AIChE National Meeting, San Francisco, November 5-10, 1989

Session Chairman, 58th Annual Meeting, Society of Rheology, Tulsa, Oklahoma, October 19-23, 1986

Member: American Institute of Chemical Engineers, American Chemical Society, Society of Rheology, North American Membrane Society, Materials Research Society, Controlled Release Society

**Research Interests:**

Polymer Materials Science and Engineering:

Phase transformations and mass transfer phenomena in quenched polymer solutions with applications to membrane formation and controlled release drug delivery. Modeling of flow-induced crystallization in polymer processing. Rheology and processing of crystallizable polymers. Rheo-optics of solutions and melts. Rheology and processing of reactive, highly-filled polymer systems. Rheology and processing of dendritic and hyperbranched polymers and blends.

**Research Grants and Contracts**:

Over $5 million dollars total from 1975 to present.

**Graduate Theses Directed:**

M.S. - 43; Ph.D. – 31

**Invited Talks, Seminars**: 150⁺

**Publications (154 total) – publications of last 4 years:**

"Observations on the Dynamics of Nonsolvent-Induced Phase Inversion ", B.F. Barton, J.L. Reeve, and A.J. McHugh, *J. Polym. Sci. Polym. Phys. Ed.*, **35**, 569-585 (1997).
"The Dynamics of Thermal Induced Phase Separation in PMMA Solutions", P.D. Graham, A.J. Pervan, and A.J. McHugh, *Macromolecules*, **30**, 1651-1655 (1997).
"Transient Flow-Induced Crystallization of a Polyethylene Melt", A.C. Bushman and A.J. McHugh, *J. Appl. Polym. Sci.*, **64**, 2165-2176, (1997).
"The Effects of Temperature and Solvent on the Rheo-Optical Behavior of Hydroxypropylcellulose Solutions", A. Immaneni, A.L. Kuba, and A.J. McHugh, **30**, *Macromolecules*, 4613-4618 (1997).
"The Effect of Concentration, Temperature and Molecular Weight on the Dynamics of Rigid-Rod Molecules in Semi-Dilute Solutions", A Immaneni and A.J. McHugh, *J. Polym. Sci. Polym. Phys. Ed.*, **36**, 181-190 (1998).
"Flow-Induced Conformational Changes and Phase Behavior of Aqueous Poly-L-Lysine Solutions", A. Immaneni and A.J. McHugh, *Biopolym.*,**45**, 239-246 (1998).
"Configuration Biased Monte Carlo and Brownian Dynamics Simulations of Semiflexible Polymers in Extensional Flows", N.C. Andrews, A.J. McHugh, and J.D. Schieber, *Macromol. Theory. Simul.*, **7**, 19-26 (1998) .
"The Dynamics of Spinodal Decomposition in Polymer Solutions Near the Glass Transition", B.F. Barton, P.D. Graham, and A.J. McHugh, *Macromolecules*, **31**, 1672-1679 (1998).
"Conformational and Rheological Dynamics of Semi-Flexible Macromolecules Undergoing Shear Flow: A Non-Equilibrium Brownian Dynamics Study", N.C. Andrews, A.J. McHugh, and J.D. Schieber, *J. Rheol.*, **42**, 281-305 (1998).
"A Phenomenological Model for Flow-Induced Crystallization", I.S. Dairanieh, A.J. McHugh, and A.K. Doufas, *Proc. SPE/ANTEC Conf.*, 212-216 (1998).
"Polyelectrolytes in Shear and Extensional Flows: Conformation and Rheology", N.C. Andrews, A.J. McHugh, and J.D. Schieber, *J. Polym. Sci. Polym. Phys. Ed.*, **36**, 1401-1417 (1998).
"The Kinetics of Thermal-Induced Phase Separation in a Crystallizable Polymer Solution", P.D. Graham and A.J. McHugh, *Macromolecules*, **31**, 2565-2568 (1998).
"The Effect of Solvent Quality on the Rheological and Rheooptical Properties of Flexible Polymer Solutions", N.C. Andrews, A. Doufas, and A.J. McHugh, *Macromolecules*, **31**, 3104-3108 (1998).
"Processing/Property/Structure Interactions in a Calcium Aluminate-Phenol Resin

Composite", A.J. Walberer and A.J. McHugh, *Advn.Cem.Bas. Mat*, **8**, 91-100 (1998).
"A Continuum Model for Flow-Induced Crystallization of Polymer Melts", A.K. Doufas, I.S. Dairanieh, and A.J. McHugh, *J. Rheol.*, **43**, 85-109 (1999).
"Phase Inversion Dynamics of PLGA Solutions Related to Drug Delivery", P.D. Graham, K.J. Brodbeck and A.J. McHugh, *J. Control. Release*, **58**, 233-245 (1999).
"A Phenomenological Model for Flow-Induced Crystallization", *J. Reinf.Plastics Comp.*, **18**, 464-471 (1999).
"Kinetics of Thermally Induced Phase Separation in Ternary Polymer Solutions. Part I. Modeling of Phase Separation Dynamics", B.F. Barton and A.J. McHugh, *J. Polym. Sci. Polym. Phys. Ed.*, **37**, 1449-1460 (1999).
"Kinetics of Thermally Induced Phase Separation in Ternary Polymer Solutions. Part II. Comparison of Theory and Experiment", P.D. Graham, B.F. Barton and A.J. McHugh, *J. Polym. Sci. Polym. Phys. Ed.*, **37**, 1461-1467 (1999).
"Phase Inversion Dynamics of PLGA Solutions Related to Drug Delivery", A.J. McHugh, P.D. Graham, and K.J. Brodbeck, in *Biomedical Materials: Drug Delivery, Implants and Tissue Engineering*, eds., T. Neenan, M. Marcolongo, R.F. Valentini, Materials Research Society, **550**, 41-46, 1999.
"The Effect of Simple Shear Flow on the Helix-Coil Transition of Poly-L-Lysine", A.T. Lee and A.J. McHugh, *Biopolymers*, **50**, 589-594 (1999).
"Phase Inversion Dynamics of PLGA Related to Drug Delivery, Part II. The Role of Solution Thermodynamics and Bath-Side Mass Transfer", K.J. Brodbeck, J.R. DesNoyer, and A.J. McHugh, *J. Control. Release*, **62**, 333-344 (1999).
"Sustained Release of Human Growth Hormone from PLGA Solution Depots", K.J. Brodbeck, S. Pushpala, and A.J. McHugh, *Pharm. Res.*, **16**, 1825-1829 (1999).
"Modeling the Dynamics of Membrane Structure Formation in Quenched Polymer Solutions", B.F. Barton and A.J. McHugh, *J. Membr. Sci.*, **166**, 119-125 (2000).
"Effects of Molecular Variables and Architecture on the Rheological Behavior of Dendritic Polymers", I. Sendijarevic and A.J. McHugh, *Macromolecules*, **33**, 590-596 (2000).
"Simulation of Melt Spinning Including Flow-Induced Crystallization. Part I. Model Development and Predictions", A.K. Doufas, A.J. McHugh, and C. Miller, *J. Non-Newtonian Fluid Mech.*,**92**, 27-66 (2000).
"Simulation of Melt Spinning Including Flow-Induced Crystallization. Part II. Quantitative Comparisons with Industrial Spinline Data", A.K. Doufas, A.J. McHugh, A. Immaneni, and C. Miller, *J. Non-Newtonian Fluid Mech.*, **92**, 81-103 (2000).
"A Comparison of the Rheology of Reactive Filled Systems Using Lubricated Squeeze Flow", J.A. Walberer, and A.J. McHugh, *J. Rheol.*, **44**, 743-758 (2000).
"Synthesis and Characterization of Hyperbranched Aromatic Poly(ether imide)s with Varying Degrees of Branching", D.S. Thompson, L.J. Markoski, J.S. Moore, I. Sendijarevic, A. Lee, and A.J. McHugh, *Macromolecules*, **33**, 6412-6415 (2000).
"The Linear Viscoelastic Behavior of Highly Filled Polydimethylsiloxane Measured in Shear and Compression", J.A. Walberer and A.J. McHugh, *J. Rheol.*, 45, 187-201 (2001).
"Role of Crystallization in the Phase Inversion Dynamics and Protein Release Kinetics of Injectable Drug Delivery", J. DesNoyer and A.J. McHugh, *J. Control. Release*, **70**, 285-294 (2001).
"Simulation of Melt Spinning Including Flow-Induced Crystallization. Part III.

Quantitative Comparisons with PET Spinline Data", A.K. Doufas and A.J. McHugh, *J. Rheol.*, **45**, 403-420 (2001).

"Effect of Linear Sequence Length on the Properties of Branched Aromatic Etherimide Copolymers", L.J. Markoski, J.S. Moore, I. Sendijarevic, and A.J. McHugh, *Macromolecules*, **34**, 2695-2701(2001).

"Dynamics of Dendrimeric Molecules Undergoing Simple Shear Flow: A Nonequilibrium Brownian Dynamics Study", A.T. Lee and A.J. McHugh, *Macromol. Theory. Simul.*, **10**, 244-254 (2001).

"Two-Dimensional Simulation of Melt Spinning Including Flow-Induced Crystallization", A.K. Doufas and A.J. McHugh, *J. Rheol.*, **45**, 855-879 (2001).

"Modeling Flow-Induced Crystallization in Fiber Spinning", A.J. McHugh and A.K. Doufas, *Composites, Part A: Appl. Sci. Eng.*, **32**, 1059-1066 (2001).

"Rheology and Structuring in Organo-Ceramic Composites", A.J. McHugh and J.A. Walberer, *Composites, Part A: Appl. Sci. Eng.*, **32**, 1085-1093 (2001).

"The Effects of Extensional Flow and Hydrodynamic Interaction on the Nonequilibrium Brownian Dynamics of Dendrimers", *Macromol. Theory. Simul.*, **10**, 430-433 (2001).

"Simulations of Fiber Spinning and Film Blowing Based on a Molecular/Continuum Model for Flow-Induced Crystallization", *Korea-Australia Rheol. J.*, **13**, 1-12 (2001).

"Simulation of Film Blowing Including Flow-Induced Crystallization", A.K. Doufas and A.J. McHugh, *J. Rheology*, **45**, 1085-1104 (2001).

"Effect of Branching on the Rheological Properties of Solutions of Aromatic Etherimide Copolymers", I. Sendijarevic, M.W. Liberatore, A.J.McHugh, L.J. Markoski, and J.S. Moore, *J. Rheol.*, **45**, 1245-1258 (2001).

"A Brownian Dynamics Study of Mixed Linear-Hyperbranched Polymers", A.T. Lee and A.J. McHugh, *Macromolecules*, **34**, 7127-7134 (2001).

"Eliminating Variations in Elemental Composition in Studies on the Physical Properties of Linear to Hyperbranched Etherimide Copolymers", I. Sendijarevic, A. J. McHugh, L. J. Markoski, and Jeffrey S. Moore, *Macromolecules*, accepted.

"Modeling the Rheology of Concentrated $AB/AB_2$ Hyperbranched Polymeric Systems", A.T. Lee and A.J. McHugh, *Macromolecules*, accepted.

2

# LIST OF MATERIALS CONSIDERED

US 5,141,790

US 5,405,675

US 4,713,273

US 3,301,741

US 5,296,277

US 5,362,516

US 5,229,186

US 3,611,919

US 3,887,678

US 5,585,178

US 5,298,791

US 4,320,162

US 5,897,930

US 5,382,464

EP 0 313 766 B1

GB 1,543,977

JP 59-78285

JP 2587198

JP 06212131A

JP 07138541

File History of US 6,197,397 and prior art cited therein

File History of US 5,897,930 and prior art cited therein

Deposition of Charles A. Calisto, dated October 23, 1001

Deposition Transcript of Mark Timmerman, dated January 30, 2002

Exhibit 26 to the Timmerman Deposition

Deposition Transcript of W. Douglas Lilac, dated April 19,2002

Deposition Transcript of Danny L. Fleming, dated April 25, 2002

Deposition Transcript of Frank Sher, dated, May 1, 2002

Deposition Transcript of Michael Hannington, dated April 12, 2002

The parties' pleadings regarding 3M's Motion for a Preliminary Injunction

Court Order United States District Court District of Minnesota , dated February 15, 2002

Plaintiff's Claim and Infringement Contentions, dated March 29, 2002

Defendant's Amended Claim Construction Contentions and Present List of Invalidating Prior Art, dated May 4, 2002 and all supporting evidence cited therein as well as prior art cited therein

Declaration of Anthony J. McHugh and Supplemental Declaration in Rebuttal to Declaration of A. Brent Strong regarding 3M's Motion for Preliminary Injunction

Declaration of A. Brent Strong in Support of 3M's Motion for Preliminary Injunction

1993-1994 Technical Information Sheets

Video Inspection of Trinity Packaging Corporation, dated January 30, 2002

Documents produced by 3M during discovery