# EXHIBIT 1

RECEIVED
SEP 2 7 2001
BY:

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| 3M INNOVATIVE PROPERTIES COMPANY<br><br>and<br><br>MINNESOTA MINING AND MANUFACTURING COMPANY,<br><br>Plaintiffs,<br><br>v.<br><br>AVERY-DENNISON CORPORATION,<br><br>Defendant. | Civil No. 01-CV-1781 DSD/JMM<br><br>COMPLAINT<br><br>DEMAND FOR JURY TRIAL |

Plaintiffs, by their attorneys Fish & Richardson P.C., P.A., complain of Defendant and allege as follows:

## NATURE OF THIS ACTION

1. This is an action for patent infringement arising under the patent laws of the United States, 35 U.S.C. §§ 271, 281-285.

## THE PARTIES

2. Plaintiff 3M Innovative Properties Company ("3M IPC") is a corporation organized and existing under the laws of the state of Delaware, and having its principal place of business at 3M Center, St. Paul, Minnesota 55133-3427.

3. Plaintiff Minnesota Mining and Manufacturing Company ("3M") is a corporation organized and existing under the laws of the state of Delaware, and having its principal place of business at 3M Center, St. Paul, Minnesota 55133-3427.



9-28

4. Defendant Avery-Dennison Corp. ("Avery"), upon information and belief, is a corporation organized and existing under the laws of the state of Delaware, and having its principal place of business at 150 North Orange Grove Boulevard, Pasadena, California 91103.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

6. This Court has personal jurisdiction over Avery because, *inter alia:* (1) Avery does business in Minnesota; and (2) under the Minnesota Long Arm Statute, Minn. Stat. § 543.19, Avery transacts business within Minnesota.

7. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and 1400(b).

## FIRST CLAIM FOR RELIEF
## INFRINGEMENT OF U.S. PATENT NO. 5,897,930

8. On April 27, 1999, United States Patent No. 5,897,930 ("the '930 patent"), entitled "Multiple Embossed Webs," was duly and legally issued by the United States Patent and Trademark Office. 3M IPC owns the '930 patent by assignment. 3M is the exclusive licensee of the '930 patent. A true and correct copy of the '930 patent is attached as Exhibit A to this Complaint.

9. Defendant Avery has been and is directly infringing, actively inducing others to infringe, and/or contributing to the infringement of the '930 patent in this District and elsewhere.

10. Upon information and belief, Avery will continue to infringe the '930 patent unless and until it is enjoined by this Court.

11. Upon information and belief, Avery's infringement of the '930 patent is taking place with knowledge of the '930 Patent and is willful. By continuing to commit acts of infringement with full knowledge of the '930 patent, Avery has failed to meet the required standard of care to avoid a finding of willful infringement.

12. Avery has caused and will continue to cause Plaintiffs irreparable injury and damage by infringing the '930 patent. Plaintiffs will suffer further irreparable injury, for which Plaintiffs have no adequate remedy at law, unless and until Avery is enjoined from infringing the '930 patent.

**PRAYER FOR RELIEF**

WHEREFORE, 3M IPC and 3M respectfully request this Court:

(1) To enter judgment that Avery has infringed the '930 patent;

(2) To enter orders preliminarily and permanently enjoining Avery and its officers, agents, servants, employees, attorneys, and all persons in active concert or participation with any of them, from infringing the '930 patent;

(3) To award 3M IPC and 3M their respective damages in amounts sufficient to compensate them for Avery's infringement of the '930 patent, together with prejudgment and post judgment interest and costs, pursuant to 35 U.S.C. § 284;

(4) To treble the damages awarded to 3M IPC and 3M by reason of Avery's willful infringement of the '930 patent;

(5) To declare this case to be "exceptional" under 35 U.S.C. § 285 and to award 3M IPC and 3M their attorneys' fees, expenses and costs incurred in this action; and

(6) To award 3M IPC and 3M such other and further relief as this Court deems just and proper.

**JURY TRIAL DEMAND**

3M IPC and 3M hereby demand a trial by jury on all issues appropriately triable by a jury.

Dated: September 27, 2001

By: FISH & RICHARDSON P.C., P.A.

R. J. Zayed (#309849)
John C. Adkisson (#266358)
FISH & RICHARDSON P.C., P.A.
60 South Sixth Street, Suite 3300
Minneapolis, Minnesota 55402
Telephone: (612) 335-5070
Facsimile: (612) 288-9696

**Of Counsel:**
Frank P. Porcelli
Kurt L. Glitzenstein
Timur S. Engin
FISH & RICHARDSON P.C., P.A.
225 Franklin Street
Boston Massachusetts 02110-2804

Carolyn V. Peters
3M Innovative Properties Company
3M Center
P.O. Box 33427
Saint Paul, MN 55133

*Attorneys for Plaintiffs*

60055635.doc

US005897930A

# United States Patent [19]

**Calhoun et al.**

[11] Patent Number: **5,897,930**

[45] Date of Patent: **Apr. 27, 1999**

[54] MULTIPLE EMBOSSED WEBS

[75] Inventors: Clyde D. Calhoun, Grant; David C. Koskenmaki, St. Paul, both of Minn.

[73] Assignee: Minnesota Mining and Manufacturing Company, St Paul, Minn.

[21] Appl. No.: 08/775,736

[22] Filed: Dec. 31, 1996

[51] Int. Cl.[6] .......... A61F 13/02; E04F 15/16

[52] U.S. Cl. .......... 428/41.8; 428/156; 428/220

[58] Field of Search .......... 428/42, 202, 343, 428/345, 352, 354, 40, 173, 200, 214, 906, 144, 148, 317.5, 355, 198, 156, 220, 41.8; 427/198, 199, 276, 208.6, 271; 156/209; 264/293, 294

[56] References Cited

U.S. PATENT DOCUMENTS



| | | | |
|---|---|---|---|
| 3,611,919 | 10/1971 | Thomas | 101/23 |
| 3,887,678 | 6/1975 | Lewicki, Jr. | 264/284 |
| 4,045,153 | 8/1977 | Maurino et al. | 425/440 |
| 4,320,162 | 3/1982 | Schultz | 428/154 |
| 4,551,297 | 11/1985 | Botcher et al. | 264/224 |
| 5,141,790 | 8/1992 | Calhoun et al. | 428/40 |
| 5,229,186 | 7/1993 | Tribble et al. | 428/156 |
| 5,296,277 | 3/1994 | Wilson et al. | 428/40 |
| 5,300,340 | 4/1994 | Calhoun et al. | 428/40 |
| 5,344,681 | 9/1994 | Calhoun et al. | 428/42 |
| 5,362,516 | 11/1994 | Wilson et al. | 427/207.1 |
| 5,382,464 | 1/1995 | Ruppel et al. | 428/172 |
| 5,449,540 | 9/1995 | Calhoun et al. | 428/42 |
| 5,462,765 | 10/1995 | Calhoun et al. | 427/198 |
| 5,585,178 | 12/1996 | Calhoun et al. | 428/343 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 1 543 977 | 4/1979 | European Pat. Off. . |
| 0 313 766 | 3/1989 | European Pat. Off. . |
| 2 055 677 | 3/1981 | United Kingdom . |
| 2 290 629 | 3/1996 | United Kingdom . |

OTHER PUBLICATIONS

Patent Abstracts of Japan for Kokai 57178718 "Embossing Apparatus" Apr. 11, 1982.

*Primary Examiner*—Lynette F. Smith
*Assistant Examiner*—Dolquan Lee
*Attorney, Agent, or Firm*—Gary L. Griswold; John H. Hornickel

[57] ABSTRACT

A carrier web having at least one surface that is multiple, sequentially embossed, wherein depressions created from the prior embossing patterns(s) are preserved during the subsequent embossing pattern(s) even though the subsequent embossing pattern(s) are superimposed on the depressions from the prior embossing pattern(s). The patterns of embossing can be Euclidean or fractal created from machine tools produced using microreplication and other techniques. The carrier webs are useful for release liners for pressure sensitive adhesives and a number of other industrial and consumer applications.

**12 Claims, 2 Drawing Sheets**




FIG. 1




FIG. 2




FIG.3

# MULTIPLE EMBOSSED WEBS

## FIELD OF INVENTION

This invention relates to embossed webs useful as liners for pressure sensitive adhesives and other industrial applications.

## BACKGROUND OF INVENTION

Pressure sensitive adhesives are useful for the joining of two materials. The interfaces between the adhesive and the materials are vital to the performance of the joined materials. The loss of adhesion at either interface can doom the usage of the materials.

One example of an adhesion interface requiring peak performance is a durable film displaying image graphics adhered to substrates, where the film is a backing material upon which an adhesive layer is added for adhesion to the substrate. Adhesion of a large image graphic film to substrates encounters the problem of entrapped air between the film and the substrate. Anyone who has ever attempted to hang wallpaper can appreciate the frustration that can arise when entrapped air beneath an adhesive-backed film can not be removed easily. The most common solutions to this problem are to remove and reapply the film or to perforate the film to release the entrapped air. Multiple attempts to adhere the same film to a substrate can compromise the pressure sensitive adhesive or increase the probability of uneven or misaligned film on the substrate. Perforating a film mars its appearance. The removal of air bubbles is also labor intensive.

Prior approaches have addressed facile adhesion of image graphics film to substrate by concentrating on specialized topographical constructions of the pressure sensitive adhesive. Commercially superior pressure sensitive adhesives for image graphics are available on image graphic films by 3M of St. Paul, Minn., USA. Pressure sensitive adhesives having this utility are disclosed in a variety of patents. Representative examples of patents describing such materials include U.S. Pat. Nos. 5,296,277 and 5,362,516 (both Wilson et al.) and 5,141,790 (Calhoun et al.). These patents disclose how the adhesive's topography is built from the interface between the adhesive and the release liner. The principal topographical features in the adhesive surface are isolated protrusions from the adhesive surface with identified contact areas.

## SUMMARY OF INVENTION

The art needs a method of obtaining a complex pattern of embossings on a web where the complex pattern is obtained by multiple steps to permit the formation of a wide variety of material(s) in the multiple embossed webs.

One aspect of the present invention provides a solution to the problem of forming complex embossing patterns by forming a web having multiple embossed patterns.

A multiple embossed web can be used as a releasable storage liner for pressure sensitive adhesive or a transfer liner for moving pressure sensitive adhesive from one web to a substrate.

"Embossed" means a topography on a web or on tooling having an effective three-dimensional pattern that generates a difference in surface planar dimension in the liner or the tooling.

"Pattern" means any formation of embossings that can utilize any theory of geometry, including without limitation, Euclidian geometry and fractal geometry.



"Multiple embossed" means two or more embossing patterns are superimposed on the web to create a complex pattern of differing depths of embossing.

Another aspect of the present invention is a carrier web having at least one surface that is multiple, sequentially embossed, wherein depressions created from the prior embossing pattern(s) are substantially preserved during the subsequent embossing pattern(s) even though the subsequent embossing pattern(s) are superimposed on the depressions from the prior embossing pattern(s).

Although the multiple embossing steps could be combined into a single step with the design of a suitable tool or mold, the advantage of multiple steps is that the depressions formed by the prior step(s) can be filled with material prior to the subsequent embossing step(s). The number of same or different materials can be as many as the number of sequential step(s) or can be any subset of them. Once the number of same or different materials reside in the multiple embossed web, they can be removed from their multiple depth depressions for use or for further manufacturing or assembly.

A wide variety of materials can benefit from being introduced into the embossed web. Nonlimiting examples of the materials include adhesives, resins, polymers, particles, slurries, or dispersions.

When the embossed web is meant to be the final article rather than a means of continued manufacturing, the materials introduced into depressions created by a first embossing then are subjected to a subsequent embossing to form the final article. In this embodiment, liquids such as soaps, lubricants, perfumes, and abrasive slurries can fill one or more levels of the embossed depressions.

The multiple embossed webs of the present invention can provide a vast array of combinations given the multitude of embossed patterns, the multiplicity of embossings, and the variety of materials introduced into the embossed web.

While the most common multiple embossing of a carrier web is a double embossed web used as a release liner for pressure sensitive adhesives, the invention is not limited to merely double embossing. A variety of complex embossed patterns can be created to advantage for a number of industrial applications, such as:

- air bleed Segmented Adhesive Transfer Tapes (SATT) (as disclosed in U.S. Pat. Nos. 5,344,681 and 5,449,540 (both Calhoun et al. and incorporated by reference herein) that are: a) positionable, b) repositionable, or c) consist of two different adhesives;
- abrasives that are: a) dual shaped and b) consist of two different mineral sizes;
- scouring pads;
- bumped pads on flexible printed circuits;
- carriers for medicaments or cosmetics;
- and the like.

Another aspect of the invention is a method of embossing, comprising the steps of embossing a carrier web having at least one surface with a first pattern, to create a first pattern of depressions; embossing the surface with a second pattern, to create a second pattern of depressions; wherein the depressions created from the first embossing step are substantially preserved during the second embossing step even though the second embossing step superimposes the second pattern on the depressions created from the first embossing step.

A feature of multiple embossed webs of the present invention is that one pattern of embossing can be used for

one purpose while another pattern of embossing can be used for a different purpose.

Another feature of the multiple embossed webs is the formation of a complex topography on the surface of the web that can be used as a liner for a field of pressure sensitive adhesive, a carrier for abrasive slurries used for later manufacturing, bumped pads for flexible printed circuits, or a carrier for medicaments or cosmetics.

Another feature of the multiple embossed webs is the ability to control the nature of complex topography of the web generated by the multiple embossed patterns.

Another feature of the multiple embossed webs is the ability to control the layered introduction of same or different materials into depressions of differing depths for later use or further manufacturing.

An advantage of the present invention is to create a means of sequential manufacturing of articles using different depths of depressions and same or different materials.

Another advantage of the present invention is the ability of pressure sensitive adhesive to permit fluid egress (e.g., plasticizer, exhaust gases or entrapped air) from the adhesive interface with a supporting substrate without specialized compositions or formulations of the pressure sensitive adhesive.

Another advantage of the present invention is the ability to use a variety of types of pressure sensitive adhesives while also providing an ability to "outgas" the pressure sensitive adhesive after adhesion of the web to the substrate. Included among such types of pressure sensitive adhesives are those disclosed in U.S. Pat. Nos. 5,296,277 and 5,362,516 (both Wilson et al.) and 5,141,790 (Calhoun et al.), the disclosures of which are incorporated by reference therein. An example of the use of multiple embossed webs of the present invention is as a release liner as disclosed in copending U.S. patent application Ser. No. 08/775,844 (Sher et al.) (Attorney Docket 52771USA9A) incorporated by reference herein.

Other features and advantages will become apparent from the embodiments of the invention described in relation to the following drawings.

## BRIEF DESCRIPTION OF DRAWINGS

FIG. 1 is a cross-sectional view of a web after a first embossing step.

FIG. 2 is a cross-sectional view of the web of FIG. 1 after a second embossing step.

FIG. 3 is a scanning electron micrograph of a double embossed web of the present invention.

## EMBODIMENTS OF THE INVENTION

FIG. 1 depicts a web 10 having a surface 12 with one pattern 14 of embossings made according to a first embossing step of the present invention. FIG. 2 depicts that web 10 having the surface 12 (with embossing pattern 14) having been subjected to a second pattern 16 of embossings made according to the present invention.

Web 10 can be any web known to those skilled in the art that is capable of being embossed. Nonlimiting examples of webs include a variety of commercial materials from Minnesota Mining and Manufacturing Company (3M) of St. Paul, Minn. and other commercial manufacturers of liner products such as Rexam Release Corporation of Oakbrook, Ill. or Daubert Coated Products of Westchester, Ill. When webs of the invention are used as release liners, such liners are typically polyethylene coated papers with commercial silicone release coatings; polyethylene coated poly(ethylene terephthalate) films with commercial silicone release coatings; or cast polypropylene films which can be embossed with pattern(s) while making such films, and thereafter coated with commercial silicone release coatings. Additional useful liners are identified in the Calhoun et al. and Wilson et al. patents.

A multiple embossed web 10 seen in FIG. 2 can have any dimensions required for the sequential formation of a complex topography. For example, web 10 has a thickness T where there is no embossing, a thickness X caused by embossings of pattern 14, and a thickness Y caused by embossing of pattern 16. Due to conservation of material, if the planar dimensions of the web 10 do not or are not permitted to expand, embossing by pattern 14, pattern 16, or both can actually increase the thickness of the web 10 compared with original thickness T, like the formation of mountains from the movement of large land masses. For example, in copending application Ser. No. 08/775,844, (Attorney Docket 52771 USA9A), ridges can be formed from the embossing of large lands, where the ridge height exceeds the original thickness of the release liner.

Regardless of conservation of material, the percentage of thickness X to thickness T can range from about 1% to about 99%, meaning that the depth of depressions caused in surface 12 by pattern 14 can range from a minor fraction of thickness T to almost the entire original thickness T.

The percentage of thickness Y to thickness T can range from about 1% to about 99%, meaning that the depth of depressions caused in surface 12 by pattern 16 can range from a minor fraction of thickness T to almost the entire original thickness T. Further, web 10 has a total area "A", a first area "B" having depressions created during embossing of pattern 14 and an area "C" having depressions created during embossing of pattern 16. FIG. 2 shows how depressions formed in pattern 14 cover the entire surface 12 of web 10 and also reside in the larger depressions formed in pattern 16. Thus, total area A=area B, and all of area C resides within area B. However, multiple embossed webs of the present invention can have a vast variety of complex topographies according to the needs of those skilled in the art.

The percentage of B to A can range from about 1% to about 100%, meaning that surface 12 can be embossed with a pattern 14 ranging from a minor fraction of surface 12 so embossed with pattern 14 to the entire surface 12 being embossed with pattern 14.

The percentage of C to A can range from about 1% to about 100%, meaning that surface 12 can be embossed with a pattern 16 ranging from a minor fraction of surface 12 so embossed with pattern 16 to the entire surface 12 being embossed with pattern 16.

The shape of embossings for either pattern 14, pattern 16, or both, can range from a constant radius of curvature to a polygonal shape of at least 2 surfaces within the depression in web 10 causing the embossing.

The width of embossings in pattern 14, pattern 16, or both can range from about 1 $\mu m$ to about 10,000 $\mu m$.

FIG. 3 shows an example of the complex topography that can be created on webs of the present invention for use as a release liner as disclosed in copending U.S. patent application Ser. No. 08/775,844 (Sher et al.) (Attorney Docket 52771USA9A) incorporated by reference herein. This scanning electron micrograph shows a liner 20 having a surface 22 with one pattern 24 of interconnected embossings and a second pattern 26 of embossings. More than two patterns can be added.

A careful viewing of FIG. 3 shows pattern 24 comprising both relatively planar lands 27, i.e., large squares that have

been depressed from the initial surface 22 of liner 20 and a series of ridges 28 formed from the material moved from the lands 27 during the embossing process. Pattern 26 forms an array of depressions 29.

A sequential manufacturing process for web 10 or liner 20 determines the order of embossings. The manufacturing of the double embossed liner 20 actually requires the formation of the smaller embossing pattern 26 first, followed by the formation of the larger embossing pattern 24, second. Between the time of making the two embossing patterns, a desired material can be introduced into second embossing pattern 26, such as glass beads, in a manner as disclosed in U.S. Pat. No. 5,296,277 (Wilson et al.), incorporated by reference herein.

The resulting multiple microembossed liner 20 has a total area "A", a first area "B" for lands 27 created during embossing of pattern 24, and an area "C" for ridges 28 created during embossing of pattern 24, and an area "D" for depressions 29 residing in both lands 27 and ridges 28. FIG. 2 shows how one depression 29 can reside in a ridge 28. Thus, A=B+C and all of area D resides within either area B or C, or both.

The patterns 24 and 26 can be varied according to requirements in the art recognizing that the patterns are superimposed on one another. For example, in FIG. 3, lands 27 are discontinuous, because separate projections on the tooling for forming pattern 24 do not intersect with one another. Likewise, depressions 29 are discontinuous because separate projections on the tooling for forming pattern 26 do not intersect with one another.

The result of pattern 24 creates separated lands 27 from one another, and the result of pattern 26 creates separated depressions 29 from one another. The connected ridges 28 are a by-product of the embossing of separated lands 27.

In other words, the topography of the tool(s) is an obverse image of the final topography of the microreplicated adhesive, with the liner 20 serving as the inverse image for transferring the image of the tool(s) to the microreplicated adhesive. Therefore, the topography(ies) of the embossing tool(s) for liner 20 is essentially the topography of the microreplicated adhesive.

When a liner 20 is used to contact adhesive to obtain a topography produced from patterns 24 and 26, the percentage area of lands 27 to surface 22 (B to A) can range from about 35% to about 99%. Desirably, the percentage can range from about 50% to about 98%. Preferably, the percentage can range from about 60% to about 97%. More preferably, the percentage can range from about 70% to about 96%. Most preferably, the percentage of B to A can range from about 85% to about 95% to provide adequate fluid egress without adversely affecting adhesion to the supporting substrate. The percentage areas, respectively, of ridges 28 to surface 22 (C to A) are the remainders.

The percentage area of depressions 29 to surface 22 (D to A) can range from about 1% to about 70%. Preferably, the percentage can range from about 2% to about 25%. Most preferably, the percentage of D to A can range from about 3% to about 15% because of a balance of repositionability of the adhesive to final adhesive bond strength.

These percentages expressed with respect to the liner 20 cause approximately the same percentages on the inverted topography of an adhesive contacting the liner 20. However, as described in U.S. Pat. No. 5,296,277 (Wilson et al.), the planar adhesive surface of their pegs is important. Therefore, this invention is not limited by these percentages concerning the area of depressions 29 when creating the volume of



depressions 29 or the geometry used to achieve those depressions. In other words, the depressions 29 can assume any solid geometric desired by those skilled in the art, within the percentage areas expressed above.

The embossing of pattern 24 to create lands 27 moves material into ridges 28. Like the formation of mountains from the movement of large land masses, ridges 28 rise from surface 22. While the depth of embossing of lands only results in a depth of a few micrometers, ridges rise from surface 22 to a height ranging range from about 3 to about 45 μm, preferably from about 5 to about 30 μm, and most preferably from about 6 to about 20 μm.

The depth of embossings for pattern 26 can range from about 4 to about 200 μm, preferably from about 8 to about 100 μm, and most preferably from about 10 to about 30 μm. Because the embossing of pattern 26 occurs before the embossing of pattern 24, the depths identified here are the cumulative effect of both embossings, not necessarily the height of the embossing tool.

Moreover, it should be apparent to those skilled in the art that the size of the embossing tooling needed may exceed the depth of embossing desired because of viscoelastic properties of the liner 20 being embossed.

The "sidewalls" of embossings for any of pattern 24, pattern 26, or any combination of them, can be any shape desired, ranging from a constant radius of curvature to any polygonal shape of at least 2 surfaces within the pattern 24 or 26. Nonlimiting examples of shapes of embossing, in cross-section, include curved, rectangular, trapezoidal, triangular, bimodal, and the like. U.S. Pat. No. 5,296,277 (Wilson et al.) describes some of the variables to be considered when forming depressions 29 in order to provide pegs in an adhesive.

The width of embossings in any of pattern 24, pattern 26, or any combination of them, can vary as needed. For example, in FIG. 3, the width of embossings that create lands 27 and depressions 29 are relatively uniform for surface 22. However, the pattern can vary across surface 22 for fluid egress, not unlike a tributary-river configuration in a watershed.

For example, to create microchannels for fluid egress, one could use a liner 20 having a pattern 24 creating ridges 28 having a final width, after viscoelastic properties have reached equilibrium, of less than about 200 μm and preferably from about 50 to 120 μm. The ridges 28 in FIG. 3 are about 100 μm wide.

Precision of topographical formation of web 10 or 20 can be achieved using a variety of machining techniques. The machine tool industry is capable of creating tools with any pattern desired by those skilled in the art.

Euclidean geometric patterns can be formed with any pattern of size, shape and depth of embossing projection in any number of steps.

Tools can range from planar presses to cylindrical drums to other curvilinear shapes, depending on how it is desired to employ the embossing steps.

Nonlimiting examples of sources of tooling include commercial sources of photolithographic printing plates and cylinders, precision engraved plates and cylinders, laser machined plates and cylinders, and the like.

Usefulness of the Invention

A multiple embossed web of the present invention can be used for the formation of materials that utilize the complex topography of the surface of the web. Because the multiple embossings of the web occur sequentially, material can be

placed in the depressions caused by first pattern being formed before the second embossing pattern is applied.

Unexpectedly, the later embossing pattern(s) does not appreciably disrupt the earlier embossing pattern(s) in order to provide a controlled complex topography to the surface of a web.

When pressure sensitive adhesive is the desired material to be formed in the pattern(s) embossed in the web 10 or 20, such pressure sensitive adhesives can be selected from a variety of conventional adhesive formulations to achieved the meshed topography on web 10 or 20.

Nonlimiting examples of adhesives include pressure sensitive adhesives, hot melt or heat activated adhesives that are pressure sensitive at the time of application such as pressure sensitive adhesives disclosed in U.S. Pat. No. 4,994,322 (Delgado et al.); U.S. Pat. No. 4,968,562 (Delgado); EPO Publication 0 570 515; EPO Publication 0 617 708; pressure sensitive adhesives disclosed in U.S. Pat. Nos. 5,296,277 and 5,362,516 (both Wilson et al.) and 5,141,790 (Calhoun et al.) and U.S. patent application Ser. No. 08/559,037 (Keller et al.), all incorporated by reference and any other type of pressure sensitive adhesive disclosed in Satas, et al., *Handbook of Pressure Sensitive Adhesives*, 2nd Ed. (Von Nostrand Reinhold, N.Y. 1989), the disclosure of which is incorporated by reference.

When other materials such as soaps, lubricants, perfumes, abrasive slurries, or any other solution, emulsion, dispersion, or other liquid are desired to be used with webs of the present invention, one skilled in the art without departing from the scope of the present invention can readily determine the array of combinations possible, given the multitude of possible embossed patterns, the multiplicity of possible embossings, and the variety of possible materials to be introduced into the embossed carrier web operating as a transfer article or as a final article for storage of the other material. With some materials, such as soaps or perfumes, the embossed web is preferably used as the final article.

Commercially available soaps, perfumes, slurries, lubricants, and the like can be used with webs of the present invention.

Further embodiments are described in the examples.

## EXAMPLES

### Example 1

An embossed Controltac™ Plus liner (commercially available from 3M, St. Paul, Minn.) with empty depressions was embossed with a metal tool having 0.25 mm diameter posts that were arranged in a square lattice pattern to provide 190 posts/cm$^2$. Commercial Controltac™ Plus liners have depressions of about 50–75 $\mu m$ in diameter and about 10–15 $\mu m$ deep arranged in a square lattice pattern to provide 1120 depressions/cm$^2$. The depth of the second embossing was varied from a few $\mu m$ to about 15 $\mu m$. Examination of the surface of the liner using scanning electron microscopyrevealed depressions from the (commercial) first emboss at the bottom of the depressions produced from the second embossing. At the greater depths of the second emboss, it appeared that the diameter of the depressions from the first emboss had a slight reduction in diameter when compared to their initial size. However, the second embossing step did not remove the presence of the depressions created by the first embossing step. A multiple embossed web was formed.

### Example 2

A second embossed Controltac™ Plus liner with its depressions filled with a glass bead slurry was embossed a second time with a tool having square posts 2.5 mm on a side and separated by intersecting grooves 0.38 mm wide. After the second embossing step, an adhesive tape was laminated to the surface of the liner and then delaminated for examination under an optical microscope. Clumps of glass beads were observed on the surface of the adhesive of the tape with the adhesive surface having intersecting grooves matching the pattern of the tool used in the second embossing. The resulting tape was a positionable adhesive tape with a topography of air channels after application of a tape to a substrate.

### Example 3

A release liner consisting of three layers with the core being 97 microns poly(ethylene terephthalate), 21–22 microns polyethylene with a matte finish on a back side layer, and 21–22 microns polyethylene with a glossy finish on the front side with a silicone release coating on the glossy side was microembossed with small pits on the glossy silicone-coated side and the pits filled with fine glass beads according to the procedure described in U.S. Pat. No. 5,362,516. The pits were about 70 microns diameter 18–19 microns deep in a square lattice of 300 micron spacing. A second emboss pattern was imposed upon the release liner by passing the release liner between an 85 durometer silicone rubber roll and an engraved metal roll. The engraved pattern was recessed lines (micro-grooves) with dimensions about 80 microns wide and 24 microns deep. The grooves were 1.3 mm apart and formed a square grid with grooves oriented 45 degrees to the circumference of the roll. The set point temperatures were 110° C. for the silicone roll and 104° C. for the engraved roll. The rolls were forced together with about 22 N/mm nip force by air cylinders. The release liner was passed through this arrangement at about 1.6 cm/sec. This formed a pattern of continuous intersecting ridges on the glossy silicone-coated side of the release liner. The ridges had a curved top and filleted junction with the base. Average dimensions of the ridges were about 85 microns wide, 18–19 microns high, and spaced the same as the engraved pattern. The intersections of the ridges were 16–19 microns high on average. This pattern was superimposed on the first microembossed pattern and did not substantially change the first pattern, except where individual pits were raised to the top of a ridge or sheared at the side of a ridge (see FIG. 3). The liner was analyzed with time-of-flight secondary ion mass spectrometry (TOF-SIMS) using a pulsed 25 keV $Ga^+$ primary ion beam, with a beam diameter of about 1 micron, rastered over an area of 400×400 microns. A uniform silicone distribution was shown over the liner both on and off the microembossed ridge areas.

An acrylic pressure sensitive adhesive solution (described as Adhesive Solution 1 in U.S. Pat. No. 5,296,277 and modified with 18.5 per hundred resin (phr) of a resin—Nirez™ 2019 from Arizona Chemical Co.) was prepared and dried at 66° C. for 10 minutes to form an adhesive film about 32 microns thick. The exposed adhesive side were laminated at room temperature to a 46 micron thick placticized, white flexible and conformable vinyl film identical to that used in 3M™ Controltac™ Plus Graphic Marking Film Series 180-10. The lamination used a Vanquisher roll laminator (Stoughton Machine and Manufacturing Co., Inc., Stoughton Wisconsin) at 200 kPa (30 psi) gauge pressure and a speed of about 2.5 cm/second to afford an essentially flat construction. After removal of the release liner the exposed pressure sensitive adhesive surface had continuous recessed micro-channels and intersections (corresponding to the micro-ridges of the removed release liner).

The pressure sensitive adhesive had an average measured channel dimensions of about 80 microns wide and about 15–18 microns deep and a uniform array of 8–12 micron high protruding mounds of glass beads corresponding to the pits on the liner.

The samples were also applied by finger pressure or by PA-1 Hand Applicator to flat substrates. Samples with the microchanneled pressure sensitive adhesive layer required no special application technique, were easily applied, and afforded evenly adhered graphic films with virtually no entrapped air bubbles. Any air pockets purposely formed by buckling the film were easily pressed out during application or after application. Air pocket elimination did not require that the air pocket be pressed as a bulge in the film to the edge of the sample (i.e., requiring pressure sensitive adhesive debond in adjacent areas as the pocket moves). The results also show that air bleed was in a lateral (X-Y dimensions) direction and did not require z-axis air dissipation through the films or lifting of the graphic film from the substrate. All samples adhered well to the substrates and showed no signs of undesired edge lifting.

In comparison, control samples were prepared from the "pit-only liner" having only embossing pattern 26 but not embossing pattern 24. The control samples required great care to prevent entrapment of many air bubbles. The trapped bubbles and pockets the control samples prepared from the "pit-only liner" could not be pressed out without lifting the graphic or pushing the pocket under the sample as it lifted.

The invention is not limited to the above embodiments. The claims follow.

What is claimed is:

1. A carrier web, comprising:

at least one surface that has a multiple embossed pattern having a first embossed pattern and a second embossed pattern, wherein the first embossed pattern forms an array of depressions, wherein the depressions of the first embossed pattern are in the second embossed pattern, wherein the second embossed pattern comprises lands and ridges between the lands, and wherein the height of the ridges over the lands ranges from about 3 to about 45 μm.

2. The web of claim 1, wherein a depth of depressions caused in the surface by any embossing pattern can range from a minor fraction of an original thickness of web to almost the entire original thickness.

3. The web of claim 1, wherein the surface can be embossed with any pattern ranging from a minor fraction of an area of the surface to the entire area of the surface.

4. The web of claim 1, wherein a shape of embossings for any pattern can range from a constant radius of curvature to a polygonal shape of at least 2 surfaces.

5. The web of claim 1, wherein a width of embossings in any pattern can range from about 1 μm to about 10,000 μm.

6. A method of embossing, comprising the steps of:

(a) embossing a carrier web having at least one surface with a first pattern, to create a first pattern of depressions;

(b) embossing the surface with a second pattern, to create a second pattern of depressions comprising lands and ridges;

wherein the depressions created from the first embossing step are substantially preserved during the second embossing step even though the second embossing step superimposes the second pattern on the depressions created by the first embossing step, and wherein the height of the ridges over the lands ranges from about 3 to about 45 μm.

7. The method of claim 6, further comprising the step of filling depressions created by the first embossing step with a material before performing the second embossing step.

8. The method of claim 7, further comprising the step of filling depressions created by the second embossing step.

9. The method of claim 6, wherein the surface can be embossed during any embossing step in an area ranging from a minor fraction of the area of the surface to the entire area of the surface.

10. The method of claim 6, wherein a shape of embossings for any embossing step can range from a constant radius of curvature to a polygonal shape of at least 2 surfaces.

11. The method of claim 6, wherein a width of embossings for any embossing step can range from about 1 μm to about 10,000 μm.

12. A method of using a web of claim 1 as a release liner for a pressure sensitive adhesive, comprising the step of filling the multiple embossed pattern with a pressure sensitive adhesive.

* * * * *

SEP.28'2001 16:04 651 737 2949 3M I P 220 10W #0667 P.016



evidence demonstrates that the Defendants' received actual knowledge of the foreclosure sale during the Summer of 1996.

Further, the Defendants have failed to argue, let alone demonstrate, that any lack of notice prevented them from exercising their legal rights. In our considered view, the Record demonstrates that the Defendants intentionally avoided formal notice of the foreclosure sale which occurred in October of 1996. Meanwhile, the Defendants had actual notice of the sale, and took affirmative steps which advanced their interests, well before the foreclosure took place. Consequently, we cannot responsibly accept the Defendants' claims of prejudice, and thereby legitimize the pattern of deception, and evasion, that they displayed, through their apparently concerted efforts to elude service of process during the Summer of 1996.[6]

[6] Lastly, our determination, that the Plaintiff properly effected service upon the Defendants, and that the foreclosure on their real property was a valid exercise of the Minnesota foreclosure Statutes, requires our rejection of the Defendants' Counterclaim, which seeks a recoupment of lost rental income as a result of the Plaintiff's foreclosure on their property. Accordingly, Summary Judgment is granted to the Plaintiff on the Defendants' Counterclaim.[7]

NOW, THEREFORE, It is—

ORDERED:

1. That the Plaintiff's Motion for Leave to file a Reply Memorandum [Docket No. 21] is GRANTED.

2. That the Plaintiff's Motion for Summary Judgment [Docket No. 10] is granted in all respects.

6. The only claim of prejudice, which is advanced by the Defendants, is that the Plaintiff purportedly did not comply with the farmer-lender mediation requirements of *Minnesota Statutes* Section 583.24, *et seq.* This alleged prejudice, however, bears no relation to the Plaintiff's allegedly defective service and, therefore, has no relevance to our analysis. However, for the sake of clarification, we note that the Defendants have not submitted any evidence which demonstrates that the Plaintiff neglected to comply with the mediation requirements of Minnesota law. Further, the Plaintiff has demonstrated that it engaged in mediation with the Defendants, albeit unsuccessfully, prior to the foreclosure. See, *Declaration of Brian Hartman,* at ¶¶ 5–7; *Exs. A–C.* As such, the Defendants have also failed to raise a genuine dispute of material fact on this issue.

7. Even if the Defendants' Counterclaim were not defeated by the validity of the Plaintiff's foreclosure proceeding, we would not have subject matter jurisdiction to consider the merits of the Defendants' claim. The Defendants do not suggest, let alone show, that they have filed the requisite claim, in accordance with the Federal Tort Claims Act, *Title 28 U.S.C. § 2675(a),* with the pertinent Federal Agency, as well as a showing that the claim was finally denied—conditions precedent to our exercise of jurisdiction over any such claim. See, *McNeil v. United States,* 508 U.S. 106, 111–112, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993); *Melo v. United States,* 505 F.2d 1026, 1028 (8th Cir.1974); *Peterson v. United States,* 428 F.2d 368, 369 (6th Cir.1970). Nor have the Defendants complied with the Little Tucker Act, *Title 28 U.S.C. § 1346(a)(2),* which vests jurisdiction in the United States Court of Claims, for non-tort actions—if that is what the Defendants' claims were to be considered—that seek damages in excess of $10,000. See also, *Title 28 U.S.C. § 1491(a)(1); Polos v. United States,* 556 F.2d 903, 905 (8th Cir. 1977) (noting claims against United States exceeding $10,000, which are founded upon the Constitution, Federal Statute, Regulation, or contract, are in exclusive jurisdiction of Court of Federal Claims); see also, *Mullally v. U.S.,* 95 F.3d 12, 14 (8th Cir.1996); *St. Louis Union Trust Co. v. Stone,* 570 F.2d 833, 836 (8th Cir.1978); *Thompson v. U.S.,* 408 F.2d 1075, 1081 (8th Cir.1969); *Winston Bros. Co. v. U.S.,* 371 F.Supp. 130, 133 (D.Minn.1973). Since the Defendants' Counterclaim is ineffectual, by virtue of the Federal Government's sovereign immunity, which, under the circumstances of this case, deprives us of subject matter jurisdiction, we would be compelled to enter Summary Judgment for the Plaintiff, even if the claims otherwise had substantive merit.



**DECADE INDUSTRIES, d/b/a Sanus Systems, Plaintiff,**

**v.**

**WOOD TECHNOLOGY, INC., Defendant.**

**No. CIV. 99–1652 (DSD/SRN).**

United States District Court, D. Minnesota.

June 21, 2000.

Owner of design patent for miniature stereo system stand sued competitor for infringement. On plaintiff's motion for preliminary injunction, the District Court, Doty, J., held that: (1) plaintiff was likely to prevail on claim that patent was valid, and (2) plaintiff was likely to prevail on claim that patent was infringed.

Motion granted.

**1. Patents ⚷298, 300, 301(5)**

In evaluating patent infringement plaintiff's motion for preliminary injunction, court considers: (1) likelihood of plaintiff's success on merits; (2) threat of irreparable harm to plaintiff in absence of relief; (3) balance between that harm and harm that relief would cause to other litigants; and (4) public interest.

**2. Patents ⚷112.5**

Design patent is presumed valid upon issuance, and party asserting invalidity bears burden of overcoming this presumption by clear and convincing evidence. 35 U.S.C.A. § 282.

**3. Patents ⚷295**

Owner of design patent for miniature stereo system stand was likely to prevail on claim patent was not invalid on obviousness grounds, for purpose of obtaining preliminary injunction against alleged infringer; design represented significant departure from cited prior art.

**4. Patents ⚷298**

Owner of design patent for miniature stereo system stand was likely to prevail on infringement claim, for purpose of obtaining preliminary injunction; although alleged infringer had obtained notice of allowance of patent for its design, resemblance between patented design and accused product, despite minor variations in angle and proportion, was striking.

**5. Patents ⚷312(1.1)**

Fact of separate patentability presents no legal or evidentiary presumption of noninfringement.

**6. Patents ⚷252**

Court determines design patent infringement by comparing allegedly infringing product, not alleged infringer's patent, to claimed design.

**7. Patents ⚷300**

For purpose of obtaining preliminary injunction in patent case, strong showing of likelihood of success on merits coupled with continuing infringement raises presumption of irreparable harm to patentee.

---

David R. Fairbairn, Michael J. Pape, Kinney & Lange, Minneapolis, MN, for plaintiff.

Donald S. Arbour, Arbour Law Offic Malcolm E. Whittaker, Mineo & Whittaker, Charlotte, NC, for defendant.

## ORDER

DOTY, District Judge.

This matter is before the court on plaintiff's motion for a preliminary injunction. Based on a review of the file, record, and proceedings herein, and for the reasons stated, the court grants plaintiff's motion.

## BACKGROUND

Plaintiff Sanus Systems ("Sanus"), the business name for Decade Industries, Inc., is a Minnesota company that makes stands and supports for audio and video equip-

Case 0:01-cv-01781-JRT-FLN Document 224-2 Filed 11/14/2005 Page 15 of 17

SEP.28'2001 16:05 651 737 2948 3M I P 220 10W #0667 P.017



ment. Defendant Wood Technology, Inc. ("Wood") is a North Carolina furniture manufacturer. In January 1998, Sanus introduced its new miniature stereo system stand, called the "Mini Stereo System Stand," at the annual Consumer Electronics Show in Las Vegas. Retailers responded enthusiastically, and the Mini Stereo System Stand was soon available at both retail electronic stores and general department stores and is currently offered in over five hundred retail locations.

On April 23, 1998, Sanus filed a design application with the U.S. Patent and Trademark Office for the design embodied by the Mini Stereo System Stand. After reviewing the application in light of the prior art, the patent examiner issued a notice of allowance. On February 23, 1999, Sanus's application issued as U.S. Patent No. Des. 405,988 ("'D988 patent").

In January 1999, at the next Consumer Electronics Show, James Wohlford, inventor of the 'D988 patent and president of Sanus, noticed that Wood was displaying a stand for a miniature stereo system. To Wohlford's eye, the design of the Wood stand seemed to be a near duplication of the patented design. On January 21, 1999, Sanus wrote a cease and desist letter informing Wood about the pending design patent for its Mini Stereo System Stand. Several months later, after Sanus had provided Wood with a copy of the 'D988 patent, Sanus discovered a summer 1999 Crutchfield catalog advertising a Wood miniature stereo stand. Although the stand was slightly modified from Wood's earlier design, Sanus continued to believe that the Wood product was an infringing knock-off of their patented design.

In November 1999, Sanus brought this suit for patent infringement. After Wood's motion to dismiss for lack of personal jurisdiction was denied, Sanus brought the present motion for preliminary injunction. Since bringing the motion, Sanus has learned that Wood is now supplying the allegedly infringing stand to Sears department stores.

## DISCUSSION

[1] Sanus now brings a motion for a preliminary injunction, asking the court to enter an order halting Wood's alleged infringement of the 'D988 patent. In evaluating a motion for preliminary injunction, the court considers the four factors set forth by the Eighth Circuit in *Dataphase Systems, Inc. v. CL Systems, Inc.*: (1) the likelihood of the movant's success on the merits; (2) the threat of irreparable harm to the movant in the absence of relief; (3) the balance between that harm and the harm that the relief would cause to the other litigants; and (4) the public interest. 640 F.2d 109, 112–114 (8th Cir.1981). The court weighs the four factors to determine whether injunctive relief is warranted. *See id.* at 113; *West Pub. Co. v. Mead Data Cent., Inc.*, 799 F.2d 1219, 1222 (8th Cir.1986), *cert. denied*, 479 U.S. 1070, 107 S.Ct. 962, 93 L.Ed.2d 1010 (1987). The movant bears the burden of proof concerning each of them. *See Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir.1987).

### A. Likelihood of Success on the Merits

To prevail on its infringement claim, Sanus must establish (1) that it owns a valid design patent and (2) that Wood's accused product infringes the 'D988 patent. The court will discuss each issue separately.

#### 1. Validity of the 'D988 Patent

[2, 3] An inventor may obtain a design patent for an article of manufacture that is new, original, and ornamental, so long as the design is not dictated by functional requirements. *See* 35 U.S.C. § 171; *Avia Group Int'l Inc. v. L.A. Gear Calif.*, 853 F.2d 1557, 1563 (Fed.Cir.1988). Upon issuance by the U.S. Patent and Trademark Office, a design patent is presumed valid. *See* 35 U.S.C. § 282. The party asserting invalidity bears the burden of overcoming this presumption by clear and convincing evidence. *See Avia Group*, 853 F.2d at 1562. As the Federal Circuit has stated:

> [O]bviousness ... is reviewed from the viewpoint of a designer of ordinary skill or capability in the field to which the design pertains. As with utility patents, obviousness is not determined as if the designer had hindsight knowledge of the patented design.
>
> When the patented design is a combination of selected elements in the prior art, a holding of obviousness requires that there be some teaching or suggestion whereby it would have been obvious to a designer of ordinary skill to make the particular selection and combination made by the patentee. The first step in the analysis, when the subject is design, is whether there is "a reference to something in existence, the design characteristics of which are basically the same as the claimed design, in order to support a holding of obviousness." Thus not only the individual elements, but the ornamental quality of the combination must be suggested in the prior art.

*L.A. Gear, Inc. v. Thom McAn Shoe Co.*, 988 F.2d 1117, 1124 (Fed.Cir.1993) (citations omitted). Here, Sanus identifies a number of ornamental features of the 'D988 patent that it contends are novel and non-obvious individually and in combination with each other: (1) an overall size that is proportioned to fit a miniature stereo system; (2) an open support system constructed by four independent cylindrical legs, quadrilaterally positioned, which extend from a base that rests on the ground to a top shelf; (3) shelving that extends outward separately from left and right side legs; (4) positioning of the left and right side shelves so that they extend outward at a height lower than the top shelf. Wood responds by directing the court to several previously patented designs that, it argues, fully anticipate the Sanus design and therefore render the 'D988 patent obvious and invalid.

If anything, however, the prior art supports Sanus's argument that the 'D988 patent represents a novel and non-obvious design. While a few of the individual ornamental elements appearing in the 'D988 patent arguably can be glimpsed in the prior art, the combination of these elements in the 'D988 patent is entirely original. The prior art may be separ[illegible] into two general categories: In the [illegible] category, the designs employ a cabinet or bookshelf-like look with simple angles and a solid sidewall support system. *See, e.g.*, U.S. Patents 2,522,748; Des. 39,491; Des. 342,172; Des. 133,436. In the second category, the designs make elaborate use of curvilinear or diagonal lines and rely on open support systems. *See, e.g.*, U.S. Patents Des. 141,319; Des. 277,439; Des. 318,280; Des. 326,377. The 'D988 patent represents a significant departure from both of these models, combining the simple angles and lines of the cabinet-like designs with the open support system of the elaborate designs.[1] When viewed in its entirety, the 'D988 patent bears almost no resemblance to any of the prior art identified by Wood. Given this unique des[illegible] and given the presumption of validit[illegible] at[illegible] taches to the issuance of the pat[illegible], the court concludes that Sanus is likely to succeed in demonstrating the validity of the 'D988 patent.[2]

#### 2. Infringement

[4] The court now turns to the question of whether Sanus is likely to prove

1. While U.S. Patent 4,099,472 makes use of both simple angles and an open support system, it teaches a stacking shelf system that combines none of the novel, ornamental features of the 'D988 patent.

2. Reference to the prior art also fatally undermines Wood's contention that the design features of the 'D988 patent are primarily functional. "When there are several ways to achieve the function of an article of manufacture, the design of the article is more likely to serve a primarily ornamental purpose." *L.A. Gear*, 988 F.2d at 1123–24. Here, the prior art shows a myriad of possible designs that can achieve the functions of a stereo stand, strongly suggesting that the claimed design is primarily ornamental.

SEP.28'2001 16:05 651 737 2948 3M I P 220 10W #0667 P.018



that Wood's product infringes the 'D988 patent. To prove infringement, Sanus must establish that Wood's design is substantially the same as the claimed design. "The criterion is deception of the ordinary observer, such that one design would be confused with the other." *L.A. Gear,* 988 F.2d at 1124. As the Supreme Court held in *Gorham v. White:*

> [I]f, in the eye of an ordinary observer, giving such attention as a purchaser usually gives, two designs are substantially the same, if the resemblance is such as to deceive such an observer, inducing him to purchase one supposing it to be the other, the first one patented is infringed by the other.

14 Wall. 511, 81 U.S. 511, 528, 20 L.Ed. 731 (1871). In addition, the accused design must appropriate the novelty that distinguished the patented design from the prior art. *See Litton Systems, Inc. v. Whirlpool Corp.,* 728 F.2d 1423, 1444 (Fed. Cir.1984).

Comparing the design shown in the 'D988 patent and Wood's accused product, the court concludes that a jury would be highly likely to find a substantial similarity between the two products. On first observation, the resemblance between the two designs is striking. Indeed, at the preliminary injunction hearing, where one of the Wood stands was put on display, the court was initially uncertain as to whether it was viewing an embodiment of the claimed patent or an example of the accused product. This confusion is understandable given that the Wood stereo stand employs each of the features described in Part A.1 above: its overall dimensions are proportioned to fit a miniature stereo system. It uses an open support system constructed by four independent cylindrical legs, positioned quadrilaterally, which extend from a base that rests on the ground to a top shelf. Two side shelves extend outward separately from the left and right side leg and are positioned so that they extend outward at a height lower than the top shelf. There is little question, then, that the accused product has copied the ornamental novelty of the 'D988 patent. While Wood has tweaked some of the angles and proportions of the Sanus design and has inserted additional shelves between the upright legs, these minor changes do not materially alter the substantial visual likeness of the two designs when they are viewed in their entirety. Indeed, given the real world circumstances in which the Wood stereo stand would be viewed, these minor changes would likely go unnoticed by the ordinary observer.

Perhaps because there is little legitimate dispute as to the visual similarity of the claimed patent and the accused product, Wood asks the court to focus on the fact that a patent examiner recently issued a notice of allowance to Wood's patent application on the design embodied by the accused product. Wood contends that the notice of allowance is "a warning flag that informed official opinion exists supporting defendant's contention of non-equivalence," *Royal Typewriter Co. v. L.C. Smith & Corona Typewriters,* 76 F.Supp. 190 (D.Conn.1947), and that the patent examiner's decision should control absent clear and convincing evidence that he made a mistake.

[5, 6] There are several reasons why the court must reject Wood's argument on this point. First, the Federal Circuit has made it clear that "the fact of separate patentability presents no legal or evidentiary presumption of noninfringement." *Hoechst Celanese Corp. v. BP Chem. Ltd.,* 78 F.3d 1575, 1582 (Fed.Cir.1996). *See also Atlas Powder Co. v. E.I. du Pont De Nemours & Co.,* 750 F.2d 1569, 1580, (Fed. Cir.1984); *National Presto Indus., Inc. v. West Bend Co.,* 76 F.3d 1185, 1192 (Fed. Cir.1996). Second, it is axiomatic that the court determines infringement by comparing the allegedly infringing product, not the alleged infringer's patent, to the claimed design. *See, e.g., Chemical Eng'g Corp. v. Essef Indus., Inc.,* 795 F.2d 1565, 1571 (Fed.Cir.1986). Both considerations



are especially relevant here, where the patent examiner has apparently proceeded on the belief that the proposed Wood design includes glass shelves, a feature that is absent from the accused product. *See* Examiner's Amendment (Feb. 23, 2000) (Pope Decl. Ex. A.) ("Figure 1 is objected to because the line that are used to represent what appears to be glass shelves are too heavy and are bleeding together."). Finally, even if the court were to ascribe some evidentiary value to the notice of allowance, the powerful direct evidence of substantial similarity would easily overcome it.

For these reasons, the court concludes that Sanus is highly likely to prevail on the merits of its infringement claim against Wood.

### B. Remaining Dataphase Factors

[7] In matters involving patent rights, a strong showing of likelihood of success on the merits coupled with continuing infringement raises a presumption of irreparable harm to the patentee. *See, e.g., H.H. Robertson, Co. v. United Steel Deck, Inc.,* 820 F.2d 384, 390 (Fed.Cir.1987). As the Federal Circuit reasoned in *Smith Int'l Inc. v. Hughes Tool Co.:*

> The very nature of the patent right is the right to exclude others. Once the patentee's patents have been held to be valid and infringed, he should be entitled to the full enjoyment and protection of his patent rights. The infringer should not be allowed to continue his infringement in the face of such a holding. A court should not be reluctant to use its equity powers once a party has so clearly established his patent rights. We hold that where validity and continuing infringement have been clearly established, as in this case, immediate irreparable harm is presumed. To hold otherwise would be contrary to the public policy underlying the patent laws.

718 F.2d 1573, 1580–81 (Fed.Cir.1983). Here, Sanus has clearly established both the validity of its design patent and the continuing infringement of that patent by Wood. Thus, Sanus is entitled to a presumption that it will suffer irreparable harm absent an injunction.

In addition, Sanus has submitted credible affidavit evidence describing the concrete irreparable harm that will result form Wood's continued infringement of the patented design: (1) frustration of Sanus's general business plan, in which the success of the Mini Stereo System Stand provides an opportunity for Sanus to leverage its entire product line into retail stores and (2) frustration of Sanus's business investment cycle, wherein profits from successful current products like the Mini Stereo System Stand are reinvested in the research and development of improved and new products. After reviewing the record, the court agrees that the continued infringement of the accused product runs a serious risk of undermining a unique chance for Sanus to gain a foothold in the retail market for its other products and to gain profits for further product development. The court also concludes that an injunction in this case would serve the public interest by protecting and promoting innovation and by preventing confusion among consumers. *See Smith,* 718 F.2d at 1581 ("[P]ublic policy favors protection of the rights secured by the valid patents.").

On the other side of the scale, a preliminary injunction will only minimally harm Wood, and will not in the least prev[ent] Wood from marketing non-infringing pr[od]ucts. Wood was fully aware of the 'D988 patent when it designed its current stereo stand and took a calculated risk that it might infringe that patent when it declined to make substantial alterations. If Wood has failed to plan for the contingency of an injunction, it has only itself to blame for any resulting injury. Moreover, Wood has already demonstrated that it is capable of quickly reworking the design of a product and placing the new product on the market. If Wood is able to employ a higher degree of creativity in its next redesign, it will have a full opportunity to compete

with Sanus in the miniature stereo stand market.

In sum, each *Dataphase* factor strongly counsels in favor of the issuance of a preliminary injunction. Accordingly, the court will grant Sanus's motion.

### C. Bond Amount

Under Federal Rule 65(c), the court is required to determine the amount of security that the preliminary injunction movant must give "for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined." Given the strong likelihood that Sanus will succeed on the merits of its infringement claim and the minimal chance that Wood will suffer significant cognizable harm from the issuance of an injunction, the court concludes that a bond of $10,000 is appropriate in this case.

## CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** that:

1. Plaintiff's motion for a preliminary injunction is granted.

2. Defendant is preliminarily enjoined from making, using, selling, or offering for sale any product which infringes U.S. Patent No. Des. 405,988. The miniature stereo stand advertised in the Summer 1999 Crutchfield catalog is such an infringing product.

3. This injunction will not take effect until plaintiff posts a bond or provides other security in the amount of $10,000.

**Robert WIELAND, Plaintiff,**

**v.**

**CITY OF ARNOLD, Defendant.**

**No. 4:98CV1600-SNL.**

United States District Court,
E.D. Missouri,
Eastern Division.

June 15, 2000.

Police officer, who had been ordered by acting police chief to immediately terminate his personal relationship with a city resident on probation for a felony offense, on grounds that such relationship constituted unbecoming conduct, brought action against city, alleging that the departmental order upon which the directive was based violated his right of free intimate association and his right to privacy or, in the alternative, that the order was unconstitutionally vague or overbroad. The District Court, Limbaugh, Senior District Judge, held that: (1) applying a modified *Pickering* balancing test, city's interest in maintaining strict order and efficiency in its police department outweighed officer's associational and/or privacy interest in continuing his dating relationship with an undisputed felon probationer, and (2) departmental order was not void for vagueness or constitutionally overbroad.

Declaratory judgment for defendant.

**1. Civil Rights ⚖206(1, 3)**

In civil rights action by municipal employee against municipality, municipality may be considered a "person" in the event that it has an explicit policy which allegedly deprives the employee of his or her constitutional rights. 42 U.S.C.A. § 1983.

See publication Words and Phrases for other judicial constructions and definitions.



**2. Declaratory Judgment ⚖209**

In cases such as civil rights action by municipal employee against municipality, where plaintiff claims an actual or imminently threatened injury that is redressable by some other statute, court may issue a ruling and remedy pursuant to the Declaratory Judgment Act. 28 U.S.C.A. §§ 2201, 2202; 42 U.S.C.A. § 1983.

**3. Constitutional Law ⚖91**

Associations that are protected by the First Amendment are distinguished by such attributes as relative smallness, a high degree of selectivity in decisions to begin and maintain affiliation, and seclusion from others in critical aspects of the relationship. U.S.C.A. Const.Amend. 1.

**4. Constitutional Law ⚖82(10), 91**

There exists a continuum of human relationships potentially protected by the freedom of intimate association; extremely close relationships, such as family relationships and marriage, are generally afforded greater protection from government interference than are merely social ones. U.S.C.A. Const.Amend. 1.

**5. Constitutional Law ⚖82(10)**

Constitutional right of privacy extends to cases involving personal decisions about marriage, procreation, contraception, family relationships, child rearing and education, and abortion.

**6. Constitutional Law ⚖82(7)**

In limited circumstances, the right of privacy has been extended to certain matters implicating individual autonomy, whether or not the individual in question was married.

**7. Constitutional Law ⚖82(7), 91**

Constitutional rights to intimate association and privacy are limited both in scope and application. U.S.C.A. Const. Amend. 1.

**8. Constitutional Law ⚖91**

**Municipal Corporations ⚖189(1)**

Although police officer's "amorphous social relationship" with felon probationer, apparently intimate to some degree, was not entitled to the full scope of constitutional protection, that was not to say that it was not entitled to some degree of protection from governmental interference. U.S.C.A. Const.Amend. 1.

**9. Constitutional Law ⚖90.1(7.2)**

In traditional First Amendment speech cases involving governmental employers, when courts have found protectable constitutional speech in issue, they have conducted the *Pickering* balancing test, which involves balancing the employee's right to free speech against the interest of the public employer. U.S.C.A. Const.Amend. 1.

**10. Constitutional Law ⚖82(11), 91**

**Municipal Corporations ⚖185(1)**

Court would apply modified *Pickering* balancing test in action by police officer against city for allegedly violating his constitutional rights of privacy and intimate association by ordering him to end his dating relationship with a felon probationer, weighing officer's associational rights against city's interest in regulating employees' behavior so as to avoid the disruption of public functions. U.S.C.A. Const. Amend. 1.

**11. Constitutional Law ⚖82(11)**

Police department has a more significant interest than the typical government employer in regulating the First Amendment activities of its employees in order to promote efficiency, foster loyalty and obedience to superior officers, maintain morale, and instill public confidence. U.S.C.A. Const.Amend. 1.

**12. Constitutional Law ⚖82(11)**

Because police departments function as paramilitary organizations charged with maintaining public safety and order, they are given more latitude in their decisions

SEP.28'2001 16:06 651 737 2948 3M I P 220 10W #0667 P.019