17, 1995 letter, that he believed Johnson was "ready to be evaluated by either a psychiatrist or psychologist of your choosing regarding his fitness to return to work full-time," as discussed above, he conceded that Johnson was not ready to resume his Assembler A duties or anything more than custodial duties. (*See* Anderson Aff.Ex. EE.) Based on his poor attendance and the other evidence relating to job performance, the Court finds that Johnson has not met his prima facie burden of establishing that he was qualified to perform the essential elements of the Assembler A position when he was terminated.

[15–17] Having found that Johnson was unqualified to perform the Assembler A job, the inquiry turns to whether reasonable accommodation was possible. *See Nesser,* 160 F.3d at 446. There is no evidence in the record that Johnson personally requested any particular accommodation from Loram. However, Dr. Albert's letter stated that Johnson was able to return to his previous work tasks. (*See* Anderson Aff.Ex. EE.) Because Johnson's previous work tasks were merely custodial rather than the tasks of an Assembler A, the Court finds that Dr. Albert's letter constitutes sufficient evidence of a request for accommodation. (*See* Anderson Aff. Ex. A at 124, 292, 367, 442–43.) However, Johnson has failed to make any facial showing that such an accommodation was reasonable, or even possible, in February 1995. Reassignment to a different position is only reasonable if a vacant position is available. *See Nesser,* 160 F.3d at 446. Loram has introduced considerable undisputed evidence that its workforce had decreased dramatically by early 1999, particularly in the shop where Johnson worked, such that no custodial position was available at that time. (*See* K. Johnson Aff. ¶ 7, Ex. 3–11.) Because Johnson has failed to meet his burden of showing that a reasonable accommodation was possible, his ADA claim fails.

C. State Law Claim

Johnson concedes that the *McDonnell-Douglas* framework governs his state law claim under the MHRA. (*See* Pl.'s Resp. at 25.) Accordingly, for the reasons discussed above with respect to Johnson's ADA claim, the Court grants summary judgment in favor of Loram on the MHRA claim.

## CONCLUSION

Accordingly, for the foregoing reasons, and upon all of the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Plaintiff's Memorandum in Response to Defendant's Motion for Summary Judgment and In Support of Plaintiff's Motion For Partial Summary Judgment (Clerk Doc. No. 30.) is **CONVERTED** into a Motion for Partial Summary Judgment on the issue of liability, which is **DENIED**.
2. Defendant's Motion for Summary Judgment (Clerk Doc. No. 25) is **GRANTED** as to all counts of Plaintiff's Complaint (Clerk Doc. No. 1), which is hereby **DISMISSED WITH PREJUDICE** in its entirety.

**SURDYK'S LIQUOR, INC., a Minnesota corporation, Plaintiff,**

v.

**MGM LIQUOR STORES, INC., a Minnesota corporation, Defendant.**

No. Civ. 99–1953 (DSD/JMM).

United States District Court, D. Minnesota.

Feb. 9, 2000.

Wine and liquor retailer brought action against competitor, alleging that competitor's flyers advertising wine sales constituted false advertising in violation of Lanham Act and Minnesota statutes. Parties moved to supplement record and plaintiff moved for preliminary injunctive relief. The District Court, Doty, J., held that: (1) parties would be permitted to supplement record; (2) fact that sales campaign had ended did not moot false advertising claim; and (3) plaintiff was likely to succeed on merits of its claim that defendant's flyers were literally false in violation of Lanham Act and, thus, was entitled to preliminary injunctive relief.

Motions granted.



1. Trade Regulation ⟹864

Parties would be permitted to supplement record on preliminary injunction motion with additional affidavits regarding current availability of advertised products in false advertising action, where parties adequately explained why they did not include materials with their original motion papers and materials shed helpful light on merits of claim.

2. Federal Courts ⟹12.1

Defendant's voluntary cessation of challenged practice does not deprive federal court of its power to determine legality of practice.

3. Injunction ⟹22

Defendant's voluntary cessation of challenged practice is important factor bearing on question of whether court should exercise its power to enjoin defendant.

4. Trade Regulation ⟹864

Action under Lanham Act seeking injunctive relief to prevent wine and liquor retailer from engaging in false advertising with respect to its wine sales campaigns was not moot despite fact that sales campaigns had ended, where retailer gave no indication that it intended to halt or modify its past advertising practices from that point forward. Lanham Trade-Mark Act, § 43, 15 U.S.C.A. § 1125.

5. Federal Civil Procedure ⟹211

Joinder of retailer's franchisees, who separately controlled inventory at wine and liquor stores, was not prerequisite to issuance of injunctive relief in action under Lanham Act seeking to prevent retailer from falsely advertising sale of wines that were unavailable at franchisee stores, where retailer, not its franchisees, was responsible for conducting challenged advertising. Lanham Trade-Mark Act, § 43(a), 15 U.S.C.A. § 1125(a).

6. Injunction ⟹138.1

In evaluating motion for preliminary injunction, court considers: (1) likelihood of movant's success on merits; (2) threat of irreparable harm to movant in absence of relief; (3) balance between that harm and harm that relief would cause to other litigants; and (4) public interest.

7. Injunction ⟹147

Party seeking injunctive relief bears burden of proof with respect to factors warranting preliminary injunction.

8. Trade Regulation ⟹870(1)

Purpose of Lanham Act is to protect persons engaged in commerce against certain forms of unfair competition, including false or deceptive advertising. Lanham Trade-Mark Act, § 43(a), 15 U.S.C.A. § 1125(a).

9. Trade Regulation ⟹870(1)

Whether product is available goes directly to one of that product's characteristics within meaning of Lanham Act section prohibiting commercial advertising or promotion that "misrepresents the nature, characteristics, qualities, or geographic origin of" advertiser's goods. Lanham Trade-Mark Act, § 43(a), 15 U.S.C.A. § 1125(a).

10. Trade Regulation ⟹870(1)

To prevail on false advertising claim under Lanham Act, plaintiff must prove that: (1) defendant made false statement of fact in commercial advertisement about its

SEP.28.2001 16:07 651 737 2948 3M I P 220 10W #0667 P.020

own or another's product; (2) statement actually deceived or would tend to deceive substantial segment of its audience; (3) deception is material, in that it is likely to influence purchasing decision; (4) defendant caused its false statement to enter interstate commerce; and (5) plaintiff has been or likely to be injured as result of false statement, either by direct diversion of sales from itself to defendant or by loss of good will associated with its products. Lanham Trade-Mark Act, § 43(a), 15 U.S.C.A. § 1125(a).

**11. Trade Regulation ⇐870(1)**

If plaintiff establishes that defendant's commercial claim in its advertising is literally false, court may grant injunctive relief under Lanham Act without considering advertisement's actual impact on consuming public. Lanham Trade-Mark Act, § 43(a), 15 U.S.C.A. § 1125(a).

**12. Trade Regulation ⇐870(1)**

Court's assessment under Lanham Act of literal falsity involves two-stage inquiry: (1) whether challenged advertisement conveys explicit factual message; and (2) whether that explicit factual message is false. Lanham Trade-Mark Act, § 43(a), 15 U.S.C.A. § 1125(a).

**13. Trade Regulation ⇐870(1)**

Issue of literal falsity in Lanham Act false advertising claim, including interpretation of commercial's message, is question of fact that is highly dependent upon context and inference. Lanham Trade-Mark Act, § 43(a), 15 U.S.C.A. § 1125(a).

**14. Trade Regulation ⇐870(1)**

Wine and liquor retailer was likely to succeed on merits of its claim that competitor's flyers advertising its wine sales events were literally false in violation of Lanham Act and, thus, retailer was entitled to preliminary injunctive relief; evidence demonstrated that competitor's stores failed to stock number of wines in quantities advertised in its flyers and that some advertised wines were completely unavailable during sales period. Lanham Trade-Mark Act, § 43(a), 15 U.S.C.A. § 1125(a).

**15. Trade Regulation ⇐864**

For purposes of granting injunctive relief, irreparable harm is presumed when Lanham Act plaintiff proves literal falsity of defendant's advertising. Lanham Trade-Mark Act, § 43(a), 15 U.S.C.A. § 1125(a).

**16. Constitutional Law ⇐90.3**

Although any court order regulating substance of commercial advertisement runs risk of trespassing on advertiser's free speech guarantees, advertiser has no First Amendment right to deceive consuming public. U.S.C.A. Const.Amend. 1.

---

Richard A Duncan, Elizabeth Hendricks Schmiesing, Michael D Beach, Faegre & Benson, Minneapolis, MN, for Surdyk's Liquor Inc.

Alan Marshall Anderson, C Eric Hawes, Larkin Hoffman Daly & Lindgren, Bloomington, MN, for MGM Liquor Stores, Inc.

## ORDER

DOTY, District Judge.

This matter is before the court on (1) the parties' cross-motions to supplement the record and (2) plaintiff's motion[1] for preliminary injunction. Based on a review of the file, record, and proceedings herein, the court (1) grants the parties' cross-motions to supplement the record and (2) grants plaintiff's motion for preliminary injunction.

## BACKGROUND

Plaintiff Surdyk's Liquor, Inc. ("Surdyk's") and defendant MGM Liquor Stores, Inc. ("MGM") are rival Twin Cities wine and liquor retailers. Surdyk's owns and operates a liquor store in Northeast Minneapolis. MGM is the franchisor for a chain of 36 area liquor stores operating under the name "MGM Liquor Warehouse." The individual MGM stores are owned and operated by six different franchisees. As part of the franchise relationship, defendant MGM orchestrates joint advertising campaigns when the MGM store owners decide to conduct a coordinated sale.



In the fall of 1999, MGM published a multiple-page advertising flyer for a wine and liquor sales event called the "29th Anniversary Wine, Liquor & Beer Sale." Twenty-three MGM stores were advertised as participating in the event, which was scheduled to run from September 30 through October 20, 1999. The flyer was published by the Star Tribune and circulated widely throughout the Twin Cities metropolitan region. On September 29, 1999, the day before the sale was to begin, three private investigators hired by Surdyk's visited ten different MGM stores and attempted to purchase case quantities of 18 wines advertised for sale in the Anniversary Sale flyer. The investigators found that at each of the MGM stores surveyed the wines requested were either out of stock or stocked in very small quantities. At about half of the stores, an MGM employee stated that the requested wines could be specially ordered and delivered within two days to a week.

On October 8, 1999, Surdyk's filed a complaint with the Minnesota Attorney General's Office about MGM's advertising in connection with the Anniversary Sale. On October 14, 1999, the Attorney General's Office sent a letter to MGM, reminding MGM that several Minnesota statutes prohibit false or deceptive advertising and that "[t]he State is empowered to seek an injunction, restitution, civil penalties and attorneys' fees in the event your company violated these statutes." Letter from Erik A. Lindseth, Assistant Attorney General, to MGM (Oct. 14, 1999) (Beach Aff., Ex. C.) The letter also stated:

> The state hereby requests that you respond immediately to this complaint. In particular, please provide evidence that the wines referenced above were available during the sale, and in what quantities they were available. . . .
>
> If the wines referenced above were not available at the outset of the sale or have not been available in reasonable quantities throughout the sale, the State requests that you cease further use of your "29th Anniversary" print advertisements for the remainder of the sale, and reconsider your use of such advertisements in future sales.

*Id.* On October 21, 1999, MGM responded to the letter from the Attorney General's Office with the following explanation:

> When MGM prepared its advertising circular (and sales of this nature are planned more than a month in advance), it listed for sale only products which appeared on price lists distributed by its suppliers. In response to your letter, MGM confirmed with its suppliers that all the wines listed in your letter were available at the time this advertising circular was prepared. It would not be unusual, however, when dealing with wines of limited availability, for there to be some wines that are not available at a subsequent date. In this case, apparently only 4 of about 1,000 wines listed in the advertisements were not available at the time checked by Surdyk's representative.

Letter from Charles S. Modell, Counsel for MGM, to Minnesota Attorney General's Office, at 2 (Oct. 21, 1999) ("MGM Letter") (Beach Aff., Ex. D).

In November 1999, MGM again prepared a multiple-page flyer to be published in local newspapers in connection with another sales event, "The Millenium Holiday Wine, Liquor & Beer Sale." The Millenium Sale involved 33 MGM stores and was scheduled to run from November 29 through December 11, 1999. On November 30, 1999, Surdyk's sent an investigator to visit a number of participating MGM stores using a list of two dozen wines and liquors. Again, the investigator found that, for the most part, the products requested were either out of stock or stocked

SEP.28'2001 16:07 651 737 2948 3M I P 220 10W #0667 P.021

SEP.29'2001 16:09 651 737 2948 3M I P 220 10W #0667 P.022



in small quantities. Again, the employees at many of the MGM stores suggested that the items could be special ordered and delivered within two days to a week.

On November 24, 1999, Surdyk's filed a complaint in Hennepin County District Court alleging that the MGM flyers constitute false advertising in violation of section 43(a) of the federal Lanham Act (codified at 15 U.S.C. § 1125(a)); the Minnesota Uniform Deceptive Trade Practices Act, Minn.Stat. § 325D.44; Minn.Stat. § 325F.67 (prohibiting false advertising), and Minn.Stat. 325F.69 (prohibiting consumer fraud). On December 6, 1999, MGM removed the complaint to federal court. Surdyk's now moves for a preliminary injunction. The parties also bring cross-motions to supplement the record with material not submitted to the court during briefing of the preliminary injunction motion.

## DISCUSSION

### A. Cross-Motions to Supplement the Record

[1] The parties have brought cross-motions to supplement the record with affidavits from local consumers who have recently attempted to purchase wine from MGM and Surdyk's. Because the parties have adequately explained why they did not include these materials with the original motion papers, and because these materials shed helpful light on the merits of plaintiff's false advertising claim, the court will grant the cross-motions.

### B. Mootness and Party Joinder

[2–4] MGM makes two threshold arguments in opposition to the motion for preliminary injunction by Surdyk's. First, MGM contends that the dispute is moot in light of the fact that the Anniversary and Millennium Sales have now ended. As the Supreme Court recently stated, however, "[i]t is well-settled that 'a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.'" *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, — U.S. —, —, 120 S.Ct. 693, 708, — L.Ed.2d — (2000) (citing *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289, 102 S.Ct. 1070, 71 L.Ed.2d 152 (1982)). Moreover, while a defendant's voluntary cessation "is an important factor bearing on the question of whether a court should exercise its power to enjoin defendant," *City of Mesquite*, 455 U.S. at 283, 102 S.Ct. 1070, *see also LensCrafters, Inc. v. Vision World, Inc.*, 943 F.Supp. 1481, 1497 (D.Minn.1996) ("[T]he need for injunctive relief is obviated when the party accused of using false or misleading advertising represents that the advertisements will not be repeated."), MGM has given no indication to the court that it intends to halt or modify its past advertising practices from this point forward. Indeed, MGM's decision to publish the Millennium flyer even in the face of a false advertising complaint by Surdyk's and a cautionary letter from the Minnesota Attorney General's Office suggests just the opposite. Given these circumstances, the court concludes that neither the present action nor the pending motion for preliminary injunction is moot.

[5] Second, MGM contends that the court cannot order the injunctive relief requested because Surdyk's has failed to join the six MGM franchisees who separately control the inventory at the 36 MGM stores. This argument ignores the critical point, however, that the Surdyk's suit is specifically directed at MGM's advertising practices, not its inventory control procedures. And it is undisputed that MGM, rather than its franchisees, is responsible for "manag[ing] an advertising fund" and "conduct[ing] advertising in the best interests of all of its franchisees." *See* Maglich Aff. at ¶ 4; *see also* Setter Aff. ¶¶ 2, 3 (describing the "internal time and effort" expended by MGM in "put[ting] together an advertising circular listing the products that would be included" in both sales). Accordingly, the court



concludes that joinder of the MGM franchisees is not a prerequisite to the issuance of the injunctive relief sought here.

### C. Preliminary Injunction

[6, 7] Surdyk's brings a motion for preliminary injunction, asking the court to enter an order halting MGM's alleged false advertising practices. In evaluating a motion for preliminary injunction, the court considers the four factors set forth by the Eighth Circuit in *Dataphase Systems, Inc. v. CL Systems, Inc.*: (1) the likelihood of the movant's success on the merits; (2) the threat of irreparable harm to the movant in the absence of relief; (3) the balance between that harm and the harm that the relief would cause to the other litigants; and (4) the public interest. 640 F.2d 109, 112–114 (8th Cir.1981). The court weighs the four factors to determine whether injunctive relief is warranted. *See id.* at 113; *West Pub. Co. v. Mead Data Cent., Inc.*, 799 F.2d 1219, 1222 (8th Cir.1986), *cert. denied*, 479 U.S. 1070, 107 S.Ct. 962, 93 L.Ed.2d 1010 (1987). The plaintiff bears the burden of proof concerning each of them. *See Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir.1987).

#### 1. Lanham Act Claim: Likelihood of Success on the Merits

[8, 9] Surdyk's brings a claim under section 43(a) of the Lanham Act based on MGM's alleged practice of advertising for sale wines and liquors that are unavailable in the supplies advertised. Congress enacted the Lanham Act to protect persons engaged in commerce against certain forms of unfair competition, including false or deceptive advertising. *See United Industries Corp. v. Clorox Co.*, 140 F.3d 1175, 1179. Section 43(a)(1)(b) of the Lanham Act prohibits "commercial advertising or promotion [that] misrepresents the nature, characteristics, qualities, or geographic origin of [the advertiser's] or another person's goods, services, or commercial activities." As courts have noted, "[w]hether a product is available goes directly to one of that product's characteristics." *Tire Kingdom, Inc. v. Morgan Tire & Auto, Inc.*, 915 F.Supp. 360, 368 (S.D.Fla.1996).[1] Further, the Federal Trade Commission ("FTC"), the administrative agency charged by Congress with preventing unfair competition, *see* 15 U.S.C. §§ 45, 46, has promulgated a regulation stating that "no advertisement containing an offer to sell a product should be published when the offer is not a bona fide effort to sell the advertised product." 16 C.F.R. § 238.1. The FTC suggests that an advertised offer will not be considered bona fide when it "fail[s] to have available at all outlets listed in the advertisement a sufficient quantity of the advertised product to meet reasonably anticipated demands, unless the advertisement clearly and adequately discloses that supply is limited and/or the merchandise is available only at designated outlets." *Id.* § 238.3(e). Thus, under the plain language of the statute and the FTC's advertising regulations, MGM's alleged conduct would appear to fall squarely within the ambit of the Lanham Act. *See B. Sanfield, Inc. v. Finlay Fine Jewelry Corp.*, 168 F.3d 967, 973 (7th Cir.1999) ("[A]s the administrative agency charged with preventing unfair trade practices, the [FTC's] assessment of what constitutes deceptive advertising commands deference from the

1. The court cannot agree, however, with the unsupported assertion in *Tire Kingdom* that Lanham Act claims based on a product's claimed availability are "limited to cases of intentional, constant, unavailability as opposed to 'bait and switch' claims." 915 F.Supp. at 368. The court believes that a per se rule of this kind is inappropriate given (1) the plain language of section 43(a), which prohibits any advertisement that misrepresents the quality or character of the advertised goods, and (2) the FTC false advertising regulations prohibiting "bait advertising." *See* 16 C.F.R. §§ 238.0–238.4. The better approach is to analyze a plaintiff's false advertising claims under the standard elements of falsity, consumer deception, and materiality discussed below.

judiciary.").[2]

[10, 11] To prevail on a false advertising claim under section 43(a), a plaintiff must prove (1) that defendant made a false statement of fact in a commercial advertisement about its own or another's product; (2) that the statement actually deceived or would tend to deceive a substantial segment of its audience; (3) that the deception is material, in that it is likely to influence the purchasing decision; (4) that defendant caused its false statement to enter interstate commerce; and (5) that the plaintiff has been or likely to be injured as a result of the false statement, either by direct diversion of sales from itself to the defendant or by a loss of good will associated with its products. *See United Industries,* 140 F.3d at 1179. "The false statement necessary to establish a Lanham Act violation generally falls into one of two categories: (1) commercial claims that are literally false as a factual matter, and (2) claims that may be literally true or ambiguous but which implicitly convey a false impression, are misleading in context, or likely to deceive consumers." *Id.* If a plaintiff establishes that the defendant's commercial claim is literally false, the court may grant injunctive relief without considering the advertisement's actual impact on the consuming public. *See id.; McNeil–P.C.C., Inc. v. Bristol–Myers Squibb Co.,* 938 F.2d 1544, 1549 (2d Cir. 1991) ("Where the advertising claim is shown to be literally false, the court may enjoin the use of the claim 'without reference to the advertisement's impact on the buying public.'" (citation omitted)); *Gendarm Corp. v. Biozone Labs.,* 1992 WL 220638 *2 (N.D.Ill.1992) (holding that explicitly false statements are presumed to be material).

### a. Literal Falsity

The court's first task is to assess whether Surdyk's is likely to prove that the commercial claims contained in MGM's sale flyers are literally false. The court will discuss the standard for analyzing literal falsity before applying that standard to the facts of this case.

#### (1) Standard for Assessing Literal Falsity

[12, 13] The court's assessment of literal falsity involves a two-stage inquiry: (1) whether the challenged advertisement conveys an explicit factual message, and (2) whether that explicit factual message is false. *See* MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION §§ 27:55–56 (separating the falsity analysis into two stages: (1) "determining the message of the advertisement" and (2) "proving falsity"); *United Industries,* 140 F.3d at 1181 (approving the analytical approach of the lower court, which had "[first] determined that the ... commercial conveyed an explicit message ... and [then] found that this message was literally untrue."). The Eighth Circuit has recently discussed the considerations that should inform an analysis of literal falsity:

> In assessing whether an advertisement is literally false, a court must analyze the message conveyed within its full context. In some circumstances, even a visual image or a visual image combined with an audio component, may be literally false. The greater the degree to which a message relies upon the viewer or consumer to integrate its components and draw the apparent conclusion, however, the less likely it is that a finding of literal falsity will be supported. Commercial claims that are implicit, attenuated, or merely suggestive usually cannot fairly be characterized as literally false.

*Id.* at 1180–81 (citations omitted). The issue of literal falsity, including the "interpretation of [a] commercial's message," is "a classic question of fact" that is "highly dependent upon context and inference." *Id.* at 1183.

#### (2) MGM Advertisements

Surdyk's has directed its Lanham Act claim at the two advertising flyers published by MGM in connection with MGM's Anniversary and Millennium Sales. The two flyers employ almost identical formats. Across a multiple-page booklet, MGM individually lists the hundreds of wine, liquor, and beer products that are being offered for sale. The vast majority of the items carry the following information: a capsule editorial description; a stock item number; the ordinary retail price, per bottle; the sale price per bottle; the sale price per case. Next to a few of the wines, the word "limited" appears in the space normally containing the sale price for cases. In the back of each flyer is a page of maps showing the location of participating MGM stores. The Anniversary Flyer contains the following disclaimer, which appears in fine print on the second page of the booklet:

> Traditionally, MGM Liquor Warehouse makes every effort to insure availability of all items that are on sale, throughout the sale period. However, with a sale of this size and the very limited availability of some of these outstanding wines (in some instances only a few cases), we think it['s] important to offer the consumer the chance to purchase these and other fine products in this 29th Anniversary Sale on a first come first served basis. Thus we may run out quickly on some items and/or vintages. Keep in mind that availability does change throughout the year, so be sure to check in with MGM periodically for availability of the world's outstanding wines. Also note that MGM Liquor Warehouse has taken the utmost care in preparing the Anniversary Sale, but we are not responsible for typographical errors. No additional discounts may be applied to sale products. All bottles are 750ml, and are packed 12 bottles to a case unless otherwise noted.

Anniversary Flyer at 2 (Beach Aff., Ex. B). The Millennium flyer contains a disclaimer with almost identical language but also adds the following parenthetical sentence to the middle of the paragraph: "Supplier shortages may also affect the availability of some products and vintages." Millennium Flyer at 2 (Beach Aff., Ex. A). The Millennium flyer also carries the following disclaiming language at the bottom of two pages: "MGM and/or our suppliers may run out without notice on some items and/or vintages." Millennium Flyer at 3, 16. Finally, both flyers attach order forms that carry similar disclaimers in very fine print at the bottom of the form, as well as a statement that customers using the form should "allow[ ] a minimum of 48 hours" before picking up their orders. *See* Anniversary Flyer & Millennium Flyer (attached order forms).

#### (3) Literal Falsity of the MGM Advertisements

The parties disagree as to the explicit message conveyed by the MGM flyers. Surdyk's contends that these flyers, on their face, represent to the buying public that MGM has the advertised products immediately available at sale price, at each participating location, by the case and by the bottle. This representation, Surdyk's argues, is false. MGM, on the other hand, contends that the flyers, on their face, merely represent that the advertised products are generally available at sale price,

2. That being said, the court believes it would be inappropriate to focus too narrowly on the FTC regulations when evaluating the question of MGM's liability under the Lanham Act. In *Sandoz Pharmaceuticals Corp. v. Richardson-Vicks, Inc.,* 902 F.2d 222 (3d Cir.1990), the Third Circuit declined a private Lanham Act plaintiff's "invitation to blur the distinctions between the FTC and a Lanham Act plaintiff," on the grounds that such an approach "would require [court's] to ignore the separate jurisprudence that has evolved under each Act, and the sound reasoning that underlies it." *Id.* at 230. The *Sandoz* court held that the Lanham Act plaintiff must "show that the [advertisements] are literally false or misleading to the public," not merely that the advertisements violate FTC guidelines. *Id. See also Sanfield,* 166 F.3d at 972 n. 3 (although administrative regulations entitled to deference, liability under the Lanham Act ultimately hinges on whether plaintiff has proved the standard elements).



SEP.28'2001 16:09 651 737 2948 3M I P 220 10W #0667 P.023

with no express message that MGM stores will stock either bottles or cases of the products. This representation, MGM argues, is true. Although the court believes that Surdyk's is likely to prove literal falsity under either interpretation of the MGM advertisements, the court will address each interpretation separately.

a. "Immediate Availability"

Surdyk's argues that the MGM flyers explicitly convey a message of immediate availability. The court agrees. First, the detailed listing of the wine and liquor products, complete with individual stock item numbers, signifies that MGM actually carries each of the sale items in inventory. Second, the specific listing of case sale prices next to most of the wine and liquor listings signifies that MGM has case quantities of the items in inventory. Third, the individualized store maps signify that each participating store had ready access to the inventory advertised in the flyers. Viewed together in context, then, the textual elements of the MGM flyers convey a clear message that the sales items are available at each participating MGM store for immediate purchase, in both bottle and case quantities.

This message is reinforced by the disclaimers that appear in both flyers. The disclaimers begin by stating that "MGM Liquor Warehouse makes every effort to insure availability of all items that are on sale" but warns about "the very limited availability of some of these outstanding wines (in some instances only a few cases)." The plain, ordinary meaning of "available" is "present or ready for immediate use." *See* MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY, TENTH EDITION, at 79. Thus, the very use of the term "availability" in the disclaimer strongly connotes that MGM stores carries an immediately accessible quantity of almost all advertised products in stock. This understanding is underscored by other statements in the disclaimer: that "in some instances," availability is limited to "only a few cases"; that supplies are available on a "first come first serve" basis; that MGM may "run out" if the consumer does not act quickly. Each of these statements indicate that MGM has at least some case quantities in actual inventory at the beginning of the sale. Likewise, the fact that MGM specifically denominates a few wines as "limited" in the main text of the flyers suggests: (1) that MGM nonetheless has a determinate amount of those wines on hand and (2) that bottle and case quantities are not limited with respect to the hundreds of remaining advertised wines.[3]

[14] Thus, the court believes it likely that a factfinder would conclude that the MGM flyers convey a clear message that MGM stores stock an immediately available supply of each product advertised in the quantities advertised. The undisputed evidence demonstrates, however, that this message is false. While shopping at certain MGM stores during both the Anniversary and Millennium Sales, private investigators hired by Surdyk's discovered that a number of wines advertised in the flyers were either completely out of stock or stocked only in small bottle quantities. *See generally* Neas & Shaw Affs. & Attached Notes. Immediately prior to the commencement of the Anniversary Sale in September, investigators visited ten MGM



stores with a list of 18 advertised wines, all but one of which had been advertised as available by the case. The Hilltop store stocked not a single bottle from the investigators' list. The West Bloomington, Crystal, and Maplewood stores had only one bottle from the list. The Blaine store stocked only "a couple bottles." The Eagan store had only three bottles. Stock was little better at the Coon Rapids, Brooklyn Park, and White Bear Lake stores. Only the Vadnais Heights store had a single wine available by the case. However, even this store stocked only seven of the eighteen wines on the list. Indeed, the manager at Vadnais Heights admitted to the investigator that MGM does not always stock all of the products in its advertisements.

Further, on the second day of the Millennium Sale in November, a private investigator hired by Surdyk's surveyed nine MGM stores,[4] including several stores not surveyed during the Anniversary Sale. On this occasion, the investigator shopped using a list of two dozen wines and liquors. The results were not significantly different from those of the first investigation. Five of the wines were entirely unavailable at all nine of the stores sampled. Three stores had none of the wines and none of the liquors on the investigator's list. Only two stores, Vadnais Heights and Minnetonka, had any of the wines in case quantities. The Vadnais Heights store had one case each of three of seventeen wines requested and the Minnetonka store had only one case.

Surdyk's directs the court to an especially telling example of the disconnect between MGM's advertised availability and its actual in-store availability. On the cover of the Millennium Flyer, MGM chose to feature a popular California Chardonnay, Far Niente. The entry for Far Niente appears on page 22 of the flyer, listing Far Niente's stock item number, its comparable bottle price, and sales prices for both bottles and cases. On the second day of the Millennium Sale, however, Far Niente was entirely unavailable at the three MGM stores in Hilltop, Crystal, and Oak Park Heights. The MGM stores in Vadnais Heights, Minnetonka, Maple Grove, Plymouth, White Bear Lake, and St. Paul had only 20 bottles of Far Niente between them. Far Niente was similarly unavailable from the ten stores shopped during the Anniversary Sale.

In short, there is ample undisputed evidence that MGM stores across the Twin Cities failed to stock a number of advertised wines in case quantities or even significant bottle quantities. Because the actual inventory in these MGM stores directly contradicts MGM's advertised claims, the court concludes that Surdyk's is likely to succeed in proving that the MGM flyers are literally false.

b. "General Availability"

MGM disagrees, however, that its sale flyers convey any message about immediate availability. Rather, MGM contends, the flyers merely communicate that the sales items are generally available, without any specific message as to whether the items are actually carried on store shelves. As discussed, the court does not believe that MGM's interpretation is correct. However, even if the court were to adopt this interpretation, the record evidence strongly supports a finding of literal falsity. Surdyk's has clearly demonstrated that a number of the sales items were unavailable even from distributors during the relevant sale periods. Jim Surdyk, the owner of Surdyk's, and Mike Cords, the wine manager at Surdyk's, have submitted affidavits stating that, based on their personal experience in the wine and liquor retail industry and a perusal of the MGM Flyers, "numerous" wines and liquors advertised by MGM "were not available in

3. As noted, there is an additional parenthetical sentence inserted into the Millennium flyer disclaimer: "Supplier shortages may also affect the availability of some products and vintages." Millennium Sale Flyer (Beach Aff. A), at 2. Further, two pages of the main text in the Millennium flyer contain the following sentence: "MGM and/or our suppliers may run out without notice on some items and/or vintages." *Id.* at 3, 16. Finally, both flyers contain an order form that tells customers using the form that they should "allow[ ] a minimum of 48 hours" before picking up the order. However, these additional disclaimers, obscurely placed and vaguely worded, do nothing to correct the explicit message conveyed by the flyer that a determinant quantity of each of the wines listed is in stock at MGM stores at the outset of the sale.

4. The investigator actually visited a tenth MGM store in Maplewood but was unable to gather actual inventory information.

Twin Cities distribution channels, and not in the case lots advertised." Card Aff. at ¶ 3; *see also* Surdyk Aff. ¶ 5. Further, the private investigation conducted by Surdyk's confirms that several products were completely unavailable in case quantities from any of the MGM stores shopped during the Anniversary and Millennium Sales. This evidence of persistent retail unavailability strongly supports the inference that these products were not available at the wholesale level either.

Indeed, the evidence of distributor unavailability for certain advertised wines goes well beyond the testimony of Surdyk's employees and investigators. As MGM itself admitted in its letter to the Minnesota Attorney General, four of the wines advertised in the Anniversary flyer were not available from distributors during the sale period. *See* MGM Letter at 2. In the same letter, MGM acknowledged that "it would not be unusual, ... when dealing with wines of limited availability, for there to be some wines that are not available [from distributors] at a [date] subsequent [to the publication of the sale flyer]." *Id.* Further, Mark Jenkins, an MGM customer, has submitted an affidavit describing his efforts to obtain three bottles of Domaine Chandon Fleur de Vigne, an item advertised for sale on the second page of the Millennium flyer. *See generally* Jenkins Aff. After traveling to MGM's Woodbury store during the sale and asking to purchase the wine, Jenkins was told by a salesperson that "Fleur de Vigne is a special order item" and informed that it would take two to three days for an order to arrive. *Id.* at ¶ 10. A week later, having heard nothing from MGM, Jenkins called to inquire about the status of the wine. He was told by the Woodbury store manager that the "[MGM] distributor was out of stock" until the next week. *Id.* at 13. Jenkins twice followed up with calls to MGM, but each time was told that the distributor remained out of stock.[5] Jenkins's experience obviously calls into doubt the accuracy of MGM's claims about distributor availability.

In response to this evidence, MGM offers virtually identical affidavits from three MGM employees averring that, prior to each sale, MGM "personally contacted MGM's wholesale suppliers and distributors ..., in order to confirm that all of the wines listed in the advertisement would be available from our suppliers and distributors at the beginning of the sale." Mills Aff. ¶¶ 3, 5 (confirming wine supply); Hanson Aff. ¶¶ 3, 5 (confirming liquor supply); Raney Aff. ¶¶ 3, 5 (confirming beer supply). Notably absent from these affidavits, however, is any specific mention of when these suppliers were contacted and what quantity of merchandise MGM was able to confirm as available. These affidavits also appear to partially contradict another statement by MGM that it confirmed supplier availability only *after* the Anniversary Sale was finished. *See* MGM Letter at 2 ("*In response to your letter,* MGM confirmed with its suppliers that all the wines listed were available [from distributors]." (emphasis added)). Further, the affidavits describe only half-hearted attempts to confirm availability in the first place: MGM merely "informed our suppliers and distributors which wines we planned to list in the advertisement, and asked them to contact [MGM] if any of the proposed products would not be available." Mills Aff. ¶ 5; Hanson Aff. ¶ 5; Raney Aff. ¶ 5. While MGM argues that its efforts were adequate to the task of ensuring availability, the record evidence clearly indicates otherwise.

Indeed, MGM's passive relationship with its suppliers highlights the fundamental problem with its conduct in this case. In its motion papers and at oral argument, MGM has repeatedly acknowledged that it has no control over the stock or inventory control procedures of any MGM franchisee. MGM has also acknowledged the unique supply difficulties associated with the wine business:

> In the case of wines, you are not dealing with a product that is manufactured in unlimited quantities. New wines represent an agricultural product whose supply is limited by matters beyond anyone's control, including the size and quality of the annual grape crop. Older wines are obviously limited to the number of bottles previously produced. Supplies are therefore always limited, and it is impossible to know in advance when a wholesaler's demand will exceed supply.

MGM Letter, at 2. Yet in spite of the inherently uncertain nature of wholesale wine supply and MGM's passive, decentralized approach to inventory control, MGM has twice orchestrated advertising campaigns that belie these business realities and the availability problems they inevitably create. While MGM and its franchisees may manage their inventory in any way they like, they may not misrepresent the actual nature of that inventory to the buying public. Because there is strong evidence that just such a misrepresentation has occurred, the court concludes that Surdyk's is likely to succeed on the issue of literal falsity.

c. The Remaining Elements of the Lanham Act Claim

[15] Because Surdyk's has shown that it is likely to prove literal falsity, the court need not consider the elements of the Lanham Act claim addressing actual consumer impact. *See United Industries,* 140 F.3d at 1170.[6] However, it is appropriate to point out that Surdyk's has offered substantial evidence that the buying public was actually and materially deceived by the MGM advertisement. Kevin Ries and Mark Jenkins, local wine consumers who read about the present lawsuit in the newspaper, have submitted affidavits in which they aver that the flyers (1) led them to believe that specific advertised items were available for immediate purchase at MGM stores, (2) enticed them into traveling to MGM stores to purchase these items, (3) and caused them ultimately to purchase merchandise different from that requested. *See* Ries Aff. at ¶ 6 ("I understood MGM's [Anniversary] flyer to mean that each of the wines advertised for sale was actually in stock and available for sale at each of the MGM stores listed."); *id.* at ¶ 14 ("I was deceived by MGM's advertising. I was angry and frustrated that I had driven all the way to MGM's Bloomington store to purchase a specific wine, relying on MGM's advertisement, only to find that MGM did not have any bottles of wine that I was seeking ... in stock."); Second Ries Aff. at ¶ 4 ("I was in their Bloomington store, needed some wine, and did indeed purchase wine I had not intended to purchase...."); Jenkins Aff. at ¶ 7 ("As a result of reading the MGM [Millennium] Flyer and believing that MGM had a wine in stock that I wanted to buy for several months, I went to the Woodbury store in early December (a few days before the end of the Millennium sale) to purchase three bottles of Domaine Chandon Fleur de Vigne."); *id.* at ¶ 17 ("I felt it was untruthful and misleading to advertise wines for sale which MGM did not have in stock at its stores...."); *id.* at ¶ 11 ("I purchased a box of Franzia White Zinfandel while in the store."). This affidavit testimony from two apparently sophisticated wine consumers supports a finding that a significant portion of the buying public would have been materially misled by the MGM flyers. This finding, in turn, provides further support for the conclusion that Surdyk's is likely to prevail on its section 43(a) claim. *See United Industries,* 140 F.3d at 1183 ("At the preliminary injunction stage, ... full-blown consumer surveys or market research are

5. More than two weeks after his initial request, twelve days after the close of the Millennium Sale, and one day after he had submitted his affidavit in this case, MGM informed Jenkins that his wine had arrived from the distributor.

6. MGM does not dispute that Surdyk's can meet the interstate commerce requirement of the Lanham Act claim. With respect to the injury requirement, irreparable harm is presumed when a Lanham Act plaintiff proves literal falsity. *See infra* Part C.2.



SEP.28'2001 16:10 651 737 2948 3M I P 220 10W #0667 P.025

SEP.28'2001 16:11 651 737 2948 3M I P 220 10W #0667 P.026



not an absolute prerequisite, and ... other evidence may at times be sufficient to obtain preliminary injunctive relief [even] in cases involving implicitly false or misleading claims.").[7]

2. The Remaining *Dataphase* Factors

Because Surdyk's has demonstrated a strong prospect of success on the merits, the court will presume that Surdyk's has suffered irreparable harm from MGM's advertising practices. *See id.* ("When injunctive relief is sought under the Lanham Act, the finding of a tendency to deceive satisfies the requisite showing of irreparable harm."); *Alternative Pioneering Systems, Inc. v. Direct Innovative Prods., Inc.,* 822 F.Supp. 1437, 1444 (D.Minn.1993) ("Irreparable harm is presumed for purposes of a preliminary injunction motion on a false advertising claim once the moving party establishes a likelihood that the disputed [advertisements] are false."). Moreover, there is no question that "the public interest favors enjoining false statements." *United Industries,* 140 F.3d at 1184. Indeed, Section 43(a) of the Lanham Act was "designed to protect the right of the consumer to be told the truth." MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 27:25.

[16] On the other side of the scale, the court recognizes that an injunctive order by the court will place a considerable burden on MGM insofar as it requires the company to modify what it considers a very successful sales tactic. The court also recognizes that any order regulating the substance of a commercial advertisement runs the risk of trespassing on the advertiser's first amendment guarantees. However, as the Supreme Court has made clear, MGM has no first amendment right to deceive the consuming public. *See Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n,* 447 U.S. 557, 563, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980) ("The government may ban forms of communication more likely to deceive the public than to inform it."). And MGM may not legitimately claim economic harm when a court merely prohibits it from continuing to engage in conduct that violates federal law. Accordingly, after carefully weighing the *Dataphase* factors, the court will grant Surdyk's motion for preliminary injunction. The court will endeavor, however, to tailor the injunction so that it goes no further than necessary to correct the deceptive aspects of MGM's advertisements.[8]

3. Bond Amount

Under Federal Rule 65(c) the court is required to determine the amount of security that the preliminary injunction movant must give "for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined." MGM suggests that a one million dollar bond is appropriate in this case, apparently basing this figure on the assumption that the court's injunctive order will effectively preclude it from conducting franchise-wide wine advertisements. However, given the strong likelihood that Surdyk's will succeed on its false advertising claim and the fact that the court's order will prevent MGM from publishing potentially deceptive advertisements only, the court believes that the bond should be set at a much lower figure of $50,000.

## CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED that:

1. The parties' cross-motions to supplement the record are granted.

2. Plaintiff's motion for preliminary injunction is granted.

3. Until further notice, MGM shall be enjoined from advertising specific wine or liquor products in bottle or case sale prices except under the following conditions:

a. MGM may advertise a bottle sale price for a specific product if each participating MGM retail store has in stock at least one case of the product on the first day of the sale period;

b. MGM may advertise both a bottle and a case sale price for a specific product if each participating MGM retail store has in stock at least two cases of the product on the first day of the sale period;

c. Even if these stock requirements are not met, MGM may advertise a specific bottle or case price if:

(1) The text associated with the specific product clearly states that the item is not available at all participating stores and clearly identifies the stores not meeting the stock requirements; or,

(2) The text associated with the specific product states that the product is available for "special order only," provided that MGM has received documented assurance from its distributors that each participating store will, during the relevant sale period, have access to the product (a) within a reasonable amount of time and (b) in a quantity sufficient to meet reasonably anticipated demands for the product at that store.

4. This injunction will not take effect until plaintiff posts a bond or provides other security in the amount of $50,000.

7. Having found that Surdyk's is likely to succeed on its Lanham Act claim, the court need not address the merits of its state law claims.

8. For example, because there is no evidence that beer supply was short during the sale periods, the court will not include the advertisement of beer products within the injunctive order. Also, the court will permit MGM to conduct clearly denominated "special order" sales as long as MGM takes the steps necessary to ensure that the products advertised are available from distributors (1) within a reasonable time period and (2) in amounts sufficient to meet the reasonably anticipated consumer demand for the products at each and every participating MGM store.



Rita PHILLIPS, Plaintiff,

v.

TACO BELL CORP., Defendant.

No. 4:96–CV–1220 (CEJ).

United States District Court,
E.D. Missouri,
Eastern Division.

Feb. 10, 2000.

Former employee brought hostile work environment sexual harassment and constructive discharge claim against former employer under Title VII. The United States District Court for the Eastern District of Missouri, Jackson, J., 989 F.Supp. 1021, entered summary judgment for former employer. Former employee appealed. The Court of Appeals, 156 F.3d 884, affirmed in part, reversed in part, and remanded. On remand, following bench trial, the District Court held that: (1) employee's allegations that her supervisor squeezed her breasts or made other unwelcome sexual advances on five separate occasions were sufficient to establish prima facie case of hostile environment sexual harassment, but (2) employer's sexual harassment policy, prompt response to employee's complaints, and employee's failure to promptly report harassment established affirmative defense to such claim.

Judgment for defendant.

1. Civil Rights ⚷167

A prima facie case of Title VII sexual harassment by a supervisor with immediate, or successively higher, authority over the employee will be established if the employee shows that: (1) she was a member of a protected class; (2) she was subject to unwelcome sexual harassment; (3) the harassment was based on sex; and (4)

SEP.28'2001 16:12 651 737 2948 3M I P 220 10W #0667 P.027



movant; (3) the evidence relied upon must not be merely cumulative or impeaching; (4) it must be material to the issues involved; and (5) it must be of such a nature that, on a new trial, the newly discovered evidence would probably produce an acquittal. *United States v. Liebo,* 923 F.2d 1308, 1313 (8th Cir.1991); *see also United States v. LaFuente,* 991 F.2d 1406, 1408 (8th Cir.1993); *United States v. Begnaud,* 848 F.2d 111, 113 (8th Cir.1988). A motion for a new trial based on newly discovered evidence should be considered cautiously, and the trial court has broad discretion in deciding whether to grant or deny the motion. *See Liebo,* 923 F.2d at 1313.

First of all, the newly discovered evidence consists, as noted above, of nine documents. Those documents were in the government discovery and were accessible to defense counsel prior to and during the trial. The Court assumes that neither the defense nor the government reviewed these documents until after the jury's verdict. Some of these documents were part of the estimated 25,000 pages of documents copied by the defense from the government's discovery of approximately 350,000–400,000 pages of documents seized or subpoenaed. Other documents were not copied or reviewed until January 30, 2001, according to the affidavit of defense counsel, William J. Mauzy.

It is the Court's view that both parties proceeded in good faith. The fact that some of these documents may have been overlooked or misfiled, and therefore not reviewed, is understandable. The failure to discover the documents was not due to lack of diligence. Certainly, the new documents are material to the verdicts reached in the case with respect to Counts 53 and 59. The new documents are not entirely cumulative, although they are not nearly as significant as asserted by the defense in its memorandum to the Court. Of more significance to the Court is the fact that, given the Court's analysis of the insufficiency of the evidence, when the new evidence is viewed in light of the entire record made at trial, the new evidence is sufficient to create a reasonable doubt. Thus, the Court concludes that the Defendant has satisfied all of the elements of the *Liebo* test because the new evidence, when viewed in the context of the entire record, would more likely than not have created sufficient reasonable doubt to produce acquittals on Counts 53 and 59.

Therefore, consistent with Rule 29(d) of the Federal Rules of Criminal Procedure and for the reasons set forth in the Memorandum of this Court, the Court conditionally grants the Rule 33 motion of Defendant Louis B. Oberhauser for a new trial in the event that the Court's decision granting the judgment of acquittal is vacated or reversed on appeal. Since the motion for a new trial has been granted conditionally, if the judgment of acquittal is reversed on appeal, the new trial shall proceed unless otherwise ordered by the appellate court. Subsequent proceedings shall be in accordance with the order of the appellate court, consistent with Rule 29(d).

**THIMBLEBERRIES, INC., Plaintiff,**

**v.**

**C & F ENTERPRISES, INC., and THE MARK GROUP, INC., Defendants.**

**No. CIV. 01–485 (DSD/JMM).**

United States District Court, D. Minnesota.

June 8, 2001.

Quilt and fabric designer that brought copyright infringement action against table



linen manufacturers moved for preliminary injunction, and manufacturers cross-moved for judgment on the pleadings. The District Court, Doty, J., held that: (1) designer's failure to obtain a certificate of copyright registration within five years after first publication did not render copyright invalid; (2) designer utilized minimal degree of creativity required to obtain copyright protection; (3) designer failed to establish that manufacturers had reasonable possibility of access to protected work, as would support finding of copying; (4) designer could likely establish requisite degree of similarity to sustain a finding of copying, as would support infringement claim; (5) designer was entitled to a preliminary injunction; and (6) designer was required to pay $1000 bond for injunction.

Defendants' motion denied, and plaintiff's motion granted.

**1. Injunction ⚷136.1**

In evaluating a motion for preliminary injunction, the court weighs four factors: (1) the threat of irreparable harm to the movant in the absence of relief; (2) the balance between that harm and the harm that the relief would cause to the other litigants; (3) the likelihood of the movant's success on the merits; and (4) the public interest.

**2. Copyrights and Intellectual Property ⚷85**

While no one factor considered in evaluating a motion for preliminary injunction is determinative, the likelihood of success on the merits predominates in a copyright infringement case.

**3. Injunction ⚷147**

Once the movant for preliminary injunction has established a likelihood of success on the merits, irreparable injury is presumed.

**4. Copyrights and Intellectual Property ⚷51**

To prevail on a copyright infringement claim, a plaintiff must prove: (1) ownership of a valid copyright and (2) copying of its copyrighted work by defendant.

**5. Copyrights and Intellectual Property ⚷83(3.1)**

To establish ownership of a valid copyright, the plaintiff must prove that the material is original, that it can be copyrighted, and that all statutory formalities have been complied with.

**6. Copyrights and Intellectual Property ⚷83(3.1)**

To establish copying, the plaintiff in a copyright infringement case generally must show that the defendant had access to the material and that there is a substantial similarity between the two works.

**7. Copyrights and Intellectual Property ⚷83(3.5)**

Purported copyright owner's failure to obtain a certificate of copyright registration within five years after first publication did not render copyright invalid; rather, it merely eliminated presumption of validity and gave court discretion to decide what evidentiary weight to accord registration certificate in judging whether owner had established requisite originality and protectability of its work. 17 U.S.C.A. § 410(c).

**8. Copyrights and Intellectual Property ⚷4.5**

Under the "merger doctrine," a court will not protect a copyrighted work from infringement if the idea underlying the copyrighted work can be expressed in only one way. 17 U.S.C.A. § 102(b).

See publication Words and Phrases for other judicial constructions and definitions.

9. Copyrights and Intellectual Property ⇐12(2)

Under the "scenes a faire doctrine," a court will not protect a copyrighted work from infringement if the expression embodied in the work necessarily flows from a commonplace idea rather than from the creative efforts of the designer.

See publication Words and Phrases for other judicial constructions and definitions.

10. Copyrights and Intellectual Property ⇐4.5

Under the "merger doctrine," copyright protection may be denied where the idea is inseparably tied to the expression of that idea. 17 U.S.C.A. § 102(b).

11. Copyrights and Intellectual Property ⇐12(2)

Under the "scenes a faire doctrine," copyright protection may be precluded where the work contains features which are indispensable or standard for such work.

12. Copyrights and Intellectual Property ⇐12(1)

Quilt and fabric designer utilized minimal degree of creativity required to obtain copyright protection, as would support copyright infringement action against table linen manufacturers, where varied patterns used to express a quilted wreath design proliferated, and variety of patterns revealed that designer's particular arrangement of public domain shapes was not at all compelled by underlying idea. 17 U.S.C.A. § 102(b).

13. Copyrights and Intellectual Property ⇐83(3.1)

Because direct evidence of copying is rarely available, a plaintiff in a copyright infringement case generally must show that the defendant had access to the copyrighted material and that the accused work is substantially similar to the copyrighted work.

14. Copyrights and Intellectual Property ⇐83(7)

Quilt and fabric designer failed to establish that table linen manufacturers had reasonable possibility of access to designer's protected work, as would support finding of copying for copyright infringement purposes, although designer displayed work at quilting shows and work also appeared in book, where designer provided no specific information regarding geographic distribution of its work.

15. Copyrights and Intellectual Property ⇐83(3.1)

While it is true that access can be inferred where the copyrighted work has been widely disseminated, bare assertions of dissemination do not satisfy the access requirement for establishing copyright infringement.

16. Copyrights and Intellectual Property ⇐53(1)

In determining substantial similarity, as would support copyright infringement claim, an extrinsic analysis is performed to determine whether the general idea of the two works is substantially similar, and where the extrinsic elements are unquestionably similar, then an intrinsic analysis is performed to determine whether there is similarity of expression.

17. Copyrights and Intellectual Property ⇐53(1)

In applying the extrinsic test in determining substantial similarity, as would support copyright infringement claim, the court considers such criteria as the type of artwork involved, the materials involved, the subject matter, and the setting for the subject.



18. Copyrights and Intellectual Property ⇐83(7)

Quilt and fabric designer could likely establish requisite degree of similarity to sustain a finding of copying, as would support copyright infringement claim against table linen manufacturers, where reasonable observer would have easily recognized similarities between parties' wreath-shaped patterns as not only substantial but striking; striking similarities between patterns stood in sharp contrast to notably different wreath patterns created by other quilt pattern designers and precluded possibility that manufacturers' designer independently arrived at same result.

19. Copyrights and Intellectual Property ⇐53(1)

In determining substantial similarity, as would support copyright infringement claim, the intrinsic test is a subjective test, where the court examines the works to ascertain if they are so dissimilar that ordinary, reasonable minds cannot differ as to the absence of substantial similarity in expression.

20. Copyrights and Intellectual Property ⇐85

Quilt and fabric designer was entitled to a preliminary injunction against table linen manufacturers, where economic harm posed to designer by unlicensed mass-production of its wreath design was obvious, and any harm to manufacturers paled in comparison.

21. Copyrights and Intellectual Property ⇐85

Balance of parties' hardships is insignificant to a copyright infringement action, for purposes of determining whether preliminary injunction is warranted.

22. Copyrights and Intellectual Property ⇐85

A willful copyright infringer which seeks to profit by copying others' creative ideas should not be heard to complain that its interests will be disturbed by an injunction.

23. Copyrights and Intellectual Property ⇐85

Amount of bond required from quilt and fabric designer to preliminarily enjoin table linen manufacturers from producing designs that allegedly infringed upon designer's protected work was $1,000, given likelihood that designer would succeed on merits of copyright infringement claim, and minimal chance that manufacturers would suffer significant cognizable harm from issuance of injunction.

---

Laura J. Hein, Ann K. Bloodhart, Gray, Plant, Mooty, Mooty & Bennett, Minneapolis, MN, counsel for plaintiff.

Brian A. Wood, Sridevi S. Anwar, Rider, Bennett, Egan & Arundel, Minneapolis, MN, Patricia A. Felch, Banner & Witcoff, Chicago, IL, counsel for defendants.

## ORDER

DOTY, District Judge.

This matter is before the court on plaintiff's motion for a preliminary injunction and defendants' motion for judgment on the pleadings. Based on a review of the file, record, and proceedings herein, and for the reasons stated, the court denies defendants' motion and grants plaintiff's motion.

## BACKGROUND

Plaintiff Thimbleberries, Inc. ("Thimbleberries") and its owner, founder and chief

SEP.28'2001 16:12 651 737 2948 3M I P 220 10W #0667 P.028

SEP.28'2001 16:13 651 737 2949 3M I P 220 10W #0667 P.029



designer, Lynette Jensen ("Jensen"), have designed and sold quilt patterns and fabric designs since 1988. In 1989, Jensen created a quilt pattern depicting a Christmas wreath adorned with a bow, called the "Countryside Wreath." Jensen and Thimbleberries displayed the pattern at quilting shows in Denver and Houston in 1989, and the design also appeared in the book *America's Best Quilting Projects*, published by Rodale Press in 1993. In January 2001, Thimbleberries obtained a copyright for the design.

Thimbleberries markets the "Countryside Wreath" pattern in quilt shops across the United States and around the world. Quilters can also obtain the pattern through quilting books and magazines. However, Thimbleberries has never licensed its patterns or designs for use in mass-produced products. Therefore, when Jensen saw a nearly identical copy of her original wreath pattern depicted on table linens marketed in a Charles Keath ("Keath") catalog in October of 2000, she contacted a lawyer, who demanded that Keath cease all sales of its allegedly infringing tablecloth and table runner designs. Thimbleberries subsequently learned that C & F Enterprises ("C & F") manufactured the linens, and through its lawyers, it demanded that C & F also cease all manufacture and sale of the allegedly infringing products. Both Keath, a division of The Mark Group, and C & F (collectively "defendants") refused to stop selling the table linens.

Based on defendants' refusal to cease production and sales, Thimbleberries filed this copyright infringement lawsuit and now moves for a preliminary injunction. Defendants deny that their table runner and tablecloth infringe on Thimbleberries' design and have filed a cross-motion for judgment on the pleadings.

## DISCUSSION

Judgment on the pleadings is appropriate only where the moving party has clearly established that no material issue of fact remains and the moving party is entitled to judgment as a matter of law. *National Car Rental Sys., Inc. v. Computer Assocs. Int'l, Inc.*, 991 F.2d 426, 428 (8th Cir.), *cert. denied*, 510 U.S. 861, 114 S.Ct. 176, 126 L.Ed.2d 136 (1993) (quoting *Iowa Beef Processors, Inc. v. Amalgamated Meat Cutters*, 627 F.2d 853, 855 (8th Cir.1980)). The court must accept as true all facts pled by the non-moving party and grant all reasonable inferences from the pleadings in favor of the non-moving party. *Id.*

[1–3] In evaluating a motion for preliminary injunction, the court considers the four factors set forth by the Eighth Circuit in *Dataphase Systems, Inc. v. C L Systems, Inc.*: (1) the threat of irreparable harm to the movant in the absence of relief; (2) the balance between that harm and the harm that the relief would cause to the other litigants; (3) the likelihood of the movant's success on the merits; and (4) the public interest. 640 F.2d 109, 112–114 (8th Cir.1981). The court weighs the four factors to determine whether injunctive relief is warranted. *See id.* at 113; *West Publ'g Co. v. Mead Data Cent., Inc.*, 799 F.2d 1219, 1222 (8th Cir.1986), *cert. denied*, 479 U.S. 1070, 107 S.Ct. 962, 93 L.Ed.2d 1010 (1987). While no one factor is determinative, the likelihood of success on the merits predominates in a copyright infringement case. *E.F. Johnson Co. v. Uniden Corp.*, 623 F.Supp. 1485, 1491 (D.Minn.1985) (citing 3 M. Nimmer, *Nimmer on Copyright*, § 14.06[A] n. 6.1). Once the movant has established a likelihood of success on the merits, irreparable injury is presumed. *West Publ'g*, 799 F.2d at 1229. Accordingly, the court turns first to an analysis of Thimbleberries' probability of success on the merits of its copyright infringement claim.



### A. Likelihood of Success on the Merits

[4–6] To prevail on a copyright infringement claim, a plaintiff must prove: (1) ownership of a valid copyright and (2) copying of its copyrighted work by defendant. *Moore v. Columbia Pictures Indus., Inc.*, 972 F.2d 939, 941 (8th Cir.1992). To establish ownership of a valid copyright, the plaintiff must prove that the material is original, that it can be copyrighted, and that all statutory formalities have been complied with. *Lakedreams v. Taylor*, 932 F.2d 1103, 1107–08 (6th Cir.1991). To establish copying, the plaintiff generally must show that the defendant had access to the material and that there is a substantial similarity between the two works. *Moore*, 972 F.2d at 941–42.

#### 1. Validity of the Copyright

[7] The United States Copyright Office issued certificate VA 1–023–787 to Thimbleberries for the Countryside Wreath pattern on January 2, 2001. Defendant correctly notes that because Thimbleberries first published the pattern in 1989, the registration certificate cannot serve as prima facie evidence of the validity of Thimbleberries' copyright. 17 U.S.C. § 410(c). However, Thimbleberries' failure to obtain a certificate of registration within five years after the first publication does not render the copyright invalid. Rather, it merely eliminates the presumption of validity and gives the court discretion to decide what evidentiary weight to accord the registration certificate in judging whether plaintiff has established the requisite originality and protectability of its work. *Id.*; *see also Cameron v. Graphic Mgmt. Assocs., Inc.*, 817 F.Supp. 19, 23 (E.D.Pa.1992).

Defendants do not directly attack the validity of Thimbleberries' copyright, and in light of a reliable registration certificate, the court has no reason to question validity. Defendants suggest nonetheless that the idea of expressing a wreath in a pattern of squares and triangles may enjoy no copyright protection whatsoever, but that even if it does, such protection extends only to the "particular compilation of public domain squares, 90–degree triangles and border-strips in the particular colors, dimensions, background quilting stitches, borders and contrasting bow and wreath designs originally selected, coordinated and arranged by Plaintiff." (Def. Mem. Opp'n Prelim. Inj. at p. 3.) Otherwise stated, defendants argue that protection of Thimbleberries' quilt pattern is limited or even precluded under the doctrines of merger and scenes a faire.

[8, 9] Under the merger doctrine, a court will not protect a copyrighted work from infringement if the idea underlying the copyrighted work can be expressed in only one way. *Janel Russell Designs, Inc. v. Mendelson & Assoc., Inc.*, 114 F.Supp.2d 856, 865 (D.Minn.2000). Under the related doctrine of scenes a faire, a court will not protect a copyrighted work from infringement if the expression embodied in the work necessarily flows from a commonplace idea rather than from the creative efforts of the designer. *Ets–Hokin v. Skyy Spirits, Inc.*, 225 F.3d 1068, 1082 (9th Cir.2000). The Ninth Circuit Court of Appeals has noted that "there is some disagreement among courts as to whether these two doctrines figure into the issue of copyrightability or are more properly defenses to infringement." *Id.*

The Eighth Circuit has not addressed the issue of whether the merger/scenes a faire analysis affects copyright validity, but Nimmer counsels that these doctrines are best applied as defenses to infringement.

rather than challenges to the validity of the copyright itself. 4 M. Nimmer & D. Nimmer, *Nimmer on Copyright*, §§ 13.03[B][3], at 13–69 through 70 and 13.03[B][4], at 13–73 (2001); *see also Kregos v. Associated Press*, 937 F.2d 700, 705 (2d Cir.1991) (holding that the merger doctrine relates to infringement, not copyrightability); *Reed–Union Corp. v. Turtle Wax, Inc.*, 77 F.3d 909, 914 (7th Cir.1996) (explaining why the doctrine of scenes a faire is separate from the validity of a copyright); *accord*, *Ets–Hokin*, 225 F.3d at 1082. Regardless of where the analysis occurs, the court believes that neither doctrine is applicable to this case.

[10, 11] The merger doctrine is based on 17 U.S.C. § 102(b), which states: "In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work." Under the merger doctrine, copyright protection may be denied where the idea—in this case, the notion of arranging public domain shapes in a wreath pattern for quilting—is inseparably tied to the expression of that idea—here, the particular arrangement created by Lynette Jensen for Thimbleberries. *Janel Russell Designs*, 114 F.Supp.2d at 865; 4 Nimmer § 13.03[B][3]. Similarly, under the scenes a faire doctrine, copyright protection may be precluded where the work contains features which are indispensable or standard for such work. *Ets–Hokin*, 225 F.3d at 1082. The rationale behind both doctrines is that there should be no monopoly on the underlying idea. *Id.*

The court agrees with defendants' position that Thimbleberries is not entitled to a monopoly on the concept of arranging squares and triangles in a wreath-shaped pattern. However, as Thimbleberries easily demonstrates, the pattern which it seeks to protect represents only one of many ways to express a quilted wreath design. Thimbleberries' counsel presents by affidavit at least nine other wreath patterns for quilters, all of which markedly differ from the Countryside Wreath not only in their arrangement of squares and triangles (and in other instances, octagons and rectangular bars), but also in the shape and design of the center opening and the presence, design and positioning of the bow and other decorative additions. (Hein Aff. Exh. B.)

[12] This proliferation of varied patterns provides more than sufficient evidence that Thimbleberries has utilized the minimal degree of creativity required to obtain copyright protection. *Feist Publ., Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991) (quoting Nimmer, § 1.08[C][1]) ("To be sure, the requisite level of creativity is extremely low; even a slight amount will suffice. The vast majority of works make the grade quite easily, as they possess some creative spark, 'no matter how crude, humble or obvious' it might be.") Moreover, the variety of patterns reveals that Thimbleberries' particular arrangement of public domain shapes is not at all compelled by the underlying idea. For this reason, the court must reject defendants' contention that the merger doctrine applies in this case. *Cf. Ellison Educ. Equip., Inc. v. Tekservices, Inc.*, 903 F.Supp. 1350, 1360 (D.Neb.1995) (holding that candy cane design of die used in paper cutting machine was not entitled to copyright protection because there were limited ways in which to depict a candy cane for a paper cutting machine and still be able to express the idea). Accordingly, the court concludes that for purposes of obtaining a preliminary injunction, Thimbleberries has established the validity of its copyright.

## 2. Copying by Defendants

[13] Having established its ownership of a valid copyright, Thimbleberries must also prove that defendants copied its protected work. Because direct evidence of copying is rarely available, a plaintiff generally must show that the defendant had access to the copyrighted material and that the accused work is substantially similar to the copyrighted work. *Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1162 (9th Cir.1977).

### a. Access

[14, 15] Thimbleberries may establish access by showing that defendants had a "reasonable possibility" of viewing the Countryside Wreath pattern. *Moore*, 972 F.2d at 942. Thimbleberries contends that defendants clearly had access to its wreath pattern, since it was featured at two international quilt shows in 1989 and has been available in quilt stores and quilting books and magazines since that time. While it is true that access can be inferred where the copyrighted work has been widely disseminated, *see, e.g., Odegard Inc. v. Costikyan Classic Carpets, Inc.*, 963 F.Supp. 1328, 1336 (S.D.N.Y.1997), Thimbleberries bare assertions of dissemination do not satisfy the access requirement.

First, Judy Short, the designer of defendants' allegedly infringing work asserts that she did not attend either of the 1989 quilting shows, does not frequent quilting shops and has not seen the Rodale press volume. (Short Aff. ¶¶ 2–5.) The court finds dubious Short's assertion that she is a professional quilt pattern designer, yet she does not visit quilting stores. Nonetheless, Thimbleberries has provided no specific information regarding the geographic distribution of its Countryside Wreath pattern, therefore it is far from clear that the pattern was displayed or sold in any location that Short may have visited during the relevant time frame. *See, e.g., McRae v. Smith*, 968 F.Supp. 559, 563–64 (D.Colo.1997) (holding that regional dissemination of 500 copies of and performance in places where defendants were not located is inadequate to establish access). Further evidence obtained during discovery may satisfy this access requirement, but the court cannot base preliminary injunction on this meager record of dissemination.

Although Thimbleberries has not satisfied the access requirement through proof of dissemination of its work, it can still establish access if the similarity between its copyrighted pattern and the allegedly infringing work is sufficiently "striking." *Moore*, 972 F.2d at 941 n. 1. Therefore, Thimbleberries must establish not only substantial similarity but also striking similarity.

### b. Similarity

[16, 17] The Eighth Circuit endorses a two-step approach in determining substantial similarity. First, an "extrinsic" analysis is performed to determine whether the general idea of the two works is substantially similar. *Moore*, 972 F.2d at 946; *Krofft Television*, 562 F.2d at 1164. In applying the extrinsic test, the court considers such criteria as the type of artwork involved, the materials involved, the subject matter and the setting for the subject. *Krofft Television*, 562 F.2d at 1164. In cases such as this, where the extrinsic elements of the two wreath-shaped quilt patterns are unquestionably similar, the court must then perform an "intrinsic" analysis to determine whether there is similarity of expression. *Id.*

SEP.28'2001 16:13 651 737 2948 3M I P 220 10W #0667 P.030

[18, 19] The intrinsic test is a subjective test, where the court examines the works "to ascertain if they are so dissimilar that ordinary, 'reasonable minds [cannot] differ as to the absence of substantial similarity in expression.'" *Hartman v. Hallmark Cards, Inc.,* 833 F.2d 117, 120 (8th Cir.1987) (quoting *Litchfield v. Spielberg,* 736 F.2d 1352, 1355–56 (9th Cir. 1984)). Judge Learned Hand described the test as whether "the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard their aesthetic appeal as the same." *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.,* 274 F.2d 487, 489 (2d Cir. 1960). In this case, the court concludes that a reasonable observer would easily recognize the similarities between the two wreath-shaped patterns as not only substantial but striking.

To the ordinary observer, the two designs are, for all practical purposes, identical: the shapes of the designs are identical, consisting of sixteen exterior points of 45 degrees and six exterior points of 90 degrees; the number and placement of squares and triangles is virtually the same, except for four triangular pieces flanking the contrasting bow which have been removed from the defendants' design; and finally, the number of pieces, their scale and the proportions used in both designs are identical. For example, both patterns utilize six square pieces and eight triangular pieces, arranged the same way, to comprise the bow, which is placed in the identical location on the wreath. Most telling is the nearly identical arrangement of squares and triangles to create both the exterior shape of the wreath and the center hole design. The striking similarities between these two works stands in sharp contrast to the notably different wreath patterns created by other quilt pattern designers. (Hein Aff. Exh. B.)

Defendants contend nonetheless that differences in fabric color, border trim and dimension, plus the absence of the four triangles flanking the bow, result in an "entirely different" design from the Countryside Wreath pattern. To the contrary, the court finds that the subtle distinctions in color and fabric choice, background quilting stitches and border trim are irrelevant to the similarity determination because these features do not constitute the subject matter of the copyright. Moreover, defendant's "lengthy recitation of differences ... while requiring considerable ink to describe, do little to lessen the overwhelming impression" that defendants' pattern is an appropriation of Thimbleberries' Countryside Wreath design. *Knitwaves, Inc. v. Lollytogs Ltd.,* 71 F.3d 996, 1004 (2nd Cir.1995); *see also Segrets, Inc. v. Gillman Knitwear Co.,* 207 F.3d 56, 62 (1st Cir.2000) ("[D]efendant cannot copy the intricate patterns and juxtapositions of the Blanket Stitch design virtually line-for-line and then escape liability for infringement merely by changing the color and saying this necessarily destroys any substantial similarity.")

Finally, the court concludes that the two works are so strikingly similar as to preclude the possibility that defendant's designer independently arrived at the same result. This conclusion is based not only on the remarkable similarities between the two wreath patterns, but also on one specific difference—the absence of the four triangles flanking the bow. The court finds it suspicious that the designer's original pattern included at least two, if not all four of the triangles, but that these triangles were removed from the design before it was incorporated into the mass-produced table linens. This subtle change in the pattern suggests defendants may have deliberately eliminated elements so as to avoid a determination of copying. *Atari, Inc. v. North American Philips Consumer Elec. Corp.,* 672 F.2d 607, 619 (7th Cir. 1982), superseded on other grounds by statute, (viewing such "superficial changes" as "an attempt to disguise an intentional appropriation."). For these reasons, the court believes that Thimbleberries can likely establish the requisite degree of similarity to sustain a finding of copying and thereby prevail on its copyright infringement claim. Consequently, defendants are not entitled to judgment as a matter of law, therefore the motion for judgment on the pleadings is denied.

### B. Remaining *Dataphase* Factors

[20] Thimbleberries has made a prima facie showing of copyright infringement, therefore it is entitled to a presumption of irreparable harm. *West Publ'g,* 799 F.2d at 1229.

[21, 22] With respect to the balance of hardships between the movant and nonmovant, this factor is generally regarded as insignificant in a copyright infringement action. *E.F. Johnson,* 623 F.Supp. at 1491. In this case, the economic harm posed to Thimbleberries' by the unlicensed mass-production of its wreath design is obvious and the court agrees that any harm to defendants pales in comparison. Indeed, "[a] willful infringer which seeks to profit by copying others' creative ideas should not be heard to complain that its interests will be disturbed by an injunction." *Id.* at 1504 (citing *Helene Curtis Indus. v. Church & Dwight Co.,* 560 F.2d 1325, 1333 (7th Cir.1977)), *cert. denied,* 434 U.S. 1070, 98 S.Ct. 1252, 55 L.Ed.2d 772 (1978).

Finally, regarding the public interest, courts have long recognized that:

> [i]t is virtually axiomatic that the public interest can only be served by upholding copyright protections and, correspondingly, preventing the misappropriation of the skills, creative energies, and resources which are invested in the protected work. The interest which the copyright laws are designed to serve is the public interest in encouraging "individual effort and creativity by granting valuable enforceable rights." A preliminary injunction enjoining copyright infringement serves the public interest by furthering the goals of individual effort and fair competition.

*E.F. Johnson,* 623 F.Supp. at 1491 (quoting *Apple Computer, Inc. v. Franklin Computer Corp.,* 714 F.2d 1240, 1255 (3d Cir.1983); *Atari, Inc. v. North American Philips Consumer Elec. Corp.,* 672 F.2d 607, 620 (7th Cir.1982)) (other citations omitted).

In sum, analysis of each *Dataphase* factor counsels in favor of the issuance of a preliminary injunction. Accordingly, the court grants Thimbleberries' motion for preliminary injunction.

### C. Bond Amount

[23] Under Federal Rule 65(c), the court is required to determine the amount of security that the preliminary injunction movant must give "for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined." Given the likelihood that Thimbleberries will succeed on the merits of its copyright infringement claim and the minimal chance that defendants will suffer significant cognizable harm from the issuance of an injunction, the court concludes that a nominal bond of $1,000.00 is appropriate in this case.

## CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** that:

1. Defendants' motion for judgment on the pleadings is denied.



SEP.28'2001 16:14 651 737 2948 3M I P 220 10W #0667 P.031

2. Plaintiff's motion for a preliminary injunction is granted.

3. Defendants C & F Enterprises, Inc. and The Mark Group, Inc., along with their officers, directors, agents, servants, employees, successors, assigns, and all those controlled by them, or in active concert or participation with them, are preliminarily enjoined from reproducing, copying, colorably imitating, manufacturing, authorizing the manufacture of, displaying, distributing, promoting, advertising, offering for sale, selling, or otherwise using in any way without the consent of Thimbleberries, Inc. its registered "Countryside Wreath" design.

4. Defendants C & F Enterprises, Inc. and The Mark Group, Inc. shall send written notice, approved by this court, to each manufacturer, printer, supplier, distributor, wholesaler and retailer or other such party who has received infringing products, with a copy of such written notice to be furnished to Thimbleberries, Inc., requesting the recipient to return the infringing products to defendants and informing the recipient of the injunction and that any further use or sale of the infringing products will constitute a violation of court order.

5. This injunction will not take effect until Thimbleberries posts a bond or provides other security in the amount of $1,000.

**Kelly Jean RITT, Petitioner,**

v.

**Lynn DINGLE, Mike Hatch, Respondents.**

No. 00–2023 ADM/RLE.

United States District Court, D. Minnesota.

June 8, 2001.

Following affirmance of her conviction for murder, 599 N.W.2d 802, state prisoner filed petition for writ of habeas corpus. On state's motion to dismiss, the District Court, Montgomery, J., held that: (1) state court's determination that petitioner's confession to police detective was voluntary was reasonable, and (2) exclusion of expert testimony concerning police detective's interrogation technique was not unreasonable.

Motion granted.

1. Criminal Law ⇐517.1(2)

Confession must be voluntary in order to be used against accused. U.S.C.A. Const.Amend. 5.

2. Habeas Corpus ⇐490(3)

State court's determination that murder suspect's confession to police detective was voluntary was not contrary to or unreasonable application of clearly established federal law, and thus did not warrant federal habeas relief, even though detective indicated that suspect's children might be under investigation if she did not confess, in light of evidence that suspect was aware that she was not under arrest before speaking with detective, she did not break down during her statement, and she disagreed with detective on many points. 28 U.S.C.A. § 2254(d).



3. Habeas Corpus ⇐490(5)

State court's exclusion in murder trial of expert testimony concerning police detective's interrogation technique was not contrary to or unreasonable application of clearly established federal law, and thus did not warrant federal habeas relief, where petitioner was allowed to present jury videotape of her interrogation by detective, which showed circumstances of her confession. 28 U.S.C.A. § 2254(d).

4. Criminal Law ⇐469.1

It is within discretion of trial court to exclude expert testimony if it is not helpful to jury.

---

Lawrence Hammerling, Deputy State Public Defender, Minneapolis, MN, for and on behalf of the Petitioner.

Lawrence F. Clark, Assistant Dakota County Attorney, Hastings, MN, for and on behalf of Respondents.

## MEMORANDUM OPINION AND ORDER

MONTGOMERY, District Judge.

### I. INTRODUCTION

On August 25, 2000, Kelly Jean Ritt ("Petitioner") filed a Petition for Writ of Habeas Corpus (Doc. No. 1] pursuant to 28 U.S.C. § 2254. This matter is now before the Court on Petitioner's Objections [Doc. No. 11] to the Report and Recommendation ("R & R") of Magistrate Judge Raymond L. Erickson [Doc. No. 10]. In the R & R, Judge Erickson recommends that the Respondents' Motion to Dismiss the Petition for Writ of Habeas Corpus [Doc. No. 8] be granted. For the reasons set forth below, the R & R is adopted and the Petition for Writ of Habeas Corpus is dismissed with prejudice.

### II. BACKGROUND

Petitioner currently is serving a life sentence of imprisonment after being convicted in Minnesota state court of two Counts of Murder in the First Degree, two Counts of Murder in the Second Degree, Murder in the Third Degree, and Arson in the First Degree. Petitioner's convictions stem from a fire at her residence on March 25, 1997, which resulted in the death of her child, Hannah Jean Ritt. Following her conviction, Petitioner appealed to the Minnesota Supreme Court on grounds similar to those raised here. The Minnesota Supreme Court affirmed Petitioner's convictions, holding that (1) the trial court did not err in admitting Petitioner's statement to Detective Rgnonti because it was voluntary, and (2) the trial court acted within its discretion when it excluded defense's expert witness from testifying on interrogation practices. *State v. Ritt*, 599 N.W.2d 802, 813 (Minn.1999). Following the denial of her state court appeal, Petitioner filed a Petition for Writ of Habeas Corpus with this Court, arguing (1) the trial court violated the Fifth Amendment of the U.S. Constitution by entering her confession into evidence because it was involuntary, and (2) her constitutional rights were violated when the trial court refused to allow a defense expert to testify on the coercive nature of her interrogation. Further background information is set forth in the R & R and is incorporated by reference for the purposes of Petitioner's present objections.

### III. DISCUSSION

A district court must make an independent, de novo evaluation of those portions of an R & R to which objection is made and may accept, reject, or modify, in whole

SEP.28'2001 16:15 651 737 2948 3M I P 220 10W #0667 P.032