n2 Sewall quibbles that the Board used "would not have been obvious" language in its opinion and that, by doing so, the Board applied an improper standard. The language Sewall objects to is in the statement at page 7 of the Board's opinion which reads: "there is no evidence submitted by the party Sewall establishing that such chips [as Sewall designed] would not have been obvious to one of ordinary skill in the art required to follow Walters' algorithm." A fair reading of this language in context indicates, however, that the Board merely meant to say, as it had only two sentences before, that no more than ordinary skill in the art would have been required to implement Walters' concept in chip form. The Board was merely emphasizing why it believed Sewall had not invented any part of the invention of the count.

**[**9]**

II. ANALYSIS

A. Inventorship

(1) Applicable Law

[HN1] Determining "inventorship" is nothing more than determining who conceived the subject matter at issue, whether that subject matter is recited in a claim in an application or in a count in an interference. Conception, and consequently inventorship, are questions of law that this *court* reviews de novo; of course, any facts found by the Board in reaching an inventorship holding are reviewed for clear error. *Hybritech Inc. v. Monoclonal Antibodies, Inc., 802 F.2d 1367, 1376, 231 U.S.P.Q. (BNA) 81, 87 (Fed. Cir. 1986)*; see also *In re Caveney, 761 F.2d 671, 674, 226 U.S.P.Q. (BNA) 1, 3 (Fed. Cir. 1985)* ("In appeals from PTO rejections, the Federal Circuit does not find facts de novo, but, instead, reviews PTO findings under the clearly erroneous standard.").

In this case, Sewall admits that he did not independently conceive the subject matter recited in the count. Instead, Sewall contends that he aided Walters in the conception of that subject matter, and therefore, that he is a joint inventor and should be designated as such pursuant to *35 U.S.C. § 116*. **[**10]** This case therefore comes to us in the context of an originality contest as opposed to a priority contest. *Applegate v. Scherer, 51 C.C.P.A. 1416, 332 F.2d 571, 573 n.1, 141 U.S.P.Q. (BNA) 796, 798 n.1 (CCPA 1964)* [HN2] ("In an originality case the issue is not who is the first or prior inventor, but who made the invention."). The "inventorship" issue to be decided is thus merely who conceived the invention for which patent protection is sought, and not who first conceived that invention.

[HN3] Conception exists when a definite and permanent idea of an operative invention, including every feature of the subject matter sought to be patented, is known. *Coleman v. Dines, 754 F.2d 353, 359, 224 U.S.P.Q. (BNA) 857, 862 (Fed. Cir. 1985)*. Conception is complete when one of ordinary skill in the art could construct the apparatus without unduly extensive research or experimentation. See *Summers v. Vogel, 52 C.C.P.A. 716, 332 F.2d 810, 816, 141 U.S.P.Q. (BNA) 816, 820 (CCPA 1964); In re Tansel, 45 C.C.P.A. 834, 253 F.2d 241, 243, 117 U.S.P.Q. (BNA) 188, 189 (CCPA 1958).* **[**11]** n3

n3 Of course, the existence of research or experimentation does not necessarily indicate, by itself, that complete conception did not exist. One must look for a nexus between the research or experimentation and the subject for which patent protection is sought. See *Bac v. Loomis, 45 C.C.P.A. 807, 252 F.2d 571, 577, 117 U.S.P.Q. (BNA) 29, 34 (CCPA 1958).*

**[*416]** (2) Application of Law to Facts

Having reviewed the record before us in its entirety, we hold that the Board did not commit any legal errors or engage in any clearly erroneous fact finding in reaching its conclusion that Sewall did not jointly conceive the subject matter of the count.

Sewall contends that he designed the hardware described in the specification as corresponding to the subject matter of the count, including that corresponding to element b, and therefore that he is a joint inventor of that subject matter. The record amply supports, however, the Board's contrary holding that Sewall's hardware design **[**12]** was dictated explicitly by Walters' specifications. In addition, Sewall has failed to persuade us that the Board clearly erred in finding that Sewall's design of circuits to carry out Walters' idea was simply the exercise of the normal skill expected of an ordinary chip designer, which did not involve any inventive acts on the part of Sewall.

We also note that the specification of each of the applications states:

> Backprojector 44 could be accomplished solely through software, but preferably the components 100, 102, 104 and 105 are implemented with VLSI integrated circuits, the structure of which will become

> evident in view of their function. [pg. 15, 1. 17]
>
> . . . .
>
> Although the precise electronic components which make up the control circuitry are not shown, the functional description of the back projector 44 will make such control circuitry or program quite evident to those skilled in the art. [pg. 16, 1. 24]

The specification thus renders the presence of Sewall's alleged coinventive contributions, namely, the circuits that he designed, completely optional to the apparatus of the count. It also explicitly states that the design of those circuits is self-evident from their **[**13]** function. Thus, the specification itself indicates that one of ordinary skill in the art could construct the back projecting apparatus functionally described therein without unduly extensive research or experimentation. n4

> n4 Cannon testified by affidavit that Sewall's contribution to the back projecting apparatus involved the design of the CMOS gate array devices designated as elements 100, 102, and 105 of the Sewall application, and the CMOS interpolation device designated as element 104. However, the count defines an apparatus, not merely a set of CMOS gate arrays and interpolators, and the specification clearly states that such hardware structure is optional and, as the Board found, easily designed by a skilled artisan.

In this regard, contrary to suggestions by Sewall, there is no record evidence that significant work was required to implement the invention of the count. The evidence regarding developmental delays deals with the fabrication and qualification of a commercial prototype of a complete CT scanner, **[**14]** and not with implementing Walters' concept of a back projecting apparatus as recited in the count, let alone with any difficulties in implementing Walters' linearization pointer memory means (element b) in chip form. The fact that it took Star a long time to develop components outside the scope of the count is not relevant to the quality of the conception of the subject matter of the count.

Sewall also argues that he contributed to the conception of the subject matter of the count in that he conceived using the interpolation method that he refers to as Word and Word Plus I in the back projecting apparatus. We note, however, that the Walters' '912 patent itself discloses the use of interpolation as a procedure to be performed in reconstructing image data in a CT scanner, and the record is clear that the interpolation used by Sewall was a well-known, common method in the prior art. See U.S Patent No. 4,135,247. In any event, the interpolation method was claimed in dependent claim 19 of the Sewall application, and it is not a necessary limitation of the count.

Notwithstanding the above, it is clear from the record that the inventive aspect of the count lies in the placement of a **[**15]** linearization pointer memory means in a back projecting apparatus of a CT scanner, and not in the particular means used for that linearization pointer memory or any of the other elements of the count. Indeed, declarative evidence of record indicates that, at the time of the invention, it was surprising and unexpected **[*417]** that Walters could achieve the results that he did by placing element b in the back projecting portion of a CT scanner. Sewall has admitted that he did not contribute to the placement of element b. Sewall's testimony of record also indicates that Sewall did not even understand the purpose or function of element b in the apparatus, and moreover, that all Sewall knew about CT scanning at the time of the July 25 meeting was what he had read in Walters' '912 patent.

In addition, the successful computer simulation carried out according to Walters' specifications in April of 1984 demonstrated the operability of every Postulate that Walters made to Sewall on or before July 25, 1983, regarding his proposed back projecting apparatus, thus further supporting the Board's holding that, as of July 25, 1983, Walters had a definite and permanent idea of an operative invention. We note **[**16]** that Star emphasized the importance of this simulation in one of its own technical proposals:

> . . . This backprojector was completely designed and simulated at the hardware register level prior to the design of the special backprojection chips. The importance of this simulation was demonstrated when 512X512 1000 view images were produced with hardware that compared exactly with the simulated images on the first attempt.

Sewall also sets forth several arguments regarding ownership, apparently attempting to establish that Walters' alleged representations regarding ownership somehow estop him from asserting inventorship of the subject matter at issue. We note for Sewall's enlightenment, however, the following:

> [HN4] It is elementary that inventorship and ownership are separate issues. . . . Inventorship is a question of who actually invented the subject matter claimed in a patent. Ownership, however, is a question of who owns legal title to the subject matter claimed in a patent, patents having the attributes of personal property.
>
> . . . .
>
> Who ultimately possesses ownership rights in that subject matter has no bearing whatsoever on the question of who actually invented that subject **[**17]** matter. [Citations omitted.]

*Beech Aircraft Corp. v. EDO Corp., 990 F.2d 1237, 1248, 26 U.S.P.Q.2D (BNA) 1572, 1582 (Fed. Cir. 1993).* Clearly, Sewall's ownership arguments have no bearing on the Board's inventorship holding in this interference.

Finally, we note that the record is devoid of any evidence that Walters ever represented or acquiesced that Sewall is a joint inventor. To the contrary, the record indicates that Walters informed Star's attorneys that Sewall was not a joint inventor before the first application was filed. In addition, on June 25, 1987, Walters filed a declaration in the Sewall application informing the PTO that he was the sole inventor of the subject matter for which patent protection was sought. Thus, this case does not involve any estoppel issues regarding any representations made by Walters concerning inventorship.

B. Alleged On-Sale Bar

Sewall argues in the alternative that, even assuming that the Board's findings as to conception are correct, the Board erred in failing to find an on-sale bar under *35 U.S.C. § 102*(b). Sewall asserts that he raised this issue in both a preliminary **[**18]** motion and in his final brief to the Board.

In his preliminary motions before the Board, Sewall argued that the invention of the count was on sale in May of 1985. However, the critical date under section 102(b) is November 15, 1984, because the Board gave both parties the benefit of Sewall's earlier November 15, 1985, filing date. In this appeal, Sewall argues for the first time that General Electric (GE) placed an order for a back projecting apparatus as recited in the count in July of 1984, more than one year before the earliest filing date of the two applications and that this constituted a sale of the invention barring a patent therefor. n5 **[*418]** Because this issue was not raised below, we do not decide it in this appeal.

> n5 GE entered into a purchase agreement with Star on February 16, 1984. The agreement did not Specifically identify a back projecting apparatus in accordance with the count. GE later requested that a functional computer simulation be carried out to evaluate the back projecting apparatus that it was considering purchasing, and this computer simulation, which was a computer model of the subject matter of the count, was completed in April of 1984. GE ultimately ordered the back projecting apparatus on July 24, 1984, and the purchase order invoice listed the contract number posted on the February purchase agreement. Sewall has never contended that the February purchase agreement or any other activities prior to the July 24, 1984, purchase constituted a "sale" under *35 U.S.C. § 102*(b).

**[**19]**

CONCLUSION

For the foregoing reasons, the decision of the Board is

AFFIRMED.

LEXSEE 802 F2D 1367

**HYBRITECH INCORPORATED, Appellant, v. MONOCLONAL ANTIBODIES, INC., Appellee**

**Appeal No. 86-531**

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

***802 F.2d 1367; 1986 U.S. App. LEXIS 20347; 231 U.S.P.Q. (BNA) 81***

**September 19, 1986**

**PRIOR HISTORY: [**1]**

Appealed from: U.S. District Court for the Northern District of California. Judge Conti.

**DISPOSITION:**

Reversed and Remanded.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff appealed a judgment of the United States District Court for the Northern District of California in favor of defendant in plaintiff's infringement action. The district court held that all claims of plaintiff's patent were invalid for anticipation under *35 U.S.C.S. § 102*(g), for obviousness under *35 U.S.C.S. § 103*, and under *35 U.S.C.S. § 112*.

**OVERVIEW:** Plaintiff, a corporation in the business of developing diagnostic kits, sued defendant corporation, alleging that the manufacture and sale of defendant's diagnostic kits infringed plaintiff's patent with claims defining a variety of sandwich assays using monoclonal antibodies. The district court ruled in favor of defendant, holding that all claims of plaintiff's patent were invalid for anticipation under *35 U.S.C.S. § 102*(g), for obviousness under § 103, and under *35 U.S.C.S. § 112*. The court reversed, holding that although some of plaintiff's inventor's laboratory notebooks were not witnessed until a few months to one year after their writing due to plaintiff's inexperience as a start-up company, the notebooks were still corroborative and clearly showed conception of the claimed invention before others. Furthermore, the large number of references relied upon by the district court to show obviousness skirted around but did not as a whole suggest the claimed invention.

**OUTCOME:** The court reversed the judgment of the district court holding plaintiff's patent invalid in all respects, since the district court's decision was based on clearly erroneous factual findings, and remanded the matter for determination of plaintiff's claim of infringement.

**LexisNexis(R) Headnotes**

***Civil Procedure > Appeals > Reviewability > Preservation for Review***
[HN1] See *Fed. R. Civ. P. 52(a)*.

***Civil Procedure > Appeals > Standards of Review > Clearly Erroneous Review***
***Patent Law > Jurisdiction & Review > Standards of Review > General Overview***
[HN2] Findings of the district court may be reversed only if clearly erroneous. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.

***Civil Procedure > Appeals > Standards of Review > Clearly Erroneous Review***
***Patent Law > Jurisdiction & Review > Standards of Review > General Overview***
[HN3] If documents or objective evidence contradict a witness's story, clear error may be found even in a trial court's finding purportedly based on a credibility determination.

***Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > General Overview***

***Patent Law > Infringement Actions > Defenses > Patent Invalidity > Validity Presumption***
***Patent Law > Infringement Actions > Burdens of Proof***
[HN4] Under *35 U.S.C.S. § 282,* a patent is presumed valid, and the one attacking validity has the burden of proving invalidity by clear and convincing evidence. Notwithstanding that the introduction of prior art not before the examiner may facilitate the challenger's meeting the burden of proof on invalidity, the presumption remains intact and on the challenger throughout the litigation, and the clear and convincing standard does not change.

***Patent Law > Anticipation & Novelty > Invention***
[HN5] *35 U.S.C.S. § 102*(g) states that a person shall be entitled to a patent unless before the applicant's invention thereof the invention was made in this country by another who had not abandoned, suppressed, or concealed it. Section 102(g) relates to prior inventorship by another in this country and retains the rules governing the determination of priority of invention.

***Patent Law > Date of Invention & Priority > Conception Date***
***Patent Law > Anticipation & Novelty > General Overview***
[HN6] See *35 U.S.C.S. § 102*(g).

***Patent Law > Anticipation & Novelty > General Overview***
***Patent Law > Jurisdiction & Review > Standards of Review > General Overview***
[HN7] Reduction to practice, and conception as well, is a legal determination subject to review free of the clearly erroneous standard. Findings of fact supporting that legal conclusion are reviewed under the clearly erroneous standard.

***Patent Law > Date of Invention & Priority > General Overview***
***Patent Law > Anticipation & Novelty > General Overview***
[HN8] Conception is the formation in the mind of the inventor, of a definite and permanent idea of the complete and operative invention, as it is hereafter to be applied in practice. Actual reduction to practice requires that the claimed invention work for its intended purpose, and constructive reduction to practice occurs when a patent application on the claimed invention is filed.

***Patent Law > Anticipation & Novelty > Fact & Law Issues***
[HN9] It is axiomatic that for prior art to anticipate under *35 U.S.C.S. § 102* it has to meet every element of the claimed invention, and that such a determination is one of fact.

***Patent Law > Claims & Specifications > Enablement Requirement > General Overview***
***Patent Law > Nonobviousness > Elements & Tests > General Overview***
[HN10] An obviousness determination under *35 U.S.C.S. § 103,* whether the claimed invention would have been obvious at the time the invention was made, is reviewed free of the clearly erroneous standard. However, the underlying factual inquiries -- scope and content of the prior art, level of ordinary skill in the art, and differences between the prior art and the claimed invention -- integral parts of the subjective determination involved in § 103, are reviewed under that standard. Objective evidence such as commercial success, failure of others, long-felt need, and unexpected results must be considered before a conclusion on obviousness is reached.

***Patent Law > Claims & Specifications > Enablement Requirement > Proof***
***Patent Law > Claims & Specifications > Enablement Requirement > Standards & Tests***
[HN11] Enablement is a legal determination of whether a patent enables one skilled in the art to make and use the claimed invention, is not precluded even if some experimentation is necessary, although the amount of experimentation needed must not be unduly extensive, and is determined as of the filing date of the patent application. Furthermore, a patent need not teach, and preferably omits, what is well known in the art.

***Patent Law > Claims & Specifications > Best Mode > Adequate Disclosure***
[HN12] Under *35 U.S.C.S. § 112,* the specification shall set forth the best mode contemplated by the inventor of carrying out his invention. In order to find that the best mode requirement is not satisfied, it must be shown that the applicant knew of and concealed a better mode than he disclosed.

***Patent Law > Claims & Specifications > Definiteness > General Overview***
***Patent Law > Claims & Specifications > Enablement Requirement > General Overview***

[HN13] Under the law pertaining to indefiniteness, if the claims, read in light of the specification, reasonably apprise those skilled in the art both of the utilization and scope of the invention, and if the language is as precise as the subject matter permits, the courts can demand no more.

**COUNSEL:**

Douglas E. Olson, Lyon & Lyon, of Los Angeles, California, argued for Appellant. With him on brief were James W. Geriak and Bradford J. Duft.

David J. Brezner, Flehr, Hohback, Test, Albritton & Herbert, of San Francisco, California, argued for Appellee. Barry E. Britschneider and Herbert I. Cantor, of Washington, District of Columbia, of Counsel.

**JUDGES:**

Rich, Davis, and Smith, Circuit Judges.

**OPINIONBY:**

RICH

**OPINION:**

**[*1368]** RICH, Circuit Judge.

This appeal is from the August 28, 1985, decision of the *United States District Court for the Northern District of California, 623 F. Supp. 1344, 227 U.S.P.Q. (BNA) 215,* in favor of defendant Monoclonal Antibodies, Inc. (Monoclonal) holding that all 29 claims of plaintiff's patent No. 4,376,110 entitled "Immunometric Assays Using Monoclonal Antibodies" ('110 patent), issued to Dr. Gary S. David and Howard E. Greene and assigned to Hybritech Incorporated (Hybritech), are invalid as anticipated under *35 USC § 102*(g), for obviousness under § 103, and under § 112 first **[**2]** and second paragraphs. We reverse and remand.

*Background*

Vertebrates defend themselves against invasion by microorganisms by producing antibodies, proteins which can complex with the invading microorganisms and target them for destruction or removal. In fact, any foreign molecule of sufficient size can act as a stimulus for antibody production. Such foreign molecules, or antigens, bear particular sites or epitopes that represent antibody recognition sites. B cell lymphocytes, the cells that actually produce antibodies, recognize and respond to an epitope on an antigen by reproducing or cloning themselves and then producing antibodies specific to that epitope. Even if the antigen is highly purified, the lymphocytes will produce antibodies specific to different epitopes on the antigen and so produce antibodies with different specificities. Furthermore, because the body is exposed to many different antigens, the blood of a vertebrate will contain antibodies to many different antigenic substances.

Scientists and clinicians have long employed the ability of antibodies to recognize and complex with antigens as a tool to **[*1369]** identify or label particular cells or molecules **[**3]** and to separate them from a mixture. Their source of antibodies has been primarily the serum separated from the blood of a vertebrate immunized or exposed to the antigen. Serum, however, contains a mixture of antibodies directed to numerous antigens and to any number of epitopes on a particular antigen. Because such a mixture of antibodies arises from many different clones of lymphocytes, it is called "polyclonal."

Recent technological advances have made it possible to isolate and cultivate a single clone of lymphocytes to obtain a virtually unlimited supply of antibodies specific to one particular epitope. These antibodies, known as "monoclonal antibodies" because they arise from a single clone of lymphocytes, are produced by a relatively new technology known as the hybridoma. Hybridomas are produced by fusing a particular cancer cell, the myeloma cell, with spleen cells from a mouse that has been injected or immunized with the antigen. These fusions are isolated by transferring them to a growth fluid that kills off the unfused cancer cells, the unfused spleen cells dying off by themselves. The fused hybrid spleen and myeloma cells, called hybridomas, produce antibodies to the **[**4]** antigen initially injected into the mouse. The growth fluid containing the hybridomas is then diluted and put into individual test tubes or wells so that there is only one hybridoma per tube or well. Each hybridoma then reproduces itself and these identical hybridomas each produce identical monoclonal antibodies having the same affinity and specificity. In this way, a virtually unlimited supply of identical antibodies is created, directed to only one epitope on an antigen rather than, as with polyclonal antibodies, to many different epitopes on many different antigens.

In addition to the specificity of antibodies to particular epitopes discussed above, antibodies also have a characteristic "sensitivity," the ability to detect and react to antigens. Sensitivity is expressed in terms of "affinity:" the greater an antibody's ability to bind with a particular antigen, the greater the antibody's affinity. The strength of that antibody-antigen bond is in part dependent upon the antibody's "affinity constant," expressed in liters per mole, for the antigen.

Immunoassays, the subject matter of the '110 patent, are diagnostic methods for determining the presence or amount of antigen in **[**5]** body fluids such as blood or

urine by employing the ability of an antibody to recognize and bind to an antigen. Generally, the extent to which the antibody binds to the antigen to be quantitated is an indication of the amount of antigen present in the fluid. Labelling the antibody or, in some cases, the antigen, with either a radioactive substance, I125, or an enzyme makes possible the detection of the antibody-antigen complex. In an extreme case, where the fluid sample contains a very low level of the antigen, binding might not occur unless the antibodies selected or "screened" for the procedure are highly sensitive.

In the case of a "competitive" immunoassay, a labelled antigen reagent is bound to a limited and known quantity of antibody reagent. After that reaction reaches equilibrium, the antigen to be detected is added to the mixture and competes with the labelled antigen for the limited number of antibody binding sites. The amount of labelled antigen reagent displaced, if any, in this second reaction indicates the quantity of the antigen to be detected present in the fluid sample. All of the antigen attached to the antibody will be labelled antigen if there is no antigen **[**6]** in the test fluid sample. The advantage of this method is that only a small amount of antibody is needed, its drawback, generally, that the system must reach equilibrium, and thus produces results slowly.

In the case of a "sandwich" assay, otherwise known as an immunometric assay, the latter being a term coined by Dr. Lawton Miles in 1971, a quantity of unlabelled antibody reagent is bound to a solid support surface such as the inside wall of a test tube containing a complex of the fluid sample **[*1370]** containing the antigen to be detected and a labelled *antibody* reagent. The result is an insoluble three part complex referred to as a sandwich having antibody bread and antigen filling. This figure is illustrative of the sandwich concept:

[SEE ILLUSTRATION IN ORIGINAL]

The advantage of the sandwich assay is that it is fast and simple, its drawback that enormous quantities of antibodies are needed.

*Hybritech*

Hybritech, started in 1978 and joined thereafter by coinventors Green and Dr. David, has, since 1979, been in the business of developing diagnostic kits employing monoclonal antibodies that detect numerous antigens and thus a broad range of conditions **[**7]** such as pregnancy, cancer, growth hormone deficiency, or hepatitis. Examples of antigens include influenza viruses, immunoglobulin E (IgE) which indicates allergic reaction, human chorionic gonadotropin (HCG) which indicates pregnancy, and prostatic acid phosphatase (PAP) which indicates prostate cancer, to name a few. Dr. Adams, a business-experienced scientist, joined the company in May 1980 as head of research and development. The '110 patent, application for which was filed August 4, 1980, issued March 8, 1983, with claims defining a variety of sandwich assays using monoclonal antibodies. Claim 19, apparently the broadest of the twenty-nine in the patent, is directed generally to a sandwich assay and reads (emphasis ours):

> 19. *In an immunometric assay* to determine the presence or concentration of an antigenic substance in a sample of a fluid comprising forming a ternary complex of a first labelled antibody, said antigenic substance, and a second antibody said second antibody being bound to a solid carrier insoluble in said fluid wherein the presence of the antigenic substance in the samples is determined by measuring either the amount of labelled antibody bound to **[**8]** the solid carrier or the amount of unreacted labelled antibody, *the improvement comprising* employing monoclonal antibodies having an affinity for the antigenic substance of at least about 10<8> liters/mole for each of said labelled antibody and said antibody bound to a sold carrier.

Claim 1, directed particularly to a reverse sandwich assay, explained infra, reads:

> 1. A process for the determination of the presence of [sic, or] concentration of an antigenic substance in a fluid comprising the steps:
>
> (a) contacting a sample of the fluid with a measured amount of a soluble first monoclonal antibody to the antigenic substance in order to form a soluble complex of the antibody and antigenic substance present in said sample, said first monoclonal antibody being labelled;
> (b) contacting the soluble complex with a second monoclonal antibody to the antigenic substance, said second monoclonal antibody being bound to a

solid carrier, said solid carrier being [*1371] insoluble in said fluid, in order to form an insoluble complex of said first monoclonal antibody, said antigenic substance and said second monoclonal antibody bound to said solid carrier;
(c) [**9] separating said solid carrier from the fluid sample and unreacted labelled antibody;
(d) measuring either the amount of labelled antibody associated with the solid carrier or the amount of unreacted labelled antibody; and
(e) relating the amount of labelled antibody measured with the amount of labelled antibody measured for a control sample prepared in accordance with steps (a)-(d), said control sample being known to be free of said antigenic substance, to determine the presence of antigenic substance in said fluid sample, or relating the amount of labelled antibody measured with the amount of labelled antibody measured for samples containing known amounts of antigenic substance prepared in accordance with steps (a)-(d) to determine the concentration of antigenic substance in said fluid sample, the first and second monoclonal antibodies having an affinity for the antigenic substance of at least about 10 <8> liters/mole.

*The District Court Decision*

Hybritech sued Monoclonal March 2, 1984, for damages and an injunction alleging that the manufacture and sale of Monoclonal's diagnostic kits infringed the '110 patent. Trial without a jury began on August 5, 1985, and [**10] concluded August 23, 1985, thirty witnesses having been heard and over 2,000 pages of transcript generated. The district court produced the reported opinion, findings, and conclusions, which use nearly verbatim Monoclonal's *pre-trial* brief and *pre-trial proposed* findings of fact and conclusions of law, in three days, in support of the judgement now on appeal.

The district court held that the claimed subject matter of the '110 patent was neither conceived nor actually reduced to practice before May 1980, and was anticipated under § 102(g) by the actual reduction to practice of the invention by Drs. Uotila and Ruoslahti at the La Jolla Cancer Research Foundation (LJCRF) as early as November of 1979 and by the actual reduction to practice of the invention by Drs. Oi and Herzenberg (Oi/Herzenberg work) at the Stanford University Laboratory as early as July 1978, later published in December of 1979.

The district court also held the claims of the '110 patent invalid for obviousness from the Oi/Herzenberg work in view of (1) a February 1979 article by M. E. Frankel and W. Gerhard (Frankel article) which discloses high-affinity monoclonal antibodies, and apparently in view of [**11] numerous other references including; (2) the work of Nobel Prize winners G. Kohler and C. Milstein disclosing a Nobel Prize-worthy method for producing monoclonal antibodies in vitro (outside the body) published in an August 7, 1975, article; (3) U.S. Patent No. *4,244,940* issued to Jeong et al. disclosing a simultaneous polyclonal assay (Jeong), U.S. Patent No. *4,098,876* to Piasio et al. disclosing a reverse polyclonal sandwich assay (Piasio), U.S. Patent No. *4,016,143* to Schurrs et al. disclosing a forward polyclonal sandwich assay (Schurrs); (4) a July 1979 publication by A. C. Cuello et al. disclosing the use of monoclonal antibodies in competitive assays; and (5) eight articles dated between January 1979 and March 6, 1980, "predicting" that monoclonal antibodies would be used in future immunoassays. n1

n1 With respect to obviousness, one portion of the district court's opinion apparently relies on all of the above listed references, (1) -- (5), for the obviousness holding while a later portion entitled "CONCLUSIONS OF LAW" relies on only the Oi/Herzenberg and Frankel articles. Furthermore, the district court did not state that the LJCRF work was considered for purposes of § 103, although we recognize that § 102(g) prior art can be used for § 103.

[**12]

The district court also invalidated the patent on various grounds based on *35 USC § 112,* first and second paragraphs, as hereinafter discussed.

[*1372] A. *The References*

1. *Kohler and Milstein's Nobel Prize-Winning Work: Producing Monoclonal Antibodies In Vitro For the First Time*

In early immunoassay work, polyclonal antibodies produced in vivo (in the body) in mice were used to bind with the antigen to be detected in the body fluid sample. Mice were immunized by injection with antigen so that the lymphocytes in their bodies produced antibodies that attacked the injected antigen. Those polyclonal antibodies were withdrawn from the animal's blood and used in immunoassays. The major problem was that when the mice's immune systems changed or the mice died, the antibodies changed or died too; supply was limited and uncertain.

As the examiner was aware, Kohler and Milstein developed a technique not only for producing antibodies in vitro, independent of a living body, thus eliminating dependence on a particular animal, but for in vitro production of monoclonal antibodies by hybridomas, discussed in the Background section, supra.

Given that [**13] sandwich assays require enormous amounts of antibodies, companies like appellant and appellee, which utilize monoclonal antibodies for sandwich assays, would not be in business were it not for the work of Kohler and Milstein.

2. *The Work of Drs. Ruoslahti, Uotila, and Engvall at the La Jolla Cancer Research Foundation (LJCRF) in 1979 and 1980*

Dr. Ruoslahti performed mostly competitive immunoassays using polyclonal antibodies to alphafetoprotein (AFP) antigens at the City of Hope since 1970. Dr. Uotila joined him in late 1978 to perform immunoassays using monoclonal antibodies to AFP. After producing monoclonal antibodies to AFP and performing competitive radio immunoassays (RIA -- a competitive assay that uses a radioactive label) with monoclonal antibodies at the City of Hope in mid-1979, Drs. Ruoslahti, Uotila and Engvall left LJCRF.

In the fall of 1979, September or October according to Dr. Uotila, discussion and work began on using monoclonal antibodies to AFP in a sandwich assay. Dr. Uotila, the principal researcher in this particular endeavor, generated six notebooks while at the City of Hope and LJCRF. The next-to-last page of notebook four contained a note to [**14] Dr. Uotila from Dr. Ruoslahti reading:

> Sometime you should enzyme label a good monoclonal antibody so that you can set up a sandwich assay. If you use two monoclonal antibodies, you may be able to do the assay with a single incubation, since the monoclonal antibodies are likely to be directed against different determinants and not compete with one another.

Although Dr. Uotila's notebook pages were, for the most part, unsigned, undated, and uncorroborated, Dr. Ruoslahti's testimony, placed the date of this note at about October 1979 by referring to the first pages of notebook five which were dated in early November 1979. Dr. Ruoslahti testified that one curve on one graph on page 43D of notebook five showed a successful simultaneous sandwich assay using monoclonal antibodies about November 5, 1979, although no data supporting that graph could be found elsewhere in the notebook. He further testified that the affinity of the monoclonal antibodies used for that test was not calculated until 1980 but that the raw data necessary for that calculation was generated in 1979.

Dr. Uotila stated in her deposition (she did not testify at trial) that she started work on a sandwich [**15] assay using monoclonal antibodies between October 4 and the end of that month, 1979, and that she could not remember the procedure used nor was there enough information in her notebook, including page 43D, to refresh her memory. She did remember, although she continued work on this assay because the tests did not yield repeatedly good curves without which she would not publish her work, that the assay on page 43D was successful. Dr. Engvall testified about a discussion of Dr. Uotila's monoclonal antibody work with [*1373] her while at the City of Hope and about first performing a sandwich assay after arriving at LJCRF in 1979.

3. *The Work of Drs. Oi and Herzenberg at the Stanford University Laboratory in 1978 Published in December 1979*

Drs. Oi and Herzenberg used monoclonal antibodies to "map" epitopes or determine the number and location of different antibody binding sites on a known quantity of IgE antigen by attaching to it an antibody bound to a carrier and exposing that antigen to other monoclonal antibodies. The antibodies either attached to epitopes on the antigen or were blocked from doing so by the other monoclonal antibodies, depending on the location and [**16] number of epitopes; if the epitopes on the antigen were too close together and the number of antibodies too great, few antibodies would bind to the antigen. Hybritech points out that both Dr. Herzenberg and Dr. Oi testi-

fied that *their work did not involve determining the presence or quantity of antigen*, that they had no idea what the affinities of the monoclonal antibodies used were, and that those values were never calculated.

One unsigned, unwitnessed page from three large laboratory notebooks, which Hybritech argues is insufficient because it does not identify the chemical reagents or protocol used, was relied on by Monoclonal to establish actual reduction to practice of the Oi/Herzenberg work in 1978 to establish a case of § 102(g) prior invention by another. The district court agreed with Monoclonal that the Oi/Herzenberg work anticipated the claimed invention and, in addition, combined this work with the Frankel publication to hold that the claimed subject matter was obvious under § 103.

4. *The Frankel Article: Monoclonal Antibodies Having Affinities of 10 (9) liters/mole*

Frankel describes an RIA (radioimmunoassay) method for the rapid determination of affinity [**17] constants for monoclonal antibodies produced from hybridomas. The article states that the assay used is applicable only to antibodies with binding constants of about 10 <10> liters/mole and discloses the binding constants for antibodies to several closely related strains of influenza virus.

The district court found that Frankel disclosed monoclonal antibodies having the affinity constants claimed in the '110 patent, 10 <8> to over 10 <9> liters/mole.

5. *The Cuello Article and the Jeong, Piasio, and Schurr Patents Considered by the Examiner*

Cuello, dated July 1979, states that it describes the usefulness of monoclonal antibodies in the characterization and localization of neurotransmitters such as Substance P, a peptide clearly associated with the transmission of primary sensory information in the spinal cord. The article discloses producing monoclonal antibodies from hybrid myelomas (hybridomas), their use in conventional radioimmunoassay techniques, and the benefits from doing so which flow from the ability to derive permanent cell lines capable of continuous production of highly specific antibodies.

The district court found that the examiner twice rejected all of the [**18] claims of the '110 patent based on Cuello alone or in combination with the Jeong, Piasio, and Schurr references which disclose various sandwich assays using polyclonal antibodies. The court also found that the examiner allowed the claims after they were amended to include the 10 <8> affinity limitation and after Richard Bartholomew, a Hybritech employee, submitted an affidavit alleging the advantages of using monoclonal rather than polyclonal antibodies in sandwich assays.

Apparently based on the testimony of Monoclonal's expert witness Judith Blakemore, a named inventor of the Jeong patent, manager of antibody programs at Bio-Rad Laboratories from 1975 to 1982, and currently manager of monoclonal antibody therapeutics at Cetus Corporation, a Hybritech competitor in immunoassay diagnostics, the district court stated that the "reasons for allowance were not well-founded because (1) the alleged advantages were [*1374] expected as naturally flowing from the well-known natural characteristics of monoclonal antibodies . . .; (2) . . . were not significant . . .; or (3) were at best minor," although they were "argued to the examiner as if they were" important. These were Monoclonal's [**19] words from its pretrial submission adopted by the court.

6. *The References That "Predicted" the Use of Monoclonal Antibodies in Immunoassays*

The district court stated, again in Monoclonal's words, that "it is of the utmost importance" that the advantages of monoclonal antibodies were "predicted by a number of authorities," eight to be exact, not important enough to list here, after the Kohler and Milstein discovery and after monoclonal antibodies became available.

B. *The Claimed Subject Matter of the '110 Patent*

Hybritech argues that the district court's determination that there is no credible evidence of conception or reduction to practice of the '110 invention before May 1980 is error because Dr. David's laboratory notebooks, Nos. 21 and 24, clearly show successful sandwich assays using monoclonal antibodies in August, September, and October of 1979. At the least, argues Hybritech, the invention was conceived in January of 1979, long before Drs. Ruoslahti, Engvall, and Uotila began work on a sandwich assay using monoclonal antibodies, and diligence was thereafter exercised until constructive reduction to practice occurred by the filing of the '110 patent application [**20] on August 4, 1980.

Dr. David and Greene testified that pages 2118 to 2122 of Dr. David's notebook, dated January 4, 1979, and witnessed January 30, 1979, disclose the generic conception of the invention in the context of the physical support structure used to carry out a sandwich assay, and Dr. David testified on redirect that (1) Page 1128 of notebook 21, dated May 27, 1979, recorded an early attempt at a sandwich assay that failed, (2) on August 3, 1979, as recorded at page 1166, a sandwich assay using monoclonal antibody 068 attached to a solid carrier, a radio-labelled 068 antibody, and a hepatitis antigen from an Abbott Labs polyclonal competitive assay kit was successfully performed, and (3) a sandwich assay using a bound 259 antibody, a radio-labelled 068 antibody, and a hepatitis antigen was successfully performed on September 21, 1979. Hybritech also urges that work in October