IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| 3M INNOVATIVE PROPERTIES COMPANY<br><br>and<br><br>MINNESOTA MINING AND MANUFACTURING COMPANY,<br><br>Plaintiffs,<br><br>v.<br><br>AVERY DENNISON CORPORATION,<br><br>Defendant. | Civil Action No. 01-1781 JRT/FLN |

**3M'S MEMORANDUM OF LAW IN OPPOSITION TO AVERY DENNISON CORPORATION'S MOTION FOR JUDGMENT AS A MATTER OF LAW OR, ALTERNATIVELY, FOR A NEW TRIAL ON ISSUES OF INFRINGEMENT**

Avery's post-trial motion suffers from the all-too-common flaw of the brief filed by the party that lost at trial. Avery seeks to retry the case, disregarding the jury's findings on disputed issues of fact and relying solely on evidence helpful to its case. Avery's selective review of the trial evidence simply disregards the deference to which the jury's verdict is entitled. Ignoring the applicable legal standards, Avery fails to consider the evidence in the light most favorable to 3M, fails to give 3M the benefit of all reasonable inferences that may be drawn from that evidence, and fails to explain how a weighing of all the trial evidence (as opposed to just the selective review of the evidence helpful to Avery set forth in Avery's motions) supports Avery's wholesale request to undo the jury's verdict on every issue decided at trial. There is nothing wrong with the

jury's verdict in this case. Avery's motions for judgment as a matter of law and for a new trial should be denied.

## I. LEGAL STANDARDS GOVERNING JMOL AND NEW TRIAL MOTIONS

### A. JMOL: "An Onerous Burden"

Avery has "an onerous burden" in its effort to convince the Court to set aside the jury's verdict and grant judgment as a matter of law ("JMOL"). *Inacom Corp. v. Sears, Roebuck & Co.*, 254 F.3d 683, 688-89 (8th Cir. 2000) (quoting *United States v. Big D Enters., Inc.*, 184 F.3d 924, 929 (8th Cir.1999), *cert. denied*, 529 U.S. 1018 (2000)). "Judgment as a matter of law is appropriate when the record contains no proof beyond speculation to support a verdict." *Wash Solutions, Inc. v. PDQ Mfg., Inc.*, 395 F.3d 888, 892 (8th Cir. 2004).

The Court must view all the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. *Wahpeton Canvas Co. v. Frontier, Inc.*, 870 F.2d 1546, 1551 (Fed. Cir. 1989) (applying Eighth Circuit law); *Itron, Inc. v. Benghiat*, No. Civ.99-501 (JRT/FLN), 2003 WL 22037710 (D. Minn. Aug. 29, 2003) (Tunheim, J.). As the Supreme Court has explained, in deciding a motion for judgment as a matter of law, a "court should review all of the evidence in the record," and it "must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000).

"A motion for judgment as a matter of law should generally be denied unless the Court, keeping all these principles in mind, concludes that judgment cannot be entered on

the jury verdict." *Itron*, 2003 WL 22037710 at *1. A court may not set aside a jury's verdict "unless there is a complete absence of probative facts to support the verdict." *Conseco Fin. Servicing Corp. v. North Am. Mortgage Co.*, 381 F.3d 811, 818 (8th Cir. 2004). "A jury verdict must be affirmed unless, viewing the evidence in the light most favorable to the prevailing party, we conclude that a reasonable jury could not have found for that party." *Stockmen's Livestock Mkt., Inc. v. Norwest Bank of Sioux City*, 135 F.3d 1236, 1240-41 (8th Cir. 1998) (internal quotes omitted). Only when the evidence is "susceptible of no reasonable inference" supporting the jury's conclusion may a court disregard a jury's verdict. *White v. Pence*, 961 F.2d 776, 779 (8th Cir. 1992).

**B. New Trial: "Miscarriage of Justice"**

"A new trial is only appropriate if the verdict was against the great weight of the evidence so as to constitute a miscarriage of justice." *Foster v. Time Warner Entm't Co., L.P.*, 250 F.3d 1189, 1197 (8th Cir. 2001). "The court is not free to set aside a verdict merely because it would have ruled differently, or believes that the jury should have drawn different inferences and conclusions from the conflicting testimony." *Ryther v. KARE 11*, 864 F. Supp. 1510, 1520 (D. Minn. 1994) (citations omitted).

**C. Avery's Failure to Meet These Standards**

The jury's verdict of infringement—literally, under the doctrine of equivalents, and through inducement—in this case was supported by substantial evidence. The verdict was neither unsupported or against the weight of the evidence as required to grant JMOL nor a new trial. Avery's gratuitous attack on the jury in calling it a "fiction" that the jury actually considered the evidence, s*ee* Doc. No. 354 at 6, is not only contrary to

the case law as Avery recognizes, but also reflects fundamental disrespect for the jury system. Avery's attempt to suggest that the time of deliberation supports reversing the jury's verdict should be rejected. If anything, the amount of time the jury spent deliberating proves the opposite: This was not a close case.

As shown below, Avery selectively addresses the evidence adduced at trial, ignoring all trial evidence in 3M's favor and miscasting other evidence in Avery's favor. Avery's arguments fall far short of meeting the "onerous burden" Avery faces to justify JMOL. Nor do Avery's arguments come close to showing that the jury's verdict represents a "miscarriage of justice." Accordingly, the Court should deny Avery's motion for JMOL or a new trial on all of the infringement issues presented by Avery's motion.

## II. THE SUBSTANTIAL EVIDENCE OF INFRINGEMENT PRESENTED AT TRIAL THAT AVERY DISREGARDS OR SIMPLY IGNORES

Avery seems to forget that 3M's expert, Dr. A. Brent Strong, testified at all. The jury obviously accepted Dr. Strong's testimony on infringement over any conflicting testimony—of which there was not much—by Avery's expert, Dr. Anthony J. McHugh. Avery also seems to forget that Dr. McHugh conceded that all but two elements of claim 1 were present in Avery's EZ Film, including one of the two elements—"depressions"—that Avery now contends 3M failed to prove during trial. (Declaration of Katherine A. Moerke ("Moerke Decl.") Ex. B at 1220:23-1221:3.) Contrary to Avery's selective and inaccurate citations, substantial evidence at trial established that Avery's EZ Film

infringes claims 1 through 5 of 3M's '930 patent, both literally and under the doctrine of equivalents.

Likewise, in arguing that there was no evidence presented at trial supporting the jury's verdict that Avery is actively inducing infringement of the '930 patent, Avery simply ignores the testimony of Mr. Charles Calisto. As explained below, Mr. Calisto's testimony provides substantial evidence that Avery induces its customers to infringe the '930 patent by explicitly instructing them on the use of Avery's EZ Film.

Finally, Avery asserts that this case is appropriate for JMOL because the structure of Avery's EZ Film liner was undisputed. (*See* Doc. No. 354 at 11-14.) That is simply not true. As shown below, the trial record reflects that Dr. Strong disagreed with Avery on a number of issues regarding the structure of Avery's liner. For purposes of this motion, one must presume that the jury agreed in full with Dr. Strong.

**A. Dr. A. Brent Strong's Testimony Fully Supports the Jury's Verdict of Direct Infringement.**

3M's expert, Dr. A. Brent Strong, testified that all of the elements of claims 1-5 of the '930 patent were present—both literally and under the doctrine of equivalents—in Avery's EZ Film. Because Avery mischaracterizes or ignores this portion of the trial record, 3M will correct the record by showing in detail how Dr. Strong provided substantial evidence that each element of each of claims 1-5 of the '930 patent is present in Avery's EZ Film.

To begin, Dr. Strong went through claim 1, element-by-element, and testified that each element was present based on actual photomicrographs of Avery's EZ Film liner.

This testimony and supporting exhibits alone provide substantial evidence sufficient to support the jury's verdict of direct infringement. *See, e.g.*, *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1324 (Fed. Cir. 2005) (holding that JMOL of patent noninfringement was properly denied in light of expert testimony and other evidence from which the jury could have found that patent was infringed); *Imonex Services, Inc. v. W.H. Munzprufer Dietmar Trenner GMBH*, 408 F.3d 1374, 1376-77 (Fed. Cir. 2005) (affirming the denial of JMOL for noninfringement because, "[o]n this record, substantial evidence from Imonex's expert supports the verdict of infringement"); *Itron*, 2003 WL 22037710, at *5 (denying motion for JMOL of noninfringement where patentee presented evidence that each claim element was present in accused device).

First, Dr. Strong testified that Avery's EZ Film has a "carrier web":

> Q. First of all, is it a carrier web?
> A. Yes. Here we see a scanning electron micrograph of the carrier web material and you can see that it's got length and breadth and it certainly fits the definition of what a carrier web would be.
> Q. Is it something that either can carry, is carrying, or has carried another material?
> A. Yes, definitely.
> Q. And is this the Court's actual claim construction of what the term "carrier web" means in this case?
> A. Yes.

(Moerke Decl. Ex. B at 728:18-729:3.)

Next, Dr. Strong testified that Avery's EZ Film has a "multiple embossed pattern":

> Q. So does Avery's carrier web have at least one surface that has a multiple embossed pattern having a first embossed pattern and a second embossed pattern?
> A. Yes, it certainly does.
> Q. And do you understand what the Court has construed the term "embossed" to mean?

A. Yes.
Q. What does embossed mean as the Court has construed it in this case?
A. Means a topography, that is, a surface profile, on a web or tooling having an effective three-dimensional pattern that generates a difference in planar surface dimension on the liner or the tooling.
Q. Now, is there anything in the Court's construction of the term "embossed" that requires that the embossing be done with a tool?
A. No. The reference to tooling is just saying "or a tooling." It could be on the surface of the tooling, but it could be on the surface of the carrier web, so there's no requirement there that it be done with a tool.
Q. So looking at the actual SEM of Avery's EZ Film liner, does it have at least one surface that has a multiple embossed pattern having a first embossed pattern and a second embossed pattern?
A. Yes, it does. As you can see down on the bottom, it says "yes."

(Moerke Decl. Ex. B at 731:5-732:5.)

Next, Dr. Strong testified that the third element of claim 1—"an array of depressions"—is present in Avery's EZ Film:

Q. Let's turn to the third element. It says: "Wherein the first embossed pattern forms an array of depressions." Let's go back. Is this the SEM again?
A. Yes, that is.
Q. Now, what's represented by the red highlighting?
A. That's the depressions, and as you can see, they are arrayed, and therefore it does contain an array of depressions.
Q. Has the Court in this case construed what the term "array" means?
A. Yes, it has.
Q. And what has the Court said array means?
A. An orderly arrangement.
Q. Let's go back and look at this SEM. Now, if I'm looking at this correctly, these depressions don't look exactly the same size.
A. That's—okay. They don't look the same size. They're a little bit irregular.
Q. Do they need to be—according to the Court's claim construction, do the depressions have to be exactly the same size in order to be in an orderly arrangement?
A. No, not required.
Q. And how has the Court construed the term "depressions"?
A. Well, a depression means a lower or sunken area or depressed area in a carrier web.

> Q. And did you observe that with your own eyes, these lower sunken or depressed areas of the carrier web?
> A. Yes, I did.
> Q. Now, I believe you told us, though, and we saw the graphic, that before the film is pulled away from the carrier web in the depressions are polyurethane forms. Did you tell us that?
> A. Yes, that's correct.
> Q. So is it still a depression, as far as you know? Is it still a depression if it's filled with polyurethane?
> A. Yes, of course.
> Q. How do you know that?
> A. Well, the polyurethane displaced the polyethylene and created that depression, and the fact that the polyurethane form is still in the depression certainly doesn't take away from the fact that the depression is still there.
> Q. Do you know whether or not the depressions then in this case can be empty or filled?
> A. Yeah, it's—it's like a lake bed. You know, the lake bed is a depression in the surface of the earth, and whether there's water in it or not, it's still a depression in the surface of the earth, so that's what's happened here.
> Q. And so do we have in Avery's EZ Film product a first embossed pattern forming an array of depressions?
> A. Yes.

(Moerke Decl. Ex. B at 732:6-734:5.)

Next, Dr. Strong testified that the first embossed pattern is "in" the second embossed pattern:

> Q. Let's go to the next element: "Wherein the depressions of the first embossed pattern are in the second embossed pattern." Same SEM.
> A. Yes.
> Q. We're still looking at an actual photo of Avery's EZ Film liner.
> A. That's correct.
> Q. And now I've highlighted in light blue and dark blue what pattern?
> A. This is the second pattern of ridges and lands. As you can see, in this case it's hexagonal, so you've shown this pattern on the Avery liner surface.
> Q. And now what does the red highlighting represent?
> A. Those are the pattern of depressions, and as you can see, they are in. Now, a comment here. They don't have to be dead center in each of those little hexagons, because the pattern of ridges and lands superimposes itself

> on these depressions, on the pattern of depression, so they're clearly in the pattern of ridges and lands.
> Q. So do we meet the element? Does Avery's EZ Film liner meet the element of "wherein the depressions of the first embossed pattern are in the second embossed pattern"?
> A. Yes, we do.

(Moerke Decl. Ex. B at 734:6-735:4.)

Then, Dr. Strong testified that Avery's EZ Film has a second embossed pattern of "lands and ridges":

> Q. And let's go to the next element: "Wherein the second embossed pattern comprises lands and ridges between the lands." Everybody's going to know what this is.
> A. Yes.
> Q. It's a picture of the Avery EZ Film carrier web.
> A. That's correct. It's the SEM.
> Q. And now I've highlighted something in blue. What is that?
> A. That light blue color is the lands.
> Q. And now I've highlighted something in a darker blue. What is that?
> A. That's the ridges.
> Q. And so is the second embossed pattern—I just want to make sure so that it's clear to the ladies and gentlemen of the jury. This highlighting that I'm doing, this is not on a graphic, is it? Is it on an actual photo of the Avery EZ Film liner?
> A. Yes, that's correct.
> Q. And does Avery's EZ Film carrier web have a second embossed pattern that comprises lands and ridges between the lands?
> A. Yes, it does.

(Moerke Decl. Ex. B at 735:5-736:3.)

Finally, Dr. Strong testified that the last element of claim 1 is also present in Avery's EZ Film:

> Q. Let's go to the very last element: "And wherein the height of the ridges over the lands ranges from about 3 to about 45 microns." First of all, were you present in court when the Court read a stipulation that Avery has stipulated that it meets this element of the claim?
> A. Yes, I was.

> Q. And just very quickly to see why Avery has stipulated, what are we looking at here?
> A. That's a specification by Avery of their product and you can see the range of the embossed height is --
> THE COURT: Just a moment.
> MR. HADLEY: Your Honor, is this really necessary when we have a stipulation?
> THE COURT: Which exhibit is this?
> MS. BROOKS: Actually, I was showing it as a demonstrative. We can just pass this. We have this before the stipulation, so if your Honor likes, I can just go right through these.
> THE COURT: Okay.
> BY MS. BROOKS:
> Q. And so has Avery in fact stipulated that it meets this last element: "Wherein the height of the ridges over the lands ranges from about 3 to about 45 microns"?
> A. Yes, it has.

(Moerke Decl. Ex. B at 736:4-737:3.)

Thus, Dr. Strong concluded that Avery's EZ Film infringes claim 1 of the '930 patent:

> Q. So, in your opinion, Dr. Strong, based on your analysis of Avery's EZ Film carrier web, does it meet each and every limitation of claim 1 of the '930 patent?
> A. This is the entire claim, and as you can see, each of the elements has been broken out and Avery does meet every single element.

(Moerke Decl. Ex. B at 737:4-9.)

Dr. Strong also testified that the additional elements found in dependent claims 2 through 5 of the '930 patent were present in Avery's EZ Film. He testified that Avery's EZ Film has the additional elements of claim 2:

> Q. All right. Let's look at dependent claim 2. First of all, we've shown all the elements of claim 1 are present in Avery's EZ Film liner.
> A. Yes. And to represent that idea, I've put on the liner in its—in its final form here with both patterns being shown, and so the demonstrative that

> you see in the middle of the screen is really to signify all of claim 1. That's what that means.
> Q. And then this claim requires that the depressions can be anywhere—they can range from a minor fraction of the original thickness of the web to almost the entire thickness. What does that mean to you?
> A. Okay. So what we've got is all of claim 1 and now we're going to talk a little bit about how deep the depressions are, because we haven't talked about that yet in claim 1. So here's claim 1, and now there will be some discussion of the depth of the depressions and they've put some limits on it.
> Q. And did you look at the SEM and determine whether or not Avery's EZ Film carrier web met the requirements of claim 2 of the patent?
> A. Yes, I did.
> Q. And what was your opinion?
> A. Well, as you can see, we have—we have the pattern of depressions in there and we also have the lands and ridges and they range from a minor fraction—we've already seen that there are about five mils deep in some cases and the ridges are 3 to 45—and we also see that it's not the entire thing. If it was the whole thing, there would be a hole that you could look all the way through and I never ever saw one. Never did I see that.
> Q. So did you find that Avery's EZ Film carrier web met claim 2 of the infringed claim 2 of the '930 patent?
> A. Yes.

(Moerke Decl. Ex. B at 738:22-740:4.)

Dr. Strong testified that Avery's EZ Film has the additional elements of claim 3:

> Q. Let's go now to claim 3. It's: "The web of claim 1, wherein the surface can be embossed with any pattern ranging from a minor fraction of an area of the surface to the entire area of the surface." Could you tell the ladies and gentlemen of the jury what we're looking at now?
> A. Okay. Now we're going to do another dependent claim, and so it's all of claim 1, again represented by the little graphic there in the middle of the screen, and now we're going to look at the area of the pattern, and the area is restricted to a minor fraction or the entire surface. And as you can see in this case, the area of the pattern is pretty much the entire surface.
> Q. So did you find that Avery's EZ Film carrier web infringed claim 3 of the '930 patent?
> A. Yes, I did.

(Moerke Decl. Ex. B at 740:5-20.)

Dr. Strong testified that Avery's EZ Film has the additional elements of claim 4:

> Q. And let's go now quickly to claim 4: "Wherein the claim 1" -- I'm sorry: "The web of claim 1, wherein a shape of embossings for any pattern can range from a constant radius of curvature to a polygonal shape of at least 2 surfaces." That was a mouthful. Can you tell the ladies and gentlemen of the jury what I just said?
> A. It's really simple. Again, it's claim 1, and the shape of the pattern can be—it can be all kinds of different shapes, like, it could be a hexagon, or it could be a square, or it could be a circle, or it could be a light bulb shape, or it could be a diamond. So it's all kinds of shapes are allowable in the pattern.
> Q. And what did you find when you looked at the SEM of Avery's EZ Film carrier web?
> A. It certainly qualifies. In this case it's a hexagon.
> Q. So did you find that Avery's EZ Film carrier web infringed claim 4 of the '930 patent?
> A. Yes, I did.

(Moerke Decl. Ex. B at 740:21-741:13.)

Finally, Dr. Strong testified that Avery's EZ Film has the additional elements of claim 5:

> Q. And let's go now to claim 5. "The web of claim 1, wherein a width of embossings in any pattern can range from about 1 micron to about 10,000 microns." Now, what are we talking about here?
> A. Okay. Again, it's the whole claim 1, and then they're just talking about how wide is the pattern.
> Q. Did you look at any specification—I'm sorry. The exhibit number is cut off on this, if I could just have one second.
>
> * * *
>
> Q. Did you look at any Avery materials that describe the width of, for example, the ridges on their liner?
> A. Yes, I did. I looked at an Avery product specification, how it's supposed to be made.
> Q. And did you find whether or not the width of—for example, we'll pick the ridges—as within the range of 1 micron to about 10,000 microns?

A. Yes, I did look at that and it is within that range.

(Moerke Decl. Ex. B at 741:14-742:7.)

Thus, Dr. Strong testified that Avery's EZ Film infringes all claims of the '930 patent that 3M asserted at trial:

Q. And so in your expert opinion, Dr. Strong, does Avery's EZ Film carrier web infringe claims 1 through 5 of the '930 patent?
A. Yes, all of them.

(Moerke Decl. Ex. B at 742:11-14.)

Turning to the doctrine of equivalents, Dr. Strong also testified that, although he concluded that Avery's EZ Film product literally infringed claims 1 through 5 of the '930 patent, the product also infringed under the doctrine of equivalents if any claim element were found for some reason to be literally lacking:

Q. Have you found in your analysis that every element of claim 1 is literally present in Avery's EZ Film carrier web?
A. Yes, I have.
Q. And have you found the same for claims 2, 3, 4 and 5, that those elements are literally present in Avery's EZ Film carrier web?
A. Yes, they are literally present.
Q. Now, if for some reason someone thinks that perhaps one of those elements is not literally present—let's take embossing from a hypothetical perspective. I know it's hard to do because you said it's literally there, but let's say for some reason it's not. Are those elements performing substantially the same function in substantially the same way to achieve substantially the same result?
A. Yes, I believe that they are.
Q. So is it your opinion that all of the elements of claims 1, 2, 3, 4 and 5 are also present in Avery's EZ Film product under the doctrine of equivalents, if for some reason they're not literally there?
A. Yes, they're all there also by the doctrine of equivalents.

(Moerke Decl. Ex. B at 743:15-744:11.)

Avery ignores this evidence of infringement in its motion. The jury did not at trial. That is why the jury's verdict should not be disregarded. *See Everest Capital Ltd. v. Everest Funds Management, L.L.C.*, 393 F.3d 755, 760 (8th Cir. 2005) (explaining that, in reviewing a post-verdict motion for JMOL, the court should consider the record as a whole and "disregard all evidence favorable to the moving party that the jury is not required to believe") (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000)); *Children's Broadcasting Corp. v. Walt Disney Co.*, 357 F.3d 860, 863 (8th Cir. 2004) (explaining that JMOL is appropriate only when *all of the evidence* points one way and is susceptible of no reasonable inference sustaining the non-movant's position).

**B. Mr. Charles Calisto's Testimony Supports the Jury's Verdict that Avery Actively Induces Infringement.**

As the Court properly instructed the jury, 3M needed to show four things to prove that Avery induced infringement:

> *First*, Avery encouraged or instructed another person how to use a product in a manner that you, the jury, find infringes the '930 patent claims.
>
> *Second*, Avery knew of the '930 patent.
>
> *Third*, Avery knew or should have known that its encouragement or instructions would likely result in the other person doing that which you find to be an infringement of the '930 patent.
>
> *Fourth*, the other person infringed the '930 patent.

(Doc. No. 331 at 30-31.) 3M met this proof at trial.

In arguing that 3M failed to present evidence of these elements, Avery simply ignores the testimony of Mr. Charles Calisto of 3M. Mr. Calisto first testified that Avery introduced and demonstrated its competitive EZ Film product at a trade show in 2002:

> Q. Okay. Describe the demonstration, if you would.
> A. I don't recall if they had a panel and a vehicle, but like any demonstration of a film and how it applies, you have an installer who's there who's speaking to the benefits and the features of the product, demonstrating it to the public, taking the liner off the film, because you have to do that in order to apply it, and then applying it and demonstrating how easily it went on and demonstrated no bubbles, et cetera, so basically replicating, you know, very much what we have been doing.
> Q. So at this trade show you saw Avery instructing their customers to take off the liner?
> A. I saw an individual there in the Avery booth telling them to remove -- well, they have to remove the liner, yes. So you remove the liner and you apply it to the graphic and showing how you squeegee it to make sure that you're applying it properly and then demonstrating that there were no air bubbles.

(Moerke Decl. Ex. B at 643:5-22.) Mr. Calisto also testified that Avery distributes literature specifically instructing customers how to use and apply its EZ Film. (*Id*. at 643-44.) Avery's literature was received into evidence without objection. (Moerke Decl. Ex. H.) Mr. Calisto's testimony and Avery's own literature provide more than enough evidence to support the jury's verdict that Avery is actively inducing its customers to infringe the '930 patent.

### C. 3M and Avery Did Not Agree on the Structure of Avery's EZ Film, and 3M Is Entitled to the Inference that the Jury Believed Only 3M.

Avery wrongly contends that undisputed evidence at trial established that its EZ Film liner "consists of a polypropylene base layer, (2) a layer of paper, (3) a layer of embossable polyethylene with embedded polyurethane dots, and (4) a layer of silicone." (*See* Doc. No. 354 at 12.) But Avery cites to no trial testimony or evidence supporting this contention. Indeed, the evidence was to the contrary. Dr. Strong's testimony was unequivocal that the embedded polyurethane forms create the depressions and sit in the

depressions before the film and liner are separated but are *not* part of the carrier web of Avery's EZ Film. (Moerke Decl. Ex. B at 779:5-11; *see also* Moerke Decl. Ex. B at 812:22-24 ("Q. Okay. That makes it [the polyurethane] part of the carrier web, doesn't it? A. No, it does not.").) 3M is entitled to the presumption that the jury agreed with Dr. Strong—finding that the polyurethane is itself carried by the carrier web—thus rejecting Avery's noninfringement argument based on the erroneous argument that the polyurethane somehow becomes part of the carrier web.

Undeterred by the trial record, Avery plows on, next arguing that undisputed evidence showed that the "polyethylene/polyurethane surface 'carries' the adhesive and film," and even citing Dr. Strong's testimony as alleged support for this contention. (*See* Doc. No. 354 at 12.) But Dr. Strong did not so testify. In the portion of the transcript that Avery cites, Dr. Strong simply testified that silicone is placed on top of the polyethylene before the polyurethane forms are embedded in the polyethylene to create depressions:

> Q. Well, let me ask you this: When the adhesive—the next step in the process is to put adhesive on top of this sheet, correct?
> A. Yes, that's true.
> Q. Now, does the adhesive make contact with the polyethylene or the silicone?
> A. With the silicone and with the top of the polyurethane.
> Q. That was going to be my next question. Let's just make sure this is clear. When the adhesive is applied, it's contacting two things, correct, the silicone and the polyurethane ink?
> A. Yes, and the silicone is following the pattern of the polyethylene even under the polyurethane.

(Moerke Decl. Ex. B at 765:1-13.) Again, the jury was perfectly reasonable in crediting this testimony, and in concluding from it that the carrier web carries both the

polyurethane and the adhesive. That further spells the end of Avery's noninfringement argument based on the erroneous argument that the polyurethane somehow becomes part of the carrier web.

In the same vein, Avery continues its fictitious recap of the supposed "undisputed" evidence at trial, arguing that Dr. McHugh provided "undisputed" testimony regarding how the "polyurethane and polyethylene combine structurally to form the top layer" and that, "[a]t the interface of the two materials, the polyurethane bonds with the polyethylene." Again, Dr. McHugh's testimony was indeed disputed by Dr. Strong (Moerke Decl. Ex. B at 717:14-718:19), and the jury presumptively agreed with Dr. Strong, not Dr. McHugh. *See Stafford v. Neurological Med., Inc.*, 811 F.2d 470, 473 (8th Cir. 1987) (holding that conflicting expert testimony "simply required the jury to assess and evaluate the strengths and weaknesses of the two experts' conflicting testimonies—a task particularly within the factfinder's province").

Perhaps most egregiously, Avery cites to the SEM (scanning electron microscope photograph) of a damaged portion of its EZ Film product that was introduced at trial. (*See* Doc. No. 354 at 12-13 (citing 3M Ex. 125).) But Avery ignores entirely the SEM of its EZ Film product that Avery stipulated was a true and accurate representation of the liner after it was removed from the film and adhesive. (*See* Moerke Decl. Ex. G.) Again, 3M is entitled to the inference that the jury accepted Exhibit 78 as the accurate representation of Avery's liner, not Exhibit 125.

Avery makes a number of additional points regarding the so-called "undisputed" structure of its EZ Film. (*See* Doc. No. 354 at 12-14.) But it is not necessary to work

through each one to demonstrate that Avery is wrong. None are material to the issue of infringement. Specifically, they have no impact on Dr. Strong's testimony, cited so extensively above, that each and every element of claims one through five of the '930 patent is found in Avery's EZ Film.

## III. AVERY IS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW ON THE ISSUE OF INFRINGEMENT

Avery next argues that no reasonable juror could have found that Avery's EZ Film has the "first embossed pattern [that] forms an array of depressions" required by claims 1 through 5 of the '930 patent. (*See* Doc. No. 354 at 10-11.) Avery then goes on to argue that its film lacks this element for two separate reasons: first, the areas in which the polyurethane is embedded in the polyethylene cannot be an "embossed pattern" under the Court's definition and second, the areas in which the polyurethane is embedded in the polyethylene cannot meet the Court's definition of "depressions." (*See* Doc. No. 354 at 14.) Avery is wrong on both counts.

### A. Reasonable Jurors Found that Avery's EZ Film Has an "Embossed Pattern."

Substantial trial evidence demonstrated that Avery's EZ Film has an "embossed pattern" of depressions. As quoted above, Dr. Strong's testimony alone provides such evidence. Just as it did to no avail at trial, Avery argues that its EZ Film liner lacks an embossed pattern of depressions because the depressions themselves are irregular. (*See* Doc. No. 354 at 15-16.) This argument misses the point of the claim language and the Court's claim construction. There is nothing in the claims of the '930 patent that requires each *depression* in the carrier web to be identical to one another. There can be an

"embossed pattern" of depressions even though no two depressions are exactly alike, just as one could have a "pattern" of snowflakes even though each snowflake itself is unique.

In accord with the Federal Circuit's claim construction, this Court instructed the jury that "'embossed' simply means a topography on a web or on tooling having an effective three-dimensional pattern that generates a difference in surface planar dimension in the liner or the tooling." (Doc. No. 331 at 20.) The SEM of Avery's EZ Film that Avery stipulated was a true and accurate representation of its liner shows that the liner indeed does have an embossed pattern of depressions—one underneath each polyurethane form—and these are most clearly visible once the polyurethane is removed:




(Moerke Decl. Ex. G.) A three-dimensional pattern that generates a difference in surface planar dimension in the liner is clearly visible in this SEM. Additionally, it shows that

the depressions are in a pattern—specifically, a square grid. A square grid is a formation of embossings, which is all that the construction of pattern ("any formation of embossings that can utilize any theory of geometry") requires.

Nothing in the definition of "embossed pattern" requires that the depression could have been formed from tooling, as argued by Avery. (*See* Doc. No. 354 at 16.) Dr. Strong explicitly addressed this point in his testimony. (*See* Moerke Decl. Ex. B at 731:5-732:5, reproduced above.) Even Avery's expert admitted that the embossed pattern existed with respect to the depressions when he was confronted with the Court's definition. (*See* Moerke Decl. Ex. B at 1218:16-1219-23.)

As 3M's counsel illustrated during closing argument with reference to a demonstrative exhibit of a pattern of snowflakes, when put together, several objects of which no two are alike can still form a pattern:

> So Avery's next point is, even if it does show an array, the individual depressions aren't the same. There is nothing that requires that.
>
> * * *
>
> Every snowflake is unique. I ask you, ladies and gentlemen, is this an array just because every snowflake is unique, and even if a couple of them are missing, does this now make it not an orderly arrangement? Of course it does.

(Moerke Decl. Ex. B at 1490:5-14.) Moreover, as was illustrated by 3M's demonstrative exhibit and explained by 3M's counsel, the overall pattern is still apparent even if some of the objects are removed. (*See id.*) The jury obviously accepted this explanation and it was far from unreasonable for it to do so.

Avery's argument that Dr. Strong's opinion on the "embossed pattern" claim limitation is contrary to the Court's claim construction and would render the claim meaningless because virtually every surface has some topography is equally groundless. Avery contends that Dr. Strong ignored the Court's definition of embossed, and applied a limited definition of only a "topography." (*See* Doc. No. 354 at 18.) Avery just ignores Dr. Strong's explicit application of the definition of embossed in detail at trial. (*See* Moerke Decl. Ex. B at 731:5-732:5, reproduced above.)

In the end, Avery's argument regarding "embossed pattern" cannot survive the substantial evidence presented at trial that Avery's EZ Film literally has one. Avery's efforts to discount all that evidence are premised on a spurious requirement that is nowhere to be found in the actual claim language or the Federal Circuit's construction of that language. An "embossed pattern" of depressions simply requires depressions in an "orderly arrangement," not that each depression be (1) formed from a tool and (2) identical to every other depression. The jury rejected those arguments, based on 3M's substantial evidence to the contrary, and this Court should do the same.

**B. Reasonable Jurors Found that Avery's EZ Film Has "Depressions."**

Substantial evidence at trial demonstrated that Avery's EZ Film has the "depressions" required by the asserted claims of the '930 patent. First, Dr. Strong repeatedly testified that Avery's EZ Film has "depressions." (Moerke Decl. Ex. B at 732:6-734:5.) Dr. Strong testified repeatedly that embedding the polyurethane forms into the polyethylene web creates depressions in the surface of the web:

[T]he polyurethane displaced the polyethylene and created that depression.

* * *

> The polyurethane forms are pressed down into the polyethylene liner, displacing it and creating the depressions.

* * *

> [I]n this case, embedding is kind of analogous to the pressing in to cause the depression.

* * *

> [A] form of embedding is the process that creates the depression.

(Moerke Decl. Ex. B at 733:18-19, 769:18-20, 773:7-9, 777:3-4.) This testimony clearly shows that Dr. Strong did not "ignore the undisputable existence of polyurethane blobs embedded into the polyurethane [sic] flush with the surface of the polyethylene," as Avery now falsely claims. (*See* Doc. No. 355 at 19.) To the contrary, Dr. Strong testified that embedding the polyurethane into the liner is precisely what creates depressions in the carrier web.

Nor did Dr. Strong rely on demonstratives that omitted the polyurethane part of the EZ Film product, as Avery also claims. (*See* Doc. No. 355 at 19.) Avery objected to this demonstrative at trial, but as the Court recognized in overruling Avery's objection, this demonstrative was "just them [the liner and the film] moving apart." (Moerke Decl. Ex. B at 724:1.) Once again, Avery simply refuses to acknowledge that the jury agreed with Dr. Strong's testimony that in Avery's infringing EZ Film product, the polyurethane resides in depressions on the surface of the liner, and the liner thus serves as a carrier web for the polyurethane as well as the adhesive.

In addition, the SEM of Avery's EZ Film liner that Avery stipulated was a true and accurate representation of the product also visibly shows the depressions:




(Moerke Decl. Ex. G.) Dr. Strong discussed this Exhibit at length in his testimony, yet Avery pretends it does not even exist.

This testimonial and physical evidence is more than sufficient for the Court to deny Avery's motion for JMOL or a motion for a new trial. *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1329 (Fed. Cir. 2002) ("The record shows that Teleflex's expert testified concerning the operation and structure of the accused device, including the details of the Ficosa clip. The accused Ficosa cable, including the clip, was available to the jury, as was a detailed diagram of the Ficosa clip. Because the details of the Ficosa

device were presented to the jury, we cannot say that substantial evidence was lacking in support of the jury's finding of infringement of claim 1 of the '182 patent. The district court's denial of Ficosa's motion for JMOL of noninfringement of the '182 patent is affirmed.").

The documentary and testimonial evidence introduced by 3M is far from alone in supporting the jury's finding that Avery's liner has "depressions." Avery's own expert witness, Dr. McHugh, conceded that there were only two points of dispute with 3M regarding infringement after the liner is removed from the adhesive, and neither of these disputes was with respect to the claim element of depressions. (*See* Moerke Decl. Ex. B at 1220:23-1221:3.) Dr. McHugh then admitted what is undeniable from Exhibit 78—that Avery's EZ Film has "depressions" after the liner is removed from the adhesive film:

> Q. And so you would agree that what I have just pointed to under the Court's construction of depression is in fact depressions in the carrier web?
> A. Yes, indeed.

(Moerke Decl. Ex. B at 1219:20-23.)

Despite these concessions, Avery nonetheless continues to argue—as it has unsuccessfully throughout the case—that there are no depressions in its EZ Film product because there are no open or sunken areas in the liner before it is detached from the film. Avery's argument runs directly contrary to the Court's construction of "depressions," which, as the Court instructed the jury, means "lower, sunken, or depressed areas of the carrier web" that "may be either empty or filled according to any number of processes or uses." (Doc. No. 331 at 20.) In accord with this instruction, the jury was perfectly reasonable in concluding that if there are empty depressions in the EZ Film liner after the

polyurethane forms are removed when the film and liner are separated, there are filled depressions in the EZ Film liner before it is separated from the film.

Avery has no support for its claim that "[s]imple logic dictates that a surface with 'filled' depressions must have had open depressions at some point." (*See* Doc. No. 355 at 3.) Absolutely nothing in the Court's claim construction of "depressions" creates any such requirement. For the past year and a half, since the Court's August 10, 2004 Claim Construction Order, this Court has been telling Avery that "depressions" in the '930 patent can be either empty or filled. It is time for Avery to listen.

Finally, repeating the same refrain, Avery continues to contend that, because a carrier web carries or has carried another material and because polyurethane carries the adhesive and film, the polyurethane must be a part of the carrier web. (*See* Doc. No. 355 at 2.) As explained above, Dr. Strong provided testimony that the polyurethane is not part of the liner. (*See* Moerke Decl. Ex. B at 779:5-11; *see also id*. at 812:22-24.) Instead, the liner serves as the carrier web for both the polyurethane forms and the adhesive. (*See id.* at 765:1-13.) The jury was perfectly reasonable in crediting this testimony, and nothing in the claim language or the Court's claim construction limits the "carrier web" to carrying the adhesive alone. There is no such limitation on the material(s) that can be carried by the claimed "carrier web." Avery's argument that the "carrier web" includes the polyurethane failed to sway the jury, and provides absolutely no basis to overturn the jury's verdict now.

**C. Reasonable Jurors Found that 3M Proved Indirect Infringement.**

In response to Avery's argument that it avoids direct infringement of the '930 patent because its EZ Film product is sold without depressions in the release liner—which is contrary to the evidence, as discussed above—3M proved with substantial evidence that Avery nonetheless actively induces its customers to infringe the '930 patent. The jury accepted this proof and had sound reason for doing so.

Avery first contends that 3M failed to prove inducement of infringement because 3M failed to prove the requisite direct infringement required for indirect infringement. (*See* Doc. No. 355 at 5.) Because 3M proved that Avery's EZ Film has all of the limitations of the asserted claims of the '930 patent, as shown above, this argument fails.

Avery also contends that 3M failed to prove its claim of inducing infringement because "3M offered no evidence that any Avery's customer [sic] used, sold, or offered for sale a spent release liner." (Doc. No. 355 at 5-6.) This contention is absurd. The testimony of Mr. Calisto demonstrated that (1) Avery distributes instructions to its EZ Film customers directing them to separate the film from the release liner and (2) Avery representatives demonstrated Avery's EZ Film product at a trade show and showed potential customers how to remove the film from the liner. (Moerke Decl. Ex. B at 643:5-22.) Because the liner and the film must be separated in order to apply the film, that separation was part of the demonstration, and Mr. Calisto testified that he saw Avery representatives show potential customers how to do just that. (*See id*.)

Furthermore, the "Application Instructions" that Avery distributes for its EZ Film product instruct the customer on the intended use of the product. (*See* Moerke Decl. Ex.

H.) These explicit instructions direct Avery's EZ Film customers to separate the film from the release liner in order to use the product. (*See id*.) Indeed, they instruct EZ Film customers to "remove the whole liner." (*Id.*)

Avery's directive to customers to "create" depressions by peeling off the film's release liner (accepting, *arguendo*, Avery's argument that such depressions are not created until they are "empty," in contravention of the claim construction to the contrary) is sufficient proof of inducing infringement. Instructions of use that necessarily lead to infringement when followed are sufficient to support a finding that Avery actively induced infringement where, as is the case here, Avery, had knowledge of the patent and sold the accused product. *See Minn. Mining & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1305 (Fed. Cir. 2002) (reversing a district court's denial of patentee's JMOL for inducing infringement because the "record indicates that Chemque was aware of the 3M patents and supplied the infringing products to . . . customers with instructions on how they were to be used, which, when followed, would lead to infringement").

Avery's focus on the litigation-induced phrase "spent release liner" is as much of a red herring as is Avery's focus on the other phrase its lawyers made up, "empty depressions." Neither can avoid infringement of the '930 patent. When customers use the Avery EZ Film liner in applying a graphic film in accordance with Avery's instructions, they are using a "material with at least one surface that carries, can carry, or has carried another material"—*i.e.*, a "carrier web" under this Court's claim construction. (*See* Doc. No. 331 at 20.) As a matter of fact, Avery's focus on a so-called "spent release liner" is misleading. The release liner is not "spent" until all of the graphic film is

removed (and even then, it is still a "carrier web" under the Court's claim construction), but before that time, as the graphic is being applied, some of the liner has been peeled away and some of it is still in contact with the adhesive. At that point, Avery's customers are plainly *using* the liner, portions of which have what Avery calls "empty depressions." So not only is Avery's "spent liner" argument wrong as a matter of law because it overlooks the Court's construction of the term "carrier web," but it also is factually inaccurate to say that Avery's customers never *use* a liner with the adhesive and graphic pulled away. In normal *use*, portions of the liner are "spent," and portions remain attached to the adhesive and graphic. Accordingly, 3M introduced sufficient evidence that Avery has induced infringement by its customers, and JMOL on this claim is inappropriate. *See Moleculon Research Corp. v. CBS, Inc*., 793 F.2d 1261, 1272 (Fed. Cir. 1986) (holding that "circumstantial evidence of extensive puzzle sales, dissemination of an instruction sheet teaching the method of restoring the preselected pattern with each puzzle, and the availability of a solution booklet on how to solve the puzzle" was sufficient proof of inducing infringement by the manufacturer of the infringing puzzle).

**D. Reasonable Jurors Found that 3M Proved Infringement Under the Doctrine of Equivalents.**

As Avery recognizes, a product may infringe under the doctrine of equivalents if the differences between a particular feature of that product and a claim limitation are "insubstantial." (Doc. No. 355 at 6 (citing *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co*., 535 U.S. 722 (2002); *Warner-Jenkinson Co. v. Hilton Davis Chemical Co*., 520 U.S. 17, 24 (1997).) As Avery also recognizes, "*one way*" to show that

differences are insubstantial is through the so-called "function-way-result" test. (*See* Doc. No. 355 at 7 (citing *Warner-Jenkinson*, 520 U.S. at 39-40; Doc No. 331 at 24-25).) Yet Avery nevertheless argues that because Dr. Strong did not recognize the function/way/result test, his testimony cannot support the jury's finding of infringement under the doctrine of equivalents. (*See* Doc. No. 355 at 6-8.)

This argument fails on its face: the function/way/result test is merely one way of proving infringement under the doctrine of equivalents; it is not the only way. *See, e.g.*, *Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1357 (Fed. Cir. 2004) (citing *Hilton Davis*, 62 F.3d at 1518-19) (indicating that equivalence can be "measured by the 'function-way-result' test or by the 'insubstantial differences' test); *see also, e.g.*, *Oak Tech., Inc. v. Int'l Trade Comm'n*, 248 F.3d 1316, 1331-32 (Fed. Cir. 2001) (citing *Warner-Jenkinson*, 520 U.S. at 40-41); *Dawn Equip. Co. v. Kentucky Farms Inc.*, 140 F.3d 1009, 1015 (Fed. Cir. 1998) ("To infringe under the doctrine of equivalents, the differences between [the accused infringer's] devices and the claimed device must be 'insubstantial,' and the familiar three-part function/way/result test *can be helpful* in making that determination." (emphasis added)). Dr. Strong provided substantial evidence that any differences between the asserted claims of the '930 patent and Avery's EZ Film are insubstantial. (Ex. B at 743:15-744:11.) Under Federal Circuit case law, nothing more was required to support the jury's finding of infringement under the doctrine of equivalents.

Not to be deterred in its mistaken belief that function-way-result is the only way to find infringement under the doctrine of equivalents, Avery wrongly contends that "the

undisputed evidence showed that Avery's 'way' of achieving positionability through embedding polyurethane differs substantially, and indeed provides efficiencies, over 3M's emboss and fill 'way.'" (*See* Doc. No. 355 at 8.) But in fact, Dr. Strong provided expert testimony that Avery's EZ Film product achieves positionability in the same way as taught in the '930 patent: by the creation of depressions in the carrier web and, in turn, protrusions on the adhesive on the film. (*See, e.g.*, Moerke Decl. Ex. B at 719:4-7 ("And that adhesive must touch onto the polyurethane so that the polyurethane comes out of that depression because the polyurethane is going to end up being the repositionability knob."); Moerke Decl. Ex. B at 724:14-17 ("The top part is what goes on the truck or the bus, and as you can see, it has those little green plastic forms underneath, and that gives repositionability, and as you can see, it also has those grooves in the yellow adhesive.").)

Even Avery's own counsel acknowledged and referred to "all the testimony . . . in terms of how Avery creates positionability pegs and 3M creates positionability pegs." (Moerke Decl. Ex. B at 781.) It is disingenuous for Avery to now contend that there was no evidence showing that Avery achieves positionability in the same way when, in Avery's own words, both Avery and 3M achieve this same result with "positionability pegs."

Avery also contends that its EZ Film product cannot infringe under the doctrine of equivalents because it lacks "an entire claim element – namely, the first embossed pattern forming an array of depressions" and that "[a]s a matter of law, without this requisite element, infringement under the doctrine of equivalents cannot exist." (Doc. No. 355 at 7.) But again, Avery simply ignores those portions of the trial record that belie its

arguments. Here, Dr. Strong testified that this element in particular is present in Avery's EZ Film under the doctrine of equivalents. (*See* Moerke Decl. Ex. B at 743.)

The jury's message could not have been clearer: Avery literally infringes each asserted claim of the '930 patent, but to the extent that any claim element is literally lacking, any differences between that element and the EZ Film are insubstantial. Having concluded that an "embossed pattern of depressions" is literally present, it certainly strains credulity to infer that the jury somehow ignored this claim element—or any other claim element, for that matter—when it found that Avery infringes under the doctrine of equivalents.

## IV. AVERY IS NOT ENTITLED TO A NEW TRIAL ON INFRINGEMENT ISSUES

A new trial is appropriate "only when necessary to avoid a miscarriage of justice." *Gearin v. Wal-Mart Stores, Inc.*, 53 F.3d 216, 219 (8th Cir. 1995). Although granting a new trial is within a district court's discretion, "[t]he district court's discretion is not boundless." *White v. Pence*, 961 F.2d 776, 780 (8th Cir. 1992). A court "is not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn difference inferences or conclusions or because judges feel that other results are more reasonable." *Id*. (internal quotation marks omitted). Although Avery suggests that a court is free to disregard the jury's verdict in favor of its own reading of the evidence, (Doc. No. 355 at 9 (quoting *White*, 961 F.2d at 780)), this mischaracterizes the law. "The trial judge may not usurp the functions of a jury . . . [which] weighs the evidence and credibility of witnesses." *White*, 961 F.2d at 781 (internal quotation marks omitted).

Here, the jury's verdict is no miscarriage of justice. The jury heard and considered all of the evidence at trial, and rightly found that Avery's EZ Film infringes the '930 patent. The verdict is not against the great weight of the evidence, rather, the converse is true: the verdict is *supported* by the a great weight of evidence. The jury's verdict of infringement was correct, and it would be a clear miscarriage of justice to overturn it.

## V. CONCLUSION

For the reasons provided above, 3M respectfully request that the Court deny Avery's motion for judgment as a matter of law or a new trial on the issue of infringement.

Dated: March 3, 2006

FISH & RICHARDSON P.C., P.A.

By: s/Katherine A. Moerke

Jonathan E. Singer (#283459)
John C. Adkisson (#266358)
Katherine A. Moerke (#312277)
FISH & RICHARDSON P.C., P.A.
60 South Sixth Street, Suite 3300
Minneapolis, MN 55402
Tel: (612) 335-5070
Fax: (612) 288-9696

Juanita R. Brooks
(Admitted Pro Hac Vice)
FISH & RICHARDSON P.C.
12390 El Camino Real
San Diego, CA 92130-2081
Tel: (858) 678-5070
Fax: (858) 678-5099

Kevin H. Rhodes (#318115)
3M Innovative Property Company
3M Center
P.O. Box 33427
St. Paul, MN 55133

Attorneys for Plaintiffs
3M INNOVATIVE PROPERTIES
COMPANY and MINNESOTA MINING
AND MANUFACTURING COMPANY

60343850.doc