IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| 3M INNOVATIVE PROPERTIES COMPANY<br><br>and<br><br>MINNESOTA MINING AND MANUFACTURING COMPANY,<br><br>Plaintiffs,<br><br>v.<br><br>AVERY DENNISON CORPORATION,<br><br>Defendant. | Civil Action No. 01-1781 JRT/FLN |

**3M'S MEMORANDUM OF LAW IN OPPOSITION TO AVERY DENNISON CORPORATION'S MOTION FOR JUDGMENT AS A MATTER OF LAW AND FOR A NEW TRIAL ON ISSUES OF INVALIDITY**

In its brief in support of its post-trial motion for judgment as a matter of law or a new trial on the issue of invalidity, Avery conspicuously ignores large chunks of its expert's testimony, mischaracterizes other portions of it, and quotes misleading excerpts of testimony from other witnesses. Nowhere in Avery's brief is there a discussion or presentation of evidence according to the legal standard required for a judgment as a matter of law—namely, *in the light most favorable to 3M*. *Itron, Inc. v. Benghiat*, 2003 WL 22037710, *1 (D. Minn. Aug. 29, 2003) (Tunheim, J. ) (citing *Wahpeton Canvas Co. v. Frontier, Inc*., 870 F.2d 1546, 1551 (Fed. Cir. 1989)). Avery's conspicuous and repeated omissions of the overwhelming testimony favorable to 3M—both from 3M's witnesses and Avery's witnesses—serves as an implicit acknowledgement that Avery cannot prevail on its motion.

Further, Avery incorrectly describes the relevant legal tests for anticipation and obviousness. For example, Avery ignores the doctrine of inherency's critical requirement that in order for an undisclosed claim element to be inherent in a prior art reference, that claim element must *necessarily* result every time an embodiment in the reference is practiced. Avery similarly mischaracterizes the law of obviousness, including the issues of motivation to combine and objective evidence of nonobviousness, casting the legal precedent for these issues in such a skewed light that it is difficult to separate Avery's fact from Avery's fiction.

The jury was right when it decided that the '930 patent is not valid, and the jury's verdict is certainly not against the great weight of the evidence. Avery's motion to set aside the jury's verdict should be denied.

## I. Argument

### A. Legal Standards

Avery "faces an onerous burden" in its effort to convince the Court to set aside the jury's verdict. *Inacom Corp. v. Sears, Roebuck & Co.*, 254 F.3d 683, 688-89 (8th Cir. 2000) (quoting *United States v. Big D Enters., Inc.*, 184 F.3d 924, 929 (8th Cir. 1999), *cert. denied*, 529 U.S. 1018 (2000)). "Judgment as a matter of law is appropriate when the record contains no proof beyond speculation to support a verdict." *Wash Solutions, Inc. v. PDQ Mfg., Inc.*, 395 F.3d 888, 892 (8th Cir. 2004). In assessing the sufficiency of the evidence, the Court must view the evidence in the light most favorable to the prevailing party. *Inacom*, 254 F.3d at 689 ("The strictures of the review process dictate that we view the evidence in a light most favorable to the jury's verdict."). As the

Supreme Court has said, in deciding a motion for judgment as a matter of law, a "court should review all of the evidence in the record," "draw all reasonable inferences in favor of the nonmoving party," and "not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000).

"A motion for judgment as a matter of law should generally be denied unless the Court, keeping all these principles in mind, concludes that judgment cannot be entered on the jury verdict." *Itron*, 2003 WL 22037710 at *1. A court may not set aside a jury's verdict "unless there is a complete absence of probative facts to support the verdict." *Conseco Fin. Servicing Corp. v. North Am. Mortgage Co.*, 381 F.3d 811, 818 (8th Cir. 2004). "A jury verdict must be affirmed unless, viewing the evidence in the light most favorable to the prevailing party, we conclude that a reasonable jury could not have found for that party." *Stockmen's Livestock Mkt., Inc. v. Norwest Bank of Sioux City*, 135 F.3d 1236, 1240-41 (8th Cir. 1998) (internal quotes omitted). Only when the evidence is "susceptible of no reasonable inference" supporting the jury's conclusion may a court disregard a jury's verdict. *White v. Pence*, 961 F.2d 776, 779 (8th Cir. 1992).

"A new trial is only appropriate if the verdict was against the great weight of the evidence so as to constitute a miscarriage of justice." *Foster v. Time Warner Entm't Co., L.P.*, 250 F.3d 1189, 1197 (8th Cir. 2001).

> "While the standard for granting a new trial is less stringent than for judgment as a matter of law, a new trial shall be granted only to prevent injustice or when the verdict strongly conflicts with the great weight of evidence. The court is not free to set aside a verdict merely because it would have ruled differently, or believes that the jury should have drawn different inferences and conclusions from the conflicting testimony."

*Ryther v. KARE 11*, 864 F. Supp. 1510, 1520 (D. Minn. 1994) (citations omitted).

**B. Anticipation**

If a single prior art reference describes and enables an embodiment that necessarily features each and every limitation of the claimed invention, the invention is anticipated by that reference. *Toro Co. v. Deere & Co.*, 355 F.3d 1313, 1321 (Fed. Cir. 2004) ("For inherent anticipation, the [prior art] must have sufficiently described and enabled at least one embodiment that necessarily featured or resulted in the subject matter embraced by limitation."); *see also Schering Corp. v. Geneva Pharms.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003) ("[A] prior art reference may anticipate without disclosing a feature of the claimed invention if that missing characteristic is necessarily present, or inherent, in the single anticipating reference."). A prior art reference does not, however, anticipate the invention if an embodiment of the reference only *possibly*, or even *probably*, contains every limitation of the claim. *Akamai Techs., Inc. v. Cable & Wireless Internet Servs.*, 344 F.3d 1186, 1192 (Fed. Cir. 2003) ("A claim limitation is inherent in the prior art if it is necessarily present in the prior art, not merely probably or possibly present."). To be an inherent anticipation under Federal Circuit law, the anticipatory reference must *always* result in the alleged inherent feature:

> The mere fact that a certain thing *may result* from a given set of circumstances is insufficient to prove anticipation. . . . [The challenger] was required to prove that [the allegedly inherent feature] is *necessarily present* in the [prior art] disclosure, and that it would be so recognized by persons of ordinary skill. . . . [It] did not discharge its burden . . . .

*Electro Med. Sys., S.A. v. Cooper Life Sci., Inc.*, 34 F.3d 1048, 1052 (Fed. Cir. 1994) (first emphasis in original; second emphasis added); *see also W.L. Gore & Assocs., Inc. v.*

*Garlock, Inc.*, 721 F.2d 1540, 1553 (Fed. Cir. 1983) ("Anticipation of inventions set forth in product claims cannot be predicated on mere conjecture respecting the characteristics of products that might result from the practice of processes disclosed in references."); *In re Oelrich*, 666 F.2d 578, 581 (C.C.P.A. 1981) ("Inherency, however, may not be established by probabilities or possibilities. The mere fact that a certain thing may result from a given set of circumstances is not sufficient.").

**C. The Jury's Verdict that the '930 Patent Was Not Anticipated by Sawka Is Supported by the Record and Is Not Against the Great Weight of the Evidence.**

Avery bore the burden to prove to the jury by clear and convincing evidence that "each and every limitation of the claim [is] present within [the Sawka '675 patent]" (Doc. No. 331 at 39-40.) 3M did more than prove that just one limitation of the '930 Patent was missing from the Sawka reference—3M proved that *numerous* limitations of the '930 patent, including "an array of depressions," "lands" and the micron height limitation were each missing from the Sawka patent. In fact, most of 3M's evidence on these points came straight from the mouth of Avery's own expert, Dr. Anthony McHugh.

Sawka does not expressly disclose every limitation of the claims of the '930 patent, nor does it describe any embodiment that necessarily includes every limitation of the claims. As such, Sawka does not anticipate the '930 patent, and Dr. McHugh testified as such on cross-examination. The jury's verdict is supported by the evidence, and Avery's arguments to the contrary are unfounded.

### 1. Sawka Does Not Teach an "Array" of Depressions.

The Court construed the claim term "array" as meaning "an orderly arrangement." (Doc. No. 181 at 12.) Sawka makes no mention of an array of depressions, and its specification does not describe an embodiment that inherently contains an array of depressions. Avery's only argument that Sawka describes an orderly arrangement of depressions is apparently based on Sawka's disclosure that its pattern of depressions "may have virtually any shape or design." (Declaration of Katherine A. Moerke ("Moerke Decl.") Ex. I at 4:14-16.) This was confirmed by Dr. McHugh:

> Q. And I believe that you referred us to this particular language in the specification when you said that Sawka taught an array, column 4, lines 5 through 19. You said it taught pebbled patterns, sandblasted, brushed, grained, simulated leather, parchment paper appearance, et cetera. Which part of this specification teaches the array of depressions?
> A. The part that says virtually any shape or design.

(Moerke Decl. Ex. B at 1258:7-14.) While it may be true that "the words 'virtually any design' *can* encompass an 'orderly arrangement,'" (Doc. No. 352 at 14 (emphasis added)), Sawka's scant description does not *necessarily* equate with the disclosure of an orderly arrangement of depressions. *See Transclean Corp. v. Bridgewood Servs., Inc.*, 290 F.3d 1364, 1373 (Fed. Cir. 2002) (reciting the axiom that a missing claim element is inherent in a prior art reference only "if that missing characteristic is necessarily present, or inherent, in the single anticipating reference"). Almost by definition, a disclosure of "virtually any design" includes some designs that are *not* in an orderly arrangement. Thus, Avery's contention that the disclosure of "virtually any shape or design" inherently discloses an array reflects a fundamental misunderstanding of the law on anticipation

through inherency. *See Electro Med. Sys., Inc.*, 34 F.3d at 1052 (refusing to grant JMOL because the challenger established only that a prior art reference was *capable* of meeting the claimed limitations, and did not prove that the limitations were "necessarily present"). Sawka's disclosure that its embossed pattern of depressions may have "virtually any shape or design" fails to disclose the required "array of depressions," and for that reason alone, the jury was reasonable in finding that Sawka fails as an anticipatory reference.

### 2. Sawka Does Not Teach a First Embossed Pattern in the Second Embossed Pattern.

Another limitation of the '930 patent is that "the depressions of the first embossed pattern are *in* the second embossed pattern." (Moerke Decl. Ex. C at 9:36-38 (emphasis added).) Avery points to language in Sawka describing "simultaneous first and second embossed patterns that were different," as the disclosure that inherently teaches this limitation. (Doc. No. 352 at 13.) This sentence in no way describes an embodiment that necessarily contains a first embossed pattern in a second embossed pattern—in fact, it describes exactly the opposite, and as such, Sawka also fails to disclose another claim element required by the '930 patent.

Avery mistakenly relies on the following paragraph for supposed proof that Sawka's disclosure of "simultaneous first and second embossed patterns" equates with the '930 patent's requirement that a pattern of depressions exists in a second pattern:

> Advantageously, base layer 12 is re-embossable; that is, base layer 12 may be repeatedly softened, embossed and set during multiple sequential heating and cooling cycles. Consequently, base layer 12 may be provided with a first embossed pattern (for example, a pebbled appearance) over virtually its entire surface, followed by the application (such as by hot-stamping or the like) of a second embossed pattern, (for example, a particular design,

> logo or legend) which selectively replaces the pebbled pattern in the area of the hot-stamping. Even more generally, base layer 12 is re-embossable in the sense that the base layer may be heated to remove a previously applied embossed pattern so that it can be replaced with an alternative pattern.

(Moerke Decl. Ex. I at 4:20-30.) Although it is hard to understand how this teaching of Sawka provides Avery with any support, Dr. McHugh testified as follows:

> A. (quoting Sawka): "Even more generally, base layer 12 is re-embossable in the sense that the base layer may be heated to remove a previously applied embossed pattern so that it can be replaced with an alternative pattern."
> Q. And that language "so that it can be replaced with an alternative pattern," does that indicate to you that it doesn't have to be replaced, that it's an option?
> A. Yes. Yes, it does.
> Q. And in the situation where it's not replaced, would that be consistent in your opinion, Dr. McHugh, with the example 3 that you showed the jury where it says that the two patterns can exist simultaneously?
> A. It would be completely consistent.
> Q. And can we just pull that up quickly, which is at column 15, beginning at line 55 through 60. Column 15 of the Sawka patent, the same patent, column 15, lines 55 through 60.
> "The embossed film was then high frequency re-embossed as described above to provide a film with simultaneous first and second embossed patterns that were different." Is the simultaneous language you were referring to?
> A. Absolutely.

(Moerke Decl. Ex. B at 1268:24-1269:21.) The Sawka disclosure that Dr. McHugh discussed in this testimony indicates only that a first pattern may be either partially obliterated by a second pattern, or completely obliterated and replaced with a different pattern. Dr. McHugh focused on the statement that "base layer 12 is re-embossable in the sense that the base layer may be heated to remove a previously applied embossed pattern so that it *can* be replaced with an alternative pattern." (Moerke Decl. Ex. B at 1268:24-

1269:2.) He asserts that Sawka's use of "can" indicates that the alternative pattern may or may not replace the first pattern. To arrive at this misguided conclusion, he ignores the first part of the sentence that states the film was "heated to *remove* a previously embossed pattern." In other words, the first pattern was obliterated. Though one "can" emboss another pattern onto the film, if one opts not to re-emboss, one is left only with an unembossed film. The use of "can" here does not indicate that practice of Sawka's Example 3 *necessarily* results in a first embossed pattern in a second embossed pattern.

Avery also looks to Figure 1 of Sawka as a supposed disclosure of a first pattern of depressions in a second embossed pattern of lands and ridges:




FIG.1

It is true that this figure shows two depressions (16), one of which is between two ridges (18). But that is it. There is no teaching or suggestion in Figure 1 of the '930 patent's requirement of a pattern of depressions *in* a pattern of lands and ridges. As described below, Figure 1 shows no "lands" at all, and it shows no "pattern" of depressions or ridges. Avery's bald assertion that this figure shows patterns "just as

described in the ’930 patent” is as unsupported as it is disingenuous. (*See* Doc. No. 352 at 15.)

### 3. Sawka Does Not Teach “Lands.”

The ’930 patent also requires that “lands” be present. As confirmed by Dr. McHugh on cross-examination, Sawka does not expressly disclose lands. In fact, Dr. McHugh had to draw his own “reference plane” onto Figure 1 of the Sawka patent to opine that hypothetical “lands” existed in that Figure:

> Q. Looking at Figure 1 without the blue line that you drew, could you please tell the ladies and gentlemen of the jury where lands are described in Figure 1.
> A. The word “lands” in the specification?
> Q. Absolutely.
> A. It’s not there.
> Q. It’s not there, is it?
> A. No, it’s not.

(Moerke Decl. Ex. B at 1264:16-25.) It can hardly be argued that no reasonable juror could have found that Sawka fails to disclose “lands,” when the only way Avery itself could find them was have its expert draw an imaginary blue line on a figure in Sawka that says not one word about the existence of such structures.

Recognizing this evidentiary shortcoming, Avery attempts to cast Dr. Mark Cavaleri’s testimony on profilimetry as evidence that Sawka “inherently” discloses lands. Avery’s reliance on Dr. Cavaleri’s fact testimony, which had nothing to do with Sawka, is misplaced, and Avery can only find the support it needs from Dr. Cavaleri’s testimony by torturously mischaracterizing it. Avery claims that Dr. Cavaleri “testified that ‘ridges’ and ‘depressions’ (both shown in

Sawka) cannot exist on a web surface unless a base or reference surface also exists," and that "persons skilled in the art commonly call this reference surface a 'land.'" (Doc. No. 352 at 15 (citing Tr. 696-98).) This was ***not*** Dr. Cavaleri's testimony. His actual testimony follows:

> Q. So if we were standing at a reference point, we could tell whether a surface had both ridges and depressions, correct?
> A. That's correct.
> Q. And that would be identified by having something that was in the red and something that was in the blue, correct?
> A. Yes.
> Q. And if we had both red and blue, then we would have a single surface that had both ridges and depressions, correct?
> A. I'm not sure that that would be a correct statement.
> Q. Why not?
> A. Because a depression in my mind would be defined as relative to a particular defined surface.
> Q. Okay. But if we had, if the zero point was our particular defined surface and from that particular defined surfaces our profilometer showed both red areas and blue areas, then we would have both ridges and depressions on the same surface, is that correct?
> A. Yes.

(Moerke Decl. Ex. B at 697:24-698:17.) Citing the above testimony, Avery somehow claims that Dr. Cavaleri testified that ridges and depressions "cannot exist on a web surface unless a base or reference surface also exists." (Doc. No. 352 at 15.) Dr. Cavaleri actually testified that *if* one had a particular defined surface, and if this surface were set as the zero point on a profilimeter, blue and red readouts on the profilimeter would indicate that this surface had ridges and depressions. (Moerke Decl. Ex. B at 698:13-18.) This does not equate with Avery's representation that Dr. Cavaleri testified that ridges and depressions *could not exist* without a reference surface, nor does it in any

way support Avery's naked assertion that Sawka in fact does disclose such a reference plane.

Avery's mischaracterizations of Dr. Cavaleri's use of the word "lands" are even more striking. Dr. Cavaleri's entire testimony on the term "lands" was limited to the following:

> Q. Have you ever heard of the term "lands"?
> A. Yes.
> Q. Would that be another term for the reference point or surface area?
> A. It could be, yes.

(Moerke Decl. Ex. B at 698:19-23.) Yet Avery unabashedly cites this testimony to claim that Dr. Cavaleri stated "persons skilled in the art commonly call this [base or reference surface] a 'land'." (Doc. No. 352 at 15.)

Avery stretches the truth even farther in the next paragraph of its brief, when it claims that "Dr. Cavaleri had to identify an arbitrary reference plain (which he called a land)." (Doc. No. 352 at 16.) Even a cursory examination of Dr. Cavaleri's actual testimony reveals that he said no such thing, and Avery's gross mischaracterizations of his testimony cannot change that. Indeed, Dr. Cavaleri's testimony that one can select an arbitrary reference point in order to conduct profilimetry on an object does not justify Dr. McHugh's litigation-induced insertion of a "reference surface" into the Sawka patent:

> Q. Now, in the figure from Sawka, this blue line right here (indicating) where you have written the words "reference surface," that does not exist in the Sawka patent, does it?
> A. It's not specifically identified in the Sawka patent, that's correct.
> Q. You simply added that to Figure 1 yourself?
> A. Yes, that's correct.

(Moerke Decl. Ex. B at 1251:1-7.) In summary, Avery's only evidence that Sawka contains "lands" is found through Dr. McHugh's addition of non-existent features to the Sawka patent and through Avery's blatant mischaracterization of the trial testimony of Dr. Cavaleri. Though Avery argues that a "clear weight of evidence" supports its motion to set aside the jury's verdict, its reliance on twisted excerpts of testimony belie this assertion. Avery did not provide clear and convincing evidence that Sawka discloses "lands," and for this additional reason, the jury reasonably found that Sawka fails to anticipate the '930 patent.

#### 4. Sawka Does Not Teach the Required Height of Ridges Over Lands.

The '930 patent requires that the height of ridges over the lands range "from about 3 to about 45 µm." (Moerke Decl. Ex. C at 9:40-41.) Sawka fails to teach any embodiment that expressly or inherently fulfills this claim limitation. To the contrary, at most Sawka provides only a disclosure from which one may be able calculate the possible height of ridges over depressions, but it does not provide any teaching on the requisite height of ridges over lands.

Avery claims that Sawka inherently teaches the patent's ridge height through the following disclosure: "if film 10 is intended for motor vehicle applications, base layer thicknesses in the range of about 25 to 350 microns are useful." (Doc. No. 352 at 13 (citing Dx 85, 5:14-16).) Avery then points to an earlier disclosure that says "[t]he depth of the embossed pattern preferably represents no more than about one-third of the total thickness of base layer 12." (Doc. No. 352 at 13 (citing Dx 85, 4:6-10).) Avery argues

that these two sentences together yield the disclosure of an embodiment that falls within the ’930 patent’s ridge height limitation. (Doc. No. 352 at 13.)

The *depth* of the embossed pattern, however, is not what the ’930 patent claims. The ’930 patent claims the *height* of ridges over lands. Sawka is silent on that issue. With respect to Figure 1 of Sawka reproduced above, for example, the teaching Avery cites merely refers to the depth of embossing of the depressions (16). It says nothing about the relative heights of the ridges (18) over any “lands” (putting aside the fact that Figure 1 shows no “lands”). Since Sawka provides no disclosure that would allow one to calculate whether an embodiment meets this claim limitation, Sawka cannot teach the ’930 patent’s ridge height limitation.

Moreover, Avery’s own expert agreed that without a disclosure of lands, a reference cannot provide any disclosure of the height of the ridges over the lands:

> Q. And, of course, if there are no lands described, it would be impossible to measure the height of the ridges over those nonexistent lands, would it not?
> A. If one did not select lands, right, it would be impossible to determine the height of ridges or even the existence of ridges.

(Moerke Decl. Ex. B at 1265:11-16.) Even if one accepted, *arguendo*, Avery’s contention that Sawka disclosed an embodiment that fulfills the ’930 patent’s ridge height limitation, the disclosure would still fail the test for inherency. Sawka does not describe an embodiment that necessarily meets the ridge height limitation, only one that may sometimes fall into it. The fact that Sawka discloses an embodiment that will sometimes fall into the ’930 patent’s claimed ridge height fails to meet the requirements of the doctrine of inherency. *See Akamai Techs., Inc. v. Cable & Wireless Internet Servs.*, 344

F.3d 1186, 1192 (Fed. Cir. 2003) ("A claim limitation is inherent in the prior art if it is necessarily present in the prior art, not merely probably or possibly present.").

The clear weight of the evidence does not support Avery's claim that *any* of the '930 patent's missing elements are inherently present in Sawka. If even one element is missing, Sawka is not anticipatory prior art; anticipation requires a prior art reference to teach either explicitly or inherently each and every limitation of the claims. *Kloster Speedsteel AB v. Crucible, Inc.*, 793 F.2d 1565, 1571 (Fed. Cir. 1986) ("[A]bsence from the reference of any claimed element negates anticipation.").

Examination of the trial record indicates that Avery failed to adduce evidence to even establish a *prima facie* case of anticipation. 3M presented substantial evidence and provided the jury with any number of perfectly reasonable reasons to conclude, as the jury did, that Sawka is not anticipatory prior art. As such, the jury's verdict is entirely reasonable, it is supported by substantial evidence, and it is in accordance with the weight of the evidence. The jury's verdict should not be set aside.

**D. Obviousness**

Avery bore the burden to prove to the jury by clear and convincing evidence that the '930 patent was obvious in light of Dr. Calhoun's earlier '790 patent, in combination with either the Unitika '060 patent or the Mitsui patent. (Doc. No. 331 at 47.) The jury was instructed to "avoid using hindsight" and was told that it "should not use the patent as a road map for selecting and combining items of prior art." (Doc. No. 331 at 41-42.) The jury was further instructed that "the test for obviousness is not whether or not it would have been obvious to try to make the invention." (Doc. No. 331 at 41-42.) In light

of the evidence presented at trial, the jury correctly found that the '930 patent is not invalid for obviousness.

**1. Motivation to Combine**

Even the most brilliant inventions are the typically the result of a new combination of old elements. *In re Kotzab*, 217 F.3d 1365, 1369-70 (Fed. Cir. 2000) ("Most if not all inventions arise from a combination of old elements. Thus, every element of a claimed invention may often be found in the prior art."). This is why obviousness cannot be established without clear and convincing evidence that one of ordinary skill would have been motivated to combine the old elements to create the claimed invention. *See id.* ("[T]here must be some motivation, suggestion, or teaching of the desirability of making the specific combination that was made by the applicant."). Although prior art references do not have to explicitly teach the desirability of their combination, "the showing of combinability must be 'clear and particular.'" *Ruiz v. A.B. Chance*, 234 F.3d 654, 665 (Fed. Cir. 2000) (quoting *In re Dembiczak*, 175 F.3d 994, 999 (Fed. Cir. 1999)).

**2. Objective Indications of Non-Obviousness**

A conclusion of obviousness cannot be reached without first considering objective indications of non-obviousness. *Ruiz,* 234 F.3d at 667. Such objective indications include commercial success, failure of others, long-felt need, and unexpected results. *Minn. Mining and Mfg. Co. v. Johnson & Johnson Orthopaedics*, 976 F.2d 1559, 1573 (Fed. Cir. 1992). Such objective indications are not merely helpful tools one should consider when an issue of obviousness is not clear. They are a necessary component of an obviousness analysis, and failure to consider objective indications of nonobviousness

is reversible error. *Simmons Fastener Corp. v. Ill. Tool Works, Inc.*, 739 F.2d 1573, 1575 (Fed. Cir. 1984) (reversing the judgment of obviousness because of the district court's failure to consider secondary considerations of obviousness). One may not come to a conclusion of obviousness without considering the impact of any objective indications of non-obviousness, which are also called "secondary considerations." *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538 (Fed. Cir. 1983) ("Thus evidence rising out of the so-called 'secondary considerations' must always when present be considered en route to a determination of obviousness."). Indeed, objective indications of non-obviousness "may often be the most probative and cogent evidence in the record." *Vulcan Eng'g Co., Inc. v. Fata Aluminum, Inc.*, 278 F.3d 1366, 1373 (Fed. Cir. 2002) (quoting *Stratoflex, Inc. v. Acroquip Corp.*, 713 F.2d 1530, 1538 (Fed. Cir. 1983)).

Objective indications cannot provide proof of nonobviousness, however, unless there is a nexus between the patented claims and the proof of those indications. *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988). The patentee bears the burden to prove that a nexus exists. *Id.* The patentee can satisfy this burden with mere proof that the successful embodiment is the invention claimed in the patent, along with its proof of the objective indication. *Id.* ("A prima facie case of nexus is generally made out when the patentee shows both that there is commercial success, and that the thing (product or method) that is commercially successful is the invention disclosed and claimed in the patent."). Once the patentee satisfies this burden of proof, the challenger bears the burden of production to rebut the patentee's evidence of nexus. *Id.* The challenger may do so by adducing evidence that commercial success was "due to

extraneous factors other than the patented invention, such as advertising, superior workmanship, etc." *Id.*

**3. The Jury's Verdict that the '930 Patent Was Not Obvious Is Supported by the Record and Is Not Against the Great Weight of the Evidence.**

In claiming that the jury's verdict on obviousness should be set aside, Avery ignores the black-letter legal requirements of 35 U.S.C. § 103. A conclusion of obviousness requires clear and convincing evidence of a motivation to combine prior art references, and one cannot reach any conclusions on obviousness without first considering objective indications of non-obviousness. The jury acted reasonably in concluding that Avery met neither burden, and its verdict of nonobviousness should not be overturned.

**a. Avery Failed to Establish a Motivation to Combine References.**

Avery's burden to prove its defense of obviousness required Avery to elicit clear and convincing evidence that one of ordinary skill in the art would have had a motivation to combine the '790 patent with either the Mitsui or Unitika reference. Avery provided no evidence supporting a motivation to combine, much less a clear weight of evidence in support of such motivation.

In fact, Avery's supposed evidence of motivation to combine was no more than motivation to solve the problem, which is not the legal test. For example, Dr. McHugh spoke of "motivation," but in an irrelevant and misleading context. In his limited testimony on motivation to combine, Dr. McHugh stated, "you want to get easier

application of the film. That's the motivation." (Moerke Decl. Ex. B at 1145:15-16.) This general desire is not, however, the necessary motivation to alter or combine prior art references that the law requires. A general motivation to create graphic films that are easier to apply does not show motivation to combine or modify *any* references, much less a motivation to combine the specific references relied upon by Avery. The law requires proof that there would be a motivation to actually select the references and combine or alter them in a particular way. *In re Rouffet*, 149 F.3d 1350, 1359 (Fed. Cir. 1998) ("[T]he Board must explain the reasons one of ordinary skill in the art would have been motivated to select the references and to combine them to render the claimed invention obvious."). Motivation to solve a problem is not motivation to combine references. *See Ecolochem, Inc. v. S. Cal. Edison Co.*, 227 F.3d 1361, 1372 (Fed. Cir. 2000) ("Although the suggestion to combine references may flow from the nature of the problem, 'defining the problem in terms of its solution reveals improper hindsight in the selection of the prior art relevant to obviousness.'") (quoting *Monarch Knitting Mach. Corp. v. Sulzer Morat Gmbh*, 139 F.3d 877, 880 (Fed. Cir. 1998)).

Avery provided no proof of motivation to combine prior art references. Avery only provided expert testimony that there was a desire in the industry to make graphic films easier to apply. Indeed, Avery's evidence about a general need in the industry that had not been met is, under the law, evidence of *non*-obviousness, not evidence of obviousness. *See Iron Grip Barbell Co. v. USA Sports, Inc.*, 392 F.3d 1317, 1324 (Fed. Cir. 2004) (reciting the well-established proposition that satisfaction of a long-felt need is probative evidence of nonobviousness).

### b. Dr. McHugh Used Impermissible Hindsight by Looking at the Face of the Patent for the Motivation to Combine.

The only other motivation to combine testimony that Dr. McHugh provided relied on the disclosure of the ’930 patent:

> Q. In fact, if we go to the ’930 patent, does the background section of the ’930 patent explain this very motivation?
> A. Yes, it does.
> Q. And was that the test—was that the sections that we looked at earlier that said it would be desirable to take basically the ’790 patent and put the air bleed solution in?
> A. Yes. That’s right. That’s what it was talking about.

(Moerke Decl. Ex. B at 1146:2-10.) It is black-letter law, however, that one cannot look to the patent itself to find the motivation to combine references. *Amgen, Inc. v. Chugai Pharm. Co.*, 927 F.2d 1200, 1208 (Fed. Cir. 1991) (“Both the suggestion to combine references and the expectation of success must be founded in the prior art, not in applicant’s disclosure.”); *In re Dow Chem. Co.*, 837 F.2d 469, 473 (Fed. Cir. 1988) (“There must be a reason or suggestion in the art for selecting the procedure used, other than the knowledge learned from the applicant’s disclosure.”). The law forbids Avery from using the ’930 patent’s disclosure in hindsight to bolster its claim that there was at the time of the invention a motivation to combine prior art references.

Avery correctly states that motivation to combine references may come from the “‘nature of the problem to be solved,’” (Doc. No. 352 at 23 (quoting *Ruiz*, 234 F.3d at 665)), and “the problem to be solved may be defined directly by the patent-in-suit” (i*d.* (citing *In re Huang*, 100 F.3d 135, 139 n.5 (Fed. Cir. 1996)). Avery does not, however, find the motivation to combine references from the nature of the problem to be solved

(making graphic films easier to apply). Avery finds the motivation solely in the problem's *solution* (providing both air bleed and repositionability) *taught in the '930 patent*. Avery attempts to turn Dr. Calhoun's own disclosure against him to find a motivation to combine references. That is legally impermissible: "It is wrong to use the patent in suit as a guide through the maze of prior art references, combining the right references in the right way so as to achieve a desired result." *Orthopedic Equip. Co. v. United States*, 702 F.2d 1005, 1012 (Fed. Cir. 1983).

**c. Mr. Meixner's Testimony Does Not Establish Motivation to Combine.**

Avery also cites testimony from Mr. Meixner as supposed evidence that at the time of the invention there was a motivation to combine the '790 patent with the Unitika or Mitsui reference. Mr. Meixner's testimony, however, fails to establish that there was any such motivation to make this combination of prior art. (Doc. No. 352 at 25-26.) His testimony establishes only that he knew that if he *followed Dr. Calhoun's instructions* and was successful in the double-embossing Dr. Calhoun had conceived, he could succeed in making a liner that would allow repositionability and air egress in graphic films. (Moerke Decl. Ex. B at 482:1-483:17.)

Once again, Avery cites testimony that establishes the opposite of what Avery argues. Mr. Meixner testified that he recognized that air bleed was a desirable feature, but no one before Dr. Calhoun had been capable of obtaining both repositionability and air bleed, despite the fact that the need to solve this problem was known and longstanding. (Moerke Decl. Ex. B at 456:3-458:18.) Thus, not only does Mr. Meixner's

testimony not establish a motivation to combine Avery's combination of prior art references, it simply confirms that it was Dr. Calhoun who provided the novel solution to a long-standing problem.

In focusing on Mr. Meixner's testimony, Avery also ignores the fact that the jury could have reasonably based its nonobviousness verdict on the admissions of Avery's own expert, Dr. McHugh. He testified that it was Dr. Calhoun who met the long-felt need by combining air bleed and repositionability technology to create the subject matter of the '930 patent:

> Q. In fact, some of these references that you have on this chart that we have up here are as old as 1974, isn't that right?
> A. That's correct.
> Q. And we heard Mr. Hannington say that that High Intensity material with the air channels had been sitting around at Avery since I think 1983 in one form or another. Do you remember that?
> A. I remember some of that discussion, yes.
> Q. And despite the fact that for decades this long felt need was out there, it wasn't until 1995 when Clyde Calhoun brought them all together?
> A. Dr. Calhoun's patent put those things, put those concepts together, yes, mm-hmm.
> Q. Concepts that had been out there for decades?
> A. Yeah.

(Moerke Decl. Ex. B at 1247:5-20.) Other than impermissible hindsight, Avery failed to present the jury with evidence of a motivation to combine the prior art so as to meet this long-felt need by creating the claimed invention. Avery's omission spelled the end of its obviousness defense. For that reason alone, the jury's nonobviousness verdict should stand.

### 4. Dr. McHugh's Failure to Consider Objective Indicia of Non-Obviousness Entitled the Jury to Reject His Obviousness Opinion.

Dr. McHugh freely admitted, on direct examination by Avery's counsel, that he failed to consider objective indications of obviousness in his analysis:

> Q. And did you consider the first three of these factors?
> A. Yes, I did.
> Q. The fourth factor refers to objective indications of nonobviousness.
> Was that part of your analysis?
> A. No, that was not.

(Moerke Decl. Ex. B at 1100:22-1101:1.) Avery is correct that it does not have a burden to establish in its *prima facie* case the non-existence of objective indications of nonobviousness. (*See* Doc. No. 352 at 27.) This, however, does not mean that Dr. McHugh was free to ignore such evidence in reaching his opinions. Objective indications are a necessary element of an obviousness analysis. *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538 (Fed. Cir. 1983). Failure to take such evidence into account when coming to a conclusion on obviousness is reversible error. *Simmons Fastener Corp. v. Ill. Tool Works, Inc.*, 739 F.2d 1573, 1575 (Fed. Cir. 1984) (reversing judgment of obviousness because of the district court's failure to consider secondary considerations of obviousness). Dr. McHugh's failure to consider the record evidence on these objective indications when coming to his conclusions on obviousness was another reason why the jury acted reasonably in rejecting his ultimate opinion on the issue of obviousness.

Further, Dr. McHugh's failure to consider or provide any testimony regarding objective indication results in a trial record that contains unrebutted evidence of commercial success, long-felt need, copying and failure of others to make the patented

invention. 3M proffered extensive evidence of these objective indicia of nonobviousness. For example, Mr. Charles Calisto provided evidence of commercial success:

> Q. And did the Ryder showdown have any effect on the marketplace's reaction, if you will, to Comply?
> A. Well, as I mentioned earlier, when we first introduced Comply, it didn't—it generated excitement, but there wasn't a lot of sales activity. After the showdown, if you will, I think there was real credibility that was established. In other words, it was no longer just talk that 3M was doing and was not just a marketing game of benefit. It was proven benefit to a large customer, a high-profile customer such as Ryder, proven benefit to a large graphic manufacturer and proven benefit to the body builders that themselves recognized the benefit of using 3M product. And they're the ones who actually passed on the big savings to Ryder by cutting the charges that they were going to have on installing the graphics, so they're the ones that passed on the savings to Ryder.
> Q. And so can you characterize just in very general terms 3M's sales in terms of the Comply product in the years following the Ryder showdown?
> A. Well, after the credibility gets established—you know, in marketing terms you talk about creating awareness, interest, trial use and then reuse. You don't have success until you have reuse. Well, with that showdown, we really proved and created the awareness, the interest and the trial, and the use and reuse really started to take place. So OEM customers, such as Polaris, Harley-Davidson, on and on and on, these people who needed to take cost out of their products, started to ask for our product, because they believed based on what they've heard and seen that our product would help them and sales started to pick up considerably.

(Moerke Decl. Ex. B at 639:13-640:18.) In the face of this unrebutted and highly probative evidence of non-obviousness, Avery can hardly argue that the clear weight of the evidence requires the Court to overturn the jury's verdict of non-obviousness. *See Vulcan Eng'g Co., Inc. v. Fata Aluminum, Inc.*, 278 F.3d 1366, 1373 (Fed. Cir. 2002) (stating that secondary considerations of nonobviousness "may often be the most probative and cogent evidence in the record").

Avery attempts to salvage its failure to rebut 3M's objective evidence by claiming that 3M did not sufficiently prove a nexus between the commercial success of its claimed invention and the patented features. Avery fails, however, to cite any caselaw to support its allegation. Instead, Avery makes the bare assertion that "3M failed to offer any evidence regarding the requisite nexus." (Doc. No. 352 at 29.) This assertion conflicts with the Federal Circuit's caselaw, which states "[a] prima facie case of nexus is generally made out when the patentee shows both that there is commercial success, and that the thing (product or method) that is commercially successful is the invention disclosed and claimed in the patent." *Demaco Corp.*, 851 F.2d at 1392. 3M introduced evidence both that its Comply™ product is an embodiment of the '930 patent and that Comply™ is commercially successful. (Moerke Decl. Ex. B at 239:4-9, 632:13-20, 639:13-640:18.) Moreover, 3M offered unrebutted testimony that Comply™ is commercially successful because of the air bleed property that is a function of its claimed properties, and customers are willing to pay a premium for this claimed feature. (Moerke Decl. Ex. B at 631:4-632:20, 635:16-23, 639:13-640:18.) In so doing, 3M more than satisfied its burden to prove a nexus between the commercial success of Comply™ and its patented features.

Avery also alleges that 3M produced no evidence supporting the graphic industry's long-felt need. The trial record, however, speaks to the contrary:

> A. There were issues for our customers. What we were finding for the customers and the applicators who were applying the graphics themselves, air release has always been a big issue and basically a time constraint in terms of putting large jobs up.

* * *

> A. Installing graphics is not easy. It's not trivial. It takes a lot of time. So the market was saying: If you want us to participate in this, you got to give us materials that are easy to install and easy to remove, and in that arose the issue of air entrapment. That was one of the problems that came out from the customers, because it takes time to get rid of the air bubbles. So if there was a way to easily do that, apply the graphic, have no air, then we could have a market that we could participate in.

(Moerke Decl. Ex. B at 241:8-12, 624:22-625:6.) Avery presented no evidence at trial to rebut 3M's evidence of these objective indications that the invention claimed in the '930 patent is anything but obvious. Given its failure to rebut this highly probative evidence, Avery should not now be heard to claim that the clear weight of the evidence supports a finding of obviousness. The jury's verdict rejecting Avery's obviousness defense should stand.

**E. The Jury's Verdict Is Not a "Miscarriage of Justice," So Avery Is Not Entitled to a New Trial.**

A new trial is appropriate "only when necessary to avoid a miscarriage of justice." *Gearin v. Wal-Mart Stores, Inc.*, 53 F.3d 216, 219 (8th Cir. 1995). A court "is not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn difference inferences or conclusions or because judges feel that other results are more reasonable." *White v. Pence*, 961 F.2d at 780. "A new trial is only appropriate if the verdict was against the great weight of the evidence so as to constitute a miscarriage of justice." *Foster*, 250 F.3d at 1197.

The jury's verdict is not against the great weight of the evidence because, as discussed above, Avery failed to even present a *prima facie* case of either anticipation or

obviousness. Without carrying its burden, Avery cannot argue that the evidence supported a verdict of invalidity, much less that the great weight of evidence supported such a verdict. As such, the jury's verdict is not a miscarriage of justice. It was correct, and it would be a clear miscarriage of justice to *overturn* it.

## II. Conclusion

The trial record is replete with evidence that supports the jury's verdict. Avery did not establish a *prima facie* case of invalidity, much less adduce a clear weight of evidence supporting its allegations of invalidity. As such, it would be improper to set aside the jury's verdict. Avery's motion for judgment as a matter of law or a new trial on issues of invalidity should be denied.

Dated: March 3, 2006

FISH & RICHARDSON P.C., P.A.

By: s/Katherine A. Moerke

Jonathan E. Singer (#283459)
John C. Adkisson (#266358)
Katherine A. Moerke (#312277)
FISH & RICHARDSON P.C., P.A.
60 South Sixth Street, Suite 3300
Minneapolis, MN 55402
Tel: (612) 335-5070
Fax: (612) 288-9696

Juanita R. Brooks
(Admitted Pro Hac Vice)
FISH & RICHARDSON P.C.
12390 El Camino Real
San Diego, CA 92130-2081
Tel: (858) 678-5070
Fax: (858) 678-5099

Kevin H. Rhodes
3M Innovative Property Company
3M Center
P.O. Box 33427
St. Paul, MN 55133

Attorneys for Plaintiffs
3M INNOVATIVE PROPERTIES COMPANY and MINNESOTA MINING AND MANUFACTURING COMPANY

60343917