# EXHIBIT B

Part 1 of 2

you will see in this case that it would have been obvious to combine prior art references that together disclose all of the limitations in the product claims of the '930 patent.

The third destination is the anticipatory prior art reference called Sawka. Now, anticipation is a fancy legal word and patent jargon for if there is a single reference that contains all of the elements of the claimed invention, it's invalid by anticipation. Obviousness requires a combination. If you need more than one reference to show all the elements, but it would have been obvious to combine them to one of ordinary skill in the art, then it's obvious and invalid. We'll talk about the Sawka reference.

Now, importantly, the claims do not require air egress or repositionability. Counsel for 3M never showed you their patent claims, but when you finally get to see all their patent claims, the five claims, those words, "air egress" and "repositionability" don't appear. So to invalidate as anticipated, Avery need only show a prior art reference that has the very few features described in 3M's product claims, and you'll see from the prior art Sawka reference that there is a multiple embossed pattern showing that ridge height limitation in that one document.

Now, the fourth and final destination of our journey is to 3M's laboratories. There together we'll discover the most troubling fact in this case, that the named



inventors on this patent do not include the true inventors, one of the true inventors. A patent is invalid if the patent does not identify all of the true inventors. This is true even if an omitted inventor is another employee, in this case 3M. At this fourth destination, Avery will demonstrate to you that Frank Sher invented the product claims of the '930 patent, he's not listed on the patent, and therefore that patent is invalid.

Now, having briefly identified each destination in our journey, I want to discuss very briefly the specific evidence you will receive at each destination.

Recall our first destination is the Patent Office. Well, Avery will present to you that there was important prior art that the examiner did not consider and which would have caused this examiner not to issue this '930 patent in the first place had he known of that prior art.

Now, you can look at me and you can say: "Dorman, how can you say that? How can you and I know what was in the mind of an examiner we've never met and who will not be a witness with us here at trial?" The answer is, we have a written record of the history of the '930 patent which details the examiner's thoughts throughout the patent application process. This document, which the narrator in the video you'll see after lunch also describes as the prosecution history, is a written record of what the examiner



did. It contains the original patent application and it contains all the communications between the examiner and the lawyers for 3M that were trying to get the PTO to issue this patent. It also includes an examiner -- an explanation by the examiner of the reasons why he finally, after twice rejecting this patent as invalid, was finally persuaded to allow it. The prosecution history is a window into the mind of the patent examiner, Danny Lee. In asking you to invalidate the product claims of the '930 patent in this case, ladies and gentlemen, I will only ask you to do what Danny Lee would have done if he knew all the facts that by the end of this trial you will know.

In order to do that, we must together during this trial examine the prosecution history, because that tells us that the only reason, the only reason these claims issued was because the applicants inserted the following language which the examiner did not believe was taught or disclosed in the prior art but in fact was in the prior art.

And if you can look back at the monitor, that last phrase, "wherein the second embossed pattern comprises lands and ridges between the lands, and wherein the height of the ridges over the lands ranges from about 3 to about 45 microns," again, this is the ridge height limitation.

In three different ways the prosecution history will tell us that the examiner only allowed the '930 patent



to issue because of the inclusion of this ridge height limitation which the examiner mistakenly believed was not in the prior art.

The first way we know this is because all of the claims of the '930 patent were twice rejected as unpatentable by the examiner as obvious or anticipated without that limitation. During this trial, various witnesses will be examined about the prosecution history and about the prior art that was examined before the ridge height was added by 3M. You will learn that the examiner believed two different embossed patterns with a pattern of depressions within the second embossed pattern was not new and was obvious. In other words, those elements were all disclosed and this was the determination of the examiner. Those elements were all disclosed either in a single prior art reference which he noted or they were disclosed in multiple prior art references which the examiner believed would have been obvious to one of ordinary skill in the art.

And as an example, in the first office action, the examiner rejected all of the then pending claims.

Can you show that?

As you can see: "Disposition of claim," it indicates which claims are then pending and then all of those claims were rejected as unpatentable. They came back again. 3M came back again. You'll see in this case that they were

again, all those claims, were rejected. Thus, all of the claims of the '930 patent, including the claims we're talking about here, were twice rejected as unpatentable by the examiner as obvious or anticipated without that ridge height limitation.

Now, the second reason we know that the '930 patent was allowed to issue only because the applicants amended the claims to include this ridge height limitation and the examiner believed this teaching was not in the prior art was the interview summary that occurred on July 30, 1998.

Now, an interview summary is a record made out by Examiner Lee summarizing a personal interview he had with 3M patent lawyers. Read with me the handwritten entry mid-page where it says: "Description of the general nature of what was agreed to, if an agreement was reached, or any other comments." Quote: "Applicant's representative will amend the claim to put in additional limitation to distinguish over the prior art."

You will learn in this case that the 3M applicants agreed to amend their claim to add the ridge height limitation because the examiner understood that the ridge height teaching or limitation was not in the prior art. The only way a new claim is distinguished over the prior art is if the new claim as written, including in this case the ridge height limitation, was not disclosed in any prior art



reference. As you will learn in this case, embossed patterns disclosing ridge heights within this very ridge height limitation existed in the prior art, but the examiner didn't know it. In fact, prior art disclosing ridge heights within that ridge height limitation was found in 3M's own files at that time.

Now, there's a third reason we know that the '930 patent was allowed to issue only because the applicants amended the claims to include this ridge height limitation and because the examiner believed that ridge heights within this limitation was not in the art, and the third reason we know this is the examiner said so.

On October 17th, Examiner Lee issued a notice of allowability wherein he expressed his reasons for finally allowing 3M to get this patent. This, ladies and gentlemen, is the clearest window into the mind of the examiner, because he is telling us why he allowed these claims now after twice rejecting them before. Let's look at the monitor, because this is his document and this is what he said:

"The application was reviewed to determine whether the rejections remain tenable in view of recent court decisions and examination guidelines promulgated by the PTO. During the course of the review, it was determined that allowable subject matter is present. The reasons for allowing the rejections" -- I'm sorry -- "The reasons for



withdrawing the rejections of record" -- those are the prior rejections -- "are as follows: The prior art does not suggest or teach a carrier web with ridges and lands that ranges from about 3 to 45 microns."

This is the only reason they got this patent, is because they added this and you will see in this case that that disclosure of ridge heights within that limitation clearly and repeatedly exist in the prior art.

Our second destination is the Japanese and Great Britain prior art that discloses the ridge heights within that ridge heights limitation and the fact that it would have been obvious to one of ordinary skill in the art to combine that reference with other prior art that had persuaded this examiner that this was not a valid patent claim.

For example, if you look at the face sheet of a patent abstract in this Japan reference, you'll see in the left hand box that the date of the application is July 5, 1984. That's over 12 years before the application for the '930 patent was filed by inventors Calhoun and Koskenmaki on December 31, 1996. This is prior art, this reference you will learn discloses embossed pattern of lands and ridges for the purpose of removing air bubbles from an adhesive-backed film, and the height of those ridges in this prior art reference is expressly disclosed to be between one and 15 microns, which is clearly within the three- to 45-micron



range claimed in the '930 product claims.

Similarly, you will learn about a British reference that has a nearly identical disclosure that not only was in 3M's files but was cited by 3M in another patent application they filed on the very same day, but which they never brought to this examiner, Danny Lee's, attention. Our expert, Dr. Anthony McHugh, will explain to you that it would have been obvious to combine such a reference with other prior art references showing a first pattern of depressions and that the product claims of the '930 patent claim are invalid based upon obviousness.

Now, the third destination in our invalidity journey is the fact of invalidity through anticipation and the Sawka prior art reference. You will see from that reference -- here's a figure of it -- that this is a multiple embossed -- multiple pattern embossed web just like their patent, and you will see and learn in this patent how the ridge height limitation is met with this single disclosure.

Now, our fourth and final invalidity destination relates to improper inventorship, and, ladies and gentlemen, this issue, of all the issues in this case, is going to I think be the most interesting for you, because it's the one where there's a very significant dispute and it's a factual dispute that you alone will get to resolve.

In the video you're going to see this afternoon,

(In open court without the Jury present.)

THE COURT: We're going to rearrange jurors. One juror is not feeling well, so we're going to try to accommodate him this afternoon, so you will see a little different configuration just for this afternoon.

Yes?

MR. SINGER: Your Honor, we have two brief matters I might address.

THE COURT: Yes. Mr. Singer.

MR. SINGER: Good afternoon. 3M is calling Dr. Clyde Calhoun as a witness this afternoon. I wanted to alert the Court that Dr. Calhoun is an elderly individual and has difficulty sitting for long periods of time. I would like to say he could sit for an hour without a break, but he told me that sometimes it's an hour, sometimes a half an hour.

So that may happen, and he may ask for a break.

THE COURT: Okay. That's fine. He can ask for one at any time, and one of the juror is in need of more frequent breaks. So we will probably take breaks anywhere between half hour and 45 minutes. We will take shorter breaks this afternoon, probably five-minute breaks, more frequently.

MR. SINGER: Thank you very much. The second point is that during Mr. Dorman's opening, he referenced a



British reference as allegedly rendering the patent obvious and claiming that is was not cited to the patent office, and we are not aware of what that reference was or is.

If you recall there was a motion in limine that set the bounds of the prior art in this case. Remember there was that long, long list that Avery had submitted, and in response Avery agreed with 3M as to what the relevant prior art was.

There were three references that were anticipatory and then a list of references that were rendered, allegedly rendered the patent obvious. There is a British patent on there, which is a cited reference, but we're not aware of anything else, and I wanted to object, frankly, to any other art being raised at this late date.

MR. DORMAN: Your Honor, the reference that I'm referring to was a cited reference in the '397 patent, which is the Great Britain 1,511,060 patent. This is a patent, the '397 patent is a patent to Sher and Clyde Calhoun. It is actually cited in that reference, and it is discussed in the document.

So it was -- I was just in error if I left that one out because that has always been part of the case. If our expert witness did not discuss that, he's not going to be able to put evidence on, but I can certainly use that reference with respect to talking about their knowledge of



it, et cetera.

I mean, I can do it with the witnesses, it seems to me.

MR. SINGER: Your Honor, I would just simply read what Avery said with respect to the references in this case. It said Avery agrees that the following prior art references are properly prior art anticipatory and identified three references.

It says, Avery agrees that the following prior art references are properly prior art anticipatory and identified three references. They is says, Avery agrees that the following prior art references are properly part of the upcoming trial as obviousness and listed references and did not include that reference.

Then Avery said, Avery will not seek to introduce other prior art references in support of its claim that the '930 patent is invalid as anticipated or obvious. This is trial by ambush to even refer to this reference at trial.

MR. DORMAN: Well, it was an error that I just didn't have that one on.

THE COURT: Error that you didn't have it where?

MR. DORMAN: Listed in that list because it has always been a part of this case, and they have been aware of this reference. What you're going to find out, and I don't think the Court is aware of this, is that



simultaneously on the same day, Clyde Calhoun is a named inventor on two patents. And what 3M did was, they took the one invention of this carrier web and separated it and got a liner patent and got an adhesive patent on the same one.

They included everybody on the adhesive but didn't include the other inventors on the one that is at issue in this case. It was just an error on my part that that was not listed on that, and there is no surprise with respect to this because they're aware of this patent referenced the whole time.

It's in their patent itself. This is not something we even found. It's theirs.

THE COURT: Which patent is it referenced in?

MR. DORMAN: In the '397 patent, which is the companion patent to the Calhoun '930 patent.

THE COURT: For the adhesive?

MR. DORMAN: Correct.

MR. SINGER: And, Your Honor, we are surprised because this was a response that was filed by Avery over three weeks ago and said this reference was not part of the case. These are not companion patents, as it were. They're different patents. Yes, they're filed the same day. We have heard that repeatedly, and I'm sure Mr. Dorman will endeavor to point that out, but the two

A. Yes. I'm first on the copy list.
Q. And if you turn to the next page, what does Plaintiffs' Exhibit 50 represent?
A. This is a document that would have been written as a trip report for three of the people who were working down in our Nevada plant to work on this particular process.
MS. BROOKS: Your Honor, we move Plaintiffs' 50 into evidence.
THE COURT: Any objection?
MR. PEARSON: No objection, Your Honor.
THE COURT: Plaintiffs' Exhibit 50 is admitted.
BY MS. BROOKS:
Q. If we look at the date on this, it says June 1997, is that right?
A. That's correct.
Q. So if I have read the '930 patent correctly, the application for the invention covered in the '930 patent was already filed on December 31st, 1996?
A. That's correct.
Q. The authors of this particular trial report are a Dan Fleming, Frank Loncar and Frank Sher, is that right?
A. That's correct.
Q. Who are they?
A. Dan Fleming worked in the commercial graphics division. He's a process engineer and typically would be responsible



for taking manufacturing processes that were in development from our engineering group down into the Nevada plant. Frank Loncar and Frank Sher were both scientists in the division laboratory itself, working on adhesives and adhesive structures.
Q. If you go to the second page of the trip report itself, there is a number at the bottom, 0893. Do you see that?
A. Yes, I do.
Q. And if you go to the very last sentence, the optimum range, it says, The optimum range of ridge heights is, and then we need to go to the next page, from 15 to 20 microns, although lower ridge heights may be useful for less demanding applications.
Is that what Mr. Loncar and Fleming and Dr. Sher reported in June of 1997?
A. That is correct.
Q. Now, at this point the '930 patent application had already been filed?
A. That's right.
Q. And in the '930 patent application, we saw the claim that talks about a range of 3 to 45 microns, is that right?
A. That's correct.
Q. So how does this fit in that six months later there are tests going on in Nevada, Missouri, to determine what the optimum ridge height is? I'm not sure I understand the



two.
MR. PEARSON: Objection. Vague.
THE COURT: Just a moment. I am sorry. The objection?
MR. PEARSON: The question is vague, Your Honor.
THE COURT: Overruled. Go ahead.
BY MS. BROOKS:
Q. If you understand the question, Dr. Cirillo.
A. I think I did do. The question as I understand it is, we've already got the patent filed. What is going on here in terms of the work that is being done to define the ranges that would be optimum for the product itself. This is optimizing a product for a specific application, which would be the application for fleet commercial graphics.
Q. And how does that differ from the range that is already in the patent application?
A. The patent application is 3 to 45, and what this is trying to do is define what the best range is in terms of the product itself.
Q. I forgot to ask you, because I keep calling you Dr. Cirillo. Do you have any type of background in technology?
A. I am a PhD surface chemist from the University of Wisconsin in Milwaukee, and I also worked in 3M's research laboratories for 17 years.



Q. When did you first join 3M?
A. I joined 3M in 1979.
Q. At some point in time -- we have been talking about the 1996 time frame. At some point in time did a commercial product result based on the work of Drs. Calhoun and Koskenmaki in the '930 patent?
A. Yes, it did.
Q. What was the name of that product?
A. The name of the product is Controltac Plus with Comply.
Q. What is Controltac? Let's take the Comply off for a second.
A. Okay.
Q. What is Controltac?
A. Controltac is a product that was developed by the commercial graphics division I believe back in the eighties, but it involved putting glass bubbles on the adhesive material so that you could place the material on a surface, especially a rough surface.
THE COURT: Could you spell that, Controltac, for all of us?
BY MS. BROOKS:
Q. If you could, Dr. Cirillo, do you know?
A. It is C-o-n-t-r-o-l and t-a-c. It's a registered trademark.
Q. So there was this Controltac product you said I think

in the mid-eighties?
A. The original Controltac product had glass bubbles on the adhesive itself, and it was used for placement. It was used to be able to slide it before you could actually apply it.
Q. Then what is Controltac Plus?
A. Controltac Plus was an attempt. It was actually a fact. What we did was, we took, instead of sprinkling the glass beads on the material itself, we actually embossed the liner in such a way that we could get a much more uniform pattern.
It gave us better performance and more uniform performance for the Controltac product.
Q. If you know, when was that released?
A. Controltac Plus is around 1993 I think somewhere, '93, '94.
Q. You mentioned that there was as a result of the work in the '930 patent something called Controltac Plus with Comply?
A. Right.
Q. What is that?
A. The idea there was, you already had something now that was movable and could be repositioned. Now you wanted something that literally would allow you to get the bubbles out from behind the film itself. So we would have both



features which were major issues in terms of applications on graphics.
Q. And up until the time that Controltac Plus with Comply was released, were those still major issues, that is air egress and repositionability?
MR. PEARSON: Objection. Lack of foundation.
THE COURT: Overruled.
THE WITNESS: There were issues for our customers. What we were finding for the customers and the applicators who were applying the graphics themselves, air release has always been a big issue and basically a time constraint in terms of putting large jobs up.
BY MS. BROOKS:
Q. Were you still technical director of the commercial graphics division when Comply was publicly released?
A. No, I was not. I left the division in mid 1997, and I believe it came out in the '98 time frame, maybe a little bit afterwards.
Q. And when you left the division in mid '97, where did you go?
A. I went to become the executive director of our life sciences laboratories and also the traffic and graphic laboratories. So I still had some relationship to commercial graphics, but I was in the executive function and really was not overseeing the laboratory directly.



Q. At some point in time did you return to the commercial graphics division?
A. I did.
Q. When was that?
A. I came back in 2001 to become the division vice president for commercial graphics division.
Q. What were your responsibilities as vice president of the commercial graphics division?
A. As vice president of commercial graphics division, I was responsible for the worldwide business in commercial graphics, which included a significant amount of sales for the company.
Q. Were you vice president of the commercial graphics position when Avery Dennison released a product into the marketplace called EZ Film?
A. I was.
Q. And before we move on, who is Avery Dennison?
A. Avery Dennison is a company centered in Los Angeles who has been a competitor of commercial graphics division and other divisions in 3M for many years. They're also a producer of graphic marking films.
Q. What was this EZ Film product that they released?
A. It was a product that again addressed both the positionability and the air release issues in the application of graphics.



Q. What was your reaction when you learned of the release of Avery Dennison's EZ Film graphic product?
A. I wanted to see it immediately.
Q. Why?
A. We felt that they were using the same technology that we were using, and we wanted to make sure that that was true.
Q. Did you know for sure that they were --
A. No, I did not, not until I saw it.
Q. Okay. Sorry. I ran over your answer.
A. I'm sorry.
Q. No. It's my fault. Did you know for sure that Avery Dennison at that point in time was, had basically knocked off 3M's product?
MR. PEARSON: Object. Leading. Lack of foundation.
THE COURT: Objection sustained. Why don't you re-ask the question?
BY MS. BROOKS:
Q. You say that you wanted to see the EZ Film product. Why did you want to see it?
A. I wanted to see how it performed, and I wanted to see what the structure was.
Q. Why did you want to see what the structure was?
A. I knew the basis for our patent, and I knew what our

is that lines per inch?
A. Correct.
Q. And the Controltac film is the Controltac Plus film we have been talking about?
A. No. In this case, CT film refers to a vendor, Consolidated Thermoplastic.
Q. Well, in the upper corner under the subject, you're using CT film there differently?
A. That is CT Plus. There is a definite distinction between the two.
Q. And what distinction is that?
A. One is Controltac Plus, which is a liner for a graphic. CT film refers to the vendor who supplied me with the 50 line per inch liner.
Q. Okay. And what is the 50 line per inch -- well, first of all, let me ask you this: Is CT film used in making Controltac Plus?
A. No.
Q. What is it used in?
A. It is used for the segmented adhesive as a liner.
Q. And what does 50 lines per inch refer to?
A. That is the spacing of ribs on that liner.
Q. What ribs on the liner?
A. The segmented adhesive is adhesive put in the pockets of a liner level full. The liner looks like a miniature



waffle, so you're filling each individual block with a separate segment of adhesive.
Q. What exactly are the lines? I'm missing that.
A. The lines, that goes back to printing industry. Lines per inch is just the spacing.
Q. Spacing of what?
A. The ribs on the liner.
Q. Okay. This may be what I'm missing. What are those ribs used for?
A. They are used to divide adhesive film into individual blocks of adhesive or segments.
Q. Segments for the segmented transfer tape?
A. True.
Q. Okay. So you brought some of this material over to Frank Sher, is that right?
A. Yes.
Q. And then if we continue down on this page, it says that when you brought this over, you had a discussion with Frank Sher, is that right?
A. True.
Q. And part of the discussion was the discussion about liner exchange, is that right?
A. Yes.
Q. And is this the liner exchange that you testified about in your direct examination?



A. Yes.
Q. And it's correct that with liner exchange, you can -- explain to me in a little bit more detail what this liner exchange is, and let me ask you this: Does liner exchange refer to putting two separate liners on a film in sequence?
A. Yes.
Q. Okay. And so these two liners that you put on a film in sequence, one liner would have possibly one type of pattern on it. You would put that on the film and peel it away, is that right?
A. Yes.
Q. And then you would take that film and attach it to a second liner that had a different type of pattern and peel that away, is that right?
A. Yes.
Q. And one of those types of liners that you were talking about with Frank Sher at this time, again in March of 1995, was to have embossed ridges on it, isn't that right?
A. Yes.
Q. And that liner with the embossed ridges would give air egress -- impart air egress channels to the adhesive on the film, is that right?
A. That's what we tried to do.
Q. Okay. And this is in March of '95, correct?
A. Yes.



Q. And you said that you had your discussion, that Frank Sher asked you to do the -- I'm sorry. Let me back up.
Dr. Calhoun asked you to do the experiment where you would take the Controltac film and put embossed ridges on it maybe a few weeks before the end of May of '95. That was your testimony, right?
A. Yes.
Q. So this discussion with Frank Sher occurred before you had any discussion with Dr. Calhoun whatsoever about trying to make air egress channels in a film, isn't that true?
A. I didn't quite catch your question.
Q. Your conversation with Dr. Sher about embossing a liner to impart air egress channels on a film happened before you had a conversation with Dr. Calhoun about the same thing?
A. This was a previously embossed liner that happened to have ridges. I did not emboss this liner.
Q. Okay. But you had -- let's continue down with this paragraph that you wrote, and by the way, you wrote this and put it in your lab notebook because you thought it was important at the time, didn't you?
A. Yes.
Q. And if we could highlight the sentence that says, "This could form." Do you see that?
You said that this liner exchange could form temporary grooves in the PSA. That's the pressure

sensitive adhesive, right?
A. Yes.
Q. That would allow air to bleed. Isn't that what you wrote?
A. Yes.
Q. And so you discussed taking a liner that was already preembossed and putting it on a film, pressure sensitive adhesive film, to create air channels for air bleed before you ever had a conversation about that with Dr. Calhoun, true?
A. I may have talked to Clyde before this about air bleed. It was a common problem.
Q. You didn't record anything in your laboratory notebook about discussing this issue with Dr. Calhoun before you made an entry in your laboratory notebook about discussing it with Dr. Sher, correct?
A. I don't know of any entries before this time.
Q. And you make entries in your lab notebook at the right time when things happen because you're told to when they might be important to conception of an invention?
A. Yes.
Q. Now, when you then have the conversation with Dr. Calhoun about taking a Controltac Plus film and embossing it to create channels for air egress, did you tell him that you had already had a conversation with



Dr. Sher about that?
A. I told them of this work where we tried to emboss the adhesive using a liner.
Q. For air egress, right?
A. Yes.
Q. So it was no secret to either you or to Dr. Calhoun that somebody else within 3M had thought of the idea already of making -- of taking a liner with embossed ridges and putting it on a PSA film to help solve the problem that everybody knew about, which was trapped air?
A. Yes.
Q. Isn't that right?
A. Yes.
Q. Now, if we go to page 58 of your notebook, which you looked at on direct examination, these pages of your notebook describe experiments that you did to -- that were follow-up to your discussions with Dr. Calhoun, right?
A. Yes.
Q. And the knowledge about how to impart positionability pegs on the adhesive on a film by embossing the surface of a liner with divots and filling it in, that was already pretty well known by this time, wasn't it?
A. It was an existing product.
Q. That was going to be my next question. 3M actually had a successful commercial product on the market that did this



very same thing, right?
A. Yes.
Q. So there wasn't a whole lot of experimentation that you needed to do on how to get those divots right and how to fill them in right to get positionability, correct?
A. It had already been done.
Q. The work that you had to do that followed your discussions with Dr. Sher and Dr. Calhoun mostly pertained to how to get these ridges right so that you could get the air egress channels, didn't it?
A. Yes.
Q. And to do that work, you had to create something called a master plate, is that right?
A. A tooling plate, yes.
Q. What is a tooling plate? Is a tooling plate sometimes referred to as a master plate?
A. It could be.
Q. And what in 3M speak is a master plate or tooling plate?
A. In this case, they were etched magnesium printing plates that had the appropriate pattern etched in by acid and then were bonded to a steel roll to make a tooling roll.
Q. And by the appropriate pattern, these would be a pattern of posts that would stick out that would impress



then in onto the liner, is that right?
A. Posts would be for Controltac Plus.
Q. Well, slightly larger posts, kind of like a waffle iron, is that right?
A. Yes, it would look a bit like a waffle iron.
Q. Okay. Only just on a much smaller scale?
A. Yes.
Q. And the ends of what I would call the waffle iron, that's what impresses down into the liner, and that creates what we have been referring to as the land area?
A. Yes.
Q. And that displaces the top of the liner, the surface of the liner and causes those ridges to form up, is that right?
A. Yes.
Q. And by the way, the top surface of these liners, that's made out of some sort of a polymer material, is that right?
A. Typically they are polyethylene.
Q. Okay. And you use polyethylene, first of all, the polyethylene is coated on top of paper to create these liners?
A. Paper or polyester.
Q. Okay. And the reason why you use polyethylene is because that is something that can be heated and melted, is that right?

**Q.** That's the written description before the claims, right?
**A.** Yes.
**Q.** And there is a background section where you describe the advantages of the '397 patent, right?
**A.** Yes.
**Q.** And in that section describing the advantages of the '397 patent, one of the things that you told the patent office about in the application for the '397 patent was an earlier patent developed back in 1978 or so where inventors had taken a liner for a pressure sensitive adhesive and created ridges on it to solve the air bleed problem, right?
**A.** I believe it's in there, yes.
**Q.** And so you knew it was no secret at the time that you applied for what became the '397 patent, and Dr. Calhoun applied for what became the '930 patent, the patent that is at issue here, that making ridges on the surface of a liner would impart grooves or channels in the pressure sensitive adhesive of a film to solve an air bleed problem, right?
**A.** Yes.
**Q.** And that was something that was known in the art, correct?
**A.** Yes.
**Q.** So when Dr. Calhoun or Mr. Sher -- well, let me back up.



When you undertook to take the Controltac 2 liner and to put an embossed pattern on it to create the ridges, whether you were -- whether you thought you would be successful in making those ridges or not, you knew if you were successful that in all likelihood, you could improve the performance of Controltac 2 by giving it air bleed characteristics, right?
**A.** That's why we did the work, yes.
**Q.** I'm sorry? That's why you did the work?
**A.** Yes.
**Q.** All right. So let me just make sure I understand this. You knew that a Controltac 2 liner gave you positionability, right?
**A.** Yes.
**Q.** And this is back in the 1995 time frame, right?
**A.** Yes.
**Q.** And you knew that installers of these graphic films liked to be able to put them on easily, right?
**A.** Yes.
**Q.** And you knew that just like anybody hanging wallpaper, you want to be able to -- installers would want to be able to position this material, right?
**A.** Yes.
**Q.** And you knew that you could put these large scale graphic films on easier if you could get air bubbles out of



them, right?
**A.** Yes.
**Q.** And you knew, it was no secret to anybody, that air bubbles can be aesthetically, you know, displeasing, right?
**A.** Yes.
**Q.** Installers, people that pay for these films to put them on the sides of trucks want them to look pretty, right?
**A.** Yes.
**Q.** And you knew that if you could be successful in embossing a Controltac 2 liner that had the depressions filled with glass beads, you would solve this problem, right? You could get the air out?
**A.** Yes.
**Q.** And that was no secret to anybody, was it?
**A.** No.
**Q.** It was pretty obvious, right?
**A.** Yes.
MR. HADLEY: That's all I have.
THE COURT: Is there any redirect examination, Mr. Singer?
MR. SINGER: Very briefly, Your Honor.
THE COURT: Go ahead.



**REDIRECT EXAMINATION**

BY MR. SINGER:
**Q.** Hello, Mr. Meixner.
**A.** Hello.
**Q.** Did you believe you could make a multiple embossed liner to achieve the goals of air egress and positionability together?
**A.** No.
**Q.** Regardless of how desirable it might be?
**A.** Yes.
**Q.** Now, I would like to show you a couple pages from your notebook that Mr. Hadley showed you, real quickly.
**A.** Okay.
**Q.** And I want to go to the page from March.
And, Your Honor, we had a redacted exhibit that was shown to the jury or published. We would simply move that we substitute the full, the full copy of the page here in the actual notebook.
MR. HADLEY: Your Honor, I just want to make it clear that the redaction was not something that Avery did. That was produced to us by 3M in that redacted format. If they want to now disclose the whole document, we're fine with that.
THE COURT: It will be admitted without the redaction.

Ryder -- they'll buy the components of that vehicle and they'll assemble the entire vehicle for Ryder or for whatever customer they're doing the job for. So they build the body and they also install the graphics.

You'll see that there's a dotted line to the graphic manufacturer, and the reason for that is is that in some cases graphic manufacturers have their own internal installers, so they're part of the organization, but in most cases they utilize independent installers that are scattered throughout the United States.

Q. And you had mentioned the graphics manufacturer. What is it that that manufacturer actually makes?

A. A graphic manufacturer would wind up buying material from 3M Company or other media suppliers. They'll buy the material from us which would come in sheets or rolls. They will then print on that material. I think you're -- in opening remarks you saw some graphics. In this case that was a small sheet, but they will actually print on the material, making the graphic. They'll then cut and convert that to the appropriate sizes and shapes necessary for the end installation of the graphic themselves.

Q. And then working backwards, what is it that 3M provides to the graphics manufacturers?

A. 3M provides a whole host of different products. In this particular case you're looking at films, so there's a wide



range of films that 3M would provide to the graphic manufacturer depending on what kind of graphic is being constructed. We provide inks, we provide accessory items of all different kinds, and in some cases we even provide the printing machine itself.

Q. Okay. Mr. Calisto, I'd like to take you, if I could, back to the 1994 time frame or thereabouts, and at that time frame, what were the products that 3M's Commercial Graphics Division was offering to its customers?

A. Well, there were many products that we offered back then, but if we want to focus on the fleet side of the business a little bit, just to give an example, I would break it up into four distinct areas by the following: removable adhesives, so you would have the ability to install a graphic and then remove it; permanent adhesives, so once it's there it's there and you're not going to take that thing off -- and a lot of those products would be used for warning labels on lawn mowers and such where you don't want somebody tampering with the graphic itself; then you have pressure-sensitive adhesives, and then you would have pressure-activated adhesives. So when you look at the combination and you put that on various different size films, that was the whole range of products.

We offered from a brand perspective primarily two. It was the Scotchcal brand, which was the pressure-sensitive



type of product, and then the Controltac Plus, which was the pressure-activated type product. So those -- if you want to look at it from a brand perspective, two primary lines. Each line obviously had its family of individual products that we sold based on thickness of film, type of adhesive, et cetera, but primarily Scotchcal, permanent; Controltac Plus, pressure-activated and removable.

Q. Let's focus on the Controltac that you just mentioned in that 1994 time frame. Were you personally involved in the sales of Controltac?

A. Well, I was personally involved in the marketing of the product, yes.

Q. And did you receive feedback as to what customers liked and what they didn't like about the Controltac product?

A. Yes, I did. The customers basically fed back to me two areas of Controltac Plus product: the positionability -- and I think we talked about -- maybe it's been talked about, positionability, the ability to apply a graphic, make sure it's in the right place before it adheres. During opening remarks, I think it was contact paper that was used as an example, that if you don't do that right, you're going to have a problem. So the positionability of the graphic itself was very, very important. Controltac Plus provided that. By the name, Controltac, it controls the tacking of the adhesive, so that's why we gave it that brand, as well as the



removability of the product itself. So two of the features that the customers really raved about and why they bought our product.

Q. Did customers communicate to you any negative feedback or any problems that existed with the Controltac product?

A. No. There weren't any problems with the Controltac product based on the claims that we made and what the installers and graphic manufacturers experienced. There were no problems with that particular product, no.

Q. Have you heard about the air entrapment problem?

A. Well, we didn't hear about an air entrapment problem from anybody per se. It was something that 3M Company went out and pursued for various reasons.

You know, we talked about the market and generating new markets and new business. One of the things that as a division we were looking to do was try to promote the short-term advertising market on vehicles. You might have seen some small vehicles that go around now with -- well, the train outside I guess would be one case. That's short-term advertising, and the only way you're going to sell short-term advertising graphics on these is if you take cost out, because graphics can be very expensive. Installing graphics is not easy. It's not trivial. It takes a lot of time. So the market was saying: If you want us to participate in this, you got to give us materials that are easy to install

and easy to remove, and in that arose the issue of air entrapment. That was one of the problems that came out from the customers, because it takes time to get rid of the air bubbles. So if there was a way to easily do that, apply the graphic, have no air, then we could have a market that we could participate in.

Could I give an analogy?

Q. Sure.

A. It really was yesterday preparing for court. I had a shirt that I needed to iron and took it to the ironing board and I started to iron. And probably all of you have ironed shirts before. It took a little bit of time to get all the wrinkles out. You know, you thought you got it right and you're moving the iron down and sure enough you get a wrinkle. The same thing happens with graphics, so then, of course, you got to lift the graphic off, make sure that the wrinkle goes away, and the wrinkles are created because air is underneath the graphic itself.

So if we could devise systems for shirts where you can take, you know, ten shirts and iron them in half an hour instead of an hour, that would be a benefit. If we could take graphic materials and make them easy to install so that an installer can do a hundred vehicles in a week rather than three weeks, that's a benefit to the user, to the installer, to the graphic manufacturer, and obviously to the material



seller such as 3M, because then we open up a whole new market.

Q. Were you able to introduce -- was Commercial Graphics able to introduce a product that helped solve these problems?

A. Yes, we did.

Q. What was that product called?

A. Well, we called it Comply. So in -- we started showing the Controltac with Comply Performance probably sometime in 1997 with formal introduction of a product at the SGIA show in 1998, SGIA standing for Screen Printers Imaging and Graphics Association, so that was basic -- a big trade show that they have every year.

Q. And did you prepare marketing materials to help launch the Comply product?

A. Lots of them.

Q. Mr. Calisto, if you would look at what's been marked as Plaintiff's Exhibit Number 69 in front of you and tell me if you recognize that document.

A. This one here?

Q. Yes.

A. Oh, I'm sorry. Yes, intimately.

MR. ADKISSON: At this time, your Honor, we would move Plaintiff's 69 in evidence.

MR. HADLEY: I have no objection.

THE COURT: 69 is admitted.



Q. Mr. Calisto, can you just briefly take us through what Exhibit Number 69 is?

A. Yeah. It was a marketing brochure that we created in order to communicate to the entire range there that you saw of the industry, the graphic manufacturers, installers and end users -- those are the people we were really trying to communicate to. This brochure takes them through the benefits of the Comply Performance. I do believe we have illustrations of how it is constructed, showing the adhesive with the Controltac post as well as the air egress channels, and there were various different applications that we were promoting, including films that they could try out for themselves so that they could get a feel for how the product would actually perform when they do a small installation.

Q. Were you personally involved in the launch of the Comply product?

A. Yes, I was, very much so.

Q. And can you tell us -- and did you receive feedback once you had launched that product from the marketplace?

A. Yes.

Q. What was the initial feedback that you received regarding the Comply product?

A. Well, I think with any new technology and feature like this, at first it was more or less, wow, this is very exciting, this is great. So what. What's it going to do for



me? And that was a whole educational process that 3M Commercial Graphics Division had engaged in. I mean, it was a hefty marketing exercise that we went through in order to convince the market that this was not just another feature on a piece of film, but it truly was a benefit to everybody within that supply chain. We made some sales, we made a lot of progress, but it took some time to get people to understand the benefit of it and really engage and embrace it.

Q. Did you undertake to show specific customers the Comply product?

A. Yes. Again, going back to that pull-through marketing diagram, that's how we sold everything to the end users. Whenever we created a new product or a new market or service, we would take it to the end user to make sure that they understood our offering so that they then in turn would pull it through the graphic manufacturer.

Q. And on that graphic we saw Ryder trucks, and was Ryder Trucks one of the companies that you showed this to in 1998?

A. Yes, it was.

Q. And how did that come about?

A. Well, it was -- in December of 1998, Ryder was getting ready to renew or let, if you will, a new contract for several thousands of vehicles that they were going to have produced and those vehicles obviously require graphics.

We were trying to position our Controltac 160 Plus with Comply Performance, which is -- let me explain. It's a four-mil. It's a little bit thicker film with a removable adhesive with the Comply Performance. And the reason why we were selling the removable adhesive in this case was because required leases their vehicles and they like to turn the vehicles around in three years, so then they want to take the graphic off and resell the vehicle to another party. They were looking for 3M and others to quote on the films that would be used to -- to produce the graphics and then have them applied to the vehicles.

Callaway, which was also on that slide, was a graphic manufacturer and they called and asked me, because I was the business unit manager at that time, to give them the best price on the film that we thought would be applicable to this particular customer, so I did that. They were not satisfied with the pricing that we gave them and tried to apply some pressure to get us to reduce the price of the product because our competitor had a substantially lower price, and that if we --

Q. Let me stop you there. When you say "competitor," do you mean Avery Dennison?

A. Yes, I do.

Q. Okay.

MR. HADLEY: Objection, your Honor. Hearsay,



personal knowledge. It's foundation for his testimony.

THE COURT: Why don't you ask some additional foundational questions, Mr. Adkisson.

MR. ADKISSON: Sure.

Q. At this time, had Ryder been a customer of 3M's?

A. Oh, yes.

Q. In 1998?

A. Yes.

Q. For how long?

A. Many, many years. I don't recollect the exact number of years, but Ryder's been a customer of 3M's for many, many years.

Q. And was Ryder a substantial customer of 3M's?

A. Yes.

Q. So in 1998, did you get a phone call?

A. In 1998 I got a phone call from Ron Moore of Callaway Systems, that's correct.

Q. And did that phone call involve the price of your product?

A. Yes, it did. He requested that I provide him a quote.

MR. HADLEY: Objection, your Honor. Hearsay.

MR. ADKISSON: Subject, your Honor, to our earlier motion in limine, customer statements about the price of the product are admissible.

MR. HADLEY: And also relevance, your Honor.



THE COURT: The objection is overruled. You may testify. Go ahead.

A. I'm sorry. Would you ask the question again?

Q. I had asked you whether Mr. Moore talked to you about the price of your product.

A. Yes, he did.

Q. What did he say?

A. Well, basically, that at the price that we were quoting, we were way above the competitor and stood little chance of getting the business, so I better sharpen my pencil.

Q. And what was your response?

A. Well, I believed in the product that we had developed and I believed that there was real value there, so I held ground and I told Ron: "I'm sorry. You know, there's real significant value here for you, real significant value for Ryder, because it's going to take cost out of the end product."

I mean, film price is a very small portion of the total applied cost of the graphic. It's a small portion, 15 to 20 percent maximum depending on the size of the graphic, et cetera, but it's a relatively small portion. Installing a graphic back then was running somewhere in the area of about a dollar a square foot, a dollar to a dollar 25 a square foot to install a graphic, and if we could take the half time out, that would reduce the cost to Ryder significantly. So the



small percentage that we had in there for what we believed was real value I thought was warranted, so I held fast to the price.

Q. And what happened next?

A. Well, he hung up on me, which was not good, but we got together again the following week. He called me and said: "All right. You know, I'm going to give you another shot." And we held firm again and I asked that he give us an opportunity to demonstrate to him the value of the product.

I think it was a couple days later or a week later -- I don't recall precisely the number of days that transpired between that phone call and the time he called me back and said: "Okay. I've thought about it. You have the opportunity to demonstrate the value of the product. Come on down on such-and-such date and you're going to show not just me, but you're going to show the Ryder executives, you're going to show the installer community, the body builders, and we're going to have your competitor here as well, so you're going to have to prove it in front of everybody that your product in fact warrants that kind of price."

Q. So this was a head-to-head showdown?

A. Yeah.

Q. And did that showdown actually take place?

A. Yes, it did.

Q. Okay. Take us through -- first of all, were you

actually -- did you actually attend this showdown?
A. Yes, I did. I felt it very important. In my position at that time as the business unit manager, there was no way I was not going to be there. I mean, it was a risky proposition. You know, you take a look at -- you know, a head-to-head showdown with a competitor in front of a very high-profile customer like Ryder was a little risky.
Q. Okay. And where did the showdown take place?
A. It was in Atlanta. It was at Callaway's facilities. He had a large garage, a barn, if you will, in the back, and when we got there they had -- you walked into this -- it was a big garage. He had two vehicles, two 24-foot -- what they call box trucks. So they had two 24-foot box trucks set up, scaffolding on one side of each vehicle. There were three of our competitors there, three individuals from Avery Dennison. There was the installer, two of the executives from Ryder, Callaway themselves, and then 3M, if I recall correctly. I don't think there was anybody else there, but 3M was obviously there, and we walked in and the showdown began.
Q. Okay. Tell us what happened next.
A. Well, the way it was conducted -- and I thought they did a nice job of laying it out. There was one installer, and the reason for having only one installer was to remove the variable of one installer being better or faster than the other and this was an independent installer, so he had no



loyalties one way or the other to any of the graphic manufacturers or film manufacturers.

We laid out the films and the installers began installing. They installed on one vehicle the 3M product and on the other vehicle -- one side now, so full 24-foot length and eight foot high. They applied the film on one vehicle and then the next, and basically what we did was take just a stopwatch and time the time for installation, how long it took the installer to apply these graphics.

Now, the criteria was that the graphic once installed had to look good. By the way, there was no graphic on the film. Let me clarify. It was just white film at that time, but it still needed to look good. There could be no bubbles. You know, there were discounts if there were bubbles or wrinkles.

So basically, whoever applied the graphic fastest and the best-looking won, and that's how it was conducted and 3M came out ahead on that one.
Q. Okay. Well, let me back up for a second, because you had mentioned that it was -- Avery was the competitor at the Ryder showdown?
A. That's correct.
Q. Do you know, first of all, which Avery product was being put on the side of the truck?
A. Well, precisely -- the number, no, but Avery had a



four-mil PlaceRite product. Now, PlaceRite is not the name of the product, it's really the adhesive, and they could put the PlaceRite adhesive on various different films just like we can the Controltac and the Comply we can put on different kinds of films.

But they had a four-mil PlaceRite product that was supposedly removable like our 160 product was, so essentially equivalent in the sense of thickness and supposedly removability. Obviously, the difference between ours and theirs is, ours had the Controltac Plus feature, which was and is a better feature for positionability, plus the Comply Performance channels which allowed for the air egress to take place.
Q. So if I heard your testimony right, it's the PlaceRite product versus the Comply product, is that right?
A. Controltac Plus with Comply Performance, correct.
Q. Okay. And then what were the results?
A. The exact times I don't recall, I think it's in the report of mine, but it was approximately 40 percent, 35 to 40 percent time savings that we were able to demonstrate to Ryder, to Callaway, to the installers and to the body builders, and that's a significant time savings installing film.
Q. What was the Avery representatives' reaction at the end of this showdown?



A. Well, I can't say for sure how they felt. I can only give you my interpretation. They did not -- it was shock.

MR. HADLEY: Objection, your Honor. This is calling for speculation as to how Avery's people felt.

THE COURT: Sustained.
Q. Were you able to notice any visible reaction from the Avery people, from whom you personally observed?
A. Yes.
Q. And what was that reaction?

MR. HADLEY: Same objection, your Honor, unless he's going to be describing physical features. If he's going to be describing their state of mind in any way, this is objectionable testimony.

THE COURT: Objection sustained. He can testify as to anything he observed rather than their own physical reaction or their own internal state of mind.
Q. Did you observe anything, Mr. Calisto?
A. Yeah, from a physical reaction. I mean, it was basically a state of agitation, you know, lots of talk, lots of pointing. I do believe even one of them went to the garbage can and took a look at our product, you know, the leftover liner. So they were agitated. I mean, that was obvious to me. Physically, they were excited.
Q. When you got back from Atlanta, did you prepare a trip report for this Ryder showdown?

A. Yes, I did, primarily because of certain actions that needed to be taken by our manufacturing people.
Q. Okay. If you could, Mr. Calisto, turn to what's been marked as Plaintiff's Exhibit Number 56 in your witness binder.
A. Okay.
Q. And do you recognize that exhibit?
A. Yes. It is my trip report after the visit.
MR. ADKISSON: Your Honor, we would ask that Plaintiff's Exhibit 56 be moved into evidence.
MR. HADLEY: No objection.
THE COURT: 56 is admitted.
Q. Mr. Calisto, if you would, the top of this page talks about the customer visited and it talks about Callaway Systems and there's some names after that. Do you know who those people are?
A. Yes, I do.
Q. And who are they?
A. Ron Moore was the owner and president of the company. Michael Plumb was one of his employees. He was basically the sales executive, if you will, for the company. Chuck Clearman was his production vice president. And Jeff question mark was one of Chuck's employees.
Q. Okay. And in this report, if you look further down on the page, is there a section called "Results"?



A. Yes.
Q. And could you take us through what that section is discussing?
A. Yeah. It's basically what I was trying to describe earlier of what actually happened and how the products were installed.
One of the things -- besides the Comply Performance that 3M introduced to the industry was the ability to install graphics in a horizontal fashion and that is described there. We say there were two rolls, one for the bottom, one for the top. Typically, graphics were installed in vertical, up and down, (indicating) sheets. Because of handling and the difficulty of applying graphics, typically people did not apply graphics in a horizontal fashion, long rolls. But that's what we also demonstrated there.
But you'll see the times for Avery and you'll see times for the 3M product, and you'll note that from a time perspective we calculated 33. With the right premask, the calculation that we were estimating would be about 40 percent, which is what I mentioned earlier.
Q. Okay. And if you turn to the second page of that report, you had mentioned earlier in your testimony December of 1998. Do the dates on the second page help you any further in determining when this Ryder showdown took place?



A. No. I can't pinpoint the date. I'm sorry. I don't know whether it was the 5th or not, but I know the minute we -- you know, when we got back we laid out the plan to begin qualifying our products, color generation, et cetera, that we needed to -- needed to provide Callaway and Ryder for their approval, but I don't recall the exact date of the visit.
Q. Okay. But can you say based on this that it was sometime in December of 1998?
A. Oh, yes, it was in December of 1998.
Q. Okay. After the Ryder showdown, did you continue to be personally involved in the selling of Comply?
A. Yes, I did.
Q. And did the Ryder showdown have any effect on the marketplace's reaction, if you will, to Comply?
A. Well, as I mentioned earlier, when we first introduced Comply, it didn't -- it generated excitement, but there wasn't a lot of sales activity. After the showdown, if you will, I think there was real credibility that was established. In other words, it was no longer just talk that 3M was doing and was not just a marketing game of benefit. It was proven benefit to a large customer, a high-profile customer such as Ryder, proven benefit to a large graphic manufacturer and proven benefit to the body builders that themselves recognized the benefit of using 3M product. And they're the ones who actually passed on the big savings to



Ryder by cutting the charges that they were going to have on installing the graphics, so they're the ones that passed on the savings to Ryder.
Q. And so can you characterize just in very general terms 3M's sales in terms of the Comply product in the years following the Ryder showdown?
A. Well, after the credibility gets established -- you know, in marketing terms you talk about creating awareness, interest, trial use and then reuse. You don't have success until you have reuse. Well, with that showdown, we really proved and created the awareness, the interest and the trial, and the use and reuse really started to take place. So OEM customers, such as Polaris, Harley-Davidson, on and on and on, these people who needed to take cost out of their products, started to ask for our product, because they believed based on what they've heard and seen that our product would help them and sales started to pick up considerably.
Q. Let's fast forward then, if you would, Mr. Calisto, to talk about this case, and are you aware of the product that's being accused of infringement in this case?
A. Yes, I am.
Q. Do you know what that product's called?
A. Well, it's the EZ-Apply, but it is, again, an adhesive system that I think could be put onto various different

products, so I don't think there's just one particular product. In this issue, I think the FT1000 EZ-Apply film is really the one that's being called out.
Q. Okay. And how did you first learn about the EZ-Apply film?
A. Well, it actually came about from one of our customers, a couple of our customers after we had the Ryder showdown and again created, I think, the enthusiasm and buying for our products. They cautioned us a little bit on what -- you know, what's your competitor going to do and so on and so forth, and eventually I got wind from our one of competitor -- excuse me -- from one of our graphic manufacturers that Avery was in fact planning on introducing a like product to the marketplace.
Q. Well, let me direct your attention, if you would, Mr. Calisto, to what's been previously marked and admitted as Plaintiff's Exhibit Number 291 which is in front you.
MR. ADKISSON: And if you would, Ms. Fuhrmann, highlight the end -- the final e-mail in that string. Thank you.
Q. Do you recognize this e-mail, Mr. Calisto?
A. Yes, I do.
Q. And did you receive this e-mail?
A. I did indeed.
Q. And in this e-mail it says that: "Avery has shown



Admark a product that is their version of Comply. It is called Easy Series, ADV26-0081."
Is this the customer that you were referring to in your testimony just a minute ago?
A. Yes, one of the customers.
Q. Okay. After you received this e-mail, do you know whether Avery launched its EZ Film into the marketplace?
A. Yes. The plan -- as standard operating procedures is the SGIA show. The SGIA show of 2001, unfortunately, was called off because of the September 11th activities, but Avery was planning to show the EZ product at the SGIA show based on even their own publications on the website. So, yeah, they did introduce it, formally took it to market in a trade show, in the ISA trade show, I think was 2002.
Q. And did you attend that trade show?
A. Yes, I did.
Q. Did you go to Avery's booth at the trade show?
A. Absolutely.
Q. Okay. And what did you see there?
A. Well, that's where they introduced the product to the industry, as I said. Now, the ISA, incidentally, is kind of the sister trade show to the screen graphics side, ISA meaning, you know, the International Sign Association. So earlier I talked that I had managed a business in the fleet and commercial side, but also the architectural and sign



graphics, so the sign graphics being signs like the Hilton sign and a lot of interior small signage as well. So there's a sign industry. At that sign industry show, they introduced the EZ product and were demonstrating it in their booth.
Q. Okay. Describe the demonstration, if you would.
A. I don't recall if they had a panel and a vehicle, but like any demonstration of a film and how it applies, you have an installer who's there who's speaking to the benefits and the features of the product, demonstrating it to the public, taking the liner off the film, because you have to do that in order to apply it, and then applying it and demonstrating how easily it went on and demonstrated no bubbles, et cetera, so basically replicating, you know, very much what we have been doing.
Q. So at this trade show you saw Avery instructing their customers to take off the liner?
A. I saw an individual there in the Avery booth telling them to remove -- well, they have to remove the liner, yes. So you remove the liner and you apply it to the graphic and showing how you squeegee it to make sure that you're applying it properly and then demonstrating that there were no air bubbles.
Q. Mr. Calisto, in conjunction with Avery's launch of this product, did you review any other literature in conjunction with Avery's launch of this product?



A. Standard operating procedure, yes. I mean, it's a competitive product that I needed to become aware of and the claims they were making, so yes, I did.
Q. If you would, Mr. Calisto, turn to Plaintiff's Exhibit 231 which has been placed in front of you.
And is this one of the pieces of literature that you reviewed?
A. Yes, it is.
MR. ADKISSON: Your Honor, we would ask that Plaintiff's Exhibit 231 be moved into evidence.
MR. HADLEY: No objection, your Honor.
THE COURT: 231 is admitted.
Q. Mr. Calisto, can you tell us what this document is?
A. Well, it would be like, you know, 3M's or FLEXcon's instruction bulletins. Basically, it instructs the customers, again, users, installers, graphic manufacturers, how to use their product, what the features, benefits and advantages of the product are. It'll get into some specifications and some application areas, but basically how to use the product.
Q. Okay. And subsequent to the Avery launch of the product, you continue to be involved in the marketing of Comply, is that correct?
A. That is correct.
Q. And what, to your knowledge, has been the impact of the

in micrometers.
Q. Okay. What about the darker images that we see? Can you tell us what those are?
A. When you say the darker images, do you mean -- this is -- there we go. This area in here (indicating)?
Q. Yes.
A. Those appear as lower regions or depressions. You can tell. You see the dark blue, and that dark blue is approximately equivalent to about that minus 5 micrometer color. The surrounding area, the floor of the cell is at about zero to plus five micrometers.
Q. Okay. And again, how can you tell that these depressions as you called them are minus five micrometers?
A. In this case I'm using the color scale. We also can take quantitative data directly from this image using the software that was used to create this.
Q. Okay. And is this image consistent with the remainder of the Avery liner that you evaluated?
A. Yes, it is.
MR. ADKISSON: Okay. I have nothing further, Your Honor.
THE COURT: Cross-examination, Mr. Hadley?
MR. HADLEY: Thank you, Your Honor.
Give me one second, Doctor.



CROSS-EXAMINATION

BY MR. HADLEY:
Q. Okay. Good afternoon, Doctor.
A. Good afternoon.
Q. My name is Larry Hadley, and I'm one of the attorneys representing Avery Dennison in this case. I've got just a few questions about your direct testimony. First of all, I want to understand a little bit more about this instrument that you use and how you use it.
A. Certainly.
Q. And this is something called a Wyko NT-3300?
A. That's correct.
Q. Is another name for this machine sometimes referred to as a profilometer?
A. Yes, it can be.
Q. And what you try to do with a profilometer or what a profilometer allows you to do is to examine the topography of a surface, is that correct?
A. That's correct.
Q. With the topography of the surface it allows you to see both areas that are raised, correct?
A. Correct.
Q. And areas that are lower or sunken or depressed, is that correct?
A. That's correct.



Q. And I believe you said that in order to find -- this makes sense. In order to find what is raised and what is lowered, you need to start it someplace, right?
A. Yes.
Q. You need to have I think what you described as an arbitrary reference point, right?
A. It can be, yes.
Q. Okay. And this reference plane is showing that you really have to identify in order to see if something is raised and something is lowered, correct?
A. Yes.
Q. And if we establish this reference point -- by the way, can we pull up Exhibit 4? That was plaintiffs' demonstrative Exhibit, 4 which is the penny, I believe the back of the penny.
Okay. There we go. To make sure that I understand, this arbitrary reference plane that you have established for this penny would be indicated on the graph on the right-hand side, is that right?
A. I'm not sure what you're asking.
Q. Well, you had to select a reference plane to determine whether something was raised and something was lower, correct?
A. That's correct.
Q. And the graph on the right-hand side, do you see there



is a zero --
A. Yes.
Q. -- right there (indicating)? And that for this surface defines the reference plane, correct?
A. Yes, it does.
Q. Okay. So if we take a reference plane, which with this profilometer defines the surface, then we can see where there may be raised areas or ridges, correct?
A. That's correct.
Q. And if we see raised areas from this zero point, then we have what might be described as ridges, correct?
A. That could be correct, yes.
Q. And that would be areas indicated by the more -- the lighter shades going into the red shades?
A. Yes.
Q. And if we wanted to see from that same arbitrary surface whether there were lower areas or something that might be called depressions, we could determine that as well, right?
A. That's correct.
Q. And that would be areas that have the darker blue going down the scale, right?
A. That's correct.
Q. So if we were standing at a reference point, we could tell whether a surface had both ridges and depressions,

698

correct?
A. That's correct.
Q. And that would be identified by having something that was in the red and something that was in the blue, correct?
A. Yes.
Q. And if we had both red and blue, then we would have a single surface that had both ridges and depressions, correct?
A. I'm not sure that that would be a correct statement.
Q. Why not?
A. Because a depression in my mind would be defined as relative to a particular defined surface.
Q. Okay. But if we had, if the zero point was our particular defined surface and from that particular defined surfaces our profilometer showed both red areas and blue areas, then we would have both ridges and depressions on the same surface, is that correct?
A. Yes.
Q. Have you ever heard of the term "lands"?
A. Yes.
Q. Would that be another term for the reference point or surface area?
A. It could be, yes.
Q. So if we defined our lands as this reference point and then saw the red area and the blue area on the same

699

surface, from the land we could have both ridges and depressions, right?
A. That's correct. Yes.
Q. Now, you said you tested a sample of Avery's liner. Let's pull up Exhibit 86. Doctor, do you know how this sample was prepared?
A. I prepared this sample.
Q. How did you prepare it?
A. In this case, I separated the adhesive film from the liner and looked at the surface of the liner that had this structure on it, so looking down on top.
Q. So you had a piece of Avery's film that had both a -- had both a film and the liner attached, right?
A. Yes, sir.
Q. And you peeled it apart?
A. Yes.
Q. And what you looked at under the microscope and took a picture of here was the liner part?
A. That's correct.
Q. Under what magnification, does it say on here?
A. 25.1 X is the nominal magnification. It's on the upper left-hand portion of the topographic image.
Q. So that's 25 times magnification?
A. That's correct.
Q. And you described this area, let's see if I can make a

700

circle here, as being a depression, is that right?
A. That is a little bit large of an area. It's the darker region within that.
Q. It's the dark region within the circle that I drew?
A. Yes.
Q. I didn't completely color the darker areas, and do you know how that, what caused that depression? Did you study that?
A. No, I did not.
Q. Sir, you saw other depressions, depressed areas in the liner, right?
A. Yes, I did.
Q. I think you testified that this was fairly consistent with what you saw in the liner, right?
A. It is.
Q. Did you happen to notice the various shapes of these dark areas?
A. In general, yes, I did.
Q. Isn't it true that you saw no two of these shapes that were exactly alike?
A. I don't know about exactly alike. They were all very similar. Some were arc-like, circular, ring-like.
Q. While they may have been ring-like. They were all different, weren't they?
A. In the absolute sense, yes.

701

Q. And with almost all of them, you saw areas that were darker and some areas that were lighter within the same general area, is that right? Let me point out what I mean.
A. Okay.
Q. If I put an arrow right here, do you see that area is darker?
A. If we could enlarge that a little bit so that I could see it better, please?
Q. Okay. Do you see that area that is darker?
A. Yes.
Q. Okay. And then we have another area here that is darker, correct?
A. That's correct.
Q. We have another little area down here that is darker, right?
A. Yes.
Q. And in fact, we even have a couple little specks here and here that are darker, right?
A. That's correct.
Q. And then we have some areas such as where I just put the next arrow where it's lighter, right?
A. Yes.
Q. And then maybe even another little area right up here where it's lighter, right?
A. Yes.

at a top view of the carrier web, so the carrier web on this graphic is represented by the gray area, is that right?
A. Yes. That's right.
Q. And then the plastic forms you say are represented by the green?
A. Yes.
MR. HADLEY: Your Honor, could we have the witness testify? These questions are all leading in terms of taking the witness through these demonstratives.
THE COURT: Objection sustained.
BY MS. BROOKS:
Q. Now, I would like you, if you could, to look at Exhibit 103 that's in your notebook. Have you seen this before?
A. Yes.
Q. What is it?
A. This is a scanning electron microscope micrograph of the Avery carrier web with the polyurethane forms on top.
MS. BROOKS: Your Honor, we would move Exhibit 103 into evidence.
MR. HADLEY: No objection, Your Honor.
THE COURT: 103 is admitted. Is that --
MS. BROOKS: It will come up on the Power Point, Your Honor.



BY MS. BROOKS:
Q. What are we looking at here, which is Exhibit 103?
A. Well, you see in the scanning electron microscope everything is kind of gray colored, but you can see the carrier web and then this array of circular forms that are the plastic forms.
Q. And I'm not sure if this will work or not. I have just done a very hand fisted circle. I tried to. Have I circled one of the polyurethane forms?
A. Kind of.
Q. Kind of. That's the best you're going to get from me, I'm afraid. There we go. What is a scanning -- you called it a SEM. What is a SEM?
A. That's a scanning electron microscope, and this is a micrograph. That is a picture that you take using electrons. They scan the surface, and you can get rather good magnification of very small things using this technique.
Q. At what stage of Avery's manufacturing process does the carrier web look like this?
A. I'm sorry. I didn't hear you.
Q. At what stage of Avery's manufacturing process does the carrier web look like what we're looking at in Exhibit 103?
A. That's the stage where those plastic forms have been applied, but nothing else has yet been done to the carrier



web.
Q. The plastic forms that you saw, the polyurethane forms, were they in this type of array that we're looking at here in Exhibit 103?
A. Yes.
Q. Did you actually go to the manufacturing facility that makes the Avery EZ Film liner?
A. Yes. I went to that facility and inspected it very closely, did several analyses while I was there. Spent the day there and listened to a deposition of the general manager of the plant, and in addition to that, I have seen a video of the plant where they put on these dots or the forms -- the plant where they put them on, and then they ship them to another place where they do the next steps in the process, and so this is the incoming product in the second plant.
Q. You say that you have actually seen a film of where they put these polyurethane forms onto the polyethylene, is that right?
A. Yes. That's correct.
Q. How are they put on?
A. They're put on as a thick ink material. They use a printing process, and they use this thick polyurethane ink, and then they -- and it's put on as an array. The general manager of that plant calls it in fact an array, and then



he says that they are cured with ultraviolet light.
So they have UV lamps, and it goes underneath that, and in fact he commented that they put in an extra UV lamp to make sure that these polyurethane forms are really hard.
Q. So are they put on with a tool?
A. Yes. There is a softened tool that has got holes in it, and as it touches the surface, it applies these polyurethane forms.
Q. Let's go to the next. Now are we back to looking at a graphic?
A. That's correct.
Q. And what are we looking at here in this graphic?
A. Well, this is the next stage in the process. As the material goes through a machine, you can see that the polyurethane forms are pressed into the surface of the polyethylene carrier web.
Q. So the blue line, the bright royal blue line that we're looking at, what does that represent on this graphic?
A. That represents the upper surface of the carrier web.
Q. And the green shapes, what are those representing on this graphic?
A. Those are the depressed in polyurethane forms.
Q. So once the polyurethane forms are depressed into the polyethylene, what happens to the surface of the carrier

web?
A. Well, it's deformed. There is little depressions that are created by this pressing in of the polyurethane forms, and so the, you know, the polyurethane displaces the polyethylene, and so the polyethylene moves aside and you get a depression in the surface of the polyethylene.
Q. Well, what is the chemical phenomenon that occurs? Why is it that the polyurethane and the polyethylene don't just get all mixed up when this happens?
A. Well, when this happens, the polyethylene has been softened with heat, so it's soft, but the heat is not sufficient to substantially soften the polyurethane. They're still hard. That's one of the reasons that the people who apply the polyurethane make sure it's so well cured.
So you've got a hard thing and a soft thing, and when they're pressed together the soft one just displaces and creates this depression to allow for the pressing down of the polyurethane.
Q. Well, how do you know that the polyethylene that is now softened, how do you know that it doesn't come all the way up and over the polyurethane?
A. Well, first of all, I saw it, and I realize that it was not pressed down that far, but there is a critical issue that would suggest that that -- well, would demand that



that could never be, and that is, as we will see later on, there is some adhesive that is applied to this -- to this -- to the tops of the polyurethane.
And that adhesive must touch onto the polyurethane so that the polyurethane comes out of that depression because the polyurethane is going to end up being the repositionability knob.
Q. Okay. We're going to get to that in a little bit.
A. Yes, we'll see that in a minute.
Q. Okay. Sorry. I was kind of jumping ahead there. Now what are we looking at in this graphic?
A. Well those -- that's the depression, the pattern of depressions that you would see when the polyurethane has been lifted out.
Q. Okay. All right. Now we have gone to another graphic. What are we looking at here? If you could walk the jury by using the color coding what we're looking at on this graphic.
A. All right. Let's start from where we were. The red of course is still the polyethylene. That's the softened, easily softened material, and you can still see the green polyurethane, the hard little forms. They're still there, but now what we have done is imposed a second pattern on top of what we had before.
If you will notice, that second pattern consists



of ridges and lands, the lands being the space in between the ridges.
Q. Go ahead.
A. And so you can see that the depressions with the polyurethane forms is in the -- in the other pattern.
Q. Now, does this imposing of the lands and ridges on top of the depressions, does that have to happen sequentially, or can it happen at the same time?
A. Doesn't matter.
Q. What are we looking at here?
A. That's the same thing that you just saw, top view. Again you can see the hexagonal pattern is the lands and the ridges, the lands being the flat part of the hexagons and the ridges the part that defines the six sided figure there, and the green things are the depressions with the plastic forms.
Q. If you could look at the notebook you have in front of you and look at Exhibit 79. You don't have it in front of you? No Exhibit 79? We'll get it if you don't.
A. I do have 79.
Q. Okay. Have you seen that before?
A. Yes.
Q. What is it?
A. It's a scanning electron microscope picture, micrograph, of the hexagonal pattern with the depression



pattern as well.
MS. BROOKS: Your Honor, we would move Exhibit 79 into evidence.
THE COURT: Any objection?
MR. HADLEY: No objection, Your Honor.
THE COURT: 79 will be admitted. I assume that's next on the screen?
MS. BROOKS: It is, Your Honor. Let's see. There we go.
BY MS. BROOKS:
Q. Looking at what is on the screen as Exhibit 79, you said this is a scanning electron microscope photo again?
A. Yes.
Q. And what is it a photograph of?
A. It's the Avery carrier web, and both patterns are present.
Q. And when you say, "Both patterns," can you show the Ladies and Gentlemen of the Jury. I think if you touch your -- maybe I should try it on my screen again. Let's see if we can do it. Okay.
I've sort of drawn a circle, and unfortunately it made an arrow in the middle, but what did I just circle?
A. You circled one of the depressions.
Q. And I'll try it again. What did I just circle there?
A. That's another depression.

Q. And now I'm just going to touch that. What does that arrow show?
A. That touches a land in the other pattern.
Q. And I'll touch right here, what does that show?
A. That's another land.
Q. Okay. Let's see if I can do this, then. How about there? What does that show?
A. That's one of the ridges in the second pattern.
Q. All right. Managed to do that. Now, did you see this pattern of depressions within a pattern of lands and ridges in the Avery liner?
MR. HADLEY: Objection. Leading.
THE COURT: Overruled.
THE WITNESS: Yes, I did.
BY MS. BROOKS:
Q. Now, I would like to go back to another graphic. We had left off with showing the pattern of lands and ridges and depressions. Now after that liner is made, what happens next?
A. I've drawn this graphic to show that there are really two things now that are added. The first is the yellow adhesive. That's a liquidy-like material so that it's spread over the top, and as you can see, it conforms to the pattern of the ridges.
Where the ridges go up, it goes up, and it



touches, and of course as I mentioned before, bonds to the top of the polyurethane plastic forms, and it fills a space in above the carrier web. It's part of what is carried by the carrier web.
Q. Then what's the sort of purply pink area?
A. Well, this product, one of its uses is the signs that go on trucks and buses and so on, and so that graphic film is then applied, and that graphic film is what you see. It's the decoration.
Q. Holding up Exhibit 74, is this similar to the Avery EZ Film product when it's complete?
A. Yes.
Q. So if I understand you, is the top, this part I'm holding up now the film, is that peeled away then from the carrier web?
A. Yes. As you use this product, you peel off the carrier web and then apply the film, and the adhesive and the polyurethane forms go with the graphic film side.
Q. Did you make an animation to show how that happens?
A. Yes, I did.
Q. All right. What are we looking at now?
MR. HADLEY: I'm sorry. Your Honor, we have not seen this animation.
MS. BROOKS: It's just the Power Point pulled apart.



THE COURT: It's just them moving apart. Is there any additional animation?
MS. BROOKS: That's it, Your Honor. I can put it back together if you would like. There you go. May I --
THE COURT: You may proceed.
MS. BROOKS: Thank you.
BY MS. BROOKS:
Q. All right. We have looked at the graphic where you say that we've got the adhesive, the film, the carrier web, the whole thing put together?
A. Yes.
Q. And now if we can separate the two, what are we looking at now?
A. The top part is what goes on the truck or the bus, and as you can see, it has those little green plastic forms underneath, and that gives repositionability, and as you can see, it also has those grooves in the yellow adhesive.
Those give air egress, and those forms were allowed to be placed in there by the carrier web, the top surface of the carrier web which is defined by the royal blue color. And as you can see, it's got ridges and lands and depressions within the pattern of ridges and lands, and then below that, that dark red, is the remaining part of that polyethylene carrier web.
Q. If one were going to apply this graphic film, could you



do it without pulling it away from the carrier web? I shouldn't get theoretical on you. I just want to make sure we understand. The adhesive part, the sticky part that has got the polyurethane bumps and the channels in it --
A. That's correct.
Q. -- is that the underside of the graphic film?
A. The way you apply it is, you peel away. As we have done here, you separate the two, and then you put the graphic side onto the surface to be decorated.
THE COURT: Ms. Brooks, let's take a ten-minute break here.
MS. BROOKS: Thank you, Your Honor.
**(Recess taken.)**

(3:15 p.m.)
IN OPEN COURT
(Jury enters)
THE COURT: You may be seated. You may continue, Ms. Brooks.
MS. BROOKS: Thank you, your Honor.
BY MS. BROOKS:
**Q.** Dr. Strong, right before the break we were looking at the graphic where the graphic film adhesive and polyurethane forms had now been pulled away from the carrier web. Do you still see that on your screen?
**A.** Yes.
**Q.** So at the bottom, is -- what does the bottom, the red and the blue, now represent on this graphic?
**A.** That's the polyethylene carrier web.
**Q.** Is it still a carrier web even though it's no longer carrying anything?
**A.** Yes, because it has carried something, and it's my understanding of the definition that's appropriate here, it by that definition would be a carrier web still.
**Q.** Let's go back now to Exhibit 79, the SEM. Is this a picture of Avery's carrier web before or after the adhesive and graphic film and polyurethane forms have been removed?
**A.** This is after the polyethylene -- I'm sorry -- after the polyurethane forms and the graphics and the adhesive have



been removed, after.
**Q.** And I believe we already -- and I circled -- we already circled the depressions that are there?
**A.** Yes, I remember.
**Q.** Now, how do you know that the depressions are there when the adhesive and the graphic film are still on the carrier web? How do you know that these depressions that we can clearly see on Exhibit 79 are there when the graphic film is still attached to the carrier web?
**A.** Well, I know it several ways, really.
The first is that the depressions were there before the separation and the depressions were there after the separation, and my knowledge of plastic tells me that they were there in between the separation too, and so I just -- I just absolutely know that they were there.
**Q.** Why didn't you take an SEM of the carrier web while the polyurethane forms and the adhesive and the graphic film was still attached?
**A.** It's not possible to get an SEM into that little tiny area. You've got to look at the top exposed surface of something, so if it's all together you can't get an SEM in there, so you have to separate it to view it.
**Q.** Now let's turn, if we could, to the patent. Well, let me just stop. Have we now described Avery's carrier web and what it looks like if we were one micron high and were able



to stand on that carrier web and take a good look?
**A.** I think so.
**Q.** Now let's turn to the patent.
What is your understanding of what it takes for a product to be infringing a claim of a patent?
**A.** To infringe a claim, the product must infringe each and every element of that claim.
**Q.** Showing you this graphic, is this claim 1 of the '930 patent that is at issue in this case?
**A.** Yes, that is.
**Q.** All right. Let's start at the very beginning of the claim. Sorry, but since you said it has to have every element in it, we're going to have to go through every single one.
We'll start with a carrier web comprising, and now we're talking about Avery's EZ Film carrier web.
**A.** That's correct.
**Q.** First of all, is it a carrier web?
**A.** Yes. Here we see a scanning electron micrograph of the carrier web material and you can see that it's got length and breadth and it certainly fits the definition of what a carrier web would be.
**Q.** Is it something that either can carry, is carrying, or has carried another material?
**A.** Yes, definitely.



**Q.** And is this the Court's actual claim construction of what the term "carrier web" means in this case?
**A.** Yes.
**Q.** So we can check off the first element?
**A.** Yes. You can make the little "yes" appear there.
**Q.** All right. Let's go to the second element.
"At least one surface that has a multiple embossed pattern having a first embossed pattern and a second embossed pattern."
Let's see if that element is present. What are we looking at again here?
**A.** Again, the SEM or scanning electron micrograph of the surface of the carrier web.
**Q.** Now, what we're looking at is not a graphic, am I correct? This is an actual photograph of Avery's EZ Film product.
**A.** That's correct. That's the real thing.
**Q.** Now, I have highlighted certain items in red. What do those highlightings show?
**A.** Well, as you can see from the legend that I've had put on there, that those are the depressions that are created by the polyurethane forms. As they are pressed down into this softened polyethylene liner, it moves them aside and creates that pattern, that array of depressions.
**Q.** Were you present when Dr. Cavaleri testified?

730

A. Yes, I was.
Q. And did you hear him talk about this profilometry that he did on this carrier web?
A. Yes.
Q. So do you know whether or not these depressions are capable of actually being measured?
A. Yes, they are.
Q. So if I were one micron high and standing on this carrier web, would I fall into one of those depressions?
A. You would if you took a step forward.
Q. If I stood on the land, I'd be okay?
A. Yes. The lands are okay, but those -- those depressions are about five -- about five microns deep.
Q. How big is a micron?
A. That's a millionth of a meter. A meter is about a yard, so it's about a millionth of a yard.
Q. Okay. So pretty small?
A. Pretty small.
Q. Now, I have highlighted one area in light blue and another area in a darker blue. What does that represent?
A. What we did here was just simply take the previous SEM, so this is still an SEM, where we have highlighted in the dark blue the ridges and highlighted in the light blue the lands, the second pattern of ridges and lands.
Q. So does the red -- what does the red represent?

731

A. That's the first pattern of depressions.
Q. And what does the light blue and the dark blue represent?
A. That's the second pattern of ridges and lands.
Q. So does Avery's carrier web have at least one surface that has a multiple embossed pattern having a first embossed pattern and a second embossed pattern?
A. Yes, it certainly does.
Q. And do you understand what the Court has construed the term "embossed" to mean?
A. Yes.
Q. What does embossed mean as the Court has construed it in this case?
A. Means a topography, that is, a surface profile, on a web or tooling having an effective three-dimensional pattern that generates a difference in planar surface dimension on the liner or the tooling.
Q. Now, is there anything in the Court's construction of the term "embossed" that requires that the embossing be done with a tool?
A. No. The reference to tooling is just saying "or a tooling." It could be on the surface of the tooling, but it could be on the surface of the carrier web, so there's no requirement there that it be done with a tool.
Q. So looking at the actual SEM of Avery's EZ Film liner,

732

does it have at least one surface that has a multiple embossed pattern having a first embossed pattern and a second embossed pattern?
A. Yes, it does. As you can see down on the bottom, it says "yes."
Q. Let's turn to the third element. It says: "Wherein the first embossed pattern forms an array of depressions."
Let's go back. Is this the SEM again?
A. Yes, that is.
Q. Now, what's represented by the red highlighting?
A. That's the depressions, and as you can see, they are arrayed, and therefore it does contain an array of depressions.
Q. Has the Court in this case construed what the term "array" means?
A. Yes, it has.
Q. And what has the Court said array means?
A. An orderly arrangement.
Q. Let's go back and look at this SEM.
Now, if I'm looking at this correctly, these depressions don't look exactly the same size.
A. That's -- okay. They don't look the same size. They're a little bit irregular.
Q. Do they need to be -- according to the Court's claim construction, do the depressions have to be exactly the same

733

size in order to be in an orderly arrangement?
A. No, not required.
Q. And how has the Court construed the term "depressions"?
A. Well, a depression means a lower or sunken area or depressed area in a carrier web.
Q. And did you observe that with your own eyes, these lower sunken or depressed areas of the carrier web?
A. Yes, I did.
Q. Now, I believe you told us, though, and we saw the graphic, that before the film is pulled away from the carrier web in the depressions are polyurethane forms. Did you tell us that?
A. Yes, that's correct.
Q. So is it still a depression, as far as you know? Is it still a depression if it's filled with polyurethane?
A. Yes, of course.
Q. How do you know that?
A. Well, the polyurethane displaced the polyethylene and created that depression, and the fact that the polyurethane form is still in the depression certainly doesn't take away from the fact that the depression is still there.
Q. Do you know whether or not the depressions then in this case can be empty or filled?
A. Yeah, it's -- it's like a lake bed. You know, the lake bed is a depression in the surface of the earth, and whether

there's water in it or not, it's still a depression in the surface of the earth, so that's what's happened here.
Q. And so do we have in Avery's EZ Film product a first embossed pattern forming an array of depressions?
A. Yes.
Q. Let's go to the next element: "Wherein the depressions of the first embossed pattern are in the second embossed pattern."
Same SEM.
A. Yes.
Q. We're still looking at an actual photo of Avery's EZ Film liner.
A. That's correct.
Q. And now I've highlighted in light blue and dark blue what pattern?
A. This is the second pattern of ridges and lands. As you can see, in this case it's hexagonal, so you've shown this pattern on the Avery liner surface.
Q. And now what does the red highlighting represent?
A. Those are the pattern of depressions, and as you can see, they are in. Now, a comment here. They don't have to be dead center in each of those little hexagons, because the pattern of ridges and lands superimposes itself on these depressions, on the pattern of depression, so they're clearly in the pattern of ridges and lands.



Q. So do we meet the element? Does Avery's EZ Film liner meet the element of "wherein the depressions of the first embossed pattern are in the second embossed pattern"?
A. Yes, we do.
Q. And let's go to the next element: "Wherein the second embossed pattern comprises lands and ridges between the lands."
Everybody's going to know what this is.
A. Yes.
Q. It's a picture of the Avery EZ Film carrier web.
A. That's correct. It's the SEM.
Q. And now I've highlighted something in blue. What is that?
A. That light blue color is the lands.
Q. And now I've highlighted something in a darker blue. What is that?
A. That's the ridges.
Q. And so is the second embossed pattern -- I just want to make sure so that it's clear to the ladies and gentlemen of the jury.
This highlighting that I'm doing, this is not on a graphic, is it? Is it on an actual photo of the Avery EZ Film liner?
A. Yes, that's correct.
Q. And does Avery's EZ Film carrier web have a second



embossed pattern that comprises lands and ridges between the lands?
A. Yes, it does.
Q. Let's go to the very last element: "And wherein the height of the ridges over the lands ranges from about 3 to about 45 microns."
First of all, were you present in court when the Court read a stipulation that Avery has stipulated that it meets this element of the claim?
A. Yes, I was.
Q. And just very quickly to see why Avery has stipulated, what are we looking at here?
A. That's a specification by Avery of their product and you can see the range of the embossed height is --
THE COURT: Just a moment.
MR. HADLEY: Your Honor, is this really necessary when we have a stipulation?
THE COURT: Which exhibit is this?
MS. BROOKS: Actually, I was showing it as a demonstrative. We can just pass this. We have this before the stipulation, so if your Honor likes, I can just go right through these.
THE COURT: Okay.
BY MS. BROOKS:
Q. And so has Avery in fact stipulated that it meets this



last element: "Wherein the height of the ridges over the lands ranges from about 3 to about 45 microns"?
A. Yes, it has.
Q. So, in your opinion, Dr. Strong, based on your analysis of Avery's EZ Film carrier web, does it meet each and every limitation of claim 1 of the '930 patent?
A. This is the entire claim, and as you can see, each of the elements has been broken out and Avery does meet every single element.
Q. Now, if we could, could we go to claim 2, and we're only going to do five and they're going to go really fast now.
Claim 2 reads as follows:
"The web of claim 1, wherein a depth of depressions caused in the surface by any embossing pattern can range from a minor fraction of an original thickness of web to almost the entire original thickness."
Is that how claim 2 reads?
A. Yes, it does.
Q. Now, first of all, it begins with the saying "The web of claim 1." Do you understand what an independent versus dependent claim is?
A. Yes, I do.
Q. Could you tell the ladies and gentlemen of the jury what is the difference between an independent claim and a dependent claim?

A. Yes, I'd be happy to.
One of the ways that patents are written is that there are some claims that stand alone and claim 1 that we've just seen stands alone. Then there are other claims that depend upon claim 1, and you can identify them usually by some phrase like we see here, "the web of claim 1." It means you've got to have claim 1 or this one doesn't even apply. And so this one becomes known as a dependent claim, depending, obviously, on claim 1, and it's going to make some other characterization about the product that goes beyond claim 1.
Q. And if I could just try an analogy here. If I had a recipe for a cake, a unique recipe that I claimed as claim 1, would a depending claim then be perhaps that cake with icing?
A. Yes. That's a good analogy.
Q. And then dependent claim 3 might be that cake with sprinkles.
A. Yes.
Q. And dependent claim 4 might be that cake with icing and sprinkles.
A. That's correct.
Q. All right. Let's look at dependent claim 2. First of all, we've shown all the elements of claim 1 are present in Avery's EZ Film liner.
A. Yes. And to represent that idea, I've put on the liner



in its -- in its final form here with both patterns being shown, and so the demonstrative that you see in the middle of the screen is really to signify all of claim 1. That's what that means.
Q. And then this claim requires that the depressions can be anywhere -- they can range from a minor fraction of the original thickness of the web to almost the entire thickness. What does that mean to you?
A. Okay. So what we've got is all of claim 1 and now we're going to talk a little bit about how deep the depressions are, because we haven't talked about that yet in claim 1. So here's claim 1, and now there will be some discussion of the depth of the depressions and they've put some limits on it.
Q. And did you look at the SEM and determine whether or not Avery's EZ Film carrier web met the requirements of claim 2 of the patent?
A. Yes, I did.
Q. And what was your opinion?
A. Well, as you can see, we have -- we have the pattern of depressions in there and we also have the lands and ridges and they range from a minor fraction -- we've already seen that there are about five mils deep in some cases and the ridges are 3 to 45 -- and we also see that it's not the entire thing. If it was the whole thing, there would be a hole that you could look all the way through and I never ever



saw one. Never did I see that.
Q. So did you find that Avery's EZ Film carrier web met claim 2 of the infringed claim 2 of the '930 patent?
A. Yes.
Q. Let's go now to claim 3. It's: "The web of claim 1, wherein the surface can be embossed with any pattern ranging from a minor fraction of an area of the surface to the entire area of the surface."
Could you tell the ladies and gentlemen of the jury what we're looking at now?
A. Okay. Now we're going to do another dependent claim, and so it's all of claim 1, again represented by the little graphic there in the middle of the screen, and now we're going to look at the area of the pattern, and the area is restricted to a minor fraction or the entire surface. And as you can see in this case, the area of the pattern is pretty much the entire surface.
Q. So did you find that Avery's EZ Film carrier web infringed claim 3 of the '930 patent?
A. Yes, I did.
Q. And let's go now quickly to claim 4: "Wherein the claim 1" -- I'm sorry: "The web of claim 1, wherein a shape of embossings for any pattern can range from a constant radius of curvature to a polygonal shape of at least 2 surfaces."
That was a mouthful. Can you tell the ladies and



gentlemen of the jury what I just said?
A. It's really simple. Again, it's claim 1, and the shape of the pattern can be -- it can be all kinds of different shapes, like, it could be a hexagon, or it could be a square, or it could be a circle, or it could be a light bulb shape, or it could be a diamond. So it's all kinds of shapes are allowable in the pattern.
Q. And what did you find when you looked at the SEM of Avery's EZ Film carrier web?
A. It certainly qualifies. In this case it's a hexagon.
Q. So did you find that Avery's EZ Film carrier web infringed claim 4 of the '930 patent?
A. Yes, I did.
Q. And let's go now to claim 5. "The web of claim 1, wherein a width of embossings in any pattern can range from about 1 micron to about 10,000 microns."
Now, what are we talking about here?
A. Okay. Again, it's the whole claim 1, and then they're just talking about how wide is the pattern.
Q. Did you look at any specification -- I'm sorry. The exhibit number is cut off on this, if I could just have one second.
MS. BROOKS: If we could have just one moment, your Honor, we need to pull up the exhibit.
Q. Did you look at any Avery materials that describe the