# EXHIBIT B

Part 2 of 2

width of, for example, the ridges on their liner?
A. Yes, I did. I looked at an Avery product specification, how it's supposed to be made.
Q. And did you find whether or not the width of -- for example, we'll pick the ridges -- was within the range of 1 micron to about 10,000 microns?
A. Yes, I did look at that and it is within that range.
MS. BROOKS: Your Honor, and we'll just move that in with the Court's permission later when we find it.
THE COURT: That's fine.
Q. And so in your expert opinion, Dr. Strong, does Avery's EZ Film carrier web infringe claims 1 through 5 of the '930 patent?
A. Yes, all of them.
Q. Now, there's been quite a great deal of discussion regarding how those depressions are made with those polyurethane forms. Do you recall that?
A. Yes.
Q. And that those polyurethane forms are actually embedded into the carrier web. Were you here when that testimony -- or discussion was had?
A. Yes.
Q. Claim 1, as I recall, requires a first pattern of embossed depressions, is that right?
A. Yes, that's correct.



Q. If in fact those depressions are created when the polyurethane forms are embedded into the carrier web, are those then embossed depressions?
A. Yes. The embedding or the pressing into the softened polyethylene liner constitutes the process of embossing that liner, so embedding in this case is the same as causing that embossing to occur, so the embedding and the embossing occur at the same time.
Q. Let's talk for a moment, if we could, about the doctrine of equivalents. Are you familiar with that?
A. Yes.
Q. And is that a concept where if, for example, a claim is not literally present -- well, actually, back up. I haven't asked you this.
Have you found in your analysis that every element of claim 1 is literally present in Avery's EZ Film carrier web?
A. Yes, I have.
Q. And have you found the same for claims 2, 3, 4 and 5, that those elements are literally present in Avery's EZ Film carrier web?
A. Yes, they are literally present.
Q. Now, if for some reason someone thinks that perhaps one of those elements is not literally present -- let's take embossing from a hypothetical perspective. I know it's hard



to do because you said it's literally there, but let's say for some reason it's not. Are those elements performing substantially the same function in substantially the same way to achieve substantially the same result?
A. Yes, I believe that they are.
Q. So is it your opinion that all of the elements of claims 1, 2, 3, 4 and 5 are also present in Avery's EZ Film product under the doctrine of equivalents, if for some reason they're not literally there?
A. Yes, they're all there also by the doctrine of equivalents.
MS. BROOKS: And, your Honor, the exhibit that has the specification which I was going to refer to is Plaintiff's Exhibit 219, and I ask that be moved into evidence.
MR. HADLEY: No objection, your Honor.
THE COURT: 219 is admitted.
MS. BROOKS: Thank you, your Honor.
Q. Thank you, Dr. Strong.
THE COURT: Cross-examination?
MR. HADLEY: Your Honor, could we take a brief recess? The presentation that Dr. Strong used in the form we got it is completely out of order from what we saw it presented, and it appears that -- as I see, the last slide number is 57. We only got 52 slides, so we need to work this



out.
THE COURT: Five-minute break, or would you like more?
MR. HADLEY: We can try to do it in five minutes.
THE COURT: Let's take a ten-minute break.
(Recess taken at 3:50 p.m.)
* * * * *
(4:05 p.m.)
IN OPEN COURT
(Jury enters)
THE COURT: You may be seated. Mr. Hadley, cross-examination.
MR. HADLEY: Thank you, your Honor.

**CROSS-EXAMINATION**

BY MR. HADLEY:
Q. Dr. Strong, my name is Larry Hadley. I don't think we've met before. I'm going to ask you some questions about your testimony and your expert opinions today. I think we've finally got your slides arranged in the proper order and we will come to those in a moment.
First of all, Dr. Strong, I understood that you were offered as an expert in the field of plastic materials, is that right?
A. Yes.
Q. And you're not an expert on embossing or embossed

A. Yes, that's correct.
Q. And that embossing roll is a big cylinder, is that correct?
A. Yes, that's true.
Q. And that cylinder has around it a hexagonal pattern.
A. That's correct.
Q. That are protrusions sticking out from the roll.
A. That's correct.
Q. And that roll --
A. No.
Q. That's not correct?
A. Well, let's be sure. What's protruding?
Q. What's protruding is the hexagonal pattern.
A. Okay.
Q. They're posts, basically, coming out.
A. If I could --
Q. Sure.
A. -- the ridges and lands of the hexagon pattern is going to be created by the inverse of ridges and lands on the embossing roll.
Q. That's your understanding of how embossing works?
A. That's one way, yes.
Q. And this cylinder is pressed up against another cylinder that doesn't have any -- that basically has a flat topography, is that right?



A. Yes. It's called a backing roll.
Q. And so the paper goes in between these two rolls and pressure is applied to the paper.
A. You mean to the carrier web?
Q. Well, pressure is applied to the entire thing that I'm holding, right?
A. Well, pressure's actually applied to the polyethylene side.
Q. There's no pressure applied to the paper side?
A. That's the side against the backing roll.
Q. But the whole thing is under pressure, isn't it?
A. Oh, yes. I'm sorry.
Q. It's just that no pattern is made on the back because the backing roll doesn't have a pattern on it.
A. That's correct.
Q. So not just what you describe as the carrier web is embossed or is passed through -- let me strike that.
Not just what you've described as the carrier web is passed through this embossing machine, the entire sheet is passed through.
A. That's correct.
Q. And when it comes out, those ink bumps that were printed on top of the liner are pressed in. Do I have that right?
A. That's one of the things that's happened, yes.
Q. And the other thing that happens is the inverse of that



hexagonal pattern gets pressed into the top -- the top of the sheet. Do I have that right?
A. Let me be a little clearer there. The polyethylene sheet has now been deformed and it now has both the pattern of the hexagonal pattern and it also has the depressions in it now from the pressing in of the polyurethane forms.
Q. The silicone has the same form, doesn't it?
A. The silicone -- that's one of the reasons I didn't count it as a layer. It just follows the polyethylene.
Q. So it ends up with the same form as the polyethylene, right?
A. Yeah. Polyethylene is the carrier and in fact in this case is carrying the silicone.
Q. And the silicone then when the adhesive is applied carries the adhesive.
A. Well, the polyethylene's the shaped member and so that's the important one in the patent.
Q. But you just said that the silicone is also shaped, right?
A. No, the silicone follows the shape of the polyethylene liner.
Q. What does that mean? Does it mean it has the same shape?
A. Well, whatever the surface of the polyethylene liner is, the silicone goes along with it.



Q. Well, let me ask you this: When the adhesive -- the next step in the process is to put adhesive on top of this sheet, correct?
A. Yes, that's true.
Q. Now, does the adhesive make contact with the polyethylene or the silicone?
A. With the silicone and with the top of the polyurethane.
Q. That was going to be my next question. Let's just make sure this is clear.
When the adhesive is applied, it's contacting two things, correct, the silicone and the polyurethane ink?
A. Yes, and the silicone is following the pattern of the polyethylene even under the polyurethane.
Q. The adhesive never makes contact with what you call the web.
A. That's -- you mean the polyethylene web?
Q. Yes.
A. Yes, the adhesive does not touch the polyethylene web.
Q. And then the film, the part that I'm now holding in my right hand, is laminated on top of the adhesive.
A. The graphic, you mean?
Q. Yes.
A. Yeah. The graphic is then placed on top of the adhesive and it adheres to the adhesive. To the other side. I'm sorry. To the other side of the adhesive.

Q. Now, at this Omnova facility there is one embossing roll, is that correct?
A. You mean one machine?
Q. One embossing machine.
A. Well, there's lots of embossing machines and one of them is used by Avery.
Q. And there's one embossing cylinder. Let me put it that way. Would you agree with that?
A. Yes. On the machine that is used by Avery, there's one cylinder that they call the embossing roll.
Q. Now, you've also studied the Comply product, haven't you?
A. No.
Q. Haven't you visited -- didn't I read someplace that you visited the facility where 3M makes its Comply product?
A. No, I didn't.
Q. You've never seen how 3M makes its Comply product, am I correct?
A. You're correct, I never have.
Q. Do you have an understanding as to how 3M makes its Comply product?
A. Well, I've been in the courtroom. I've heard what testimony has been given.
Q. And you understand that when 3M makes its Comply product it uses two embossing cylinders instead of one.



A. I've heard that that's one of the options, yes.
Q. Well, it's not just one of the options. There is no other way that 3M makes its Comply product, is there?
A. Well, I don't know that because I haven't seen the 3M process.
Q. Well, you just said that it's one of the options. I took that answer to mean that there was another option, but you don't really know whether there's another option, right?
A. Yes, I do know that.
Q. There's another option that 3M employs?
A. Well, there's another option because the patent calls for another option.
Q. And what's that?
A. It says it can all be done in one step on a single roll.
Q. And if it's done all in one step on a single roll, you understand that what gives you -- with the Comply the positionability is the ability to fill the first depressions, the holes, with a glass bead slurry. You've been in the courtroom when that's been talked about, right?
A. Well, I've been in the courtroom. I don't know exactly how 3M would do it if they did it with a single roll.
Q. That wasn't my question. You don't know -- in fact, we've heard no testimony as to how 3M could fill those depressions with a glass bead slurry to get positionability if you used a single tool to make both patterns.



A. I don't know how that would happen. I'm sorry. I don't know what 3M would do because I haven't heard anything about it.
Q. Well, in fact, did you hear Mr. Meixner's testimony?
A. I did hear his testimony, yes.
Q. I believe I asked him something to the effect of whether they'd figured out to get both patterns to create air egress and positionability in something other than using two embossing rolls at different times, and he said they didn't know of a way. Did you hear that?
A. I'm sorry. I don't remember that testimony.
Q. At least you don't know of another way and you don't know that 3M has figured out another way.
A. Well, all I know is what the patent says and there is another way according to the patent, but I don't know if 3M has figured it out, how to do it.
Q. Well, when you say that there's another way according to the patent, the patent doesn't say anywhere in it that a first set of depressions can be filled with glass beads and simultaneously have a pattern of lands and ridges if it's all done at the same time. You didn't see that in the patent anywhere, did you?
A. Well, you're making a lot of restrictions there that -- no, I didn't see what you said in the patent.
Q. The patent just makes in one sentence a reference that



with an appropriate tool two patterns can be made at the same time, correct?
A. That's more like what I read, yes.
Q. And that sentence has nothing to do with filling the depressions with glass beads.
A. I don't know if that's the way 3M would do it or not.
Q. My question was that sentence had nothing to do in the patent with filling the depressions with glass beads.
A. Well, the glass beads are not in that sentence and so I don't know if it has to do with that or not.
Q. Now, turning back to Avery's liner, you would agree with me that when that embossing roll presses in the ink so that the silicone and polyethylene is displaced and the polyurethane goes where the polyethylene and silicone had been, that those ink dots are embedded flush with the surface of the liner?
A. Well, this was -- yeah. Let's be clear about what that means. The polyurethane forms are pressed down into the polyethylene liner, displacing it and creating the depressions, and I'm not sure -- and I gave testimony in my deposition about how I'm not sure -- if the poly -- if the top of the polyurethane was even with the surrounding liner or not. Certainly I said that when it comes through the nip -- I'm sorry -- through that pressure point (indicating) on the embossing, it's likely even with the surrounding

770

material of the polyethylene liner.
Q. Well, let's see exactly what you said in your deposition. Can we go to page 53, line 21?
"Question: Do you agree with me that after the Avery product passes through the nip roller, that at that point in time the embedded ink is flush with the surface of the liner?
"Answer: One would certainly think so. As I recall, SEMS -- sorry -- the scanning electron microscope studies, I don't remember any instances where that was not the case. So in general, I think I would conclude that the ink dots or bumps are -- the top part of those is flush with the surface of the liner."
That's what you said in your testimony, correct?
A. Yes, and by that I mean, of course, that it's even in height with the surrounding area. You shouldn't take that it's flush with the bottom of the depression. I mean, that's crazy. It's not flush with the bottom of the depression.
Q. It's flush with the surface.
A. It's flush with the surface surrounding the polyurethane form.
Q. Now, let's talk a little bit about what's in dispute here.
MR. HADLEY: Can we pull up claim 1 of the '930 patent?

771

Q. You've read Dr. McHugh's expert reports in this case, correct?
A. Yes.
Q. And those reports reflect what Avery contests in this case regarding infringement, isn't that true?
A. I presume so.
Q. And if we look at the second clause, "wherein the second embossed pattern," do you see that language at the bottom, "wherein the second embossed pattern comprises lands and ridges between the lands," "ranges from about 3 to 45 microns"? You understand that that's not in dispute in this case.
A. Yes. I understand that Avery has stipulated that they are in compliance or that they are within that range.
Q. And as far as you know, Avery's never contested that issue, correct?
A. I don't know.
Q. Well, you never saw Dr. McHugh in his report contest that issue, did you?
A. (No response).
Q. Other than the word "second."
A. I can't remember that detail.
Q. So what is really at issue --
MR. HADLEY: If we can highlight "carrier web" -- let's delete the highlighting down here. Let's highlight

772

"carrier web" and "at least one surface," "having a first embossed pattern," "wherein the first embossed pattern forms an array of depressions."
That's where the dispute is, right?
A. That's up to you to say where the dispute is.
Q. Well, you understand that that's what Avery is contesting in this case.
A. If you say so. You represent Avery.
Q. Fair enough. This is what I want to focus on, this area of your opinion, for the remainder of my questions.
Now, you said in your direct examination, as I understood it, that Avery's liner has this first embossed pattern forming an array of depressions, is that right?
A. Yes.
Q. And that this first embossed pattern forming an array of depressions exists on the surface of the liner where the ink is encased within the silicone and polyethylene material. Did I understand that correctly?
A. No, I didn't ever say "encased."
Q. Well, where it's pressed in, embedded. Those are all the same thing, right?
A. No.
Q. What did you say, it's where it's embedded?
A. I said where it is pressed in.
Q. Okay. That's fine. Let's not argue about that. Where

773

it's pressed in, that's where this first embossed pattern forms an array of depressions.
A. Yes.
Q. And you also said that where the ink is pressed in -- let's just explore that in just a little bit more detail.
Do you disagree that the ink is embedded?
A. Well, I think I already said that, in this case, embedding is kind of analogous to the pressing in to cause the depression.
Q. So the ink is within the polyethylene.
A. No, it's on the surface, but the surface has been depressed. It is not within.
Q. So it's not -- in your opinion, that ink is not in the polyurethane?
A. You're switching prepositions on me.
Q. Okay. How have I done that?
A. You said "within" and then you said "in." Let me characterize it properly.
There is a depression and the polyurethane is sitting within, if you like, the depression, but not within the liner itself.
Q. So it's in the depression but not within the liner itself?
A. Yeah. The surface of the liner has been deformed, but, for instance, there's no within the material of the

polyethylene. It's just simply on the surface in a depression.
Q. Well, you're not saying, are you, that the depression in the surface is made first and then the ink is added later, are you?
A. No, I'm sorry. I do not mean that at all. The pressing in of the ink -- of the polyurethane form displaces the polyethylene and creates the depression. That happens simultaneously.
Q. So if I have cookie dough and I take a chocolate chip and I put it on the surface of the cookie dough and I take my thumb and I press that chocolate chip into the cookie dough, you wouldn't say that that chocolate chip is now within the cookie dough, you would say that chocolate chip is sitting in a depression in the cookie dough?
A. Well, I think what you've done is perhaps not been careful enough in your characterization. If you have a thin piece of cookie dough and you press the poly -- the chocolate chip so that it creates a depression -- but there certainly isn't any indication that the cookie dough would come over the top of the chocolate chip. So, we eat chocolate chip cookies and sometimes those chips are fully encased in the cookie dough. That's not the case here.
Q. So to be fully encased, something that is to come over the top; is that your testimony?



A. Yeah.
Q. What if something just comes a little bit over the top?
A. Well, to the extent that anything goes over the top -- to the extent that the polyethylene goes over the top, that cuts down on the bonding of the polyurethane to the film and that's avoided in this case.
Q. Well, my question was a little bit different. Let's just start with more basic.
If I have -- if I take one material and I press it into another and the material I'm pressing it into flows even slightly over the top, have I now encased the embedded material?
A. Well, you said "fully encased," so I suppose in that instance you would partially encase.
Q. So if I have any flow over the top, now I have at least partially encased.
A. Seems so.
Q. What experiment and analyses did you do to conclude with an absolute certainty that when the polyurethane -- polyethylene material is heated and that ink is pressed in and then it's cooled, that there isn't some flow back over the top, at least some amount?
A. It doesn't matter. If they're sufficient that the polyurethane bonds to the film and is withdrawn, then it doesn't matter.



Q. So some of it may flow over the top. You just don't know.
A. What I -- I did not see any, but I did not study that. The crux of the matter is that a sufficient amount of the polyurethane must be exposed to the film -- sorry -- to the adhesive that it is withdrawn.
Q. And as long as it can be withdrawn it's not encased, in your view?
A. I think that if it is encased, that would impede the withdrawing and so it seems that that would be avoided.
Q. Well, just because something impedes withdrawing doesn't mean that you can't withdraw it.
A. That's -- pardon me. That almost went down the wrong pipe. I suppose that's true.
Q. I mean, you know, we have stop signs that hopefully impede people from running into intersections, but every once in awhile it happens, right?
A. Not in my own personal knowledge.
(Laughter)
Q. I've seen it a couple of times, but I've never done it.
Okay. So let's try to sum this up and see where we are.
We agree that the ink is pressed into the polyurethane, what you described as the carrier web.
A. That's correct.



Q. And do we have an agreement or a disagreement on whether that ink is embedded?
A. Well, I think embedding is the process -- a form of embedding is the process that creates the depression.
Q. Is the ink embedded or not, yes or no?
A. It can be embedded if you use the proper definition of embedded.
Q. And in your opinion, is the ink encased by the -- or let me ask it differently.
Does the polyethylene material encase the polyurethane ink?
A. Not fully.
Q. But maybe partially.
A. It doesn't matter if it's still exposed sufficiently to adhere to the adhesive.
Q. Well, whether it matters or not, Doctor, do you know -- is it partially encased, possibly or not?
A. I didn't study that.
Q. So you just don't know.
A. No, not from experiments.
Q. And if I understood your testimony correctly -- let me make sure I've got this right. You described that ink that was pressed in, the resulting -- in fact, why don't we do this: Let me just make it a little bit easier.
MR. HADLEY: Can we pull up slide 19?

Q. Okay. This is one of the demonstratives that you had created, right?
A. Yes.
Q. And if I understand this correctly, you've said that there are depressions in the polyethylene, right?
A. That's correct.
Q. And that the depressions are filled by the polyurethane ink, which is the green area?
A. At this moment, yes.
Q. And you drew a blue line here to illustrate what you consider to be the surface of the carrier web, is that right?
A. Yes.
Q. So you do not consider the surface of the carrier web to be the line that I've just done kind of a bad job but tried to draw directly across the -- starting on the left side where I put an arrow and going to the right side -- that cuts straight across in a parallel line with the bottom where I've now put arrows and running across the top of the green areas. To you that's not the surface.
A. No, the carrier web surface is the blue line that goes underneath the polyurethane forms and follows the surface of the deformed polyethylene.
Q. And that's because you only consider the polyethylene material to be the carrier web, right?
A. It is the carrier web.



Q. Well, you say it's the carrier web, right?
A. It is the carrier web.
Q. That's your testimony.
A. That's my testimony.
Q. And the ink, even though it is embedded into the surface of that polyurethane, is not part of the carrier web.
A. It's caused an embossment in that surface and it sits in the embossment, in the depression at this moment, that's correct.
Q. But it's not part of what you describe as a carrier web.
A. It is not.
Q. So let's go back to my cookie example. If I took that chocolate chip and put it in cookie dough and I took my thumb and I pressed it into the cookie dough, you would not consider the chocolate chips part of the cookie.
A. I wouldn't consider it part of the cookie dough.
Q. You wouldn't consider it part of the cookie either, would you?
A. It's not part of the cookie dough.
Q. Even if it's then melted?
A. Polyurethane forms are not melted.
Q. You also -- do you consider these ink bumps to be an embossing tool?
A. Yes.
Q. The first time that you saw the embossing line at the



Omnova plant, that's when you came up with this concept that these polyurethane ink blobs operate as an embossing tool, isn't that right?
A. That's where I observed it being done, yes.
Q. And you had not thought of this concept before you actually saw this embossing line, right?
A. That's correct. I didn't envision exactly how those ink forms would create those depressions.
Q. Now, at this point, if you consider these ink dots to be part of the surface of the liner, you would agree with me that there would be no depressions.
A. It's hard to consider something that's not reality.
Q. Well, I'm asking you to consider it. If the jury believes -- let me put it this way: If the jury finds that these ink dots form part of the carrier web, then you would agree with me that there are no depressions on the surface.
MS. BROOKS: Objection. Improper hypothetical, your Honor.
THE COURT: Overruled. Go ahead.
A. Well, I don't think the jury can find that, because it's not true.
Q. But if they do find it, do you agree or disagree?
A. If they do find that the -- I'm sorry. Say your hypothetical one more time.
Q. That the ink when it's pressed in forms part of the



carrier web?
A. Well, we don't know if that's flush or not for sure because I haven't investigated it, but I have looked at the surface and it seems to be about even with the area surrounding the -- I'm sorry. Can I draw -- I'm not very good at that. It's not doing it.
Q. I'm not sure yours does it.
THE COURT: It does, but it needs to be turned on right there.
Q. I'm not sure how to do it, but in any event, let me ask this. Let's see if we can do it this way. Let's just go on.
Now, based on all the testimony that you've heard in terms of how Avery creates positionability pegs and 3M creates positionability pegs, you're not testifying, are you, that it's your opinion that Avery copied 3M's product, are you?
A. Well, I think that what Avery did is make a product that violates the 3M patent.
Q. My question was it's not your opinion that Avery copied.
A. I don't know what was in Avery's mind.
Q. You don't have that opinion, though, it's not an opinion you expressed in your report.
A. I don't know what was in Avery's mind.
Q. My question was that's not an opinion you expressed in your report.

have the structure to carry, therefore it depends upon the polyethylene to be embossed, and it follows the surface of the polyethylene.
So the carrier is the polyethylene. It just happens to have a slick substance, a silicone on top, to effect the release.
**Q.** Okay. You said the polyurethane was hard, right?
**A.** It is hard.
**Q.** And that has structure to carry something, doesn't it?
**A.** Not only that, but it can emboss.
**Q.** And in the slide that we're looking at in these areas of the green, it's carrying adhesive, isn't it?
**A.** It is actually being supported by the polyethylene, so it's carried by the polyethylene.
**Q.** And it's carrying the adhesive?
**A.** Well -- pardon me. Yes. The adhesive is sitting on top of it.
**Q.** All right. My question is, Do you agree with me or disagree with me that in these areas the ink is carrying the adhesive?
**A.** It is supporting the adhesive, yes.
**Q.** Okay. That makes it part of the carrier web, doesn't it?
**A.** No, it does not.
**Q.** In the areas of the green -- never mind. Let's take a



look at slide 19. Now, this is a slide you showed to the jury yesterday as a demonstrative of Avery's liner?
**A.** Yes.
**Q.** Dr. Strong, Avery's liner never looks anything like this, does it?
**A.** Well, this is an illustration, a demonstrative.
**Q.** What I mean is, it's not even an accurate demonstrative, is it?
**A.** Well, I think it shows the basic concept.
**Q.** Sir, when the ink dots are pressed in flush with the polyethylene as you've shown it here, the embossed ridges exist on the liner, don't they?
**A.** Well, it doesn't matter if the ridges are there. This was done to show where the polyurethane dots go.
**Q.** Okay. I just want to make sure that's clear because when these ink dots are pressed in flush as you've shown it, that's done by the embossing roll that Avery uses, right?
**A.** Well, at the embossing roll they certainly do press in on the -- on the plastic forms.
**Q.** And that's the single tool that Avery uses to create the ridges?
**A.** Well, that's a -- that's a matter of method, and I think what we need to do is focus on the product. The product here shows that those ink dots have been pressed



into and actually created the depressions.
**Q.** Sir, my point is that if we're focusing on the structure, this structure to be accurate of Avery's liner would need to show the ridges as well, right?
**A.** Not necessarily, but it certainly does of the next, I think the next demonstrative does show those ridges.
**Q.** What do you mean by "not necessarily"? Do you agree or disagree with me that when the ink is pressed in flush with the surface, the ridges also exist at the same time on the surface of Avery's liner?
**A.** What I'm saying is that that's a method discussion that isn't important.
**Q.** I'm not talking about a method discussion, sir. I am talking about the structure of Avery's liner. Yes or no. When the ink is impressed into the surface of the liner, does the structure of Avery's liner have the ridges or not have the ridges?
**A.** After the nip roll, it does have the ridges.
**Q.** Thank you. Now, you heard the testimony yesterday of Dr. Cavaleri about profilometers?
**A.** I did.
**Q.** And you know what a profilometer is, right?
**A.** Yes, in general.
**Q.** It's a device to measure changes in the surface elevations on a microscopic level?



**A.** I think that's an accurate description
**Q.** And you also were in the courtroom when Mr. Meixner testified, correct?
**A.** Yes.
**Q.** And you heard his testimony about 3M's Controltac Plus product, correct?
**A.** Yes.
**Q.** And you heard him say that with the Controltac Plus product that the glass beads that are put in the depressions never really fill up the embossed depressions the whole way, correct?
**A.** I think he said that they may or may not and often don't.
**Q.** Okay. And so if we took just the Controltac Plus product and we ran that profilometer across it, we would see depressions even after the glass beads are put into the depressions because -- in places where they're not all the way filled, right?
**A.** I believe so.
**Q.** On the profilometer if you remember where there is depressions, that's the darker blue shades?
**A.** Yes, on the scale that we saw.
**Q.** Okay. Now, if you took that same device and ran it over the surface of Avery's liner after it left the embossing roll, we would see on that profilometer areas

A. Yes, December 31, '96.
Q. And did you notice who the inventors were on the '397 patent?
A. Yes. The inventors are Dr. Sher, Mr. Meixner, Mr. Loncar and Dr. Calhoun.
Q. Did you review any files of 3M people that were involved in, as named inventors on either of these patents?
A. Yes, I did. I reviewed a file that was entitled structured films from 3M.
Q. Did you have any understanding of whose file that belonged to?
A. Yes, that was a file of Dr. Sher.
Q. What did you find in this file?
A. Well, basically the file has a bunch of different documents in it, mostly patent, prior art patent literature that relates to structured films.
Q. Did the file contain any prior art relating to this air egress problem?
A. Yes, it did.
Q. Now, in reaching your opinion on obviousness, you were provided with a legal standard or legal test under which you performed your analysis, is that right?
A. Yes. That's correct.
Q. Okay. Have you prepared a slide showing the legal standard that you were provided and followed in this case?



A. Yes, I have.
Q. Okay. Can we bring up slide 1?
Now, is this the slide you prepared?
A. Yes, it is.
Q. Can you explain to the jury what you consider --
THE COURT: Is this a demonstrative?
MR. HADLEY: This is a demonstrative exhibit, Your Honor.
THE COURT: Is there any objection?
MS. BROOKS: No, not as a demonstrative, Your Honor. Sorry.
THE COURT: Okay.
THE WITNESS: Thank you. Well, basically what is being shown here in the top bullet is the fundamental question that needs to be addressed and as the legal test for obviousness, and that question says, Would it have been obvious for a skilled person who knew of the prior art to make the claimed invention?
And then in considering that question, there are factors underneath that have to be taken into account.
BY MR. HADLEY:
Q. And did you consider the first three of these factors?
A. Yes, I did.
Q. The fourth factor refers to objective indications of nonobviousness. Was that part of your analysis?



A. No, that was not.
Q. And why is that?
A. Well, I have been -- I have been led to believe that that has to do with issues related to commercial success and so forth. That's something that is just completely outside my area of expertise.
Q. Okay. Now, based on the factors that you considered in this test for obviousness, I want to ask you a slide -- a question, which is, if -- a hypothetical question, and that is, If the scope and the content of the prior art had been in total only what the examiner considered in making the decision to allow the application for the '930 patent to issue and nothing else, would you have agreed with the examiner's decision that this patent is not obvious?
A. Yes, I would have agreed, and basically because what the examiner found in concluding that Claims 1 through 5 were not obvious was that there was really no prior art that the examiner knew of that taught anything about ridge heights and this range of 3 to 45 microns.
Q. And what did you find out about the prior art that the examiner did not consider?
A. Well, in the prior art that I looked at, I found that very issue addressed, exactly that issue of liners that have ridges in that 3 to 45 micron size height range.
Q. Okay. Now, what I would like to do is go through the



three factors that you considered that we see up on the screen and have you take the jury through the analysis that you performed step by step.
A. Okay.
Q. And what I want to do is focus on the third factor first, the one that refers to ordinary skill in the art. In the top question that you considered when we see that obviousness is for a skilled person who knew of the prior art to make the claimed invention, in evaluating obviousness, does it matter whether the patent examiner or the inventor actually knew about all of the prior art that was available?
A. No, it doesn't. The viewpoint is that of this person of ordinary skill in the art. That's the test case that you measure against.
Q. Okay. Now, what is this? What is a person skilled in the art? What does that mean to you?
A. Well, a person skilled in the art means that this is a person who would have the requisite background in the area, the field of the invention.
Q. Now, is this a real person?
A. No. It's really a made up person.
Q. Okay. For this made up person, do you assume -- what do you assume that he or she knows about the prior art?
A. Well, this is kind of a special feature about this made

6?
A. Right.
Q. And what are you showing on this by adding in the next leg?
A. Yeah. What I am showing on this leg now is the missing part of the triangle, which is really there, and that's prior art literature which I have listed there that talks about embossed ridges in this height range and the fact that this produces air egress.
Q. And how do you illustrate it if this leg was really there?
A. Now, it's solid now. It exists. And if in fact if we can just slide it over, this completes what I call the triangle of obviousness. All the elements are there now.
Q. Okay. Now, Dr. McHugh, is it your understanding that simply combining two or more prior art references makes a patent invalid for obviousness?
A. No. There has to be more to it than just combining. You have to have a motivation, a reason to do it.
Q. Is that known as the motivation or suggestion requirement?
A. Yeah. That's correct.
Q. Okay. Now, have you prepared a chart showing your understanding of where a person skilled in the art would be able to find this motivation or suggestion for combining



different pieces of prior art?
A. Yes. I put together a slide that lists those things, if we can bring that out.
Q. Can we bring up the next demonstrative, slide 7? .
THE COURT: Any objection?
MS. BROOKS: No objection, Your Honor.
BY MR. HADLEY:
Q. Can you explain this slide to the jury?
A. Yeah. What basically I'm listing here under the heading of obviousness is this concept of either motivation or suggestion from various sources to do this combination process, and it's either explicit or implicit, but the bottom line is there I'm listing there three -- three motivations or suggestion sources that would lead this person of ordinary skill in the art to make this combination.
Q. And one of them, and this is either explicitly or implicitly, is that your understanding?
A. Yes. That's correct.
Q. And the first source you could look at are the prior art references themselves?
A. Yes, that means whatever has been talked about there.
Q. And the next place you might find this motivation or suggestion is in the knowledge of those of ordinary skill in the art that certain references or disclosures in those



references are of special interest or important in the field?
A. Yes. That's right.
Q. And then the final one would be from the nature of the problem to be solved that would lead inventors to look for references relating to possible solutions to the problem?
A. Yes. That's right.
Q. Okay. If we can go back to your triangle, did you find a motivation to combine or suggestion to combine these prior art references?
A. Yeah. Basically it was item 3 which in simple layman's terms was to solve the problem and produce a desirable result and --
Q. Can we show that?
A. Yeah. There it is. The bottom line is, you want to get easier application of the film. That's the motivation, and there is the prior art that would enable you to do it.
Q. So let me make sure I understand this. If you combined -- there would be a motivation to make films easier to apply by combining the positionability with air egress. Is that what you have illustrated here?
A. Yes. That's correct, but then with the knowledge that you can put both embossing patterns onto the same surface.
Q. And that was something that was already known in the art and considered by the examiner?



A. That's correct.
Q. In fact, if we go to the '930 patent, does the background section of the '930 patent explain this very motivation?
A. Yes, it does.
Q. And was that the test -- was that the sections that we looked at earlier that said it would be desirable to take basically the '790 patent and put the air bleed solution in?
A. Yes. That's right. That's what it was talking about.
Q. Now, did you read any testimony that has been given in this case already indicating that it would be obvious to combine a Controltac Plus liner with embossings for air egress?
A. Yes. It was the testimony of Mr. Meixner.
Q. Can we bring that testimony up? And that's page 483, lines 9 through 17. Okay. If we can highlight 9 through 17.
Can you just read for the jury what Mr. Meixner said in response to questions that I asked him?
A. Yes. I will read the question. The question is:
"And you knew that if you could be successful in embossing a Controltac 2 liner that had the depressions filled with glass beads, you would solve this problem, right? You could get the air out?

Q. No, I said it had carried at one point in time the polyurethane.
A. Had carried?
Q. Yes. We're looking at this past tense one right here, has carried another material. At one point in time what I'm holding in my right hand had carried polyurethane?
A. No.
Q. Polyurethane had never been carried by this material?
A. Correct.
Q. The polyurethane is now on the adhesive at this point in time, am I correct?
A. Correct.
Q. And it went from what I'm holding in my right hand onto the adhesive?
A. Correct.
Q. What I am holding in my right hand had carried the adhesive, correct?
A. Yes.
Q. And what I am holding in my right hand had carried the graphic film on top of the adhesive, correct?
A. Yes.
Q. All right. So it is the material that has carried --
A. Yes.
Q. -- something?
A. Yes.



Q. That was all I was trying to establish, Dr. McHugh. I'm sorry if my questions weren't clear.
A. Yeah.
Q. Okay. Thank you. Now, let's look at what that carrier web that had carried another material actually looks like. When you did your infringement analysis for us, you based it on demonstrative 217 that Mr. Hannington had prepared, is that right?
A. I'm sorry. I can't remember the demonstrative numbers. You're going to have to help me.
Q. Of course you don't. Here we go. Thank you. You did your infringement analysis, began your infringement analysis by referring the jury to Exhibit 217?
A. Yes.
Q. And this was a demonstrative that Mr. Hannington had prepared, is that right?
A. Yes, it is.
Q. Did you hear Mr. Hannington say when I asked him on recross whether or not this demonstrative was actually based on any SEM's. Do you remember that?
A. Yes, I do.
Q. And he said it was not?
A. Yes, he did.
Q. And a SEM is an actual photograph taken by a scanning electron microscope, is that correct?



A. That is correct.
Q. Now, you heard Dr. Brent Strong's testimony, didn't you?
A. Yes, I did.
Q. And Dr. Strong walked the jury through a series of demonstratives, and every demonstrative that Dr. Strong had was based upon an actual photograph that had been taken of Avery's EZ Film liner with a scanning electron microscope, isn't that true?
A. That is correct.
Q. Now, let's look at Plaintiffs' Exhibit 78 that is in evidence. Dr. Strong testified that this is what Avery's EZ Film liner looks like after the adhesive and the graphic film have been removed. Do you recall that testimony?
A. Yes.
Q. Now, let's look at what we can all walk through together, and I'm going to need a pen to make sure I'm pointing correctly.
Would you agree with me, Dr. McHugh, that what I'm pointing to right here appears to be a lower, and I want to get the words exactly right, a lower or sunken area -- a lower, sunken or depressed area of the carrier web. Do you see that right there?
A. Yes.
Q. And would you agree with me that what I'm pointing to



right here appears to be a lower or sunken area of the carrier web?
A. Yes.
Q. And here?
A. Correct.
Q. And here?
A. Yes, I agree.
Q. And here?
A. Yes, I agree.
Q. And here?
A. I agree.
Q. And here?
A. I agree.
Q. And here?
A. I agree, although that one is not quite as clear.
Q. And here?
A. Yes, I agree.
Q. And here?
A. Yes.
Q. And so you would agree that what I have just pointed to under the Court's construction of depression is in fact depressions in the carrier web?
A. Yes, indeed.
Q. And you are aware, are you not, Dr. McHugh, that Avery has already stipulated that its carrier web has lands and

ridges wherein the lands -- excuse me -- wherein the ridges are 3 to 45 microns higher than the lands. They've already said that's not an issue in this trial?
A. Yes. That's correct. I agree.
Q. Now, the second pattern that is required in Claim 1 is the pattern of lands and ridges?
A. Yes. That's accurate.
Q. And would you agree that what we have just identified as depressions are within that pattern of lands and ridges?
A. Yes.
Q. So now we come down to just two areas that are left really contested, and one is whether or not these depressions form an array, correct?
A. That is correct.
Q. And your testimony is, if I heard you correctly, that because some depressions -- excuse me -- some of the ink dots occasionally fall off that they are not going to in turn be able to create an array of depressions?
A. Yeah. I'm -- I want to go back to your question that I said yes to about the depressions because there was an adjective missing there that I should have included. Embossed array of depressions.
Q. We're going to get to that. We're narrowing down what we disagree about, and I think we have established that we agree about everything that is present in this carrier web



other than array and whether or not the depressions are embossed?
A. That is correct.
Q. Good. Okay. So let's start with array. Okay? An array means, going back to your demonstrative, the Court has said an array means an orderly arrangement, is that correct?
A. Yes. That's correct.
Q. You did what you called a cartoon of what Avery's EZ Film liner actually looks like?
A. Yeah, and I wanted to make sure that was an idealist drawing not a cartoon.
Q. And Mr. Hannington did what he called I don't think a cartoon but a graphic of what Avery's EZ Film looks like?
A. Yes.
Q. I would like to show you an actual scanning electron microscope photograph of what Avery's EZ Film looks like. Are you telling the Ladies and Gentlemen of the Jury, Dr. McHugh, that when you can see a depression here and here and here and here and here and here and here and here, and you can see depressions going here and here and here and here, and I could do it with every single row, are you telling the Ladies and Gentlemen of the Jury that that is not an orderly arrangement?
A. I would tell the Ladies and Gentlemen of the Jury



that in that isolated area of this large web that the electron microscope has blown up, what you have said is an accurate statement.
Q. Thank you. And you say this is an isolated area. Did you, Dr. McHugh, bring to the courtroom to show the Ladies and Gentlemen of the Jury all the scanning electron microscope photographs you did wherein these depressions are allegedly missing?
A. No, I did not bring those.
Q. All you brought was a cartoon?
A. I --
Q. I'll withdraw the question, Dr. McHugh.
A. No. I'm sorry. I'm trying to remember. I don't know if my cartoon showed or drawing as I would prefer it showed depressions. Did I show a cartoon with depressions?
Q. You know, you're right. You know whose it was, it was Mr. Hannington's. That was the cartoon where there were some missing ink dots?
A. Oh, yeah, but I'm sorry. You said I showed a cartoon with depressions, and that's why I was stopping. I don't think I did, nor did Mr. Hannington in his show anything about depressions.
Q. Okay. So we don't have -- not only do we not have any scanning electron microscope photographs showing supposedly where these depressions are missing in Avery's carrier web,



but we don't actually even have a cartoon of that?
A. That's correct.
Q. Now, let's move on, if we could, to embossing. You put up this demonstrative, and you said, the Court has construed the term embossing to mean a topography on a web or on a tooling having an effective three-dimensional pattern that generates a difference in surface planar dimension in the liner or the tooling, is that correct?
A. That's the precise definition.
Q. I read that correctly?
A. Yes, ma'am.
Q. And now let's go back to the scanning electron microscope photograph of Avery's carrier web. Would you agree that this is a topography on a web having an effective three-dimensional pattern that generates a difference in the surface planar dimension in the liner?
A. Well, I really -- I really have a problem with the issue of what we're looking at when we look at these depressions, what their regularity is, what their precise positional location is, and so that's why I am kind of hesitating in my answer. It's just not clear to me that this is fulfilling precisely what you said.
Q. Okay. Let me repeat my question to see. We're not yet talking about the shape of the individual depressions. What I'm asking you is, Having pointed out all these

depressions, would you agree that all those represent a topography on a web having an effective three-dimensional pattern that generates a difference in surface planar dimension in the liner.

In other words, are we seeing a three-dimensional difference in the surface planar dimension of the liner?

**A.** Not of what I would call a perfect pattern.

**Q.** We're going to get to pattern in just a second. Okay?

**A.** But you used -- that's why I just want to make sure we're using the same language and we understand.

**Q.** Is there anything in this definition of embossing that says pattern, a topography on a web having an effective -- oh, it does say pattern. You're right -- effective three-dimensional pattern that generates a difference in surface planar dimension. You're right.

So that's where we're having our issue is whether or not these individual depressions are actually a pattern, the depression itself, is that right?

**A.** That's what I've sort of been hesitating on.

**Q.** Okay. That's fair, and I apologize. You're right. So let's look at what the definition of pattern is. The Court has also construed that term. Pattern means any formation of embossings that can utilize any theory of geometry, including without limitation, Euclidean geometry and fractal geometry.



Is that how the Court has construed the term pattern?

**A.** Yes, it is.

**Q.** I'm not about to claim that I have a PhD, so hopefully you can help me out here. Euclidean geometry is a form of geometry, is that right?

**A.** By definition.

**Q.** Based on Euclid's theories?

**A.** That's correct.

**Q.** And fractal geometry is another form of geometry, isn't it?

**A.** Yes, it is.

**Q.** And in fact, since I'm not a PhD, in order to help myself out, I went into Answers.com to see exactly what fractal is. Would you agree that fractal geometry is a geometric pattern that is repeated at ever smaller scales to produce irregular shapes and surfaces that cannot be represented by classical geometry? Fracters are especially -- are used especially in computer modeling of irregular patterns in -- let me stop right there.

Irregular patterns, would you agree that that is an appropriate definition of what fractal geometry is?

**A.** It would help me if you went back to that definition and slowed down where you got to the point where it said pattern in the fractal part.



**Q.** A geometric pattern that is repeated at ever smaller scales to produce irregular shapes and surfaces that cannot be represented by classical geometry. Fractals are used especially in computer modeling of irregular patterns and structures.

**A.** Okay. I must have misheard it the first time. I thought there was something in there about -- would you read again the part about the ever smaller scale?

**Q.** Sure.

**A.** That's where I'm just -- better yet, can you give me a copy of that?

**Q.** Well, it's my only copy, but I will be happy to hand it to you.

**A.** I've never -- I've never read this definition of fractal so --

THE COURT: Put it on the screen.

MS. BROOKS: Can I put it on the screen, Your Honor? Thank you.

THE WITNESS: So if we are going to use it -- yes.

BY MS. BROOKS:

**Q.** Did I read that correctly, sir?

**A.** Yes, you did.

THE COURT: Mr. Hadley, do you have an objection to showing this to the jury?



MR. HADLEY: No objection, Your Honor.

THE COURT: Okay. This is a demonstrative.

MS. BROOKS: Thank you, Your Honor.

BY MS. BROOKS:

**Q.** And so it is describing that fractal geometry deals with irregular patterns, does it not?

**A.** Yes.

**Q.** And, in fact, one of those irregular patterns that they use as an example representative of fractal geometry is the Koch snowflake. Do you know that?

**A.** I have no idea.

**Q.** Okay. Well, I didn't either until I went into Answers.com. So but would you agree then that going back to the --

**A.** You know, could I really get a copy of that to have in front of me because --

**Q.** With the Court's permission, I would be happy to give it to you, but then you're the only one that has it so --

**A.** Well, that's dangerous, I guess, giving a professor something.

**Q.** Just to go back to the Court's construction of the term "pattern," pattern can include a pattern based on fractal geometry, is that right?

**A.** I agree.

**Q.** And so therefore, pattern can include shapes that while

not perfect in the Euclidean sense can be irregular in the fractal sense?
A. Provided one carries out the test of the definition of a fractal and make sure that you meet that test, yes.
Q. Thank you. So now I think we have talked about the two areas where we disagreed, which were array and embossing, is that right?
A. I don't remember us disagreeing about embossing but yeah, if you say so.
Q. Okay. I would like then to move on to the second aspect or one other -- two other aspects of your testimony, obviousness and anticipation. Do you recall testifying about those?
A. Yes, I do.
Q. Thank you.
If I can have just one moment, Your Honor, I'm going to shift.
THE COURT: That's fine.
BY MS. BROOKS:
Q. You told us yesterday, Dr. Strong, about an analysis that you did --
A. This Dr. Strong is one popular guy, I must say. Don't we look at least a little bit different? He's a handsome guy.
Q. So stipulated, I'm sure. You told us yesterday,



Dr. McHugh, about your analysis regarding obviousness and whether or not it would have been obvious to one of ordinary skill in the art to essentially come up with a claimed invention, do you recall that?
A. Yes.
Q. And what you did was, you put in front of us again a graphic, and you laid out what is called the legal test for obviousness. Now I assume since you're not an attorney that you had the help of attorneys in preparing this graphic?
A. For sure.
Q. First of all, is it your understanding that since you said you have some patent applications yourself, is it your understanding that once a patent is issued, it is presumed valid?
A. Yes.
Q. And in order to overcome that presumption of validity, the burden is upon the defendants to prove by clear and convincing evidence that the patent is invalid?
A. Yes.
Q. And the test in order to make that evaluation is to first of all look at what would have been obvious for a skilled person who knew of the prior art to make the claimed invention. That's what you told us?
A. That is the test.



Q. Now, is there something missing from this first bullet point that is part of the test?
A. Well, I'm -- I'm using my understanding of skilled person.
Q. All right. So you're incorporating your understanding of what one of skill in the art, who they would be, this hypothetical person, is that right?
A. Who they would be and what they would know.
Q. And it's who they would be and what they would know when? When is that?
A. Thank you. That's what I was driving at. At the time the invention was made.
Q. So actually we're not looking now in 2005 as to what someone might know, but actually what the person of ordinary skill in the art might know in 1995?
MR. HADLEY: Objection, Your Honor. Foundation.
THE COURT: Overruled. Go ahead.
BY MS. BROOKS:
Q. Is that correct, Dr. McHugh?
A. The thing that's important for me, again, because as you've pointed out, I'm not a lawyer, when I look -- when I look at a patent, it's my normal understanding that the date of filing of the patent is when you start the clock, and you start going backwards with this imaginary person in terms of their knowledge.



And I recall that date as December 31, 1996. Now you've put up another date that may be getting into some legal definitions of timing that I'm not -- I'm not competent to make a judgment on. So I just, I am a little hesitant about the number you've written down for that reason.
Q. Well, before you rendered an opinion in this case on obviousness, I assume that you wanted to feel fully prepared to render that opinion?
A. Yes.
Q. And so you would want to know what is the time period that you're looking at in order to determine whether or not this invention would have been obvious?
A. Yes, indeed.
Q. And so you would want to know not just when the patent was filed, but what the inventor, Dr. Clyde Calhoun, said was the date that he reduced this invention to practice, wouldn't you?
A. That's something I can't know. I don't know that.
Q. Did you sit in the courtroom while Dr. Clyde Calhoun testified?
A. Yes, I did. Well, I -- I'm sorry. I have to be accurate. I believe I was only there for his cross-examination.
Q. Did you look at the transcript of his direct

everything apart here, but you did that triangle of obviousness, and what came flying in from the right were these references that you say were not before the examiner?
A. I can't remember if I had all three of them on there, but yes.
Q. You certainly had the Unitika reference, did you not? That was the Great Britain reference.
A. Yes. I call it Unitika.
Q. Unitika, and you actually described it at length to us yesterday?
A. Yes.
Q. And if I understand you correctly, you began your testimony by saying that based upon the prior art that was before the examiner, you think that Danny Lee, the patent examiner, did not make a mistake in issuing this patent, is that correct?
A. That's an accurate statement.
Q. But the problem you said was that the white column was not before the examiner, isn't that right?
A. That's correct.
Q. And Mr. Dorman in fact in his opening statement, and I want to see if you agree with this said: Similarly, you will learn about a British reference. That's this one right here (indicating), that has a nearly identical disclosure that not only was in 3M's files but was cited by



3M in another patent application they filed on the very same day but which they never brought to this examiner Danny Lee's examination.
Do you agree with that statement?
A. I agree with what Mr. Dorman said. He made the presentation.
Q. Now, this Unitika reference was actually or how do you pronounce it?
A. Well, I say Unitika just because it's easier to say.
Q. That's fine. I will go with Unitika. This Unitika reference was brought to the patent examiner's attention even according to Mr. Dorman in a different patent, the Sher '397 patent, is that right?
A. Since that -- since that reference was -- was discussed in the background of the specifications of what is the '397 patent, yeah, for sure it was in there.
Q. For sure that Unitika reference was brought to the examiner's attention during the prosecution of the '397 patent, right?
A. Yes.
Q. And one of the reasons for that is because this is already in evidence as Plaintiffs' Exhibit 51, it's the Sher patent which Dr. Calhoun is also on. Right there in the background you say, and this is column 1 column 48 through 66. There it is, the British patent specification



1,511,060. That's the Unitika patent, isn't it?
A. This what you are showing me here is taken from the '397 patent?
Q. Yes, it is.
A. Yeah, I agree with you.
Q. So it was referenced in the background section, and then I am now going to show you what is Plaintiffs' Exhibit 18, the Calhoun patent, the '930 patent that is at issue in this case.
Isn't it true that the Sher patent that I just referred you to, the Sher application, was incorporated by reference in the '930 patent?
A. Yes, it was.
Q. And do you know that to mean that everything that was referenced to the examiner during the prosecution of the '397 patent, including the Unitika reference, is now incorporated by reference into the '930 patent, isn't that right?
A. If that's what you mean by the legal definition of incorporated in?
Q. Yes.
A. I accept what you say.
Q. And so in fact, that Unitika reference was in front of the examiner during the prosecution of the '930 patent, wasn't it?



A. I really -- I really had no way of knowing that. That's not the record that I have.
Q. Did you examine the prosecution history of the '397 patent, Dr. McHugh?
A. I did.
Q. Okay. Well, let me show it to you because it's already in evidence, too, as Plaintiffs' Exhibit 180. How are references sent to a patent examiner, do you know?
A. Frankly, no.
Q. Well, they're sent in what is called an information disclosure statement. Will you accept that?
A. Certainly.
Q. And they're put together, and they're sent to the patent examiner for the patent examiner to look at and examine. All right?
A. Mm-hmm (Yes).
Q. And I would like to show you the information disclosure statement out of Plaintiffs' Exhibit 180, which is the patent prosecution of the '397 patent. Right there, I will zoom in a little bit, do you see the very reference we were talking about, 1,511,060? That's the British reference, do you see that?
A. Yes, I do.
Q. Do you see that, sir?
A. Yes, I do.

1240

Q. And these initials are probably pretty hard to read, but do you know this means that the examiner saw it and is acknowledging that by initialing it?
A. I'll accept that. Sure.
Q. This signature is a little hard to read, too. So let's go to another page of the prosecution of the '397 patent. Who was the examiner that not only saw but read and acknowledged receipt of the Unitika patent?
MR. HADLEY: Objection. Foundation.
THE COURT: Overruled. The witness can testify if he knows.
Go ahead.
THE WITNESS: Would you ask that again, please?
BY MS. BROOKS:
Q. Sure. Looking right now at what is on the screen in front of you which is already in evidence as Plaintiffs' Exhibit 180 at page 189, who is the examiner at this point in time that is receiving and reviewing the Unitika -- we're trying to just figure out because the signature is hard to read who that is?
A. The documents you've shown me indicate that the patent in question, the Unitika patent, was part of this package that was submitted with the '397 -- with what became the '397. What you're showing me is initials to the left and then on the bottom the name of the person. Yes to all of

1241

those.
Q. And who is that person, sir?
A. Mr. or maybe it's Dr. Danny Lee.
Q. The person that Mr. Dorman claimed had never seen the Unitika reference is the very person that actually received the Unitika reference, isn't that true?
A. You know, I'm going on my recollection of what Mr. Dorman said.
Q. Would you like me to read it again?
A. Yeah, please.
Q. Sure.
A. I just want to be accurate in my answer.
Q. Mr. Dorman said, and I asked if you agreed with it, similarly you will learn about a British reference. He was holding up this UK reference right here that's highlighted.
Similarly you will learn about a British reference that has a nearly identical disclosure that not only was in 3M's files but was cited by 3M in another patent application they filed on the very same day but which they never brought to this examiner Danny Lee's attention.
Do you now disagree with what Mr. Dorman represented to the Ladies and Gentlemen of the Jury in opening statement?
A. Something may be missing from what you said. That's

1242

why I have a hesitation.
Q. What do you think might be missing, sir?
A. That Mr. Dorman was referring to the documents that were brought to Mr. Lee that pertained to the application of what became the '930 patent, and if that's the case, then what Mr. Dorman said is quite accurate.
Q. What Mr. Dorman said was, which they never brought to this examiner Danny Lee's attention. Those were Mr. Dorman's words, and I'm asking whether you now disagree that in fact the Unitika patent was brought to this examiner Danny Lee's attention?
A. I'll give exactly the same answer because the context within which this material was brought to me is of seminal importance. It was of seminal importance when I did my obviousness analysis to determine what did the patent examiner use in evaluating the patent in question. That is the question that I must honestly answer and do my best to determine, and that's what I did.
Q. And it now turns out that one of the references that you thought that Danny Lee did not have and put on your triangle of obviousness, one of the references that you thought that Danny Lee did not have, the '060, in fact he had?
A. I don't agree with that characterization. I'm sorry. You've taken it out of context.

1243

Q. Are we talking about two different Danny Lee's?
A. No, but we're talking about two different patents.
Q. And one of those patents, the '397 patent, was incorporated as a whole into the '930 patent, was it not?
A. I have never been instructed in terms of an obviousness analysis to have to take into consideration something that may have been incorporated in another patent. My instructions are clear. You must look at the record of the file history of the patent in question. That's your bible. That's all you know.
I can't know anything else, including what you brought up earlier about precisely the date that Dr. Calhoun put in his lab book. I don't have access to those materials. I have only access to the record at hand, and that's what I must follow, and that's what I did my very best to follow.
Q. I appreciate that, Dr. McHugh, and I am in no way, I hope you know, faulting you. Are you saying then that the attorneys never instructed you to take into consideration the fact or even tell you what you should do with the fact that the entire Sher prosecution was incorporated by reference into the Calhoun prosecution?
A. I have never heard --
MR. HADLEY: Objection. Foundation.
THE COURT: Just a moment. Pardon?

MR. HADLEY: Objection. Foundation as to the entire Sher prosecution. Misstates the facts.
THE COURT: Sustained.
BY MS. BROOKS:
Q. I'm sorry. I did misstate what this says. Are you saying the attorneys never told you what legal significance you should give to the fact that the U. S. patent application, and here is the patent number of Sher, was incorporated by reference in the '930 patent? Are you saying they never told you what legal significance that has?
A. With regard to my analysis of obviousness?
Q. Yes, with regard to your analysis of obviousness.
A. No, they never did.
Q. To determine what prior art was actually before the examiner, they never told you the legal significance of what is in front of the jury right now?
A. No, they never did.
Q. Now, you told us, I believe, about these prior art references, and I wanted to go back to that column that you had. Assuming that it is in fact the same Danny Lee that had this reference, then this Unitika should actually be in blue as one of the references that Danny Lee was aware of, isn't that correct?
A. No.



Q. Because it's not the same Danny Lee?
A. Not because it's not the same Danny Lee.
Q. Okay. Now, let's move on to what you said was how you combined these references. Are you telling the Ladies and Gentlemen of the Jury that it would have been obvious to combine, for example, Calhoun with any of these double embossed references and the Unitika reference, it would have been obvious to one of skill in the art to combine them?
A. Given the circumstances that I then elaborated on of the motivation to do that, yes, it would have been obvious.
Q. You said the motivation to do it was contained in the '930 patent itself. Do you recall that testimony? If I have a minute, I will go get your transcript from yesterday.
A. It would help.
Q. You said at page 1146 when asked about the motivation to combine, the question was, "In fact if we go to the '930 patent, does the background section of the '930 patent explain this very motivation?"
And your answer was, "Yes, it does."
Do you remember that?
A. Yes. Thank you.
Q. Not a problem. It's unfair to you. I'm sure you don't have a copy of what you said yesterday.



A. No.
Q. And so you said that to find the motivation to combine, you went to the '930 patent itself, the patent at issue, and looked for it there?
A. No.
Q. All right. Did you tell us that the '930 patent, if I read this correctly, that if you go to the background section of the '930 patent it explains the motivation?
A. Yes.
Q. Have you ever heard the term "hindsight is 20/20"?
A. Yes.
Q. And, in fact, did the attorneys instruct you that in determining whether or not an invention is obvious, you may not use the patent as a road map for a blueprint in looking for motivation to combine?
A. That would violate the entire concept of a person of ordinary skill, so absolutely correct.
Q. And so you would not have done that, is that correct?
A. I would not have done that in my analysis of the prior art that would be used to construct the obviousness analysis.
Q. What you did was, you looked elsewhere to find the motivation to combine, didn't you?
A. Yes.
Q. And what you did was, the elsewhere was the fact that



it had been long known that there was a problem with repositionability and air egress?
A. It was known prior to the -- prior to the date of the invention in question, yes.
Q. In fact, some of these references that you have on this chart that we have up here are as old as 1974, isn't that right?
A. That's correct.
Q. And we heard Mr. Hannington say that that High Intensity material with the air channels had been sitting around at Avery since I think 1983 in one form or another. Do you remember that?
A. I remember some of that discussion, yes.
Q. And despite the fact that for decades this long felt need was out there, it wasn't until 1995 when Clyde Calhoun brought them all together?
A. Dr. Calhoun's patent put those things, put those concepts together, yes, mm-hmm.
Q. Concepts that had been out there for decades?
A. Yeah.
MS. BROOKS: Your Honor, I'm going to move on to anticipation.
THE COURT: Okay.
MS. BROOKS: I don't know if this is a good breaking point or not.

(1:50 p.m.)
IN OPEN COURT
(JURY PRESENT)
THE COURT: You may continue, Ms. Brooks.
MS. BROOKS: Thank you, Your Honor.
BY MS. BROOKS:
Q. Good afternoon, Dr. McHugh.
A. Good afternoon.
Q. I believe right before the lunch break we were about to turn to your opinion regarding anticipation.
A. Okay.
Q. And do you recall giving us an opinion, I believe it was this morning, regarding anticipation?
A. Yes, I do.
Q. Now, is it your understanding that, once again, an issued patent is presumed valid?
A. Yes, that's correct.
Q. And in order to overcome that presumption of validity, the defendants must show by clear and convincing evidence that that patent is for some reason invalid?
A. Yes, that's right, I understand.
Q. And in the case of anticipation, what the defendants must show by clear and convincing evidence is that every element of a claim is found in one reference. Is that your understanding?



A. That is my understanding, yes.
Q. So unlike the obviousness case that we were talking about right before lunch where you can pick something from column A, column B, column C, and then provided you can show motivation to combine you might have an obviousness case, in anticipation you must find every element in one reference; is that right?
A. That's my understanding, yes.
Q. And, in fact, you can't even look to the prior art to try to shore up that reference, it all has to be right there?
A. That's my understanding, yes.
Q. And if I recall correctly, you told the ladies and gentlemen of the jury that you believe a reference called Sawka anticipates the '930 patent.
A. That's what I said, yes.
Q. And the way you did that analysis to determine whether or not it anticipates is you showed us a figure from Sawka, which I will put up on the ELMO. Is this (indicating) the figure that you showed the ladies and gentlemen of the jury that came out of the Sawka reference?
A. Yes, that is the figure.
Q. And is this the figure that you used to do your anticipation analysis?
A. Yes, it is.



Q. Now, in the figure from Sawka, this blue line right here (indicating) where you have written the words "reference surface," that does not exist in the Sawka patent, does it?
A. It's not specifically identified in the Sawka patent, that's correct.
Q. You simply added that to Figure 1 yourself?
A. Yes, that's correct.
Q. And showing you what's already been introduced into evidence as Defendant's Exhibit 85, is this (indicating), in fact, the front page of the Sawka patent?
A. Yes, it is.
Q. And is that Figure 1 right there?
A. Yes. It's not labeled as such, but that's the same.
Q. So this is what in the Sawka patent -- if the ladies and gentlemen of the jury wish to turn to it, this is what they'll see, is this figure right here without any blue line cutting through it?
A. Yes, that's correct.
Q. And, again, this is what you used to do your anticipation analysis?
A. Yes, that's correct.
Q. Let's, if I could, please, I will try to do this quickly, walk through -- there's all these numbers on here on Figure 1. Do you see that?
A. Yes, I do.



Q. And do those numbers correlate to something that's within the patent specification?
A. Yes, those numbers are identified inside the specifications.
Q. So if one looked to the Sawka patent to see what Figure 1 was actually teaching, we could label each of these numbers based upon what we find in the specification; is that right?
A. That's absolutely correct.
Q. All right. As I say, trying not to take too long to do this, but there's quite a few numbers. If you look at column 3 of the Sawka patent, lines 57 through 62, is the number 10 identified?
A. Yes, it is.
Q. And that is identified as an embossed multilayer film?
A. That's correct.
Q. And if you go to column 3, lines 57 through 62, is the number 12 identified?
A. Yes, it is.
Q. And is that identified as an embossed base layer?
A. Yes, it is.
Q. And if you go to column 3, lines 57 through 62, is the number 14 identified?
A. Yes, it is.
Q. And is that identified as a conformable protective

opinion that Sawka actually taught an array of depressions; is that right?
A. Yes.
Q. And so if we look at Figure 1, is it your testimony that even though we've got one depression that's this deep (indicating) and another depression over here that's this deep (indicating) and another depression way over here that's that deep (indicating), that that teaches an array of depressions?
A. I don't agree with your last characterization. Do you want to ask -- you called something a depression.
Q. Okay. I was pointing to what I thought we had already said were identified as depressions, number 16.
A. Yes.
Q. I'm sorry, I shouldn't have pointed to -- number 16 right here (indicating)?
A. Yes, I agree.
Q. So are you saying that even though we have one depression over here (indicating) that appears to be very narrow and shallow and another depression over here (indicating) that appears to be very wide and deep, that that teaches an array of depressions?
A. That is correct.
Q. Whereas when Avery's EZ Film product is missing one out of ten ink dots, that's not an array?



A. That's correct.
Q. But this (indicating) is?
A. I don't understand -- but this is an array, is that what you're saying?
Q. That's my question.
A. Yes, it is.
Q. And I believe that you referred us to this particular language in the specification when you said that Sawka taught an array, column 4, lines 5 through 19. You said it taught pebbled patterns, sandblasted, brushed, grained, simulated leather, parchment paper appearance, et cetera. Which part of this specification teaches the array of depressions?
A. The part that says virtually any shape or design.
Q. So when Avery's EZ Film liner has what Mr. Hannington described as an array of ink dots where one out of every nine -- ten fall off, that's not an array, but that language is?
MR. HADLEY: Objection to the characterization of Mr. Hannington's testimony as having an array.
THE COURT: Why don't you rephrase the question, Ms. Brooks.
MS. BROOKS: I will, Your Honor.
BY MS. BROOKS:
Q. Actually, Dr. McHugh, you've made it clear for us. If



you could just tell us one more time where in pebbled, sandblasted, brushed, et cetera, array is taught.
A. As I said, I focused on the phrase any shape or design.
Q. Now, if we could, let's go to the next element and I realize you didn't put a "No" there.
A. For sure.
Q. Wherein the depressions of the first embossed pattern are in the second embossed pattern, you said that was present in Sawka?
MR. HADLEY: Your Honor, this demonstrative now mischaracterizes the witness's testimony with having that "No" up there.
MS. BROOKS: I thought I made it clear that he didn't say "No." What happened, Your Honor, we had -- the PowerPoint broke, so I'm having to resort to the ELMO and I can't take the "No" off.
MR. HADLEY: She can put the first one up that just has them all blank.
THE COURT: Let's do that.
MS. BROOKS: Good idea.
THE COURT: There we go.
BY MS. BROOKS:
Q. Let's move to the next one. Wherein the depressions of the first embossed pattern are in the second embossed pattern, do you recall saying that Sawka taught that?



A. Yes.
Q. Now, Sawka teaches something called re-embossing; is that right?
A. Yes.
Q. That's where the surface is embossed -- where that protective layer goes over the top, it's embossed and then it can be heated and as a result re-embossed?
A. That's right.
Q. And Sawka discusses that re-embossing at column 4, lines 20 through 23; is that right? If you look, it says, Advantageously, base layer 12 is re-embossable.
A. Yes, I see that.
Q. It says, That is, base layer 12 may be repeatedly softened, embossed and set during multiple sequential heating and cooling cycles.
A. Yes, that's correct.
Q. And it goes on and says, Consequently, base layer 12 may be provided with a first embossed pattern (for example, a pebbled appearance); is that right?
A. Yes, that's correct.
Q. Now, I take it your testimony isn't that this first embossed pattern that is a pebbled appearance, that's not teaching an embossed array of depressions, is it?
A. I'm focusing on the first embossed pattern.
Q. But you're not saying that the pebbled appearance that

it's describing here is a first array of depressions?
A. I'm simply focusing on the phrase the first embossed pattern.
Q. I just want to make sure, though, that you're not saying that the pebbled appearance is an array of depressions.
A. I'm saying the first embossed pattern.
Q. So is your answer yes or no regarding whether the pebbled appearance is or is not an array of depressions?
A. I don't have -- you know, as I said, what I'm looking for is two embossed patterns and so when it says provided with a first embossed pattern, that to me is the key phrase.
Q. Okay. But I just for the ladies and gentlemen of the jury want to clear up in your opinion is a pebbled -- I want to get the words exactly right. A pebbled appearance, is that teaching an array of depressions?
A. I'm not sure what a pebbled appearance is. I don't -- I can't answer that question.
Q. And yet you studied Sawka very carefully before rendering your anticipation opinion?
A. Yes, I did.
Q. It goes on and says, This pebbled appearance could be over virtually the entire surface followed by the application (such as hot-stamping or the like) of a second embossed pattern (for example, a particular design, logo or legend). Do you see that?



A. Yeah. You said a pebbled appearance, but he's saying a first embossed pattern over virtually its entire surface. That's what I'm focusing on.
Q. Right, I understand that; and I went on to say, Followed by the application (such as by hot-stamping or the like) of a second embossed pattern (for example, a particular design, logo or legend.) Is that what it says?
A. That's what it says.
Q. And then it goes on and describes how you do that. Picture, if you would, a pebbled appearance of like a football. Okay?
A. Okay.
Q. Can you picture that?
A. I can picture a football.
Q. All right. And it has kind of that grainy, pebbly look to it?
A. Okay.
Q. And now one is going to stamp a logo into that football.
A. Okay.
Q. And that describes something similar here, a hot-stamping where you stamp in a design, logo, or legend; is that right?
A. I guess what you've characterized fits that description.
Q. And when that happens, when that second pattern is applied, it says it selectively replaces the pebbled pattern



in the area of the hot-stamping; is that correct?
A. Yes, that's correct.
Q. And so at that point in time the first pattern, i.e., the pebbling, doesn't, in fact, reside in the second pattern, but is, in fact, replaced by the second pattern?
A. Yes, that's correct.
Q. Kind of like the phenomenon that Dr. Calhoun was afraid would happen, the obliteration of the first pattern by the application of the second pattern, correct?
A. I have no idea what he meant.
Q. But that's the phenomenon that's being described here in Calhoun -- excuse me -- in Sawka?
A. Yes.
Q. Let's go on, then, to the next element. This says, Wherein the depressions of the first embossed pattern are in the second embossed pattern. So just to be clear, you're not sure whether this discussion of pebbling is depressions or not; is that correct?
A. That's correct.
Q. And the way this describes how the second pattern is applied, the depressions aren't in that pattern, but, in fact, are obliterated by the second pattern?
A. Well, the wording is clear, he's saying depressions of the first embossed pattern -- sorry. The wording in the claim is clear, the depressions of the first embossed



pattern are in the second embossed pattern. So I'm not sure I'm getting what your question is.
Q. That's what the claim requires?
A. Absolutely.
Q. Sawka describes exactly the opposite, when the second pattern is put on the first pattern is obliterated?
A. Yes, that's correct.
Q. Let's go to the next element, wherein the second embossed pattern comprises --
A. I'm sorry. Could you slide that over a little bit?
Q. Oh, I'm sorry. I should be more careful.
A. Thank you.
Q. Wherein the second embossed pattern comprises lands and ridges between the lands. Do you see that?
A. Yes, I do.
Q. Looking at Figure 1 without the blue line that you drew, could you please tell the ladies and gentlemen of the jury where lands are described in Figure 1.
A. The word "lands" in the specification?
Q. Absolutely.
A. It's not there.
Q. It's not there, is it?
A. No, it's not.
Q. It's not described in Sawka, is it?
A. It's not used in Sawka.

1265

Q. The word "lands" doesn't exist?
A. I'd have to read all the way through to see if the word was ever used, but barring that, yeah, I agree.
Q. And so the second pattern that comprises lands and ridges between the lands, there are no lands described on Figure 1, correct?
A. There are no lands described on Figure 1 in the patent as called? Again, I have to -- I maybe should be careful to look and see, but I don't believe that word was used, if you'd just give me a little leeway there.
Q. And, of course, if there are no lands described, it would be impossible to measure the height of the ridges over those nonexistent lands, would it not?
A. If one did not select lands, right, it would be impossible to determine the height of ridges or even the existence of ridges.
MS. BROOKS: Thank you, Dr. McHugh. I have no further questions.
THE COURT: Is there redirect examination, Mr. Hadley?
MR. HADLEY: Yes, there is, Your Honor.
THE COURT: You may proceed.

**REDIRECT EXAMINATION**

BY MR. HADLEY:
Q. Just while everything is still fresh in everybody's

1266

mind, let's start with the Sawka patent.
MR. HADLEY: Now, if we can pull up Figure 1. Do I need to do something here?
BY MR. HADLEY:
Q. Now, first Ms. Brooks pointed out to you that the depressions 16 were at different depths. Do you recall that testimony?
A. Yes, I do.
Q. Does claim 1, the first embossed pattern of depressions, does that have any restrictions on the depth of the depressions?
A. No, it does not.
Q. In fact, do you recall that one of the dependent claims say something to the effect that the depressions can be any depth or depths?
A. That's correct, I do recall that.
Q. Now, let's turn to the array issue and if we can pull up column 4 at lines -- I think you were shown about lines 10 through 19 and you were pointed to this language that says that the pattern may have virtually any shape or design.
Now, by the term "any shape or design," does that mean that the shape of these embossed patterns might not be in an array?
A. Yes, it could.
Q. And does it also mean, by virtually any shape, that it

1267

can be in an array?
A. Yes.
Q. And if it is in array, then that's within claim 1?
A. Yes, that's correct.
Q. So would another way of describing this be -- would you agree that --
MS. BROOKS: Object, leading just based on the beginning.
THE COURT: Sustained.
BY MR. HADLEY:
Q. In your opinion, are both nonarrays -- nonarray patterns and arrayed patterns disclosed in Sawka?
A. Yes, they are.
Q. Now, you also talked just briefly about this pebbled surface. Have you ever seen surfaces that are pebbled?
A. Well -- yes, I have.
Q. And in your opinion, would it be possible to make a pebbled appearance using some sort of an embossing tool so you make that same pebbled appearance over and over again?
A. I would expect so, yes.
Q. And if it was done like that, in your opinion, would those -- would that pebbled surface be in an array?
A. Yes, it would.
Q. Would it also be possible to make a random pebbled surface with something other than an embossing tool?

1268

A. Yes.
Q. And in that case, in your opinion, might that surface not be in an array?
A. That's correct, it would not.
Q. And so, again, would you consider this language to disclose both situations where you have an array and don't have an array?
A. Yes, I would.
Q. Let's turn to column 4 -- I'm sorry.
MR. HADLEY: Yeah, let's turn to column 4 just a little bit further down.
BY MR. HADLEY:
Q. You were shown some language on your cross examination starting about line 25 and going through line 30, about line 30, and what I want to do is blow up all the way down to 34.
Now, do you recall being shown the language down to about line 30 where it talks about the second pattern selectively replacing the first pattern in the area of the hot-stamping?
A. Yes, I do.
Q. Now, can you read to the jury the next sentence that you were not shown.
A. Even more generally, base layer 12 is re-embossable in the sense that the base layer may be heated to remove a

previously applied embossed pattern so that it can be replaced with an alternative pattern.
Q. And that language so that it can be replaced with an alternative pattern, does that indicate to you that it doesn't have to be replaced, that it's an option?
A. Yes. Yes, it does.
Q. And in the situation where it's not replaced, would that be consistent in your opinion, Dr. McHugh, with the example 3 that you showed the jury where it says that the two patterns can exist simultaneously?
A. It would be completely consistent.
MR. HADLEY: And can we just pull that up quickly, which is at column 15, beginning at line 55 through 60. Column 15 of the Sawka patent, the same patent, column 15, lines 55 through 60.
BY MR. HADLEY:
Q. The embossed film was then high frequency re-embossed as described above to provide a film with simultaneous first and second embossed patterns that were different. Is the simultaneous language you were referring to?
A. Absolutely.
Q. Then finally on Sawka, the last thing is that -- if we go back to Figure 1, Ms. Brooks asked you some questions about whether the term "land" was used and you said that the term "land" doesn't appear in the patent itself. How do you



know that there are lands in Figure 1 if the word doesn't appear?
A. You know that there are lands because, as Dr. Cavaleri pointed out, you have to establish a reference surface to determine topographies and the reference surface is the land.
Q. Now, we saw from the patent that what is called item 18 and item 16 are ridges and depressions; is that right?
A. That is correct.
Q. From a scientific point of view using -- with the profilometry studies that we heard Dr. Cavaleri talk about, in other words, how you from a scientific standpoint examine the surface of a particular topography, would it be possible to identify ridges and lands -- I'm sorry -- ridges and depressions without a land?
A. It would not be possible.
Q. Let's -- what I would like to do is, I think, work backwards and ask you some questions about your obviousness conclusion.
Now, there were a number of questions that Ms. Brooks asked you about whether the '060 patent, that's the Unitika reference, was known and considered during the prosecution of the '930 patent. Do you recall all of those questions?
A. Yes, I do.



Q. Let me go into that in a little bit more detail. First of all, you were asked some questions by Ms. Brooks about incorporation by reference. Do you recall that?
A. I do recall that, yes.
Q. Let's look at the specific language of the '930 patent that describes this and that is at column 3 at about lines 30 through 38. Now, does this say that the Sher application was incorporated by reference or the entire Sher file history?
A. Just the Sher application.
Q. And did you see anything in the patent saying that the prior art that was cited in the Sher application is incorporated by reference?
A. No, there was no such statement.
Q. Now, you were shown something called IDSs. Do you remember that?
A. IDS?
Q. Yeah. It stood for information disclosure statement.
A. I remember -- yes, yes, I do remember that.
Q. Let's -- first of all, you understand that the '930 patent and the application for the Sher patent were filed on the same day?
A. Yes.
Q. Let's take a look at the -- back at the IDS, the information disclosure statement, that was filed for the



Sher patent.
MR. HADLEY: Can we bring that up on the screen and if we can bring up first the page that shows the submission. This is in Plaintiff's Exhibit 180. If we can blow up the date at the bottom.
BY MR. HADLEY:
Q. Now, this is the document that the patent lawyer for 3M submitted to the patent examiner with this information disclosure statement listing the prior art references that were disclosed in the prosecution of the Sher patent. And can you read what date this was submitted to the patent examiner.
A. The date is April 2, 1997.
Q. Now, if we can go to the actual disclosure statement itself, the list of the prior art.
MR. HADLEY: Can we bring that up.
BY MR. HADLEY:
Q. Now, is this what you were shown in your direct examination by Ms. Brooks?
A. Yeah, that looks familiar.
Q. And we see on here that one of those references was the '060.
MR. HADLEY: There we go. Thank you, Mr. Okada.
BY MR. HADLEY:
Q. Do you see what's been highlighted?

A. My understanding was -- maybe I am just confused -- that I was being shown the pages that you showed me earlier and I said, yes, I had seen those. You showed those to me.
Q. And did you go through any other parts of the '397 during lunch?
A. Oh, no, and I didn't go through what you just said over lunch. Good heavens, no.
Q. Was there anything that you were shown during lunch in the '397 prosecution history that showed that Danny Lee was indeed the examiner that received the Unitika reference?
A. Absolutely not.
Q. I'm sure --
A. You said over lunch.
Q. Oh, okay. So is there anything that you were shown over lunch that showed he didn't receive it?
A. I wasn't shown anything over lunch regarding this trial. My understanding is -- and, Your Honor, you can correct me on this -- in the involvements I have had before with these situations, when a witness gives testimony and then the opposing attorneys begin their cross examination, from that point forward you cannot have any discussions of the details of what's going on in the trial. And I held to that completely, so I did not discuss or look at anything. I had a sandwich and I had some salad and a chocolate chip cookie and I came back here.



Q. All right. Dr. McHugh, then I apologize. I didn't know how you spent your lunch.
Let's go back to what you just told us, though, about the '397. Do you recall saying that you don't dispute that the '397 application was incorporated by reference in the '930 application? I'm showing it to you right here. This is column 3, line --
A. Oh, yes. I'm sorry. I wasn't sure which -- this is the '930, yes.
Q. The '930 is the patent at issue in this case.
A. Yes, that's -- the answer is yes.
Q. And in the application for the patent at issue in this case the Sher application is incorporated by reference?
A. Yes.
Q. And Mr. Hadley just asked you about whether you were familiar with all sorts of patent regulations on how to file patents. Do you remember that he put some in front of you?
A. Certain aspects of the patent filing procedure, yeah.
Q. So, of course, you are familiar with Section 2163.07 of the manual of patent examining procedure wherein it says that the information incorporated by reference is as much a part of the application as filed as if the text was repeated in the application and should be treated as part of the text of the application filed?
MR. HADLEY: Your Honor, could we all see this?



MS. BROOKS: Yes, of course. This is the MPEP.
THE COURT: Put it on.
THE WITNESS: You're asking me if I have seen this and know about it?
BY MS. BROOKS:
Q. Yes.
A. No, I haven't.
Q. So you're familiar with the statutes that Mr. Hadley showed you, but you're not familiar with this section of the manual for patent examiners?
A. I wouldn't even say I was familiar in detail. What I am familiar with and since you asked me is what I have been instructed or told is what's called the duty of candor and that term I've heard of. That means -- my understanding of that is the duty of candor means that when you deal with the Patent Office, because a patent is a privilege, it really gives you monopoly and that's okay because that rewards you for being inventive, but the price you pay for that, so to speak, up front is you have to make sure that you have in all candor given everything you know about the background, past work, and if you have data books that are relevant, especially to tables and things you have in that patent, the duty of candor says you've got to show those things so that we have a fair, level playing field here before we give you your monopoly. That's my understanding of it.



Q. Thank you. You were shown by Mr. Hadley the background section of the Sher application, which is incorporated -- let me go back -- by reference in the Calhoun application. You were shown by Mr. Hadley the background application that talked about the British reference. Do you recall that?
A. Yes, I do.
Q. And you were asked whether or not that description in the background was an accurate description. Do you recall that?
A. Yes.
Q. And I think you said you didn't think it was.
A. That's correct.
Q. Let's look at the British reference itself, shall we. That's Defendant's Exhibit 512 that is already in evidence. The description that you were shown that was contained in the background section said something about how -- I want to get the wording right -- an effective topography is at least 45 microns and then only if the width of the recesses -- sorry. Let me start that again. Effective topography is at least 45 microns and then only if the width of the recesses is at least 130 microns. Do you recall that?
A. That's the statement you're saying that was made in which document?
Q. In the background section of the Sher application --
A. Yes.

infringement after the customer removes the graphic film, then we have met our burden easily and well beyond more likely than not, well beyond 51 percent.

But we don't want to stop there because we don't need to. That sounds sort of like a technicality. This actually proves when you put the pieces together that when this goes out the door at Avery, it is infringing.

How do we know that? Let's look at what are the sole noninfringement arguments of Avery. They come down to two. This is my question of Dr. McHugh. He had said something, and I told him that we were going to get to that because it was slightly off topic.

I said we're narrowing down to what we disagree about. I think we have established that we agree about everything, everything that was on here. Remember how I walked him through that and pointed to where the depressions? They stipulated to the lands and ridges. They stipulated that the height of the ridges over the lands is in the 3 to 45 micron range, in fact dead center, so what's the issue? What are we down to?

The only two issues is whether or not present in this carrier web is an array and whether or not the depressions are embossed, and Dr. McHugh agreed those were the last two things, the only things that Avery is disputing.



So the first is array. Avery's defense that there is not an array is, first of all, absent from this courtroom, with hundreds of sheets of this carrier web, bring us one, just one, and show us that there is no array because of this ink pick off problem. Avery didn't do it because Avery couldn't do it because there is an array.

The whole purpose of the ink dots is to give it that repositionability. Is Avery really telling us they're letting this product go out the door defective, that it is missing so many ink dots that it's not going to have repositionability? Of course they're not saying that.

And what did Mike Hannington actually say in this e-mail that is in evidence? The question was, Looking at the various pictures, which of course we never saw, I got the impression that sometimes a few dots are missing or shifted.

So ask yourself if there are just a few that are missing or shifted, does that make it not an orderly arrangement because that's all that's required for it to be an array, and if in fact you say to yourself, well, it may not literally be an array, then.

Then ask yourself whether or not under the Doctrine of Equivalents array is there. I know these are highly technical terms, but it's just a very common sense. Dr. McHugh put it up there. Doctrine of Equivalents means



if something isn't literally present, is the difference between what it says in the claim and what is present in the product insubstantial?

In other words, if we've got two dots missing, and so you find it's not literally an array, is that difference insubstantial so that an array is still there under the Doctrine of Equivalents? But, ladies and gentlemen, I submit, it's there literally.

And how do we know that? This question right here. Looking at the various pictures, I got the impression that sometimes a few dots are missing. Ask yourself this, one of the instructions you're going to get is to keep your common sense and apply it to this case, as hard as that it is when we're talking about patents.

You have a jigsaw puzzle. You dump all the pieces out on the table. While they're there in a random pile, can you tell whether or not there are a couple of pieces missing? Absolutely not. How do you know if there are pieces missing from your jigsaw puzzle? Only after you put them in an orderly array.

How would they know that there are, quote, "A few dots missing"? From what, if indeed as Avery contends it's random? You can't be missing something that is random. Only when they are in an orderly array can you tell if something is missing, and then if they are, you put your



jigsaw puzzle all together in an orderly array, and you say oh, I'm missing a piece of the sky, and I'm missing a piece of this tree. That doesn't mean it's not an orderly array. In fact it is. It's just missing two pieces.

So Avery's next point is, even if it does show an array, the individual depressions aren't the same. There is nothing that requires that. We've heard about snowflakes in this court. You saw them outside actually during this trial. We heard about them in opening from Mr. Dorman. We heard about them from Dr. McHugh.

Every snowflake is unique. I ask you, ladies and gentlemen, is this an array just because every snowflake is unique, and even if a couple of them are missing, does this now make it not an orderly arrangement? Of course it does. It's all there. Just use your common sense. There is nothing magical about this patent stuff. It's why you, the jury, get to decide whether or not Avery is infringing and not Mike Hannington.

And then the next noninfringement defense is, well, it's not embossed, and the implication being because the depressions are not created by a, quote unquote "embossing tool." Read the Court's construction, if you would, please, very carefully. There is no requirement that these depressions be created by a classic embossing tool.