IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

3M INNOVATIVE PROPERTIES COMPANY and MINNESOTA MINING AND MANUFACTURING COMPANY,

Plaintiffs,

vs.

AVERY-DENNISON CORPORATION,

Defendant.

Civil Action No. 01-CV-1781 (JRT/FLN)

**AVERY DENNISON CORPORATION'S REPLY MEMORANDUM IN SUPPORT OF ITS MOTION FOR JUDGMENT AS A MATTER OF LAW OR, ALTERNATIVELY, FOR A NEW TRIAL ON ISSUES OF INFRINGEMENT**

## TABLE OF CONTENTS

**Page**


I. INTRODUCTION .......... 1

II. DR. STRONG'S TESTIMONY CANNOT SUPPORT THE JURY'S VERDICT OF DIRECT INFRINGEMENT .......... 2

A. The Evidence Cannot Support the Jury's Conclusion that Avery's EZ Film Has an "Embossed Pattern" .......... 3

1. A Surface Comprising An "Embossed Pattern" Requires More than A Surface Topography .......... 3

2. An Embossed Pattern Must Be Created With a Web or Tooling, Which Dr. Strong Admittedly Failed to Show .......... 4

3. An Embossed Pattern Must Utilize Some Theory of Geometry, Which Dr. Strong Admittedly Failed to Show .......... 6

B. The Evidence Cannot Support the Jury's Conclusion that Avery's EZ Film, As Made and Sold by Avery, Contains "Depressions" .......... 8

1. The surface of Avery's liner Consists of Both Polyurethane and Polyethylene .......... 8

2. With a Composite Surface, Avery's EZ Film liner, As Made and Sold, lacks any change in surface topography .......... 11

3. 3M Offered No Evidence Supporting its Contention that the Polyurethane Embedded Into The Surface Of Avery's Liner Creates "Filled" Depressions In The Polyethylene .......... 12

III. THE JURY COULD NOT REASONABLY FIND INDIRECT INFRINGEMENT .......... 13

IV. THE JURY COULD NOT REASONABLY FIND INFRINGEMENT UNDER THE DOCTRINE OF EQUIVALENTS .......... 15

**TABLE OF CONTENTS (cont'd)**

**(Page)**

V. CONCLUSION ........................................................................................ 16

# TABLE OF AUTHORITIES

**Page**

## Cases

3M Innovative Props. Co. v. Avery Dennison Corp.
2002 U.S. Dist. LEXIS 27814 (D. Minn. 2002) .......... 10

3M Innovative Props. Co. v. Avery Dennison Corp.
350 F.3d 1365 (Fed. Cir. 2003) .......... 10

3M v. Chemque, Inc.
303 F.3d 1294 (Fed. Cir. 2002) .......... 13

Bancorp Servs., L.L.C. v. Hartford Life Ins. Co.
359 F.3d 1367 (Fed. Cir. 2004) .......... 7

Del Mar Avionics, Inc. v. Quinton Instrument Co.
836 F.2d 1320 .......... 11

Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.
93 F.3d 1572 (Fed. Cir. 1996) .......... 7

Kaz Mfg. Co. v. Cheesebrough-Ponds, Inc.
317 F.2d 679 (2d Cir. 1963) .......... 14

Moleculon Research Corp. v. CBS, Inc.
793 F.2d 1261 (Fed. Cir. 1986) .......... 13

Northpoint Tech. v. MDS Am.
413 F.3d 1301 (Fed. Cir. 2005) .......... 8

PC/Connector v. Smart Disk
406 F.3d 1359 (Fed. Cir. 2005) .......... 15

Resolution Trust Corp. v. Murray
935 F.2d 89 (5th Cir. 1991) .......... 6

## Statutes

35 U.S.C. § 112 .......... 13

35 U.S.C. § 271(a) .......... 11, 13

## I. INTRODUCTION

3M's opposition maintains the erroneous application of the construed claim language to the structure of Avery's accused liner. This erroneous application, which formed the basis for Dr. Strong's trial testimony, underlies the jury's verdict in this case.

With the claim constructions adopted by the Federal Circuit and this Court, this case should be decided as a matter of law in Avery's favor because the jury resolved no disputed issues of fact. According to the unambiguous language that 3M used in its claims (as confirmed by every embodiment described in the specification of the '930 patent), 3M's invention covers only a surface consisting of an "embossed pattern," which forms an "array of depressions." This case is not close – the claim language as construed cannot possibly read on a flush liner surface consisting of a composite blend of polyurethane ink embedded into a polyethylene layer.

3M's opposition to Avery's motion confirms that the jury's verdict rests solely on four fictions:

1. Despite the claim language and constructions provided by the Court, a surface comprising an "embossed pattern" encompasses ***any*** surface topography, irrespective of whether that topography has been created with a web or tooling, or whether the topography utilizes any theory of geometry.
2. As sold, Avery's EZ Film product contains a liner with surface "depressions," even though the liner lacks any change in surface topography.
3. The surface of Avery's liner is formed from only polyethylene, and does not include the polyurethane, despite the fact that (i) the polyurethane is embedded into the surface of Avery's liner, and (ii) the polyurethane, as well as the polyethylene, carries the adhesive and the film.
4. The polyurethane embedded into the surface of Avery's liner creates "filled" depressions in the polyethylene, even though no depressions ever

existed in the polyethylene that were filled.

Dr. Strong, 3M's expert, provided the sole support for each premise at trial. Avery's motion for JMOL does not "simply ignore" Dr. Strong's testimony. Rather, Dr. Strong's testimony cannot support any of the premises because each is demonstrably wrong. Because the jury verdict necessarily rests on each false premise, the verdict of direct infringement cannot stand. So too, the jury's verdict of inducing infringement and infringement under the doctrine of equivalents must fail.

## II. DR. STRONG'S TESTIMONY CANNOT SUPPORT THE JURY'S VERDICT OF DIRECT INFRINGEMENT

Claim 1 requires a web surface with two embossed patterns. Besides lands and ridges, claim 1 requires a surface with an "embossed pattern [that] forms an array of depressions." Without this limitation, infringement cannot exist. (Doc. 331 no. 20 ("If Avery's product omits even a single structure recited in a claim, then you must find that Avery has not infringed that claim.")).

For this element of claim 1, Dr. Strong provided largely conclusory testimony that failed to provide any meaningful technical analysis. Rather, he simply testified that he had read the patent, looked at photographs of Avery's used liners, and could see an "embossed pattern" and an "array of depressions." In much the same way, 3M's opposition substitutes pejorative attacks for reasoned analysis of how Avery's liner, both as sold and following separation from the film, meets the "first embossed pattern" element of claim 1. In contrast, Dr. McHugh explained how the polyurethane and polyethylene combined to form a liner with a uniform surface having a single topography – namely, the lands and ridges – and why the embedded polyurethane does not create a "first embossed pattern" of "depressions."

### A. The Evidence Cannot Support the Jury's Conclusion that Avery's EZ Film Has an "Embossed Pattern"

Under the constructions provided by this Court, "embossed" means more than a "topography." Likewise, an "embossed pattern" must utilize some theory of geometry. By applying a definition of "embossed" at odds with the Court's construction, and failing to explain how the areas beneath the embedded polyurethane meet the Court's definition of pattern, the evidence cannot support the jury's verdict.

#### 1. A Surface Comprising An "Embossed Pattern" Requires More than A Surface Topography

3M argues that Dr. Strong provided legally sufficient evidence of an "embossed pattern" of depressions on the surface of Avery's liner. (Doc. 360 at 7, (citing pages 731-732 of the trial transcript.)). In his testimony, however, Dr. Strong confirmed that he viewed the Court's definition of "embossed" as requiring just a "topography." (Tr. at 731:12-17 (Strong).) Indeed, Dr. Strong's view of "embossed" is so broad, and so far from any accustomed understanding of the term, that he could not explain the difference between a surface with an embossed topography and a surface with just a topography. For example, Dr. Strong admitted that both a sponge and the surface of Avery's liner prior to any embossing or embedding of polyurethane (as shown in Px 97) could be considered an embossed surface. (Tr. 838:24-839:4 (Strong).) Dr. Strong's opinion, upon which the jury admittedly relied, reads the term "embossed" out of the claim.

In its opposition, 3M simply denies as "groundless" the fact that Dr. Strong based his opinion on a definition of "embossed" as coextensive with "topography." (Doc. 360 at 21.) Despite calling Avery's argument groundless, 3M can only point to testimony in which Dr. Strong recited the Court's construction of embossed , but then provided no analysis of how Avery's liner met the definition. Rather, after reciting the Court's definition of embossed, Dr. Strong simply testified that an SEM photograph of Avery's liner, following use by a customer (Px 78), has a "topography." (Doc. 360 at 21 (citing

Tr. at 731:5-732:5 (Strong).) In fact, 3M's opposition effectively admits the flaw in its case and in the jury's decision: "An 'embossed pattern' of depressions simply requires depressions in an orderly arrangement." (Doc. 360 at 21.) If that were true, claim 1 would have recited only a first "array of depressions," not an "embossed pattern [forming] an array of depressions."

### 2. An Embossed Pattern Must Be Created With a Web or Tooling, Which Dr. Strong Admittedly Failed to Show

To support the jury's verdict, 3M further relies on Dr. Strong's testimony that an embossed pattern can exist on a surface even if no tool were used in forming the surface. (Doc 360 at 7 (citing Tr. 731:18-24 (Strong).) But even 3M's counsel, in questioning Dr. Strong, recognized that an embossed pattern can be generated only through ***embossing***:

> Q. Now, is there anything in the Court's construction of the term "embossed" that requires that ***the embossing*** be done with a tool?
>
> A. No. The reference to tooling is just saying "or a tooling." It could be on the surface of the tooling, but it could be on the surface of the carrier web, so there's no requirement there that it be done with a tool.

As 3M conceded during its questioning of Dr. Strong, an embossed pattern can exist on the surface of a liner only if the liner has been "embossed." But 3M does not and cannot explain how a liner can be embossed without the use of some embossing tool or other material that generates an embossed pattern.

Dr. Strong's testimony that no "tool" is required stems from his incorrect opinion that "embossed" is synonymous with "topography." The Court's definition of "embossed," to say the least, is more expansive. Under the construction provided to the jury, "embossed" refers on its face to a particular type of "topography" – a difference in "surface planar dimension in a "liner or tooling" generated from a topography on a "web or tooling." According to Dr. McHugh, a "tooling" can generate a pattern on a liner (as

described in the '930 patent), or a "web" can act as a tooling to generate an "embossed" pattern in the adhesive. (Tr. 1187:5-1188:11 (McHugh).) Either way, the Court's definition of "embossed" refers to differences in dimensions formed on a surface by a topography on a web or tooling, not simply to ***any*** changes in dimension on a surface.

3M tries to sidestep this issue by arguing that the claims of the '930 patent do not require that each "depression" in the carrier web "be identical to one another." (Doc. 360 at 18.) 3M's argument misses the point. Certainly an embossed pattern can exist when the individual embossed shapes have some variation. In fact, the patent specification explains that an embossed pattern can be formed from any "size, shape and depth of embossed projections in any number of steps." (Col. 6, ll. 53-55.) But unlike an embossed pattern created from projections of different sizes, shapes, and depths in a number of steps, it is undisputed that the areas beneath the millions of embedded polyurethane deposits within Avery's liner are each unique. Moreover, every liner Avery creates has its own different, unique shapes of embedded polyurethane. All witnesses confirmed that no web or tooling could generate such a topography on a liner. (Tr. 703:25-704:12 (Strong) and 1190:17-1191:4 (McHugh).) In other words, Avery's liner cannot have a surface with an "embossed pattern" of depressions because, admittedly, it is never embossed, and no evidence supported the jury's conclusion to the contrary.

3M further argues that Px 78 shows a "three-dimensional pattern that generates a difference in surface planar dimension in the liner…" (Doc. 360 at 19.) But 3M carefully omits language from the Court's definition of embossed. Under the Court's construction, an "embossed" surface exists when a three-dimensional pattern "***on a web or on tooling***" generates a difference in surface planar dimension in the liner. Nothing in Px 78 or in any other photograph of Avery's liner, shows a difference in surface planar dimension generated from a topography on a "web or tooling."

Finally, 3M argues that Dr. McHugh "admitted" that an embossed pattern existed on Avery's carrier web. (Doc. 360 at 20.) Dr. McHugh admitted no such thing. In the

testimony 3M cites, Dr. McHugh agreed that depression exist on the surface of Avery's used liner after the customer separates the liner from the film, removing the polyurethane in the process. (Tr. 1218:16-1219:23 (McHugh).) Avery has never contended otherwise. While Dr. McHugh agreed that depressions exist on the used release liner, Dr. McHugh did not "admit" that the depressions were either embossed or a pattern. 3M's loose treatment of the evidence demonstrates why the facts cannot support the jury's verdict.

### 3. An Embossed Pattern Must Utilize Some Theory of Geometry, Which Dr. Strong Admittedly Failed to Show

Just as Avery said in its opening brief, 3M cannot show that Dr. Strong applied the Court's construction of "pattern" in opining on infringement. Attempting to overcome this failure of proof, 3M points to its counsel's reference to "snowflakes" in closing argument. (Doc. 360 at 20.) 3M further points to Px 78, arguing that it shows depression in a "square grid" pattern. (Id.) 3M's arguments are legally irrelevant and substantively flawed.

First, as the Court instructed the jury, counsel's closing arguments are not evidence upon which a verdict may rest. (Doc. 331 no. 5.) Likewise, neither Dr. Strong nor any other witness ever testified that "depressions" on the surface of Avery's liner are in a "square grid" pattern. Arguments and evidence raised for the first time in opposing a motion for JMOL or new trial cannot sustain a jury verdict. See, e.g., Resolution Trust Corp. v. Murray, 935 F.2d 89, 94 (5th Cir. 1991).

Second, 3M's argument confuses the term "pattern" with "array." In fact, counsel's snowflake illustration, as quoted in 3M's opposition, addressed the term "array," not "pattern." (Tr. 1490:5-14 (Closing).) Under the Court's definitions, an "array" refers to the "arrangement" of depressions across the liner – specifically, an "orderly arrangement." (Doc. 331 no.18.) Contrastingly, a "pattern" refers to the shape of the depressions – specifically, the "formation" of embossings, which can "utilize any

theory of geometry" (e.g., circles, squares, hexagons, etc.). (Id.)

If "pattern" and "array" in claim 1 both referred to the arrangement of the surface depressions on a web, the language would be redundant. Settled patent law favors constructions in which each term is given meaning. See, Bancorp Servs., L.L.C. v. Hartford Life Ins. Co., 359 F.3d 1367, 1373 (Fed. Cir. 2004), citing, Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp., 93 F.3d 1572, 1579 (Fed. Cir. 1996) ("the use of both terms in close proximity in the same claim gives rise to an inference that a different meaning should be assigned to each.")

Moreover, 3M acknowledged the distinction between a "pattern" and an "array" repeatedly during trial. For example, claim 4 refers to the "shape of embossings for any pattern." As Dr. Strong explained, the shape of the pattern can be "all kinds of different shapes, like, it could be a hexagon, or it could be a square, or it could be a circle…." (Tr. at 740:21-741:13 (Strong).) Similarly, as Avery showed it its moving papers, 3M attempted to overcome its lack of evidence on "pattern" by suggesting to Dr. McHugh that the depressions fell within the field of Euclidian geometry. But Dr. McHugh rejected the notion, explaining on redirect why the areas beneath the polyurethane in Avery's liner do not form Euclidian geometric shapes. (Tr. 1291-92 (McHugh).)

In short, 3M can point to no evidence in which Dr. Strong ever addressed the shape of the alleged depressions or showed how they utilize any theory of geometry. And, of course, they do not. Every polyurethane shape, as well as every area beneath the polyurethane shapes, differ and actually are made up of various fractured particles. (Tr. 700:16-25 (Cavaleri).) Importantly, the polyurethane even changes shape when it is embedded. (Tr. 1198:23-1191:4 (McHugh).) 3M disputed none of this evidence and trial, and offers no response in opposition to Avery's motion. This failure of proof alone warrants JMOL in Avery's favor.

### B. The Evidence Cannot Support the Jury's Conclusion that Avery's EZ Film, As Made and Sold by Avery, Contains "Depressions"

Throughout its opposition, 3M relies on a photograph of a spent release liner (Px. 78), after the customer has separated the liner from the adhesive, which is not what Avery makes or sells. As to what Avery makes and sells, 3M's opposition confirms that it finds depressions by refusing to consider the polyurethane as part of the liner. When the polyurethane is considered part of the liner, 3M still argues that depressions exist – they are just "filled" with polyurethane. Neither argument can support the jury's verdict as a matter of law. The polyurethane is as much a part of the liner as is any other material, and one material embedded into another cannot be considered a "filled depression" when no depression existed that was ever filled.

#### 1. The surface of Avery's liner Consists of Both Polyurethane and Polyethylene

3M argues that Dr. Strong disputed the structure of Avery's liner, and that the jury could properly resolve the conflicting expert testimony in 3M's favor. (Doc. 360 at 5, 16.) 3M's alleged dispute cannot support the jury's verdict.

First, 3M claims that Avery offered no evidence regarding the structure of its liner. (Doc. 360 at 15.) Of course, Dr. McHugh described Avery's liner in detail and explained why, from a structural standpoint, the polyurethane forms part of the liner. (Tr. 1176:1-25 (McHugh).)

Second, Dr. Strong provided no analysis or basis for his conclusion that Avery's liner does not include polyurethane. It is well settled that an expert's testimony cannot support a judgment where the expert offers no substantial basis for an opinion, but rather testifies in conclusory form. See, e.g., Northpoint Tech. v. MDS Am., 413 F.3d 1301, 1316 (Fed. Cir. 2005). Moreover, in the testimony that 3M cites, Dr. Strong simply stated that the polyurethane and polyethylene do not get "all mixed up," but rather the polyurethane "displaces" the polyethylene. (Tr. at 718:2-19 (Strong).) Whether the

polyurethane gets "mixed up" with the polyethylene makes no difference: When one material displaces another, within a substrate, it becomes part of the substrate, just as gravel pressed into wet asphalt becomes part of a road.[1]

Third, unlike Dr. Strong, Dr. McHugh explained the basis for this conclusion, describing how the "polyurethane and polyethylene combine structurally to form the top layer." (Tr. 717:14-718:19 (Strong)). 3M offered no rebuttal to Dr. McHugh's testimony, and it was not enough for Dr. Strong to simply say that the polyurethane can be ignored.

Fourth, Dr. Strong did not dispute that on the surface of Avery's liner, polyurethane is pressed into the polyethylene, forming a flush surface. (Tr. 769:11-770:21 (Strong)). Dr. Strong's supposed "dispute" that the polyurethane is not part of the liner makes no sense and cannot be squared with his admission.

Fifth, the '930 patent itself confirms that the claimed carrier web, when used as a liner (as in this case), "carries" an adhesive and a film:

- "The invention relates to embossed webs useful as liners for pressure sensitive adhesives." ('930 patent, col. 1, ll. 5-7.)
- "When webs of the invention are used as release liners, such liners are typically polyethylene coated papers with commercial silicone release coatings ….." (Col. 3, ll. 64-68.)

[1] 3M argues that Avery "most egregiously" cites to a photograph of a "damaged" portion of its EZ Film product – namely, Px 125. (Doc. 360 at 17.) At trial, Dr. McHugh put to rest any contention that Px 125 showed a "damaged" portion of Avery's liner. (Tr. 1303:21-1305:25 (McHugh).) As Dr. McHugh explained, Px 125 is a SEM of Avery's liner taken ***after*** the embossing roll, and had not been damaged in any way. Indeed, 3M offers no evidence supporting its claim that Avery relied on an SEM of a damaged liner. If anything is "egregious," it is 3M's argument that the jury could have "accepted" SEM of Px. 78 as an accurate representation showing that the polyurethane is not part of the liner. (Doc. 360 at 17.) As Dr. Strong confirmed, Px 78 is not an SEM of Avery's release liner with embedded polyurethane. It is Avery's used liner after a customer has separated the liner from the film, thus removing the polyurethane. (Tr. 879:15-23 (Strong).)

- When a liner 20 is used to contact adhesive to obtain a topography produced from patterns 24 and 26, the percentage area of lands 27 to surface 22 (B to A) can range from about 35% to about 98%." (Col. 5, ll. 42-46.)
- When the pressure sensitive adhesive is the desired material to be formed in the pattern(s) embossed in the web 10 or 20, such pressure sensitive adhesives can be selected from a variety of conventional adhesive formulations…." (Col. 7, ll. 7-10.)

3M does not and cannot dispute that both the polyurethane and the polyethylene carry the adhesive and film, and thus must be part of the liner.

Sixth, in granting summary judgment to Avery, the Court in this case already concluded that the structure of Avery's liner includes the polyurethane ink: "[A]n embedded ink dot displaces a portion of the PE liner material, forming a composite PE/PU liner material with a flush surface." 3M Innovative Props. Co. v. Avery Dennison Corp., 2002 U.S. Dist. LEXIS 27814 (D. Minn. 2002). Although the Federal Circuit reversed this Court's claim constructions, the Federal Circuit did not disturb the Court's factual findings regarding the structure of Avery's liner. To the contrary, the Federal Circuit expressly described the polyurethane as part of Avery's liner in much the same way:

> The EZ Film liner is created by first depositing or printing polyurethane "ink" dots (the "PU dots") on top of the liner's outer polyethylene layer (the "PE layer") and then embossing a pattern of hexagonal ridges and lands in the liner ***when the PU/PE combination*** passes over an embossing roll. This hexagonal pattern in the liner creates air-egress-enabling [**7] channels in the adhesive layer when the liner is removed. At some point (or points) in the manufacturing process, the PU dots are pressed into the PE layer of the liner.

3M Innovative Props. Co. v. Avery Dennison Corp., 350 F.3d 1365, 1369 (Fed. Cir. 2003) (emphasis added). Because the structural formation of Avery's EZ Film liner had

been established as the law of the case, the jury was not free to accept Dr. Strong's testimony, which depended on the exclusion of the polyurethane. Del Mar Avionics, Inc. v. Quinton Instrument Co., 836 F.2d 1320, 1324 (Fed. Cir. 1987) ("[P]rior findings and the claim construction based thereon are the law of the case. They are not available for redetermination.").

**2. With a Composite Surface, Avery's EZ Film liner, As Made and Sold, lacks any change in surface topography**

In arguing that "depressions" exist in Avery's liner, 3M confuses Avery's EZ Film product as sold with the used liner after a customer removes it from the film. Specifically, in arguing that depressions exist in Avery's liner, 3M relies on Plaintiff's Exhibit 78, which 3M calls a "SEM of Avery's EZ Film." (Doc. 360 at 19, 23.) 3M further claims that Avery "stipulated" that Exhibit 78 "was a true and accurate representation of its liner." (Id.) 3M cites no support for the alleged stipulation because there is none. While Avery stipulated to the admissibility of Px 78, Avery never stipulated that it was a true and accurate representation of its liner or its "EZ Film." Rather, it is a SEM of a used release liner after the film has been separated from the liner, removing the embedded polyurethane from the polyethylene. Thus, Exhibit 78 lacks any relevance to Avery's alleged direct infringement because ***Avery*** does not make, use, sell, or offer for sale a liner that looks like Exhibit 78. 35 U.S.C. § 271(a).

Nor can Dr. Strong's conclusory testimony that "depressions" exist in the polyethylene beneath the polyurethane provide support for the jury's verdict. Dr. Strong premised his testimony on the mistaken notion that the polyurethane is not part of the liner surface. (Doc. 360 at 25.) As shown above, however, compelling evidence contradicts Dr. Strong's opinion in this regard, and 3M cannot read claim 1 on Avery's liner by randomly picking and choosing which materials are part of Avery's liner and which are not. When the polyurethane is considered part of the carrier web as it must,

there is no dispute that it forms a flat surface together with the polyethylene, leaving no "depressions."

### 3. 3M Offered No Evidence Supporting its Contention that the Polyurethane Embedded Into The Surface Of Avery's Liner Creates "Filled" Depressions In The Polyethylene

Besides contending that the polyurethane is not part of the carrier web, 3M maintains that depressions "filled with polyurethane" exist in Avery's EZ Film. In support, 3M points to Dr. Strong's testimony in which he says that polyurethane fills depressions in the polyethylene, much as water might fill a dry lake bed but still leave a depression on the surface of the earth. (Doc. 360 at 8, 25.)

While Avery respectfully disagrees that a "depression" can exist on the surface of a carrier web if it is "filled," Dr. Strong's testimony, like 3M's argument, cannot be correct because it ignores the structural differences between a surface with "filled depressions" and a surface containing one material embedded into another. Fundamentally, there has never been a dispute that Avery's liner structurally differs from the embossed liners described in the '930 patent. Each embodiment described in the specification of the '930 patent contains depressions created from an embossing tool, which are suitable for filling with some material after formation. In the case of a liner for a pressure sensitive adhesive, the depressions can be filled with a glass bead slurry. ('930 patent, col. 7, ll. 45 to col. 9, ll. 30.) In contrast, Avery's liner for a pressure sensate adhesive never has depressions suitable for filling with some material after formation. Instead, its surface structure consists of one polymer material pressed into and embedded flush in another polymer material.

For this reason, Dr. Strong's lake bed analogy is inept. Lakes are never created by water pressing into the earth to create a lake bed. Rather, lakes are formed when water fills depression already existing in the earth's surface. Moreover, once filled, a lake is not viewed as a depression in the earth – it is viewed as a lake. Either way, Avery's liner

lacks any "filled depressions" because it never has depressions that are filled and it structurally differs from filled depressions. 3M fails to address these difference in its opposition. Likewise, the jury's acceptance of Dr. Strong's testimony that "filled depressions" can exist without depressions not only lacks reasonableness, it completely undermines the requirement that inventors distinctly describe their inventions in patents. 35 U.S.C. § 112. 3M never invented a liner with a surface structure of one material embedded into another. For this reason, 3M should not be allowed to judicially expanded its embossed depressions invention to cover something Avery invented, not 3M.

## III. THE JURY COULD NOT REASONABLY FIND INDIRECT INFRINGEMENT

3M's opposition ignores the reason why Avery, as a matter of law, cannot be liable for indirect infringement. In its opposition, 3M contends that Mr. Calisto's testimony supports the jury's verdict that Avery induces infringement by instructing customers how to use and apply its EZ Film. (Doc. 360 at 14-15, 36.) But Avery cannot be liable for inducing infringement on an entirely separate ground: 3M failed to show that any Avery customer commits an act of patent infringement. To infringe a patent, one must "make, use, sell or offer for sale" and infringing product. 35 U.S.C. § 271(a). At trial, however, 3M offered no evidence that any Avery customer commits an infringing act.

3M relies on <u>3M v. Chemque, Inc.</u>, 303 F.3d 1294, 1305 (Fed. Cir. 2002), and <u>Moleculon Research Corp. v. CBS, Inc.</u>, 793 F.2d 1261, 1272 (Fed. Cir. 1986), in arguing that Avery can be liable for inducing infringement by supplying infringing products to customers together with instructions for use. But <u>Chemque</u> and <u>Moleculon</u> are inapposite to the facts established at trial. 3M's inducement claim assumes that the Avery's EZ Film product, as sold, does not infringe because the liner lacks depressions until removed from the film. Otherwise, 3M's inducement claim would be entirely superfluous to its direct infringement claim. Thus, unlike <u>Chemque</u> and <u>Moleculon</u>, 3M's inducement

claim does not involve either supplying infringing materials with instructions on use, or supplying components with instructions on how to perform an infringing method.

Nor do customers "create" an infringing carrier web containing an embossed pattern of depressions by peeling off the film's release liner. Even assuming that the remaining material structurally meets all limitations of claim 1 once separated from the film (which Avery disputes), Avery's customers still have not created an infringing "carrier web" upon separation. Under the Court's definition of carrier web, the allegedly infringing structure "created" does not carry anything and never had carried anything at the time it allegedly infringed. The fact that the used liner had carried the adhesive and film makes no difference. At that time, it lacked the requisite depressions under 3M's theory of inducement. Because the ***allegedly infringing*** structure never carried anything, as opposed to the non-infringing structure, Avery's customers cannot be said to have "created" an infringing product.

Recognizing this flaw in its inducement theory, 3M suggests that Avery's customers actually "use" an infringing liner for the few seconds it takes to peel the liner from the film. (Doc. 360 at 28.) While imaginative, 3M's argument cannot withstand scrutiny. Even if portions of the liner are infringing and portions not infringing during the time it takes to remove the liner entirely, 3M fails to explain how a customer "uses" the portion that has peeled away, because it has no continuing use. Under the Patent Act, "use" requires some concept of putting an infringing device to some utility. See, Kaz Mfg. Co. v. Cheesebrough-Ponds, Inc., 317 F.2d 679, 680 n. 3 (2d Cir. 1963) ("one who constructs a patented wall safe but uses it only as an anchor for his boat would not be a patent infringer since such use would not be for the purpose of utilizing the teachings of the patent."). In the case of Avery's EZ Film, the portion of the liner removed from the film serves no utility, even as it is peeled away. Thus, 3M's inducement theory fails as a matter of law and lacks sufficient evidentiary support.

## IV. THE JURY COULD NOT REASONABLY FIND INFRINGEMENT UNDER THE DOCTRINE OF EQUIVALENTS

Avery's entitlement to JMOL or a new trial on infringement under the doctrine of equivalents necessarily follows from any decision in Avery's favor on direct infringement. If the Court agrees that Avery's liner lacks the embossed pattern of depressions element, then infringement under the doctrine of equivalents cannot exist. PC/Connector v. Smart Disk, 406 F.3d 1359, 1365 (Fed. Cir. 2005). 3M does not dispute this law in its opposition. Rather, 3M argues that Dr. Strong provided sufficient evidence to show doctrine of equivalents infringement under the "insubstantial differences" test. (Doc. 360 at 29-30.) Yet Dr. Strong never addressed this test either during trial. In the testimony cited, Dr. Strong said nothing more than infringement under the doctrine of equivalents would be met if the Court or jury failed to find literal infringement. That is exactly the kind of conclusory expert testimony courts have found insufficient to support a jury verdict. Northpoint Tech., 413 F.3d at 1316.

Finally, 3M's effort to beef up Dr. Strong's testimony regarding the function/way/result test cannot avoid JMOL. For one, Dr. Strong never provided the analysis at trial. Second, 3M's attempt to substitute its own analysis during post trial briefing, after failing to officer legally sufficient evidence at trial, improperly confuses and conflates the "way" of achieving positionability with the "result" of positionability. (Doc. 360 at 30.) For any of these reasons, the jury's verdict of infringement under the doctrine of equivalents cannot stand.

## V. CONCLUSION

For the foregoing reasons, Avery respectfully asks that the Court grant judgment as a matter of law, or alternatively, a new trial, on direct infringement, inducing infringement, and infringement under the doctrine of equivalents.

DATED: March 17, 2006

Respectfully submitted,

By /S/ Lawrence M. Hadley

David P. Pearson
Matthew D. Spohn
WINTHROP & WEINSTINE, P.A.
225 South Sixth Street, Suite 3500
Minneapolis, Minnesota 55402
(612) 347-0700 - Telephone
(612) 347-0600 - Facsimile

Of Counsel:

Roderick G. Dorman
Lawrence M. Hadley
HENNIGAN, BENNET & DORMAN
601 South Figueroa Street, Suite 3300
Los Angeles, California 90017
(216) 694-1200 - Telephone
(216) 621-1234 – Facsimile