**Anticipation**

6. Did Avery prove that it is highly probable that any of the following claims of the '930 patent are invalid because they are anticipated by U.S. Patent 5,405,675 (the Sawka '675 patent)?

Claim 1 of the '930 patent: **YES** ___ **NO** ✓

If you answer "No" on Claim 1, you need not answer claims 2 - 5.

Claim 2 of the '930 patent: **YES** ___ **NO** ___

Claim 3 of the '930 patent: **YES** ___ **NO** ___

Claim 4 of the '930 patent: **YES** ___ **NO** ___

Claim 5 of the '930 patent: **YES** ___ **NO** ___

**Obviousness**

7. Did Avery prove that it is highly probable that any of the following claims of the '930 patent are invalid because they would have been obvious at the time the invention was made in light of United States Patent No. 3,887,678 – (the Lewicki '678 patent) and United States Patent No. 5,141,790 – (the Calhoun '790 patent) in combination with Japan Publication No. 59078285A (the Mitsui patent)?

Claim 1 of the '930 patent: **YES** ____ **NO** ✓

If you answer "No" on Claim 1, you need not answer claims 2 - 5.

Claim 2 of the '930 patent: **YES** ____ **NO**____

Claim 3 of the '930 patent: **YES** ____ **NO**____

Claim 4 of the '930 patent: **YES** ____ **NO**____

Claim 5 of the '930 patent: **YES** ____ **NO**____

**8.** Did Avery prove that it is highly probable that any of the following claims of the '930 patent are invalid because they would have been obvious at the time the invention was made in light of United States Patent No. 3,887,678 – (the Lewicki '678 patent) and United States Patent No. 5,141,790 – (the Calhoun '790 patent) in combination with GB Patent Specification No. 1,511,060 – (the Unitika '060 patent)?

Claim 1 of the '930 patent: **YES** ____ **NO** ✓

If you answer "No" on Claim 1, you need not answer claims 2 - 5.

Claim 2 of the '930 patent: **YES** ____ **NO** ____

Claim 3 of the '930 patent: **YES** ____ **NO** ____

Claim 4 of the '930 patent: **YES** ____ **NO** ____

Claim 5 of the '930 patent: **YES** ____ **NO** ____

**YOU HAVE COMPLETED YOUR DELIBERATIONS. PLEASE HAVE YOUR FOREPERSON SIGN AND DATE THIS FORM BELOW.**

Beatrice G Murphy
FOREPERSON'S SIGNATURE

December 21, 2005
DATE

# Productie 11 B

AO450 (Rev. 5/85) Judgment in a Civil Case

# UNITED STATES DISTRICT COURT
## District of Minnesota

3M Innovative Properties Company, and
Minnesota Mining and Manufacturing Company

V.

Avery Dennison Corporation

## JUDGMENT IN A CIVIL CASE

Case Number: 01-1781 (JRT/FLN)

[X] **Jury Verdict.** This action came before the Court for a trial by jury. The issues have been tried and the jury has rendered its verdict.

[ ] **Decision by Court.** This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

IT IS ORDERED AND ADJUDGED THAT:
judgment is entered in favor of the Plaintiffs and against Defendant. Plaintiffs recover from Defendant their costs of action

December 23, 2005
Date

RICHARD D. SLETTEN, CLERK

s/Mary Kaye Conery
(By) Mary Kaye Conery, Deputy Clerk

s/John R. Tunheim

John R. Tunheim
United States District Judge

# Productie 11 C

Case 0:01-cv-01781-JRT-FLN Document 368 Filed 03/17/2006 Page 1 of 4

UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | |
|---|---|
| 3M INNOVATIVE PROPERTIES COMPANY and MINNESOTA MINING AND MANUFACTURING COMPANY,<br><br>Plaintiffs,<br><br>v.<br><br>AVERY-DENNISON CORPORATION,<br><br>Defendant. | Civil No. 01-1781 (JRT/FLN)<br><br>**ORDER** |

Katherine A. Moerke, **FISH & RICHARDSON P.C.**, 3300 Dain Rauscher Plaza, 60 South Sixth Street, Minneapolis, MN 55402; Juanita R. Brooks, **FISH & RICHARDSON P.C.**, 12390 El Camino Real, San Diego, CA 92130; and Kevin H. Rhodes, **3M INNOVATIVE PROPERTY COMPANY**, 3M Center, Post Office Box 33427, St. Paul, MN 55133, for plaintiffs.

Lawrence M. Hadley and Roderick G. Dorman, **HENNIGAN, BENNETT & DORMAN LLP**, 601 South Figueroa Street, Suite 3300, Los Angeles, CA 90017; and David P. Pearson, **WINTHROP & WEINSTINE, P.A.**, 225 South Sixth Street, Suite 3500, Minneapolis, MN 55402; for defendant.

This matter is before the Court on a motion by 3M Innovative Properties Company and Minnesota Mining and Manufacturing Company (collectively "3M") for a permanent injunction. On December 22, 2005, the jury in this case found that defendant Avery Dennison Corporation infringes claims 1 through 5 of 3M's U.S. Patent No. 5,897,930 ("the '930 patent") by making and selling its EZ Series Fleet Marketing Film. Specifically, the jury found that Avery infringed the '930 patent literally, under the

doctrine of equivalents, and by inducing others to infringe. The jury rejected all of Avery's invalidity defenses. Based on this verdict, the Court entered Judgment in favor of plaintiffs on December 23, 2005. As explained below, the Court grants 3M's motion for a permanent injunction.

It is the general rule that "courts will issue permanent injunctions against patent infringement absent exceptional circumstances." *MercExchange L.L.C. v. eBay Inc.*, 401 F.3d 1323, 1339 (Fed. Cir. 2005). Avery urges the Court to deny the permanent injunction because it has several post-trial motions pending before the Court. An important public need for an invention may justify denial of an injunction, *id.* at 1338, but the routine filing of post-trial motions cannot.

Avery further asserts that it would be severely prejudiced by an injunction because it may not be able to restart operations or reacquire its customers. Avery believes it should be permitted to continue making and selling its infringing products because it is willing to financially compensate 3M for this continuing infringement. Avery's arguments rest on its proposition that 3M will not be harmed if it receives sufficient monetary compensation, but this argument contradicts established law. "In a patent infringement case, where the infringing device will continue to infringe and thus damage Plaintiffs in the future, monetary damages are generally considered to be inadequate." *Schneider (Europe) AG v. Scimed Life Sys., Inc.*, 852 F. Supp. 813, 861 (D. Minn. 1994). To prevent further harm to 3M, the Court must enter the injunction. Furthermore, the Court cannot allow Avery to sell its existing inventory of EZ Series Fleet Marketing

Film. Now that the jury has found that this product infringes 3M's '930 patent, Avery must negotiate any the sale of this inventory with 3M.

Although Avery does not make a formal motion, Avery asks this Court to stay enforcement of the injunction pending appeal. The Court must consider four factors in exercising its discretion whether to stay the injunction: (1) whether Avery has made a "strong showing" that it will likely succeed on the merits; (2) whether Avery will be irreparably injured absent a stay; (3) whether a stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies. *Standard Havens Prod., Inc. v. Gencore Indus., Inc.*, 897 F.2d 511, 512 (Fed. Cir.1990). Upon considering the four factors and balancing the equities of this case, the Court determines that no stay should issue.

**ORDER**

Based on the foregoing, all the records and files herein, **IT IS HEREBY ORDERED** that:

1. Plaintiffs' Motion for Permanent Injunction [Docket No. 337] is **GRANTED**. A permanent injunction is hereby entered against defendant Avery as follows:

> Effective on the date of this Order, and until further order of this Court, absent explicit written permission from plaintiffs, defendant is hereby enjoined from infringing claims 1 through 5 of the United States Patent No. 5,897,930 by making, using, selling, offering for sale or importing into the United States

Avery's EZ Series Fleet Marketing Film, or any other product no more than colorably different from that product.

DATED: March 17, 2006
at Minneapolis, Minnesota.

s/ John R. Tunheim
JOHN R. TUNHEIM
United States District Judge

# INTERNATIONAL SEARCH REPORT

International Application No
PCT/US 97/09711

A. CLASSIFICATION OF SUBJECT MATTER
IPC 6 B29C59/02 C09J7/02

According to International Patent Classification (IPC) or to both national classification and IPC

B. FIELDS SEARCHED

Minimum documentation searched (classification system followed by classification symbols)
IPC 6 B29C C09J

Documentation searched other than minimum documentation to the extent that such documents are included in the fields searched

Electronic data base consulted during the international search (name of data base and, where practical, search terms used)

C. DOCUMENTS CONSIDERED TO BE RELEVANT

| Category * | Citation of document, with indication, where appropriate, of the relevant passages | Relevant to claim No. |
|---|---|---|
| X | WO 93 01047 A (TREDEGAR IND INC) 21 January 1993 | 1-5 |
| Y | see the whole document<br>--- | 6-8 |
| Y | EP 0 429 269 A (MINNESOTA MINING & MFG) 29 May 1991<br>cited in the application<br>see the whole document<br>--- | 6-8 |
| X | EP 0 313 766 A (CHICOPEE) 3 May 1989<br>see the whole document<br>--- | 1-5 |
| X | GB 2 055 677 A (EMI LTD) 11 March 1981<br>see the whole document<br>--- | 1-5 |
| | -/-- | |

[X] Further documents are listed in the continuation of box C.

[X] Patent family members are listed in annex.

* Special categories of cited documents :

"A" document defining the general state of the art which is not considered to be of particular relevance
"E" earlier document but published on or after the international filing date
"L" document which may throw doubts on priority claim(s) or which is cited to establish the publication date of another citation or other special reason (as specified)
"O" document referring to an oral disclosure, use, exhibition or other means
"P" document published prior to the international filing date but later than the priority date claimed

"T" later document published after the international filing date or priority date and not in conflict with the application but cited to understand the principle or theory underlying the invention
"X" document of particular relevance; the claimed invention cannot be considered novel or cannot be considered to involve an inventive step when the document is taken alone
"Y" document of particular relevance; the claimed invention cannot be considered to involve an inventive step when the document is combined with one or more other such documents, such combination being obvious to a person skilled in the art.
"&" document member of the same patent family

| Date of the actual completion of the international search | Date of mailing of the international search report |
|---|---|
| 18 September 1997 | 29.09.97 |

| Name and mailing address of the ISA | Authorized officer |
|---|---|
| European Patent Office, P.B. 5818 Patentlaan 2<br>NL - 2280 HV Rijswijk<br>Tel. (+31-70) 340-2040, Tx. 31 651 epo nl,<br>Fax: (+31-70) 340-3016 | Labeeuw, R |

Form PCT/ISA/210 (second sheet) (July 1992)

# INTERNATIONAL SEARCH REPORT

Internal Application No
PCT/US 97/09711

C.(Continuation) DOCUMENTS CONSIDERED TO BE RELEVANT

| Category ° | Citation of document, with indication, where appropriate, of the relevant passages | Relevant to claim No. |
|---|---|---|
| X | US 3 887 678 A (LEWICKI JR WALTER J) 3 June 1975<br>see column 5, line 46 - line 55; claims; figures<br>--- | 1-5 |
| X | PATENT ABSTRACTS OF JAPAN<br>vol. 007, no. 024 (M-189), 29 January 1983<br>& JP 57 178718 A (KANTOU LEATHER KK), 4 November 1982,<br>see abstract<br>--- | 1,4 |
| X | GB 2 290 629 A (ALPS ELECTRIC CO LTD) 3 January 1996<br>see claims 1-10,15-17; figures<br>--- | 1,4 |
| A | GB 1 543 977 A (ARMSTRONG CORK CO) 11 April 1979<br>see the whole document<br>----- | 1-5 |

4

# INTERNATIONAL SEARCH REPORT

Information on patent family members

International Application No
PCT/US 97/09711

| Patent document cited in search report | Publication date | Patent family member(s) | Publication date |
|---|---|---|---|
| WO 9301047 A | 21-01-93 | US 5229186 A | 20-07-93 |
| | | AU 655560 B | 22-12-94 |
| | | AU 2298592 A | 11-02-93 |
| | | BR 9206250 A | 13-12-94 |
| | | CA 2102692 A | 09-01-93 |
| | | EP 0593594 A | 27-04-94 |
| | | JP 2593046 B | 19-03-97 |
| | | JP 6509132 T | 13-10-94 |
| | | NO 934574 A | 13-12-93 |
| EP 0429269 A | 29-05-91 | US 5141790 A | 25-08-92 |
| | | AU 634594 B | 25-02-93 |
| | | AU 6550590 A | 23-05-91 |
| | | CA 2028052 A | 21-05-91 |
| | | DE 69030993 D | 07-08-97 |
| | | JP 3181578 A | 07-08-91 |
| EP 0313766 A | 03-05-89 | US 4859519 A | 22-08-89 |
| | | AU 2182388 A | 09-03-89 |
| | | CA 1322088 A | 14-09-93 |
| | | DE 3888283 D | 14-04-94 |
| | | DE 3888283 T | 06-10-94 |
| | | ES 2049739 T | 01-05-94 |
| | | JP 1145132 A | 07-06-89 |
| | | JP 2577784 B | 05-02-97 |
| | | PT 88418 B | 29-04-94 |
| GB 2055677 A | 11-03-81 | US 4288481 A | 08-09-81 |
| US 3887678 A | 03-06-75 | US 3953639 A | 27-04-76 |
| | | BE 808359 A | 29-03-74 |
| | | CA 1011638 A | 07-06-77 |
| | | CH 574728 A | 30-04-76 |
| | | DE 2361870 A | 04-07-74 |
| | | FR 2210512 A | 12-07-74 |
| | | GB 1456374 A | 24-11-76 |
| | | JP 49089756 A | 27-08-74 |
| | | LU 68960 A | 12-02-74 |
| | | NL 7317128 A | 18-06-74 |
| | | SE 402418 B | 03-07-78 |

Form PCT/ISA/210 (patent family annex) (July 1992)

# INTERNATIONAL SEARCH REPORT

Information on patent family members

International Application No
PCT/US 97/09711

| Patent document cited in search report | Publication date | Patent family member(s) | Publication date |
|---|---|---|---|
| GB 2290629 A | 03-01-96 | JP 8006027 A | 12-01-96 |
| | | JP 8022007 A | 23-01-96 |
| | | DE 19523132 A | 04-01-96 |
| GB 1543977 A | 11-04-79 | US 4131663 A | 26-12-78 |
| | | AU 1176276 A | 04-11-76 |
| | | CA 1077216 A | 13-05-80 |
| | | DE 2612767 A | 18-11-76 |
| | | JP 51136745 A | 26-11-76 |
| | | US 4089731 A | 16-05-78 |
| | | CA 1088711 A | 04-11-80 |
| | | JP 52054756 A | 04-05-77 |

Form PCT/ISA/210 (patent family annex) (July 1992)

(19) Europäisches Patentamt
European Patent Office
Office européen des brevets

(11) EP 0 951 518 B1

(12) EUROPEAN PATENT SPECIFICATION

(45) Date of publication and mention of the grant of the patent: 04.09.2002 Bulletin 2002/36

(51) Int Cl.7: C09J 7/02

(21) Application number: 97928724.0

(86) International application number: PCT/US97/09274

(22) Date of filing: 30.05.1997

(87) International publication number: WO 98/029516 (09.07.1998 Gazette 1998/27)

(54) ADHESIVES HAVING A MICROREPLICATED TOPOGRAPHY AND METHODS OF MAKING AND USING SAME

KLEBSTOFFE MIT MIKROREPLIZIERTER TOPOGRAPHIE,HERSTELLUNGSVERFAHREN UND VERWENDUNGSVERFAHREN

ADHESIFS A TOPOGRAPHIE MICROREPETITIVE ET LEURS PROCEDES DE FABRICATION ET D'UTILISATION

(84) Designated Contracting States: CH DE DK ES FR GB IT LI NL SE

(30) Priority: 31.12.1996 US 775844

(43) Date of publication of application: 27.10.1999 Bulletin 1999/43

(73) Proprietor: MINNESOTA MINING AND MANUFACTURING COMPANY
St. Paul, Minnesota 55133-3427 (US)

(72) Inventors:
- SHER, Frank, T.
  Saint Paul, MN 55133-3427 (US)
- MEIXNER, Larry, A.
  Saint Paul, MN 55133-3427 (US)
- LONCAR, Francis, V., Jr.
  Saint Paul, MN 55133-3427 (US)
- CALHOUN, Clyde, D.
  Saint Paul, MN 55133-3427 (US)

(74) Representative: VOSSIUS & PARTNER
Siebertstrasse 4
81675 München (DE)

(56) References cited:
EP-A- 0 459 059

- PATENT ABSTRACTS OF JAPAN vol. 095, no. 007, 31 August 1995 & JP 07 090231 A (SEKISUI CHEM CO LTD), 4 April 1995,
- PATENT ABSTRACTS OF JAPAN vol. 018, no. 578 (C-1269), 7 November 1994 & JP 06 212131 A (SEKISUI CHEM CO LTD), 2 August 1994,
- PATENT ABSTRACTS OF JAPAN vol. 096, no. 008, 30 August 1996 & JP 08 100155 A (KURAMOTO SANGYO:KK), 16 April 1996,

Note: Within nine months from the publication of the mention of the grant of the European patent, any person may give notice to the European Patent Office of opposition to the European patent granted. Notice of opposition shall be filed in a written reasoned statement. It shall not be deemed to have been filed until the opposition fee has been paid. (Art. 99(1) European Patent Convention).



Printed by Jouve, 75001 PARIS (FR)

## Description

[0001] This invention relates to adhesives having a controlled topographical surface of microchannels and the methods of making and using them.

[0002] Pressure sensitive adhesives are useful for the joining of two materials. The interfaces between the adhesive and the materials are vital to the performance of the joined materials. The loss of adhesion at either interface can doom the usage of the materials.

[0003] One example of an adhesion interface requiring peak performance is a durable film displaying image graphics adhered to substrates, where the film is a backing material upon which an adhesive layer is added for adhesion to the substrate. Adhesion of a large image graphic film to substrates encounters the problem of entrapped air between the film and the substrate. Anyone who has ever attempted to hang wallpaper can appreciate the frustration that can arise when entrapped air beneath an adhesive-backed film can not be removed easily. The most common solutions to this problem are to remove and reapply the film or to perforate the film to release the entrapped air. Multiple attempts to adhere the same film to a substrate can compromise the pressure sensitive adhesive or increase the probability of uneven or misaligned film on the substrate. Perforating a film mars its appearance. The removal of air bubbles is also labor intensive.

[0004] Prior approaches have addressed facile adhesion of image graphics film to substrate by concentrating on specialized topographical constructions of the pressure sensitive adhesive. Commercially superior pressure sensitive adhesives for image graphics are available on image graphic films by 3M of St. Paul, Minnesota, USA. Pressure sensitive adhesives having this utility are disclosed in a variety of patents. Representative examples of patents describing such materials include U.S. Patent Nos. 5,296,277 and 5,362,516 (both Wilson et al.) and 5,141,790 (Calhoun et al.). These patents disclose how the adhesive's topography is built from the interface between the adhesive and the release liner. The principal topographical features in the adhesive surface are isolated protrusions from the adhesive surface with identified contact areas.

[0005] Another approach to topographical adhesives is the formation of ridges or recesses in a release or transfer liner to generate a temporary topography on the adhesive. For example, British Patent Specification 1,511,060 discloses a heat- and pressure sensitive adhesive on an impermeable backing that is formed by application of heat and pressure and a release liner having a specific topography or by coating the adhesive onto the release liner, whereupon the release liner is removed. Then, bonding of the adhesive to the desired substrate also requires a step of heat and pressure that adheres the adhesive layer to the substrate. This step is also required to improve the appearance of the final product. This complicated procedure of generating the adhesion of the layer to the backing and then generating the adhesion to the final substrate minimizes utility of the construction for use in large format graphics and other industrial requirements. Furthermore, the depth of the recesses used to create an effective temporary topography on the nontacky adhesive surface is at least 45µm, and then only if the width of the recesses is at least 130 µm.

[0006] Another example of a temporary topography formed on an adhesive surface is disclosed in U.S. Pat. Nos. 5,344,681 and 5,449,540 (both Calhoun et al.). A segmented pressure-sensitive adhesive transfer tape is designed to prevent lateral flow of the adhesive prior to transfer but allows flow after transfer to form a continuous adhesive bond. The small adhesive segments have controllable thickness. An adhesive transfer tape comprises: a carrier with two opposed surfaces with one containing a series of recesses and the other being relatively smooth; a pressure sensitive adhesive being present in the recesses which are surrounded by an adhesive free area such that when the tape is wound about itself with the surfaces contacting and then unwound, adhesive transfers from the one surface to the other. Preferably, the recesses are formed by embossing and are in spaced-apart relationship. Preferably, they are oval, circular, polygonal or rectangular in cross section. Preferably, the adhesive is acrylic or rubber resin, pressure sensitive.

[0007] Another example of a temporary topography formed on an adhesive surface is disclosed in U.S. Pat. No. 5,268,228 (Orr). A double-sided adhesive-coated tape has fine grooves on one or both sides of the tape to facilitate air venting to minimize non-contact areas. The grooves in the tape are fine enough that, once the two surfaces to be bonded are in position, the grooves largely or completely disappear. Example 1 describes scribing lines through a protective sheet that placed grooves 70-150 microns deep in the underlying adhesive surface.

[0008] JP-A-7 090 231 discloses an adhesive sheet comprising a vinyl chloride resin sheet, an irregularity 15 µm deep applied thereon, an acrylic tacky adhesive layer applied to the irregular face, and a releasing paper laminated to the tacky adhesive layer.

[0009] Desirable topographical adhesives face three limiting conditions to solve problems in the art of adhering one material to another, especially large format graphics on supporting substrates having large flat surfaces interrupted by rivets, seams, and the like:

(1) An adhesive without channels provides no effective route for egress of fluids in the X-Y dimensions of the interface between the adhesive and the substrate, especially if the backing material, adhesive, and/or the substrate

are fluid-impermeable. But if the channels are too large, a path of fluid egress could also be a path of passive ingress of the same or other fluids.

(2) The backing material, and especially its outer imagable surface, can not be adversely affected by the adhesive topography chosen, thereby limiting the size of the channels in the adhesive and also limiting the method of construction. The backing material needs a flat, uniform surface for imaging and other aesthetic reasons. The formation of large channels into the laminate of backing and adhesive will adversely disrupt the flat, uniform surface of the backing material. Also, adhesive topographies that are too large will create undesired undulations or other imperfections in the appearance of the backing material on the final substrate. Such undulations or other imperfections make the image graphic unacceptable for most commercial markets.

(3) The area of adhesive actually contacting the substrate and the holding power (i.e., shear and peel adhesion) of the adhesive affect bonding performance of the backing material to the substrate. If either the holding power is too weak or the area of the adhesive contact is too small, or both, the performance of the adhesive is entirely inadequate. Microspheres or other large abrupt surface patterns have been used to reduce the area of adhesive surface on the substrate, either temporarily or permanently, which can affect holding power of the adhesive or area of adhesive contact. If the size of the surface features is increased, air channels in the topography are formed but there is insufficient adhesive interface remaining to provide effective permanent adhesion.

[0010] While the air bubble and fluid egress problems associated with large format graphics are easy to understand, these problems also exist for small graphics and decals where speed of application or applications without pre-masking are significant for economic or manufacturing considerations.

[0011] The problem of fluid egress is even more acute whenever the two materials contacting the adhesive effectively inhibit any egress in the Z axis through either or both materials. Further if the materials are inflexible as well as fluid impermeable, such as metallic plates, there is no avenue that can be created, during application, for fluid egress.

[0012] The art needs a different approach to control adhesion at the interfaces between a pressure sensitive adhesive and two materials within the three enumerated limiting conditions. Indeed, the art needs to engineer the geometry of the adhesive surface to provide a controlled topography of the adhesive surface at any adhesion interface where particular performance is required.

[0013] For this invention, that particular performance should include the provision for fluid egress in the X-Y dimensions of the adhesive interface but without adversely affecting the desired appearance of the backing material which should remain flat and uniform for imaging, but preferably conformable during use. Further, fluid egress should be reconciled with adhesive bond strength for maintaining an adhesive interface.

[0014] The present invention concerns a method of controlling the topography of an adhesive surface according to claim 1, an article according to claim 10, and a method of using a release liner according to claim 16.

[0015] One aspect of the present invention provides a means of controlling the topography of an adhesive surface, comprising contacting a microembossed pattern to a layer of adhesive and forming a microreplicated surface, such that when an adhesion interface is established between the layer of adhesive and a supporting substrate, the topography of the adhesive surface controls the performance of the adhesion interface between that adhesive and the supporting substrate.

[0016] "Adhesive" means any form of adhesive that has pressure sensitive adhesive properties at the time of application to a supporting substrate. As identified by the Pressure Sensitive Tape Council, a pressure sensitive adhesive requires firm adhesion to a variety of dissimilar surfaces upon mere contact without need of more than finger or hand pressure.

[0017] Another aspect of the present invention provides a microreplicated adhesive surface formed by microreplication from any contacting technique such as casting, coating, or compressing techniques. Microreplication can be achieved by at least any of (1) casting using a tool having a microembossed pattern, (2) coating of an adhesive onto a release liner having that microembossed pattern, or (3) passing through a nip roll to compress pressure sensitive adhesive against a release liner having that microembossed pattern. Desired embossing topography can be formed in tools via any of a number of well-known techniques, selected depending in part upon the tool material and features of the desired topography. Illustrative techniques include etching (e.g., via chemical etching, mechanical etching, or other ablative means such as laser ablation or reactive ion etching, etc.), photolithography, stereolithography, micromachining, knurling (e.g., cutting knurling or acid enhanced knurling), scoring or cutting, etc.

[0018] The microreplicated topography resides on at least one major surface of the pressure sensitive adhesive and can optionally reside on both major, opposing surfaces of the adhesive affecting the properties of the interface(s) in the same or different manners, as desired by those skilled in the art.

[0019] When a microembossed liner is used, the liner can be a release liner (e.g., a releasable storage liner for the adhesive or a transfer liner for moving the adhesive from one location to another) or a tape backing on a self-wound roll that also serves as a liner, such that the microembossed surface of the tape backing microreplicates the surface of the adhesive exposed as the tape is unwound.

[0020] "Microembossed" means a topography on the liner or the casting tooling having an effective three-dimensional pattern that generates a maximum difference of less than about 45µm in surface planar dimension in a continuous adhesive. The pattern can be interconnected or continuously parallel.

[0021] "Interconnected" means that at least two three-dimensional features in the microembossed pattern intersect causing the microreplicated formation of an intersection of the inverse of such three-dimensional features in the adhesive surface.

[0022] "Microreplicated adhesive" means adhesive having a topography in at least one major, substantially continuous surface that is essentially, but not necessarily perfectly, the inverse of the microembossed pattern to which the adhesive surface is contacted and has a contact area of at least about 35%.

[0023] "Pattern" means any formation of embossings that can utilize any theory of geometry, including without limitation, Euclidian geometry and fractal geometry.

[0024] Optionally, the microembossed patterns can be multiple. "Multiple" means two or more embossing patterns are superimposed on the liner to create a complex pattern of differing depths or heights of embossing to form the microreplicated adhesive having a complex pattern of differing depths or heights.

[0025] Another aspect of the present invention is an article having a microreplicated adhesive of the present invention.

[0026] The microembossed liners, tools, or nip-rolls used to make microreplicated adhesive of the present invention can provide a vast array of microreplication combinations given the multitude of microembossed patterns, the multiplicity of embossings, and the variety of materials available.

[0027] A feature of microreplicated adhesives of the present invention is that the microembossed pattern is retained for an effective period of time on the microreplicated adhesive surface during intended use. The retention of microreplication can range from minutes to years depending upon the rheology of the pressure sensitive adhesive chosen and the conditions of application. Fluid egress may only be desired for limited times.

[0028] The invention not only provides a three-dimensional topography for pressure sensitive adhesives, but because of the unusual properties of pressure sensitive adhesives, their flow characteristics can be engineered. Therefore, the invention also contemplates the effective use of the pressure sensitive adhesive chemistry and substrate application techniques to control the fourth dimension, how long after substrate application the surface of the adhesive remains three-dimensional. The topography need not be permanent. For example, it can be desired to collapse any portion of the adhesive interface after sufficient fluid egress is completed.

[0029] Another feature of the microreplicated adhesive topography is the ability to control the engineering of the adhesive surface for desired uses, such as air bleeding from large image graphics, plasticizer migration routes from plastic materials, and other applications that require fluid transport in the X-Y dimensions of the adhesive interface(s) rather than the Z axis from the surface of the adhesive. In other words, aerodynamics of the adhesive interface can be engineered as required.

[0030] Another feature of the microreplicated adhesive, when using multiple microembossed patterns, is the ability to control the types of materials introduced into recesses of differing depths in the topography for complex adhesion usages, such as positionability as that disclosed in U.S. Patent Nos. 5,296,277 and 5,362,516 (both Wilson et al.) and 5,141,790 (Calhoun et al.) and PCT Patent Application Serial No. WO US98/1687.

[0031] An advantage of the present invention is the creation of an engineered adhesive surface that serves specific intended uses for a controlled period of time when transferred or adhered to another material.

[0032] Another advantage of the present invention is a pressure sensitive adhesive that provides effective fluid egress without adversely affecting the appearance of the backing material which that adhesive adheres to a substrate.

[0033] Another advantage of the present invention is the ability of the adhesive surface(s) to exhaust fluids such as gases, entrapped air, plasticizers, or moisture from the plane of the adhesive surface independent of specialized compositions or formulations of the adhesive.

[0034] Another advantage of the present invention is the formation of the same or different adhesive topographies to each of the opposing major surfaces of the adhesive. For example, one adhesive interface could provide plasticizer migration from one engineered topography and the opposing major surface could provide fluid egress from a second engineered topography.

[0035] Another advantage of the present invention is the ability of the adhesive surface(s) to permit controlled ingress of fluids at a desired time to affect the adhesive interface(s), such as to facilitate removal, alter surface characteristics, provide additional remedial treatments, and the like.

[0036] Other features and advantages will become apparent from the embodiments of the invention described in relation to the following drawings.

[0037] Fig. 1 is a scanning electron micrograph of a double microembossed liner that has been used to make an adhesive surface of the present invention.

[0038] Fig. 2 is a scanning electron micrograph of the double microembossed liner of Fig. 1 at a higher magnification.

[0039] Fig. 3 is a scanning electron micrograph of a microreplicated adhesive surface of the present invention.

[0040] Fig. 4 is a scanning electron micrograph of the microreplicated adhesive surface of Fig. 3 at a higher magni-

fication.

[0041] Fig. 1 shows an example of the complex topography that can be created on liners. This scanning electron micrograph shows a liner 20 having a surface 22 with one pattern 24 of embossings and optionally a second pattern 26 of embossings. More than one optional pattern can be added according the techniques disclosed in copending WO-A-98/29231.

[0042] A careful viewing of Fig. 1 shows pattern 24 comprising both relatively planar lands 27, i.e., large squares that have been depressed from the initial surface 22 of liner 20 and a series of ridges 28 formed from the material moved from the lands 27 during the embossing process. Pattern 26 forms an array of depressions 29.

[0043] If multiple embossing patterns are desired, the manufacturing process reverses the order of embossings, with the required pattern(s) coming last. The manufacturing of the double embossed liner 20 actually requires the formation of the second embossing pattern 26 first, followed by the formation of the required first embossing pattern 24, second. Between the time of making the two embossing patterns, a desired material can be introduced into optional second embossing pattern 26, such as glass beads, in a manner as disclosed in U. S. Pat. No. 5,296,277 (Wilson et al.).

[0044] The resulting multiple microembossed liner 20 has a total area "T", a first area "A" for lands 27 created during embossing of pattern 24, and an area "B" for ridges 28 created during embossing of pattern 24, and an area "C"for depressions 29 residing in both lands 27 and ridges 28. Fig. 2 shows how one depression 29 can reside in a ridge 28. Thus, T = A+B and all of area C resides within either area A or B, or both.

[0045] The patterns 24 and 26 can be varied according to requirements in the art recognizing that the patterns are superimposed on one another. For example, in Fig. 1, lands 27 are discontinuous, because separate projections on the tooling for forming pattern 24 do not intersect with one another. Likewise, depressions 29 are discontinuous because separate projections on the tooling for forming pattern 26 do not intersect with one another.

[0046] The result of pattern 24 creates separated lands 27 from one another, and the result of pattern 26 creates separated depressions 29 from one another. The interconnected ridges 28 are a by-product of the embossing of separated lands 27.

[0047] In other words, the topography of the tool(s) is an obverse image of the final topography of the microreplicated adhesive, with the liner 20 serving as the inverse image for transferring the image of the tool(s) to the microreplicated adhesive. Therefore, the topography(ies) of the embossing tool(s) for liner 20 is essentially the topography of the microreplicated adhesive.

[0048] For the embodiment of adhesive to be produced from patterns 24 and 28, the percentage area of lands 27 to surface 22 (A to T) can range from about 35% to about 99%. Desirably, the percentage can range from about 50% to about 98%. Preferably, the percentage can range from about 60% to about 97%. More preferably, the percentage can range from about 70% to about 96%. Most preferably, the percentage of A to T can range from about 85% to about 95% to provide adequate fluid egress without adversely affecting adhesion to the supporting substrate. In other words, the percentage of A to T essentially determines contact area for the microreplicated adhesive on the supporting substrate. The percentage areas, respectively, of interconnected ridges 28 to surface 22 (B to T) are the remainders, respectively.

[0049] The percentage area of depressions 29 to surface 22 (C to T) can range from about 1% to about 70%. Preferably, the percentage can range from about 2% to about 25%. Most preferably, the percentage of C to T can range from about 3% to about 15% because of a balance of repositionability of the adhesive to final adhesive bond strength.

[0050] These percentages expressed with respect to the liner 20 cause approximately the same percentages on the inverted topography of the microreplicated adhesive. However, as described in U.S. Pat. No. 5,296,277 (Wilson et al.), the planar adhesive surface of their pegs is important. Therefore, the present invention is not limited by these percentages concerning the area of depressions 29 when creating the volume of depressions 29 or the geometry used to achieve those depressions. In other words, the depressions 29 can assume any solid geometry desired by those skilled in the art, within the percentage areas expressed above.

[0051] The embossing of pattern 24 to create lands 27 moves material into ridges 28. Like the formation of mountains from the movement of large land masses, ridges 28 rise from surface 22. While the depth of embossing of lands only results in a depth of a few micrometers, ridges rise from surface 22 to a height ranging range from about 3 to about 45 μm, preferably from about 5 to about 30 μm, and most preferably from about 6 to about 20 μm.

[0052] The depth of embossings for optional pattern 26 can range from about 4 to about 200 μm, preferably from about 8 to about 100 μm, and most preferably from about 10 to about 30 μm. Because the embossing of pattern 26 occurs before the embossing of pattern 24, the depths identified here are cumulative effect of both embossings, not necessarily the height of embossing tool.

[0053] Moreover, it should be apparent to those skilled in the art that the size of the embossing tooling needed may exceed the depth of embossing desired because of viscoelastic properties of the liner 20 being embossed.

[0054] The "sidewalls" of embossings for any of pattern 24, pattern 26, or any combination of them, can be any shape desired, ranging from a constant radius of curvature to any polygonal shape of at least 2 surfaces within the pattern 24 or 26. Nonlimiting examples of shapes of embossing, in cross-section, include curved, rectangular, trapezoidal,

triangular, bimodal, and the like. U.S. Pat. No. 5,296,277 (Wilson et al.) describes some of the variables to be considered when forming depressions 29 in order to provide pegs in the microreplicated adhesive.

[0055] The width of embossings in any of pattern 24, pattern 26, or any combination of them, can vary as needed. For example, in Fig. 1, the width of embossings that create lands 27 and depressions 29 are relatively uniform for surface 22. However, the pattern can vary across surface 22 for fluid egress, not unlike a tributary-river configuration in a watershed.

[0056] For example, to create microchannels for fluid egress, one could use a liner 20 having a pattern 24 creating ridges 28 having a final width, after viscoelastic properties have reached equilibrium, of less than about 200 µm and preferably from about 50 to 120 µm. The ridges 28 in Fig. 1 are about 100 µm wide.

[0057] Precision of topographical formation of liner 20 can be achieved using a variety of machining techniques. The machine tool industry is capable of creating tools with any pattern desired by those skilled in the art. Euclidean geometric patterns can be formed with any pattern of size, shape and depth of embossing projection in any number of steps.

[0058] Tools can range from planar presses to cylindrical drums to other curvilinear shapes, depending on how it is desired to employ the embossing steps.

[0059] Nonlimiting examples of sources of tooling include commercial sources of photolithographic printing plates and cylinders, precision engraved plates and cylinders, laser machined plates and cylinders, and the like.

[0060] Fig. 3 shows a scanning electron micrograph of a layer 30 of microreplicated adhesive prepared from liner 20 seen in Fig. 1.

[0061] The adhesive layer 30 has a surface 32 having a topography essentially replicating the inverse of the topography of surface 22 caused by patterns 24 and 26. As explained above how the transfer of topography from tooling to liner to adhesive proceeds, Figs. 1 and 3 provide photographic proof of the essential replication of topography during transfer. The topography of liner 20 therefore can determine the resulting topography of surface 32 of adhesive layer 30 that fills the recess(es) of microembossed liner 20.

[0062] Surface 32 has topographical features of a series of interconnected microchannels 37 essentially matching ridges 28 and an array of optional pegs 39 essentially matching depressions 29. The duration of microchannels and pegs depends on the chemistry of the adhesive chosen and the conditions of application.

[0063] Layer 30 can be coated in any thickness that is greater than the height of ridges 28 of liner 20. Desirably, the thickness can be at least about 5 µm. Preferably, for image graphic applications on vertical supporting substrates, the thickness can range from at least about 20 µm to about 50 µm.

[0064] Adhesives can be selected from a variety of conventional adhesive formulations to achieve the topography of surface 32.

[0065] Nonlimiting examples of adhesives include pressure sensitive adhesives, hot melt or heat activated adhesives that are pressure sensitive at the time of application such as pressure sensitive adhesives disclosed in U.S. Pat. No. 4,994,322 (Delgado et al.); U.S. Pat. No. 4,968,562 (Delgado); EPO Publication 0 570 515; EPO Publication 0 617 708; pressure sensitive adhesives disclosed in U.S. Patent Nos. 5,296,277 and 5,362,516 (both Wilson et al.) and 5,141,790 (Calhoun et al.) and PCT Patent Application Serial No. WO US95/1687 (Keller et al.), and any other type of pressure sensitive adhesive disclosed in Satas, et al., Handbook of Pressure Sensitive Adhesives, 2nd Ed. (Von Nostrand Reinhold, N.Y., 1989).

[0066] Chemistry and polymer physics of the adhesive can be used to control the fourth dimension, duration, of three-dimensional microreplicated adhesives of the invention. Understanding the rheology, such as creep compliance, of an adhesive can assist in controlling how quickly or if the microchannels 37 close after application.

[0067] Layer 30 of adhesive can cover all or a part of surface 22 of liner 20. The remaining portions of surface can be covered by other adhesive formulation(s) or left exposed for a pattern of microreplicated adhesive on a film. Pattern coating of adhesives can be found in PCT Patent Publication WO96/15715 (Yasis et al.).

[0068] For example, if one desired to have differential rheological properties on a given film, one could pattern coat adhesive layers, such as concentrically, in order to control how quickly certain portions of the microchannels 37 close. In the tributary-river paradigm, the adhesive layer pattern coated at the relative interior of the surface 32 could flow more quickly and close off microchannels to fluid ingress while microchannels of the relative perimeter of the surface 32 permit continued "drainage" of fluids from the interior of adhesive interface toward the perimeter.

[0069] Other materials besides adhesives can be used to fill one of the multiple embossed patterns if adhesive is used to fill other(s) of the multiple embossed patterns. For example, non-adhesive protrusions can be formed in, or different adhesive formulations can be filled into, depressions 29. Because pattern 26 is embossed before pattern 24 is embossed, the non-adhesive material or different adhesive formulation is added to depressions 29 after the embossing of pattern 26 and before the embossing of pattern 24. Then, layer 30 is coated over surface 22, resulting in a layer 30 of adhesive having non-adhesive protrusions 39 thereon.

[0070] Non-adhesive protrusions can be constructed from any material that can utilize the topographical features of the liner 20 and is compatible in performance with the adhesive and the desired adhesive use. Nonlimiting examples of non-adhesive materials include those materials disclosed in the Calhoun et al. and Wilson et al. patents. The purpose

of using such protrusions 39 can also be found in these patents.

[0071] Liner 20 can be any release or transfer liner known to those skilled in the art for use with adhesives and that is capable of being microembossed. Nonlimiting examples of liners include a variety of commercial materials from 3M of St. Paul, Minnesota and other commercial manufacturers of liner products such as Rexam Release Corporation of Oakbrook, Illinois or Daubert Coated Products of Westchester, Illinois. Such liners are typically polyethylene coated papers with commercial silicone release coatings; polyethylene coated poly(ethylene terephthalate) films with commercial silicone release coatings; or cast polypropylene films which can be embossed with pattern(s) while making such films, and thereafter coated with commercial silicone release coatings. Additional useful liners are identified in the Calhoun et al. and Wilson et al. patents.

[0072] Any film can be contacted to the major surface of adhesive opposite the major surface(s) of adhesive created by the topography of liner 20. Because the film is laminated to adhesive after the topography of adhesive 30 is microreplicated from liner pattern 24, and optionally, pattern 26, the appearance of an exposed major surface is not adversely affected by the topography of the microreplicated adhesive during use. With that advantage, film can be imaged using any commercial technique, including electrography, inkjet, screen printing, flexography, electronic cutting, or other imaging or graphic techniques.

[0073] Alternatively, both major surfaces of adhesive layer 30 can be microreplicated using the same or different liner(s) 20 to provide the same or different adhesive performance properties at the two different adhesive interfaces during use.

[0074] For example, different types of fluid egress can be desired from the different adhesive interfaces: namely, gaseous egress at one interface and liquidic egress at the other.

[0075] Another example is the formation of adhesive topography at the interface between the film and adhesive in order to specifically create a pattern in the film using the adhesive topography to achieve that pattern.

[0076] Yet another possible embodiment is the use of same or different adhesives having same or different topographies where two or more adhesives are laminated together before adhesion to the film and supporting substrate. With the chemistry of the different adhesives determined, one can provide through-channels in the X-Y dimensions of the adhesive-adhesive interface without affecting the adhesive bond strength of the adhesive laminate to the film or the supporting substrate.

[0077] Nonlimiting examples of films useful for contact with adhesive surfaces of the present invention include Controltac™ branded films commercially available from 3M, films disclosed in PCT Patent Application Serial No. WO US98/19683, foils, metallic plates, ceramic plates, polymeric sheets, vibration damping materials, reflective sheeting, retroreflective sheeting, top-coated materials, industrial tape backings, hypoallergenic tape backings, and combinations thereof.

[0078] Image graphic films are unexpectedly improved by the microreplicated adhesive surfaces of the present invention. Image graphic films having adhesive surfaces of the present invention can be used to ensure fluid egress for a predetermined period of time according to the rheology of the adhesives (creep compliance, modulus, etc.).

[0079] For example, one skilled in the art can control fluid egress but minimize fluid ingress at the adhesive interface by (a) selecting a suitable adhesive and (b) forming a topography according to the present invention, and (c) appropriately applying the adhesive to the supporting substrate. This provides air bleed during installation but afterwards seals the interface between the adhesive and the supporting substrate.

[0080] Alternatively, one skilled in the art can select an adhesive having a different rheology to maintain the topography of the adhesive surface for a longer period of time after initial installation to permit multiple reinstallations onto the same or different supporting substrate or to maximize available routes for fluid egress.

[0081] One can make image graphic films with two different types of adhesives in the differing depths of patterns on liner 20 for ease of installation of an image graphic film. This construction is an alternative to products described in the Calhoun and Wilson patents identified above but can function in similar manners.

[0082] Adhesive surfaces of the present invention improve economic value by reducing manufacturing costs, reducing labor costs during installation, and minimizing maintenance required by adhesive interface problems.

[0083] Adhesive surfaces of the present invention can tolerate lower temperature applications, where incomplete bonding of an adhesive to a substrate at the lower temperature is a problem because the adhesive is slow to "wet" the substrate surface. Over time, the extent of the adhesive contact can change, possibly entrapping air. Without microchannels provided by microreplicated adhesive surfaces of the present invention, the fluid can not egress.

[0084] Wavefront motion is usually used to apply murals or graphics to a supporting substrate. These graphics benefit from the adhesive topography of the present invention because, surprisingly, the microchannels of the adhesive not only promote fluid egress during adhesive application of the graphic to the substrate but also survive the application process that involves high transient pressures to provide routes of fluid egress for residual air pockets.

[0085] Further features, advantages, and embodiments are described in the examples.

Examples

**Sample Analyses:**

[0086] Liner and adhesive samples were evaluated using a JSM-6400 (JEOL, Tokyo, Japan) scanning election microscope, light microscopy with a JENA JENAVERT (Jana, Germany) incident light microscope or Bausch and Lomb stereo microscope (Bausch & Lomb, Rochester, NY), or interferometry microscopy using a WYKO RST surface profiler (WYKO Corp., Tucson, AZ). A Surtronic 3P stylus profilometer (Rank Taylor-Hobson, Inc., Leicester, U.K.) was also used for some liner evaluations.

**Tests:**

[0087] Peel Test: Adhesion tests were a modification of ASTM method D3330 (1992) and Pressure Sensitive Tape Council method PSTC-1 (1989). Caustic etched and acid desmut aluminum test panels (6061 T6, Q-Panel Co., Phoenix, Arizona) and painted aluminum test panels (Fruehauf, Indianapolis, IN) were cleaned with DuPont "PrepSol" and allowed to dry. Samples of pressure sensitive adhesive and film on liner were cut into 2.54 centimeter wide strips. The release liner was removed, and the strips were applied to the panels using either a PA-1 Hand Applicator (available from Minnesota Mining and Manufacturing Company (3M) St. Paul, MN) at a speed of about 2.5 centimeter/second or a Vanquisher roll laminator (Stoughton Machine and Manufacturing Co., Inc., Stoughton Wisconsin) at 2.76 bar (40 psi) gauge pressure and a speed of about 2.5 cm/second. A backing strip of 2.54 centimeter wide 3M Scotchcal™ Film Series 3650 adhesive film was laminated in registration onto each sample strip. The backing film prevented the sample films and pressure sensitive adhesive from excessively stretching during peel back testing. After 24 hours in a constant temperature and humidity room at 22°C and 50% relative humidity or after 7 days at 66°C followed by 24 hour equilibration in the constant temperature and humidity room, peel adhesion was measured as a 180 degree peel back at a crosshead speed of 30.5 centimeters per minute using a Lloyd 500 tensile tester (Lloyd Instruments, Segensworth Fareham England).

[0088] Creep Compliance Testing: A sandwich of pressure sensitive adhesive layer (about 125 microns thick) between two sheets of 48 micron thick poly(ethylene terephthalate) film was prepared by coating the pressure sensitive adhesive onto one sheet of the polyester film, drying at 66°C to constant weight (at least about 20 minutes) to afford about ½ the test specimen thickness, and doubling over the coated construction. The test pieces were cut from this sandwich, and the average thickness (*h*) of the pressure sensitive adhesive layer was determined using a caliper gauge and subtracting the thickness of the polyester films. Two test pieces of equal size were die-cut and placed in the parallel plate creep compliance rheometer, one piece being on each side of the center plate, with an outer plate contacting the exposed surface of each. One end of the center plate was connected to a linear variable transducer, which measures the plate displacement (due to material flow) and outputs an electrical signal proportional to the displacement, to a recorder. The parallel plates were placed in horizontal arrangement and the two outer plates were then clamped firmly so as to compress the interposed layers approximately 10%. A hook was attached to the opposite end of the center plate with a flexible wire extending horizontally from the hook and then downward over a pulley, the outer plates being held in a fixed position. A suitable weight (sufficient to measurably deform the sample a distance no greater than its thickness) was attached to the free end of the wire, then the recorder was started. For these examples, the weight used to exert the stress (*f*) was 500 g. From the recorder, the time (t) and the displacement (*X*, i.e., strain) were read. The creep compliance at a given temperature was then calculated according to the equation:

$$J_{(t)}=2AX/hf$$

where *t* is the time at which the measurement is taken, *A* is the area of one face of the pressure sensitive adhesive samples, *h* is the thickness of the adhesive mass, *X* is the displacement at time *t* (where *X* is less than *h*) and *f* is the force due to the mass attached to the wire connected to the middle plate. Where *A* is expressed in cm², *h* in cm, *X* in cm, and *f* in dynes, then the compliance value $J_{(t)}$ is given in cm²/dyne. As an example, a creep compliance *J* value calculated at a time of 3 minutes is indicated here as $J_{(3 min.)}$. The weight may be removed after time *t* allowing the pressure sensitive adhesive to relax or recover. After some additional time *t relax*, the compliance may be determined again. As an example, if a weight is applied for 3 minutes and then removed, and the compliance determined after an additional 3 minutes, the relaxed *J* value is indicated here as $J_{(3 min. + 3 min. relax)}$. A percent recovery under the test conditions may also be calculated: % recovery = $100\%\times[J_{(t)}-J_{(t+t\,relax)}]/J_{(t)}$.

[0089] Slide Test for Positionability: A horizontal glass plate was heated to 40-43°C and cleaned with methyl ethyl ketone (MEK). A test sample (i.e., pressure sensitive adhesive on the indicated backing) , approximately 2.5 cm by 7.5 cm, was draped flat onto the glass plate with the pressure sensitive adhesive side down for approximately 10

seconds. The end edge of the sample was lifted and pulled laterally. The test ratings are as follows:

1 sample slid freely
2 sample slid easily with some resistance
3 sample slid with considerable resistance because of adhesion to the plate, but could be lifted without damage
4 sample stuck to the plate and could not be repositioned without damage

[0090] Hot Application/Reapplication Test: A horizontal glass plate was heated to 40-43°C and cleaned with methyl ethyl ketone (MEK). A test sample, approximately 2.5 cm by 7.5 cm, was draped flat onto the glass plate with the pressure sensitive adhesive side down for approximately 10 seconds, and the edges were pressed with a finger with approximately 500 g "force" to uniformly contact the periphery (from the edge to about 0.5 cm inward) to the glass plate. The sample was then pressed by a finger around the periphery and toward the center of the sample to prevent the PSA from debonding and prevent the entire air pocket from moving to the edge of the sample. The sample applied in this fashion was then evaluated for presence or absence of trapped bubbles. The strip was slowly peeled off of the stage and reapplied in the same procedure. A third reapplication was also done. The test ratings are as follows:

"poor" sample showed trapped bubbles after the first application (indicating no detectable air release properties)
"fair" sample did not show bubbles after the first application, but did show bubbles after either the second or third reapplication
"good" no bubbles were observed on any of the three applications and reapplications (showing air release properties for the first application and showing retention of air release properties for the subsequent reapplications). Also, the microchannels in the pressure sensitive adhesive layer of samples rated "good" were still present after the first and second removal steps.

[0091] Cold Application Test: Test samples were premasked with SCPM-3 (3M) premask tape. Sample strips approximately 5 cm by 23 cm were cut from the premasked film samples. The samples and Fruehauf painted test panels were conditioned at the test temperature for at least 20 minutes. The sample strips were applied to the test panels using one pass of a PA-1 Hand Applicator maintained at a constant 45 degree angle during application and a speed of about 1.5 m/min. Constant application force was supplied by 2 kg, 4 kg, or 6 kg masses mounted on top of the squeegee. Immediately, the premask was removed from the applied strip at a 180 degree angle and a peel rate of approximately 1.5 m/min. The test panel with the applied films was then heated at 66°C for 5 minutes to develop any blistering. The size and extent of the blistering was rated on a scale of 1 to 10, with 1 being no blistering and 10 being complete adhesion failure of the film sample. The appearance of the sample parallels the rating. Particularly good are ratings of less than or equal to 5-6 with a mass of 2 kg, 3-4 at 4 kg, and 1-3 at 6 kg.

[0092] Indent Panel Test: A circular indent was made in 0.7 mm thick aluminum test panel using a hemispherical drop hammer with a tip diameter of 2.5 cm. The indent was about 2.8 cm diameter at the plane of the panel and was about 0.6 cm deep. A 7.5 cm by 7.5 cm test sample to be tested was centered over the indent and applied flat onto the panel and taut over the indent. A PA-1 Hand Applicator with a protective sleeve (SA-1, available from 3M) was used to press the sample onto the panel using a mass of about 1 kg. Then the film was pressed with a thumb into the depressed indent. At least 3 kg of mass was applied. The ability of the sample to conform into the indent and uniformly contact the depressed panel indent was rated as follows:

0 sample would not conform significantly into the indent against the entrapped air
1 sample could be pressed down into the indent to the extent of about 50%
2 sample could be pressed down to conform with much of the indent leaving small air bubbles
3 sample could be pressed down to conform slowly (greater than 5 seconds) and completely into the indent
4 sample could be pressed down to conform swiftly (less than 5 seconds) and completely into the indent

[0093] Rivet Panel Test: A test sample was manually pressed over a 12 mm diameter by 2.5 mm high rounded rivet onto a Fruehauf flat panel with rivets by starting at the edges of the sample 3.8 cm from the center of the rivet. The sample was pressed down, using both thumbs, with thumb pressure (approximately 750 g for each thumb) at the periphery using a circular motion to entrap a large air pocket under the film. The film was then pressed in at the edge of the air pocket towards the rivet keeping thumbs at opposite sides of the rivet and making half-circular motions in alternating directions with decreasing radii to keep the thumbs along the margin of the pocket (approximately 750 g for each thumb). The force was limited so as not to burst the film. This procedure ensured that a large air pocket was formed under the sample and was prevented from being pushed under the film, to the sample edge by debonding of the pressure sensitive adhesive. The time required for dissipating the air pocket and conforming the film to within 2 mm of the rivet was determined. If a large air pocket remained after 5 minutes of working the film, the diameter of the

air pocket was determined. Samples with best air dissipation generally required less than about 30 to 60 seconds to conform the film up to the rivet. Poorest samples entrapped about a 35 mm (or larger) air pockets after 5 minutes of working application.

[0094] Air Bleed Test: A circular test sample 4.4 cm diameter was applied with 4 passes of a rubber roller (specifications as indicated in the specific examples) onto an acrylic panel. The sample was centered over a 6.4 mm diameter hole in the panel. With the sample side up, the panel was sealed onto a gasket by clamping to center the hole over a recessed chamber in an air delivery stage. After 5 mins., the stage was connected to an air-line (45 $cm^3$ total volume) and initially pressurized to 50 inches (127 cm) of water as determined by a pressure gauge connected to the system. The system was closed by a valve, and the time for the pressure to fall to 25 inches (63.5 cm) of water was determined. Poorest samples, such as representative of films with pressure sensitive adhesive layers having no microchannels, showed no air bleed even after several days. For lower adhesion pressure sensitive adhesives, the initial pressure must be adjusted such that the sample does not appreciably debond from the panel.

[0095] Rivet/Corrugated Panel Test: A sample was applied by hand onto a 10 cm by 30.5 cm painted aluminum Fruehauf corrugated panel having four 12 mm diameter by 2.5 mm high rounded rivets. The sample was large enough to cover a substantial portion of the panel. The degree of ease of pressing the sample into the valleys and conformably onto the rivets to prevent air entrapment was evaluated.

**Examples:**

Pressure Sensitive Adhesive Solution 1

[0096] An acrylic pressure sensitive adhesive solution (described as Adhesive Solution 1 in US Patent 5,296,277 and modified with 18.5 phr of a rosin -- Nirez™ 2019 from Arizona Chemical Co.) was prepared. The average 21°C, 3 minute creep compliance, $J_{(3\,min.)}$, of the pressure sensitive adhesive prepared from this solution was 0.53 sq. cm./dyne and the 21°C, relaxed creep compliance, $J_{(3\,min.\,+\,3\,min.\,relax)}$, was 0.08 sq. cm./dyne.

Pressure Sensitive Adhesive Solution 2

[0097] Isooctyl acrylate-acrylic acid (98:2) copolymer was prepared as a solution in ethyl acetate and heptane at a solids content of about 28%. The average 21°C, 3 minute creep compliance, $J_{(3\,min.)}$, of the pressure sensitive adhesive prepared from this solution was 1.64 sq. cm./dyne and the 21°C, relaxed creep compliance, $J_{(3\,min.\,+\,3\,min.\,relax)}$, was 0.52 sq. cm./dyne.

Pressure Sensitive Adhesive Solution 3

[0098] An acrylic pressure sensitive adhesive solution (described as Adhesive Solution 2 in US Patent 5,296,277 and containing 1 part of the crosslinker solution) was prepared at a solids content of about 25%.

Pressure Sensitive Adhesive Solution 4

[0099] Kraton 1107 resin (20 parts and available from Shell Chemical Company, Westbrook, IL), Escorez 1310LC (20 parts), and toluene (60 parts) were combined. The average 21°C, 3 minute creep compliance, $J_{(3\,min.)}$, of the pressure sensitive adhesive prepared from this solution was 0.11 sq. cm./dyne and the 21°C, relaxed creep compliance, $J_{(3\,min.\,+\,3\,min.\,relax)}$, was 0.004 sq. cm./dyne.

Pressure Sensitive Adhesive Solution 5

[0100] A latex acrylic pressure sensitive adhesive (described in Example 1 of US 4,629,663) was prepared at about 54% solids.

Pressure Sensitive Adhesive Solution 6

[0101] A latex pressure sensitive adhesive (prepared according to the procedures of US Patent 5,196,246 and containing about 72% by dry weight of the acrylic pressure sensitive adhesive component) was prepared. The average 21°C, 3 minute creep compliance, $J_{(3\,min.)}$, of the pressure sensitive adhesive prepared from this solution was 0.63 sq. cm./dyne and the 21°C, relaxed creep compliance, $J_{(3\,min.\,+\,3\,min.\,relax)}$, was 0.08 sq. cm./dyne.

Pressure Sensitive Adhesive Resin 7

[0102] A pressure sensitive adhesive similar to pressure sensitive adhesive 1, but without added crosslinker, was isolated from solution as 100% solids resin for hot melt coating.

Pressure Sensitive Adhesive Solution 8

[0103] A pressure sensitive adhesive solution (Adhesive Solution 2 of US Patent 5,296,277 modified such that the alkyl acrylate component was 2-methylbutyl acrylate and 1.8 parts of crosslinker solution was added) was prepared at a solids content of about 35-40%.

Pressure Sensitive Adhesive Solution 9

[0104] Pressure sensitive adhesive solution 1 (100 phr) was modified by adding 5 phr of Pycal 94 (available from ICI Americas, Wilmington, DE).

Pressure Sensitive Adhesive Solution 10

[0105] Isooctyl acrylate-acrylic acid (94:6) copolymer was prepared as a solution in ethyl acetate and heptane at a solids content of about 45%. To 100 parts of the solution was blended 20 parts of Foral 85 (available from Hercules, Inc., Wilmington, DE), 7.5 parts of Hercolyn-D (available from Hercules, Inc.), and 7.5 parts of Pycal 94 (available from ICI Americas). To 100 parts of the combined solution was added 1.5 parts of a solution of 5% crosslinker (described in US Patent 5,296,277) in toluene.

Examples 1-4.

[0106] A release liner consisting of four layers with the core being 97 microns poly(ethylene terephthalate), 21-22 microns polyethylene with a matte finish on a back side layer, and 21-22 microns polyethylene with a glossy finish on the front side with a silicone release coating on the glossy side, was microembossed on the glossy side by passing the release liner between an 85 durometer, 15 cm diameter silicone rubber roll and a 15 cm diameter engraved metal roll. The engraved pattern on the metal roll was intersecting recessed lines (microgrooves) forming a square grid with the microgrooves at a 45 degree angle to the circumference of the roll. The nominal metal roll groove dimensions are listed in the table below. The silicone rubber roll and the engraved roll were heated by circulating oil through the rolls. The set temperatures for the oil heater are indicated in the table below. The rolls were forced together with about 22 N/mm nip force by air cylinders. The release liner was passed through this arrangement at about 1.6 cm/sec. This formed a pattern of continuous raised intersecting microridges (and essentially flat land areas between the raised ridges) on the glossy silicone-coated side of the release liner. The intersections were also raised. The ridges had a curved top and filleted junction with the base. Average ridge dimensions are listed in the table below. The ridges were spaced the same as the engraved pattern. A similar liner microembossed as described above was analyzed with time-of-flight secondary ion mass spectrometry (TOF-SIMS) using a pulsed 25 keV $Ga^{+}$ primary ion beam, with a beam diameter of about 1 micron, rastered over an area of 400X400 microns. A uniform silicone distribution was shown over the liner both on and off the microembossed ridge areas.

[0107] Pressure Sensitive Adhesive Solution 1 was coated onto each microembossed release liner and dried at 66°C for 10 minutes to form an adhesive *film* about 32 microns thick. A control sample was prepared using a similar liner that had not been microembossed with ridges. The exposed adhesive side of these were laminated at room temperature to a 46 micron thick plasticized, white flexible and conformable vinyl (PVC) film identical to that used in 3M™ Controltac™ *Plus* Graphic Marking Film Series 180-10. The lamination used a Vanquisher roll laminator (Stoughton Machine and Manufacturing Co., Inc., Stoughton Wisconsin) at 200 kPa (30 psi) gauge pressure and a speed of about 2.5 cm/second to afford an essentially flat construction. After removal of the release liner the exposed pressure sensitive adhesive surface had continuous recessed microchannels and intersections (corresponding to the microridges of the removed release liner) The average channel dimensions are listed in the table below. The results showed that the channels allowed air bubbles and large air pockets to be easily pressed out by hand during or after application of the film on a surface. Thus, the films could be applied much faster than the control film while retaining uniform appearance of the applied graphic film. The samples adhered well to the substrates and showed no signs of undesired edge lifting. The control sample with no microchannels required more careful application, otherwise air bubbles and an uneven appearing graphic resulted. Trapped air bubbles under the applied control film could not be pressed out.