


FIG.1




FIG.2

3/4

0951518




FIG.3




FIG.4

EPA/EPO/OEB
D-80298 München

+49 89 2399-0
TX 523 656 epmu d
FAX +49 89 2399-4465

Europäisches Patentamt
Generaldirektion 2

European Patent Office
Directorate General 2

Office européen des brevets
Direction Générale 2

Vossius & Partner
Siebertstrasse 4
81675 München
ALLEMAGNE

| Application No. / Patent No. | Ref. | Date |
|---|---|---|
| 97 928 724.0 - 2102 / 951518 / | | 17.08.2005 |
| Proprietor: MINNESOTA MINING AND MANUFACTURING COMPANY | | |

**Interlocutory decision in Opposition proceedings (Articles 102(3) and 106(3) EPC)**

The Opposition Division - at the oral proceedings dated 27.04.2005 - has decided:

**Account being taken of the amendments made by the patent proprietor during the opposition proceedings, the patent and the invention to which it relates are found to meet the requirements of the Convention.**

The reasons for the decision are enclosed.

Documents for the maintenance of the patent as amended:

**Auxiliary Request 2**

**Description, Pages**

| | |
|---|---|
| 1, 2, 8-10, 12-29 | of the patent specification |
| 3-7, 11 | filed during Oral proceedings on 27.04.2005 |

**Claims, Numbers**

| | |
|---|---|
| 1-13 | filed during Oral proceedings on 27.04.2005 |

**Drawings, Sheets**

| | |
|---|---|
| 1-4 | of the patent specification |

**Possibility of appeal**
This decision is open to separate appeal according to Article 106(3) EPC. Attention is drawn to the attached text of Articles 106 to 108 EPC.

**Registered letter with advice of delivery**

Date 17.08.2005 Sheet 2 Application No.: 97 928 724.0

**Opposition Division:**

| | |
|---|---|
| **Chairman:** | Dury, O |
| **2nd Examiner:** | Kaul-Buchberger, E |
| **1st Examiner:** | Van de Panne, V |

Europäisches Patentamt • European Patent Office • Office européen des brevets

Connolly, M
**Formalities Officer**
Tel. No.: +49 89 2399-8021

**IDOP coded**

11. 08. 05 Cn

Enclosure(s): 8 page(s) reasons for the decision (Form 2916)
Wording of Articles 106 - 108 (Form 2019)
Documents relating to the amended text

to EPO postal service: 11.08.05

**Europäisches Patentamt**
**GD2-Einspruch**

**European Patent Office**
**DG2 - Opposition**

**Office européen des brevets**
**DG2 - Opposition**

Application No.: 97 928 724.0

Patent No.: EP-B-951518

**A copy of the communication (communication/decision/minutes) was printed for and notified to each of the following representatives/parties:**

Vossius & Partner
Siebertstrasse 4
81675 München
ALLEMAGNE

01
Rutetzki, Andreas
Müller-Boré & Partner Patentanwälte Grafinger Strasse 2
81671 München
ALLEMAGNE

## FACTS and SUBMISSIONS

I European Patent 0 951 518 was granted to Minnesota Mining and Manufacturing Company on the European Patent Application 97928724.0, filed on 30-05-9997 as PCT/US/97/09274, claiming a right of priority to the date of 31-12-1996, with mention of the grant of the patent on 04-09-2002.
The patent was granted with 17 claims, of which 4 independent claims.

The present decision is based on the the patent as granted as Main Request and on two auxiliary requests, which are annexed to the Minutes.

II A Notice of Opposition dated 04-06-2003 was filed by Avery Dennison Corporation. Revocation of the patent was requested on the basis of lack of novelty and lack of inventive step (Article 100(a) EPC).
The Opponent relied on the following documents:
D1 JP-A 59-78285 + English translation
D2 JP-A 59 53787 + English translation
D3 JP-U 2587198 + English translation
D4 DE-A 3 417 746
D5 WO 95/11945
D6 JP-A 57 178718 + English translation
D7 US-A 5 405 675
D8 US-A 5 141 790
D9 US-A 5 362 516
D10 US-A 5 122 902
D18 JP-A 06 212131 + English translation
The documents mentioned in the International Search Report were mentioned as D11 to D17 and D19

III In the Statement of Opposition the Opponent argued that the subject-matter of claims 1, 10, 16 and 17 lacks novelty in view of D1 and D18 and lacks an inventive step in view of D18 alone or D18 in combination with D2 or D3 or in view of the combination of D2 with one or more of D3, D4, D5 or D9.

In his letter of reply dated 20-01-2004, the Patentee countered the arguments of the Opponent and submitted a set of 12 claims as auxiliary request.

IV The Opposition Division arranged for Oral Proceedings to be held on 13-04-2005, later changed to 27-04-2005, and set out its provisional opinion in a letter dated 09-03-2004. This provisional opinion held that D18 seemed to take away the novelty of claims 1, 10, 16 and 17 of the main request and that the subject-matter of these claims seems to lack an inventive step in view of a combination of D1 or D3 with the general knowledge of those skilled in the art. The subject-matter of the claims of the auxiliary request seems to be novel, but the inventive step still would have to be discussed. Some problems regarding clarity were noted.

With a letter dated 29-03-2005 the Patentee submitted auxiliary requests 1 to 7 to replace the earlier auxiliary request and submitted arguments in favor of novelty and inventive step of the main and auxiliary requests.

V In the course of the oral proceedings which were held on 27-04-2005, the Patentee withdrew his earlier auxiliary requests 1, 2 and 4-7, entered a new first auxiliary request and maintained the earlier auxiliary request number 3, together with amended pages 3-7 of the description, as his second auxiliary request. At the end of the proceedings, the Opposition Division decided to maintain the patent in the form of the second auxiliary request.

## REASONS

I The opposition was filed in due time and in proper form, observing all requirements of Articles 99 and 100 and of Rule 55 EPC and is admissible.

As documents D11-D17and D19 are mentioned in the proceedings leading to grant of the patent, they are allowed in the opposition proceedings too, even though the opposition brief does not discuss them in detail.

II The Patentee argues that the essential concept of his invention is the provision of a

sheet having an adhesive layer with a topography, in particular in the form of microchannels, which will remain intact for at least some time after the installation of the sheet. The expression "contact area" would indicate that area over which the sheet and the substrate are in direct contact after installation of the sheet, in distinction to an area of initial contact that might change due to the (final) installation of the sheet. The Patentee cites paragraphs [0027], [0028], [0066], [0080], [0084] in support of this thesis.

The claims of the patent as granted do not explicitly require that the micro-channels remain open for any longer period. This feature is moreover not implied by the description. The last sentence of paragraph [0028] reads on sheets wherein the channels collapse immediately after installation with concomittant removal of air, for example in the installation of the sheet on an essentially flat surface. Paragraph [0079] describes that there can be air bleed **during** installation but afterwards the interface between the adhesive and the substrate is sealed. This reads on collapse of the channels essentially during installation. The embodiment in which the channels remain open over a certain time is clearly described as an **alternative** embodiment in paragraph [0080].
Working example 35 has a rating of "fair" in the hot application/reapplication test and this is consistent with disappearance of the channels upon the first application, and the same applies to working examples 71 and 100 (40-43 °C). The control of the structure combined with adhesive rheology so as to give microchannels that remain open for a longer time may be the preferred embodiment of the patent, but the Opposition Division is of the opinion that the present claims also read on the embodiment in which the microchannels exist only long enough to permit air bleeed during the actual installation of the sheet on a substrate.

The Opponent objected to the introduction of an auxiliary request in which elements of the description would be inserted in the claims in order to restrict them to the preferred embodiment, and in view of Rule 71a EPC the Opposition Division was obliged to refuse to allow the introduction of such an auxiliary request in the proceedings.

## III Main Request, novelty

Document D1 discloses an article with a pressure sensitive adhesive layer having microchannels ("grooves") with a depth of 1 to 15 µm, preferably 2 to 10 µm which prevent air from being "entangled" during the affixing procedure and also prevent air from being entangled and/or facilitate the elimination of "entangled" air, and a liner embossed in such a way that said microtopography will be transcribed in the adhesive layer, see claim 1 and page 2 lines 13-22. D1 shows all features of claims 1, 10, 16 and 17 as granted, except

for the feature that the adhesive has a "contact area" of at least about 35 %. This document does not take away the novelty of any of the claims of the patent as granted. It is noted that the final application of the sheet to the substrate is effected with the aid of a heated press roll at 50 °C. It may very well be that under this condition the microchannels disappear, but that they would remain intact at least partially when the installation is done at a lower temperature and/or pressure.

Document D18 discloses a repositionable pressure sensitive adhesive sheet with a microtopography of the adhesive layer with "concave" and "convex" portions having a difference in height of 10 to 20 µm, wherein the bottom part of each concave portion has a width of 50 to 100 µm and the flat part of each convex portion has a width of 50 to 100 µm. This structure is created with the aid of an embossed liner and serves to render the sheet repositionable in the sense that it can be easily peeled from a substrate after application under a light pressure and can be repositioned, but is firmly affixed after the application of stronger pressure. There is no mention of the prevention or elimination of entrapped air. The "schematic view" of figure 1 shows concave and convex parts of about equal size. The Patentee argues that this is an isolated cross section and that the adhesive surface could consist of rows of convex portions in the form of protrusions, separated from a similar parallel row by a flat surface, in which case a cross section taken in another direction might show an entirely different structure. The mention that **each** concave respectively convex portion has a width of 50-100 µm speaks against this interpretation, since such an interpretation would lead to concave portions having the required width in one direction (X-axis), but an entirely different width in another direction (Y-axis). The figure in context of the description is consistent with a pattern of parallel channels or ridges, or with a checkerboard pattern. The convex portions of the adhesive layer would form the contact surface; in the extreme case that the convex portions are 50 µm wide and the concave portions 100 µm wide, the contact area would be 50/(50 + 100 + some µm for the slope) x100 and thus would be only somewhat under 35 %. At about equal concave and convex portions, the contact area would be close to 50 %. It is thus likely that the contact area is over 35 %, but this is not **unequivocally** disclosed. If there is a "ridge and channel" structure, an ability to exhaust fluid from the plane of adhesion is implied, but if there is a checkerboard structure, it is not certain that air could be exhausted. The feature that "fluid may be exhausted from the plane of adhesion interface" is thus not **unequivocally** disclosed. D18 thus does not take away the novelty of the claims of the

patent in suit.

As the further documents in the proceedings are less close, the claims of the main request are novel.

## IV Main Request, inventive step

The closest prior art is D1 since this document solves the same problem as the present invention, namely the prevention of entrapped air bubbles, and solves it by the same means, namely the provision of microchannels in the adhesive surface. The skilled man who has to put the teaching of D1 into practice inevitable has to decide how many channels he is going to inscribe in the adhesive surface, and thus how large the remaining "contact" surface will be. Since a firm final bond is desired in D1, the surface available for bonding must be not too small. D1 indicates in the examples that the film is treated with a heated roller in order to obtain a firm bond without entrapped air, see also page 2 lines 22-26 where it is indicated that - under the influence of heat and pressure - a closed adhesive interface should be formed. The more channels there are - and thus the lower the "contact" surface is going to be- the more difficult it will be to close them all in order to obtain a homogeneous adhesive interface, and this also will lead the skilled person to a contact surface that is not too small. The skilled man will thus be led to design a sheet wherein the contact surface of the adhesive will be well over 35 % of the total surface. Note also that there is no evidence in the patent that the value of 35 % is a sharply defined limit. Claim 1 of the main request thus does not involve an inventive step and this request cannot be allowed.

## V First auxiliary request

**Rule 71a EPC** This request was entered by the Patentee in the course of the oral proceedings. Claims 1 and 9 of this request were obtained by inclusion of the subject-matter of claim 8 as granted in the claims 1 respectively 10 of the patent as granted. A new request based exclusively on a combination of claims of the patent as granted cannot surprise the Opponent and its introduction during oral proceedings is allowable under Rule 71a EPC. Claim 14 of this request is identical to claim 13 of the third auxiliary request filed with Patentees letter dated 29-03-2005 and thus also cannot surprise the Opponent. The Opposition Division therefore uses its discretion to admit this first auxiliary request in the procedure.

**Article 123 EPC** With regard to claim 14, the requirements of this article are met since paragraphs [0042] and [0052] provide sufficient support.

**Article 84 EPC** Said claim also meets the requirements of Article 84 EPC. The passages [0042] in connection with [0044] and [0048] make clear that the "contact area" in this claim indicates the surface of the lands, and thus the total surface between the ridges, regardless of the area occupied by the depressions. It is further clear that the "maximum difference of less than 45 m in surface planar dimension" refers to the difference in height between the lands and the ridges, because the passage [0052] allows a depth of the depression largely exceeding the value of 45 µm; the depth of the depression clearly cannot be added to the height of the ridges in order to calculate the "maximum difference in surface planar dimension".

**Novelty** The subject-matter of claims 1-13 is clearly novel, see the discussion of claim 1 of the main request. The subject-matter of claim 14 is novel because D1 does not disclose the presence of depressions as well as ridges in the liner.

**Inventive step** Again D1 is the closest prior art here. The proviso that the topography of the adhesive surface is maintained "for a time effective to allow exhaustion of fluids .... " does not necessarily mean that the topography is maintained for a noticeable time after application of the sheet to the substrate, as argued by the Patentee. It reads as well on maintaining said topography from the moment in which the liner is removed from the adhesive surface to the moment in which the sheet is finally fixed to the substrate by firm pressure with simultaneous removal of air bubbles. D1 mentions that the structure with microchannels also *facilitates the elimination of entangled* (= entrapped) *air* and this implies a method in which the sheet is first fixed lightly, with entrapment of some air bubbles, followed by firm pressing to remove the air bubbles. D1 thus discloses at least one embodiment meeting the conditions of former claim 8. Selecting a contact area of at least 35 % is well within reach of the skilled man as discussed above with respect to claim 1 of the main request, and the selection of a maximum contact area of 99 % is not inventive for the same reasons. The subject-matter of claims 1 and 8 of the first auxiliary request thus does not involve an inventive step, and this request cannot be allowed.

**VI Second auxiliary request**

**Article 123 EPC** As mentioned above, the patent as granted, and the PCT application, clearly disclose an embodiment in which the liner is provided with depressions in the lands and the adhesive layer accordingly is provided with pegs extending above the contact surface, see [0042] and [0052]. The presence of microchannels in the adhesive surface and of ridges on the liner is mentioned throughout the description, see inter alia paragraphs [0042] to [0050]. The range of 35 to 99 % of the contact area is disclosed in paragraph [0048]. The amendments do not extend the scope of the claims and the claims of the second auxiliary request meet the requirements of Article 123 EPC.

**Novelty** Novelty is evident, see the earlier discussion of D1 and D18.

**Inventive step** The embodiment now claimed provides two effects: not only a good exhaustion of air from the adhesion interface, but also at least repositionability of the sheet. If the upper surface of the pegs consists of adhesive, the sheet will be merely repositionable, and if the surface consists of non-adhesive material the sheet will be slideable. The claims of this request cover both possibilities.

D1 was discussed above and shows one of these effects, namely the exhaustion of air, and one of the technical features, namely the microchannels.

D3 forms part of the prior art under Article 54(2) EPC and discloses pressure sensitive adhesive sheets with a non-adhesive liner. The liner is provided with depressions and the adhesive surface is correspondingly provided with pegs ("square truncated pyramids"), with a height of 3 to 50 µm, see figures 1 and 2, page 7 paragraphs [0020] and [0021], page 8 line paragraph [0024]. The effects are that the sheet is repositionable and that air entrapped between the adhesive layer and the substrate can easily be removed, see page 10 paragraphs [0041] and [0042], and further paragraphs [0003], [0005], [0006], [0008] and [0009]. D3 thus discloses both effects and one of the technical features of the claims of the 2nd auxiliary request, namely the provision of pegs on the adhesive.

It is acccepted practice of the EPO to select the document having the most of the effects and the technical features in common with the claims under discussion as closest prior art for discussing the inventive step. In the present case that is document D3.

The comparative examples 10, 12, 14 and 16 of the patent in suit show an adhesive sheet with only pegs (glass filled) which has a very good slideability but does not prevent entrapment of air, as shown by the rating of "poor" in the hot application/reapplication test. This goes counter to the teaching of D3 and the problem to be solved would be to make

pressure sensitive adhesive sheets having both good slideability/repositionability and air exhaustion. In view of the assertion in D3 that the pegs/truncated pyramids do allow the exhaustion of air, a skilled person will be led to solve the problem by altering the shape and/or number of the pegs. Alternatively, in view of D1 and D18, he might be led to change from a structure with pegs to a structure as shown in according to D18 with parallel ridges and channels, because D18 promises repositionability and the channels might be assumed to allow air exhaustion on the basis of common sense or on the basis of the teaching of D1. The skilled man would not necessarily be led to combine the teaching of D3 and D1 in such a way as to obtain a pressure sensitive adhesive sheet showing both pegs and microchannels. Only with hindsight would such a combination be seen as the straightforward solution that would offer itself to the skilled worker.

The subject-matter of the claims of the second auxiliary request such seems to be not only novel but also to involve an inventive step. As the description has been amended so as to agree with the claims and as the other requirements of the EPC are also met, the second auxiliary request can be allowed.

*************************

**Article 106**
**Decisions subject to appeal**

(1) An appeal shall lie from decisions of the Receiving Section, Examining Divisions, Opposition Divisions and the Legal Division. It shall have suspensive effect.

(2) An appeal may be filed against the decisions of the Opposition Division even if the European patent has been surrendered or has lapsed for all the designated States.

(3) A decision which does not terminate proceedings as regards one of the parties can only be appealed together with the final decision, unless the decision allows separate appeal

(4) The apportionment of costs of opposition proceedings cannot be the sole subject of an appeal.

(5) A decision fixing the amount of costs of opposition proceedings cannot be appealed unless the amount is in excess of that laid down in the Rules relating to Fees.

**Article 107**
**Persons entitled to appeal and to be parties to appeal proceedings**

Any party to proceedings adversely affected by a decision may appeal. Any other parties to the proceedings shall be parties to the appeal proceedings as of right.

**Article 108**
**Time limit and form of appeal**

Notice of appeal must be filed in writing at the European Patent Office within **two months** after the date of notification of the decision appealed from. The notice shall not be deemed to have been filed until after the fee for appeal has been paid. Within **four months** after the date of notification of the decision, a written statement setting out the grounds of appeal must be filed.

**Further information concerning the filing of an appeal**

(a) The appeal is to be filed with the European Patent Office either at its seat in Munich, at its branch at The Hague or at its Berlin sub-office. The postal addresses are as follows:

(i) European Patent Office
D-80298 Munich
Germany
(Telex: 523656 epmu d)
(Fax: +49 89 2399-4465)

(ii) European Patent Office
Branch at The Hague
Patentlaan 2
Postbus 5818
NL-2280 HV Rijswijk (ZH)
Netherlands
(Telex: 31651 epo nl)
(Fax: +31 70 340-3016)

(iii) European Patent Office
Berlin sub-office
D-10958 Berlin
Germany
(Fax: +49 30 25901-840)

(b) The notice of appeal must contain the name and address of the appellant in accordance with the provisions of Rule 26(2)(c) EPC, and a **statement** identifying the decision which is impugned and the extent to which amendment or cancellation of the decision is requested (see Rule 64 EPC). The notice of appeal and any subsequent submissions stating the grounds for appeal must be signed.

(c) Notice of appeal must be **filed in writing** (typewritten or printed (Rule 36(2) EPC), by telegram, telex or fax (Rule 36(5) EPC; OJ EPO 6/89, 219-225; OJ EPO 9/89, 396)).

(d) The fee for appeal is laid down in the Rules relating to Fees. The equivalents in the national currencies in which the fee for appeal can be paid are regularly published in the Official Journal of the European Patent Office under the heading "Guidance for the payment of fees, costs and prices".

Letterhead of the law firm of Brinkhof

**WRIT OF SUMMONS FOR EXPEDITED PROCEEDINGS ON THE MERITS OF THE CASE**

(In connection with European Patent 1 011 955 b1)

This fourth day of October in the year two thousand and five, at the request of the company incorporated under foreign law 3M COMPANY (previously named: MINNESOTA MINING AND MANUFACTURING COMPANY), established and having offices at St. Paul, Minnesota, United States of America, opting for the address for service in this matter at (1075 HH) Amsterdam, the Netherlands at De Lairessestraat number 111-115, at the offices of the law firm of Brinkhof, of which law firm J.J. Brinkhof and R.E. Ebbink have been appointed to represent and act as attorneys at law in this case, as well as opting for the address for service at The Hague, at Noordeinde 33, at the offices of the law firm of Houthoff Buruma, of which law firm P.J.M. von Schmidt auf Altenstadt has been appointed to act as procurator litis and shall do so in law for the plaintiff;

Did I, Mike van Lingen, supplementary candidate court process server, employed at the offices of Ferdinand van Horssen, court process server of Leiden, having offices at Leiden at Schipholweg 101 D and hence both having their address for service their;

given the ruling handed down by the Instructing Judge of the District Court of The Hague of 27 September, two thousand and five, which ruling is appended hereunto;

**SUMMON**
**EXCLUDING THE RIGHT TO SUBMIT STATEMENTS OF REBUTTAL AND REJOINDER**

the company incorporated under the laws of the Netherlands AVERY DENNISON MATERIALS NEDERLAND B.V. having its registered offices at (2321 JZ) Leiden, at Lammenschansweg 140, hence serving my writ there and speaking with and leaving a copy hereof with

Mrs. A.G.M. van Leeuwen, who works there

Addendum to serving my writ (at the aforementioned address in a sealed envelope on which reference is made as prescribed by the law as I did not find anyone present there to whom I could lawfully hand a copy hereof signed

**IN ORDER THAT:**

appearance be made on the second of November, two thousand and five, in the morning at 10.a.m., not in person but rather represented by a procurator litis, at a session of the District Court of The Hague, which shall be held then and there in one of the Courtrooms of the Palace of Justice at Prins Clauslaan 60;

**EXPRESS NOTICE BEING GIVEN:**

that should the defendant not make appearance at these proceedings, or should the defendant fail to appoint a procurator litis despite having been served notice of this being required, and should the time periods prescribed and further formalities have been complied with, the Court shall rule in absentia and shall grant the claims made pending in law unless the Court shall deem those claims to be unlawful or unsubstantiated;

**WITH A VIEW:**

that it be heard, then and there, on behalf of the plaintiff, as follows:

FACTS/BACKGROUND

The plaintiff

1.
The plaintiff (hereinafter referred to as 3M) is part of a world-wide operation called the 3M Group. The 3M Group is active in specialist and various markets including those for offices supplies, plastics and health care. In this case, the matter concerns, put briefly, adhesive foil products for use, for example, on the exterior walls and panels of trucks and buses. Those foils are often printed, with advertisements, for example.

2.
3M is the holder of European patent EP 1 011 955 B1 (hereinafter referred to as the patent) for multiple embossed webs. A copy of this patent as well as the Dutch language translation thereof shall be entered into the proceedings on the first day thereof as Exhibits 1 and 2.

The patent

3.
The patent was granted on 2 April 2003 on the basis of an application submitted on 3 June 1998, in which priority was invoked of an American patent application dated 31 December 1996 (US 775 736). The patent was granted for and is valid in Switzerland, Germany, Denmark, Spain, France, Great Britain, Italy, Lichtenstein, the Netherlands and Sweden (Exhibit 3).

4.
The patent claims are in the authentic, original English language as follows:

See original
"..."

5.
The Dutch language translation thereof reads as follows:

See original
"...."

6.
The patent concerns multiple embossed webs which are claims as carrier webs. The carrier webs have a three dimensional, multiple, embossed relief pattern. The relief pattern consists

of (at least) two different patterns. The one pattern contains an array of depression. The other pattern comprises lower lying lands and ridges.

7.
One of the applications of the carrier web is that is serves as a release liner for a pressure sensitive adhesive. If the protective layer and pressure sensitive adhesive are pressed together, the three dimensional multiple relief pattern of the protective layer ensure for (an almost complete) complementary three dimensional multiple relief pattern in the adhesive. This means that relatively deep points in the protective layer such as the depressions result in high points in the adhesive. The high points in the protective layer, such as ridges, result in deep points in the adhesive.

8.
The adhesive, with which the protective layer is brought into contact, may be found on a film. After removing the protective layer, the relief pattern of the adhesive makes sure that the foil can be evenly and suitably fixed to a surface such as the exterior of a vehicle. The three dimensional, complementary pattern in the adhesive, in relation to the three dimensional, multiple web pattern, in the adhesive, makes it possible to mount the film on a surface, re-position it, and prevent air bubbles from being trapped under the foil. Please refer to column 1, lines 20-33 of the patent. This works as follows.

9.
The depression in the protective layer result, as already stated, in rises to the surface of the adhesive. When mounting the film, the whole surface area of the adhesive is therefore not directly fixed to the surface but only those higher areas will touch the surface in question. This makes it easier to re-position the film once it has been initially mounted. Once the film is in the correct position, the film is pressed firmly on to the surface so that in any case that part of the adhesive layer which aggress with the lower areas (lands) of the protective layer, sticks to the surface.

10.
The ridges in the protective layer result in channels in the surface of the adhesive. These channels are the escape routs of any air trapped.

The defendant and the Easy Apply Products

11.
The defendant (hereinafter referred to as Avery) puts film products on the market just like 3M does. Avery trades in adhesive film products, inter alia, under the following designations (in combination or not with the words Easy Apply):

1. MPI 1005;
2. MPI 107; and
3. MPI 2005.

These products shall be referred to hereinafter collectively as the Easy Apply products.

12.
Information about the Easy Apply products may be found, inter alia, on the website www.easy-apply.com and www.europe.averygraphics.com (Exhibit 4) as well as in a brochure disseminated by Avery about the MPI 2005 (Exhibit 5).

13.
Avery also manifests itself in public using the words Graphics Division Head Office and Avery Dennison – Graphics Europe. Please refer to the print-out of the website www.europe.averygraphics.com which is entered into these proceedings as Exhibit 6 and the brochure disseminated by Avery (Exhibit 5) in which the address information is mentioned of the branch office of Avery in Hazerswoude. Avery has distributors in all the designated countries afforded protection by the terms of the patent. Please refer to the print out of the website ww.europe.averygraphics.com (Exhibit 7). Avery is therefore active in all the countries in which the patent is effective.

14.
In the United States, litigation concerning a breach of patent rights is on-going between 3M and the parent company of Avery, Avery Dennison Corporation. The subject of those legal proceedings is the question as to whether or not certain adhesive film products made by Avery are covered by the protection afforded of US 5 897 930 which patent is held by 3M. US 5 897 930 is an American parallel patent to and with the patent currently under discussion.

BREACH

15.
The Easy Apply products made by Avery, as shall be shown below, are covered by the protection afforded by the patent, in particular patent claims 1 and 8. Avery trades and offers Easy Apply products for sale in all the countries where the patent is in effect. Moreover, it is also plausible that Avery concerns itself in one or more of the designated countries with the manufacture of those products. By acting in this manner Avery breaches the rights which 3M derives from the patent in question.

Analysis of the Easy Apply products

16.
3M has obtained samples of each of the Easy Apply products. A sample of MPI 2005 was obtained by 3M at the Fespa Trade Fair in Hannover, Germany which took place between 31 May and 4 June 2005. That sample is part of the brochure entered into the proceedings as Exhibit 5. Samples of MPI 1005 and MPI 1007 were obtained by 3M through a distributor of Avery in the Netherlands.

17.
These samples have been analysed by 3M. The carrier web/protective layer of each of the samples has been subjected to a so-Called SEM micro-graph (a photograph of that registered using an electron microscope which magnifies 25 times what it sees. Moreover, measurements were also taken of the heights of the protective layers taken from each of the samples. On the first day of the proceedings, Exhibit 8 shall be entered into the proceedings, which is a report containing the findings of research conducted on and, for each Easy Apply

product, an SEM micrograph, as well as graphic colour illustrations and graphs showing the result of the measurements taken.

18.
Research has confirmed that each of the Easy Apply products in any case is covered by the scope of protection afforded by patent claims 1 and 8 of the patent in question.

Claim 1

19.
Claim 1 contains the following features:
A. A carrier web (20) comprising: A carrier web (20) consisting of:
Etc.….

MPI 2005-10-04
20.
The MPI 2005 product complies with all the features contained by claim 1 of the patent.

21.
That the product includes feature A appears from that that the product is an adhesive film, which makes use of a protective layer which protects the adhesive layer. Please refer to Avery's website in which mention is made of a liner (Exhibit 4, p. 4). There is also a carrier web.

22.
Features B-E appears from the SEM micrograph shown below taken of the carrier web/protective layer of the MPI 2005 (please also refer to the report Exhibit B).

Illustration

A surface with a multiple relief pattern is visible. There is a first pattern consisting of an array of depressions and a second pattern consisting of lower lying lands and ridges.

23.
In the German language brochure (Exhibit 5), the channels are referred to as being found in the adhesive layer of the MPI 2005 product, which channels are complementary to the lower lying areas or lands and ridges in the protective layer and which ensure for that any air trapped can escape. Please refer to p. 2 of Exhibit 5:

See original

24.
MPI 2005 also meets feature F. The results of the measurements taken show that the protective layer has ridges protruding above the surface depressions ranging from about 3 to about 45 μm. Please refer to the report (Exhibit 8).

25.
That referred to by Avery on its website www.easy-apply.com confirms that the MPI 2005 product benefits from the presence of the features A-F, namely the possibility of having trapped air escape and that the film can be re-positioned. Please refer to p. 3 of Exhibit 4.

"…."

MPI 1005

26.
The product MPI 1005 also meets all the features of patent claim 1.

27.
Feature A appears from the fact that the product is a self-adhesive film which makes use of a protective layer for an adhesive. Please refer to Avery's website in which reference is made to a liner (Exhibit 4. p. 4). There is also a carrier web.

28.
Features B-F appears from the following SEM micrograph of the carrier web/the protective layer of MPI 1005 (Please refer to the report (Exhibit 8)).

29.
Illustration

There is a surface with a multiple relief pattern with a first pattern consisting of an array of depressions and a second pattern consisting of lower lying lands and ridges. Please refer, in this connection, to Avery's website www.easy-apply.com (Exhibit 4, p. 3), quoted above in section 25.

30.
The website www.europe.averydennison.com confirms that he MPI 1005 product makes use of the features which are distinguished by the patented invention. Please refer to Exhibit 4, p. 6.

"Entrapped air can easily be rubbed out without the need to punch the vinyl film. The easy-to-apply feature offers the benefits of faster application of decals and graphics."

MPI 1007

31.
The MPI 1007 product also has all the features of patent claim 1.

32.
That the product has feature A appears from the fact that the product is a self-adhesive film, which makes use of a protective layer which protects the adhesive layer. Please refer to Avery's website where mention is made of a liner (protective layer) (Exhibit 4, p.4). There is also a carrier web.

33.
Features B-E appear from the following SEM micrograph of the carrier web / the protective layer of MPI 1007 (please refer to the report, Exhibit 8)).

Illustration

A surface with a multiple relief pattern is visible. The first pattern consists of an array of depressions. The second pattern consists of lower lying Lands and ridges. Please refer to Exhibit 4, quoted above in section 25.

34.
MPI 1007 also has feature F. The height of the ridges above the lower lying depressions varies from about 3 to about 45 µm (Please refer to the report (Exhibit 8)).

35.
The website www.europe.averygraphics.com (Exhibit 3) makes it clear that the MPI 1007 product benefits from the features of the patented invention. Please refer to Exhibit 4. p. 7.

"Entrapped air can easily be rubbed out without the need to punch the vinyl film. The easy-to-apply feature offers the benefits of faster application of decals and graphics."

Patent Claim 8

36.
Patent Claim 8 distinguishes the following feature:

G. A method of using a web of any of Claims 1-4 as a release liner for a pressure sensitive adhesive/

37.
All Easy Apply products are based on Patent Claim 8.

38.
The carrier webs of the Easy Apply products in the first instance all comply with the features of patent claim 1 (please refer to section 20 and thereafter of the foregoing). Moreover, those carrier webs are used by Avery as a release liner for a pressure sensitive adhesive. Avery hence applies the working method described in patent claim 8.

39.
Moreover, the Easy Apply products are the directly obtained results of applying this working method. The application of this method for using a web as a protective layer for a pressure sensitive adhesive allows the Easy Apply products to be obtained and used. Offering and trading in the results of directly acquired and obtained applications of the working method, as described in patent claim 8, renders Avery in breach of the Netherlands Patent Act, article 53, section 1, preamble, sub-section b, 1995, pursuant to the sole right to use that working method which is retained by 3M.

In conclusion

40.
From the foregoing, it follows that all the Easy Apply products referred to have a carrier web which literally complies and agrees with all the features of patent claim 1. Moreover, the carrier web is used for and in the Easy Apply products as a protective layer or liner for pressure sensitive adhesive. Such use and the resulting Easy Apply products themselves hence are covered by patent claim 8. In any case, the Easy Apply products embody the essence of 3M's invention. Carrying out or conducting one or more of the actions referred to in article 53, section 1, preamble, under sub-sections a and b of the Netherlands Patent Act, 1995 (such as offering, selling and delivering, in brief, trading in) such products renders Avery in breach of 3M's exclusive rights arising out of the European Patent as this was granted for the Netherlands.

41.
The patent laws in the other designated countries contain comparable stipulations in this connection. By trading in the products in questions in those other designated countries, Avery also breaches the exclusive rights retained by the patent holders arising out of the European Patent granted for those countries.

DEFENCE

42.
3M is not aware of any defence to be mounted by Avery.

INTEREST / CLAIMS MADE IN LAW

43.
3M has invested a lot of time and money in developing products which agree with the invention protected by the patent. As a result of the breaches of its rights committed by Avery, 3M sustains damage, including damage in the form of loss of sales and profits and loss of exclusivity. Moreover, Avery unjustly benefits from its breaching 3M's rights from the development and management efforts expended by 3M.

44.
Given the foregoing, 3M has a right and an interest in the breaches of its rights committed by the defendant in all the countries in which the patent is effective being brought to an end and having the damaging consequences of the breaches already committed limited as far as possible. The claims formulated below for a prohibition on any further breaches being made, a court order to recall products, and, a rectification as well as a court order requiring the destruction of all stocks on hand of the products constituting the breach of right, are all intended to serve 3M's rights and interests.

45.
Moreover 3M is also entitled to receive compensation for damage/divestiture of profits as a result of the breaches committed by Avery to the extent Avery knew or had reasonable grounds for knowing that it committed breaches of 3M's rights (compare article 45, section 1 TRIPs). As such, Avery has committed breaches in any case by acting in the way it has done in the designated countries subsequent to this writ of summons having been served. Avery should be required to account for itself in connection with the compensation for damage due /

divestiture of profits. The scale and scope of the compensation due to 3M shall be required to be determined in a separate set of legal proceedings to be made pending specifically for the purpose of establishing exactly the scale and scope of the damage sustained.

(CROSS BRODER) COMPETENCE

46.
The Court is competent to be made cognizant of these claims made in law on the basis of that determine in article 2, EEX Decree in conjunction with article 80, section 1, sub-section a of the Netherlands Patent Act, 1995.

47.
The Court has cross border competence in respect of Avert which is established and incorporated in the Netherlands, on the grounds of established Supreme Court of the Netherlands case law. ?

EXHIBITS AND OFFER TO FURNISH EVIDENCE

48.
3M shall enter the Exhibits referred to in this writ of summons as well as any other Exhibits on the first day of the proceedings under cover of a deed.

49.
Further to this, 3M offer to prove all its statements to the extent that the onus of proof rests with it, using all lawful means, particularly by means of calling witnesses and/or experts to testify. 3M offers in particular to prove, to the extent that the onus of proof rests with it, all the facts and circumstances on the strength of which it has based its statements concerning the breaches of the patent rights committed by Avery in the designated countries.

CONSEQUENTLY;

May it please the District Court of The Hague to rule:

A.
prohibiting the defendant, effective immediately, from breaching European Patent 1 011 955 B1 in all the countries designated in that patent, in particular further to the products which are protected by that patent such as the Easy Apply products MPI 1005, MPI 1007 and MPI 2005 as well as any products which resemble them designated differently, and prohibit the defendant from manufacturing, using or trading in any such products, offering them, importing them, or holding them in stock, under penalty of a fine becoming due immediately of Euros 100,000.00 (one hundred thousand Euros) for each square metre of product with which said prohibition shall be infringed, or, at the discretion of the plaintiff, for each day or part thereof that the defendant persists in infringing said prohibition;

B.
ordering the defendant to provide the plaintiff within four weeks (28 days) after the ruling shall have been handed down in this case, with a written, signed list, certified by a Netherlands Certified Public Accountant/Auditor, together with copies of all the documents required to substantiate said lit, with the full names and addresses of all persons and legal entities for whom and which the defendant has manufactured the aforementioned products in

all the countries designated by the European Patent 1 011 955 B1, or used said products, or traded in said products, as well as a full list of the quantities of said products and the sales prices thereof, and the profits made by the defendant as a result of the aforementioned breaches of the rights retained by 3M, under penalty of a fine becoming due immediately of Euros 50,000.00 (fifty thousand Euros) for each day or part thereof the defendant persists in failing to comply with this injunction;

C.
ordering the defendant to make it clear to the persons and legal entities referred to above under B. that the products referred to above under A. are protected by European Patent 1 011 955 B1 and to request those parties to return the products supplied to them against restitution of the purchase price, reimbursement of costs, all this within fourteen (14) days after the ruling shall have been handed down in this case, together with a copy being sent at the same time of that notice to counsel for the plaintiff, which shall solely have the following content and without any further content:

Rectification letter:
See original

or at least having content which the Court shall determine in the pursuit of justice, under penalty of a fine becoming due immediately of Euros 50,000.00 (fifty thousand Euros) for each time, or, at the discretion of the plaintiff, for each day the defendant persists in failing to comply with this injunction;

D.
ordering the defendant, within four weeks (28 days) after the ruling shall have been handed down in this case, to destroy all the of sticks of the products referred to in this writ of summons at its own expense in an ecologically responsible manner and within two (2) working days thereafter, send a certified verbatim report of said destruction having been carried out drawn up by a Court Process Server to counsel for the plaintiff, and ordering the defendant, within ten (10) working days after the products returned to it shall have been received by it, to destroy those products carefully, in an ecologically responsible manner at its own expense and within two (2) working days thereafter to send a certified verbatim report of said destruction having been carried out drawn up by a Court Process Server to counsel for the plaintiff, under penalty of a fine becoming due immediate of Euros 100,000.00 (one hundred thousand Euros) for each day the defendant persists in failing to comply with this injunction;

E.
ordering the defendant to compensate the plaintiff for the damage sustained by the plaintiff or yet to be sustained by the plaintiff resulting from the breaches and infringements of its rights, at the discretion of the plaintiff, divestiture of profits made by the defendant to the plaintiff which profits have been made resulting from the breaches and infringements of the European Patent 1 011 955 B1 in all the countries designated therein, and profits yet to be made by the defendant as a result thereof, to be increased by lawful interest which shall have accrued from the date the defendant shall have been made aware of the breach or at least from the date of

the writ of summons until complete compensation shall have been paid, all this to be listed and scheduled in accordance with the stipulations of the law;

F.
ordering the defendant to pay the costs of these proceedings; and

G.
declaring these measures to be executable in anticipation.

The costs of this instrument for me, Court Process Server are EUROS

| | |
|---|---|
| Writ of summon: | Euros 71.93 |
| VAT | Euros 13,67 |
| Total | Euros 85.60 |

Court Process Server
Signed

The plaintiff may off-set VAT charged on the grounds of the Netherlands Value Added Tax Act, 1968, and the undersigned hence declares having increased the costs by the percentage which equals the percentage referred to in the aforementioned Act

THE INSTRUCTING JUDGE OF THE DISTRICT COURT OF THE HAGUE

Given the petition submitted by;

The company incorporated under foreign law
3M COMPANY,
Established and incorporated at St. Paul, Minnesota, United States of America, hereinafter referred to as the plaintiff;
Procurator litis: P.J.M. von Schmidt von Altenstadt;
Attorneys at law: J.J. Brinkhof an R.E. Ebbink, of Amsterdam

In respect of:

The private limited liability company incorporated under the laws of the Netherlands
AVERY DENNISON MATERIALS NEDERLAND B.V.,
Established at Leiden, hereinafter referred to as the defendant,

In connection with a patent dispute concerning EP 1 011 955, asking leave to serve a writ of summons for expedited proceedings on the merits of the case in patent cases,
the following ruling has been handed down:

RULING:

1.
The Court grants the plaintiff leave to serve a writ of summons on the defendant to summon the defendant to appear as a session of this Court to be held on November 2, 2005, in compliance with the following:

2.
The plaintiff shall have the writ of summons served no later than on October 7, 2005, for the most part in agreement with the draft submitted and under cover of this ruling.

3.
The plaintiff shall also on that date send the text of that writ of summons and of this ruling by registered mail directly to the defendant.

4.
At the Court session to be held on November 2, 2005, the plaintiff shall, where necessary by means of providing further information concerning all the facts and statements it has made, also enter all the Exhibits into the proceedings which the plaintiff wishes to refer to and invoke in compliance with articles 2.1 and 3.1 of the Netherlands National Procedural Rules and Regulations. To this end, aside from that stipulated by article 3.2 of the Netherlands National Procedural Rules and Regulations, no continuance may be granted.

5.
The plaintiff shall also be required to produce these Exhibits on the first day of the proceedings and make them available to the defendant.

6.
Thereafter, the case shall be adjourned until the hearing to be held on March 8, 2006 at which hearing the defendant shall be required to submit a statement of reply, for which no continuance shall be granted, and shall also be required to enter all Exhibits into the proceedings which the defendant wishes to make use of in mounting its defence, all this in compliance with article 2.1 of the Netherlands National Procedural Rules and regulations, while the defendant shall also be required to have provided the aforementioned statement of reply and the aforementioned Exhibits directly on the aforementioned date to the plaintiff.

7.
Should the defendant submit a motion, this may be done within the same time frame as shall apply for submitt8ing the statement of reply or earlier under cover of a deed to the office of the clerk of the court for the docket. In both cases, the time period set for any reply in the motion shall be in compliance with that determine n article 2.7 of the Netherlands National Procedural Rules and Regulations, and be 2 weeks, in default of compliance therewith, the motion shall not be upheld. Any motions submitted shall not suspend the defendant's being bound to submit a reply in the main case and do so within the time period set for submitting a statement of reply, in default of which the Court shall deem the defendant having failed to submit a reply.

8.
Should the defendant submit a statement of reply which shall also be a counter-claim, the plaintiff shall be required at the hearing to be held on July 12, 2006 to submit a statement of reply in the counter-claim as the defendant in the counter-claim, for which no continuance shall be granted. For the Exhibits to and for the statement of reply in the counter-claim, that determined under section 6 concerning the Exhibits to be entered into the proceedings to and for the statement of reply in the main claim shall be accordingly applicable. In default of a counter-claim being instituted in which the patent invoked is rendered the subject of a petition to have it revoked, the plaintiff may mount a defence at the juncture of submitting a statement of reply in the main claim based on the nullity of said patent, given that determined in article 2.11 of the Netherlands National Procedural Rules and Regulations, as well as in compliance with adherence to the principles of granting parties and opportunity to make and submit statements and make and submits statements of rebuttal and in the pursuit of justice at a Court hearing set for July 12, 2006 at which time a deed may be submitted in which a response is given to the arguments submitted for the nullity of the patent. Any Exhibits which are to entered into the proceedings at this juncture shall also be required to comply with that laid down above in section 6 which shall be accordingly applicable. Any defence mounted in response to the reaction given to the arguments submitted concerning nullity may be ignored by the Court should the plaintiff not be able to respond sufficiently given the opportunities available, in principle for submitting arguments and rebutting them.

9.
Should the defendant in the counter-claim submit a motion, the time period for a statement of reply in the motion shall be set, in compliance with article 2.7 of the Netherlands National Procedural Rules and Regulations at 2 weeks, in default of which the motion shall be denied. The ruling the Court shall hand down in connection with the motion shall also be taken into consideration with the final ruling to be handed down by the Court

Brinkhof

ADVOCATEN

**DAGVAARDING IN VERSNELDE BODEMPROCEDURE**
**(betreft: EP 1 011 955 B1)**

Heden de vierde oktober oktober tweeduizend en vijf, ten verzoeke van de vennootschap naar vreemd recht **3M COMPANY** (voorheen genaamd: MINNESOTA MINING AND MANUFACTURING COMPANY), gevestigd en kantoorhoudende te St. Paul, Minnesota, Verenigde Staten van Amerika, te dezer zake domicilie kiezende te (1075 HH) Amsterdam aan de De Lairessestraat 111-115, ten kantore van Brinkhof, van welk kantoor mr. J.J. Brinkhof en mr. R.E. Ebbink deze zaak als advocaten behandelen, alsmede domicilie kiezende te (2514 GC) Den Haag aan het Noordeinde 33, ten kantore van Houthoff Buruma, van welk kantoor mr. P.J.M. von Schmidt auf Altenstadt tot procureur wordt gesteld en als zodanig in rechte voor rekwirante zal optreden;

heb ik, Mike van Lingen, als toegevoegd kandidaat-gerechtsdeurwaarder werkzaam ten kantore van Mr. Ferdinand van Horssen, gerechtsdeurwaarder te Leiden, kantoorhoudende te Leiden aan de Schipholweg 101 D en mitsdien beiden ten deze woonplaats hebbende aldaar;

gelet op de beschikking van de Voorzieningenrechter van de Rechtbank 's-Gravenhage van 27 september tweeduizend en vijf, welke beschikking hieraan is gehecht;

**GEDAGVAARD**
**MET UITSLUITING VAN CONCLUSIES VAN REPLIEK EN DUPLIEK:**

de besloten vennootschap **AVERY DENNISON MATERIALS NEDERLAND B.V.**, statutair gevestigd te (2321 JX) Leiden, aan de Lammenschansweg 140, aldaar mijn exploot doende, sprekende met en afschrift dezes latende aan:

(voormeld adres in gesloten envelop met daarop de vermeldingen als wettelijk voorgeschreven omdat ik aldaar niemand aantrof aan wie rechtsgeldig afschrift kon worden gelaten; (ell's,)

Mevr. A.G.M. van Leeuwen, aldaar werkzaam

**OM:**

op woensdag, de tweede november tweeduizend en vijf, des voormiddags om 10.00 uur, niet in persoon maar vertegenwoordigd door een procureur, te verschijnen ter terechtzitting van de Rechtbank te 's-Gravenhage, welke zitting alsdan aldaar gehouden zal worden in één der zalen van het Paleis van Justitie aan de Prins Clauslaan 60;

Brinkhof

ADVOCATEN

**MET DE UITDRUKKELIJKE VERMELDING:**

dat indien gedaagde niet in het geding verschijnt dan wel verzuimt procureur te stellen hoewel haar dat hierbij is aangezegd, en de voorgeschreven termijnen en formaliteiten in acht zijn genomen, de Rechtbank verstek tegen haar verleent en de vorderingen toewijst, tenzij deze de Rechtbank onrechtmatig of ongegrond voorkomen;

**TENEINDE:**

alsdan namens mijn rekwirante als eiseres te horen eis doen en concluderen als volgt:

## FEITEN / ACHTERGROND

### Eiseres

1 Eiseres (hierna: "3M") maakt onderdeel uit van de wereldwijd opererende 3M-groep. De 3M-groep is actief op specialistische en uiteenlopende markten, waaronder die van kantoorbenodigdheden, kunststoffen en gezondheidszorg. In deze zaak gaat het - kort gezegd - om klevende folie producten voor het beplakken van bijvoorbeeld de buitenwanden van vrachtauto's en bussen. Deze folies zijn veelal bedrukt met bijvoorbeeld advertenties.

2 3M is houdster van het Europees octrooi EP 1 011 955 B1 (hierna: het "octrooi") voor "*multiple embossed webs*" (in het Nederlands vertaald als "weefsels met meervoudig reliëf"). Kopie van dit octrooi alsmede van de Nederlandse vertaling daarvan zullen op de eerstdienende dag worden overgelegd als **Producties 1 en 2.**

### Het octrooi

3 Het octrooi is op 2 april 2003 verleend op basis van een op 3 juni 1997 ingediende aanvrage, waarbij prioriteit is ingeroepen van een Amerikaanse octrooiaanvrage d.d. 31 december 1996 (US 775 736). Het octrooi is verleend voor, en geldig in, Zwitserland, Duitsland, Denemarken, Spanje, Frankrijk, Groot-Brittannië, Italië, Liechtenstein, Nederland en Zweden (**Productie 3**).

4 De conclusies van het octrooi luiden in de authentieke, Engelse taal als volgt:

> "1. *A carrier web (20), comprising:*
> *at least one surface (22) that is a multiple embossed pattern, having a first embossed pattern (26) and a second embossed pattern (24), wherein the first embossed pattern forms an array of depressions (29), wherein the depressions of the first embossed pattern are in the second embossed pattern,*

*wherein the second embossed pattern comprises lands (27) and ridges (28) between the lands, and wherein the height of the ridges over the lands ranges from about 3 to about 45 µm.*

2. *The web of Claim 1, wherein the surface (22) can be embossed with any pattern ranging from a minor fraction of an area of the surface to the entire area of the surface.*

3. *The web of Claim 1 or Claim 2, wherein a shape of embossings for any pattern (26,24) can range from a constant radius of curvature to a polygonal shape of at least 2 surfaces and wherein a width of embossings in any pattern can range from about 1 µm to about 10,000 µm.*

4. *A method of embossing, comprising the steps of: (a) embossing a carrier web having at least one surface (22) with a first pattern (26), to create a first pattern of depression (29), (b) embossing the surface with a second pattern (24) to create a second pattern of depressions comprising lands (27) and ridges (28), wherein the depressions created from the first embossing step are substantially preserved during the second embossing step even though the second embossing step superimposes the second pattern on the depressions created from the first embossing step, and wherein the height of the ridges over the lands ranges from about 3 to about 45 µm.*

5. *The method of Claim 4, wherein depressions (29) created from the first embossing step can be used for one purpose while depressions created from the second embossing step can be used for a different purpose.*

6. *The method of Claim 4 or Claim 5, further comprising the step of filling depressions (29) created by the first embossing step with a material before performing the second embossing step.*

7. *The method of any of Claims 4-6, further comprising the step of filling depressions created by the second embossing step.*

8. *A method of using a web of any of Claims 1-4 as a release liner for a pressure sensitive adhesive."*

9. *A method of using a web of any of Claims 1-4 as a final article for storage of another material."*

De conclusies luiden in de Nederlandse vertaling als volgt:

"1. *Een dragend weefsel (20) dat bestaat uit:
ten minste één oppervlak (22) dat een meervoudig reliëfpatroon bevat met een eerste reliëfpatroon (26) en een tweede reliëfpatroon (24), waarbij het eerste reliëfpatroon een reeks indrukken (29) vormt en waarbij de indrukken van het eerste reliëfpatroon zich in het tweede reliëfpatroon bevinden, waarbij het tweede reliëfpatroon bestaat uit laaggelegen delen (27) en randen (28) tussen die laagten, waarbij de hoogte van de randen boven de laagten uiteenloopt van ca. 3 tot ca. 45 µm.*

2. *Het weefsel overeenkomstig conclusie 1, waarbij het oppervlak (22) van reliëf kan worden voorzien volgens alle mogelijke patronen, variërend van een kleine fractie van het oppervlak tot het gehele oppervlak*

3. *Het weefsel overeenkomstig conclusie 1 of 2, waarbij de vorm van de reliëfs voor elk patroon (26, 24) kan variëren van een constante krommingsstraal tot een polygonale vorm van ten minste 2 oppervlakken en waarbij de breedte van de reliëfs in elk patroon kan variëren van ca. 1 µm tot ca. 10.000 µm.*

4. *Een methode van reliëfvorming die bestaat uit de volgende stappen:
(a) het aanbrengen van een reliëf op een dragend weefsel met ten minste één oppervlak (22) met een eerste patroon (26) voor het creëren van een eerste patroon van indrukken (29);
(b) het aanbrengen van een reliëf met een tweede patroon (24) voor het creëren van een tweede patroon van indrukken dat bestaat uit laaggelegen gebieden (27) en randen (28);
waarbij de door de eerste stappen van reliëfvorming gecreeerde indrukken in hoge mate bewaard blijven bij de tweede stap van reliëfvorming, hoewel deze tweede stap van reliëfvorming het tweede patroon over de bij de eerste stap van reliëfvorming gecreëerde indrukken heen aanbrengt, en waarbij de hoogte van de randen boven de laaggelegen delen varieert van ca. 3 tot ca. 45 µm.*

5. *De methode overeenkomstig conclusie 4, waarbij de door de eerste stap van reliëfvorming gecreëerde indrukken (29) ge-*

Brinkhof

ADVOCATEN

*bruikt kunnen worden voor het ene doel terwijl de indrukken gemaakt door de tweede stap van reliëfvorming voor een ander doel kunnen worden gebruikt.*

6. *De methode overeenkomstig conclusie 4 of 5 die verder nog bestaat uit de stap van het met een materiaal vullen van indrukken (29) die door de eerste stap van reliëfvorming zijn gecreëerd voordat de tweede stap van reliëfvorming wordt uitgevoerd.*

7. *De methode van één van de conclusies 4-6 die verder nog bestaat uit de stap van het vullen van de indrukken die bij de tweede stap van reliëfvorming zijn gemaakt.*

8. *Een methode voor het gebruik van een weefsel overeenkomstig één van de conclusies 1-4 als beschermlaag voor een drukgevoelig kleefmiddel.*

9. *Een methode voor het gebruik van een weefsel overeenkomstig één van de conclusies 1-4 als een eindproduct voor de opslag van een ander materiaal."*

6 Het octrooi heeft betrekking op weefsels met meervoudig reliëf ("multiple embossed webs") die worden geclaimd als dragende weefsels ("carrier webs"). De dragende weefsels hebben een driedimensionaal, meervoudig reliëfpatroon. Het reliëfpatroon bestaat uit (minimaal) twee verschillende patronen. Het ene patroon omvat een reeks indrukken ("an array of depressions"). Het andere patroon omvat laaggelegen delen ("lands") en randen ("ridges").

7 Eén van de toepassingsmogelijkheden van het dragende weefsel bestaat hierin dat het dienst doet als beschermlaag ("release liner") voor een drukgevoelig kleefmiddel ("pressure sensitive adhesive"). Indien de beschermlaag en het drukgevoelig kleefmiddel op elkaar worden gedrukt, zorgt het driedimensionale meervoudig reliëfpatroon van de beschermlaag voor een (nagenoeg volledig) complementair driedimensionaal meervoudig reliëfpatroon in het kleefmiddel. Dit betekent dat relatief diepe punten in de beschermlaag, zoals de indrukken, resulteren in hoge punten in het kleefmiddel. De hoge punten in de beschermlaag, zoals de randen, resulteren in diepe punten in het kleefmiddel.

8 Het kleefmiddel, waarmee de beschermlaag in contact wordt gebracht, kan zich bevinden op een folie ("film"). Na verwijdering van de beschermlaag zorgt het reliëfpatroon van het kleefmiddel ervoor dat de folie gelijkmatig en passend op een ondergrond, zoals de buitenwand van een voertuig, kan worden aangebracht. Het ten opzichte van het driedimensionale, meervoudige reliëfpatroon van de beschermlaag eveneens driedimensionale, complementaire patroon in het kleefmiddel maakt het onder andere mogelijk de folie bij het aanbrengen

Brinkhof

ADVOCATEN

op zo'n ondergrond te herpositioneren en te voorkomen dat luchtbellen onder de folie gevangen blijven. Zie kolom 1, regels 20-33 van het octrooi. Dit werkt als volgt.

9 De indrukken ("depressions") in de beschermlaag resulteren, zoals gezegd, in verhogingen aan het oppervlak van het kleefmiddel. Bij het aanbrengen van de folie zal daardoor niet direct het gehele oppervlak van het kleefmiddel aan de ondergrond kleven, maar zullen eerst slechts de verhogingen in aanraking komen met de ondergrond. Dit maakt het eenvoudiger om de folie na het aanbrengen te herpositioneren. Als de folie eenmaal op de juiste plaats is aangebracht, wordt de folie stevig op het object gedrukt waardoor in ieder geval dat deel van de kleeflaag dat overeenkomt met de laaggelegen delen ("lands") van de beschermlaag kleeft aan de ondergrond.

10 De randen ("ridges") in de beschermlaag resulteren in kanaaltjes in het oppervlak van het kleefmiddel. Via deze kanaaltjes kan eventueel gevangen lucht ontsnappen.

**Gedaagde en de Easy Apply producten**

11 Gedaagde (hierna: "Avery") brengt net als 3M klevende folie producten op de markt. Avery verhandelt onder andere klevende folie producten onder de volgende aanduidingen (al dan niet in combinatie met de woorden "Easy Apply"):

1. MPI 1005;
2. MPI 1007; en
3. MPI 2005.

Deze producten zullen hierna gezamenlijk worden aangeduid als: "de Easy Apply producten".

12 Informatie over de Easy Apply producten is onder meer te vinden op de websites www.easy-apply.com en www.europe.averygraphics.com **(Productie 4)** alsmede in een door Avery verspreide brochure over de MPI 2005 **(Productie 5)**.

13 Avery treedt naar buiten ook op onder de aanduidingen "Graphics Division Head Office" en "Avery Dennison - Graphics Europe". Zie resp. de uitdraai van de website www.europe.averygraphics.com die wordt overgelegd als **Productie 6** en de door Avery verspreide brochure (Productie 5), waarin de adresgegevens staan vermeld van de nevenvestiging van Avery in Hazerswoude. Avery beschikt over distributeurs in alle gedesigneerde landen van het octrooi. Zie uitdraai website www.europe.averygraphics.com **(Productie 7)**. Avery is dus is actief in alle landen waar het octrooi van kracht is.

Brinkhof

ADVOCATEN

14 In de Verenigde Staten is een octrooi-inbreukprocedure aanhangig tussen 3M en de moedervennootschap van Avery, Avery Dennison Corporation. Het onderwerp van deze procedure is de vraag of bepaalde klevende folieproducten van Avery vallen onder de beschermingsomvang van US 5 897 930 ten name van 3M. US 5 897 930 is een Amerikaans parallel octrooi van het onderhavige octrooi.

**INBREUK**

15 De Easy Apply producten van Avery vallen - zoals hierna zal worden geadstrueerd - onder de beschermingsomvang van het octrooi, in het bijzonder van de conclusies 1 en 8. Avery verhandelt en biedt de Easy Apply producten te koop aan in alle landen waar het octrooi van kracht is. Voorts is aannemelijk dat Avery zich in één of meer van de gedesigneerde landen bezig houdt met het vervaardigen van deze producten. Door het verrichten van die handelingen maakt Avery inbreuk op de rechten die 3M aan het octrooi ontleent.

**Analyse van de Easy Apply producten**

16 3M heeft van elk van de Easy Apply producten monsters verkregen. Een monster van MPI 2005 heeft 3M bemachtigd op de Fespa-beurs in Hannover, Duitsland welke van 31 mei tot 4 juni 2005 plaatsvond. Dit monster maakte onderdeel uit van de als Productie 5 over te leggen brochure. Monsters van MPI 1005 en MPI 1007 heeft 3M verkregen via een distributeur van Avery in Nederland.

17 Deze monsters zijn door 3M geanalyseerd. Van het dragend weefsel/de beschermlaag van elk van de monsters is een zogenaamde "SEM-micrograph" gemaakt (een foto van hetgeen geregistreerd wordt met een elektronenmicroscoop die 25 maal vergroot). Voorts zijn hoogtemetingen verricht aan de beschermlagen van elk van de monsters. Op de eerstdienende dag zal als **Productie 8** een rapport worden overgelegd met daarin een verslag van het onderzoek en - per Easy Apply product - een "SEM-micrograph" alsmede grafische kleurenweergaven en grafieken met de resultaten van de verrichte hoogtemetingen.

18 Het onderzoek bevestigt dat elk van de Easy Apply producten in ieder geval valt onder de beschermingsomvang van de conclusies 1 en 8 van het octrooi.

**Conclusie 1**

19 Conclusie 1 heeft de volgende kenmerken:

| | | |
|---|---|---|
| A | A "carrier web" (20), comprising: | *Een dragend weefsel (20) dat bestaat uit:* |

Brinkhof

ADVOCATEN

| | | |
|---|---|---|
| B | at least one surface (22) that is a multiple embossed pattern, having a first embossed pattern (26) and a second embossed pattern (24), | *ten minste één oppervlak (22) dat een meervoudig reliëfpatroon bevat met een eerste reliëfpatroon (26) en een tweede reliëfpatroon (24),* |
| C | wherein the first embossed pattern forms an array of "depressions" (29), | *waarbij het eerste reliëfpatroon een reeks indrukken (29) vormt en* |
| D | wherein the "depressions" of the first embossed pattern are in the second embossed pattern, | *waarbij de indrukken van het eerste reliëfpatroon zich in het tweede reliëfpatroon bevinden,* |
| E | wherein the second embossed pattern comprises "lands" (27) and "ridges" (28) between the "lands", and | *waarbij het tweede reliëfpatroon bestaat uit laaggelegen delen (27) en randen (28) tussen die laagten,* |
| F | wherein the height of the "ridges" over the "lands" ranges from about 3 to about 45 µm. | *waarbij de hoogte van de randen boven de laagten uiteenloopt van ca. 3 tot ca. 45 µm.* |

*MPI 2005*

20 Het product MPI 2005 voldoet aan alle kenmerken van conclusie 1 van het octrooi.

21 Dat het product <u>kenmerk A</u> bevat, blijkt uit het feit dat het product een klevende folie is, waarbij gebruik gemaakt wordt van een beschermlaag die de kleeflaag beschermt. Zie Avery's website waarin wordt gesproken van een "liner" (beschermlaag) (Productie 4, p. 4). Er is dan ook sprake van een dragend weefsel ("carrier web").

22 <u>Kenmerken B-E</u> blijken uit onderstaande SEM-micrograph van het dragend weefsel/de beschermlaag van MPI 2005 (zie ook het rapport (Productie 8)).




Een oppervlak met een meervoudig reliëfpatroon is zichtbaar. Er is sprake van een eerste patroon bestaande uit een reeks indrukken ("array of depressions") en een tweede patroon bestaande uit laaggelegen delen ("lands") en randen ("ridges").

23 In de Duitse brochure (Productie 5) wordt bevestigd dat de kanaaltjes in het kleefmiddel van het MPI 2005 product, die complementair zijn aan de laaggelegen delen en randen in de beschermlaag, ervoor zorgen dat eventueel gevangen lucht kan ontsnappen. Zie p. 2 van Productie 5.

> *"Mit Hilfe mikroskopisch kleiner Luftkanäle wird das Anbringen von selbstklebenden Folien zu einem Kinderspiel."*
>
> *"Die Luft entweicht durch kleine Kanäle."*
>
> *"Wir haben entdeckt, dass das Muster einer Bienenwabe ausgezeichnet dazu beitragen kann, das Luft beim Anbringen einer selbstklebenden Folie entweicht. Mit dieser Technik können Sie digital bedruckte Folien schnell und blasenfrei auf glatten und gewölbten Oberflächen anbringen. So erreichen Sie hervorragende Klebeergebnisse schneller, besser und einfacher."*

Brinkhof

ADVOCATEN

24 MPI 2005 voldoet voorts aan kenmerk F. Uit de resultaten van de hoogtemetingen volgt dat bij de beschermlaag de hoogte van de randen boven de laagten uiteenloopt van ca. 3 tot ca. 45 µm. Zie het rapport (Productie 8).

25 Hetgeen Avery vermeldt op haar website www.easy-apply.com bevestigt dat het MPI 2005 product profiteert van de aanwezigheid van de kenmerken A-F, namelijk de mogelijkheid dat gevangen lucht kan ontsnappen en dat de folie kan worden geherpositioneerd. Zie p. 3 van Productie 4.

> *"A Revolutionary Way to Maximize Your Productivity.*
> *The embossed liner of Avery Easy Apply Products create air egress channels in the adhesive, a new way to provide smooth coverage and fewer wrinkles. Projects are quicker and easier – a significant advantage over other self-adhesive films.*
>
> *Easier Application: Easy Apply technology allows air bubbles and wrinkles to simply be pushed down and out, making application easier. Amazingly, you can expect up to 50% saving in application time.*
>
> *More forgiving: Easy Apply technology gives you the extra help you need to restore mistakes. More forgiving material means less time wasted on rework and less wasted material."*

*MPI 1005*

26 Ook het product MPI 1005 voldoet aan alle kenmerken van conclusie 1 van het octrooi.

27 Kenmerk A blijkt uit het feit dat het product een klevende folie is, waarbij gebruik wordt gemaakt van een beschermlaag voor een kleefmiddel. Zie Avery's website waarin wordt gesproken van een "liner" (beschermlaag) (Productie 4, p. 4). Er is dan ook sprake van een dragend weefsel ("carrier web").

28 Kenmerken B-E blijken uit onderstaande SEM-micrograph van het dragende weefsel / de beschermlaag van MPI 1005 (zie ook het rapport (Productie 8)).

Brinkhof

ADVOCATEN




Er is sprake van een oppervlak met een meervoudig reliëfpatroon met een eerste patroon bestaande uit een reeks indrukken ("array of depressions") en een tweede patroon bestaande uit laaggelegen delen ("lands") en randen ("ridges"). Zie in dit verband ook Avery's website www.easy-apply.com (Productie 4, p. 3), hierboven geciteerd in § 25.

29 MPI 1005 voldoet voorts aan kenmerk F. De hoogte van de randen boven de laagten loopt uiteen van ca. 3 tot ca. 45 µm (Zie het rapport (Productie 8)).

30 De website www.europe.averygraphics.com bevestigt dat het MPI 1005 product gebruik maakt van de wezenlijke kenmerken van de geoctrooieerde uitvinding. Zie Productie 4, p. 6.

> *"Entrapped air can easily be rubbed out without the need to punch the vinyl film. The easy-to-apply feature offers the benefits of faster application of decals and graphics."*

*MPI 1007*

31 Het product MPI 1007 voldoet eveneens aan alle kenmerken van conclusie 1 van het octrooi.

Brinkhof

ADVOCATEN

32 Dat het product kenmerk A bevat, blijkt uit het feit dat het product een klevende folie is, waarbij gebruik gemaakt wordt van een beschermlaag die de kleeflaag beschermt. Zie Avery's website waarin wordt gesproken van een "liner" (beschermlaag) (Productie 4, p. 4). Er is dan ook sprake van een dragend weefsel ("carrier web").

33 Kenmerken B-E blijken uit onderstaande SEM-micrograph van het dragend weefsel / de beschermlaag van MPI 1007 (zie ook het rapport (Productie 8)).




Een oppervlak met een meervoudig reliëfpatroon is zichtbaar. Het eerste patroon bestaat uit een reeks indrukken ("array of depressions"). Het tweede patroon bestaat uit laaggelegen delen ("lands") en randen ("ridges"). Zie ook Productie 4, hierboven geciteerd in § 25.

34 MPI 1007 voldoet voorts aan kenmerk F. De hoogte van de randen boven de laagten loopt uiteen van ca. 3 tot ca. 45 μm (Zie het rapport (Productie 8)).

35 De website www.europe.averygraphics.com (Productie 3) maakt duidelijk dat bij het MPI 1005 product profiteert van de wezenlijke kenmerken van de geoctrooieerde uitvinding. Zie Productie 4, p. 7.

> *"Entrapped air can easily be rubbed out without the need to punch the vinyl film. The easy-to-apply feature offers the benefits of faster application of decals and graphics."*

**Conclusie 8**

36 Conclusie 8 heeft het volgende kenmerk:

| | | |
|---|---|---|
| G | A method of using a web of any of Claims 1-4 as a release liner for a pressure sensitive adhesive. | *Een methode voor het gebruik van een weefsel overeenkomstig één van de conclusies 1-4 als beschermlaag voor een drukgevoelig kleefmiddel.* |

37 Alle Easy Apply producten lezen op conclusie 8 van het octrooi.

38 De dragende weefsels van de Easy Apply producten voldoen om te beginnen aan alle kenmerken van conclusie 1 (Zie hierboven §§ 20 e.v.). Voorts worden deze weefsels door Avery gebruikt als beschermlaag ("release liner") voor een drukgevoelig kleefmiddel ("pressure sensitive adhesive"). Avery past daarmee de in conclusie 8 geclaimde werkwijze toe.

39 Voorts zijn de Easy Apply producten de rechtstreeks verkregen voortbrengselen van toepassing van deze werkwijze. Immers, door toepassing van deze methode voor het gebruik van een weefsel als beschermlaag voor een drukgevoelig kleefmiddel, worden de Easy Apply producten verkregen. Met het aanbieden en verhandelen van voortbrengselen die rechtstreeks verkregen zijn door toepassing van de werkwijze als omschreven in conclusie 8, maakt Avery ingevolge artikel 53 lid 1, aanhef onder b ROW 1995 inbreuk op het uitsluitend recht van 3M.

**Slotsom**

40 Uit het bovenstaande volgt dat alle genoemde Easy Apply producten voorzien zijn van een dragend weefsel dat letterlijk voldoet aan de kenmerken van conclusie 1. Bovendien wordt het dragend weefsel in de Easy Apply producten als beschermlaag voor een drukgevoelig kleefmiddel gebruikt. Dergelijk gebruik en de resulterende Easy Apply producten vallen derhalve ook onder conclusie 8 van het octrooi. In ieder geval is in de Easy Apply producten het wezen van 3M's uitvinding belichaamd. Met het verrichten van een of meer van de handelingen opgesomd in artikel 53 lid 1, aanhef onder a en b van de Rijksoctrooiwet 1995 (zoals aanbieden, verkopen en afleveren, kort gezegd: verhandelen) maakt Avery derhalve inbreuk op 3M's exclusieve rechten voortvloeiend uit het Europese octrooi zoals voor Nederland verleend.

41 De octrooiwetten in de andere gedesigneerde landen bevatten op dit punt vergelijkbare bepalingen. Door het verhandelen van de betreffende producten in de andere gedesigneerde landen maakt Avery derhalve ook inbreuk op de exclusieve rechten uit het Europese octrooi zoals voor die landen verleend.

**VERWEER**

42 3M is niet bekend met het verweer van Avery.

Brinkhof

ADVOCATEN

## BELANG / VORDERINGEN

43 3M heeft veel tijd en geld geïnvesteerd in de ontwikkeling van producten overeenkomstig de uitvinding beschermd door het octrooi. Als gevolg van het inbreukmakende handelen van Avery lijdt 3M schade, onder meer in de vorm van omzet- en winstderving en aantasting van exclusiviteit. Voorts profiteert Avery met haar inbreukmakende handelingen van de ontwikkelings- en exploitatie-inspanningen van 3M.

44 Gelet op het vorenstaande heeft 3M er recht op en belang bij dat aan de inbreukmakende handelingen van gedaagde in alle landen waarin het octrooi geldt een einde wordt gemaakt en dat de schadelijke gevolgen van de reeds gepleegde inbreuken zoveel mogelijk worden beperkt. De hieronder geformuleerde vorderingen tot een inbreukverbod, een bevel tot recall en rectificatie alsmede een bevel tot vernietiging van de voorraden zijn hierop toegesneden.

45 Voorts heeft 3M recht op schadevergoeding en/of winstafdracht als gevolg van door Avery verrichte inbreukmakende handelingen voor zover Avery wist of redelijke grond had om te weten dat zij inbreuk pleegde (vergelijk artikel 45 lid 1 TRIPs). Als zodanig verricht hebben in ieder geval te gelden inbreukmakende handelingen die Avery in de gedesigneerde landen heeft verricht na betekening van deze dagvaarding. Avery dient in verband met de schadevergoeding en/of winstafdracht rekening en verantwoording af te leggen. De omvang van de haar toekende vergoeding wenst 3M in een separate schadestaatprocedure te laten vaststellen.

## (GRENSOVERSCHRIJDENDE) BEVOEGDHEID

46 De rechtbank is bevoegd van deze vorderingen kennis te nemen op basis van het bepaalde in artikel 2 EEX-Verordening jo. artikel 80 lid 1 sub a ROW 1995.

47 De rechtbank heeft grensoverschrijdende bevoegdheid jegens Avery, die in Nederland is gevestigd, op grond van vaste rechtspraak van de Hoge Raad.

## PRODUCTIES EN BEWIJSAANBOD

48 3M zal de producties waarnaar in deze dagvaarding wordt verwezen alsmede mogelijk verdere producties op de eerstdienende dag bij akte in het geding brengen.

49 In aanvulling daarop biedt 3M aan, voor zover op haar enige bewijslast rust, al haar stellingen te bewijzen door alle middelen rechtens, in het bijzonder door het doen horen van getuigen en/of deskundigen. 3M biedt in het bijzonder, voor zover op haar enige bewijslast rust, bewijs aan van de feiten en omstandigheden die zij ten grondslag legt aan haar stellingen ter zake van de inbreuk op het octrooi door Avery in alle gedesigneerde landen.

**MITSDIEN:**

Het de Rechtbank te 's-Gravenhage moge behagen bij vonnis:

A. gedaagde te verbieden, met onmiddellijke ingang, inbreuk maken op het Europese octrooi 1 011 955 B1 in alle in dat octrooi aangewezen landen, in het bijzonder door onder de beschermingsomvang van dat octrooi vallende producten, zoals MPI 1005, MPI 1007 en MPI 2005 Easy Apply producten, alsmede daaraan wezenlijk gelijke producten onder andere aanduidingen, in deze landen te vervaardigen, te gebruiken of te verhandelen dan wel voor een of ander aan te bieden, in te voeren of in voorraad te hebben,
zulks op straffe van verbeurte van een onmiddellijk opeisbare dwangsom van EUR 100.000 (zegge: honderdduizend euro) voor ieder vierkante meter product waarmee, dan wel, zulks ter keuze van eiseres, voor ieder dag of gedeelte van een dag dat gedaagde dit verbod zal overtreden;

B. gedaagde te bevelen om binnen vier weken (28 dagen) na betekening van het in dezen te wijzen vonnis, eiseres te voorzien van een schriftelijke, door een registeraccountant geaccordeerde en ondertekende opgave, met aanhechting van kopieën van alle ter staving van deze opgave relevante bescheiden, met de volledige naam-, adres- en woonplaatsgegevens van alle (rechts)personen aan of voor wie gedaagde de bovenbedoelde producten in alle door het Europese octrooi 1 011 955 B1 aangewezen landen heeft vervaardigd, gebruikt of verhandeld, alsmede met een volledige opgave van de betreffende aantallen en verkoopprijzen, en van de door gedaagde genoten winst ten gevolge van de bedoelde inbreuk,
zulks op straffe van verbeurte van een onmiddellijk opeisbare dwangsom van EUR 50.000 (zegge: vijftigduizend euro) voor iedere dag of gedeelte van een dag dat gedaagde dit bevel niet zal nakomen;

C. gedaagde te bevelen om aan de onder B bedoelde (rechts)personen kenbaar te maken dat de onder A bedoelde producten vallen onder de beschermingsomvang van het Europese octrooi 1 011 955 B1 en om de reeds aan die (rechts)personen geleverde producten terug te vragen tegen terugbetaling van de koopsom en vergoeding van kosten, door deze personen binnen veertien (14) dagen na betekening van het in dezen te wijzen vonnis, een aangetekende brief te zenden op eigen briefpapier, met gelijktijdige verzending van een kopie van die brief aan de raadslieden van eiseres, met uitsluitend de navolgende inhoud en zonder bijschrift:

> ***"Re: our infringement of 3M's patent rights***
>
> *Dear Madam, Sir,*
>
> *Recently, we have offered, sold and/or delivered to you one or more*

*products by the name EASY APPLY with product numbers MPI 1005, MPI 1007 and/or MPI 2005, and/or products that are essentially the same but have different names. In its decision of [DATE], the District Court in The Hague, the Netherlands, has decided that these products fall within the scope of protection of 3M's European patent 1 011 955 B1.*

*For the manufacturing, offering and/or sale of these products, we did not ask 3M's permission nor did we receive 3M's permission to do so. These products shall, therefore, not be manufactured, used, sold and/or offered, imported or kept in stock for these purposes in Switzerland, Denmark, Spain, France, Germany, Great-Britain, Italy, Liechtenstein, the Netherlands and Sweden.*

*The District Court has ordered us to request you to cancel placed orders for Easy Apply products with product numbers MPI 1005, MPI 1007 and/or MPI 2005 and to return all delivered products with these product number to us, at our costs, whereby we will reimburse the purchase price.*

*Yours faithfully,*

*Avery Dennison - Graphics Europe (Hazerswoude)*
*(Avery Dennison Materials Nederland B.V.)"*

althans met een door de Rechtbank in goede justitie te bepalen inhoud, zulks op straffe van verbeurte van een onmiddellijk opeisbare dwangsom van EUR 50.000 (zegge: vijftigduizend euro) voor ieder keer, dan wel, zulks ter keuze van eiseres, voor iedere dag dat gedaagde dit bevel niet zal nakomen;

D. gedaagde te bevelen om binnen vier weken (28 dagen)na betekening van het in dezen te wijzen vonnis, de totale door hen gehouden voorraad van de in het lichaam van deze dagvaarding bedoelde producten op eigen kosten, op zorgvuldige, ecologisch verantwoorde wijze te vernietigen en daarvan binnen twee (2) werkdagen na deze vernietiging een door een deurwaarder opgemaakt proces-verbaal van constatering aan de raadslieden van eiseres toe te zenden,
alsmede gedaagde te gebieden om binnen tien (10) werkdagen nadat geretourneerde producten bij haar zijn binnengekomen, die producten op eigen kosten op zorgvuldige, ecologisch verantwoorde wijze te vernietigen en daarvan binnen twee (2) werkdagen na deze vernietiging een op kosten van gedaagde door een deurwaarder opgemaakt proces-verbaal van constatering aan de raadslieden van eiseres toe te zenden,
zulks op straffe van verbeurte van een onmiddellijk opeisbare dwangsom van EUR 100.000 (zegge: honderdduizend euro), voor iedere dag dat gedaagde dit bevel niet zal nakomen;

Brinkhof

ADVOCATEN

E. gedaagde te veroordelen tot vergoeding aan eiseres van de door eiseres ten gevolge van de inbreuk geleden of nog te lijden schade of, ter keuze van eiseres, tot het afdragen aan eiseres van de ten gevolge van de inbreuk in alle door het Europese octrooi 1 011 955 B1 aangewezen landen, genoten en nog te genieten winst, te vermeerderen met de wettelijke rente, vanaf de datum dat gedaagde op de hoogte is van de inbreuk althans vanaf de datum van de dagvaarding tot aan die der algehele voldoening, een en ander op te maken bij staat en te vereffenen volgens de wet;

F. gedaagde te veroordelen in de kosten van deze procedure; en

G. deze maatregelen uitvoerbaar bij voorraad te verklaren.

De kosten dezes zijn voor mij, deurwaarder, EUR

dagvaarding € 71,93
btw 13,67
€ 85,60

Deurwaarder

Eiser kan op grond van de Wet op de Omzetbelasting 1968 de hem/haar in rekening gebrachte omzetbelasting niet verrekenen, derhalve verklaart ondergetekende opgemelde kosten te hebben verhoogd met een percentage gelijk aan het percentage genoemd in bovengenoemde wet.

DE VOORZIENINGENRECHTER IN DE RECHTBANK 's-GRAVENHAGE

Gezien het verzoek van:

**de vennootschap naar vreemd recht**
**3M COMPANY,**
gevestigd te St. Paul, Minnesota, Verenigde Staten van Amerika,
verder te noemen: de eisende partij,
procureur: mr. P.J.M. von Schmidt auf Altenstadt,
advocaat: mrs. J.J. Brinkhof en R.E. Ebbink te Amsterdam,

om:

**de besloten vennootschap met beperkte aansprakelijkheid**
**AVERY DENNISON MATERIALS NEDERLAND B.V.,**
gevestigd te Leiden
verder te noemen: de gedaagde partij,

in verband met een octrooigeschil inzake EP 1 011 955 te mogen dagvaarden in de versnelde bodemprocedure in octrooizaken,
heeft de navolgende beschikking gegeven:

**BESCHIKKENDE:**

1. Verleent de eisende partij verlof de gedaagde partij te dagvaarden tegen de terechtzitting van deze rechtbank van

**2 november 2005**

zulks met inachtneming van het navolgende:

2. De eisende partij zal de dagvaarding uiterlijk doen uitbrengen op **7 oktober 2005**, zulks in hoofdzaak volgens het ingezonden concept en onder betekening van de onderhavige beschikking.

3. Tevens zal de eisende partij uiterlijk op die datum de tekst van die dagvaarding en van deze beschikking per aangetekende post rechtstreeks aan de gedaagde partij dienen toe te zenden.

4. Ter zitting van

**2 november 2005**

zal de eisende partij, zo nodig onder verdere toelichting van de feiten en stellingen waarop een beroep wordt gedaan, alle producties waarop de eisende partij zich wil beroepen dienen over te leggen conform artt. 2.1 en 3.1 van het Landelijk rolreglement. Daartoe zal, behoudens conform art. 3.2 van het Landelijk rolreglement, geen verder uitstel worden verleend.

5. Tevens zal de eisende partij deze producties op deze eerst dienende dag in het bezit dienen te hebben gesteld van de gedaagde partij.

6. Vervolgens zal de zaak worden aangehouden tot de (rol)zitting van

**8 maart 2006**

op welke zitting de gedaagde partij zal moeten concluderen voor antwoord, waartoe geen verder uitstel zal worden verleend, eveneens onder overlegging van alle producties waarop gedaagde partij zich wil beroepen conform art. 2.1 van het Landelijk rolreglement, terwijl de gedaagde partij deze conclusie met producties tevens op deze dag rechtstreeks in het bezit dient te hebben gesteld van de eisende partij;

7. Indien de gedaagde partij een incident opwerpt, dan kan dat tegelijk met de voor conclusie van antwoord ten gronde bepaalde termijn, maar ook eerder bij akte ter rolle. In beide gevallen is de termijn voor antwoord in het incident conform art. 2.7 van het Landelijk rolreglement 2 weken, op straffe van akte niet dienen in het incident. Opgeworpen incidenten ontslaan de gedaagde partij niet van de verplichting in de hoofdzaak te antwoorden op de voor antwoord bepaalde termijn op straffe van akte niet dienen.

8. Indien de gedaagde partij bij antwoord tevens eis in reconventie heeft ingesteld, zal de eisende partij ter (rol)zitting van

**12 juli 2006**

moeten concluderen van antwoord in reconventie, waartoe geen verder uitstel zal worden verleend. Voor de bij antwoord in reconventie over te leggen producties is hetgeen onder 6. met betrekking tot de bij antwoord in conventie over te leggen producties is aangegeven van overeenkomstige toepassing. Bij gebreke van een eis in reconventie waarbij de vernietiging van het ingeroepen octrooi wordt gevorderd, kan de eisende partij ingeval bij antwoord in conventie ten verwere een beroep op nietigheid is gedaan, gelet op het bepaalde in art. 2.11 van het Landelijk rolreglement, alsmede de beginselen van hoor en wederhoor en de goede procesorde, ter (rol)zitting van

**12 juli 2006**

een akte nemen waarin uitsluitend op de bij antwoord gebezigde nietigheidsargumenten kan worden gereageerd. Ook voor de bij deze akte over te leggen producties is hetgeen hiervoor onder 6 ten aanzien van de producties bij antwoord is aangegeven van overeenkomstige toepassing. Aan na antwoord opgeworpen nietigheidsverweren zal de rechtbank voorbij kunnen gaan, indien de eisende partij daar gelet op de beginselen van hoor en wederhoor en de goede procesorde onvoldoende op kan reageren.

9. Indien de reconventie verwerende partij een incident opwerpt, dan is de termijn voor antwoord in het incident conform art. 2.7 van het Landelijk rolreglement 2 weken, op

straffe van akte niet dienen in het incident. In het incident zal tegelijk met het eindvonnis vonnis worden gewezen.

10. Pleidooi in de zaak zal plaatsvinden in het Paleis van Justitie te 's-Gravenhage aan de Prins Clauslaan nr. 60 op

**10 november 2006 te 9.30 uur**

alwaar ieder van partijen een **pleittijd van maximaal 90 minuten in eerste termijn en in tweede termijn maximaal 20 minuten** zal worden gegund. Alsdan kunnen de standpunten mondeling nader worden toegelicht.

11. Partijen wordt in herinnering gebracht dat de eisende partij ten behoeve van pleidooi voor de meervoudige kamer **3 extra (complete) procesdossiers** dient over te leggen, die voldoen aan de daaraan conform het versneld regime in octrooizaken gestelde eisen en wel conform artikel 6.3 van het Landelijk rolreglement uiterlijk **2 weken** voor de dag van de pleidooien.

12. Voor bij gelegenheid van pleidooi nog over te leggen producties geldt het volgende. Uitgangspunt is in verband met de goede procesorde dat nadere producties buiten de in 4., 6. en 8. bedoelde gevallen **steeds in een zo vroeg mogelijk stadium** rechtstreeks aan de (raadslieden van de) wederpartij en (in drievoud) aan de rechtbank (buiten de rol om) dienen te worden ingezonden. De **uiterlijke termijn** waarbinnen dergelijke producties nog kunnen worden ingezonden is conform art. 1.12 van het Landelijk rolreglement **2 weken** voor pleidooi, onverminderd het recht van de andere partij zich te beroepen op de omstandigheid dat die stukken eerder hadden kunnen worden overgelegd of op andere omstandigheden op grond waarvan de rechtbank die stukken niet in haar oordeelsvorming zou mogen betrekken, tot welke conclusie de rechtbank ook ambtshalve kan komen.

13. Indien de eisende partij niet conform het bepaalde in deze beschikking procedeert, zal de zaak ambtshalve uit het regime van de versnelde bodemprocedure in octrooizaken worden verwijderd.

14. Van toepassing is de op www.rechtspraak.nl gepubliceerde regeling omtrent de versnelde bodemprocedure in octrooizaken, voor zover daarvan bij deze beschikking niet is afgeweken.

Aldus gewezen door mr. J.W. du Pon te 's-Gravenhage op 27 september 2005.

RECHTBANK 's-GRAVENHAGE

Voor copie conform
De griffier van de rechtbank 's-Gravenhage

EPA/EPO/OEB
D-80298 München
+49 89 2399-0
TX 523 656 epmu d
FAX +49 89 2399-4465

Europäisches Patentamt | European Patent Office | Office européen des brevets

Generaldirektion 2 | Directorate General 2 | Direction Générale 2

Vossius & Partner
Siebertstrasse 4
81675 München
ALLEMAGNE

| Application No. / Patent No. | Ref. | Date |
| --- | --- | --- |
| 97 928 724.0 - 2102 / 951518 / | | 17.08.2005 |
| Proprietor<br>MINNESOTA MINING AND MANUFACTURING COMPANY | | |

**Interlocutory decision in Opposition proceedings (Articles 102(3) and 106(3) EPC)**

The Opposition Division - at the oral proceedings dated 27.04.2005 - has decided:

**Account being taken of the amendments made by the patent proprietor during the opposition proceedings, the patent and the invention to which it relates are found to meet the requirements of the Convention.**

The reasons for the decision are enclosed.

Documents for the maintenance of the patent as amended:

**Auxiliary Request 2**

**Description, Pages**

| | |
| --- | --- |
| 1, 2, 8-10, 12-29 | of the patent specification |
| 3-7, 11 | filed during Oral proceedings on 27.04.2005 |

**Claims, Numbers**

| | |
| --- | --- |
| 1-13 | filed during Oral proceedings on 27.04.2005 |

**Drawings, Sheets**

| | |
| --- | --- |
| 1-4 | of the patent specification |

**Possibility of appeal**
This decision is open to separate appeal according to Article 106(3) EPC. Attention is drawn to the attached text of Articles 106 to 108 EPC.

**Registered letter with advice of delivery**

Date 17.08.2005 | Sheet 2 | Application No.: 97 928 724.0

**Opposition Division:**

| | |
|---|---|
| **Chairman:** | Dury, O |
| **2nd Examiner:** | Kaul-Buchberger, E |
| **1st Examiner:** | Van de Panne, V |

Connolly, M
**Formalities Officer**
Tel. No.: +49 89 2399-8021

IDOP coded

11. 08. 05 Cn

| | |
|---|---|
| Enclosure(s): | 8 page(s) reasons for the decision (Form 2916)<br>Wording of Articles 106 - 108 (Form 2019)<br>Documents relating to the amended text |

to EPO postal service: 11.08.05

**Registered letter with advice of delivery**

Europäisches Patentamt
GD2-Einspruch

European Patent Office
DG2 - Opposition

Office européen des brevets
DG2 - Opposition

Application No.: 97 928 724.0

Patent No.: EP-B-951518

**A copy of the communication (communication/decision/minutes) was printed for and notified to each of the following representatives/parties:**

Vossius & Partner
Siebertstrasse 4
81675 München
ALLEMAGNE

01
Rutetzki, Andreas
Müller-Boré & Partner Patentanwälte Grafinger Strasse 2
81671 München
ALLEMAGNE

## FACTS and SUBMISSIONS

I European Patent 0 951 518 was granted to Minnesota Mining and Manufacturing Company on the European Patent Application 97928724.0, filed on 30-05-9997 as PCT/US/97/09274, claiming a right of priority to the date of 31-12-1996, with mention of the grant of the patent on 04-09-2002.
The patent was granted with 17 claims, of which 4 independent claims.

The present decision is based on the the patent as granted as Main Request and on two auxiliary requests, which are annexed to the Minutes.

II A Notice of Opposition dated 04-06-2003 was filed by Avery Dennison Corporation. Revocation of the patent was requested on the basis of lack of novelty and lack of inventive step (Article 100(a) EPC).

The Opponent relied on the following documents:

D1 JP-A 59-78285 + English translation
D2 JP-A 59 53787 + English translation
D3 JP-U 2587198 + English translation
D4 DE-A 3 417 746
D5 WO 95/11945
D6 JP-A 57 178718 + English translation
D7 US-A 5 405 675
D8 US-A 5 141 790
D9 US-A 5 362 516
D10 US-A 5 122 902
D18 JP-A 06 212131 + English translation

The documents mentioned in the International Search Report were mentioned as D11 to D17 and D19

III In the Statement of Opposition the Opponent argued that the subject-matter of claims 1, 10, 16 and 17 lacks novelty in view of D1 and D18 and lacks an inventive step in view of D18 alone or D18 in combination with D2 or D3 or in view of the combination of D2 with one or more of D3, D4, D5 or D9.

In his letter of reply dated 20-01-2004, the Patentee countered the arguments of the Opponent and submitted a set of 12 claims as auxiliary request.

**IV** The Opposition Division arranged for Oral Proceedings to be held on 13-04-2005, later changed to 27-04-2005, and set out its provisional opinion in a letter dated 09-03-2004. This provisional opinion held that D18 seemed to take away the novelty of claims 1, 10, 16 and 17 of the main request and that the subject-matter of these claims seems to lack an inventive step in view of a combination of D1 or D3 with the general knowledge of those skilled in the art. The subject-matter of the claims of the auxiliary request seems to be novel, but the inventive step still would have to be discussed. Some problems regarding clarity were noted.

With a letter dated 29-03-2005 the Patentee submitted auxiliary requests 1 to 7 to replace the earlier auxiliary request and submitted arguments in favor of novelty and inventive step of the main and auxiliary requests.

**V** In the course of the oral proceedings which were held on 27-04-2005, the Patentee withdrew his earlier auxiliary requests 1, 2 and 4-7, entered a new first auxiliary request and maintained the earlier auxiliary request number 3, together with amended pages 3-7 of the description, as his second auxiliary request. At the end of the proceedings, the Opposition Division decided to maintain the patent in the form of the second auxiliary request.

## REASONS

**I** The opposition was filed in due time and in proper form, observing all requirements of Articles 99 and 100 and of Rule 55 EPC and is admissible.

As documents D11-D17and D19 are mentioned in the proceedings leading to grant of the patent, they are allowed in the opposition proceedings too, even though the opposition brief does not discuss them in detail.

**II** The Patentee argues that the essential concept of his invention is the provision of a

sheet having an adhesive layer with a topography, in particular in the form of microchannels, which will remain intact for at least some time after the installation of the sheet. The expression "contact area" would indicate that area over which the sheet and the substrate are in direct contact after installation of the sheet, in distinction to an area of initial contact that might change due to the (final) installation of the sheet. The Patentee cites paragraphs [0027], [0028], [0066], [0080], [0084] in support of this thesis.

The claims of the patent as granted do not explicitly require that the micro-channels remain open for any longer period. This feature is moreover not implied by the description. The last sentence of paragraph [0028] reads on sheets wherein the channels collapse immediately after installation with concomittant removal of air, for example in the installation of the sheet on an essentially flat surface. Paragraph [0079] describes that there can be air bleed **during** installation but afterwards the interface between the adhesive and the substrate is sealed. This reads on collapse of the channels essentially during installation. The embodiment in which the channels remain open over a certain time is clearly described as an **alternative** embodiment in paragraph [0080].
Working example 35 has a rating of "fair" in the hot application/reapplication test and this is consistent with disappearance of the channels upon the first application, and the same applies to working examples 71 and 100 (40-43 °C). The control of the structure combined with adhesive rheology so as to give microchannels that remain open for a longer time may be the preferred embodiment of the patent, but the Opposition Division is of the opinion that the present claims also read on the embodiment in which the microchannels exist only long enough to permit air bleeed during the actual installation of the sheet on a substrate.

The Opponent objected to the introduction of an auxiliary request in which elements of the description would be inserted in the claims in order to restrict them to the preferred embodiment, and in view of Rule 71a EPC the Opposition Division was obliged to refuse to allow the introduction of such an auxiliary request in the proceedings.

## III Main Request, novelty

Document D1 discloses an article with a pressure sensitive adhesive layer having microchannels ("grooves") with a depth of 1 to 15 µm, preferably 2 to 10 µm which prevent air from being "entangled" during the affixing procedure and also prevent air from being entangled and/or facilitate the elimination of "entangled" air, and a liner embossed in such a way that said microtopography will be transcribed in the adhesive layer, see claim 1 and page 2 lines 13-22. D1 shows all features of claims 1, 10, 16 and 17 as granted, except

for the feature that the adhesive has a "contact area" of at least about 35 %. This document does not take away the novelty of any of the claims of the patent as granted. It is noted that the final application of the sheet to the substrate is effected with the aid of a heated press roll at 50 °C. It may very well be that under this condition the microchannels disappear, but that they would remain intact at least partially when the installation is done at a lower temperature and/or pressure.

Document D18 discloses a repositionable pressure sensitive adhesive sheet with a microtopography of the adhesive layer with "concave" and "convex" portions having a difference in height of 10 to 20 µm, wherein the bottom part of each concave portion has a width of 50 to 100 µm and the flat part of each convex portion has a width of 50 to 100 µm. This structure is created with the aid of an embossed liner and serves to render the sheet repositionable in the sense that it can be easily peeled from a substrate after application under a light pressure and can be repositioned, but is firmly affixed after the application of stronger pressure. There is no mention of the prevention or elimination of entrapped air. The "schematic view" of figure 1 shows concave and convex parts of about equal size. The Patentee argues that this is an isolated cross section and that the adhesive surface could consist of rows of convex portions in the form of protrusions, separated from a similar parallel row by a flat surface, in which case a cross section taken in another direction might show an entirely different structure. The mention that **each** concave respectively convex portion has a width of 50-100 µm speaks against this interpretation, since such an interpretation would lead to concave portions having the required width in one direction (X-axis), but an entirely different width in another direction (Y-axis). The figure in context of the description is consistent with a pattern of parallel channels or ridges, or with a checkerboard pattern. The convex portions of the adhesive layer would form the contact surface; in the extreme case that the convex portions are 50 µm wide and the concave portions 100 µm wide, the contact area would be 50/(50 + 100 + some µm for the slope) x100 and thus would be only somewhat under 35 %. At about equal concave and convex portions, the contact area would be close to 50 %. It is thus likely that the contact area is over 35 %, but this is not **unequivocally** disclosed. If there is a "ridge and channel" structure, an ability to exhaust fluid from the plane of adhesion is implied, but if there is a checkerboard structure, it is not certain that air could be exhausted. The feature that "fluid may be exhausted from the plane of adhesion interface" is thus not **unequivocally** disclosed. D18 thus does not take away the novelty of the claims of the