EXHIBIT 1B

Rechtbank 's-Gravenhage
Zitting van 8 maart 2006
Rolnummer 2005/3435

CONCLUSIE VAN ANTWOORD IN CONVENTIE EN CONCLUSIE VAN EIS IN RECONVENTIE

**Inzake**

de besloten vennootschap
**AVERY DENNISON MATERIALS NEDERLAND B.V.** ("Avery")
gevestigd te Leiden;
gedaagde in conventie,

Procureur: mr W.P. den Hertog
Advocaat: mr dr. D.J.B. Bosscher
Octrooigemachtigde: prof. dr. ir. H.R. Brouwer

tegen

de vennootschap naar vreemd recht
**3M COMPANY** ("3M")
gevestigd te St. Paul, Minnesota in de Verenigde Staten van Amerika;
gedaagde in conventie,

Procureur: mr P.J.M. von Schmidt auf Altenstadt
Advocaten: prof. mr J.J. Brinkhof en mr R.E. Ebbink

Namens Avery, gedaagde in conventie en eiseres in reconventie wordt geconcludeerd voor antwoord in conventie en voor eis in reconventie, als volgt:

## A. ANTWOORD IN CONVENTIE

### 1. INLEIDING

1. Het gaat in deze versnelde bodemprocedure in octrooizaken voor uw Rechtbank om de vermeende inbreuk door Avery op het Europees octrooi EP 1 011 955 ten name van 3M (hierna het "Octrooi") in de landen waarvoor het Octrooi is gedesigneerd[1]. Avery zou zulks doen door het vervaardigen, gebruiken, verhandelen, aanbieden voor een ander, invoeren of in voorraad hebben (hierna het "Gebruik") van de MPI 1005, 1007 en 2005 Easy Apply producten (hierna de "Easy Apply producten"). Op grond van de vermeende inbreuk door het Gebruik vordert 3M van uw Rechtbank het opleggen van een (grensoverschrijdend) verbod van dat Gebruik in de gedesigneerde landen, alsmede het geven van bevelen tot het uitvoeren van een groot aantal nevenvorderingen.

2. 3M heeft deze procedure ingeleid met een dagvaarding (hierna de "Dagvaarding") welke in meerdere opzichten opmerkelijk is te noemen. 3M merkt daarin bijna terloops op dat zij met de moedervennootschap van Avery in een procedure is verwikkeld over de beschermingsomvang van het Amerikaanse parallel octrooi van het Octrooi. Dat is een zeer summiere samenvatting van een procedure waarin meerdere vonnissen zijn gewezen en een uitgebreid debat heeft plaatsgevonden over al dan niet letterlijke of equivalente inbreuk.

3. Desalniettemin beperkt 3M haar aantijgingen van octrooi-inbreuk in Europa slechts tot de vermeende letterlijke inbreuk op het Octrooi door het Gebruik. Merkwaardig is dat 3M niet de Easy Apply producten van Avery analyseert, maar afvalproducten (hierna de "Afvalproducten") daarvan. Deze Afvalproducten worden echter noch door Avery, noch door haar afnemers in het economisch verkeer gebruikt, of industrieel toegepast in octrooirechtelijk relevante zin.

4. In haar Dagvaarding rept 3M verder met geen woord over eventuele bezwaren ten aanzien van de geldigheid van het Octrooi. De daarin beschreven "uitvinding" betreft echter een combinatie van op zichzelf reeds in de stand der techniek bekende maatregelen, wat sowieso vragen oproept over nieuwheid en inventiviteit. Bovendien wijken de conclusies in meerdere aspecten af van de oorspronkelijk ingediende Amerikaanse aanvrage (hierna de "Aanvrage") waarvan het Octrooi de prioriteit inroept. Zo claimt het Octrooi het product op vrijwel alleen op basis van structurele eigenschappen van het dragend weefsel, terwijl in de productclaim in de Aanvrage expliciet specifieke werkwijzestappen zijn opgenomen.

5. In deze conclusie van antwoord toont Avery aan geen inbreuk te maken op het Octrooi door Gebruik. Verder laat Avery zien dat 3M zich beroept op een ongeldig octrooi (althans in Nederland) vanwege gebrek aan nieuwheid en inventiviteit, uitbreiding van materie en niet-nawerkbaarheid van het Octrooi. Om die reden vordert Avery in reconventie de nietigheid van het Nederlands deel van het Octrooi.

---

[1] Het Octrooi is gedesigneerd voor Duitsland (DE), Denemarken (DK), Spanje (ES), Frankrijk (FR), Verenigd Koninkrijk (GB), Italië (IT), Liechtenstein (LI), Nederland (NL), Zweden (SE), Zwitserland (CH). 3M heeft overigens geen bewijs overlegd dat het Octrooi geldig is in de gedesigneerde landen

## 2. ONBEVOEGDHEID TE OORDELEN OVER GRENSOVERSCHRIJDENDE VORDERING VAN INBREUK EN NEVENVORDERINGEN

6. Avery betwist dat uw Rechtbank bevoegd is kennis te nemen van de vorderingen voor zover deze een grensoverschrijdend karakter hebben. Avery doet namelijk, zoals hierna nader wordt toegelicht, een beroep op de nietigheid van het Octrooi. Advocaat-Generaal Geelhoed van het Europees Hof van Justitie heeft in zijn conclusie van 16 september 2004 bij de zaak GAT/LuK (C-4/03) aangegeven dat de nationale rechter zich alleen dient uit te spreken over de geldigheid van het octrooirecht voorzover het zijn jurisdictie betreft. Aangezien een inbreukvordering geldigheid van het octrooi veronderstelt, moet de rechter zich van een oordeel over de inbreukvordering te onthouden voor zover dit betrekking heeft op het buitenland wanneer een serieus nietigheidsverweer wordt gevoerd. Dat is in deze zaak het geval.

7. Vast beleid[2] van uw Rechtbank na deze conclusie is dan ook om de behandeling van grensoverschrijdende vorderingen te schorsen wanneer een serieus nietigheidsverweer wordt opgeworpen. Avery verwijst ondermeer naar het vonnis van uw Rechtbank in de zaak Stork/CFS Bakel (Rb. 's-Gravenhage 19 januari 2005, IER 2005/40).

## 3. NIETIGHEID VAN HET OCTROOI

8. Avery beroept zich in eerste instantie op de nietigheid van het Octrooi bij wege van verweer.

De "uitvinding"

9. De "uitvinding" als beschreven in het Octrooi betreft een dragend weefsel dat door middel van bosseleren is voorzien van een meervoudig reliëfpatroon ("multiple embossed webs"). Het meervoudig reliëfpatroon bevat tenminste twee reliëfpatronen met verschillende dieptes. Het eerst gebosseleerde patroon omvat een geordende reeks holtes ("an array of depressions")[3]. Uit de beschrijvingsinleiding blijkt dat de holtes opvulbaar moeten zijn. Een tweede gebosseleerd patroon omvat laaggelegen delen (hierna "laagtes") tussen randen (hierna "randen "). De hoogte van de "randen" boven de "laagtes" dient tussen ca. 3 en ca. 45 µm te liggen. Het eerste reliëfpatroon moet zich in het tweede reliëfpatroon bevinden[4].

10. Bosseleren (de vertaling van het Engelse "to emboss", zie **Productie** 1), is de gangbare term die de vakman gebruikt voor het aanbrengen van een reliëfpatroon in een weefsel door het indrukken met een stempelkop uit een harder materiaal. Daardoor verschijnt het spiegelbeeld van het patroon op de stempelkop in het weefstel. Waar randen zijn op de stempelkop, verschijnen kanalen in het weefsel, en vice versa.

11. Het meervoudig reliëf in het dragend weefsel wordt verkregen door het weefsel achtereenvolgens te bosseleren waarbij in een eerste bosseleerstap het eerste reliëfpatroon wordt verkregen, en in een daaropvolgende tweede bosseleerstap het tweede reliëfpatroon. Volgens het Octrooi wordt de werkwijze dusdanig uitgevoerd dat het in de eerste bosseleerstap verkregen eerste reliëfpatroon in hoge mate wordt bewaard tijdens de tweede bosseleerstap. Deze sequentiële werkwijze heeft als voordeel dat de in de eerste

---

[2] Voor zover het een bodemprocedure betreft

[3] Avery bestrijdt de juistheid van de Nederlandse vertaling van het Octrooi, zie paragraaf 18 en verder en gebruikt om die reden zo nodig de terminologie van de authentieke Engelstalige tekst

[4] Avery zal hierna aantonen dat dit kenmerk later is toegevoegd zonder dat dit wordt gedekt door de inhoud van de aanvrage waarvan de prioriteit wordt ingeroepen

bosseleerstap gevormde indrukken kunnen worden gevuld met een materiaal voorafgaand aan de tweede bosseleerstap (zie met name kolom 2, regels 40-51 van het Octrooi).

12. Door het creëren van een meervoudig reliëfpatroon met indrukken op verschillende dieptes wordt een dragend weefsel verkregen waarin verschillende materialen kunnen worden opgeslagen, zoals bijvoorbeeld cosmetica, medicijnen, en dergelijke meer (zie bijvoorbeeld kolom 3, regels 10-28 van het Octrooi).

13. In deze procedure is hoofdzakelijk aan de orde de toepassing als beschermlaag ("release liner") voor een drukgevoelig kleefmiddel ("pressure sensitive adhesive") aangebracht op de achterzijde van een decoratieve folie. Wanneer een ondergrond van een decoratieve folie wordt voorzien, wordt de beschermlaag verwijderd en de folie met de kleefmiddelzijde tegen de ondergrond aangedrukt. Doordat de beschermfolie en het drukgevoelig kleefmiddel op elkaar zijn aangebracht wordt het meervoudig reliëfpatroon van de beschermfolie spiegelbeeldig overgezet op de laag drukgevoelig kleefmiddel. Dit betekent dat holtes in de beschermfolie resulteren in verhogingen in het kleefmiddel. Omgekeerd resulteren randen in de beschermfolie in kanalen in het kleefmiddel.

14. De geordende reeks holtes van het eerste reliëfpatroon resulteert in een geordende reeks verhogingen in de kleeflaag. Deze maatregel geeft de mogelijkheid het dragend weefsel te herpositioneren. De randen in het dragende weefsel resulteren in kanalen in het kleefmiddel. Deze maatregel zorgt er voor dat eventuele lucht die zich tussen de kleefmiddellaag en de ondergrond bevindt, kan ontwijken naar de kanalen en/of de zijkanten van het dragend weefsel. Volgens het Octrooi is hiervoor een kanaaldiepte tussen ca. 3 en ca. 45 µm[5] vereist.

<u>De conclusies</u>

15. Voor de goede orde zij opgemerkt dat het Octrooi negen conclusies telt. Conclusie 1 is een onafhankelijke conclusie gericht op een meervoudig gebosseleerd dragend weefsel. Conclusies 2 en 3 zijn afhankelijke verbijzonderingen van conclusie 1. Conclusie 4 is een onafhankelijke conclusie voor een werkwijze voor het sequentieel bosseleren van het dragend weefsel. Conclusies 5 – 7 zijn gericht op varianten van de in conclusie 4 geclaimde werkwijze. Conclusies 8 en 9 tenslotte zijn gericht op het gebruik van het in conclusies 1-3 geclaimde dragend weefsel als beschermfolie voor een drukgevoelig kleefmiddel, respectievelijk als eindproduct voor de opslag van een ander materiaal.

16. Het Octrooi roept de prioriteit in van de op 31 december 1996 ingediende Amerikaanse octrooiaanvrage US 5,987,930 (aanvraagnummer 775,736). De effectieve datum voor de beoordeling van de geldigheid (nieuwheid etc.) van het Octrooi is dus 31 december 1996. Het Octrooi is de Europese voortzetting van een op 3 juni 1997 ingediende PCT aanvrage met publicatienummer WO 98/29231 **(Productie 2)**.

17. Voor de volledigheid merkt Avery op dat het Octrooi niet onderworpen is aan de zware test van oppositie bij het Europees Octrooibureau (hierna het "EOB").

<u>Onjuiste vertaling conclusies, in het bijzonder conclusie 1</u>

18. Conclusie 1 luidt in de authentieke, Engelse taal:

---

[5] 1 µm = 1 duizendste mm (10-6 m)

*"1. A carrier web, comprising:*

*at least one surface (22) that is a multiple embossed pattern, having a first embossed pattern (26) and a second embossed pattern (24), wherein the first embossed pattern forms an array of depressions (29), wherein the depressions of the first embossed pattern are in the second embossed pattern, wherein the second embossed pattern comprises lands (27) and ridges (28) between the lands, and wherein the height of the ridges over the lands ranges from about 3 to about 45 µm."*

19. De Nederlandse vertaling luidt echter:

*"1. Een dragend weefsel (20) dat bestaat uit:*

*ten minste één oppervlak (22) dat een meervoudig reliëfpatroon bevat met een eerste reliëfpatroon (26) en een tweede reliëfpatroon (24), waarbij het eerste reliëfpatroon een reeks indrukken (29) vormt en waarbij de indrukken van het eerste reliëfpatroon zich in het tweede reliëfpatroon bevinden, waarbij het tweede reliëfpatroon bestaat uit laaggelegen delen (27) en randen (28) tussen die laagten, waarbij de hoogte van de randen boven de laagten uiteenloopt van ca. 3 tot ca. 45 µm."*

20. De Nederlandse vertaling vertoont onjuistheden die een verruimde beschermingsomvang van het Octrooi suggereert: Ten eerste is de term "embossed pattern" vertaald met "reliëfpatroon". Hiermee is alleen het resultaat van het bosseleren weergegeven (het reliëfpatroon) zonder nog te verwijzen naar het proces van verkrijging ervan. De correcte vertaling luidt "gebosseleerd reliëfpatroon". De conclusies in de Duitse en Franse taal welke werden ingediend als onderdeel van de Europese verleningsprocedure spreken terecht over respectievelijk een "geprägtes Muster" en een "motif à gaufrage".

21. Dat het reliëfpatroon slechts door bosseleren wordt verkregen blijkt uit het Octrooi, bijvoorbeeld uit kolom 4, regels 42-44. Daar is aangegeven dat geschikte weefsels bosseleerbaar dienen te zijn ("capable of being embossed"). Uit kolom 5, regels 6-14 blijkt bovendien dat bij het aanbrengen van de reliëfpatronen het materiaal weliswaar wordt weggedrukt ("like the formation of mountains from the movement of large land masses") doch dat geen (vreemd) materiaal wordt toegevoegd ("conservation of material"). Dit duidt op bosseleren, en niet bijvoorbeeld op wegnemen (zoals beitelen, frezen, schaven), of toevoegen van materiaal (zoals inbedden, injecteren, beschieten, wapenen).

22. Verder is de term "depressions" vertaald met "indrukkingen", daar waar "uitsparingen of holtes" juister ware geweest. Daaruit blijkt duidelijker dat de "depressions" opvulbaar zijn. Volgens het Octrooi zijn namelijk de "depressions" gevormd opdat deze met materiaal zijn te vullen (zie kolom 2, regels 40-44: "can be filled with material").

23. Tenslotte is de term "array (of depressions)" vertaald met "reeks (indrukkingen)". Deze vertaling is onjuist voor zover daarmee ook een willekeurig of chaotisch patroon wordt bedoeld. Deze vertaling versluiert het geordende karakter van een "array". Een betere vertaling ware "geordende reeks" of "matrix" geweest.

24. Gelet op bovengenoemde onnauwkeurigheden zal hieronder zo nodig worden verwezen naar de authentieke Engelse tekst van de conclusies en beschrijvingsinleiding van het Octrooi.

<u>Stand der techniek</u>

25. Uit eigen onderzoek van Avery blijkt dat 3M niet alle relevante stand van de techniek heeft ingebracht in de Europese verleningsprocedure. De documenten D1,D2 en D4 – D9 maakten ten onrechte geen onderdeel uit van de verleningsprocedure van het Octrooi.

| | | |
|---|---|---|
| D1 | US 4,986,496 (3M Company) | **(Productie 3)** |
| D2 | US 5,405,675 (3M Company) | **(Productie 4)** |
| D3 | US 5,141,790 (3M Company) | **(Productie 5)** |
| D4 | US 5,362,516 (3M Company) | **(Productie 6)** |
| D5 | US 3,301,741 (3M Company) | **(Productie 7)** |
| D6 | JP 59-78285 (Mitsui) | **(Productie 8)** |
| D7 | GB 1 511 060 (Unitika) | **(Productie 9)** |
| D8 | JP 2587198 (Nichiei) | **(Productie 10)** |
| D9 | JP 59-53787 | **(Productie 11)** |
| D10 | US 3,887,678 (Lewicki) | **(Productie 12)** |
| D11 | WO 93/01047 (Tredegar Industries) | **(Productie 13)** |
| D12 | EP 0 313 766 (Chicopee) | **(Productie 14)** |

26. Ten overvloede merkt Avery op dat elk van de hierboven aangehaalde documenten openbaar toegankelijk was vóór de prioriteitsdatum van het Octrooi.

Gronden van het nietigheidsverweer

27. In het vervolg zal worden aangetoond dat de in de conclusies van het Octrooi neergelegde materie niet nieuw, althans niet inventief is. Het Octrooi had op grond van de artikelen 52 tot en met 57 van het Europees Octrooiverdrag (EOV) nooit verleend behoren te worden. Derhalve is het Octrooi nietig volgens artikel 75, lid 1, sub a van de Rijksoctrooiwet 1995 (hierna "ROW"). Bovendien heeft tijdens de verleningsprocedure een uitbreiding van materie plaatsgevonden, hetgeen in strijd is met artikel 123 lid 2 EOV. Daarnaast is, althans een deel van het Octrooi onvoldoende duidelijk voor een vakman om te kunnen worden toegepast, wat in strijd is met artikel 83 EOV. Ook om deze redenen is het Octrooi nietig volgens de artikelen 75, lid 1 sub b en 75 lid 1 sub c ROW.

3.1. Nietigheid van conclusie 1

3.1.1. Conclusie 1 is niet nieuw

3.1.1.1. Conclusie 1 is niet nieuw ten opzichte van document D1

28. Document D1 beschrijft een folie 10 met een gekarteld reliëfpatroon. De folie is een drager voor een drukgevoelig kleefmiddel (kolom 4, regels 1-10). Het gekarteld reliëfpatroon kan worden verkregen door het oppervlak te bosseleren. In verwarmde toestand wordt het oppervlak bewerkt met een koele gegraveerde rol (kolom 6, regels 34-43).

29. Volgens figuur 5 van D1 kan de dragerfolie 10 een meervoudig gebosseleerd reliëfpatroon vertonen. Het in figuur 5 getoonde bovenvlak vormt immers een "complex patroon van bosseleerpatronen met verschillende dieptes". Dat komt overeen met de in het Octrooi gegeven definitie van "multiple embossed", zoals hierboven reeds werd aangegeven. Figuur 5 is ter verduidelijking in **Productie** 15 vergroot weergegeven. De detailtekening toont een gebosseleerd reliëfpatroon van randen 28 en laagten 28a (nummering toegevoegd), waarin zich nog een reliëfpatroon bevindt van holtes 22, in D1 aangeduid met "valleys" (kolom 5, regels 28-30, en regels 38-40). Omdat het reliëfpatroon volgens figuur 5 wordt herhaald vormt dit reliëfpatroon een geordende reeks holtes, randen en laagtes.

30. Ook de hoogte van de randen boven de laagten wordt in D1 geopenbaard. De vakman leert uit kolom 5, regel 65 tot kolom 6, regel 2 dat piekhoogtes kunnen variëren van 20 tot 400 µm, waarbij de geopenbaarde piekhoogte van 20 µm midden in het in conclusie 1 geclaimde bereik valt. D1 anticipeert met andere woorden op het bereik van ca. 3 tot ca. 45 µm in het Octrooi.

31. Document D1 beschrijft <u>alle</u> technische maatregelen van conclusie 1. Conclusie 1 is dus niet nieuw ten opzichte van D1.

<u>3.1.1.2. Conclusie 1 is niet nieuw ten opzichte van document D2</u>

32. Document D2 beschrijft een gebosseleerd dragend weefsel 12 (figuur 1 en kolom 1, regels 6-10: "embossed base layer") dat kan worden gebruikt in een decoratieve folie voorzien van drukgevoelig kleefmiddel (kolom 1, regels 23-35).

33. Figuur 1 van D2 openbaart een dragend weefsel 12 met tenminste één oppervlak (het bovenvlak) met een meervoudig gebosseleerd reliëfpatroon. Het bovenvlak vormt een "complex patroon van bosseleerpatronen met verschillende dieptes", wat overeenkomt met de in het Octrooi gegeven definitie van "multiple embossed" (zie het Octrooi, kolom 2, regels 29-31). Volgens deze definitie wordt de complexe topologie van het oppervlak met verschillende dieptes verkregen door overlapping ("superimposed") van verschillende bosseleerpatronen met verschillende diepte. Dit complex patroon wordt sequentieel verkregen, maar kan onder welbepaalde voorwaarden ook in één bosseleerstap worden verkregen (zie het Octrooi, kolom 2, regels 40-44).

34. Figuur 1 van D2 toont een dergelijk complex oppervlak. Figuur 1 van D2 is ter verduidelijking in **Productie** 16 vergroot weergegeven, waarbij enkele verwijzingen zijn toegevoegd. Dit toont het oppervlak van links naar rechts met verschillende gedeeltes, aangeduid met (in volgorde) referentienummers 20, 18(1), 16(1), 18(2), 16(2), een gedeelte "x", en 14. Hierin zijn tenminste vier diepteniveaus zichtbaar. Het originele bovenvlak van het weefsel (vóór het bosseleren) wordt weergegeven door de gedeeltes 20, 18(2) en 14. Een eerste bosseleerniveau wordt gevormd door gedeelte 16(1), een tweede niveau door het gedeelte 16(2), een derde niveau door het gedeelte 18(1) en tot slot een vierde niveau gevormd door gedeelte "x". Gedeeltes 18(1) en "x" vormen randen (opgestuwde weefselgedeeltes), terwijl gedeeltes 16(1) en 16(2) lager gelegen gedeeltes vormen ten opzichte van het originele oppervlak.

35. Een eerste gebosseleerd reliëfpatroon wordt gevormd door gedeelte 16(2). Omdat het eerste reliëfpatroon van figuur 1 wordt herhaald (zie kolom 4, regels 11-13: "a series of alternating depressions and ridges") vormt dit reliëfpatroon een geordende reeks uitdiepingen, bijvoorbeeld een kiezel- of lijnenpatroon (kolom 9, regels 38-43). Een dergelijk patroon beantwoordt bovendien aan de in het Octrooi gegeven definitie van "patroon",

zijnde een door een meetkundige theorie voortgebrachte (en daardoor regelmatige) oppervlaktestructuur (zie het Octrooi, kolom 2, regels 26-29: "any formation of embossings that can utilize any theory of geometry").

36. Een tweede reliëfpatroon wordt gevormd door de gedeeltes 18(1), 16(1) en "x". Dit tweede patroon omvat laagtes 16(1) en randen 18(1), "x" tussen die laagtes. Ook dit patroon wordt herhaald.

37. Figuur 1 toont ook dat de uitdiepingen 16(2) van het eerste reliëfpatroon zich in het tweede reliëfpatroon bevinden.

38. Ook de hoogte van de randen boven de laagtes wordt in D2 geopenbaard. De vakman leert uit kolom 4, regels 6-9 van D2 dat de hoogte van de randen 18 boven de laagten 16 bij voorkeur niet meer dan 1/3 van de dikte van basislaag 12 bedraagt. Basislaag 12 kan in dikte variëren van ca. 25 tot 350 µm (kolom 5, regels 14-17). D2 openbaart dus dat de randen 18 boven de laagten 16 kunnen uitsteken van ca. 8 tot ca. 115 µm. Dit gebied overlapt aanzienlijk met de in het Octrooi geclaimde hoogtes van ca. 3 tot ca. 45 µm, waarbij de in D2 geopenbaarde hoogte van 8 µm midden in het geclaimde bereik valt.

39. Document D2 beschrijft eveneens alle technische maatregelen van conclusie 1. Conclusie 1 is dus niet nieuw ten opzichte van D2.

<u>3.1.2. Conclusie 1 is niet inventief</u>

<u>3.1.2.1. Conclusie 1 is niet inventief ten opzichte van document D3 in combinatie met document D6</u>

40. Document D3 beschrijft een herpositioneerbare kleeffolie ontwikkeld van 3M op de markt gebracht onder de naam "Controltac Plus". De kleeffolie omvat een geordende reeks verhogingen in de drukgevoelige kleeflaag, waarbij de toppen van de verhogingen in hoofdzaak vrij zijn van kleefmiddel (kolom 2, regels 61-67). De verhogingen omvatten bijvoorbeeld klompjes glasbolletjes 19 (kolom 3, regels 28-31 en figuur 1). Bij het aanbrengen van de folie op een ondergrond zullen eerst slechts de verhogingen in contact komen met de ondergrond zonder dat direct het gehele oppervlak van het kleefmiddel aan de ondergrond zal kleven. Dit maakt het mogelijk de folie bij een foutieve plaatsing eenvoudig te herpositioneren. Als de folie op de juiste plaats is aangebracht, kan deze stevig op de ondergrond worden aangedrukt waardoor een goede hechting tussen folie en ondergrond ontstaat. De folie van D3 lost dus het probleem van voortijdig hechten op zoals het Octrooi dat doet.

41. Om de folie te maken wordt in D3 gebruik gemaakt van een dragend weefsel 12 waarin een reliëfpatroon wordt gebosseleerd in de vorm van een regelmatige reeks holtes 14 ("uniformly distributed depressions"), die vervolgens worden gevuld met de deeltjes (figuur 1 en kolom 3, regels 58-66). Na aanbrengen van een drukgevoelige kleeflaag over de indrukken resulteert het reliëfpatroon in een geordende reeks verhogingen in de kleeflaag die met de deeltjes zijn gevuld (kolom 5, regels 19-40).

42. Het onderscheid tussen het dragend weefsel van D3 en het dragend weefsel volgens conclusie 1 van het Octrooi is dat deze laatste naast de (eerste) reeks holtes een tweede gebosseleerd reliëfpatroon heeft in de vorm van laagtes tussen randen, waarbij de hoogte van de randen boven de laaggelegen delen tussen 3 en 45 µm dient te liggen.

43. Het objectieve technische probleem welke dit kenmerk oplost, is onder andere weergegeven in kolom 1, regels 20-33 van het Octrooi, waarin het probleem van het insluiten van lucht wordt besproken. In kolom 11, regels 28-35 wordt aangegeven dat het tweede reliëfpatroon verantwoordelijk is voor het kunnen uitdrukken van ingesloten lucht. De in het Octrooi beschreven vergelijkende test (kolom 11, regels 28-35) laat immers zien dat bij gebruik van een kleeffolie, die weliswaar is voorzien van het eerste gebosseleerd reliëfpatroon maar niet van het tweede patroon (in de vergelijkende test aangeduid met "pit-only liner"), lucht wordt ingesloten tijdens het aanbrengen van de folie, die vervolgens niet meer kan worden verwijderd zonder de folie op te tillen.

44. De in conclusie 1 beschreven uitvinding zou er dus in bestaan het op zich uit D3 bekende Controltac plus weefsel te voorzien van een gebosseleerd reliëfpatroon in de vorm van laagtes en randen met de geclaimde hoogte van ca. 3 µm tot ca. 45 µm om zo naast de uit D3 reeds bekende herplaatsbaarheid tevens de mogelijkheid te creëren voor het ontsnappen van ingesloten lucht.

45. Het aanbrengen van een dergelijk gebosseleerd reliëfpatroon voor dit doel is echter al bekend uit D6. Hierin wordt een kleeffolie omschreven die bestaat uit een beschermlaag, een kleeflaag en een decoratieve laag ("base film"), dus een toepassing die volledig gelijkaardig is aan deze van het Octrooi. Om ingesloten lucht te voorkomen en eventueel opgesloten lucht gemakkelijk te laten ontsnappen wordt de beschermfolie van de kleeflaag met bosseleren voorzien van een reliëfpatroon met laaggelegen gedeeltes en randen (pagina 2, regels 12-21). De aldus in de kleeflaag gevormde groeven hebben een hoogte van 1 tot 15 µm, en bij voorkeur van 2 tot 10 µm. Deze hoogten liggen midden in het gebied dat in conclusie 1 van het Octrooi wordt geclaimd.

46. De vakman die, vertrekkende van D3, zoekt naar een oplossing voor het insluiten van lucht zal bij lezing van D6 onmiddellijk worden aangezet tot het uitproberen van de in D6 geopenbaarde oplossing in de verwachting van verbetering of voordeel, en zodoende tot het geclaimde in conclusie 1 komen zonder dat hiervoor uitvinderswerkzaamheid is vereist. De vakman zal D6 consulteren omdat D6 betrekking heeft op dezelfde soort folieproducten als beschreven in D3, en omdat D6 bovendien dezelfde soort problemen oplost. Conclusie 1 is dus niet inventief.

<u>3.1.2.2. Conclusie 1 is niet inventief ten opzichte van document D3 in combinatie met document D7</u>

47. Dezelfde argumentatie als in de voorgaande paragraaf kan worden herhaald voor de combinatie van D3 en D7. De hierboven genoemde probleemoplossingcombinatie wordt immers eveneens in D7 beschreven.

48. D7 beschrijft een kleeffolie van hetzelfde type als in het Octrooi. De kleeffolie kan worden gebruikt voor het beplakken van grote objecten zoals verkeersborden. De drukgevoelige lijmlaag van de kleeffolie bevat uitsparingen 3a, 3b, 3c of verhogingen 4a, 4b, 4c (zie figuren 1 en 2), waarvan tenminste een uiteinde zich tot de rand van de kleeffolie uitstrekt. Figuur 5-3 toont een typisch reliëfpatroon. Eventueel ingesloten lucht kan via de uitsparingen 3a, 3b, 3c of via de ruimtes tussen de verhogingen 4a, 4b, 4c uitwijken naar de rand van de kleeffolie (pagina 2, regels 80-95). De uitsparingen 3a, 3b, 3c of verhogingen 4a, 4b, 4c in de kleeflaag worden verkregen door gebruik te maken van een dragend weefsel dat is voorzien van overeenkomstige verhogingen of uitsparingen (pagina 3, regels 5-12).

49. D7 leert de vakman hoe hij ingesloten lucht kan voorkomen door de beschermfolie van de kleeffolie te voorzien van een reliëfpatroon in de vorm van laagtes en randen bij het aanbrengen van de kleeffolie. Bovendien leert D7 dat een hoogte in de grootteorde van 45 µm van de randen ingesloten lucht grotendeels voorkomt, waarbij de breedte van de kanalen tevens een rol speelt (Voorbeeld 1, pagina 3, regels 60-65). In voorbeeld 2 van D7 (pagina 4, vanaf regel 8) wordt de hoeveelheid ingesloten lucht gemeten voor randhoogtes, variërend van 20 µm tot 100 µm. Uit de in Tabel 2 op pagina 4 weergegeven resultaten blijkt dat een randhoogte vanaf 40 µm leidt tot goede luchtafvoer, een en ander afhankelijk van de vorm van de kanalen[6].

50. De vakman die wordt geconfronteerd met het in het voorgaande gedefinieerde objectieve probleem voor het vinden van een oplossing voor ingesloten lucht, zal worden aangezet tot het uitproberen van de uit D7 bekende oplossing. Zodoende zal hij zonder enige uitvinderswerkzaamheid tot het geclaimde in conclusie 1 komen. Conclusie 1 is dus niet inventief.

<u>3.1.2.3. Conclusie 1 is niet inventief ten opzichte van document D3 in combinatie met document D8</u>

51. Ook D8 openbaart bovengenoemde probleemoplossingcombinatie. D8 beschrijft eveneens een kleeffolie voorzien van een drukgevoelige kleeflaag. Het in D8 beschreven dragend weefsel lost bovendien hetzelfde probleem op als het Octrooi. D8 openbaart enerzijds de mogelijkheid tot herpositioneren, en anderzijds het voorkomen dat lucht wordt ingesloten of blaasvorming optreedt doordat gassen vrijkomen uit het drukgevoelige kleefmiddel (zie pagina 4, paragrafen [0003]-[0006]).

52. De in D8 hiertoe verschafte oplossing omvat een beschermfolie 5 met een geordende reeks uitsparingen 4 (figuren 1 en 2), die een geordende reeks verhogingen 2 vormen in de kleeflaag 3. Bij verwijderen van de beschermfolie 5 van de kleeflaag 3 en aanbrengen van de kleeflaag op een ondergrond zullen enkel de verhogingen 2 contact maken met de ondergrond. Door het kleine contactoppervlak is de kleeffolie gemakkelijk te herpositioneren. Bovendien zorgen de open kanalen tussen de verhogingen 2 er voor dat ingesloten lucht gemakkelijk kan ontsnappen naar de randen van de kleeffolie. De hoogte van de kanalen ligt tussen 3 µm en 50 µm, en bij voorkeur tussen 15 µm en 25 µm (pagina 7, paragraaf [0021]).

53. Ook D8 leert de vakman dat hij insluiten van lucht kan voorkomen bij het aanbrengen van een kleeffolie door de beschermlaag te voorzien van een reliëfpatroon in de vorm van laagtes en randen. D8 openbaart dat de randen 3 tot 50 µm boven de laagtes uitsteken. De vakman die wordt geconfronteerd met het in het voorgaande gedefinieerde objectieve probleem voor het vinden van een oplossing voor ingesloten lucht zal dus ook bij lezing van D8 worden aangezet tot het uitproberen van de uit D8 bekende oplossing en zodoende tot het geclaimde in conclusie 1 komen, zonder dat hiervoor enige uitvinderswerkzaamheid is vereist. Conclusie 1 is dus niet inventief.

<u>3.1.2.4. Conclusie 1 is niet inventief ten opzichte van document D4 in combinatie met document D6, D7 of D8</u>

54. Document D4 beschrijft een herpositioneerbare kleeffolie, welke 3M verhandelt onder de naam "Controltac". Controltac is de voorloper van het in D3 beschreven "Controltac plus"

---

[6] In Tabel 2 wordt een goede luchtafvoer weergegeven met de symbolen Δ en 0 (zie legende van Tabel 1 op pagina 3)

product. D4 beschrijft een kleeffolie met een geordende reeks verhogingen in de drukgevoelige kleeflaag, waarbij de toppen van de verhogingen in hoofdzaak vrij zijn van kleefmiddel (kolom 1, regels 57-60). De verhogingen omvatten bijvoorbeeld glasbolletjes 34 (figuur 6). De verhogingen in de kleeflaag worden verkregen door een dragend weefsel te voorzien van een geordende reeks holtes (kolom 5, regels 8-12). Dit gebeurt door bosseleren van het dragend weefsel (kolom 7, regels 24-32). Het is volgens kolom 6, regels 8-14 van D4 tevens mogelijk meerdere geordende reeksen holtes in het dragend weefsel aan te brengen, waarbij elke reeks holtes slechts verschilt in diepte.

55. Zo is het bijvoorbeeld mogelijk een eerste reeks met een diepte van 15 µm te bosseleren, en een tweede reeks met een diepte van 25 µm. Impliciet blijkt dus al uit D4 dat het mogelijk is twee gebosseleerde reliëfpatronen in een dragend weefsel aan te brengen, waarbij beide reliëfpatronen naast elkaar kunnen bestaan.

56. Bij het aanbrengen van de folie van D4 op een ondergrond zullen eerst slechts de verhogingen in contact komen met de ondergrond zonder dat direct het gehele oppervlak van het kleefmiddel aan de ondergrond zal kleven. Dit maakt het mogelijk de folie bij een foutieve plaatsing eenvoudig te herpositioneren. Als de folie op de juiste plaats is aangebracht kan deze stevig op de ondergrond worden aangedrukt waardoor een goede hechting tussen folie en ondergrond ontstaat. De folie van D4 lost dus het probleem van voortijdig hechten aan de ondergrond op zoals het Octrooi dat doet.

57. Conclusie 1 mist inventiviteit op basis van de gecombineerde leer van D4 en D6 of D7, of D8. De redenering is analoog aan die voor het gebrek aan inventiviteit van het Octrooi ten opzichte van de combinatie van documenten D3 met D6, D7 of D8.

<u>3.1.2.5. Conclusie 1 is niet inventief ten opzichte van document D5 in combinatie met document D6 of D7 of D8</u>

58. Document D5 beschrijft net als D4 een herpositioneerbare kleeffolie van 3M. De in D5 beschreven kleeffolie omvat een geordende reeks verhogingen in de drukgevoelige kleeflaag, waarbij de toppen van de verhogingen in hoofdzaak vrij zijn van kleefmiddel (figuur 3 en kolom 3, regels 4-9). De verhogingen omvatten niet-klevende toppen 28 (kolom 3, regels 4-9). De verhogingen in de kleeflaag worden verkregen door een dragend weefsel te voorzien van een geordende reeks holtes (figuur 2 en kolom 2, regels 64-69). Dit gebeurt door het bosseleren van het dragend weefsel.

59. Conclusie 1 mist inventiviteit op basis van de gecombineerde leer van D5 en D6 of D7 of D8. De redenering is analoog aan die voor het gebrek aan inventiviteit van het Octrooi ten opzichte van de combinatie van documenten D3 met D6, D7 of D8.

<u>3.1.2.7. Conclusie 1 is niet inventief ten opzichte van document D3, D4 of D5, in combinatie met document D9 en experimentele gegevens</u>

60. Conclusie 1 van het Octrooi is door het EOB verleend na beperking van de hoogte van de randen van 3 tot ca. 45 µm. Dit bereik leidt bij gebruik als dragend weefsel voor een kleeffolie tot een overeenkomstig bereik voor de diepte van de uitsparingen in de drukgevoelige lijmlaag. Hierboven toonde Avery al aan dat het geclaimde bereik op zichzelf al niet inventief is omdat de stand van de techniek (in D6, D7 en in D8) voor het voorkomen van ingesloten lucht in drukgevoelige kleeffolies uitdrukkelijk verwijst naar dieptes die in het aangegeven bereik liggen of duidelijk verwijzen naar het geclaimde bereik.

61. Document D9 beschrijft een waterresistente kleeffolie met een drukgevoelige kleeflaag. De beschermfolie ervan wordt door middel van bosseleren voorzien van randen 3A en laaggelegen gedeelten 3B (zie figuur 2). De randen vormen een regelmatig patroon, dat zich tot de rand van de kleeffolie uitstrekt (zie figuur 3). Eventueel ingesloten lucht kan bij het aanbrengen van de decoratieve folie via overeenkomstig in de kleeflaag 3 aangebrachte groeven 3A uitwijken naar de rand van de kleeffolie (figuur 1). D9 leert de vakman dat een patroon van luchtkanalen een oplossing biedt voor het insluiten van lucht, maar zegt niets over de optimale hoogte van deze kanalen. D9 leert de vakman dus dat ingesloten lucht kan worden voorkomen bij het aanbrengen van een kleeffolie door de beschermlaag ervan te voorzien van een reliëfpatroon in de vorm van laagtes en randen.

62. De vakman die kennis neemt van D9 zal aangezet worden tot het bosseleren van het uit D3, D4 of D5 bekende weefsel. De meest geschikte hoogte van de randen ten opzichte van de laagtes zal hij door eenvoudige proefnemingen kunnen vaststellen zonder uitvinderswerkzaamheid. Hierbij wordt nog opgemerkt dat het beschikbare bereik voor de randhoogte al beperkt is door de dikte van de in decoratieve folies toegepaste kleeflaag. Deze kleeflaagdikte is doorgaans van de grootteorde van hooguit 50 µm. In D4 bijvoorbeeld worden diktes genoemd van 20-40 µm (kolom 6, regels 62-66). Het geclaimde bereik voor de randhoogte (dus voor de diepte van de luchtkanalen in de kleeflaag) bestrijkt dus praktisch volledig het uit de stand van de techniek reeds bekende bereik voor de kleeflaagdikte. Omdat de diepte van de in de kleeflaag gevormde luchtkanalen niet groter kan zijn dan de dikte van deze kleeflaag en de uit de stand der techniek bekende kleeflaagdikte van de grootteorde van hooguit 50 µm is, is niet in te zien dat het geclaimde bereik inventief zou zijn. Het geclaimde bereik vloeit dus direct voort uit de gebruikelijke kleeflaagdiktes.

3.2. Conclusies 2-3

63. De onderconclusies bevatten slechts details die triviaal zijn voor een vakman die bovengenoemde documenten, of combinaties daarvan bestudeert, waardoor deze onderconclusies nieuwheid, of althans inventiviteit missen.

64. In de authentieke Engelse taal luidt conclusie 2:

*"The web of claim 1, wherein the surface (22) can be embossed with any pattern ranging from a minor fraction of an area of the surface to the entire area of the surface."*

Deze conclusie geeft aan dat het oppervlak van het dragend weefsel kan worden gebosseleerd met om het even welk patroon. Dit kenmerk is niet onderscheidend. Bovendien zijn er legio voorbeelden bekend uit de stand der techniek (zie bijvoorbeeld D2) waar gedeelten, of juist nagenoeg het gehele oppervlak van een dragend weefsel worden gebosseleerd.

65. In de authentieke Engelse taal luidt conclusie 3:

*"The web of claim 1 or claim 2, wherein a shape of embossings for any pattern (26, 24) can range from a constant radius of curvature to a polygonal shape of at least 2 surfaces and wherein a width of embossings in any pattern can range from about 1 µm to about 10,000 µm."*

66. Deze conclusie geeft aan dat het oppervlak van het dragend weefsel kan worden gebosseleerd met patronen variërend met een constante straal tot veelhoekige patronen,

waarbij de dikte binnen zeer brede grenzen kan variëren. Ook deze kenmerken zijn op zich reeds niet onderscheidend en in onder andere D2-D5 en D6-D9 beschreven.

3.3. Conclusie 4

67. Conclusie 4 ziet op een werkwijze ter verkrijging van een dragend weefsel met tenminste twee reliëfpatronen. In de authentieke, Engelse taal luidt de conclusie als volgt:

*"4. A method of embossing, comprising the steps of:*

*(a) embossing a carrier web having at least one surface (22) with a first pattern (26), to create a first pattern of depression (29);*

*(b) embossing the surface with a second pattern (24) to create a second pattern of depressions comprising lands (27) and ridges (28),*

*wherein the depressions created from the first embossing step are substantially preserved during the second embossing step even though the second embossing step superimposes the second pattern on the depressions created from the first embossing step, and wherein the height of the ridges over the lands ranges from about 3 to about 45 µm."*

3.3.1. Conclusie 4 is niet nieuw ten opzichte van document D2

68. D2 openbaart het sequentieel bosseleren van eerste en tweede reliëfpatronen, waarbij een eerste gevormd patroon in hoofdzaak bewaard blijft bij het aanbrengen van het tweede patroon. Volgens D2 kan het weefsel een eerste reliëfpatroon, bijvoorbeeld in de vorm van een achtergrondpatroon, en een tweede reliëfpatroon, bijvoorbeeld in de vorm van een achteraf gebosseleerd logo hebben (kolom 2, regels 41-45, en kolom 10, regels 10-16). Volgens voorbeeld 3 van D2 (kolom 15, regels 52-60) kan het dragend weefsel tegelijkertijd ("simultaneously") eerste en tweede gebosseleerde reliëfpatronen bezitten die verschillend zijn, en die zijn verkregen door eerst op thermomechanische wijze een eerste gebosseleerd patroon aan te brengen, en vervolgens het gebosseleerde oppervlak opnieuw hoogfrequent te bosseleren waarbij het tweede patroon ontstaat.

69. Omdat de patronen verschillen, zijn beide tegelijkertijd zichtbaar. De vakman die kennis neemt van Voorbeeld 3 zal zich onmiddellijk realiseren dat er hierbij slechts twee mogelijkheden zijn die dus beide geopenbaard zijn: of het eerste patroon bevindt zich in het tweede reliëfpatroon (zoals geclaimd in conclusie 1 van het Octrooi) of andersom. Bovendien is duidelijk dat het eerste patroon in hoofdzaak bewaard blijft omdat beide patronen zichtbaar zijn, en omdat uitdrukkelijk wordt aangegeven dat het weefsel een dusdanig hoge verwekingstemperatuur ("softening temperature") dient te bezitten dat het aangebrachte reliëfpatroon stabiel blijft (kolom 2, regels 51-56). D2 leert de vakman dat het eerste patroon kan behouden blijven. Conclusie 4 mist kortom nieuwheid ten opzichte van document D2, omdat D2 alle technische maatregelen van conclusie 4 openbaart.

3.3.2. Conclusie 4 mist inventiviteit in het licht van documenten D10, D11 of D12

70. Documenten D10, D11 en D12 beschrijven alle methodes om een meervoudig gebosseleerd reliëfpatroon aan te brengen op een weefsel of folie door dit weefsel ten minste in twee afzonderlijke bosseleerstappen van een dergelijk patroon te voorzien. Het tweede patroon overlapt met het eerste patroon dat echter in stand blijft.

71. Relevante passages in D10 zijn figuur II waar een patroon 31 wordt geopenbaard in een tweede patroon 34, waarbij beide patronen behouden blijven. D11 beschrijft een meervoudig gebosseleerde film met een aantal gebosseleerde macro cellen die een aantal micro cellen bevatten (pagina 1, regels 10-12). De patronen kunnen in twee stappen worden aangebracht (pagina 3, regels 20-24 en figuur 2). D12 beschrijft eveneens een van een macro- en een micropatroon voorzien weefsel. Beide patronen worden door een tweevoudig bosseleerproces aangebracht (kolom 2, regels 34-45).

72. Het moge duidelijk zijn dat sequentieel bosseleren van een weefsel of folie teneinde dit te kunnen voorzien van twee "geneste" reliëfpatronen die beide behouden blijven bekend was uit de stand van de techniek. Conclusie 4 is dus ook niet inventief.

3.4. Conclusies 5 – 7

73. De onderconclusies van conclusie 4 bevatten alle details die triviaal zijn voor een vakman die bovengenoemde documenten, of combinaties daarvan, bestudeert, waardoor deze onderconclusies nieuwheid, of althans inventiviteit missen.

74. Conclusie 5 ziet op een methode waarbij de indrukkingen van de eerste bosseleerstap worden gebruikt voor een eerste doel, terwijl de indrukkingen van de tweede bosseleerstap gebruikt kunnen worden voor een tweede doel. Meervoudig gebosseleerde folie oppervlakken zijn bijvoorbeeld bekend uit D10, D11 en D12. Elk gebosseleerd reliëfpatroon heeft zijn eigen doel.

75. Conclusie 6 ziet op een methode waarbij de indrukken van de eerste bosseleerstap worden gevuld met een materiaal voordat de tweede bosseleerstap wordt uitgevoerd. Ook deze maatregel is reeds bekend, bijvoorbeeld uit D3, D4 of D5.

76. Conclusie 7 ziet tenslotte op een methode waarbij de indrukken van de tweede bosseleerstap worden gevuld. Ook deze maatregel is reeds bekend uit de stand van de techniek, bijvoorbeeld uit D6, D7 of D8, waarbij de laaggelegen gedeeltes tussen de randen van het tweede reliëfpatroon worden gevuld met drukgevoelig kleefmiddel.

3.5. Conclusies 8 en 9

77. Conclusies 8 en 9 zijn onafhankelijke conclusies en zien op een werkwijze voor het gebruik van een dragend weefsel volgens conclusies 1 tot 4 als beschermingsfolie voor een drukgevoelig kleefmiddel, respectievelijk als eindartikel voor de opslag van een ander materiaal. In de authentieke, Engelse taal luiden beide conclusies als volgt:

*"8. A method of using a web of claim 1 as a release liner for a pressure sensitive adhesive."*

*"9. A method of using a web of any of claims 1-4 as a final article for storage of another material."*

78. Conclusie 8 mist nieuwheid ten opzichte van D2 omdat de in D2 beschreven dragende folie gebruikt kan worden als beschermende folie ("base layer") voor een drukgevoelig kleefmiddel (kolom 1, regels 6-9 en regels 22-26), en omdat D2 de dragende folie volgens conclusie 1 beschrijft. Om dezelfde reden is conclusie 9 eveneens niet nieuw ten opzichte van D2. De in D2 beschreven folie met erin opgenomen holtes kan inderdaad worden toegepast als eindartikel. De holtes kunnen desgewenst worden gevuld met "een ander" materiaal.

79. Conclusies 8 en 9 missen inventiviteit ten opzichte van D3 in combinatie met D6, D7 of D8 omdat alle genoemde documenten betrekking hebben op dragers voor drukgevoelige kleefmiddelen. Dit geldt eveneens voor de andere hierboven genoemde inventiviteitsschadelijke combinaties van documenten. Om onnodige herhaling te voorkomen wordt verwezen naar de argumentatie in paragraaf 3.1.2.

3.6. Uitbreiding van materie

80. Het Octrooi is de Europese voortzetting van de PCT-aanvrage met publicatienummer WO 98/29231 (**Productie** 2). Het Octrooi vertoont uitbreiding van materie als bedoeld in artikel 75 lid 1 sub c ROW, en is daarom nietig. Dat is vast te stellen aan de hand van de eerste hoofdconclusie welke in "uitgebreide" vorm is opgenomen als hoofdconclusie in het Octrooi. De hoofdconclusie uit de PCT-aanvrage luidt:

*"1. A carrier web, comprising:at least one surface that is multiple,* ***sequentially*** *embossed with a pattern, wherein depressions created from the prior embossing pattern (s) are* ***substantially preserved*** *during the subsequent embossing patterns(s) even though the subsequent embossing pattern(s) are superimposed on* the depressions from the prior embossing pattern(s) " (nadruk toegevoegd).

81. Bij de voortzetting van de PCT-aanvrage in Europa zijn gewijzigde conclusies ingediend. Deze kwamen in hoge mate overeen met de conclusies die 3M op dat moment in de verleningsprocedure voor de overeenkomstige Amerikaanse octrooiaanvraag hanteerde. De kenmerken "sequentially" en "substantially preserved" zijn hierbij uit de hoofdconclusie verdwenen. Dit is een ongeoorloofde uitbreiding van materie.

82. Oorspronkelijk zag de uitvinding namelijk op een dragend weefsel met meerdere, sequentieel gebosseleerde patronen. In de Amerikaanse verleningsprocedure is ook duidelijk gesteld door 3M dat het sequentieel bosseleren van tenminste twee reliëfpatronen essentieel is voor de uitvinding. Dit blijkt uit een antwoord van 3M op een door de de Amerikaanse vooronderzoeker geopperd bezwaar, zie **Produktie** 17 (pagina 5, gemerkte passage). In de Europese verleningsprocedure is deze stellingname echter onopgemerkt gebleven omdat de huidige conclusies reeds bij overgang van de PCT-aanvrage naar de Europese regionale fase door 3M werden ingediend, en niet pas tijdens de Europese verleningsprocedure.

83. Ook uit de beschrijvingsinleiding blijkt dat de sequentiële werkwijze essentieel is voor de uitvinding, waarbij de latere gebosseleerde patronen de eerdere gebosseleerde patronen niet noemenswaardig verstoren (het Octrooi, kolom 8, regels 34-37, en alle voorbeelden). Dit wordt verder nog bevestigd in kolom 8, regels 27-33, waar wordt aangegeven dat een voordeel van de uitvinding wordt gevormd door de mogelijkheid materiaal in de holtes van het eerste patroon aan te brengen voorafgaand aan de tweede bosseleerstap.

84. Door de verwijzingen naar "sequentially" en "substantially preserved" uit de hoofdconclusie te verwijderen heeft 3M de inhoud van het Octrooi uitgebreid buiten de inhoud van de oorspronkelijke aanvrage. In de aanvrage is geen "basis" te vinden voor een dragend weefsel met een meervoudig reliëfpatroon zonder de wijze van verkrijging te noemen (namelijk sequentieel en dusdanig dat eerdere gebosseleerde patronen in hoofdzaak behouden blijven bij verdere bosseleerstappen). In kolom 2, regels 40-44 wordt weliswaar de mogelijkheid van een éénstapsproces besproken, echter alleen in combinatie met een tweetal hiertoe essentiële kenmerken. Zo dient er gebruik te worden gemaakt van een voor het meervoudig bosseleren geschikt gemaakt(e) gereedschap, of matrijs, met ander

woorden een matrijs met meerdere hoogteniveaus. Ook kan een éénstapsproces slechts worden uitgevoerd als geen enkele holte van het weefsel is opgevuld voorafgaand aan de (enige) bosseleerstap.

85. Omdat deze kenmerken niet zijn opgenomen bij het redigeren van de huidige hoofdconclusie stijgt deze uit boven hetgeen door de aanvrage is gedekt. Het Octrooi, en in het bijzonder conclusie 1 is dus nietig op basis van artikel 75 lid 1 sub c ROW[7].

86. Hoofdconclusie 1 zoals verleend bevat nog een kenmerk dat geen basis vindt in de aanvraag zoals oorspronkelijk ingediend, namelijk het kenmerk dat de uitdiepingen van het eerste gebosseleerde patroon zich in het tweede gebosseleerde patroon bevinden ("*wherein the depressions of the first embossed pattern are in the second embossed pattern*").

87. Howel dit kenmerk niet wordt gedekt door de inhoud van de aanvraag zoals ingediend, wordt dit kenmerk niettemin als essentieel aangemerkt door 3M omdat het kenmerk is opgenomen in de hoofdconclusie 1. Een mogelijke verklaring is deze. Beide (eerste en tweede) patronen zijn per definitie regelmatig omdat zij door bosseleren tot stand worden gebracht, en een bosseleerrol uiteraard een regelmaat creëert. Beide patronen zijn dus opgebouwd uit een eenheidspatroon dat een onbepaald aantal keren herhaald wordt.

88. Als nu een aantal indrukkingen van het eerste patroon overlapt met de randen van het tweede patroon, zullen deze randen op een aantal plaatsen worden ingedrukt waardoor hun hoogte afneemt. Dit betekent dat ter plaatse van deze "defecten" het drukgevoelig kleefmiddel onderbrekingen zal vertonen in de door de randen gevormde luchtkanalen. Omdat dergelijke defecten door het regelmatig en repeterend karakter een onbepaald aantal keren worden herhaald, is het aannemelijk dat de luchtuitwijkende werking van een met het dragend weefsel gemaakte folie teniet gaat. Om dit te vermijden dienen volgens 3M de holtes van het eerste patroon zich in het tweede patroon te bevinden. Nu een essentieel kenmerk van de uitvinding niet wordt gedekt door de inhoud van de ingediende aanvrage is het Octrooi volgens Artikel 75 lid 1 sub c ROW nietig.

89. Ten overvloede merkt Avery op dat wanneer 3M er toe over zou gaan het kenmerk "wherein the depressions of the first embossed pattern are in the second embossed pattern" uit conclusie 1 te verwijderen zulks onherroepelijk leidt tot uitbreiding van de beschermingsomvang van het octrooi na verlening. Dat betekent dat het Octrooi nietig is volgens Artikel 75, lid 1, sub d ROW. Een dergelijke aanpassing van de hoofdconclusie leidt dus tot nietigheid van het Octrooi. Wordt het kenmerk echter niet verwijderd dan is het Octrooi nietig wegens uitbreiding van materie.

### 3.7. Niet-nawerkbaarheid

90. Conclusie 4 beschrijft op zichzelf geen nawerkbare uitvinding, en doet dat ook niet in het licht van de beschrijvingsinleiding van het Octrooi. Conclusie 4 ziet op een werkwijze voor het sequentieel bosseleren van een eerste en een tweede reliëfpatroon op een dragend weefsel, waarbij (onder andere) de door de eerste bosseleerstap gemaakte uitdiepingen in hoofdzaak bewaard blijven gedurende de tweede bosseleerstap, terwijl het tweede patroon daarbij over de eerste uitdiepingen heen wordt aangebracht. De (deskundige) lezer van het Octrooi zal echter tevergeefs zoeken naar de specifieke processtappen en - voorwaarden

---

[7] 3M zou wellicht op het idee kunnen komen zich te beroepen op kolom 2, regels 11-13 van het Octrooi. Deze passage is echter later pas toegevoegd.

om het behoud van eerdere gebosseleerde patronen bij de hierop volgende bosseleerstappen te bereiken. Zo is niet duidelijk tussen welke grenzen bijvoorbeeld hij de bosseleersdruk en/of –temperatuur moet nemen. Wellicht dat ook de eigenschappen van de gebruikte folies een rol spelen, of de lijnsnelheid, wat de tekst niet vermeldt.

91. 3M geeft zelf al aan dat het gaat om een complex proces. Zo merkt zij op dat de afmetingen van de gebosseleerde patronen sterk afhangen van de viscoelastische eigenschappen van de beschermlaag (kolom 7, regels 39-43) zonder daar nadere mededelingen over te doen die de vakman in staat stellen de werkwijze na te werken. Niet duidelijk is tussen welke grenzen de vakman bijvoorbeeld de bosseleerdruk en/of –temperatuur moet nemen. Daarbij komt dat waarschijnlijk ook de eigenschappen van de gebruikte folies een rol spelen, of de lijnsnelheid.

92. Zo kan het goed zijn dat bij bepaalde procesomstandigheden het eerste bosseleerpatroon als het ware "dichtslibt" bij aanbrengen van het tweede bosseleerpatroon. Zonder nadere gegevens over de wijze waarop de werkwijze succesvol kan worden toegepast, is er in feite sprake van een wensconclusie. De essentiële kenmerken van de werkwijze worden zo geformuleerd in termen van het gewenste effect. Een wens is echter op zichzelf niet octrooieerbaar. Dit is des te opmerkelijker omdat 3M blijkbaar zelf aangeeft dat de uitvinding schuilt in het bewaren van het eerst aangebrachte bosseleerpatroon bij het aanbrengen van het tweede bosseleerpatroon, zie **Productie** 17 (gemerkte passage op pagina 5).

93. Omdat conclusie 4, althans de in het Octrooi geopenbaarde werkwijze niet nawerkbaar is, is het Octrooi nietig volgens Artikel 75 lid 1 sub b ROW, althans voor zover het de werkwijze betreft.

## <u>B. EIS IN RECONVENTIE</u>

### 1. INLEIDING

<u>1.1. De producten van Avery</u>

94. De Avery Easy Apply producten betreffen decoratieve folies met een drukgevoelige kleeflaag beschermd door een dragend weefsel ("release liner"). De Easy Apply producten verschillen onderling slechts in de karakteristieken van de kleeflaag en de decoratieve folie. Dat is in het kader van deze procedure echter niet van belang aangezien het Octrooi slechts ziet op dragende weefsels.

<u>1.2. Productiewijze van de Easy Apply producten</u>

95. De Easy Apply producten worden op de volgende wijze gemaakt. Als uitgangsmateriaal wordt een dragend weefsel gebruikt dat is samengesteld uit een polypropeenfolie, een laag papier, een polyetheenfolie en een siliconen deklaag, zie **Productie** 18. Dit dragend weefsel wordt in een eerste stap flexografisch bedrukt met inktdruppels van polyurethaan (PUR), zie **Productie** 19. Het microscopisch beeld van de print toont **Productie** 20. Vervolgens worden de inktdruppels gefixeerd door middel van ultraviolet licht. Na fixatie vindt de eerste (en enige) bosseleerstap plaats. In één beweging wordt een reliëfpatroon van "randen" en "laagtes" gevormd[8], en worden de inktdruppels in het oppervlak van het dragend weefsel ingebed, zie de middelste tekening in **Productie** 21. Tot slot wordt de

[8] Vergelijkbaar met het tweede gebosseleerde reliëfpatroon van het Octrooi.

aldus verkregen drager voorzien van een laag drukgevoelig kleefmiddel ("pressure sensitive adhesive") en een decoratieve folie, zie de onderste tekening in **Productie** 21.

96. Geen onderdeel van het productieproces is aanbrengen van de afbeelding op de Easy Apply producten. Dat gebeurt door de afnemers van Avery.

97. Bij het bosseleren worden de meeste inktdruppels ingebed in het dragend weefsel. Hierbij worden de inktdruppels vervormd en deels gefragmenteerd. De inktdruppels steken lichtjes boven het oppervlak van het dragend weefsel uit of liggen op gelijk niveau hiermee. Uit hoogtemetingen (**Productie** 22) blijkt dat het dragende weefsel van de Easy Apply producten geen holtes heeft[9] .

98. Ook maakt Avery niet de Afvalproducten die inbreuk zouden maken op het Octrooi. 3M heeft SEM-Micrographs gepresenteerd bij de "Analyse van de Easy Apply produkten" in de Dagvaarding. Dat zijn echter niet de Easy Apply producten maar de producten die pas ontstaan door het lostrekken van het dragende weefsel van de film met kleeflaag (zie de afbeeldingen bij de paragrafen 22, 28 en 33 van de Dagvaarding). Dit lostrekken gebeurt door de afnemer bij het aanbrengen van de decoratieve folie. Het losgetrokken dragend weefsel is een afvalproduct.

99. Een duidelijker beeld van het Afvalproduct toont **Productie** 23. Hierin zijn "randen" en "laagtes" te onderscheiden. Uit de afbeelding valt op te maken dat in de "laagtes" holtes voorkomen. Deze holtes vormen het nabeeld van de inktdruppels welke zich aan de kleeflaag hebben gehecht en met het lostrekken van de drager zijn meegekomen met de kleeflaag. De holtes hebben noch een vaste diepte, noch een vaste plaats, noch een vaste vorm. Het Afvalproduct is niet meer in economische zin te gebruiken, onder andere omdat het verknipte stukken betreft. Het Afvalproduct is alleen al om die reden niet te hergebruiken in een rendabel proces, en dus ook niet industrieel toepasbaar wat een voorwaarde is om onder de beschermingsomvang van een octrooi te vallen.

## 2. GEEN INBREUK

100. In de Dagvaarding motiveert 3M slechts hoe in haar ogen Avery letterlijk inbreuk maakt op de conclusies 1 en 8. Of, en in hoeverre 3M zich eveneens beroept op inbreuk op overige conclusies, dan wel op niet-letterlijke inbreuk argumenten is voor Avery niet te bepalen. Bovendien analyseert 3M alleen het Afvalproduct en niet de Easy Apply producten. Avery zal zich beperken tot het weerleggen van de aangevoerde argumenten, aangezien zij niet bekend is met andere gesubstantieerde gronden.

*Geen inbreuk op conclusie 1*

2.1. Niet voldaan aan Kenmerk A

101. Voor haar aantijging van inbreuk op conclusie 1 maakt 3M gebruik van een claim chart in paragraaf 19 van de Dagvaarding welke zes kenmerken (A-F) onderscheidt. Kenmerk A luidt in de authentieke Engelse tekst:

*"a "carrier web" (20), comprising."*

---

[9] Overeenkomstig het eerste gebosseleerde reliëfpatroon welke het Octrooi veronderstelt

Daaraan is volgens 3M voldaan omdat de Easy Apply producten "klevende folie[s] [zijn], waarbij gebruik gemaakt wordt van een beschermlaag die de kleeflaag beschermt" (paragraaf 21). Vergelijkbare omschrijvingen zijn te vinden in paragraaf 27 en 32 (voor respectievelijk de MPI 2005, 1005 en 1007). De Easy Apply producten zijn geen dragende weefsels, maar bevatten die. Het dragende weefsel is echter niet als zodanig te onderscheiden in de Easy Apply producten. Bij scheiding ontstaat slechts een Afvalproduct dat niet meer is te gebruiken als dragend weefsel.

2.2. Niet voldaan aan Kenmerk B

i. geen aanwezigheid sequentieel gebosseleerde reliëfpatronen

102. Voor zover uw Rechtbank van oordeel is dat Afvalproducten zich als beschermlaag in de Easy Apply producten bevinden, dient hij vervolgens onder ogen te zien of voldaan is aan de overige kenmerken. Kenmerk B luidt in de authentieke Engelse tekst:

*"at least one surface that is multiple embossed pattern, having a first embossed pattern (26) and a second embossed pattern (24)".*

103. In dit[10] kenmerk ligt besloten dat het dragende weefsel in meer dan één stap is gebosseleerd. "Multiple embossed pattern" slaat niet alleen op een driedimensionaal patroon wat verschilt in de dieptes, maar ook op een patroon dat in meer dan één bosseleerstap is aangebracht. Zulks volgt duidelijk uit de beschrijving van het Octrooi, zie bijvoorbeeld regel 40 en verder op p. 2 van het Octrooi:

*"Although the multiple embossing steps could be combined into a single step with the design of a suitable tool or mold, the advantage of multiple steps is that the depressions formed by the prior step(s) can be filled with material prior to the subsequent embossing step(s). The number of same or different materials can be as many as the number of **sequential** step(s) or can be any subset of them." (nadruk toegevoegd)*

104. Zoals blijkt uit de beschrijving van het productieproces hiervoor is er slechts sprake van één bosseleerstap welke de "randen" en "laagtes" creëert, tegelijk met het daarin inbedden van de gefixeerde inkt. Omdat bij het productieproces van Avery slechts sprake is van één bosseleerstap, vallen de Easy Apply producten niet onder conclusie 1.

ii. Holtes niet gemaakt door bosseleren

105. Zelfs als uw Rechtbank van oordeel zou zijn dat onder conclusie 1 ook een dragend weefsel valt welk met één stap is gebosseleerd zoals de Easy Apply producten, is er nog geen sprake van een "multiple embossed pattern". Uit het hiervoor aangehaalde citaat en de overige kenmerken volgt dat er sprake moet zijn van gebosseleerde reliëfpatronen.

106. De holtes in de "laagtes" van de Afvalproducten zijn dat niet. Die zijn het resultaat van het aanbrengen, fixeren en inbedden van de inktdruppels, waarbij deze laatste op willekeurige wijze in het vlak en in de diepte vervormen en/of fragmenteren. Een dergelijke willekeurige vorm en reliëfpatroon is niet met bosseleren te verkrijgen.

2.3. Niet voldaan aan Kenmerk C

I. Geen regelmatig patroon van holtes

---

[10] En overigens ook in de overige van de door 3M onderscheiden kenmerken!

107. Voor zover uw Rechtbank van oordeel is dat desalniettemin voldaan is aan kenmerk B, voldoet het dragende weefsel niet aan kenmerk C. Dit luidt in de authentieke Engelse tekst:

*"wherein the first embossed pattern forms an array of depressions"*

108. Klaarblijkelijk gaat 3M er vanuit dat onder een "array of depressions" welke deel uitmaken van het kenmerk ook holtes vallen die op min of meer willekeurige positie en met een willekeurige diepte aanwezig zijn. Kennelijk miskent 3M daarmee dat kenmerk C vereist dat de "depressions" een regelmatig patroon vormen. Dit volgt logischerwijs uit het feit dat deze worden gecreëerd door te bosseleren, waarmee slechts vooraf vastgelegde patronen kunnen worden gereproduceerd. Hetzelfde volgt uit de woordkeus: een "array" duidt op een regelmatig patroon.

ii. Geen holtes die kunnen worden opgevuld

109. Kennelijk miskent 3M daarmee verder dat er bij het Afvalprodukt geen sprake is van "depressions" zoals het Octrooi dit bedoelt. Zoals blijkt uit de beschrijving van het Octrooi moet het gaan om holtes welke tussen de bosseleerstappen kunnen worden opgevuld met een ander materiaal. Een van de passages waaruit dat volgt is (regel 40-50 op p. 2 van het Octrooi):

*"Although the multiple embossing steps could be combined into a single step with the design of a suitable tool or mold, the advantage of multiple steps is that the depressions formed by the prior step(s)* ***can be filled*** *with material prior to the subsequent embossing step(s). The number of same or different materials can be as many as the number of sequential step(s) or can be any subset of them. Once the number of same or different materials reside in the multiple embossed web, they can be removed from their multiple depth depressions for use or for further manufacturing or assembly."* (nadruk toegevoegd)

110. Zoals hierboven al is aangegeven is het praktisch niet mogelijk in de Afvalproducten de onregelmatige holtes te vullen met een ander materiaal omdat het hier verknipte stukken materiaal betreft die niet in een productielijn kunnen worden ingevoerd. Zelfs als dat al zou kunnen bevinden de holtes zich in de "laagtes" tussen de "randen". Het is moeilijk een economisch rendabele werkwijze te bedenken waarbij slechts de holtes kunnen worden gevuld, en niet de "laagtes".

*Geen inbreuk op conclusie 8*

111. Zoals hierboven uitvoerig is aangegeven, vallen de Easy Apply producten niet onder conclusie 1. Daarmee volgt dat de Easy Apply producten ook niet vallen onder de productconclusies 2 en 3 welke afhankelijk zijn van conclusie 1. Conclusie 8 beschrijft een werkwijze voor het gebruik van een onder de conclusies 1-3[11] vallend product in een drukgevoelig kleefmiddel. Aangezien dit niet bij de Easy Apply producten het geval is, kan Avery noch inbreuk op conclusie 8 worden verweten, noch dat zij gebruik maakt van een voortbrengsel welke rechtstreeks wordt verkregen met de werkwijze van conclusie 8.

<u>2.5. Conclusie inbreuk</u>

112. De conclusie moet dan ook zijn dat de Easy Apply producten niet voldoen aan de door 3M onderscheiden kenmerken van de hoofd(product)conclusie van het Octrooi. 3M's aantijging dat Avery de in de artikel 8 geclaimde werkwijze toepast, of gebruik maakt van met die

[11] Abusievelijk vermeld de Dagvaarding conclusies 1-4

werkwijze rechtstreeks verkregen voortbrengselen is dan ook onjuist. Daarmee is 3M niet geslaagd in het bewijzen van de door haar gesubstantieerde grondslagen voor inbreuk op het Octrooi.

## C. CONCLUSIE VAN EIS IN RECONVENTIE

### 5. VERNIETIGING VAN HET OCTROOI

113. Avery verzoekt al hetgeen zij in conventie heeft gesteld in reconventie als herhaald en ingelast te beschouwen.

114. Avery verzoekt uw Rechtbank het Nederlandse deel van het Octrooi op grond van artikel 75 ROW te vernietigen. Voor de gronden van deze vordering wordt verwezen naar hetgeen hierover in conventie is gesteld, inclusief de daarbij overgelegde producties.

### 6. BETALING VAN HET HONORARIUM VAN DE RAADSMAN EN OCTROOIGEMACHTIGDE

115. Avery verzoekt uw Rechtbank 3M in conventie en reconventie te veroordelen tot betaling van de (forfaitaire) proceskostenvergoeding welke gewoonlijk wordt toegekend in civiele zaken. Daarnaast vordert zij ook de betaling van het honorarium van haar raadsman en octrooigemachtigde.

116. Voor de volledigheid wijst Avery erop dat geen regel van Nederlands recht in de weg staat aan toewijzing van een volledige proceskostenveroordeling. Artikel 239 van het Wetboek van Burgerlijke Rechtsvordering (hierna "Rv") beperkt die tot de kosten van rechtsbijstand. Er is echter geen wettelijke basis is de hoogte daarvan te begroten tot het veelal toegepaste liquidatietarief. Strikt genomen is dat slechts een handvat voor de rechter. Noch Rv, noch de Wet tarieven in burgerlijke zaken bevat echter een verwijzing naar de liquidatietarieven. De strekking van artikel 239 Rv is dan ook slechts dat geen andere kosten als proceskosten worden aangemerkt dan de kosten van rechtsbijstand. Een limitering voor wat betreft de hoogte van die kosten ligt daarin niet besloten. Hierbij merkt Avery op dat het Rapport Voor-werk II geen "recht" is in de zin van art. 79 van de Wet op de Rechterlijke Organisatie (HR 19 november 2004, JOL 2004/608), zodat het de rechter vrijstaat hier vanaf te wijken.

117. Voor zover uw Rechtbank meent dat het nationale Nederlandse recht niet voldoende basis biedt voor een vergoeding van de volledige proceskosten zij verwezen naar Richtlijn 2004/48 van het Europees Parlement en de Raad van 29 april 2004 betreffende de handhaving van intellectuele eigendomsrechten (hierna de "Richtlijn"). De Richtlijn legt in artikel 14 vast dat de verliezende partij de kosten van rechtsbijstand draagt tenzij de billijkheid zich daartegen verzet. Uit de toelichting in het Voorstel[12] voor de Richtlijn blijkt dat de Europese Commissie bij die laatste bijzin voor ogen heeft het geval dat de economische situatie van de verliezende partij dit niet toestaat. Zulks is bij 3M niet het geval.

118. De Nederlandse wetgever is bezig de Richtlijn om te zetten in de Nederlandse wet. Uit de Memorie van Toelichting bij de implementatiewet[13] (hierna de "Implementatiewet") blijkt dat de wetgever beoogt een volledige proceskostenvergoeding in te voeren in zaken ten aanzien van intellectueel eigendom. De toelichting bij het nieuw in te voeren artikel 1019h Rv vermeldt dat artikel 14 Richtlijn verplicht tot een ruime proceskostenvergoeding, en de

---

[12] COM (2004) 46 definitief.
[13] Wetsvoorstel 30392, vergaderjaar 2005-2006.

rechter moet komen tot een vergoeding van de zogenaamde evenredige kosten van een procedure.

119. Nu de Tweede Kamer zich nog buigt over de Implementatiewet zal de implementatietermijn van de Richtlijn van 29 april 2006 niet worden gehaald. Mogelijk zal zelfs artikel 1019h Rv niet van kracht zijn voordat uw Rechtbank uitspraak doet in deze zaak. Dat laat onverlet dat uw Rechtbank binnen de ruimte die hem daarvoor ter beschikking staat de Nederlandse wet, in het bijzonder artikel 239 Rv conform de Richtlijn dient uit te leggen. Zoals hierboven is uitgelegd verzet de Nederlandse wet zich op zichzelf niet tegen toekenning van een ruime proceskostenvergoeding.

120. Het overgangsrecht staat hier overigens óók niet aan in de weg. Artikel IX bepaalt dat de Implementatiewet niet van toepassing is op procedures welke aanhangig zijn gemaakt voor inwerkingtreding van die wet. Dit laat echter onverlet dat uw Rechtbank het civiele (proces)recht conform de Richtlijn moet uitleggen, en de ruimte is vergund een ruime proceskostenvergoeding toe te kennen.

121. Voor zover uw Rechtbank zich niet, of niet alleen op de Richtlijn wil baseren, kan hij zich ook baseren op artikel 45 lid 2 van het TRIPs verdrag[14]. Deze bepaling legt vast dat de houder van een intellectueeleigendomsrecht aanspraak heeft op de vergoeding van de passende honoraria van zijn raadslieden wanneer de inbreukmaker wordt veroordeeld. De redelijkheid en billijkheid vereist dat de spiegelbeeldige verplichting bestaat voor zover de houder van zo'n recht ten onrechte een derde van inbreuk beschuldigt en dientengevolge tot betaling van proceskosten wordt veroordeeld.

122. Dat de verplichting symmetrisch is volgt ook uit artikel 14 van de Richtlijn die zowel de houder van een intellectueeleigendomsrecht, als de derde die onterecht is aangesproken ter zake van inbreuk op zo'n recht aanspraak geeft op een ruime proceskostenvergoeding. Dit artikel beoogt uitvoering te geven aan artikel 45 lid 2 TRIPs, zie ook de vijfde considerans van de Richtlijn en het al eerder genoemde Voorstel daarvoor.

123. Ten overvloede merkt Avery op dat het bepaalde in arrest van het Europese Hof van Justitie in de zaak Dior/Tuk van 14 december 200 (C-300/98) niet in de weg staat aan de directe werking van artikel 45 lid 2 TRIPs. In Dior/Tuk ging het specifiek om de eventuele directe werking van artikel 50 lid 6 TRIPs ten aanzien van voorlopige maatregelen. Men neemt aan de dat dit arrest ook geldt ook voor andere bepalingen van TRIPs[15].

124. Het Europese Hof heeft in Dior/Tuk onder meer bepaald dat de (nationale) rechter vrij is TRIPs direct toe te passen voor zover de Europese Gemeenschap op dat vlak nog niet regelgevend is opgetreden. Daarmee is gelijk te stellen de situatie dat er een richtlijn van kracht is welke beoogt rechten te geven aan burgers, maar deze nog niet omgezet is in nationale wetgeving zodat die burgers gebruik kunnen maken van die rechten. Verder bepaalde het Europese Hof dat de rechter het nationale recht in overeenstemming met TRIPs moet toepassen.

125. Voor zover uw Rechtbank desalniettemin meent geen rechtsgrondslag te hebben voor een ruime proceskostenvergoeding verzoekt Avery in het eindvonnis een overweging ten overvloede te wijden aan de vergoeding die zij had kunnen ontvangen als de maatstaf van

---

[14] Overeenkomst inzake de handelsaspecten van de intellectuele eigendom, beter bekend onder het Engelse acronym TRIPs, Trb. 1995, 130, inwerkingtreding 1 januari 1996
[15] Zie o.a. mr Nynke A.H. Hendriks, "De directe werking van het Nederlandse TRIPs-Verdrag en de gevolgen voor het Nederlandse octrooirecht", IER 2003, juli, pp. 146-153

de Richtlijn en artikel 1019h Rv wel was toegepast. Dat maakt het mogelijk de Nederlandse staat aan te spreken vanwege de schade die Avery lijdt door het niet tijdig, of onjuist omzetten van de Richtlijn in Nederlandse wetgeving. Hierbij komt dat aannemelijk is dat artikel IX sowieso in strijd is met de Richtlijn. Blijkens de Memorie van Toelichting van de Implementatiewet is het doel van artikel IX een tsunami van eisvermeerderingen te voorkomen, wat een efficiënte procesvoering ten goede zou komen. De Richtlijn beoogt echter eiser en gedaagde in procedures over intellectueel-eigendom een uitbreiding te verschaffen van hun procesrechten, en niet een inperking ervan om efficiënter te kunnen procederen.

## D. IN CONVENTIE EN RECONVENTIE

### 7. BEWIJSAANBOD EN CONCLUSIE

126. Onder betwisting daartoe gehouden te zijn, biedt Avery aan haar stellingen met alle middelen rechtens te bewijzen, daartoe mede begrepen het overleggen van schriftelijke of elektronische bewijsstukken, verklaringen van (partij-) deskundigen en het (doen) horen van (partij-)deskundigen en (partij-) getuigen.

127. Avery concludeert:

(a) In conventie: dat het uw Rechtbank behage 3M Company in haar vorderingen niet ontvankelijk te verklaren, althans deze haar te ontzeggen

(b) In conventie: dat het uw Rechtbank behage zich onbevoegd te verklaren tot kennisneming van de vorderingen van 3M Company voor zover deze zien op andere landen dan Nederland, althans het vonnis op dit punt aan te houden.

(c) In reconventie: dat het uw Rechtbank behage bij vonnis het Nederlandse deel van het Octrooi te vernietigen;

(d) In conventie en reconventie: 3M Company, uitvoerbaar bij voorraad, te veroordelen in de proceskosten van het geding, waaronder begrepen de volledige kosten van rechtsbijstand van Avery.

**Lijst met producties**

1. Grote van Dale voor "bosseleren";
2. PCT aanvrage Octrooi (WO 98/29231);
3. US 4,986,496 (3M Company);
4. US 5,405,675 (3M Company);
5. US 5,141,790 (3M Company);
6. US 5,362,516 (3M Company);
7. US 3,301,741 (3M Company);
8. JP 59-78285 (Mitsui) ;
9. GB 1 511 060 (Unitika) ;
10. JP 2587198 (Nichiei) ;
11. JP 59-53787;
12. US 3,887,678 (Lewicki);
13. WO 93/01047 (Tredegar Industries);
14. EP 0 313 766 (Chicopee);
15. Vergrote weergave figuur 5 van D1 (US 4,986,496);
16. Vergrote weergave figuur 1 van D2 (US 5,405,675);
17. Antwoord van 3M op bezwaar examiner in Amerikaanse verleningsprocedure;
18. Onbewerkt dragend weefsel;
19. Schema productieproces;
20. Microscropisch opname dragend weefsel na flexografische print;
21. Tekeningen van dragend weefsel na de verschillende productiestappen;
22. Hoogtemetingen dragend weefsel;
23. SEM micrograph van Afvalproduct.