EXHIBIT 1C

**District Court of The Hague**
Cause-list no.: 2005/3435
Court session of 12 July 2006

**REPLY TO THE COUNTERCLAIM**

**on behalf of:**

the company incorporated under foreign law
**3M COMPANY,**
having its registered office in St. Paul, Minnesota,
United States of America,

claimant in the main action,
defendant in the counterclaim,

local counsel: P.J.M. von Schmidt auf Altenstadt,
attorneys: J.J. Brinkhof and R.E. Ebbink,

**vs:**

the private limited company
**AVERY DENNISON MATERIALS NEDERLAND B.V.,**
having its registered office in Leyden, the Netherlands,

defendant in the main action,
claimant in the counterclaim,

local counsel: W.P. den Hartog,
attorney: D.J.B. Bosscher.

* * * * * * * * * * * * * * * * * * * * * * * * *

Honourable Members of the Court,

The claimant in the main action, also being the defendant in the counterclaim, hereinafter referred to as: "3M" respectfully moves and claims as reply to the counterclaim as follows. The defendant in the main action, also being the claimant in the counterclaim, will hereinafter be referred to as "Avery".

**INTRODUCTION**

1. On 4 October 2005 3M summoned Avery in the present main action to obtain a ban on infringement with ancillary claims on the grounds of its European patent EP 1 011 955 B1 (the "patent"). On 8 March 2006 Avery filed its statement of defence, also containing a counterclaim ("Avery defence/counterclaim").

   Please note: In its defence/counterclaim Avery noted that 3M failed to furnish proof in its summons with regard to the validity of its patent in all designated countries. 3M contends that Avery did not contest that validity. 3M will nevertheless, by a separate motion of today, submit this proof to the court as **exhibit 9**.

2. In the counterclaim Avery claims the nullification of the Dutch part of the patent, contending that this patent:

   a) lacks novelty (Section 75 (1) (a) in conjunction with Section 4 of the Dutch Patents Act 1995);
   b) lacks the inventive step (Section 75 (1) (a) in conjunction with Section 6 of the Dutch Patents Act 1995);

c) extends the subject matter of the filed application (Section 75 (1) (c) of the Dutch Patents Act 1995); and
d) cannot be worked by a skilled person (Section 75 (1) (b) of the Dutch Patents Act 1995).

3. According to 3M Avery's counterclaims must be dismissed. The patent is an invention that is both novel and involves an inventive step. The scope of protection of the patent is not extended and the patent can be worked by a skilled person. Below, 3M will further discuss each of the nullification arguments put forward by Avery.

4. Before discussing the nullification arguments put forward by Avery, 3M believes it to be useful to discuss certain terms used in the patent in further detail. After all, in its defence/counterclaim, Avery wrongly interprets various terms used in the claims of the patent. Avery not only uses those interpretations in relation to the question of infringement. They also recur in the arguments put forward by Avery in its counterclaim to nullify the patent.

5. For the record, 3M contests the accuracy and complete nature of Avery's contentions, in as far as they are not expressly subscribed to by 3M. 3M also offers, in as far as the onus of proof lies with 3M, to furnish evidence for all its contentions by all legal means, in particular by hearing experts and/or witnesses. 3M in particular offers to furnish evidence, in as far as the onus of proof lies with 3M, for all the facts and circumstances underlying its contentions that its patent is novel and involves an inventive step, that the subject matter is not extended and that its patent can be worked by a skilled person. In that respect, 3M applies to the Court to provide 3M with the opportunity at a later stage, if required, to submit a list of names of witnesses/experts.

THE PATENT

6. Avery wrongly interprets the following terms in claim 1 of the patent.[1]

**"multiple embossed pattern"**

7. According to Avery "embossed pattern" in claim 1 means "by means of embossing" (see, inter alia, §§ 9, 20 and 21 Avery defence/counterclaim). According to Avery the translation of this term should thus refer to the working method by which the embossing is obtained. This contention is incomprehensible and incorrect.

8. The term "embossed pattern" means nothing other than a "*reliëfpatroon*" (Dutch translation). The same goes for the words "*geprägter Muster*" and "*motif à gaufrage*" in the German and French translation of claim 1. The working method by which the pattern is obtained is irrelevant. This also follows from the definition of the words "embossed" and "pattern" in the patent description. See [0010] and [0011]:

*"**[0010]** "Embossed" means topography on a web or on tooling having an effective three-dimensional pattern that generates a difference in surface planar dimension in the liner or the tooling.*
***[0011]** "Pattern" means any formation of embossings that can utilize any theory of geometry, including without limitation, Euclidian geometry and fractal geometry."*

9. For the record, please note that Avery uses the term embossing wrongly (see § 10 Avery defence/counterclaim). Other than contended by Avery, this term is not restricted to "applying an embossed pattern on the web by means of a *punch nose* of a harder material". The term embossing comprises all kinds of methods for applying an embossed pattern.

[1] 3M contends that the Dutch translation of the patent is accurate. As in the summons, 3M will therefore make use of the terminology used in that translation.

10. Avery also wrongly contends that according to claim 1 the embossed pattern must have been obtained in two, sequential steps (see § 11 Avery defence/counterclaim). After all, the patent description not merely refers to the application of the multiple embossed pattern in several steps. It specifically mentions the possibility of applying the multiple embossed pattern in a single step.

    See [0014] of the patent:
    *"(...) the multiple embossing steps could be combined into a single step with the design of a suitable tool or mold (...)"*

    See also [0056] of the patent:
    *"Euclidean geometric patterns can be formed (...) in any number of steps".*

11. Avery itself confirms the fact that the pattern can also be applied in a single step in § 33 Avery defence/counterclaim.

12. Nor can it be derived from the term "multiple" in the sense of "multiple embossed pattern" that the embossed pattern cannot be applied in a single step. The term "multiple embossed" merely means that two patterns are superimposed and that are both visible. See [0012] of the patent:

    *"**[0012]** "Multiple embossed" means two or more embossing patterns are superimposed on the web to create a complex pattern of differing depths of embossing."*

**"depressions"**[2]

13. According to Avery, "depressions" (*indrukkingen*") must be be "filled" (see § 9 Avery defence/counterclaim). According to Avery, the term "depressions" should therefore be replaced by "cavities" ("*holtes*") or "holes" ("*uitsparingen*") since this would better express the fact that those elements can be filled (see § 22 Avery defence/counterclaim).

14. The word "depression" is therefore used correctly. In fact, it does not follow from the patent that "depressions" are at all times filled. Example 1 concerns depressions that are not filled.

    See [0066] of the patent (underlining not in original):
    *"An embossed Controltac TM Plus liner (commercially available from 3M, St.Paul, MN) <u>with empty depressions</u> was embossed (...)".*

**"array"**

15. Avery furthermore contends that "array" does not mean "series" ("*reeks*"), but an "<u>ordered</u> series" or "matrix" (see §§ 9 and 23 Avery defence/counterclaim). According to Avery, a random or chaotic pattern is not an "array".

16. Avery's restricted interpretation of the word "array" does not follow from the description. The description explicitly states that the patterns may utilize all kinds of geometric theories, including without limitation, Euclidian and fractal geometry. Fractal geometry, for example, is characterized by the variable, random and chaotic, at least appearing as such, form.

    See [0011] of the patent:
    *"Pattern" means any formation of embossings that can utilize any theory of geometry, including without limitation, Euclidian geometry and fractal geometry."*

---

[2] Note translator: paragraphs 13-18 deal with issues of interpretation involving both Dutch and English terms. The present English text therefore differs slightly from the original Dutch text for reasons of clarity.

See also [0049], final sentence, of the patent:
*"In other words, the depressions 29 can assume any solid geometric desired by those skilled in the art, within the percentage areas expressed above."*

17. There is nothing in the patent from which a skilled person might derive that the depressions might solely and exclusively be configured in an ordered manner in the sense of a matrix. This is also confirmed by the following passage from the description.

See [0063] of the patent:
*"(...) the array of combinations possible, given the multitude of possible embossed patterns, the multiplicity of embossed patterns (...)"*

18. In short, it is incorrect that the array should necessarily be ordered.

**NOVELTY**

19. Avery contends that claims 1, 2, 3, 4, 8 and 9 of the patent should be revoked since they lack novelty. According to Avery, the invention as described in claim 1 is disclosed in D1 (US 4 986 496 (Marentic), Avery exhibit 3) and in D2 (US 5 405 675 (Sawka), Avery exhibit 4). According to Avery, the invention as described in claims 2, 3, 4, 8 and 9 is disclosed in D2.

<u>Please note</u>: As an abbreviation for documents which it invokes in the context of novelty and the inventive step, Avery uses the indicator "D" followed by a number. Although unusual in national revocation proceedings, 3M will follow Avery in this respect and hereinafter refer to the Avery exhibits 3-14 as D1-D12, respectively.

20. A document impairs the novelty if it discloses directly and unequivocally *all* distinguishing features of the invention as claimed. As explained below, D1 does not disclose all distinguishing features of claim 1, nor does D2 disclose all distinguishing features of claims 1, 2, 3, 4, 8 and 9. These documents do therefore not impair the novelty.

21. (The parent company of) Avery unsuccessfully invoked D2 in the US proceedings relating to US 5 897 930, a US parallel patent of the patent at issue. The court ruled that D2 does not impair the novelty of claim 1 of the US patent, which claim is (virtually) equivalent to claim 1 of the patent at issue. The US patent and the relevant documents from the US proceedings are submitted to the court as **exhibits 10 and 11**.

**US 4 986 496 (D1)**

22. D1 is a "drag reduction article". This means – stated succinctly – a flexible film material of which the surface has a certain pattern to reduce drag if fluid flows across the surface on which the film is attached (see D1, column 2, lines 5-9). D1 mentions the possibility to apply (a layer of) adhesive. However, not – as suggested by Avery – on the surface with the pattern, but rather on the (flat) surface on the other side (see D1, column 6, lines 62-64). The surface with the pattern comprises parallel peaks and valleys (see D1, column 5, lines 27-29 and claim 1). Figure 5 demonstrates peaks 28 *and* 30 divided by valleys 22, whereby peaks 28 and 30 are parallel, but the height of peaks 28 differs from that of peaks 30 (see D1, column 5, lines 37-39).

23. Avery is of the opinion that figure 5 of D1 discloses a multiple embossed pattern consisting of depressions, lands and ridges. In that respect, Avery refers to a detailed drawing it made (Avery exhibit 15, bottom figure). This detailed drawing is however no enlargement of (a part of) figure 5 of D1, but rather a drawing in which the relative heights of the peaks and valleys are changed compared to the original. Furthermore,

a dotted line has been added (referred to as 28a) between the tops of the peaks 30 which is absent in figure 5. In as far as 3M understands it, Avery contends that:

- the valleys 22 in figure 5 correspond to the depressions according to claim 1;
- the peaks 28 in figure 5 correspond to the ridges according to claim 1; and
- the *imaginary* line drawn between the peaks 30 in figure 5 by Avery corresponds to the lands according to claim 1.

24. 3M contests that (figure 5 of) D1 discloses a multiple embossed pattern with a first embossed pattern (formed by depressions) *and* a second embossed pattern (formed by lands and ridges between those lands) in the sense of the patent. After all, if presuming as Avery does, although 3M contests this, that the depressions of the first embossed pattern in figure 5 are formed by the valleys 22 and the ridges of the second embossed pattern by the peaks 28, D1 in any event fails to disclose lands in the sense of the patent.

25. Based on the wording used in claim 1, a "land" is a certain continuous surface surrounded by ridges. This interpretation is, for example, confirmed by figure 3 of the patent. The fact that a land must concern a surface also follows from the function of this distinguishing feature if the pattern surface of D1 serves as a release liner for a pressure sensitive adhesive. In such an event, the lands of the release liner ensure that in any event that part of the adhesive layer corresponding with those lands adheres to the base. See, for example, [0047] of the patent.

26. The imaginary line between the tops of the peaks 30 which Avery *itself* drew in the detailed drawing it made of figure 5 (Avery exhibit 15) is not disclosed in D1. Nor is this imaginary line a land. After all, there is no continuous surface between the tops of peaks 30. In as far Avery contends that, the tops of peaks 30 may not be qualified as lands in the sense of the patent either. After all, the tops are not limited by higher ridges, nor are they a continuous surface.

27. Nor does D1 disclose the distinguishing feature that "the height of the ridges over the lands ranges from 3 to about 45 μm". This cannot be derived from the passage cited by Avery (D1, column 5, line 65 – column 6, line 2). After all, this passage merely states that the height of the peaks may range from 20 to 400 μm. The distance between the particles qualified by Avery in figure 5 as ridges and lands cannot be derived clearly and directly from this information regarding the height of the peaks. The fact that it is possible that this distance might lie within the claimed range of approximately 3 to approximately 45 μm does not suffice to impair the novelty on the basis of that.

See, for example, Technical Board of Appeal 30 August 1994 (T 943/93):

*"2.5. (...) A hypothetical possibility of operating within the claimed region per se is legally not sufficient to destroy the novelty of this region, particularly if the skilled person has no technical motive and there exists no practical necessity to work within this region."*

28. In short, D1 neither directly nor unequivocally discloses all distinguishing features of claim 1 of the patent. A second embossed pattern comprising lands and ridges between those lands is in any event lacking. Aside from that, D1 does not disclose ridges and lands whereby the distance between those particles lies between the range of approximately 3 to approximately 45 μm claimed in claim 1.

**US 5 405 675 (D2)**

29. D2 concerns an "embossed multilayer film" consisting of a basic layer with embossing and a superimposed, protective surface layer (see D2, column 1, lines 7-10). The

embossing merely has a decorative function (see, for example, D2, column 1, lines 28-32). It may comprise a background embossing, a legend or a logo or combinations of those (see D2, column 2, lines 41-45). Figure 1 discloses an embossed pattern consisting of depressions 16 and ridges 18. No further particulars are provided. The description states that the pattern merely serves as an illustration (see D1, column 4, lines 11-19). Further details on possible embossed patterns are not disclosed in D2.

*Claim 1*

30. According to Avery, D2 discloses a multiple embossed pattern in the sense of claim 1 of the patent. It bases this contention on (an enlargement of) figure 1 to which it has added some changes and in which it includes some particles in the first and second embossed pattern while excluding other particles (see Avery exhibit 16). According to 3M, D2 does not disclose a multiple embossed pattern as claimed in claim 1 of the patent.

31. First of all, a first embossed pattern constituting an array of depressions is missing. According to Avery, only one of the depressions 16 in figure 1 (referred to as 16(2) by Avery) should be qualified as a depression in the sense of the patent. Based on Avery's interpretation, there is no *array* of depressions. After all, D2 does not teach that depression 16(2) occurs more than once. Although the description refers to "a series of alternating depressions 16" (see D2, column 4, lines 11-13), it is not clearly and unequivocally evident from these words that the pattern of figure 1 is repeated. Nor is it clear what the entire multiple embossed pattern should look like. After all, the left and right part of the pattern of figure 1 cannot simply be aligned, since the height of the surface on the extreme left (above reference figure 20) does not correspond to that of the surface on the extreme right (under reference figure 14) in the figure.

32. Moreover, in (figure 1 of) D2 a second embossed pattern consisting of lands and ridges between those lands is missing. According to Avery, in figure 1 only one of the ridges 18 (referred to as Avery by 18(1)) and a particle referred to as Avery by X may be qualified as a ridge in the sense of the patent. In addition, according to Avery, in figure 1 one of the depressions 16 (referred to as Avery by 16(1)) is a land in the sense of the patent. This selection by Avery is completely arbitrary and implausible. If 18(1) is to be qualified as a ridge in the sense of the patent, why should not the particle referred to by Avery as 18(2) also be qualified as such? In any event, Avery's interpretation does not refer to lands, but only to one land. As explained in the preceding paragraph, there is no evidence to demonstrate that the pattern of figure 1 is repeated. Nor are there any ridges between those lands.

33. What is also missing from Avery's interpretation is the distinguishing feature that the depressions of the first embossed pattern reside in the second embossed pattern. After all, according to Avery, the second embossed pattern merely comprises particles 18(1), 16(1) and x. The first embossed pattern, referred to as Avery as depression 16(2) does not reside in that second pattern.

34. Finally, D2 does not disclose directly and unequivocally what the height of the ridges is compared to the lands. D2 merely teaches that the "depth of the embossed pattern preferably represents not more than one-third of the total thickness of base layer 12" (see D2, column 4, lines 6-9). It is unclear how the depth of the embossed pattern should be calculated. Is it about the difference between the highest and the lowest point of the embossing (in figure 1 the difference between 18(1) and 16(2))? Or perhaps the average of them? Or is it about how much the highest point rises above the original thickness of the base layer? In any event, it cannot be derived from this what the height is of the particles 18(1) and x qualified as ridges by Avery compared to particle 16(1) qualified as land, let alone that this falls within the claimed range of approximately 3 to approximately 45 μm.

35. It follows from the foregoing that D2 does not disclose all distinguishing features of claim 1 of the patent.

*Claims 2 and 3*

36. Although Avery is not entirely clear on this point, it would appear that Avery contends that the subject matter of claim 2 lacks novelty in the light of D2 (see § 64 Avery defence/counterclaim). This is however not substantiated. Avery also contends that the invention described in claim 3 lacks novelty in view of D2 (see § 66 Avery defence/counterclaim). Both contentions are incorrect.

37. Claims 2 and 3 depend on claim 1. Given that D2 does not impair the novelty of claim 1, it cannot impair the novelty of claims 2 and 3.

*Claim 4*

38. According to Avery, D2 impairs the novelty of the working method claimed in claim 4. This is not the case.

39. As stated earlier in the context of claim 1, D2 neither discloses a first pattern of depressions, nor a second pattern of lands and ridges. D2 thus discloses no working method whereby such a first pattern is applied followed by such a second pattern.

40. Aside from that, the working method disclosed in D2 does not comply with the distinguishing feature that depressions created by the embossing in the first step are to a large degree maintained in the second step of embossing, although this second step of embossing superimposes the second pattern over the depressions created in the first step of embossing. Although the passages cited by Avery (D2, column 2, lines 41-45, column 10, lines 10-16 and column 15, lines 52-60) of the description of D2 refer to the subsequent application of patterns, it does not follow from this that the first pattern is maintained once the second pattern is superimposed. On the contrary. The words "re-embossed" and "re-embossable" in these passages indicate that the second pattern replaces the first pattern. This interpretation is confirmed by, inter alia, the following passages in the description of D2.

    D2, column 4, lines 20-34:
    *"Advantageously, base layer 12 is re-embossable; that is, base layer 12 may be repeatedly softened, embossed and set during multiple sequential heating and cooling cycles. Consequently, base layer 12 may be provided with a first embossed pattern (for example, a pebbled appearance) over virtually its entire surface, followed by the application (such as by hot-stamping or the like) of a second embossed pattern, (for example, a particular design, logo or legend) <u>which selectively replaces the pebbled pattern in the area of the hot-stamping.</u> Even more generally, base layer 12 is re-embossable in the sense that the base layer <u>may be heated to remove a previously applied embossed pattern</u> so that it can be replaced with an alternative pattern."*

    D2, column 10, lines 13-15:
    *"the subsequently applied legend or logo <u>being surrounded by</u> an overall embossed background pattern which was provided during the first embossing step".*

41. Nor does D2 disclose the distinguishing feature that the height of the ridges above the lands ranges from approximately 3 to approximately 45 μm (see § 33 above).

*Claim 8*

42. According to Avery, D2 also discloses the distinguishing features of claim 8. That is incorrect. It follows from the foregoing that D2 discloses no web corresponding to one

of the claims 1-4[3]. Aside from that, it cannot be concluded that the web according to D2 serves as a release liner for a pressure sensitive adhesive.

43. If the web in accordance with one of the claims 1-4 of the patent serves as a release liner for a pressure sensitive adhesive, the three-dimensional multiple embossed pattern of that web serves to create (virtually complete) complementary three-dimensional embossed pattern in the adhesive (see, inter alia, [0046] of the patent). This pattern in the adhesive ensures that it is easier to reposition the film after applying it and to exhaust any entrapped air (see §§ 7-10 summons). The adhesive is thus applied on the embossed pattern of the release liner. That is not the case in D2.

44. In D2 the base layer 12 with the embossed pattern of the film merely has a decorative function (see above § 28). In order to apply the film on an object, it may contain an adhesive 24 (see D2, column 8, lines 38-40). It is evident from figure 1 that this adhesive is not applied to the side with the embossed pattern, but on the flat side. The adhesive is usually covered by a release liner (see D2, column 9, lines 27-29). It follows from this that D2 does not disclose a web with embossed pattern which itself is a release liner for an adhesive.

*Claim 9*

45. Avery also contends that D2 discloses all distinguishing features of claim 9. This is also incorrect according to M3. Other than contended by Avery, D2 does not disclose that the film may be used as an end product for the storage of another material. Aside from that, D2, as explained above, does not disclose a web in accordance with any of the claims 1-4.

**Conclusion novelty**

46. D1 and D2 do not disclose the inventions claimed in the patent. The patent does not lack novelty. The patent may therefore not be nullified on the basis of Section 74 (1) (a) in conjunction with Section 4 of the Dutch Patents Act 1995.

**THE INVENTIVE STEP**

47. Avery also contends that all claims of the patent may be nullified on account of lacking the inventive step. Avery bases this contention on several documents, i.e. D3-D12 (or Avery exhibits 5-14), which it combines with one another in various ways.

48. As regards claim 1, Avery's arguments amount to the following. Avery regards D3, D4 or D5 as the closest prior art. Each of these documents discloses webs with depressions on behalf of repositioning adhesive films. According to Avery, the objective technical problem which the skilled person faced on the priority date was to prevent air from being entrapped. According to Avery, the skilled person would find the solution for this problem in D6, D7, D8 or D9. These documents disclose – according to Avery – webs with channels to exhaust entrapped air. Avery contends that the skilled person would combine web with depressions (according to D3, D4 or D5) with a web with channels (according to D6, D7, D8 or D9 in combination with experimental data) and thus realize the claimed invention. Inventive activity would not be required in that respect.

49. As regards the other claims, Avery puts forward the same argumentation as for claim 1. As regards claims 4 and 5, this argumentation is apparently supplemented by D10 D11 or D12.

50. 3M believes that Avery incorrectly applies the problem-solution approach. Avery's application is a matter of hindsight. None of the combinations of documents impairs

[3] In §§ 15 and 111 Avery defence/counterclaim, Avery contends (wrongly) that claims 8 and 9 relate to a method for the use of a web in accordance with claims 1-3.

the inventive step of the inventions described in the claims of the patent. The subject matter claimed in the patent involves an inventive step.

*Problem-and-solution approach*

51. According to the Guidelines the assessment of the inventive step on the basis of he problem-and -solution approach should be based on the following (see Guidelines, part C, Chapter IV, § 9.8.1):

*"(i) determining the "closest prior art",*
*(ii) establishing the "objective technical problem" to be solved, and*
*(iii) considering whether or not the claimed invention, starting from the closest prior art and the objective technical problem, would have been obvious to the skilled person."*

52. First of all, the closest prior art must therefore be determined. According to the Guidelines the following procedure must be followed in that respect (see Guidelines, part C, Chapter IV, § 9.8.1):

*"In selecting the closest prior art, the first consideration is that it should be directed to a similar purpose or effect as the invention or at least belong to the same or a closely related technical field as the claimed invention. In practice, the closest prior art is generally that which corresponds to a similar use and requires the minimum of structural and functional modifications to arrive at the claimed invention (T606/89, not published in OJ)."*

53. Next, the objective technical problem to be solved must be formulated. This is formulated by determining the differences between the distinguishing feature(s) of the invention and the closes prior art. See Guidelines, part C Chapter IV, § 9.8.2:

*"To do this [establishing the objective technical problem to be solved] one studies the application (or the patent), the closest prior art and the difference (also called "the **distinguishing feature(s)**" of the invention) in terms of features (either structural or functional) between the invention and the closest prior art and then formulates the technical problem.*
*(...)*
*In the context of the problem-and-solution approach, the technical problem means the aim and task of modifying or adapting the closest prior art to provide the technical effects that the invention provides over the closest prior art. The technical problem thus defined is often referred to as the "**objective technical problem**"."*

54. The Guidelines warn that the formulated problem should not contain pointers to the solution (see Guidelines, part C, Chapter IV, § 9.8.2):

*"It is noted that the objective technical problem must be so formulated as not to contain pointers to the solution, since including part of a solution offered by an invention in the statement of the problem must, when the state of the art is assessed in terms of that problem, necessarily result in an ex post facto view being taken of inventive activity."*

55. Finally, it must be assessed whether the solution offered by the invention involves an inventive step. It concerns the following (see Guidelines, part C, Chapter IV, § 9.8.3):

*"In the third stage the question to be answered is whether there is any teaching in the prior art as a whole that **would** (not simply could, but would) have prompted the skilled person, faced with the objective technical problem, to modify or adapt the closest prior art while taking account of that teaching, thereby arriving at something falling within the terms of the claims, and thus achieving what the invention achieves (...).*

*In other words, the point is not whether the skilled person could have arrived at the invention by adapting or modifying the closest prior art, but whether he* ***would have done*** *so because the prior art incited him to do so in the hope of solving the objective technical problem or in expectation of some improvement or advantage (see T2/83, OJ 6/1984, 265)."*

**Claim 1**

*Application problem-and-solution approach*

56. The invention of claim 1 is essentially a carrier web with a multiple embossed pattern formed by a first embossed pattern consisting of depressions and a second embossed pattern consisting of lands with ridges in between which rise above the lands ranging from approximately 3 to 45 µm.

57. Avery – in the context of the assessment of the inventive step of claim 1 – submitted to the court seven documents which in its view constitute the closest relevant prior art. These documents disclose – stated succinctly – the following:

- D3 (the US patent US 5 141 790 (Calhoun), Avery exhibit 5) discloses a carrier web with depressions preferably distributed evenly over the surface filled with particles. An adhesive is superimposed over the web. See D3, column 3, lines 58-68). The particles ensure that the final adhesive product may be repositioned. See D3, column 2, lines 56-67.

  The examining Division had available the European patent (EP 0 429 269 B1) equivalent to D3. See International Research Report 18 September 1997 (exhibit 12). This European patent is also listed on the cover page of the patent.

  D3 is explicitly mentioned in the patent, together with D4. See [0004]:

  *"(...) U.S. Patent Nos. (...) 5,362,516 [D34] and 5,141,790 [D43] (...) disclose how the adhesive's topography is built from the interface between the adhesive and the release liner. The principal topographical features in the adhesive surface are isolated protrusions from the adhesive surface with identified contact areas."*

- D4 (the US patent US 5 632 516 (Wilson), Avery exhibit 6) also teaches the use of an adhesive product that may be repositioned by the depressions made in the release liner. See D4, column 5, lines 8-12 and column 2, lines 57-60.

- D5 (the US patent US 3 301 741 (Hendrickson), Avery exhibit 7) dates from 1963, more than 30 years *before* the priority date. Just as D3 and D4, it discloses a carrier with a pattern of depressions and a superimposed adhesive layer for repositioning. See D5, column 2, line 64 – column 3, line 1.

- D6 (the Japanese application JP 59 078 285 A (Mitsui), Avery exhibit 8) focuses on preventing and removing entrapped air. See, for example, D6, page 2, lines 17-21. It discloses a protective film with convex lines that ensure concave lines (notches) in the adhesive layer. See D6. page 2, lines 12-17.

- D7 (the British application GB 1 511 060 (Unitika), Avery exhibit 9) dates from 1974. It discloses the presence of ridges in a release liner which provide channels in the adhesive layer to exhaust air. See D7, page 3, lines 5-21.

- D8 (the Japanese utility model JP 2 587 198 (Ohike), Avery exhibit 10) discloses a release liner with recessed areas that are designed in such a way as to realize a pattern of square truncated pyramids in the adhesive layer with a height of 3 to 50 µm. See D8, par. [0012], [0014], [0021]. As a result, D8 teaches, the film cannot only be repositioned, but it is also easy to remove the

air entrapped between the adhesive layer and the surface. See [0041], [0042] and [0003], [0005], [0006], [0008] and [0009].

- D9 (the Japanese layer 59-53-787 (?), Avery exhibit 9) discloses a release liner with a pattern of protrusions which create notches in the adhesive layer exhausting the entrapped air. See D9, page 2, line 19 – page 3, line 3.

58. Considering the documents submitted to the court by Avery, D8 might be selected as the closest prior art for the subject matter described in claim 1. D8, just as all other documents, discloses a web with one pattern. However, contrary to the other documents, D8 is neither concerned with the problem of repositioning nor with the problem of entrapped air. D8 teaches that the single pattern it discloses, consisting of depressions with a special design, provides a solution for each of these problems.

58. D8 was also discussed in opposition proceedings instituted by Avery against the extension of the European patent EP 0 951 518 B1 ("Sher") of 3M (**exhibits 13 and 14**). The Opposition Division maintained the patent in an amended form, in conformance with 3M's second ancillary request (**exhibit 15**). The (interim) decision of the Opposition Division of 17 August 2005 is submitted to the court as **exhibit 16**. 3M does not concur with the decision of the Opposition Division to maintain a limited part of the patent. However, the decision of the Opposition Division regarding the second ancillary request is of interest to the present proceedings. After all, the embodiments of the second ancillary request are such that air can be exhausted *and* that the film can be repositioned. In the case of such a combination of these two options, D8 (in the opposition proceedings referred to as D3) is the closest prior art according to the Opposition Division.

See (interim) decision of the Opposition Division (3M exhibit 16), page 7:

*"The embodiment now claimed **[as summarized in the second ancillary request, see 3M exhibit 15, attorney]** provides two effects:*
*not only a good exhaustion of air from the adhesion interface, but also at least repositionability of the sheet. (...)*
*D1 **[= D6 in the present proceedings, attorney]** (...) shows one of these effects, namely the exhaustion of air, and one of the technical features, namely the microchannels.*
*D3 **[= D8 in the present proceedings, attorney]** forms part of the prior art under Article 54(2) EPC and discloses pressure sensitive adhesive sheets with a non-adhesive liner. The liner is provided with depressions and the adhesive surface is correspondingly provided with pegs ('square truncated pyramids'), with a height of 3 to 50 μm, see figures 1 and 2, page 7 paragraphs [0020] and [0021], page 8 line paragraph [0024]. The effects are that the sheet is repositionable and that air entrapped between the adhesive layer and the substrate can easily be removed, see page 10 paragraphs [0041] and [0042], and further paragraphs [0003], [0005], [0006], [0008] and [0009]. D3 thus discloses both effects and one of the technical features of the claims of the 2nd auxiliary request, namely the provision of pegs on the adhesive. It is accepted practice of the EPO to select the document having the most effects and the technical features in common with the claims under discussion as closest prior art for discussing the inventive step. In the present case that is document D3."*

60. The most distinguishing difference between on the one hand D8 and on the other hand claim 1 of the patent is the design of the embossed pattern of the carrier web. In D8, as stated earlier, there is only one pattern consisting of depressions. The invention on the other hand discloses a multiple embossed pattern: two, superimposed patterns, the first consisting of depressions and the second of lands and ridges.

61. The benefit of the invention is that each of the patterns of the carrier web may serve a different purpose.

See [0019] of the patent:

*"A feature of multiple embossed webs of the present invention is that one pattern of embossing can be used for one purpose while another pattern of embossing can be used for a different purpose."*

62. For example, in the case of release layers for adhesive, one pattern is used to exhaust the entrapped air, while the other pattern is used to reposition the film.

See [0047] and [0048] of the patent (underlining not in original):
*"[0047] When a liner is 20 is used to contact adhesive to obtain a topography produced from patterns 24 and 26, the percentage <u>area of lands 27 to surface 22</u> (B to A) can range from about 35% to about 99%. (...) Most preferably, the percentage of B to A can range from about 85% to about 95% <u>to provide adequate fluid egress</u> without adversely affecting adhesion to the supporting substrate.*
*(...)*
*[0048] The percentage of <u>depressions</u> 29 to surface 22 (D to A) can range from about 1% to about 70% (...) Most preferably, the percentage of D to A can range from about 3% to about 15% because of a balance of <u>repositionability</u> of the adhesive to final adhesive bond strength."*

63. Compared to films with a single embossed pattern with single depressions, such as D8, the invention is a substantial improvement.

See also [0071] and [0072] of the patent:
*"[0071] (...) Samples with the microchanneled pressure sensitive adhesive layer required no special application technique, were easily applied, and afforded evenly adhered graphic films with virtually no entrapped air bubbles. Any air pockets purposely formed by buckling the film were easily pressed out during application or after application. Air pocket elimination did not require that the air pocket be pressed as a bulge in the film to the edge of the sample (i.e., requiring pressure sensitive adhesive debond in adjacent areas as the pocket moves). The results also show that air bleed was in a lateral (X-Y dimensions) direction and did not require z-axis air dissipation through the films or lifting of the graphic film from the substrate. All samples adhered well to the substrates and showed no signs of undesired edge lifting.*
*[0072] In comparison, control samples were prepared from the "pit-only liner" having only embossing pattern 26 but not embossing pattern 24 [i.e.: only depressions and no lands and ridges, just as in D8, <u>attorney</u>]. The control samples required great care to prevent entrapment of many air bubbles. The trapped bubbles and pockets in the control samples prepared from the "pit-only liner" could not be pressed out without lifting the graphic or pushing the packet under the sample as it lifted."*

64. In view of the foregoing, it may be concluded that the objective technical problem facing the skilled person on the priority date was: how to improve the carrier webs to make it easier to apply adhesive films and produce a better looking result.

65. Based on the closest prior art, the invention described in claim 1 would not, as a matter of course, present itself as the solution to the skilled person.

66. As stated earlier, D8 may be regarded as the closest prior art. D8 discloses that the depressions in the carrier web that correspond to "square truncated pyramids" in the adhesive layer ensure that the film can be repositioned and that entrapped air can be exhausted. Based on D8, the skilled person, wishing to solve the objective technical problem, is directed towards the use of depressions and the special design of those. D8 does not lead the skilled person to combine the depressions with another pattern or, more in particular, with a pattern of lands and ridges.

See also (interim) decision of the Opposition Division (3M exhibit 16), page 8:

*"(...) In view of the assertion in D3* ***[= D8 in the present proceedings, attorney]*** *that the pegs/truncated pyramids do allow the exhaustion of air, a skilled person will be led to solve the problem by altering the shape and/or number of the pegs. (...) The skilled man would not necessarily be led to combine the teaching of D3 and D1* ***[= D6 in the present proceedings, attorney]*** *in such a way as to obtain a pressure sensitive adhesive sheet showing both pegs and microchannels. Only with hindsight would such a combination be seen as the straightforward solution that would offer itself to the skilled worker.*
*The subject matter of the claims of the second auxiliary request such seems to be not only novel but also to involve an inventive step.*
*(...)"*

67. The other documents submitted to the court by Avery as relevant prior art merely concern either the problem of the repositioning (D3, D4 or D5) or the problem of the entrapment of air (D6, D7 or D9). The documents relating to the repositioning do not mention or even hint at the problem of the entrapment of air. The documents relating to the entrapment of air do not mention or even hint at the problem of repositioning. The skilled person will therefore not be led, based on the documents relating to repositioning, to consult documents relating to the entrapment of air. And vice versa: the skilled person will not be led, based on the documents relating to the entrapment of air, to consult documents relating to repositioning.

68. In finding a solution to improve the carrier web to make it easier, where adhesive films are used, to apply them and produce a better looking result, inventive activity is required to recognize that two problems must be solved at once, namely the problem of the entrapment of air and the problem of repositioning. Inventive activity is also required to find the solution, namely to combine a single pattern of lands and ridges with another single pattern of depressions.

69. Although the skilled person will not do so, it must be noted that, even if the skilled person would like to combine the pattern of depressions with another pattern, he/she will not come up with the claimed invention without inventive activity. None of the documents cited by Avery indicate the manner in which the patterns should be combined. These documents do not teach the skilled person to use a first embossed pattern consisting of depressions which can be found in the second embossed pattern, whereby the second embossed pattern consists of lands and ridges rising furthermore approximately 3-45 µm above the lands. Considering prior art, the skilled person would not, as a matter of course, be led to come up with a carrier web with multiple embossed pattern.

70. In short, it follows from the correct application of the problem-and-solution approach that the invention described in claim 1 is novel.

*Secondary indicators*

71. The inventive step of the invention is illustrated by the fact that for years there has been a need to make the application of foils easier and better looking. For example, everyone who has ever hung wallpaper knows the problems caused by air bubbles and the problems you face if you hang the wallpaper and it immediately glues to the wall making it impossible to (re)position it.

72. For decades, single embossed patterns were known. These patterns consisted either solely of single depressions. See, for example, D5 which dates from 1963, and deals with the problem of repositioning. Or they consisted solely of lands with ridges, as a solution for the exhaustion of air. See, for example, D7 which dates from 1975.

73. In all those years, no-one came up with the idea of a multiple embossed pattern as described in the patent. Only single patterns were known and could be manufactured. If the invention had been obvious to the skilled person, it would not have taken

decades to produce it, given the need on the market for films that can be applied easily and properly.

*The incorrect application of the problem-and-solution approach by Avery*

74. Avery applied the problem-and-solution approach incorrectly. As a result, Avery draws the incorrect conclusion that the invention claimed in claim 1 lacks an inventive step.

<u>D3 in combination with D6, D7, D8 or D9 and experimental data</u>

75. Avery, in the first place, contends that claim 1 lacks an inventive step since – stated succinctly – the skilled person without any inventive intellectual activity would combine D3 with D6, D7, D8 or D9 and experimental data. This contention is wrong for the following reasons.

76. First of all, D8 should be regarded as the closest prior art (see above §§ 57 et seq.). D3 merely discusses one of the problems underlying the present invention, namely (improvement of) the possibility of repositioning adhesive films (see D3, column 1, lines 32-60). No mention is made of (solutions for) the exhaustion of entrapped air.

77. In as far as this Court is of the opinion that D3 should be regarded as the closest prior art, Avery inaccurately formulated the objective technical problem based on D3. After all, rather than basing the problem in the formulation on what was known to the skilled person on the basis of prior art, Avery bases the problem in the formulation on what the present patent teaches the skilled person on the benefits of the present invention (see § 43 Avery defence/counterclaim). D3 does not in any way refer to the problem of the entrapment of air. It is therefore unacceptable to specifically mention as a problem the prevention of the entrapment of air. Based on D3, the problem should be formulated as: the wish to make it easier to apply adhesive films and produce a better looking result.

78. The skilled person was not led, as a matter of course, to combine D3 with D6. After all, D3 does not mention the problem of the entrapment of air. There was thus no reason for the skilled person, based on D3, to consult documents relating to the problem of the entrapment of air. Another reason why the skilled person would not consult D6 is that it focuses on a technical field other than at issue in the invention. Contrary to the invention, D6 does not focus on large-scale adhesive films, but rather on adhesive films for optical applications, such as sunglasses (see D6, page 1 under 3, first sentence and page 3, lines 20-23).

79. Even if the skilled person had considered combining D3 with D6, he/she would not have known that both embossed patterns could be combined in the same carrier web, let alone how this should be accomplished effectively. In addition, D6 fails to disclose the distinguishing feature that the ridges rise approximately 3 – 45 μm above the lands. On the contrary, according to D6 it is essential that the convex lines amount to 1 to 15 μm. The invention clearly opposes this view. Even ridges of more than 15 μm have the desired effect.

80. In the US proceedings (the parent company of) Avery, in the context of the lack of an inventive step, also appealed to D3 in combination with D6. The US court, however, ruled that claim 1 of the US patent involves an inventive step in the light of these documents. See 3M exhibit 11A, page 5.

81. Nor was there any reason for the skilled person to combine D3 with D7. Even if the skilled person were to consult D7, this document moves away from the utilization of ridges rising approximately 3 – 45 μm above the lands. After all, it is evident from D7, table 2 on page 4, that the full exhaustion of air is only realized with ridges of 60 μm or, preferably, higher. Based on a combination of D3 and D7, the skilled person would thus not come up with a range of approximately 3 – 45 μm.

82. A combination of D3 with D7 was also discussed in the US proceedings. In the light of this combination, the US court also ruled that claim 1 of the US patent involves an inventive step. See exhibit 11A, page 6.

83. Based on D3, the skilled person would not consult D8 either, and at any rate not come up with the present invention. After all, D8, just as D3, merely concerns the utilization of depressions. The utilization of a second pattern consisting of lands and ridges is not disclosed in any way.

84. Finally, the skilled person would not combine D3 with D9 either. Based on D3, there was no reason for the skilled person to consult D9. And vice versa (see § 62 Avery defence/counterclaim): based on D9, there was no reason for the skilled person to consult D3. Moreover, D9 does not demonstrate how the patterns of D9 and D3 should be combined. Nor does D9 disclose anything relating to the height of the ridges in relation to the lands. 3M contests that the skilled person, by way of simple experimental measurements, might come up with the claimed range of approximately 3 – 45 µm. Based on the adhesive layer thickness, a skilled person would not come up with a range of 3 – 45 µm without inventive activity.

<u>D4 in combination with D6, D7, D8 or D9 and experimental data</u>

85. Avery contends that claim 1 does not involve an inventive step either, because the skilled person without any inventive intellectual activity would combine D4 with D6, D7, D8 or D9 and experimental data. That is incorrect.

86. Just as D3, D4 discloses (merely) the utilization of a single pattern consisting of depressions. D4 also solely focuses on the problem of repositioning. The previous statement relating to D3 also applies to D4. D4 even moves the skilled person away from the utilization of patterns of lands and ridges. See D4, column 2, lines 22-30 noting that such patterns (of concave/convex lines) result in an adhesive layer with insufficient adhesive strength and whose adhesion alters in the course of time.

<u>D5 in combination with D6, D7, D8 or D9 and experimental data</u>

87. Avery also contends that a skilled person would combine D5 with D6, D7, D8 or D9 and experimental data and thus come up with the subject matter described in claim 1. This is based on the same incorrect reasoning as with D3 and D4 in combination with D6, D7, D8 or D9 and experimental data. In order to avoid needless repetition, 3M therefore refers to what is stated above in relation to D3 and D4 in combination with D6, D7, D8 or D9 and experimental data.

*Conclusion*

88. The conclusion is that, on the priority data, the skilled person was not led, as a matter of course, to come up with the distinguishing features claimed in claim 1.

**Claims 2 and 3**

89. Claims 2 and 3 depend on claim 1. In view of the foregoing, the inventions described in these claims also involve an inventive step.

**Claim 4**

90. Avery contends that the invention of claim 4 lacks an inventive step in the light of D10, D11 or D12. This contention is incorrect.

91. On the priority date, the skilled person was not led, as a matter of course, to combine a first pattern consisting of depression with a second pattern of lands and ridges. Please refer to the statements in this context in claim 1. Furthermore, inventive

activity is required to combine these patterns according to the working method claimed in claim 4.

92. It cannot be derived from D10, D11 and D12 that the first and second pattern could be combined, let alone how to do so. D10, D11 and D12 concern a technical field entirely different from the field which the patent concerns. The skilled person would not consult these documents. Furthermore, the embossed patterns disclosed in these documents are of an entirely different scale than those described in the patent.

- D10 (the US patent application US 3 887 678 (Lewicki), Avery exhibit 12) is mentioned in the international search report (see 3M exhibit 12). It concerns "embossed laminar floor material made with a resilient foam backing" (D10, column 1, lines 8-10). D10 does not concern adhesive films and materials important in that respect. The applied embossed patterns are furthermore 10 "mils" (= 1/1,000 inch = 0.2540 mm = 254 μm) or more (see, for example, D10, column 4, line 53).

- D11 (the international patent application WO 93/01047 (Tribble), Avery exhibit 13) concerns "deep embossed plastic films" for use in "the disposables field, in agricultural applications and in packaging applications" (see D11, page 6, lines 9-13). The height of one of the embossed patterns is between 2.5 and 15 "mil" (i.e. between 63.5 and 381 μm!) (see, for example, D11, page 3, lines 24-25).

- D12 (the European application EP 0 313 766 A2 (Cable), Avery exhibit 14) also forms part of the granting file (see 3M exhibit 12). It discloses "apertured plastic films for use in absorbent products". One of the patterns is 0.3 mm (300 μm) or more.

93. In short, the invention as described in claim 4 involves an inventive step.

**Claims 5, 6 and 7**

94. Claims 5, 6 and 7 depend on claim 4. It follows from the foregoing that, on the priority date, the working methods described in these claims would not be obvious to the skilled person either.

**Claim 8**

95. Avery contends that the invention of claim 8 does not involve an inventive step, with reference to its contentions in the context of the inventive step of claim 1.

96. The invention of claim 8 does involve an inventive step. This claim concerns a specific kind of carrier webs according to claims 1-4, namely as a release liner for a pressure sensitive adhesive. In this respect, 3M refers, for the sake of brevity, to its statements in relation to claims 1-4.

**Claim 9**

97. Avery is also of the opinion that the invention described in claim 9 is obvious to the skilled person. It bases this on the contentions put forward in paragraph 3.1.2 Avery defence/counterclaim in respect of the inventive step of claim 1.

98. The invention of claim 9 was not obvious to the skilled person. None of the documents invoked by Avery in this respect disclose the use of a web as an end product for the storage of another material or indicate such use to the skilled person. 3M also refers to its statements in relation to claims 1-4, to which claims claim 9 refers.

**Conclusion**

99. The inventions described in the claims of the patent are the result of inventive activity. The patent can thus not be nullified on the grounds of the lack of an inventive step in the sense of Section 75 (1) (a) in conjunction with Section 4 of the Dutch Patents Act 1995.

**NO EXTENSION OF SUBJECT MATTER**

100. According to Avery, the patent should also be revoked as its subject matter was not covered by the content of the patent application (PCT application WO 98/ 29231, Avery exhibit 2).

101. Avery contends, first of all, that the subject matter is extended since during the granting proceedings the words "multiple sequentially embossed" in claim 1 of the original application had been changed into "multiple embossed" and the words "substantially preserved" were removed from claim 1. This contention is incorrect.

102. Subject matter is extended in the sense of Section 75 (1) (c) of the Dutch Patents Act 1995 if the "subject matter of the patent extends beyond the content of the patent application". The question is therefore whether the subject matter as claimed in claim 1 of the patent is sufficiently based on the description of WO 98/ 29231. This is the case.

103. During the granting proceedings, claim 1 of WO 98/ 29231 was amended. The phrase "a carrier web, comprising: at least one surface that is multiple, sequentially embossed with a pattern" was replaced by "a carrier web, comprising: at least one surface that is a multiple embossed pattern". The words "substantially preserved" were furthermore removed from claim 1. The amendments to claim 1 were based on the fact that according to the case law of the European Patent Office (see, for example, T 150/82 and T205/83) and considering the Guidelines (see, for example, part C.III.4.7 a, b) a product must preferably be defined on the basis of the distinguishing features occurring in the end product rather than on how it is obtained. However, the subject matter was not extended.

104. The distinguishing feature "multiple embossed" without the addition "sequentially" is sufficiently based on the application. This distinguishing feature is frequently mentioned in WO 98/ 29231. It is even explicitly defined:

See page 2, lines 19-24:

*"Multiple embossed" means two or more embossing patterns are superimposed on the web to create a complex pattern of differing depths of embossing."*

105. It cannot be derived from the description that the distinguishing feature "multiple embossed" is or should be confined to a multiple embossed pattern that has been obtained in a certain way, e.g. by the sequential application of the different embossed patterns. Furthermore, as regards the "multiple embossed" patterns or webs, the description not only discusses the multiple step application of the multiple embossed pattern. It specifically refers to the possibility of applying the multiple embossing in a single step. See WO 98/ 29231, page 2, lines 30-31:

*"(...) the multiple embossing steps could be combined into a single step with the design of a suitable tool or mold (...)"*

106. Other than contended by Avery (in § 82 Avery defence/counterclaim), the sequential method to obtain the claimed multiple embossed pattern of claim 1 is not essential to the invention as described in that claim. In as far as relevant, this was not contended in the US granting proceedings – contrary to what Avery contends. Nor can it be derived from the passage cited by Avery from a document from the US

granting proceedings (Avery exhibit 17, page 5) that the invention is restricted to this. The claims of the US patent are in any event not identical to the European patent.

107. Although the words "substantially preserved" were removed from claim 1, this does not imply an extension of the subject matter. It follows in any event from the distinguishing feature in the present claim 1 that "the depressions of the first embossed pattern reside in the second embossed pattern" that the first pattern must continue to be visible after applying the second pattern.

108. Secondly, Avery contends that the subject matter is extended because the distinguishing feature that "the depressions of the first embossed pattern reside in the second embossed pattern" did not occur in the original claim 1. This contention is also incorrect.

109. Figure 3 of WO 98/ 29231 clearly demonstrates that the depressions of the first embossed patterns reside in the second embossed pattern. This is also explicitly stated in the description. See WO 98/ 29231, page 8, line 4 which states that "depressions 29 residing in both lands 27 and ridges 28". The distinguishing feature that "the depressions of the first embossed pattern reside in the second embossed pattern" is therefore sufficiently based on application WO 98/ 29231.

110. In short, the subject matter of the patent is covered by the content of the filed application. The patent can thus not be nullified on the grounds of the provision in Section 75 (1) (c) of the Dutch Patents Act 1995.

**WORKING THE PATENT**

111. Avery, finally, contends that claim 4 cannot be worked by the skilled person. The working of the other claims is not contested. Essentially, Avery contends that, in respect of the working method claimed in claim 4, the claim inadequately discloses how the first embossed pattern can be maintained upon applying the second pattern. The description would supply insufficient information on, for example, the pressure and/or the temperature that should be used.

112. The essence of the invention described in claim 4 is that upon applying the second pattern (of lands and ridges), the first pattern (of depressions) is maintained. The description contains detailed examples of obtaining sequentially a multiple embossed pattern in the sense of the patent. Examples 1 and 2 specify the distinguishing features of the two embossed patterns. Based on simple, routine testing, the skilled person will be able to realize the required pressure and temperature in order to create the multiple embossed pattern. Furthermore, example 3 not only specifies the distinguishing features of the two embossed patterns, but also indicates in great detail which temperature and pressure are required.

113. Avery's contention that claim 4 cannot be worked by the skilled person is therefore incorrect. The description combined with the general expertise enable the skilled person to apply the working method claimed in this claim. This claim can thus not be nullified on the grounds of the provision in Section 75 (1) (b) of the Dutch Patents Act 1995.

**CONCLUSION**

114. It follows from the foregoing that none of the grounds put forward by Avery impair the validity of one or more claims of the patent. Avery's claims to nullify the Dutch part of the patent must therefore be dismissed.

**CONCLUDING IN THE COUNTERCLAIM:**

May it please the Court:

- to disallow Avery's counterclaims, or alternatively, to dismiss these counterclaims;
- to order Avery to the pay the costs of the counterclaim proceedings;
- to declare the judgment immediately enforceable.

Local Counsel

[signed]

**SUMMARY OF EXHIBITS IN THE REPLY TO THE COUNTERCLAIM**

**Exhibit 10**: The US patent US 5 897 930, a US parallel patent of the present patent;

**Exhibit 11**: Relevant documents from the US proceedings relating to the US patent US 5 897 930 between 3M and the (parent company of) Avery;
A. "Special Verdict Form" of 21 December 2005;
B. "Jury Verdict" of 23 December 2005; and
C. "Order" of US District Court of Minnesota of 17 March 2006;

**Exhibit 12**: The international search report of the present patent;

**Exhibit 13**: The European patent EP 0 951 518 B1;

**Exhibit 14**: The Dutch translation of the European patent EP 0 951 518 B1;

**Exhibit 15**: The second auxiliary request regarding the European patent EP 0 951 518 B1, in which form the patent was maintained by the Opposition Division by the (interim) decision of 17 August 2005; and

**Exhibit 16**: The (interim) decision of the Opposition Division of 17 August 2005.

Brinkhof

ADVOCATEN

**Rechtbank 's-Gravenhage**
Rolnummer: 2005/3435
Zitting d.d. 12 juli 2006

**CONCLUSIE VAN ANTWOORD IN RECONVENTIE**

**namens:**

de vennootschap naar vreemd recht
**3M COMPANY,**
gevestigd te St. Paul, Minnesota,
Verenigde Staten van Amerika,

eiseres in conventie,
verweerster in reconventie,

procureur: mr. P.J.M. von Schmidt auf Altenstadt,
advocaten: mrs. J.J. Brinkhof en R.E. Ebbink,

**tegen:**

de besloten vennootschap
**AVERY DENNISON MATERIALS NEDERLAND B.V.,**
gevestigd te Leiden,

gedaagde in conventie,
eiseres in reconventie,

procureur: mr. W.P. den Hartog,
advocaat: mr. D.J.B. Bosscher.

* * * * * * * * * * * * * * * * * * * * * * * *

Brinkhof

ADVOCATEN

Edelachtbaar college,

Eiseres in conventie, tevens verweerster in reconventie, hierna te noemen: "3M", zegt en concludeert als volgt voor conclusie van antwoord in reconventie. Gedaagde in conventie, tevens eiseres in reconventie, zal daarbij verder worden aangeduid als "Avery".

**INLEIDING**

1 3M heeft Avery op 4 oktober 2005 gedagvaard in de onderhavige procedure in conventie ter verkrijging van een inbreukverbod met nevenvorderingen op basis van haar Europese octrooi EP 1 011 955 B1 (het "octrooi"). Avery heeft op 8 maart 2006 haar conclusie van antwoord, tevens conclusie van eis in reconventie ("CvA/CvE ir") ingediend.

> NB: Avery heeft in haar CvA/CvE ir erop gewezen dat 3M bij dagvaarding geen bewijs heeft overgelegd van de geldigheid van haar octrooi in alle gedesigneerde landen. 3M stelt vast dat Avery die geldigheid niet heeft betwist. Desondanks zal 3M bij separate akte van heden dit bewijs als **productie 9** in de procedure brengen.

2 Avery vordert in reconventie de vernietiging van het Nederlandse deel van het octrooi, stellende dat sprake is van:

a) gebrek aan nieuwheid (art. 75 lid 1 sub a jo. art. 4 ROW 1995);
b) gebrek aan inventiviteit (art. 75 lid 1 sub a jo. art. 6 ROW 1995);
c) uitbreiding van materie (art. 75 lid 1 sub c ROW 1995); en
d) niet-nawerkbaarheid (art. 75 lid 1 sub b ROW 1995).

3 Volgens 3M dienen de reconventionele vorderingen van Avery te worden afgewezen. Het octrooi betreft een uitvinding die nieuw en inventief is. Voorts is geen sprake van uitbreiding van beschermingsomvang en is het octrooi nawerkbaar. 3M zal dit hieronder toelichten en op elk van de door Avery aangevoerde nietigheidsargumenten ingaan.

4 Alvorens in te gaan op Avery's nietigheidsargumenten, acht 3M het wenselijk om bepaalde begrippen van het octrooi nader te bespreken. In haar conclusie geeft Avery namelijk aan diverse begrippen in de conclusies van het octrooi een onjuiste uitleg. Deze uitleg hanteert Avery niet alleen in het kader van de inbreukvraag. Deze komt ook terug in Avery's argumentatie ter zake van haar reconventionele vordering tot vernietiging van het octrooi.

5 Volledigheidshalve betwist 3M de juistheid en volledigheid van de stellingen van Avery, voor zover deze niet uitdrukkelijk door 3M worden onderschreven. Voorts biedt 3M aan, voor zover op haar enige bewijslast rust, al haar stellingen te bewijzen door alle middelen rechtens, in het bijzonder door het doen horen

van deskundigen en/of getuigen. 3M biedt in het bijzonder bewijs aan, voor zover op haar enige bewijslast rust, van de feiten en omstandigheden die ten grondslag liggen aan haar stellingen dat haar octrooi nieuw en inventief is, dat geen sprake is van uitbreiding van materie en dat haar octrooi nawerkbaar is. 3M vraagt de Rechtbank in dat verband haar te gelegener tijd zonodig in de gelegenheid te stellen namen van getuige(n)/deskundige(n) op te geven.

## HET OCTROOI

6 Avery geeft aan de volgende begrippen in conclusie 1 van het octrooi een onjuiste uitleg.[1]

### "multiple embossed pattern"

7 Volgens Avery zou "*embossed pattern*" in conclusie 1 betekenen "door middel van bosseleren" (zie o.m. §§ 9, 20 en 21 CvA/CvE ir). Volgens Avery zou de vertaling van dit begrip daarom moeten verwijzen naar de werkwijze waarmee het reliëf is verkregen. Dit standpunt is onbegrijpelijk en onjuist.

8 De term "embossed pattern" betekent niet meer dan reliëfpatroon. Hetzelfde geldt voor de woorden "geprägtes Muster" en "motif à gaufrage" in resp. de Duitse en Franse vertaling van conclusie 1. De werkwijze waarmee het reliëf is verkregen, doet niet ter zake. Dit volgt ook uit de definitie van de woorden "embossed" en "pattern" in de beschrijving van het octrooi. Zie [0010] en [0011]:.

> *"**[0010]** "Embossed" means a topography on a web or on tooling having an effective three-dimensional pattern that generates a difference in surface planar dimension in the liner or the tooling.*
> ***[0011]** "Pattern" means any formation of embossings that can utilize any theory of geometry, including without limitation, Euclidian geometry and fractal geometry."*

9 Voor de volledigheid wordt opgemerkt dat Avery een onjuist begrip hanteert van de term bosseleren (zie § 10 CvA/CvE ir). Anders dan Avery stelt, is deze term niet beperkt tot "het aanbrengen van een reliëfpatroon in een weefsel door het indrukken met een *stempelkop* uit een harder materiaal". De term bosseleren omvat allerlei methoden voor het aanbrengen van een reliëfpatroon.

10 Avery stelt ook ten onrechte dat het reliëfpatroon volgens conclusie 1 in twee, sequentiële stappen moet zijn verkregen (zie § 11 CvA/CvE ir). In de beschrijving van het octrooi wordt namelijk niet alleen gesproken over het in meerdere stappen aanbrengen van het meervoudig reliëfpatroon. Uitdrukkelijk wordt de

1 3M stelt zich op het standpunt dat de Nederlandse vertaling van het octrooi juist is. Zij zal in deze conclusie – net als in de dagvaarding – dan ook (mede) de terminologie uit de vertaling gebruiken.

mogelijkheid genoemd het meervoudig reliëfpatroon in één keer aan te brengen.

> Zie [0014] van het octrooi:
> *"(...) the multiple embossing steps could be combined into a single step with the design of a suitable tool or mold (...)"*
>
> Zie ook [0056] van het octrooi:
> *"Euclidean geometric patterns can be formed (...) in any number of steps".*

11 Dat het patroon ook in één keer kan worden aangebracht, wordt door Avery zelf bevestigd in § 33 CvA/CvE ir.

12 Ook uit het begrip "multiple" in de zin van "multiple embossed pattern" kan niet worden afgeleid dat het reliëfpatroon niet in één keer kan worden aangebracht. De term "multiple embossed" betekent niet meer dan dat twee patronen over elkaar zijn geplaatst en beide zichtbaar zijn. Zie [0012] van het octrooi:

> ***"[0012]*** *"Multiple embossed" means two or more embossing patterns are superimposed on the web to create a complex pattern of differing depths of embossing."*

**"depressions"**

13 Volgens Avery moeten "depressions" opvulbaar zijn (zie § 9 CvA/CvE ir). Derhalve, aldus Avery, zou de term "depressions", in plaats van met "indrukkingen", moeten worden vertaald als "holtes" of "uitsparingen" omdat daarmee beter tot uitdrukking zou komen dat deze elementen opvulbaar zijn (zie § 22 CvA/CvE ir).

14 Het woord "indrukking" is een correcte vertaling van het woord "depression". Uit het octrooi volgt bovendien niet dat "depressions" altijd opgevuld moeten zijn. Zo is in voorbeeld 1 sprake van niet gevulde indrukken.

> Zie [0066] van het octrooi (onderstreping niet in origineel):
> *"An embossed Controltac TM Plus liner (commercially available from 3M, St. Paul, MN) with empty depressions was embossed (...)".*

**"array"**

15 Avery stelt voorts dat "array" niet "reeks" betekent, maar een "geordende reeks" of "matrix" (zie §§ 9 en 23 CvA/CvE ir). Volgens Avery is een willekeurig of chaotisch patroon geen "array".

16 De vertaling van "array" met "reeks" is juist. Avery's beperkte uitleg van het woord "array" volgt niet uit de beschrijving. De beschrijving vermeldt uitdrukkelijk dat de patronen gebruik kunnen maken van alle mogelijke meetkundige theorieën, waaronder maar niet beperkt tot Euclidische en fractale geometrie. Bijvoorbeeld de genoemde fractale geometrie kenmerkt zich door de grillige, willekeurig en chaotische, althans als zodanig ogende, vorm.

> Zie [0011] van het octrooi:
> *"Pattern" means any formation of embossings that can utilize any theory of geometry, including without limitation, Euclidian geometry and fractal geometry."*
>
> Zie ook [0049], laatste, zin van het octrooi:
> *"In other words, the depressions 29 can assume any solid geometric desired by those skilled in the art, within the percentage areas expressed above."*

17 Er is niets in het octrooi dat de vakman leert dat de indrukken uitsluitend geordend kunnen zijn gerangschikt in de zin van een matrix. Dit wordt ook bevestigd door de volgende passage uit de beschrijving.

> Zie [0063] van het octrooi:
> *"(...) the array of combinations possible, given the multitude of possible embossed patterns, the multiplicity of embossed patterns (...)"*

18 Kortom, dat een reeks er per se geordend uit moet zien, is onjuist.

## NIEUWHEID

19 Avery stelt zich op het standpunt dat conclusies 1, 2, 3, 4, 8 en 9 van het octrooi nietig zijn wegens gebrek aan nieuwheid. Volgens Avery is de uitvinding zoals neergelegd in conclusie 1 geopenbaard in D1 (US 4 986 496 (Marentic), Avery productie 3) en in D2 (US 5 405 675 (Sawka), Avery productie 4). De uitvinding zoals neergelegd in conclusies 2, 3, 4, 8 en 9 is volgens Avery geopenbaard in D2.

> Nb. Als afkorting voor de documenten waarop zij zich beroept in het kader van nieuwheid en inventiviteit, hanteert Avery de aanduiding "D" gevolgd door een nummer. Hoewel ongebruikelijk in nationale nietigheidsprocedures zal 3M Avery hierin volgen en de Avery producties 3-14 hierna aanduiden als resp. D1-D12.

20 Een document is nieuwheidsschadelijk wanneer daarin direct en ondubbelzinnig *alle* kenmerken zijn geopenbaard van de uitvinding zoals geclaimd. Zoals hieronder zal worden toegelicht, openbaart D1 niet alle kenmerken van conclu-

sie 1 van het octrooi en D2 niet alle kenmerken van conclusies 1, 2, 3, 4, 8 en 9. Deze documenten zijn dan ook niet nieuwheidsschadelijk.

21 D2 is door (de moedermaatschappij van) Avery zonder succes ingeroepen in de Amerikaanse procedure met betrekking tot US 5 897 930, een Amerikaanse parallel octrooi van het onderhavige octrooi. Geoordeeld werd dat D2 niet de nieuwheid aan conclusie 1 van het Amerikaans octrooi ontneemt, welke conclusie (nagenoeg) gelijk luidt aan conclusie 1 van het onderhavige octrooi. Als **producties 10** en **11** worden het Amerikaanse octrooi en de relevante stukken uit de Amerikaanse procedure overgelegd.

**US 4 986 496 (D1)**

22 D1 betreft een "drag reduction article". Dit is - kort gezegd - een buigzaam foliemateriaal waarvan het oppervlak een bepaald patroon heeft om luchtweerstand ("drag") te verminderen wanneer fluïdum stroomt over het oppervlak waarop de folie is bevestigd (zie D1, k. 2, r. 5-9). D1 noemt de mogelijkheid (een laag) lijm aan te brengen. Echter niet - zoals Avery suggereert - op het oppervlak met het patroon, maar op het aan de andere zijde gelegen (vlakke) oppervlak (zie D1, k. 6, r. 62-64). Het oppervlak met het patroon bestaat uit parallelle pieken en valleien (zie D1, k. 5, r. 27-29 en conclusie 1). Figuur 5 toont pieken 28 én 30 gescheiden door valleien 22, waarbij pieken 28 en 30 parallel zijn, maar pieken 28 een andere hoogte hebben dan pieken 30 (zie D1, k. 5, r. 37-39).

23 Avery meent dat figuur 5 van D1 een meervoudig reliëfpatroon openbaart bestaande uit "depressions" (indrukken), "lands" (laaggelegen delen) en "ridges" (randen). Avery verwijst daarbij naar een door haar gemaakte detailtekening (Avery productie 15, onderste figuur). Deze detailtekening is echter geen vergroting van (een deel van) figuur 5 van D1, maar een tekening waarbij de relatieve hoogte van de pieken en valleien is gewijzigd ten opzichte van het origineel. Bovendien is daaraan een stippellijn toegevoegd (aangeduid met 28a) tussen de toppen van de pieken 30, die niet in figuur 5 voorkomt. Voor zover 3M begrijpt, stelt Avery zich op het standpunt dat:

- de dalen 22 ("valleys") in figuur 5 corresponderen met de indrukken volgens conclusie 1;
- de pieken 28 ("peaks") in figuur 5 corresponderen met de randen volgens conclusie 1; en
- de *denkbeeldige* lijn die Avery tussen de toppen van de pieken 30 in figuur 5 heeft getekend, correspondeert met de laaggelegen delen volgens conclusie 1.

24 3M betwist dat (figuur 5 van) D1 een meervoudig reliëfpatroon openbaart met een eerste reliëfpatroon (gevormd door indrukken) én een tweede reliëfpatroon (gevormd door laaggelegen delen en randen tussen die laaggelegen delen) in de

zin van het octrooi. Immers, als met Avery er vanuit zou worden gegaan, hoewel dit wordt betwist door 3M, dat de indrukken van het eerste reliëfpatroon in figuur 5 worden gevormd door de dalen 22 en de randen van het tweede reliëfpatroon door de pieken 28, openbaart D1 in elk geval geen laaggelegen delen in de zin van het octrooi.

25 Uitgaande van de bewoordingen van conclusie 1, is een "laaggelegen deel" een zeker continu vlak omgeven door randen. Deze uitleg wordt bijvoorbeeld bevestigd door figuur 3 van het octrooi. Dat bij een laaggelegen deel sprake moet zijn van een vlak volgt ook uit de functie van dit kenmerk indien het reliëfoppervlak van D1 dienst doet als beschermlaag ("release liner") voor een drukgevoelig kleefmiddel. In dat geval zorgen de laaggelegen delen van de beschermlaag er immers voor dat in ieder geval dat deel van de kleeflaag dat overeenkomt met die laaggelegen delen kleeft aan de ondergrond. Zie bijv. [0047] van het octrooi.

26 De denkbeeldige lijn tussen de toppen van de pieken 30 die Avery *zelf* heeft getekend in de door haar gemaakte detailtekening van figuur 5 (Avery productie 15), wordt niet in D1 geopenbaard. Deze denkbeeldige lijn vormt ook geen laaggelegen deel. Van een continu vlak tussen de toppen van pieken 30 is daarbij immers geen sprake. Voor zover Avery dat zou betogen, zijn ook de toppen van pieken 30 niet als laaggelegen delen in de zin van het octrooi aan te merken. De toppen worden immers nergens begrensd door hoger gelegen randen en zijn bovendien geen continu vlak.

27 D1 openbaart evenmin het kenmerk dat "the height of the ridges over the lands ranges from 3 to about 45 μm" (de hoogte van de randen boven de laagten uiteenloopt van ca. 3 tot ca. 45 μm). Uit de door Avery aangehaalde passage (D1, k. 5, r. 65 - k. 6. r. 2) kan dit niet worden afgeleid. Daarin staat immers slechts dat de hoogte van pieken kan variëren tussen de 20 tot 400 μm. Uit deze informatie over de hoogte van de pieken, is de afstand tussen de door Avery in figuur 5 als randen en laaggelegen delen aangemerkte delen niet duidelijk en direct af te leiden. Dat het mogelijk zou zijn dat deze afstand binnen het geclaimde bereik van ca. 3 tot ca. 45 μm zou kunnen liggen, is onvoldoende om op basis daarvan gebrek aan nieuwheid aan te nemen.

> Zie bijv. TKvB 30 augustus 1994 (T met 943/93):
>
> *"2.5. (...) A hypothetical possibility of operating within the claimed region per se is legally not sufficient to destroy the novelty of this region, particularly if the skilled person has no technical motive and there exists no practical necessity to work within this region."*

28 Kortom, D1 openbaart niet direct en ondubbelzinnig alle kenmerken van conclusie 1 van het octrooi. In elk geval ontbreekt een tweede reliëfpatroon bestaande uit laaggelegen delen en randen tussen die laaggelegen delen. Afgezien daarvan openbaart D1 geen randen en laaggelegen delen waarbij de af-

stand tussen deze delen ligt binnen het in conclusie 1 geclaimde bereik van ca. 3 tot ca. 45 µm.

**US 5 405 675 (D2)**

29 D2 heeft betrekking op een "embossed multilayer film" bestaande uit een basislaag met reliëf en een daaroverheen liggende, beschermende oppervlaklaag (zie D2, k. 1, r. 7-10). Het reliëf heeft enkel een decoratieve functie (zie bijv. D2, k. 1, r. 28-32). Het kan bestaan uit een achtergrondpatroon, een opschrift of een logo of combinaties daarvan (zie D2, k. 2, r. 41-45). Figuur 1 openbaart een reliëfpatroon bestaande uit indrukken 16 en randen 18 ("depressions 16 and ridges 18"). Bijzonderheden worden verder niet gegeven. In de beschrijving wordt opgemerkt dat dit patroon louter illustratief is (zie D2, k. 4, r. 11-19). Verdere details over mogelijke reliëfpatronen worden in D2 niet geopenbaard.

*Conclusie 1*

30 Avery meent dat D2 een meervoudig reliëfpatroon in de zin van conclusie 1 van het octrooi openbaart. Daaraan legt zij (een uitvergroting van) figuur 1 ten grondslag, waarin zij een aantal verwijzingen heeft toegevoegd en bepaalde onderdelen wel tot het eerste en tweede reliëfpatroon rekent en andere onderdelen niet (zie Avery productie 16). Naar de mening van 3M is in D2 geen sprake van een meervoudig reliëfpatroon zoals geclaimd in conclusie 1 van het octrooi.

31 Allereerst ontbreekt een eerste reliëfpatroon dat een reeks indrukken vormt. Uitsluitend één van de indrukken 16 in figuur 1 (door Avery aangeduid met 16(2)) dient volgens Avery te worden aangemerkt als een indruk in de zin van het octrooi. Uitgaande van Avery's interpretatie is geen sprake van een *reeks* indrukken. D2 leert namelijk niet dat indruk 16(2) meerdere malen voorkomt. De beschrijving spreekt weliswaar over "a series of alternating depressions 16" (zie D2, k. 4, r. 11-13). Uit deze woorden blijkt echter niet direct en ondubbelzinnig dat het patroon van figuur 1 wordt herhaald. Het is ook onduidelijk hoe het gehele meervoudig reliëfpatroon eruit zou moeten zien. Het linker- en rechterdeel van het patroon van figuur 1 passen namelijk niet eenvoudig aan elkaar, omdat de hoogte van het uiterst links gelegen vlak (boven verwijzingscijfer 20) niet overeenkomt met dat van het in de figuur uiterst rechts gelegen vlak (onder verwijzingscijfer 14).

32 Voorts ontbreekt in (figuur 1 van) D2 een tweede reliëfpatroon bestaande uit laaggelegen delen en randen tussen die laaggelegen delen. Volgens Avery is in figuur 1 slechts één van de randen 18 (door Avery aangeduid met 18(1)) alsmede een door Avery met X aangeduid deel aan te merken als een rand in de zin van het octrooi. Verder is volgens Avery in figuur 1 één van de indrukken 16 (door Avery aangeduid met 16(1)) een laaggelegen deel in de zin van het octrooi. Deze keuze van Avery is volstrekt arbitrair en ongeloofwaardig. Als 18(1) moet worden aangemerkt als rand in de zin van het octrooi, waarom geldt dit dan niet ook

voor het door Avery met 18(2) aangeduide onderdeel? In elk geval is in de uitleg van Avery geen sprake van laaggelegen *delen*, maar slechts van één laaggelegen deel. Zoals uiteengezet in voorgaande paragraaf, blijkt immers uit niets dat het patroon van figuur 1 wordt herhaald. Verder is geen sprake van randen tussen die laagten.

33 Voorts ontbreekt in Avery's interpretatie het kenmerk dat de indrukken van het eerste reliëfpatroon zich bevinden in het tweede reliëfpatroon. Immers, het tweede reliëfpatroon bestaat volgens Avery uitsluitend uit onderdelen 18(1), 16(1) en x. Het eerste reliëfpatroon, het door Avery als indruk aangeduide 16(2), bevindt zich niet in dat tweede patroon.

34 Tot slot openbaart D2 niet direct en ondubbelzinnig wat de hoogte is van de randen ten opzichte van het laaggelegen gedeelte. D2 leert slechts dat de "depth of the embossed pattern preferably represents not more than one-third of the total thickness of base layer 12" (zie D2, k. 4, r. 6-9). Hoe de diepte van het reliëfpatroon moet worden berekend, is onduidelijk. Gaat het om het verschil tussen het hoogste en laagste punt van het reliëf (in figuur 1 het verschil tussen 18(1) en 16(2))? Of misschien het gemiddelde hiervan? Of gaat het om hoeveel het hoogste punt uitstijgt boven de oorspronkelijke dikte van de basislaag? In elk geval kan hieruit niet worden afgeleid wat de hoogte is van de door Avery als randen getypeerde onderdelen 18(1) en x ten opzichte van het als laaggelegen gedeelte aangemerkt onderdeel 16(1), laat staan dat dit valt binnen het geclaimde bereik van ca. 3 tot ca. 45 µm.

35 Uit het voorgaande volgt dat D2 niet alle kenmerken openbaart van conclusie 1 van het octrooi.

*Conclusies 2 en 3*

36 Hoewel Avery op dit punt niet helemaal duidelijk is, lijkt zij zich op het standpunt te stellen dat de materie van conclusie 2 niet nieuw is in het licht van D2 (zie § 64 CvA/CvE ir). Dit wordt echter niet onderbouwd. Avery stelt zich ook op het standpunt dat de in conclusie 3 neergelegde uitvinding niet nieuw is gelet op D2 (zie § 66 CvA/CvE ir). Beide stellingen zijn onjuist.

37 Conclusies 2 en 3 zijn afhankelijk van conclusie 1. Nu D2 niet de nieuwheid aan conclusie 1 ontneemt, kan het ook niet de nieuwheid aan conclusies 2 en 3 ontnemen.

*Conclusie 4*

38 Avery meent dat D2 nieuwheidsschadelijk is voor de in conclusie 4 geclaimde werkwijze. Dat is niet het geval.

Brinkhof

ADVOCATEN

39 Zoals hierboven uiteengezet in het kader van conclusie 1, openbaart D2 geen eerste patroon van indrukken en een tweede patroon van laaggelegen gebieden en randen. D2 openbaart derhalve ook geen werkwijze waarbij eerst een dergelijk eerste patroon wordt aangebracht en daarna een dergelijk tweede patroon.

40 Afgezien daarvan, is bij de in D2 geopenbaarde werkwijze niet voldaan aan het kenmerk dat de door de eerste stap van reliëfvorming gecreëerde indrukken in hoge mate bewaard blijven bij de tweede stap van reliëfvorming, hoewel deze tweede stap van reliëfvorming het tweede patroon over de bij de eerste stap van reliëfvorming gecreëerde indrukken heen aanbrengt. In de door Avery aangehaalde passages (D2, k. 2, r. 41-45, k. 10, r. 10-16 en k. 15, r. 52-60) van de beschrijving van D2 wordt weliswaar gesproken over het achtereenvolgens aanbrengen van patronen, maar daaruit volgt niet dat het eerste patroon behouden blijft als het tweede patroon daarover wordt aangebracht. In tegendeel. De woorden "re-embossed" en "re-embossable" in deze passages wijzen erop dat het tweede patroon juist het eerste patroon overschrijft. Deze uitleg wordt bevestigd door o.m. de volgende passages in de beschrijving van D2.

> D2, k. 4, r. 20-34:
> *"Advantageously, base layer 12 is re-embossable; that is, base layer 12 may be repeatedly softened, embossed and set during multiple sequential heating and cooling cycles. Consequently, base layer 12 may be provided with a first embossed pattern (for example, a pebbled appearance) over virtually its entire surface, followed by the application (such as by hot-stamping or the like) of a second embossed pattern, (for example, a particular design, logo or legend) which selectively replaces the pebbled pattern in the area of the hot-stamping. Even more generally, base layer 12 is re-embossable in the sense that the base layer may be heated to remove a previously applied embossed pattern so that it can be replaced with an alternative pattern."*
>
> D2, k. 10, r. 13-15:
> *"the subsequently applied legend or logo being surrounded by an overall embossed background pattern which was provided during the first embossing step".*

41 Tot slot openbaart D2 ook niet het kenmerk dat de hoogte van de randen boven de laaggelegen delen varieert van ca. 3 tot ca. 45 µm (zie § 33 hierboven).

*Conclusie 8*

42 Avery meent dat D2 ook de kenmerken van conclusie 8 openbaart. Dat is onjuist. Uit het bovenstaande volgt dat D2 geen weefsel overeenkomstig één

van de conclusies 1-4[2] openbaart. Afgezien daarvan kan niet worden gezegd dat het weefsel volgens D2 dient als beschermlaag ("release liner") voor een drukgevoelig kleefmiddel.

43 Indien het weefsel overeenkomstig één van de conclusies 1-4 van het octrooi dienst doet als beschermlaag voor een drukgevoelig kleefmiddel, dient het driedimensionale meervoudig reliëfpatroon van dat weefsel ertoe een (nagenoeg volledig) complementair driedimensionaal reliëfpatroon in het kleefmiddel te creëren (zie o.m. [0046] van het octrooi). Dit patroon in het kleefmiddel zorgt ervoor dat de folie na het aanbrengen eenvoudiger te herpositioneren is en dat eventueel gevangen lucht kan ontsnappen (zie §§7-10 dagvaarding). Het kleefmiddel wordt dus aangebracht op het reliëfpatroon van de beschermlaag. Dat is in D2 niet het geval.

44 In D2 heeft de basislaag 12 met het reliëfpatroon van de folie uitsluitend een decoratieve functie (zie hierboven § 28). Om de folie aan te brengen op een object, kan deze een laag lijm 24 ("adhesive") bevatten (zie D2, k. 8, r. 38-40). Uit figuur 1 blijkt dat deze lijmlaag zich niet bevindt aan zijde met het reliëfpatroon, maar aan de vlakke zijde. De lijmlaag is normaliter afgedekt door een beschermlaag ("release liner") (zie D2, k. 9, r. 27-29). Hieruit volgt dat D2 geen weefsel met reliëfpatroon openbaart dat zelf een beschermlaag is voor een kleefmiddel.

*Conclusie 9*

45 Avery stelt zich ook op het standpunt dat D2 alle kenmerken van conclusie 9 openbaart. Ook dit is volgens 3M onjuist. Anders dan Avery stelt, wordt in D2 niet geopenbaard dat de folie kan worden gebruikt als eindproduct voor de opslag van een ander materiaal. Afgezien daarvan openbaart D2, zoals hierboven is toegelicht, geen weefsel overeenkomstig één van de conclusies 1-4.

**Conclusie nieuwheid**

46 De in het octrooi geclaimde uitvindingen worden niet geopenbaard in D1 en D2. Van gebrek aan nieuwheid is geen sprake. Het octrooi komt dan ook niet voor vernietiging in aanmerking op grond van art. 75 lid 1 sub a jo. art. 4 ROW 1995.

## INVENTIVITEIT

47 Avery stelt zich voorts op het standpunt dat alle conclusies van het octrooi nietig zijn op grond van gebrek aan inventiviteit. Avery legt aan deze stelling

2 In §§ 15 and 111 CvA/CvE ir, stelt Avery (per abuis) dat conclusies 8 en 9 betrekking heeft op een methode voor het gebruik van een weefsel overeenkomstig conclusies 1-3.

diverse documenten ten grondslag, te weten D3 - D12 (resp. Avery producties 5 - 14), die zij op verschillende manieren met elkaar combineert.

48 Ten aanzien van conclusie 1 komt Avery's argumentatie neer op het volgende. Avery neemt als meest nabije stand van de techniek D3, D4 of D5. Elk van deze documenten openbaart een weefsels met indrukken ten behoeve van de herpositionering van kleeffilms. Volgens Avery is het objectieve technische probleem waar de vakman voor stond op de prioriteitsdatum het voorkomen van het gevangen raken van lucht. Volgens Avery zou de vakman voor de oplossing van dit probleem bij D6, D7, D8 of D9 komen. Deze documenten openbaren - volgens Avery - weefsels met kanalen voor het afvoeren van gevangen lucht. Avery stelt dat de vakman een weefsel met indrukken (volgens D3, D4 of D5) zou combineren met een weefsel met kanalen (volgens D6, D7, D8 of D9 in combinatie met experimentele gegevens) en zo tot de geclaimde uitvinding zou komen. Inventieve arbeid zou daarvoor niet zijn vereist.

49 Ten aanzien van de overige conclusies neemt Avery eenzelfde argumentatie tot uitgangspunt als voor conclusie 1. Voor wat betreft conclusies 4 en 5 wordt deze argumentatie kennelijk aangevuld met D10, D11 of D12.

50 3M is van mening dat Avery de "problem-solution approach" op onjuiste wijze hanteert. Avery's toepassing getuigt van "hindsight". Geen van de combinaties van documenten ontneemt de inventiviteit aan de uitvindingen neergelegd in de conclusies van het octrooi. De in het octrooi geclaimde materie is inventief.

**Problem and solution approach**

51 Bij de beoordeling van de inventiviteit aan de hand van "problem and solution approach" komt het volgens de Guidelines aan op het volgende (zie Guidelines, deel C, Hoofdstuk IV, § 9.8.1):

> *"(i) determining the "closest prior art",*
> *(ii) establishing the "objective technical problem" to be solved, and*
> *(iii) considering whether or not the claimed invention, starting from the closest prior art and the objective technical problem, would have been obvious to the skilled person."*

52 Allereerst dient derhalve de meest nabije stand van de techniek te worden vastgesteld. Volgens de Guidelines moet dit als volgt (zie Guidelines, deel C, Hoofdstuk IV, § 9.8.1):

> *"In selecting the closest prior art, the first consideration is that it should be directed to a similar purpose or effect as the invention or at least belong to the same or a closely related technical field as the claimed invention. In practice, the closest prior art is generally that which corresponds to a similar use and requires the minimum of*

*structural and functional modifications to arrive at the claimed invention (T 606/89, not published in OJ)."*

53 Vervolgens dient het op te lossen technische probleem te worden geformuleerd. Dit gebeurt door de kenmerkende verschillen te bepalen tussen de uitvinding en de meest nabije stand van de techniek. Zie Guidelines, deel C, Hoofdstuk IV, § 9.8.2:

*"To do this [establishing the objective technical problem to be solved] one studies the application (or the patent), the closest prior art and the difference (also called "the* ***distinguishing feature(s)****" of the invention) in terms of features (either structural or functional) between the invention and the closest prior art and then formulates the technical problem.*
*(...)*
*In the context of the problem-and-solution approach, the technical problem means the aim and task of modifying or adapting the closest prior art to provide the technical effects that the invention provides over the closest prior art. The technical problem thus defined is often referred to as the "****objective technical problem****"."*

54 De Guidelines waarschuwen voor het opnemen van aanwijzingen naar de oplossing in het geformuleerde probleem (zie Guidelines, deel C, Hoofdstuk IV, § 9.8.2):

*"It is noted that the objective technical problem must be so formulated as not to contain pointers to the solution, since including part of a solution offered by an invention in the statement of the problem must, when the state of the art is assessed in terms of that problem, necessarily result in an ex post facto view being taken of inventive activity."*

55 Tot slot moet worden beoordeeld of de door de uitvinding geboden oplossing inventief is. Het gaat om het volgende (zie Guidelines, deel C, Hoofdstuk IV, § 9.8.3):

*"In the third stage the question to be answered is whether there is any teaching in the prior art as a whole that* ***would*** *(not simply could, but would) have prompted the skilled person, faced with the objective technical problem, to modify or adapt the closest prior art while taking account of that teaching, thereby arriving at something falling within the terms of the claims, and thus achieving what the invention achieves (...).*
*In other words, the point is not whether the skilled person could have arrived at the invention by adapting or modifying the closes prior art, but whether he* ***would have done*** *so because the prior*

*art incited him to do so in the hope of solving the objective technical problem or in expectation of some improvement or advantage (see T2/83, OJ 6/1984, 265)."*

**Conclusie 1**

*Toepassing problem and solution approach*

56 De uitvinding van conclusie 1 betreft in wezen een dragend weefsel met een meervoudig reliëfpatroon gevormd door een eerste reliëfpatroon bestaande uit indrukken en een tweede reliëfpatroon bestaande uit laaggelegen gedeelten met daartussen randen die tussen de ca. 3 tot 45 µm uitsteken boven de laaggelegen delen.

57 Avery heeft - in het kader van de beoordeling van de inventiviteit van conclusie 1 - zeven documenten overgelegd die volgens haar relevante stand van de techniek vormen. Deze documenten openbaren - kort gezegd - het volgende:

- D3 (het Amerikaans octrooi US 5 141 790 (Calhoun), Avery productie 5) openbaart een dragend weefsel ("carrier web") met bij voorkeur gelijkmatig over het oppervlak verdeelde indrukken ("depressions") gevuld met deeltjes ("particles"). Over het weefsel wordt een kleeflaag aangebracht. Zie D3, k. 3, r. 58-68. De deeltjes zorgen ervoor dat het uiteindelijke kleefproduct kan worden geherpositioneerd. Zie D3, k. 2, r. 56-67.

  De Examining Division heeft het aan D3 equivalente Europese octrooi (EP 0 429 269 B1) voorhanden gehad. Zie International Search Report 18 september 1997 (**Productie 12**). Dit Europese octrooi wordt ook op het voorblad van het octrooi vermeld.

  D3 wordt uitdrukkelijk in het octrooi genoemd, samen met D4. Zie [0004]:

  > *"(...) U.S. Patent Nos. (...) 5,362,516 [D34] and 5,141,790 [D43] (...) disclose how the adhesive's topography is built from the interface between the adhesive and the release liner. The principal topographical features in the adhesive surface are isolated protrusions from the adhesive surface with identified contact areas."*

- D4 (het Amerikaans octrooi US 5 362 516 (Wilson), Avery productie 6) leert ook het gebruik van een klevend product dat herpositioneerbaar is door de in de beschermlaag aangebrachte indrukken. Zie D4, k. 5, r. 8-12 en k. 2, r. 57-60.

- D5 (het Amerikaans octrooi US 3 301 741 (Hendrickson), Avery productie 7) dateert van 1963, meer dan 30 jaar vóór de prioriteitsdatum. Net als D3 en

D4, openbaart het een drager met een patroon van indrukken en een daarop aangebrachte lijmlaag voor herpositionering. Zie D5, k. 2, r. 64 - k. 3, r. 1.

- D6 (de Japanse aanvrage JP 59 078 285 A (Mitsui), Avery productie 8) richt zich op het voorkomen en verwijderen van gevangen lucht. Zie bij. D6, p. 2, r. 17-21. Het openbaart een beschermfolie waarin convex lijnen zijn aangebracht, welke zorgen voor concave lijnen (groeven) in de kleeflaag. Zie D6, p. 2, r. 12-17.

- D7 (de Britse aanvrage GB 1 511 060 (Unitika), Avery productie 9) is uit 1974. Het openbaart het aanbrengen van randen in een beschermlaag die zorgen voor kanaaltjes in de kleeflaag om lucht te laten ontsnappen. Zie D7, p.3, r. 5-21.

- D8 (het Japanse utility model JP 2 587 198 (Ohike), Avery productie 10) openbaart een beschermlaag met uitsparingen ("recessed areas") die zodanig zijn vormgegeven dat zij een patroon van "square truncated pyramids" bewerkstelligen in de lijmlaag met een hoogte van 3 to 50 μm. Zie D8, par. [0012], [0014], [0021]. Hierdoor, zo leert D8, is de folie niet alleen te herpositioneren, maar ook gevangen lucht tussen de kleeflaag en het oppervlak eenvoudig te verwijderen. Zie [0041], [0042] en [0003], [0005], [0006], [0008] en [0009].

- D9 (de Japanse aanvrage 59-53 787 (?), Avery productie 9) openbaart een beschermlaag met een patroon van uitsteeksels ("protrusions") die zorgen voor groeven in de kleeflaag waardoor gevangen lucht kan ontsnappen. Zie D9, p. 2, r. 19 - p. 3, r. 3.

58 In aanmerking nemende de door Avery overgelegde documenten, zou voor de in conclusie 1 neergelegde materie als meest nabije stand van de techniek gekozen kunnen worden voor D8. D8 openbaart net als alle andere documenten een weefsel met één patroon. Echter, in tegenstelling tot de andere documenten, houdt D8 zich niet bezig met ofwel het probleem van de herpositionering ofwel het probleem van het gevangen raken van lucht. D8 leert dat het daarin geopenbaarde enkelvoudige patroon, bestaande uit indrukken met een speciale vormgeving, een oplossing biedt voor elk van deze problemen.

59 D8 is ook aan de orde geweest in een door Avery aanhangig gemaakte oppositieprocedure tegen de verlening van het Europees octrooi EP 0 951 518 B1 ("Sher") van 3M (**producties 13** en **14**). De Oppositie-Afdeling heeft dit octrooi gewijzigd in stand gelaten, conform 3M's tweede hulpverzoek (**productie 15**). De (tussen)beslissing van de Oppositie-Afdeling van 17 augustus 2005 wordt overgelegd als **productie 16**. 3M is het niet eens met de beslissing van de Oppositie-Afdeling het octrooi beperkt in stand te laten. Echter, de beslissing van de Oppositie-Afdeling ter zake van het tweede hulpverzoek is interes-

sant voor de onderhavige procedure. De uitvoeringsvormen volgens het tweede hulpverzoek zijn namelijk zodanig dat lucht kan ontsnappen én dat de folie kan worden geherpositioneerd. In geval van een dergelijke combinatie van deze twee mogelijkheden is volgens de Oppositie-Afdeling, D8 (in de oppositie aangeduid als D3) de meest nabije stand van de techniek.

Zie (tussen)beslissing van de Oppositie-Afdeling (3M productie 16), p. 7:

*"The embodiment now claimed* ***[als vervat in het tweede hulpverzoek, zie 3M productie 15, adv.]*** *provides two effects: not only a good exhaustion of air from the adhesion interface, but also at least repositionability of the sheet. (...)*

*D1* ***[= D6 in de onderhavige procedure, adv.]*** *(...) shows one of these effects, namely the exhaustion of air, and one of the technical features, namely the microchannels.*

*D3* ***[= D8 in de onderhavige procedure, adv.]*** *forms part of the prior art under Article 54(2) EPC and discloses pressure sensitive adhesive sheets with a non-adhesive liner. The liner is provided with depressions and the adhesive surface is correspondingly provided with pegs ('square truncated pyramids"), with a height of 3 to 50 µm, see figures 1 and 2, page 7 paragraphs [0020] and [0021], page 8 line paragraph [0024]. The effects are that the sheet is repositionable and that air entrapped between the adhesive layer and the substrate can easily be removed, see page 10 paragraphs [0041] and [0042], and further paragraphs [0003], [0005], [0006], [0008] and [0009]. D3 thus discloses both effects and one of the technical features of the claims of the 2nd auxiliary request, namely the provision of pegs on the adhesive.*

*It is accepted practice of the EPO to select the document having the most of the effects and the technical features in common with the claims under discussion as closest prior art for discussing the inventive step. In the present case that is document D3."*

60 Het meest kenmerkende verschil tussen enerzijds D8 en anderzijds conclusie 1 van het octrooi is de vormgeving van het reliëfpatroon van het dragend weefsel. In D8 is zoals gezegd slechts sprake van één patroon bestaande uit indrukken. De uitvinding daarentegen openbaart een meervoudig reliëfpatroon: twee, elkaar overlappende patronen, een eerste bestaande uit indrukken én een tweede bestaande uit laaggelegen delen en randen.

61 Het voordeel van de uitvinding is dat elk van de patronen van het dragende weefsel, een verschillend doel kan dienen.

Zie [0019] van het octrooi:

*"A feature of multiple embossed webs of the present invention is that one pattern of embossing can be used for one purpose while another pattern of embossing can be used for a different purpose."*

62 Bijvoorbeeld in geval van beschermlagen voor kleefmiddel, zorgt het ene patroon ervoor dat gevangen lucht kan ontsnappen en het andere patroon dat de folie herpositioneerbaar is.

Zie [0047] and [0048] van het octrooi (onderstreping niet in origineel):
*"[0047] When a liner is 20 is used to contact adhesive to obtain a topography produced from patterns 24 and 26, the percentage area of lands 27 to surface 22 (B to A) can range from about 35% to about 99%. (...) Most preferably, the percentage of B to A can range from about 85% to about 95% to provide adequate fluid egress without adversely affecting adhesion to the supporting substrate. (...)*
*[0048] The percentage of depressions 29 to surface 22 (D to A) can range from about 1% to about 70%. (...) Most preferably, the percentage of D to A can range from about 3% to about 15% because of a balance of repositionability of the adhesive to final adhesive bond strength."*

63 In vergelijking met folies met een enkelvoudig reliëfpatroon met enkel indrukken, zoals D8, vormt de uitvinding een aanzienlijke verbetering.

Zie ook [0071] en [0072] van het octrooi:
*"[0071] (...) Samples with the microchanneled pressure sensitive adhesive layer required no special application technique, were easily applied, and afforded evenly adhered graphic films with virtually no entrapped air bubbles. Any air pockets purposely formed by buckling the film were easily pressed out during application or after application. Air pocket elimination did not require that the air pocket be pressed as a bulge in the film to the edge of the sample (i.e., requiring pressure sensitive adhesive debond in adjacent areas as the pocket moves). The results also show that air bleed was in a lateral (X-Y dimensions) direction and did not require z-axis air dissipation through the films or lifting of the graphic film from the substrate. All samples adhered well to the substrates and showed no signs of undesired edge lifting.*
*[0072] In comparison, control samples were prepared from the "pit-only liner" having only embossing pattern 26 but not embossing pattern 24* [dus: enkel indrukken en geen laaggelegen delen en randen, net als in D8, adv.]. *The control samples required great care to prevent entrapment of many air bubbles. The trapped bubbles and pockets in the control samples prepared from the "pit-only*

*liner" could not be pressed out without lifting the graphic or pushing the pocket under the sample as it lifted."*

64 Gezien het voorgaande kan gezegd worden dat het objectieve technische probleem waarvoor de vakman zich gesteld zag op de prioriteitsdatum was: hoe te komen tot een verbetering van dragende weefsels zodat, in geval van gebruik voor kleeffolies, deze eenvoudiger zijn aan te brengen en een fraaier resultaat opleveren.

65 Uitgaande van de meest nabije stand van de techniek, lag het voor de vakman niet voor de hand te komen tot de uitvinding neergelegd in conclusie 1.

66 Zoals gezegd kan D8 als meest nabije stand van de techniek worden genomen. D8 openbaart dat de indrukken in het dragende weefsel die corresponderen met "square truncated pyramids" in de kleeflaag ervoor zorgen dat de folie kan worden geherpostioneerd en dat gevangen lucht kan ontsnappen. Op grond van D8, wordt de vakman, wanneer hij het objectieve technische probleem wil oplossen, gewezen in de richting van het gebruik van indrukken en het speciaal vormgeven daarvan. D8 motiveert de vakman niet om de indrukken te combineren met een ander patroon of, meer in het bijzonder, een patroon van laaggelegen gedeelten en randen.

Zie ook (tussen)beslissing van de Oppositie-Afdeling (3M productie 16), p. 8:

*"(...) In view of the assertion in D3* ***[= D8 in de onderhavige procedure, adv.]*** *that the pegs/truncated pyramids do allow the exhaustion of air, a skilled person will be led to solve the problem by altering the shape and/or number of the pegs. (...) The skilled man would not necessarily be led to combine the teaching of D3 and D1* ***[= D6 in de onderhavige procedure, adv.]*** *in such a way as to obtain a pressure sensitive adhesive sheet showing both pegs and microchannels. Only with hindsight would such a combination be seen as the straightforward solution that would offer itself to the skilled worker.*

*The subject-matter of the claims of the second auxiliary request such seems to be not only novel but also to involve an inventive step. (...)"*

67 De andere documenten die Avery heeft overgelegd als relevante stand van de techniek, hebben uitsluitend betrekking op ofwel het probleem van herpositionering (D3, D4 of D5) ofwel het probleem van het gevangen raken van lucht (D6, D7 of D9). In de documenten betreffende herpositionering wordt niet gesproken over en zelfs niet gehint naar het probleem van het gevangen raken van lucht. In de documenten betreffende het gevangen raken van lucht wordt niet gesproken en zelfs niet gehint naar de richting van het probleem van her-

positionering. De vakman zal derhalve niet gemotiveerd zijn om, uitgaande van de documenten die betrekking hebben op herpositionering documenten te raadplegen die betrekking hebben op het gevangen raken van lucht. En vice versa: de vakman zal niet zijn gemotiveerd om, uitgaande van documenten die betrekking hebben op het gevangen raken van lucht, documenten te raadplegen die betrekking hebben op herpositionering.

68 Bij de oplossing van het probleem te komen tot een verbetering van dragende weefsels zodat, in geval van gebruik voor kleeffolies, deze eenvoudiger zijn aan te brengen en een fraaier resultaat opleveren, is inventieve arbeid vereist om te herkennen dat twee problemen tegelijkertijd moeten worden opgelost, namelijk het probleem van het gevangen raken van lucht en dat van de herpositionering. Voorts is inventieve arbeid vereist om te komen tot de oplossing, namelijk het combineren van een enkelvoudig patroon van laaggelegen delen en randen met een ander enkelvoudig patroon van indrukken.

69 Hoewel de vakman dit niet zal doen, wordt opgemerkt dat, zelfs al zou de vakman het patroon van indrukken willen combineren met een ander patroon, hij niet zonder inventieve arbeid zal kunnen komen tot de geclaimde uitvinding. Geen van de door Avery aangehaalde documenten geven aanwijzingen over de wijze waarop de patronen zouden moeten worden gecombineerd. Deze documenten leren de vakman niet het gebruik van een eerste reliëfpatroon gevormd door indrukken die zich in het tweede reliëfpatroon bevinden, waarbij dat tweede reliëfpatroon bestaat uit laaggelegen gedeelten en randen die bovendien ca. 3-45 μm uitstijgen boven de laaggelegen gedeelten. In aanmerking nemende de stand van de techniek lag het voor de vakman niet voor de hand om tot een dergelijk dragend weefsel met meervoudig reliëfpatroon te komen.

70 Kortom, uit een juiste toepassing van de problem and solution approach volgt dat de in conclusie 1 neergelegde uitvinding inventief is.

*Secundaire indicia*

71 De inventiviteit van de uitvinding wordt geïllustreerd door het feit dat al jarenlang de behoefte bestond aan het op eenvoudigere wijze, mooier aanbrengen van folies. Zo weet een ieder die ooit behang heeft aangebracht, voor welke problemen de luchtbellen zorgen en de problemen die je hebt wanneer je het behang aanbrengt en dit tegelijk vastkleeft, terwijl je het niet (meer) kunt (her)positioneren.

72 Al decennialang waren enkelvoudige reliëfpatronen bekend. Deze patronen bestonden ofwel enkel uit indrukken. Zie bijvoorbeeld D5, dat dateert van 1963, en het probleem van de herpositionering aanpakt. Ofwel deze patronen bestonden enkel uit laaggelegen delen met randen, voor het ontsnappen van lucht. Zie bijvoorbeeld D7, dat dateert van 1975.

73 Al die tijd is er nooit iemand op het idee gekomen van een meervoudig reliëfpatroon zoals neergelegd in het octrooi. Enkel enkelvoudige patronen waren bekend en konden worden gemaakt. Als de uitvinding voor de vakman voor de hand lag, had het, gezien de behoefte in de markt aan folies die goed en eenvoudig konden worden aangebracht, niet decennia hoeven duren voordat deze werd gedaan.

*De onjuiste toepassing van de problem and solution approach door Avery*

74 Avery heeft de problem and solution approach op onjuiste wijze toegepast. Dit heeft tot gevolg dat Avery tot de onjuiste conclusie komt dat de in conclusie 1 geclaimde uitvinding niet inventief is.

<u>D3 in combinatie met D6, D7, D8 of D9 en experimentele gegevens</u>

75 Avery stelt in de eerste plaats dat conclusie 1 niet inventief zou zijn omdat - kort gezegd - de vakman zonder inventieve denkarbeid D3 zou combineren met D6, D7, D8 of D9 en experimentele gegevens. Dit standpunt is om de volgende redenen onjuist.

76 Allereerst zou eerder voor D8 als meest nabije stand van de techniek kunnen worden gekozen (zie hierboven §§ 57 e.v.). D3 noemt uitsluitend één van de problemen die ten grondslag liggen aan de onderhavige uitvinding, namelijk (verbetering van) de mogelijkheid tot herpositionering van klevende folies (zie D3, k. 1, r. 32-60). Over (oplossingen voor) het laten ontsnappen van gevangen lucht wordt niet gesproken.

77 Voor zover Uw rechtbank van mening is dat D3 wel als meest nabije stand van de techniek geldt, heeft Avery op basis van D3 het objectieve technische probleem onjuist geformuleerd. Avery baseert zich bij de formulering van het probleem namelijk niet op wat de vakman bekend was op basis van de stand van de techniek, maar op wat het onderhavige octrooi de vakman leert over de voordelen van de onderhavige uitvinding (zie § 43 CvA/CvE ir). In D3 wordt op geen enkele manier gerefereerd aan het probleem van het gevangen raken van lucht. Het is derhalve ontoelaatbaar om als probleem specifiek te noemen het voorkomen van het gevangen raken van lucht. Op basis van D3 zou een correcte formulering van het probleem zijn: de wens om op eenvoudigere wijze een mooier resultaat te bereiken bij het aanbrengen van kleeffolies.

78 Het lag voor de vakman niet voor de hand om D3 met D6 te combineren. Immers, D3 spreekt niet over het probleem van het gevangen raken van lucht. Er bestond voor de vakman dan ook geen aanleiding om, uitgaande van D3, documenten te raadplegen die zich richten op het probleem van het gevangen raken van lucht. De vakman zou D6 te meer niet raadplegen, omdat dit focust op een ander technisch gebied dan de uitvinding. In tegenstelling tot de uitvinding, richt D6 zich niet op kleeffolies met grote afmetingen, maar op kleeffolies

voor "optical applications", zoals zonnebrillen (zie D6, p. 1, onder 3, eerste zin en p. 3, r. 20-23).

79 Zelfs al had de vakman overwogen D3 met D6 te combineren, dan had hij nog niet geweten dat de beide reliëfpatronen in eenzelfde weefsel konden worden gecombineerd laat staan hoe dit op effectieve wijze moest gebeuren. Daarbij komt dat het kenmerk dat de randen ca. 3 - 45 µm uitstijgen boven de laaggelegen gedeelten niet in D6 wordt geopenbaard. In tegendeel, volgens D6 is het "essential" dat de "convex lines" 1 tot 15 µm bedragen. De uitvinding gaat hier duidelijk tegenin. Ook randen van meer dan 15 µm hoog vertonen het gewenste effect.

80 In de Amerikaanse procedure heeft (de moedermaatschappij van) Avery in het kader van gebrek aan inventiviteit ook een beroep gedaan op D3 in combinatie met D6. De Amerikaanse rechter heeft echter geoordeeld dat conclusie 1 van het Amerikaanse octrooi inventief is in het licht van deze documenten. Zie 3M productie 11A, p. 5.

81 Voor de vakman bestond evenmin aanleiding om D3 met D7 te combineren. Als de vakman D7 al zou raadplegen, wijst dit document weg van het gebruik van randen die ca. 3 - 45 µm boven de laaggelegen gedeelten uitsteken. Uit D7, tabel 2 op p. 4 blijkt immers dat het volledig ontsnappen van lucht pas wordt bereikt bij verhogingen vanaf 60 µm of bij voorkeur meer. Op basis van een combinatie van D3 met D7 zou de vakman derhalve niet zijn gekomen tot een bereik van ca. 3 - 45 µm.

82 Een combinatie van D3 met D7 is eveneens in de Amerikaanse procedure aan de orde geweest. Ook in het licht van deze combinatie heeft de Amerikaanse rechter geoordeeld dat conclusie 1 van het Amerikaanse octrooi inventief is. Zie productie 11A, p. 6.

83 Uitgaande van D3 zou de vakman ook D8 niet raadplegen en in elk geval niet tot de onderhavige uitvinding komen. Immers, D8, net als D3, betreft slechts het gebruik van indrukken. Het gebruik van een tweede patroon bestaande uit laaggelegen delen en randen wordt geheel niet geopenbaard.

84 Tot slot zou de vakman D3 ook niet combineren met D9. Uitgaande van D3 bestond voor de vakman geen aanleiding om D9 te raadplegen. En andersom ook niet (zie § 62 CvA/CvE ir): uitgaande van D9 bestond voor de vakman geen aanleiding om D3 te raadplegen. Daarbij komt dat D9 niet duidelijk maakt hoe de patronen van D9 en D3 met elkaar te combineren. Ook openbaart D9 niets over de hoogte van de randen ten opzichte van de laaggelegen gedeelten. 3M betwist dat de vakman door eenvoudige proefnemingen zou komen tot het geclaimde bereik van ca. 3 - 45 µm. Op basis van de kleeflaagdikte zou een vakman niet zonder uitvinderswerkzaamheid tot het bereik van ca. 3 - 45 µm zijn gekomen.

D4 in combinatie met D6, D7, D8 of D9 en experimentele gegevens

85 Avery stelt dat conclusie 1 ook niet inventief zou zijn omdat de vakman zonder inventieve denkarbeid D4 zou combineren met D6, D7, D8 of D9 en experimentele gegevens. Dit is onjuist.

86 Net als D3 openbaart D4 (slechts) het gebruik van een enkelvoudig patroon bestaande uit indrukken. D4 richt zich ook alleen op het probleem van herpositionering. Wat hiervoor is opgemerkt ten aanzien van D3 geldt dan ook eveneens ten aanzien van D4. D4 wijst de vakman zelfs weg van het gebruik van patronen van laaggelegen gedeelten en randen. Zie D4, k. 2, r. 22-30 waar wordt opgemerkt dat dergelijke patronen (van concave / convexe lijnen) leiden tot een kleeflaag met onvoldoende kleefkracht en waarvan de aankleving verandert na verloop van tijd.

D5 in combinatie met D6, D7, D8 of D9 en experimentele gegevens

87 Avery voert ook nog aan dat een vakman D5 zou combineren met D6, D7, D8 of D9 en experimentele gegevens en zo tot de in conclusie 1 neergelegde materie zou komen. Hieraan ligt eenzelfde onjuiste redenering ten grondslag als bij D3 en D4 in combinatie met D6, D7, D8 of D9 en experimentele gegevens. Om nodeloze herhalingen te voorkomen verwijst 3M daarom naar wat hierboven is opgemerkt ter zake van D3 en D4 in combinatie met D6, D7, D8 of D9 en experimentele gegevens.

*Slotsom*

88 De conclusie luidt dat het, op de prioriteitsdatum, voor de vakman niet voor de hand lag om te komen tot de in conclusie 1 geclaimde kenmerken.

**Conclusies 2 en 3**

89 Conclusies 2 en 3 zijn afhankelijk van conclusie 1. Gezien het bovenstaande, zijn de in deze conclusies neergelegde uitvindingen eveneens inventief.

**Conclusie 4**

90 Avery stelt dat de uitvinding van conclusie 4 niet inventief is in het licht van D10, D11 of D12. Deze stelling is onjuist.

91 Op de prioriteitsdatum lag het voor de vakman niet voor de hand om een eerste patroon bestaande uit indrukken te combineren met een tweede patronen van laaggelegen gedeelten met randen. Verwezen wordt naar hetgeen in dit verband in conclusie 1 is opgemerkt. Er is bovendien inventieve arbeid vereist om deze patronen te combineren volgens de in conclusie 4 geclaimde werkwijze.

92 Uit D10, D11 en D12 kan niet worden afgeleid dat het eerste en tweede patroon konden worden gecombineerd laat staan hoe dat moest gebeuren. D10, D11 en D12 liggen op een geheel ander technisch gebied dan waar het octrooi betrekking op heeft. De vakman zal deze documenten niet raadplegen. Bovendien zijn de reliëfpatronen die worden geopenbaard in deze documenten van een hele andere orde van grootte dan die volgens de uitvinding.

- D10 (de Amerikaanse octrooiaanvrage US 3 887 678 (Lewicki), Avery productie 12) wordt genoemd in het international search report (zie 3M productie 12). Het heeft betrekking op "embossed laminar floor material made with a resilient foam backing" (D10, k. 1, r. 8-10). Met kleeffolies en de materialen die daarbij van belang zijn, heeft D10 niets van doen. De aangebrachte reliëfpatronen zijn bovendien minimaal 10 "mils" (= 1/1000 inch = 0,2540 mm = 254 µm) (zie bijv. D10, k. 4, r. 53).

- D11 (de internationale octrooiaanvrage WO 93/01047 (Tribble), Avery productie 13) betreft "deep embossed plastic films", voor gebruik in "the disposables field, in agricultural applications and in packaging applications" (zie D11, p. 6, r. 9-13). De hoogte van één van de reliëfpatronen bedraagt tussen de 2,5 en 15 "mil" (dat is tussen de 63,5 en 381 µm!) (zie bijv. D11, p. 3, r. 24-25).

- D12 (de Europese aanvrage EP 0 313 766 A2 (Cabe), Avery productie 14) maakt ook onderdeel uit van het verleningsdossier (zie 3M productie 12). Het openbaart "apertured plastic films for use in absorbent products". Eén van de patronen bedraagt minimaal 0,3 mm (300 µm).

93 Kortom, ook de uitvinding als neergelegd in conclusie 4 getuigt van inventiviteit.

**Conclusies 5, 6 en 7**

94 Conclusies 5, 6 en 7 zijn afhankelijk van conclusie 4. Uit het bovenstaande volgt dat de in deze conclusies geclaimde werkwijzen evenmin voor de vakman voor de hand lagen op de prioriteitsdatum.

**Conclusie 8**

95 Avery stelt dat de uitvinding van conclusie 8 niet inventief is, onder verwijzing naar hetgeen zij heeft aangevoerd in het kader van de inventiviteit van conclusie 1.

96 De uitvinding van conclusie 8 is wel inventief. Deze conclusie betreft een specifiek soort dragende weefsels volgens conclusies 1-4, namelijk als beschermlaag voor een drukgevoelig kleefmiddel. 3M verwijst hierbij kortheidshalve naar wat zij heeft uiteengezet in verband met conclusies 1 -4.

**Conclusie 9**

97 Avery meent ook dat de uitvinding neergelegd in conclusie 9 voor de vakman voor de hand lag. Zij baseert zich daarbij op hetgeen zij heeft aangevoerd in par. 3.1.2 CvA/CvE ir, ter zake van inventiviteit van conclusie 1.

98 De uitvinding van conclusie 9 lag voor de vakman niet voor de hand. Geen van de door Avery in dit verband ingeroepen documenten openbaren het gebruik van een weefsel als eindproduct voor de opslag van een ander materiaal of wijzen de vakman in de richting van een dergelijk gebruik. 3M verwijst verder naar hetgeen zij heeft uiteengezet in het kader van conclusies 1-4, naar welke conclusies in conclusie 9 wordt verwezen.

**Conclusie**

99 De uitvindingen neergelegd in de conclusies van het octrooi zijn het resultaat van uitvinderswerkzaamheid. Voor vernietiging van het octrooi op basis van gebrek aan inventiviteit in de zin van art. 75 lid 1 sub a jo. art. 4 ROW 1995 is geen plaats.

**GEEN UITBREIDING VAN MATERIE**

100 Volgens Avery zou het octrooi ook nietig zijn, omdat het onderwerp daarvan niet gedekt zou worden door de inhoud van de ingediende aanvrage (PCT-aanvrage WO 98/29231, Avery productie 2).

101 Avery stelt in de eerste plaats dat sprake is van ongeoorloofde uitbreiding van materie omdat tijdens de verleningsprocedure de woorden "multiple sequentially embossed" in conclusie 1 van de oorspronkelijke aanvrage zijn gewijzigd in "multiple embossed" en de woorden "substantially preserved" uit conclusie 1 zijn verwijderd. Deze stelling is onjuist.

102 Er is sprake van uitbreiding van materie in de zin van art. 75 lid 1 sub c ROW 1995 indien "het onderwerp van het octrooi niet wordt gedekt door de inhoud van de ingediende aanvrage". De vraag is derhalve of de materie zoals geclaimd in conclusie 1 van het octrooi voldoende basis vindt in de beschrijving van WO 98/29231. Dat is het geval.

103 Tijdens de verleningsprocedure is conclusie 1 van WO98/29231 gewijzigd. De zinsnede "a carrier web, comprising: at least one surface that is multiple, sequentially embossed with a pattern" is vervangen door "a carrier web, comprising: at least one surface that is a multiple embossed pattern". Ook zijn uit conclusie 1 onder meer verwijderd de woorden "substantially preserved". Aan de wijziging van conclusie 1 ligt ten grondslag dat volgens vaste rechtspraak van het Europees Octrooibureau (zie bijv. T 150/82 en T 205/83) en in aanmerking nemende de Guidelines (zie bijv. deel C.III.4.7 a, b) een product bij voorkeur

moet worden gedefinieerd aan de hand van kenmerken die voorkomen in het eindproduct en niet aan de hand van de wijze van verkrijging. Van uitbreiding van materie is echter geen sprake.

104 Voor het kenmerk "multiple embossed", zonder de toevoeging "sequentially", is voldoende basis te vinden in de aanvrage. Dit kenmerk komt veelvuldig voor in WO98/29231. Het is zelfs uitdrukkelijk gedefinieerd.

Zie p. 2, r. 19-24:

*"Multiple embossed" means two or more embossing patterns are superimposed on the web to create a complex pattern of differing depths of embossing."*

105 Uit de beschrijving valt niet af te leiden dat het kenmerk "multiple embossed" is of zou moeten worden beperkt tot een meervoudig reliëfpatroon dat op een bepaalde wijze is verkregen, bijv. door het sequentieel aanbrengen van de verschillende reliëfpatronen. In verband met de "multiple embossed" patronen of weefsels wordt in de beschrijving bovendien niet alleen gesproken over het in meerdere stappen aanbrengen van het meervoudig reliëfpatroon. Uitdrukkelijk wordt gewezen op de mogelijkheid het meervoudig reliëf in één keer aan te brengen. Zie WO 98/29231, p. 2, r. 30-31:

*"(...) the multiple embossing steps could be combined into a single step with the design of a suitable tool or mold (...)"*

106 Anders dan Avery stelt (in § 82 CvA/CvE ir), is de sequentiële werkwijze voor de verkrijging van het geclaimde meervoudig reliëfpatroon van conclusie 1 ook niet essentieel voor de uitvinding zoals neergelegd in die conclusie. Voor zover al relevant, is dit in de Amerikaanse verleningsprocedure - in tegenstelling tot wat Avery beweert - ook nooit gesteld. Uit de door Avery aangehaalde passage uit een document afkomstig uit de Amerikaanse verleningsprocedure (Avery productie 17, p. 5) kan evenmin worden afgeleid dat de uitvinding hiertoe is beperkt. In elk geval zijn de conclusies van het Amerikaanse octrooi niet identiek aan het Europese octrooi.

107 De woorden "substantially preserved" zijn weliswaar verwijderd uit conclusie 1, maar ook daardoor is van uitbreiding van materie geen sprake. Uit het kenmerk in de huidige conclusie 1 dat "de indrukken van het eerste reliëfpatroon zich in het tweede reliëfpatroon bevinden" volgt in elk geval dat het eerste patroon zichtbaar moet blijven na aanbrenging van het tweede patroon.

108 Avery stelt in de tweede plaats dat sprake is van uitbreiding van materie, omdat in oorspronkelijke conclusie 1 het kenmerk dat "de indrukken van het eerste reliëfpatroon zich in het tweede reliëfpatroon bevinden" niet voorkwam. Ook deze stelling is onjuist.

109 Figuur 3 van WO98/29231 toont duidelijk dat de indrukken van het eerste reliëfpatroon zich bevinden in het tweede reliëfpatroon. Ook wordt dit uitdrukkelijk genoemd in de beschrijving. Zie WO98/29231, p. 8, r. 4 waar staat dat "depressions 29 residing in both lands 27 and ridges 28". Het kenmerk dat "de indrukken van het eerste reliëfpatroon zich in het tweede reliëfpatroon bevinden" vindt derhalve voldoende basis in de ingediende aanvrage WO98/29231.

110 Kortom, het onderwerp van het octrooi wordt gedekt wordt door de inhoud van de ingediende aanvrage. Het octrooi komt derhalve niet voor vernietiging in aanmerking op basis van het bepaalde in art. 75 lid 1 sub c ROW 1995.

## NAWERKBAARHEID

111 Avery stelt zich tot slot op het standpunt dat conclusie 4 niet nawerkbaar zou zijn. De nawerkbaarheid van de overige conclusies wordt niet betwist. In essentie betoogt Avery dat, ten aanzien van de in conclusie 4 geclaimde werkwijze, niet voldoende is geopenbaard hoe het eerste reliëfpatroon bewaard kan blijven bij het aanbrengen van het tweede patroon. De beschrijving zou onvoldoende informatie verschaffen over bijvoorbeeld de te gebruiken druk en/of temperatuur.

112 Het wezen van de in conclusie 4 neergelegde uitvinding is dat bij het aanbrengen van het tweede patroon (van laaggelegen delen en randen), het eerste patroon (van indrukken) gehandhaafd blijft. De beschrijving bevat uitgebreide voorbeelden betreffende het op sequentiële wijze verkrijgen van een meervoudig reliëfpatroon in de zin van het octrooi. Voorbeelden 1 en 2 specificeren de kenmerken van de twee reliëfpatronen. Aan de hand van eenvoudig, routinematig testen zal de vakman in staat zijn te komen tot de vereiste druk- en temperatuurvereisten om het meervoudig reliëfpatroon te creëren. Bovendien specificeert voorbeeld 3 niet alleen de kenmerken van de twee reliëfpatronen, maar geeft het ook gedetailleerd aan welke temperatuur en druk zijn vereist.

113 Avery's standpunt dat conclusie 4 niet-nawerkbaar zou zijn, is dan ook onjuist. De beschrijving gecombineerd met de algemene vakkennis stellen de vakman in staat om de in deze conclusie geclaimde werkwijze toe te passen. Voor vernietiging van deze conclusie op grond van het bepaalde artikel 75 lid 1 sub b ROW 1995 is dan ook geen plaats.

## CONCLUSIE

114 Uit het bovenstaande volgt dat geen van de door Avery aangevoerde gronden de geldigheid aantasten van één of meerdere conclusies van het octrooi. De vorderingen van Avery tot vernietiging van het Nederlandse deel van het octrooi dient derhalve te worden afgewezen.

Brinkhof

ADVOCATEN

**MET CONCLUSIE IN RECONVENTIE:**

Dat het de rechtbank moge behagen:

- Avery niet-ontvankelijk te verklaren in haar vorderingen in reconventie, althans haar deze te ontzeggen;

- Avery te veroordelen in de kosten van de procedure in reconventie; en

- het vonnis uitvoerbaar bij voorraad te verklaren.

Procureur

loco

## OVERZICHT PRODUCTIES
## BIJ CONCLUSIE VAN ANTWOORD IN RECONVENTIE

**Productie 10:** Het Amerikaanse octrooi US 5 897 930, een Amerikaans parallel octrooi van het onderhavige octrooi;

**Productie 11:** Relevante stukken uit de Amerikaanse procedure ter zake van het Amerikaanse octrooi US 5 897 930 tussen 3M en (de moedermaatschappij van) Avery;

A. "Special Verdict Form" van 21 december 2005;
B. "Jury Verdict" van 23 december 2005; en
C. "Order" van US District Court of Minnesota van 17 March 2006;

**Productie 12:** Het international search report van het onderhavige octrooi;

**Productie 13:** Het Europese octrooi EP 0 951 518 B1;

**Productie 14:** De Nederlandse vertaling van het Europese octrooi EP 0 951 518 B1;

**Productie 15:** Het tweede hulpverzoek ter zake van het Europese octrooi EP 0 951 518 B1, in welke vorm dit octrooi door de Oppositie-Afdeling bij (tussen)beslissing van 17 augustus 2005 in stand is gelaten; en

**Productie 16:** De (tussen)beslissing van de Oppositie-Afdeling van 17 augustus 2005.